1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3

4  GRANT BIRCHMEIER, et al.,    )
                         )
5             Plaintiffs,  )  Docket No. 12 C 4069
                         )
6           vs.           )
                         )
7  CARIBBEAN CRUISE LINE, INC.,  )  Chicago, Illinois
  et al.,               )  April 17, 2013
8                       )  9:40 a.m.
            Defendants.  )
9

10               TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiff:    LOEVY & LOEVY
                   BY:  MR. SCOTT R. RAUSCHER
                 312 North May Street, Suite 100
15                 Chicago, Illinois  60607

16

17               EDELSON LLC
                   BY:  MR. JAY EDELSON
                       MS. EVE-LYNN J. RAPP
18                 350 North LaSalle Street
                 Suite 1300
19                 Chicago, Illinois   60654

20

21               ANDERSON & WANCA
                   BY:  MR. GEORGE LANG
                 3701 Algonquin Road
22                 Suite 760
                 Rolling Meadows, Illinois   60008
23

24

25

```
 1   For the Defendant:        GREENSPOON MARDER, P.A.
                                    BY:  MR. JEFFREY BACKMAN
 2                              200 East Broward Boulevard
                                Suite 1500
 3                              Fort Lauderdale, Florida  33301

 4
                                TABET, DI VITO, ROTHSTEIN
 5                                  BY:  MR. TIMOTHY A. HUDSON
                                209 South LaSalle Street
 6                              7th Floor
                                Chicago, Illinois   60604
 7

 8                              ROSE, HARRISON & GILREATH, P.C.
                                    BY:  MR. M. PEEBLES HARRISON
 9                              700 Blue Jay Street
                                Suite 1
10                              Kill Devil Hills, North Carolina  27948

11
                                MC GUIRE WOODS, LLP
12                                  BY:  MR. BRIAN P. O'MEARA
                                77 West Wacker Drive
13                              Suite 4100
                                Chicago, Illinois   60601
14

15

16

17

18

19

20

21

22

23              LAURA M. BRENNAN - Official Court Reporter
                 219 South Dearborn Street - Room 2102
24                    Chicago, Illinois  60604
                         (312) 435-5785
25
```

1         (The following proceedings were had in open court:)

2             THE CLERK:  12 C 4069, Birchmeier v. Caribbean

3 Cruise; 13 C 903, Wright v. The Berkley Group; and 13 C 908,

4 Vigus v. Caribbean Cruise.

5             THE COURT:  All right, starting over there.

6             MR. BACKMAN:  Jeffrey Backman for Caribbean Cruise

7 Line, defendant.

8             MR. HARRISON:  Peebles Harrison for the Bank of

9 America Group.

10            MR. O'MEARA:  Brian O'Meara, also here on behalf of

11 The Berkley Group.

12            MS. RAPP:  Eve-Lynn Rapp on behalf of plaintiff David

13 Wright, with Edelson LLC.

14         I just wanted to note that Jay Edelson, who is to be

15 appointed as co-lead interim counsel, is in another courtroom

16 down the hall, but I'm more than happy to stand in for him.

17            MR. RAUSCHER:  Scott Rauscher for the Birchmeier

18 plaintiffs.

19            MR. LANG:  George Lang for the Vigus plaintiffs, your

20 Honor.

21            MR. HUDSON:  Tim Hudson on behalf of defendant CCL.

22            THE COURT:  Well, so if we need Mr. Edelson in here,

23 you know, I'm happy to put this off to give him a chance to

24 finish up in the other courtroom.

25            MS. RAPP:  We would really appreciate that.  The

1  other case is actually up first, so it should be done.

2          THE COURT:  Fine.  I will just wait.  Have a seat.

3          MS. RAPP:  Okay.  Thank you very much.

4          THE COURT:  But you've got to stand in the same

5  places when you start over.

6          (Brief recess.)

7          THE CLERK:  Recalling 12 C 4069, Birchmeier v.

8  Caribbean Cruise; 13 C 903, Wright v. The Berkley Group;

9  13 C 908, Vigus v. Caribbean.

10         MR. EDELSON:  Good morning, your Honor; Jay --

11         THE COURT:  Let's go through the names again,

12  starting over there.

13         MR. HUDSON:  Good morning, your Honor; Tim Hudson on

14  behalf of defendant Caribbean Cruise Line.

15         MR. BACKMAN:  Jeff Backman for Caribbean Cruise Line.

16         MR. HARRISON:  Peebles Harrison for The Berkley

17  Group.

18         MR. O'MEARA:  Brian O'Meara on behalf of The Berkley

19  Group.

20         MR. EDELSON:  Jay Edelson for plaintiffs.

21         Thank you for passing the case, your Honor.

22         THE COURT:  Sure.

23         MS. RAPP:  Eve-Lynn Rapp for plaintiff David Wright.

24         MR. RAUSCHER:  Scott Rauscher for the Birchmeier

25  plaintiffs.

1    MR. LANG:  George Lang for the Vigus plaintiffs, your
2    Honor.

3    THE COURT:  Okay.  I need to take care of some sort
4    of basic housekeeping kinds of things first.

5    So, first of all, there are a bunch of pro hac vice
6    motions that were filed in the two cases that came over to me
7    from, I think, Judge Bucklo and Judge Coleman.  Those are all
8    granted.

9    In the Missouri case, who is the Missouri case?

10    MR. LANG:  (Indicating.)

11    THE COURT:  That's you.  Evidently there was a motion
12    to dismiss that was filed when the case was still in Missouri.
13    Did that get ruled on?

14    MR. HARRISON:  No, your Honor.

15    THE COURT:  Okay.  I'm going to terminate it without
16    prejudice to refiling.  So I've covered that on that sheet I
17    gave you, Augie.  That particular one is document number 21.

18    The next housekeeping thing, and I suspect that this
19    is a function of everybody having their appearances kind of
20    transferred from the other cases onto the docket in this case,
21    but there are three lawyers who do not have an email address
22    associated with their appearance.  That may be because they're
23    out-of-town people who don't have e-filing accounts in this
24    district or it may be because of just some sort of glitch, but
25    it needs to get fixed.

1        Those people are Mr. Bilik, who is a McGuire Woods

2    lawyer from Florida.  So that needs to get fixed.  I will tell

3    you why in a second.

4        Secondly, there's a Mr. O'Neill from Missouri.  I

5    don't know if he's a plaintiff's lawyer in the Missouri case

6    or a defendant's lawyer.  I'm assuming a plaintiff's lawyer.

7        And then the third one is -- just a second -- is

8    Mr. York, who is a McGuire Woods lawyer from Florida.

9        The reason that needs to get fixed is so that when an

10   order gets entered or when anything gets filed, those come up

11   as kind of a you need to mail it to these people, and I don't

12   think it's appropriate to impose the burden on the Clerk's

13   office to do that.  So just get those fixed.

14       MR. O'MEARA:  I will take care of that, your Honor.

15       THE COURT:  Okay.  So I've looked at the documents

16   that were filed -- this is all on this side of the room

17   here -- on the motions for appointment of interim class

18   counsel.

19       So, first of all, give me -- and I know it's in here

20   somewhere, but it's just helpful for me to have it in one

21   place.  The Birchmeier case was filed in late May of 2012.

22   When was the Wright case filed in wherever it was filed?

23       MR. EDELSON:  I believe it was a day after.

24       THE COURT:  Okay.  And when was the -- is it Vigus

25   or --

1    MR. LANG:  I say Vigus.

2    THE COURT:  When was that filed?

3    MR. LANG:  I believe that was November, later that

4 year.

5    THE COURT:  Of 2012.  Vigus is the one from Missouri?

6    MR. LANG:  Yes, your Honor.

7    THE COURT:  The other one was filed originally in

8 Florida?

9    MS. RAPP:  Yes, Southern District.

10    THE COURT:  All right.  That was the first thing.

11    The second thing, I guess I just would like a little

12 bit more explanation of what -- of how exactly, I guess what I

13 will call for want of a better term, the decision-making

14 structure would be under the proposal that came from the, I

15 will just say the Edelson folks and the Loevy folks, on the

16 one hand, and the Anderson & Wanca folks, on the other hand,

17 because I'm not sure I have a clear sense of it.

18    So since the issue was sort of teed up, I think, by

19 the Anderson & Wanca folks, why don't you explain to me what

20 you think under your proposal the decision-making structure

21 ought to be or would be, number one, and then, number two,

22 what you understand it to be under the proposal that has been

23 made by the other lawyers.

24    MR. LANG:  In reverse order, your Honor, under their

25 proposal, I specifically asked in emails what that structure

1   would be; i.e., everybody doesn't get to be lead in every

2   case.  Sometimes you don't get to be lead.

3         THE COURT:  Right.

4         MR. LANG:  So I asked, okay, if there is disagreement

5   in the decisions, what's going to be the decision-making

6   process -- et cetera.  And I had proposed an executive

7   committee structure which would have taken care of most of

8   that.  Your dep people would have made those decisions -- but

9   I got no feedback.

10        THE COURT:  So your answer to that part of the

11  question is I don't know.

12        MR. LANG:  I don't know.

13        THE COURT:  Okay.  So tell me what you think it

14  should be under your proposal.

15        MR. LANG:  Under our proposal, it would be depending

16  on if everybody can play fair, we could have a three --

17        THE COURT:  When you say depending upon whether

18  everybody can play fair, I guess what I need to know is what's

19  the decision-making structure you propose, not what is the

20  decision-making structure you propose under a particular

21  scenario.  I need to know what the bottom line is.

22        MR. LANG:  Two out of three.

23        THE COURT:  Okay.  So there would be, you know, one

24  person from each of the law firms who would, if there was a

25  dispute that you couldn't work out by consensus or whatever,

1   you would have some sort of a vote.

2            MR. LANG:  Correct.

3            THE COURT:  And it would be done that way.

4            MR. LANG:  Correct.

5            THE COURT:  All right.  Who is going to talk about

6   this, you, Mr. Edelson, or you, Mr. Rauscher?

7            MR. EDELSON:  Yes.  We're suggesting co-lead, me and

8   Scott.

9            If you're asking about how ties will be broken, I

10  mean --

11           THE COURT:  Well, it's not really a tie if there's --

12           MR. EDELSON:  If there's two.

13           THE COURT:  Yes.

14           MR. EDELSON:  So we would make decisions jointly.

15           THE COURT:  Okay.  So, in other words, your proposal

16  is that the Anderson & Wanca folks wouldn't get a vote, and

17  I'm not saying that's good or bad; I'm just asking what it is.

18           MR. EDELSON:  Correct, your Honor.

19           THE COURT:  Okay.  Why wouldn't you have just told

20  him that in these emails?

21           MR. EDELSON:  We did.  We --

22           THE COURT:  Point to me the one where you told him

23  that.  I have got them all.  Point to me the one where you

24  told him.

25           MR. EDELSON:  Your Honor, with respect, you don't

1  have them all.

2  THE COURT:  Okay.  Show me the one where you did.

3  MR. EDELSON:  I mean, I don't have it on me but --

4  THE COURT:  Tell me the date.

5  MR. EDELSON:  What?

6  THE COURT:  Tell me the date.

7  I mean, look at what's in there and tell me where it

8  fits in.  I mean, I've been given a whole bunch of emails,

9  and, you know, you could have filed a response to what they

10  submitted.

11  MR. EDELSON:  I, frankly, thought bogging the Court

12  down in --

13  THE COURT:  Oh, you have all bogged me down with a

14  lot of sniping between you in particular and people with your

15  firm, which I will tell you is quite unbecoming and borderline

16  unprofessional and doesn't bode well for either of you having

17  much, if any, of a role in any kind of decision-making.

18  So tell me the date when you told him that their role

19  was zero.  Tell me the date or the approximate date or where

20  it fits in within the emails that you say I got bogged down

21  with.  I didn't get bogged down.  It wasn't that hard to read.

22  MR. EDELSON:  I apologize.

23  THE COURT:  It wasn't pleasant to read, but it wasn't

24  that hard.

25  MR. EDELSON:  Your Honor --

1     THE COURT:  Get to my question.

2     MR. EDELSON:  It was -- every email was consistent.

3  It's all in those emails and in phone calls.  Their --

4     What they were actually asking for, your Honor, they

5  weren't asking the time for --

6     THE COURT:  You're getting off my question, Mr.

7  Edelson.

8     MR. EDELSON:  It's hard.  I know.  I want to answer

9  it directly, but I need to give you context.

10     THE COURT:  Well, you're going to have to try harder

11  then because I'm not going to let you say anything else until

12  I get an answer.

13     MR. EDELSON:  I don't know how to answer that

14  question.

15     THE COURT:  So then you're done talking for a while

16  until I ask to talk to you.

17     Do you know, Mr. Rauscher?

18     MR. RAUSCHER:  Do I know?

19     THE COURT:  Do you know when it was that they were

20  told that under the proposed structure in the motion by the

21  Birchmeier and Wright people that the Vigus attorneys were

22  not -- wouldn't have any role in the decision-making?

23     MR. RAUSCHER:  I don't.  The way that I read those

24  emails when I saw them was I actually thought it was an

25  assumption from Vigus at that point that they wouldn't be part

1  of the decision.

2      THE COURT:  Yes, but Mr. Edelson has just told me

3  that it's not an assumption, that it's true, so --

4      MR. RAUSCHER:  I don't know.

5      THE COURT:  Okay.  Did you ever get an email that

6  said under their proposal -- when I say "you," I mean

7  collectively the people in your group.  Did you ever get an

8  email that said under their proposal, you would not have any

9  kind of a decision-making role?

10     MR. LANG:  Yes, your Honor.  There was -- I had

11  specifically asked for guarantees that we would be able to

12  participate.  The only guarantee I got back is that we would

13  be able to attend mediation.

14     THE COURT:  Okay, listen to.

15     MR. LANG:  That's the one.

16     THE COURT:  Okay.  All right.  Well, that's about as

17  close to an answer as I'm going to get, I think.

18     So, you know, understanding that this isn't sort of

19  an everyday dispute, you know, like a motion to compel

20  discovery or something like that, and understanding, on the

21  other hand, that all three of the classes are essentially

22  coextensive, so, you know, you're all potentially fiduciaries

23  for the class, but then you also all have clients -- in other

24  words, Mr. Rauscher's clients are Birchmeier and Parkes,

25  Mr. Edelson's client is Wright, and Mr. Lang's client is

1    Vigus.  So what then under the proposal that you have made,

2    what then would become of Ms. Vigus?  Would she be a class

3    representative or not?

4                MR. EDELSON:  We don't understand enough about her

5    specific situation.  We would seek to file a consolidated

6    complaint.  We would ask for information about her to see if

7    she is interested in continuing on and whether she is an

8    appropriate class representative.  If so, then we would

9    suggest that she should be a proposed class representative.

10               THE COURT:  Okay.  So what is the kind of information

11   that you would be looking for from her in order to --

12               MR. EDELSON:  We just want to make sure that she has

13   standing, that she did the same type of --

14               THE COURT:  That she got robocalls, et cetera, et

15   cetera.

16               MR. EDELSON:  That she understands that it's a class

17   action, that she's going to hold up in a deposition.

18               THE COURT:  Okay.  So let's assume then for purposes

19   of discussion that you go through all of that, you know, and

20   she has got standing and she doesn't have, you know, any

21   terribly unique issues that other people don't have and she's,

22   you know, willing to do everything that a class member -- a

23   class representative has to do in order to be a class

24   representative.

25               Under your proposed structure, though, how then do I

1    deal with the fact that she is Anderson & Wanca's client and

2    then all of a sudden -- but then would have no role in any

3    kind of decision-making?

4              MR. EDELSON:  I --

5              THE COURT:  Do you understand the question?

6              MR. EDELSON:  I do.  I think that's common in -- that

7    happens kind of in matters of course.

8              THE COURT:  Like I say, this isn't a common sort of

9    thing that I have to deal with every day, so explain it to me.

10             MR. EDELSON:  So, first, we still want Anderson &

11   Wanca to be involved in the litigation.  So we -- you know,

12   Scott and I have discussed this before.  We want to lead

13   through consensus.  This isn't something where they're going

14   to be shut out.  Especially if they have a client who wants to

15   continue on, they get to make their own decisions as they

16   continue on with the litigation.

17             For example, at the end, if there is a settlement,

18   they will have a voice in that.  They will either support it

19   or they won't.  So it makes sense for us to make sure that

20   they understand what's going on, that they participated.

21             But in terms of whether the fact that they filed --

22   that they're named plaintiff, that means that they're entitled

23   to their own counsel having decision-making --

24             THE COURT:  So I guess the way I see this is this.

25   So under the proposal that you have made, it seems to me that

1    it's a road to one of two things:  Number one, Ms. Vigus

2    remaining as a plaintiff but not being able to maintain her

3    choice of an attorney because you would be the attorney, you

4    and your firm and Mr. Rauscher's firm would be the attorneys

5    for the class, not -- or at least the lead attorneys for the

6    class making the decision, not Mr. Lang and his firm, or,

7    conversely, that the fact that they're not part of the

8    decision-making structure is a fairly short road to a

9    conclusion that, well, she's not going to be a class

10    representative, because she might come --

11        You know, it would be reasonable to expect that if

12    you got through all of that and said, okay, we think you're an

13    appropriate class representative, that she would turn around

14    and say, well, but I want my lawyers involved in the decision-

15    making.  And you would then say, well, no, Judge Kennelly has

16    made a ruling that we two are the decision-makers, which is

17    kind of a -- and can pretty quickly, I think, lead to somebody

18    saying, well, okay, Ms. Vigus, sorry if that's your condition,

19    then you can't be a class rep.

20        MR. EDELSON:  That's a good point.  I've never -- I

21    can't recall a situation where a named plaintiff has said

22    that.  Generally you speak to them, and if they want to file

23    in the first place, they're interested in continuing on.  And

24    this isn't something we would be shutting out her attorney, so

25    she would still have that counsel to understand the process,

1  to make sure that she has got proper buy-in and is

2  participating.  So I wouldn't expect, for example, that I

3  would be speaking to her directly without them being on the

4  phone.  You know, that would feel impolite and probably not

5  productive anyways.

6          THE COURT:  Okay.  I guess I should ask:  Does

7  anybody on this side of the room have anything that you want

8  to input on any of this stuff that has been covered in any of

9  these motions or responses?

10         MR. BACKMAN:  No, your Honor.  Our only concern is

11  that we have one voice that we're dealing with.

12         THE COURT:  Yes, you need to know who you're talking

13  to, obviously.  All right.

14         So I have, I think, a pretty clear sense at this

15  point of what the Wright/Birchmeier proposal is.  The proposal

16  that you have made, Mr. Lang, is -- I want to have a clear

17  understanding.  So there would be three voting members, and so

18  by definition there would be a majority.

19         MR. LANG:  Correct.

20         THE COURT:  Presumably, and it would be majority

21  rule.

22         MR. LANG:  Correct.

23         THE COURT:  Don't you kind of see how that's going to

24  work out?

25         MR. LANG:  Yes, but at least in this situation, I

1   have a voice.  In the other situation, the only voice that I'm

2   guaranteed is a chair at mediation, and I don't even know if I

3   have a vote then.  And based on our experience, based on our

4   knowledge in this area of the law, that's not fair to any of

5   the clients.

6           THE COURT:  So how does it work out?  Again, I have

7   not been on your side of the fence in anything where there's

8   been one of these structures, at least -- well, not that I can

9   remember.  So, you know, you have got three voting members.

10  You have two who you know are aligned with each other because

11  they have proposed to be the only voting members.  You say you

12  have a voice, but all you get is a vote basically, and your

13  voice in this day and age probably consists of email which you

14  would have anyway.

15          And so what do you think you gain or what do you

16  think the process gains by having, you know, what is likely to

17  be the minority vote?

18          MR. LANG:  Other than --

19          THE COURT:  In other words, a vote that is

20  insufficient to overcome the cloture motion.

21          MR. LANG:  Well, other than us saying that we should

22  be the only lead in the case, which I think is unfair, this

23  guarantees that we at least have a voice, that we at least are

24  able to participate.  If they choose to ignore us, fine.  But

25  at least when a decision comes up, then at least I get an

1   email that says, hey, this is a decision that needs to be

2   made, what do you guys think, whereas under their structure,

3   that's not even guaranteed.

4       THE COURT:  What's the problem with what Mr. Lang is

5   proposing?

6       MR. EDELSON:  I think it's inefficient.  I think that

7   we have not all been able to show that we can work

8   cooperatively with each other.  It's felt to me like there's

9   been a lot of positioning as opposed to everybody focused on

10  results.  We just want a smooth efficient ride for this case.

11  We certainly will include and have incentives to include the

12  Wanca firm or their group in what's going on with the case and

13  get their input.  So I don't think that's a concern.

14      But the idea that every time we have got to do a show

15  of hands to make a decision --

16      THE COURT:  You would be doing that anyway between

17  the two of you.

18      MR. EDELSON:  Well, no.  That's not -- Scott and I,

19  we have not worked together before.  The reason we decided to

20  work together was when we sat down, we had a shared view of

21  the case.  And so at least from my experience, the

22  relationship has been very smooth where we both understand

23  what each firm can offer.

24      THE COURT:  Are you saying that you don't think that

25  the other firm has a shared view of the case or have you just

1 | not talked to them about it?

2 | MR. EDELSON: That has not been the focus of their

3 | communications. They have not invested the same amount of

4 | time. All we have heard from them is that they are the --

5 | that they have filed a lot of TCPA cases and that they want a

6 | guaranteed amount of work. We have not been able to break

7 | through and say, what is it you would like to do with this

8 | case, where do you see it going, and what specifically can you

9 | add concretely.

10 | For us, at least, it's been a little bit more chest

11 | pumping, which is -- but I'm sure you get the same sense from

12 | us, too. So I don't want to further anger the Court.

13 | THE COURT: Okay. So if you could pull out -- I have

14 | a specific question or two. If you could pull out the

15 | document that was filed by Mr. Lang that has the emails

16 | attached to it. And mine isn't tabbed, but what I'm about to

17 | ask you about is under Exhibit 13.

18 | So the first page -- I'm looking at the second page

19 | of Exhibit 13 and specifically at the email that you sent to

20 | Mr. Lang on the 8th of March at 10:35 in the morning, which is

21 | down at the bottom of the second page of Exhibit 13. So do

22 | you have it there?

23 | MR. EDELSON: Exhibit 13?

24 | THE COURT: Yes, second page.

25 | MR. EDELSON: Yes.

1      THE COURT:  The email from you on March the 8th at

2   10:35 a.m. at the bottom of the page.

3      So in the second paragraph of your email, you say,

4   quote:

5      "During our conversation, I thought we had reached an

6   understanding or at least we're close," and it goes on from

7   there.

8      What was the understanding that you thought you had

9   reached in the conversation?  I assume by conversation you're

10   referring to something verbal rather than email.

11      MR. EDELSON:  Correct.

12      THE COURT:  What was the understanding that you

13   thought you had?

14      MR. EDELSON:  My understanding was at the time, what

15   I understood they wanted was some guarantee of work, that they

16   weren't asking for a co-lead.  They just wanted to make sure

17   they weren't going to be shut out of the case.  And so that is

18   why I struggled to answer your question.

19      THE COURT:  Okay.  So what was the understanding you

20   thought you had?

21      MR. EDELSON:  The understanding was that we said to

22   them, look, we can't give you -- we can't say you are in

23   charge of discovery, but here's what we see as your role --

24   excuse me -- here is what we see as your role in the case.  We

25   want you to be at the mediation.  We're happy to have you be

1    involved and give your input into big decisions in the case.

2            If you want to deal -- if they want to house the

3    documents, if you want to do that, that's great.  We're happy

4    to have help in the case.

5            And that's why I said -- at the end of the

6    conversation, I thought -- I thought we were close.  I thought

7    that we had a shared understanding even though we weren't

8    making any formal commitment.  And then the email came back,

9    and it felt like we were back in the loop of we need a formal

10   commitment.

11           And the idea of saying we're going to give you X

12   percent of the case, I don't think it's proper, and they

13   weren't asking for that.  They never said, we want X percent

14   of the case, but it felt like -- that the discussion could

15   head there.

16           THE COURT:  So, Mr. Lang, are you -- do you know what

17   conversation he's talking about?

18           MR. LANG:  I do, and that's not --

19           THE COURT:  What was your understanding of the

20   conversation?

21           MR. LANG:  We had already retained Mr. Biggerstaff,

22   one of the premier experts in this area.  I asked that we

23   participate in the expert part.  I asked that we house the

24   documents.  I asked that we second chair depositions, we

25   participate in briefing.

1        And then when I pressed for those guarantees, the

2   only guarantee that I ever got was that we could participate

3   in mediation.  And when I pressed that one, I asked if we

4   would even have a vote at mediation, and I was told that I was

5   creating issues for briefing purposes.

6        THE COURT:  Okay.  So with regard to Mr. Biggerstaff,

7   you say you have retained him.  Does that mean that if I end

8   up opting for the Birchmeier and Wright proposal that

9   Biggerstaff is going to take his marbles and go home?

10       MR. LANG:  That is a question that only he can

11   answer.

12       THE COURT:  Oh, come on.

13       MR. LANG:  No.  It would be our position that we

14   would let him go forward with the case.  I would scream and

15   yell, but we would go forward.

16       THE COURT:  In other words, you wouldn't suggest to

17   him that, well, since you're not part of the management

18   structure, then Biggerstaff should take a pass.

19       MR. LANG:  No.  The way I see it, he's going to bring

20   value to the case.  The more value that's brought to the case,

21   the better off my clients are.

22       THE COURT:  Okay.  So a couple of the points that Mr.

23   Lang raised there.  And, you know, the reason I'm getting this

24   stuff out on the table at this point, or at least some of it,

25   is that I'm confident that there's at least a good chance that

1     it's going to come back later, you know, if there ends up

2     being a settlement or a judgment.  There's going to be issues

3     about, you know, who gets what and what work was reasonable

4     and was it reasonable to have X number of lawyers at

5     depositions and so on and so forth.

6             And so, Mr. Edelson, under the -- and I know that

7     there was some discussion about these being manufactured

8     issues -- I'm taking your term -- but I don't really see it

9     that way.

10            So what is your sense of how depositions would be

11    staffed from a lawyer's standpoint?

12            MR. EDELSON:  The -- by the way, I agree with his

13    characterization of the discussion.  He did mention those

14    other things.  And what I expressed to him, and I expressed to

15    you, too, is those are all things which would be appropriate

16    roles.  We have no problem with that.  This isn't something

17    where Scott and I are trying to horde the work.  If they can

18    do work, that's terrific.  So if they want -- if they can show

19    value by second chairing depositions or help with briefing or

20    give us experts, that's terrific.

21            And, you know, I think the disconnect where we

22    weren't able to make the deal was those were just words to him

23    as opposed to, well, what does that mean --

24            THE COURT:  Somewhere in here you're going to get to

25    my question.

1       Do you remember what it was?

2       MR. EDELSON:  I do.

3       THE COURT:  Okay.  Let's get to it.

4       MR. EDELSON:  Your question was why I -- why I

5   struggled with him, too.  It depends on the deposition.  It

6   depends.  We have never worked with him before.

7       THE COURT:  I didn't ask about him.  I asked about

8   number of lawyers at depositions.

9       MR. EDELSON:  I believe there should be very few

10  lawyers at a deposition.

11      THE COURT:  Well, what does that mean?

12      MR. EDELSON:  I believe there should be --

13      THE COURT:  That could mean two or it could mean

14  four.

15      MR. EDELSON:  I mean two.  There should be two.

16      So if he was going to second chair it, perhaps it's

17  Scott and he go.  But I do not -- this is not a case where you

18  need 30 lawyers on everything, at all.

19      THE COURT:  There's a big amount of space between two

20  and 30.

21      MR. EDELSON:  Two attorneys at a deposition would be

22  more than appropriate, in my view.

23      THE COURT:  Well, my view is there's plenty of

24  depositions where one is appropriate, and so now you know

25  that, so I just have that out on the table.

1          MR. LANG:  Permission to clarify, your Honor?

2          My concern is that if it becomes document intensive,

3    that there be one person for continuity to handle the

4    documents at depositions.  Other than that --

5          THE COURT:  I didn't say every deposition; I said a

6    lot of depositions.

7          MR. LANG:  Thank you, your Honor.

8          THE COURT:  Okay.  And then the big elephant in the

9    room, I guess, is the Ashford Gear litigation.  So I don't

10   know whether there is anything more that you all want to say

11   to me about that than you already said.  I mean, presumably

12   you're aware that I, you know, had some of those cases as

13   well.  I think I may have had the first one that resulted in

14   any kind of a decision actually, CE Design v. Cy's Crab House.

15         So is there anything more you want to say about all

16   of those issues?

17         MR. LANG:  That it's gone back to Judge Gettleman.

18   We have been vindicated.  And the issue with the letter that

19   they wrote, which Judge Posner said that the word -- I believe

20   the word "putative" should have been in the letter and it

21   wasn't.  So these are issues that are -- they haven't

22   affected --

23         THE COURT:  When you say Judge Gettleman, you were

24   vindicated before Judge Gettleman, what exactly do you mean

25   "vindicated"?

1    MR. LANG:  After the case went up to the Seventh, the
2  Seventh said there was an issue, it was sent back down.  Judge
3  Gettleman then gave --

4    THE COURT:  You're talking about his July 2011
5  decision.

6    MR. LANG:  Correct, correct, and the case went back
7  down to Judge Gettleman.

8    THE COURT:  So when Judge Gettleman said over at star
9  page 5 of the Westlaw version, which is 2011 Westlaw 3273078,
10  quote, "with respect to the broken promise in the instant
11  case, the Court is inclined to agree with the CE Design Court
12  that counsel's conduct was not entirely on the up and up,"
13  close quote, do you regard that as a vindication?

14    MR. LANG:  Well, your Honor --

15    THE COURT:  I wouldn't have, personally, but maybe
16  I'm missing something.

17    MR. LANG:  No.  I guess we feel that it's a little --
18  that this whole issue has been misunderstood and at least
19  that --

20    THE COURT:  By me and Gettleman as well as by the
21  three judges on the Seventh Circuit?

22    MR. LANG:  No, your Honor.  No, your Honor.

23    THE COURT:  Because he's quoting me on the entirely
24  -- "not entirely on the up and up thing" there.

25    MR. LANG:  Right.

1      And as you're well aware, that was an issue where the

2   hard drive was gotten by an alternative means.  It was found

3   to be that that means was found to be valid.  It was an issue

4   of whether or not there was a promise broken before.

5          THE COURT:  Okay.  Anything more you want to talk to

6   me and say?

7          MR. LANG:  No, your Honor.

8          THE COURT:  Mr. Edelson or Mr. Rauscher?

9          MR. EDELSON:  Nothing.

10         MR. RAUSCHER:  Nothing, your Honor.

11         THE COURT:  Anybody else want to say anything?

12         MR. HUDSON:  No, Judge.

13         THE COURT:  Okay.  Let me look back at one thing

14  here.

15     (Brief interruption.)

16         THE COURT:  All right.  So this is a motion under

17  Rule 2 -- I'm not going to write an opinion; I'm just going to

18  make an oral ruling.

19         It's a motion under Rule 23(g) of the Federal Rules

20  of Civil Procedure.  23(g)(3) provides for appointment of

21  interim counsel in certain types of cases before deciding

22  whether to certify the case as a class action.  I don't think

23  there is really much dispute that that is needed here.

24         There are three cases that came from three different

25  districts.  There needs to be some sort of a management

1    structure for efficient case management.

2         The factors that are considered under Rule 23(g)(1)

3    are the work that counsel has done identifying and/or

4    investigating potential claims, counsel's experience in

5    handling class actions, complex litigation and claims of the

6    type asserted, counsel's knowledge of the applicable law, and

7    the resources counsel will commit to representing the proposed

8    class.

9         And I'm borrowing this from the submission by the

10   Wright and Birchmeier plaintiffs.  "No single factor is

11   determinative."  And I'm reading from page 7.  And I agree,

12   it's a correct statement of the law.

13        "Each of them must be considered along with any other

14   matter pertinent to counsel's ability to fairly and adequately

15   represent the interests of the class."

16        I will say that I do have some concern based on the

17   exchange of emails that I have, and acknowledging that may not

18   be every email, I certainly got enough to get a taste.  I do

19   have some concern about the ability of Mr. Edelson's firm and

20   Mr. Lang's firm to work cooperatively.  I may have used the

21   word "sniping" before.  If I didn't, I should have.  I think

22   there was a good amount of sniping that went back and forth in

23   those emails.  And by sniping, I mean diversion from the

24   issues, at some point getting pretty close to personal

25   attacks, and that does not -- that suggests some potential

1   issues.

2           That aside, and going back to those four factors, I

3   mean, I think it is fair to say that each of the three law

4   firms involved has done or has significant experience handling

5   class actions, complex litigation and claims of this sort.  I

6   don't have any doubt about any of the attorneys' knowledge of

7   the applicable law.  I don't have any doubt about the

8   resources that they will commit in representing the proposed

9   class.  I haven't had so many cases with Mr. Edelson, but I

10  have had some.  I have had plenty of class actions both with

11  the Anderson & Wanca firm and with the Loevy firm, and I don't

12  have any doubt as to either one -- any of the three firms',

13  you know, willingness to put the necessary resources in.

14          I do think it's probably fair to say that somewhat

15  more work has been done by the Edelson firm and the Loevy firm

16  in terms of identifying and investigating claims, but it's a

17  nuance.  It's not a really terribly stark difference.  I think

18  the bigger factors are these sort of catchall factors that I

19  referred to in quoting from page 7 of the brief here.

20          I have to be frank to say that I think that the, what

21  I will call generically the Ashford Gear litigation is -- that

22  there is good chance that were I to appoint the Anderson &

23  Wanca firm as one of the co-lead counsel, that that would make

24  that an issue on a class certification motion.  One of the

25  factors that has to be considered on class certification is,

1　you know, the ability of the attorneys involved -- I don't

2　want to paraphrase it, so I will pull out Rule 23 here and

3　quote it directly.

4　　　　　"Class counsel must fairly and adequately represent

5　the interests of the class."

6　　　　　That's Rule 23(g)(4).  And it's pretty generally

7　worded, but, you know, the case law is relatively well-

8　developed that issues that an attorney has had, which I could

9　sort of generically refer to as ethical issues without reading

10　too much into that, are a legitimate factor to be considered.

11　And there is enough, I think, arguably questionable -- and I'm

12　not making any judgments on that -- I'm just saying there is

13　enough arguably questionable about the conduct of the Anderson

14　& Wanca firm in what again I'm generically referring to as the

15　Ashford Gear litigation, but what I really mean by that is

16　their dealings with the Abrahams and Business to Business

17　Solutions, that it's pretty likely that that would be raised

18　as an issue were they one of the lead attorneys.

19　　　　　So I do think that that is an appropriate factor to

20　consider, and so that tips things, in my view, in favor of

21　the -- more in favor of the proposal that is made by the

22　Wright and Birchmeier lawyers.

23　　　　　And, you know, those two firms have agreed to a

24　cooperative management structure, but I'm going to say this,

25　and I'm going to say it again for the third time now.  I

1   believe that the -- and understanding that I may not be seeing

2   every email, but I'm certainly seeing enough of it to get a

3   flavor, and understanding where Mr. Edelson was coming from in

4   terms of what his impression was that Mr. Lang and his firm

5   were looking for, I do think that the way that that was dealt

6   with by Mr. Edelson, which I would regard as a

7   back-of-the-hand approach in the emails that I read -- by

8   back-of-the-hand, I mean what I just did there -- suggests

9   some reason for concern about Mr. Edelson's and his firm's

10  ability to work cooperatively.

11          And so I'm willing to approve the proposal that has

12  been made here, but my view is that the Loevy firm should be

13  the first among equals because I did not see any of that from

14  them.  I have had extensive experience with that firm in

15  dealing with class actions, including a couple of the bigger

16  ones that have ever been litigated in this district.  I'm

17  speaking specifically of the Young v. Cook County strip search

18  case.  And I have had a number of their individual cases but

19  some class actions and I've never seen anything other than

20  completely professional as well as classy as well as high

21  quality work on their part.

22          So I'm not going to get down involved into the

23  nitty-gritty of exactly who talks to who when and why and

24  whatnot, but from my standpoint, as between the two firms that

25  I'm going to appoint as co-lead class counsel, my view is that

1    the Loevy firm is the first among equals.

2           So the motion by the -- this is document number 88,

3    Augie.  The motion by the Wright, Birchmeier and Parkes

4    plaintiffs in support of appointment of interim co-lead class

5    counsel is granted subject to the comments made here.

6           The motion, and this one is document number 94, of

7    the Vigus plaintiffs in support of their motion for

8    appointment is denied.  And I will just make -- I guess I'm

9    going to need some sort of a written order that I'm going to

10   ask you to draft.

11          I'm just going to make two other comments.  Comment

12   number one is that I am going to hold, you know, the people

13   that I have appointed as co-lead class counsel to -- you know,

14   what I regard as anytime you say something to a judge in a

15   case that is pretty close to a binding commitment, I am going

16   to hold people to what they say about not, you know, cutting

17   off the Anderson & Wanca folks entirely.  I do think that they

18   have value to contribute to this.

19          And, secondly -- and I know -- I mean I'm not so

20   naive as to think that this is all about, you know -- it's

21   primarily about, you know, how's it going to work best, but

22   it's also about money.  Okay, I know that.  Everybody knows

23   that.  But I do want to emphasize that the fact that I'm

24   appointing co-lead class counsel is not carte blanche for

25   everybody to double up, triple up or quadruple up on

1  everything.  Any fee petition that I eventually get in this

2  case is going to be looked at very carefully for, you know,

3  unnecessary duplication of effort and things like that.  And

4  so I just want to make sure people take that to heart.

5          I'm going to expect that -- so I guess what we need

6  to do at this point is I'm going to set a date for -- I think

7  one of the things we were going to talk about today was coming

8  up with a schedule, including a schedule for the filing of a

9  consolidated complaint.  So have people given thought to that

10  because, if not, I'm just going to set one?  I mean, I will

11  ask your opinions and we'll set it.

12          So what date do you propose for filing of a

13  consolidated complaint?

14          MR. EDELSON:  Your Honor, two weeks would be terrific

15  for us.

16          THE COURT:  All right.  So the consolidated

17  complaint -- and I think the thing to do at this point is

18  we're going to file it under 12 C 4069, and then I'm going to

19  administrate it.  Once we get it on file, I'm going to

20  administratively terminate the other two cases because there

21  don't really need to be three cases pending.  So you don't

22  need to put all three docket numbers on it.

23          So the amended consolidated complaint is to be filed

24  by the 2nd of May.

25          Have you talked about a schedule between the two

1  sides or not?  I'm guessing not.

2           MR. O'MEARA:  No.

3           THE COURT:  Okay, fine.  I want you to, starting now,

4  and I'm going to have you come back on the 9th of May at 9:30,

5  and I want you to have a proposal to give me.  You don't have

6  to write it down.  If you want to, you can, but you don't have

7  to submit a status report or anything like that.  Come in with

8  a proposal.  If you can agree on a schedule, that's terrific.

9  Be prepared to tell me what it is.  And unless I think it's

10  outlandish, I will approve it.  If you're not in a position to

11  agree on something, just come prepared to tell me what each

12  side's proposal is.

13           Okay.  That will be the 9th of May at 9:30 in the

14  morning.  And as far as I know, some of the folks on the

15  defense side of the room are from out of town.  You will

16  make --

17           I mean, all I'm going to be doing is setting a

18  schedule.  You will decide whether the out-of-town people need

19  to be here or not.  It doesn't matter to me.  Okay.

20           All right, thanks.

21           MR. EDELSON:  Thank you, your Honor.

22           MR. O'MEARA:  Thank you.

23           MR. HARRISON:  Thank you.

24           MR. BACKMAN:  Thank you.

25           MR. HUDSON:  Thank you, Judge.

1      MR. RAUSCHER:  Thank you, your Honor.

2

3      (Which were all the proceedings had in the above-entitled

4  cause on the day and date aforesaid.)

5

6

7               C E R T I F I C A T E

8

9      I hereby certify that the foregoing is a true and

10  correct transcript of the above-entitled matter.

11

12

13  */s/ Laura M. Brennan*                    April 19, 2013

14

15  _____          _____
    Laura M. Brennan
16  Official Court Reporter                         Date
    Northern District of Illinois
17

18

19

20

21

22

23

24

25