**IN THE UNITED STATES DISTRICT COURT FOR THE**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| GRANT BIRCHMEIER, STEPHEN PARKES, SUSAN VIGUS, and REGINA STONE, on behalf of themselves and a class of others similarly situated, | Case No. 1:12-cv-04069 |
| *Plaintiffs*, | Honorable Matthew F. Kennelly |
| *v.* | |
| CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY, LLC, THE BERKLEY GROUP, INC., and VACATION OWNERSHIP MARKETING TOURS, INC., | |
| *Defendants.* | |

## PLAINTIFFS' MOTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF CLASS CERTIFICATION

## TABLE OF CONTENTS

OVERVIEW ................................................................................................................................... 1

FACTS .......................................................................................................................................... 4

ARGUMENT ................................................................................................................................ 7

I.     The TCPA ................................................................................................................. 7

II.    The Applicable Legal Standard for Class Certification Under Rule 23 .............................. 9

III.   The Proposed Classes are Readily Ascertainable ...................................................... 10

IV.   The Classes Satisfy Rule 23(a) .............................................................................. 11

V.    The Classes Satisfy Rule 23(b)(3) ......................................................................... 19

CONCLUSION ............................................................................................................................ 21

# TABLE OF AUTHORITIES

## Cases

*Adams v. R.R. Donnelley & Sons*, Nos. 98 C 4025, 96 C 7717, 2001 WL 336830
(N.D. Ill. Apr. 6, 2001) ..................................................................................................... 12, 20

*Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) ................................... 2, 9

*Alliance to End Repression v. Rochford*, 565 F.2d 975 (7th Cir. 1977) ................................ 10

*Banks v. Caribbean Cruise Line, et al.*, Case No. 1:12-cv-00584-JG-VMS,
Dkt. 49, Report and Recommendation ......................................................................... 15

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012) .......................................... 15

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983) ............................ 17

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ...................................................... 11, 17

*Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394 (N.D. Ill. 1987) ..................................... 18

*Hamlett v. Santander Consumer USA Inc.*, No. 11-CV-6106 JFB GRB, 2013 WL 1150048
(E.D.N.Y. Mar. 19, 2013) ............................................................................................... 15

*Hinman v. M and M Rental Ctr., Inc.*, 545 F.Supp.2d 802 (N.D. Ill. 2008) .............. 10, 11, 14

*In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
27 F.C.C.R. 1830 (F.C.C. 2012) ................................................................................... 8

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., &
the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the
Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574 (2013) .............................. 8-9

*Ira Holtzman, C.P.A. v. Turza*, No. 11-3188, --- F.3d ---, 2013 WL 4506176
(7th Cir. Aug. 26, 2013) ............................................................................................... 2, 9

*Jackson v. Sheriff of Cook County*, No. 06-cv-04932006, 2006 WL 3718041
(N.D. Ill. Dec. 14, 2006) ............................................................................................... 11

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ................................................................. 12

*Kernats v. Comcast Corp.*, No. 09 C 3368, 2010 WL 4193219 (N.D. Ill. October 20, 2010) .......... 20

*Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-CV-0964-GPC-DHB, 2013 WL 4774763
(S.D. Cal. Sept. 5, 2013) ............................................................................................... 10

*Lau v. Arrow Fin. Servs.*, LLC, 245 F.R.D. 620 (N.D. Ill. 2007) .................................................. 10

*Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013) ............................................. 2

*Manno v. Healthcare Revenue Recovery Grp.*, LLC, 289 F.R.D. 674 (S.D. Fla. 2013) ...................... 2

*Maxwell v. Arrow Fin. Servs.*, *LLC*, No. 03 C 1995, 2004 WL 719278
    (N.D. Ill. Mar. 31, 2004) ......................................................................................... 18

*McCabe v. Crawford & Co.*, 21 F.R.D. 631 (N.D. Ill. 2002) ...................................................... 11

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ........................... 9, 19, 20

*Mims v. Arrow Fin. Servs.*, *LLC*, 132 S. Ct. 740 (2012) ............................................................ 16

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 WL 4931001
    (N.D. Ill. Nov. 29, 2010) .................................................................................... 14, 21

*Parker v. Risk Mgmt. Alt.*, 206 F.R.D. 211 (N.D. Ill. 2002) ..................................................... 11

*Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007) ............................... 20-21

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) .......................................................... 12, 13

*Savanna Grp., Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004 (N.D. Ill. Sept. 3, 2013) ........... 9

*Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013) ........... 19

*Streeter v. Sheriff of Cook County*, 256 F.R.D. 609 (N.D. Ill. 2009) ......................................... 20

*Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894 (N.D. Ill. 2010) ......... 16

*Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp.2d 898 (N.D. Ill. 2012) ........................... 13

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................................................... 11, 19

*Whitten v. ARS Nat'l Servs. Inc.*, No. 00 C 6080, 2001 WL 1143238 (N.D. Ill. Sept. 27, 2001) ............ 12

*Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374 (N.D. Ill. 2011) ...................... 19

*Young v. County of Cook*, 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) ........................... 20

**Rules & Statutes**

105 Stat. 2394 § 2(10) ......................................................................................................... 7

47 U.S.C. § 227 ...................................................................................................................................*passim*

Fed. R. Civ. P. 23 ...............................................................................................................................*passim*

## **Other**

MAN. FOR COMPLEX LITIG. (4th ed. 2004) § 21.222 ............................................................................... 10

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Grant Birchmeier, Stephen Parkes, and Regina Stone (the "Plaintiffs")[1] respectfully move this Court for an order (i) certifying two Classes of individuals as defined below, (ii) appointing Plaintiffs as the Class Representatives, (iii) appointing Jay Edelson of Edelson LLC and Scott Rauscher of Loevy & Loevy as Class Counsel, and (iv) granting such further relief as this Court deems reasonable and just. In support thereof, Plaintiffs state as follows:

## OVERVIEW

This case arises from a massive, unsolicited robocall campaign designed to sell vacation packages and timeshare properties for Defendants The Berkley Group, Inc. ("Berkley"), Caribbean Cruise Line, Inc. ("CCL"), and Vacation Ownership Marketing Tours, Inc. ("VOMT," and with Caribbean and Berkley, collectively the "Defendants").[2] The campaign involved millions of calls to cellular and residential telephones, all made without the consent of the called party in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* Each call contained a prerecorded voice offering the called party a "free" cruise in exchange for taking a purported automated public opinion or political survey,[3] each was effectuated using the same autodialing

---

[1] As it was recently determined through discovery that Susan Vigus received different phone calls than the other named plaintiffs, she is not a member of either of the proposed classes.

[2] There are three additional defendants in this case: Economic Strategy Group; Economic Strategy Group, Inc.; and Economic Strategy LLC (collectively, "ESG"). Having not answered the Consolidated Complaint or otherwise participated in this litigation, they are in default. Plaintiffs, however, do not seek to certify a class against them at this time.

[3] There is no real difference between Defendants' "public opinion" and "political" survey calls. Each call was made without the recipients' consent, using the same autodialing technology, and an automated voice to offer a "free" cruise in exchange for completion of the survey. Additionally, each survey was effectuated by Jacob DeJongh—the President and sole employee of the ESG Defendants—for the collective benefit of CCL, VOMT, and Berkley. Although the public opinion surveys were purportedly done by Employment for America ("EFA")—rather than ESG—EFA is merely another one of DeJongh's shell polling companies. *See* Ex. 1, Excerpts of Deposition of Jacob DeJongh ("DeJongh Dep.") at 79-80; *see also* Ex. 2, CCL001675 (indicating that, in response to complaints from a company using the same initials as ESG, DeJongh would change the name mentioned on the surveys from ESG to another one of his "DBA compan[ies] name[d] EFA Survey

technology, and each was a guise to sell expensive vacation and timeshare packages for the benefit of Berkley, CCL, and VOMT.

The policy behind Rule 23 is to aggregate this type of claim into a class action, and so numerous courts have certified similar TCPA class actions under Rule 23(b)(3). *See e.g. Manno v. Healthcare Revenue Recovery Grp.*, LLC, 289 F.R.D. 674 (S.D. Fla. 2013) (certifying a class of individuals who received illegal automated calls under the TCPA)*; Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013) (certifying nationwide class of individuals who received unsolicited text message calls); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) (same); *see also Ira Holtzman, C.P.A. v. Turza*, No. 11-3188, --- F.3d ---, 2013 WL 4506176, at *1 (7th Cir. Aug. 26, 2013) (observing that "[c]lass certification is normal in litigation under § 227, because the main questions, such as whether a given [communication] is an advertisement, are common to all recipients."). Class certification is equally appropriate here.

As such, Plaintiffs now ask the Court to certify two classes: (1) one of people who received the illegal survey calls on their residential telephone lines; and (2) another of people who received the illegal survey calls on their cellular telephone lines,[4] defined as follows:

> **Cellular Telephone Class**: All persons in the United States to whom (1) one or more telephone calls were made by, on behalf of, or for the benefit of the Defendants; (2) purportedly offering a free cruise in exchange for taking an automated public opinion and/or political survey; (3) which delivered a

---

Group"). Moreover, DeJongh's own testimony indicates that EFA and ESG were used interchangeably, that some of EFA's surveys were in fact political (and vice versa), and that both were used to generate leads for Defendants. As such, any mention of political surveys throughout this Motion encompasses both the purportedly "political" and "public opinion" survey calls.

[4]     Given the Court's recent ruling (*see* Dkt. 143), Plaintiffs' Proposed Classes are narrower than those defined in their Consolidated Complaint. That is, the Proposed Classes only include individuals to whom Defendants made calls offering a free cruise in exchange for taking an automated political survey, rather than all automated survey calls offering a free cruise that were caused to be made by Defendants. *Compare* Plaintiffs' Consolidated Complaint ("Compl."), Dkt. 102 at ¶ 31. Given Rule 23's instruction that orders granting "class certification may be altered or amended before final judgment," such modification is appropriate. Fed. R. Civ. P. 23(c)(1)(C).

message using a prerecorded or artificial voice; (4) to a telephone number assigned to a cellular service; (5) since May 24, 2008.

**Landline Telephone Class:** All persons in the United States to whom (1) one or more telephone calls were made by, on behalf of, or for the benefit of the Defendants; (2) purportedly offering a free cruise in exchange for taking an automated public opinion and/or political survey; (3) which delivered a message using a prerecorded or artificial voice; (4) to a residential landline telephone number; (5) since May 24, 2008.

(collectively, the "Proposed Classes").[5]

The common questions arising from Defendants' uniform practice predominate for each of the Proposed Classes, and the Proposed Classes are amply numerous—each numbering in the millions. In addition, a class action is the superior method for addressing Defendants' systematic TCPA violations, given the inefficiency of what might otherwise be numerous nearly identical lawsuits, or none at all, as many class members would otherwise forfeit their claims due to the high cost of suing individually compared to the relatively modest damages, and because many people may be unaware of their rights. Finally, Defendants engaged in such a massive robocalling campaign because it is economically advantageous to do so—CCL acknowledges that the robocall campaign was one of its major marketing programs—and a handful of individual lawsuits holds no realistic hope of bringing Defendants into compliance. Thus, classwide liability is the only way to ensure that Defendants stop systematically violating the law and to compensate those who were injured, and the Proposed Classes should be certified.

---

[5]     Excluded from the Classes are 1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors; 2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family; 3) persons who execute and file a timely request for exclusion; 4) the legal representatives, successors, or assigns of any such excluded person; and 5) Plaintiffs' counsel and Defendants' counsel.

## FACTS

Defendants are collectively responsible for effectuating a massive robocall marketing campaign that offers a "free" cruise in exchange for completing a purportedly political survey. The real motive of these surveys is to increase Defendants' vacation package and timeshare sales, and thus, ultimately their profits. *See, e.g.,* Ex. 3, Excerpts of CCL 30(b)(6) Deposition of Daniel Lambert ("CCL Lambert Dep.") at 189-90 and CCL Lambert Dep. at Ex. 24 (referring to the program as "the next great mousetrap … as far as sales go," and further explaining that the robocalls were one of CCL's major marketing programs). As explained below, because each Defendant contributed to and benefitted from the illegal calls at issue, each has violated the TCPA.

### The Defendant Companies and Their Lead Generation Efforts

Berkley is a "timeshare sales and marketing company" with approximately 2,000 employees throughout the country that sells timeshare interests for its affiliated properties in "Florida, Virginia, Massachusetts, and Nevada." Ex. 4, Excerpts of Berkley Rule 30(b)(6) Deposition ("Berkley Dep.") at 14-20. CCL is a Florida company that "markets and sells vacation packages" to consumers, including by acting as a lead generator for Berkley's Florida timeshare properties. *See* Ex. 3, CCL Lambert Dep. at 16. It was founded and is operated by Daniel Lambert and James Verillo, who also founded and operated VOMT. *See* Ex. 3, CCL Lambert Dep. at 148-51.

CCL carried out its role as a Berkley lead generator through an exclusive contract it had with VOMT, pursuant to which CCL provided all of its sales leads for timeshare properties to VOMT. *See* Ex. 5, Marketing Agreement Between VOMT and CCL; *see also* CCL Lambert Dep. at 147-48. VOMT, in turn, had an exclusive contract with Berkley, whereby VOMT provided all of its sales leads for timeshare properties to Berkley. *See* Ex. 6, Marketing Agreement Between Berkley and

VOMT; *see also* Ex. 4, Berkley Dep. at 84-86 & Berkley Dep. at Ex. 12, Response to FTC Civil Investigative Demand.

Despite its purported role as lead generator for Berkley, VOMT never had any employees, officers, directors, office space, telephone numbers, or email addresses. *See* Ex. 7, Excerpts from VOMT 30(b)(6) Deposition of Daniel Lambert ("VOMT Lambert Dep.") at 7-11, 21:21-24. In short, VOMT existed only on paper, and the sales leads passed directly from CCL to Berkley.[6]

In or around August 2011, through its lead-broker Scott Broomfield (and his then-company Linked Service Solutions), CCL, acting for the benefit of both VOMT and Berkley, agreed to pay ESG and EFA to "solicit survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer." Ex. 8, Supplier Agreement Between ESG and CCL and Ex. 9, Supplier Agreement Between EFA and CCL. Instead of paying DeJongh—as President of ESG and EFA—directly, however, CCL paid Broomfield approximately $2 for each transferred survey call that was connected to CCL for more than thirty seconds, Ex. 10, Excerpts of Broomfield's FTC Deposition ("Broomfield FTC Dep.") at 71-73, and that money was then passed to DeJongh to pay for the costs associated with arranging and executing Defendants' robocall campaign. Ex. 11, Excerpts of DeJongh's FTC Deposition ("DeJongh FTC Dep.") at 28-29. Throughout the relevant time period, Berkley met with Lambert and Verillo to discuss their marketing relationship. Ex. 4, Berkley Dep. at 24-25, 49-50.

### Defendants' Telemarketing Campaign Offers an Automated Political Survey in Exchange for a "Free" Cruise Using a Prerecorded Voice and a Single Automated Dialing System

With all the key players in place, starting in or around August 2011, and continuing through about August 2012, Defendants effectuated their robocalls in the following common manner.

---

[6]     After this lawsuit was filed, Lambert and Verillo replaced VOMT with another company, through which they can continue to inconspicuously provide Berkley with leads. As with VOMT, the new company has no employees. Ex. 3, CCL Lambert Dep. at 172-76.

Foremost, using the funds originally provided by CCL, DeJongh purchased telephone numbers from "a lot of different places." Ex. 1, DeJongh Dep. at 342-343. Importantly, neither Defendants nor DeJongh contend that those individuals expressly consented to receive Defendants automated survey calls. Next, using online software services, DeJongh recorded the automated political surveys, *id.* at 144-46; 148-49, all which offered a "free" cruise in exchange for taking the survey. Thereafter, through a single automated dialer (similarly paid for by funds originating from CCL), DeJongh, through his dialer, placed robocalls to consumers nationwide. DeJongh made these calls, indiscriminately, and admittedly with the goal to call "the whole country." Ex. 1, DeJongh Dep. at 117:14-25 - 118:1-16; *see also id.* at 258:23 - 259:1-4 (confirming that the survey calls were made to people all over the country). DeJongh believes that he made approximately fifty million calls using the above-described process, Ex. 11, DeJongh FTC Dep. at 79:3-14, and CCL's own records indicate that nearly two million of those calls were transferred to CCL (and lasted more than thirty seconds) after completion of the survey. Ex. 12, Excerpts of Deposition of CCL's Director of Marketing Jennifer Poole ("Poole Dep.") at 67.

Each class member who completed the survey received an offer to be transferred to a live CCL sales agent, and those who were connected to an agent were all offered a materially identical pitch for an upgraded vacation package that included a mandatory presentation at one of Berkley's timeshare properties. Ex. 3, CCL Lambert Dep. at 64-65, 144-46. If the consumer chose not to upgrade to a more expensive vacation package, he or she was offered a timeshare presentation later, when they took the vacation. *Id.* at 64-65.

### *Plaintiffs Received the Same Calls and Suffered the Same Injury as the Class Members*

Each of the Plaintiffs' experiences are materially identical and mirror those described above. Specifically, on May 7, 2012, Plaintiff Grant Birchmeier received one of Defendants' political survey

calls on his cellular telephone. Ex. 13, Excerpts of Birchmeier's Responses to VOMT's Interrogatories at Resp. Nos. 1 & 8. When he answered the telephone, he heard a robocall promoting a "free" cruise in exchange for answering a series of questions. *Id.* The robocall stated that the questions and calls were on behalf of "Political Opinions of America" ("POA"), which is one of the many fake names Defendants placed on the illegal survey calls. *Id.* at Resp. No. 1.

Similarly, Plaintiff Stephen Parkes received multiple robocalls identical to the one that Birchmeier received, also on his cellular telephone. Ex. 14, Excerpts of Parkes' Responses to VOMT's Interrogatories at Resp. Nos. 1 & 8. Plaintiff Regina Stone received the same calls, on both her residential landline and on her cellular telephone from POA. Ex. 15, Excerpts of Stone's Responses to CCL's Interrogatories at Resp. No. 2.[7]

The Plaintiffs' experiences in receiving a barrage of such calls parallel those described by the thousands of putative class members similarly reporting Defendants' harassing phone calls. *See, e.g.,* Exs. 16 & 17, Sample of Online Consumer Complaints, and Letter from Kentucky Office of Attorney General to Berkley Re: Consumer Complaints, respectively.

## **ARGUMENT**

## I.     **The TCPA**

The TCPA is a consumer-protection statute Congress enacted after finding that robocalls had become a serious problem, posing a nuisance and invading the privacy of telephone subscribers nationwide. *See* TCPA, 47 U.S.C. § 227 note; *see also* 105 Stat. 2394 § 2(10). To solve the problem,

---

[7]     At least one of the unsolicited robocalls Stone received used the fake survey name "Independent Research Group" (or something similar) rather than "Political Opinions of America," but was otherwise identical to the other calls. Ex. 15 at Resp. No. 2; *see also* Ex. 3, CCL Lambert Dep. at 137-140 and CCL Lambert Dep. at Ex. 19 (demonstrating that Broomfield told CCL, in response to complaints about Political Opinions of America, that www.independentsurveygroup.org was the new name that CCL should be referring to); Ex. 18, CCL001754 (earlier email from Broomfield informing CCL employees that the "new name [on the survey] is Political Opinions of America", but that "the message is exactly the same other than the name change.").

Congress, with limited exceptions that do not apply to the calls at issue in this case, prohibited callers from using a prerecorded voice to deliver a message to cellular telephones and residential telephones without the prior express consent of the called party, and granted a private right of action with statutory damages for victims of illegal calls. *See* 47 U.S.C. § 227(b). Despite these measures, however, illegal calls continue to be a widespread problem. *See, e.g., In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C.R. 1830, 1839 ¶ 22, (F.C.C. 2012) ("Since the TCPA's enactment…the Commission has continued to receive thousands of complaints regarding unwanted telemarketing robocalls.").

As part of the continuing effort to prevent the type of wide-scale violation at issue in this case—where profitable businesses hire others in an effort to hide their role in robocall campaigns— the FCC recently ruled that companies may be held vicariously liable for calls made on their behalf, in a wide variety of situations, including when the companies knowingly benefit from the calls. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013). As the FCC explained:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.

*Id*; *see also id.* at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods

or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised").[8]

Moreover, courts routinely certify class actions to remedy telemarketing campaigns that systematically violate the TCPA, like the conduct at issue here, and this Court should do the same in this case. *See e.g. Agne*, 286 F.R.D. 559, 572 (W.D. Wash. 2012) (certifying class "for resolving the claims of consumers who received text message advertisements [calls] sent by or at the instruction of the Defendants"); *see also Turza*, 2013 WL 4506176 (affirming class certification in blast fax case involving mixed advertisement and information material).

## II.     The Applicable Legal Standard for Class Certification Under Rule 23

Classes should be certified when they satisfy all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012). Specifically, under Rule 23(a), the movant must demonstrate four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Additionally, Rule 23(b)(3)—the prong under which Plaintiffs seek to certify the Proposed Classes here—requires Plaintiffs to show that "questions of law or fact common to the members of the class predominate over any questions affecting individual members, and [that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed. R. Civ. P. 23(b)(3); *see also Messner*, 669 F.3d at 808. As fully explained below, the Proposed Classes satisfy Rule 23(a) and Rule 23(b)(3) and should be certified.

---

[8]     This Court, and other courts within this District agree that such vicarious liability is necessary to enforce the TCPA. *See* Dkt. 75 a 2 (rejecting CCL's "contention that liability attaches under the TCPA only to the party that placed the call"); *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004, at *4-6 (N.D. Ill. Sept. 3, 2013) (explaining that in *Dish Network* the FCC determined that a "'seller'—who does not generally 'initiate' calls within the meaning of the TCPA—may nevertheless be vicariously liable under federal common law agency principles for violations of either § 227(b) or § 227(c) committed by third-party telemarketers" and further holding that the FCC's "ruling concerning violations of § 227(b) [] is controlling").

### III. The Proposed Classes are Readily Ascertainable

As an initial matter, and though it is not explicitly provided for in Rule 23(a), courts require that a proposed class be sufficiently definite, or in other words, ascertainable. *Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)). A class is sufficiently definite "if its members can be ascertained by reference to objective criteria." *Id.* The goal of Rule 23's implicit ascertainability requirement is not to determine the actual identities of individual class members, but to ensure that class members generally "receive the best notice practicable and have an opportunity to opt out." MAN. FOR COMPLEX LITIG. (4th ed. 2004) § 21.222 at 270. As a result, Plaintiffs "need not identify each class member to secure class certification," *Lau v. Arrow Fin. Servs.*, LLC, 245 F.R.D. 620, 624 (N.D. Ill. 2007), and a class is sufficiently ascertainable where its "scope is defined by the activities of the defendants." *Rochford*, 565 F.2d 975 at 978; *see also Hinman*, 545 F. Supp. 2d at 806.

Here, class membership is straightforward and turns on simple and objective criteria: if an individual's cellular or residential telephone number was called by, called on behalf of, or called for the benefit of Defendants for the purpose of promoting Defendants' timeshare packages by offering a purportedly free cruise in exchange for taking an automated political survey or public opinion poll, he or she is a member of one of the Proposed Classes. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-CV-0964-GPC-DHB, 2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively."). Thus, the class definitions are based upon Defendants' standardized conduct and procedures, and the Proposed Classes can be easily ascertained. *See Rochford*, 565 F.2d at 978 (noting that "[i]n those cases in which class certification has been denied on account of

indefiniteness, the primary defect in the class definition has been that membership in the class was contingent on the state of mind of the prospective class members."); *Hinman*, 545 F.Supp.2d at 806.

## IV.    The Classes Satisfy Rule 23(a)

### *Numerosity*

The first express requirement of Rule 23(a)(1) requires that the class be so numerous that joinder of all members in a single action is impracticable. Fed. R. Civ. P. 23(a)(1). Generally, a class of forty or more satisfies this requirement. *Hinman*, 545 F. Supp. 2d at 803; *see also McCabe v. Crawford & Co.,* 21 F.R.D. 631, 642 (N.D. Ill. 2002). Plaintiffs may rely on "common sense assumptions" to meet the numerosity requirement, and they need not establish an exact number of members in the class. *See Jackson v. Sheriff of Cook County*, No. 06-cv-04932006, WL 3718041, at *3 (N.D. Ill. Dec. 14, 2006); *Parker v. Risk Mgmt. Alt.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) (same).

As previously discussed, here, the Proposed Classes each number in the millions. CCL's records indicate that it received nearly 2 million transferred political survey calls from DeJongh lasting over thirty seconds. *See* Ex. 12, Poole Dep. at Deposition Ex. 3 (recording the total amount of political calls made and then transferred to CCL between August 8, 2011 to August 5, 2012 to be 1,945,866). And, DeJongh admits that more than 50 million total calls were made as part of the political/public opinion survey campaign. Ex. 11, DeJongh FTC Dep. at 79:3-14. Thus, both Classes plainly satisfy the numerosity requirement.

### *Commonality*

Next, under Rule 23(a)(2), there must be at least one question of law or fact that is common to the class. Fed. R. Civ. P. 23(a)(2). To meet the commonality requirement, the named representative must demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157

(1982)). In other words, commonality requires that the claims of the class "depend upon a common contention…of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Commonality is present where a "a common nucleus of operative fact" exists, even if as to one question of law or fact, *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and is often found where "defendants have engaged in standardized conduct toward members of the proposed class." *Whitten v. ARS Nat'l Servs. Inc.*, No. 00 C 6080, 2001 WL 1143238, at *3 (N.D. Ill. Sept. 27, 2001). Thus, achieving commonality is a relatively low hurdle and "does not require that all or even most of the issues in the litigation be common issues…one common issue is enough." *Adams v. R.R. Donnelley & Sons*, Nos. 98 C 4025, 96 C 7717, 2001 WL 336830, at *5 (N.D. Ill. Apr. 6, 2001).

Here, there are multiple common issues. To start, Plaintiffs' and the Proposed Classes' claims rely on a single contention: Defendants violated the TCPA by placing, causing to be placed, or benefitting from, robocalls that utilized a prerecorded voice to send the same type of message, from the same person, using the same technology. *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("Common nuclei of fact are typically manifest where . . . the defendants have engaged in standardized conduct towards members of the proposed class."). Those common facts give rise to several common and controlling factual and legal questions that will resolve each class members' TCPA claims against Defendants in one stroke.

***First,*** whether each Defendant can be held commonly liable to Plaintiffs and the putative class members for placing, causing to placed, or benefitting from the survey calls is a common question. Here, while CCL's past contention that it cannot be liable for calls it did not directly place was labeled by the Court as "absurd," in denying CCL's motion to dismiss on that ground, *see* Dkt.

75 a 2 (holding that CCL's "contention that liability attaches under the TCPA only to the party that placed the call…w[as] absurd indeed."), Defendants Berkley and VOMT will likely undertake this same defense. And though Plaintiffs anticipate that any attempt to recycle this argument will similarly be unsuccessful, such a determination will nevertheless turn on the various contracts and relationships between Defendants—all which are the same. *See* Exs. 5-6 & 8-9. Thus, the ultimate answer to any question of Defendants' liability can be commonly resolved.

*Second*, whether Defendants' survey calls utilized an artificial or prerecorded voice also presents a controlling common issue, the answer to which is undoubtedly "yes." Indeed, CCL's contracts with DeJongh's companies explicitly state that they will "solicit[] survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer." Exs. 8-9. Likewise, it is undisputed that each and every survey call was made using a single autodialer and dialer service. *See* Ex. 1, DeJongh Dep. at 272:23-25 - 273:1-4; 371 (DeJongh explaining that the "same dialer" was used for all survey calls). Thus, because each class member was confronted with a prerecorded message containing materially identical content, which was delivered by the same autodialing equipment and service, the Court's determination as to whether prerecorded calls were placed to the class members will similarly be resolved by consideration of the same operative facts. *See Rosario*, 963 F.2d at 1018.

*Third*, Defendants' ability to assert, and ultimately satisfy their burden of proving, any attempted affirmative defense of consent also presents a common question. *See Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp.2d 898, 905 (N.D. Ill. 2012) ("'express consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof."). Here, neither DeJongh nor any of the other Defendants have presented even a shred of evidence demonstrating that anyone consented to their robocalls. Instead,

13

DeJongh testified that he wanted to indiscriminately call the entire country, Ex. 1, DeJongh Dep. at 117-118, 258:23 – 259:1-4, and CCL admits that it made no effort to verify Plaintiffs' consent to be called, *see e.g.* Ex. 3, CCL Lambert Dep. at 106-107 (stating that Caribbean "ha[d] no idea" whether individuals provided their consent to receive survey calls), and that the individuals called were randomly selected. *See* Ex. 24, February 13, 2012 Letter from CCL to Office of Ohio Attorney General. Thus, the question of whether Defendants can meet their burden of demonstrating consent can be decided on a class-wide basis, based on the absence of any such evidence. *See, e.g., Paldo Sign & Display Co. v. Topsail Sportswear, Inc.,* No. 08-CV-5959, 2010 WL 4931001, at *2-3 (N.D. Ill. Nov. 29, 2010) (Kennelly, J.) (Rule 23(b)(3) satisfied in TCPA case because method by which defendant obtained and used fax numbers made individualized consent unlikely, and further noting that "evidence regarding consent would be in [defendant's] hands if it is anywhere, yet [defendant] has offered nothing to suggest that any of the recipients might have consented to receive faxed advertisement"); *see also Hinman*, 545 F. Supp. 2d at 806-07 (collecting authorities and agreeing that when thousands of calls are made "'*en masse*'… the question of consent may rightly be understood as a common question").[9]

**Fourth**, any contention that Defendants are exempt from liability as a result of the so-called "political" nature of their surveys will similarly rise or fall with generalized proof. Specifically, whether Defendants will be able to assert the defense that the calls were exempt under the TCPA because they were political in nature is another common issue—either the calls are altogether

---

[9]     Additionally, and even though it is Defendants' burden, Plaintiffs' own evidence demonstrates that consent is lacking. Indeed, each of the Plaintiffs has affirmatively represented— both through their written discovery responses and during their deposition testimony—that they never consented to receive Defendants' political survey calls. *See, e.g.,* Exs. 13-15. Likewise, thousands of individuals throughout the nation have lodged nearly identical complaints of these exact calls on online consumer complaint forums, and even with various state agencies, indicating that their consent to be contacted was similarly lacking. *See* Ex. 16 & 17.

exempted or they are altogether violative of the TCPA. Here, the answer is that the calls are not exempt.

With respect to the cellular telephone class, the TCPA plainly prohibits all calls to cellular telephones made using automatic dialing technology and/or a prerecorded or artificial voice (both present in the calls at issue here) and made without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(iii). There are absolutely no exceptions to this rule. *Id.*; *see also Hamlett v. Santander Consumer USA Inc.*, No. 11-CV-6106 JFB GRB, 2013 WL 1150048, at *5 (E.D.N.Y. Mar. 19, 2013) ("the section governing calls to cell phones (which often charge recipients on a per-call basis), does not provide for an exemption"). With respect to the residential telephone class, the defense equally lacks merit. Even assuming there is an exemption for political calls made using auto-dialing equipment (which this Court previously rejected as "a non-starter" (*see* Dkt. 75)), that exemption plainly does not extend to telemarketing or dual-purpose calls that include an otherwise exempt automated message and an effort to sell goods or services. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 917 (9th Cir. 2012) (holding unsolicited "robot-calls [that] urged the listener to 'redeem' his Reward Zone points, directed him to a website where he could further engage with the RZP, and thanked him for 'shopping at Best Buy'" violated the TCPA) (citing FCC 2003 Report and Order at 14097–98 ¶¶ 140–42); *see also* Ex. 19, *Banks v. Caribbean Cruise Line, et al.*, Case No. 1:12-cv-00584-JG-VMS, Dkt. 49, Report and Recommendation at 11-13, 26 n.11 (recommending denial of CCL's motion for summary judgment, rejecting argument that the same calls at issue in this case fit under a political call exemption, and suggesting that "a legal finding that [the survey call] was made for a commercial purpose could be entered" by the district court); Ex. 20, *Banks* Docket Sheet at 4, Order Adopting Magistrate's Recommendation and Report.

15

Moreover, in disputing any political call defense, Plaintiffs will rely on common proof, which would include, *inter alia*, proffering evidence of the monetary benefits realized by Defendants as a result of their survey calls, and of the statements made by VOMT and CCL's principal Dan Lambert in which he states that the political program was to be "the next great mousetrap" and a "a great way to get lots of sales." Ex. 3, CCL Dep. at 189-90. Thus, the applicability of any political exemption defense asserted by Defendants, and the proof used to support or refute it, will not be unique to any one class member.

**Fifth,** and finally, the amount of statutory damages to which Plaintiffs and the class members are entitled is also a common question capable of determination on a class-wide basis. *See Dukes*, 131 S. Ct. at 2551. Here, Plaintiffs allege a single violation of the TCPA, which exists to address privacy violations caused by the annoying and invasive transmission of unsolicited telemarketing calls. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). The TCPA provides for statutory injunctive relief and monetary damages of $500 per violation to remedy the injuries resulting from such violations, which may be trebled to $1,500 if Defendants' conduct is proven willful. 47 U.S.C. § 227(b)(3)(C). As such, calculating the amount of statutory damages, as well as proving that Defendants' conduct was knowing and willful, and therefore that damages should be trebled, will be a collective task. *See, e.g., Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010) (availability of statutory damages in TCPA case made individualized damages inquiry unnecessary and class certification appropriate).

In sum, the common questions presented by the Plaintiffs are the exact sort found to apply in TCPA class actions, and justify class certification here.

### *Typicality*

Rule 23(a) also requires that the Plaintiffs' claims are typical of the Proposed Classes. Fed. R. Civ. P. 23(a)(3). The purpose of the typicality inquiry is to ensure that the named plaintiffs will be proving

the class members' claims as they pursue their own. *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (typicality inquiry asks "whether the named representatives' claims have the same essential characteristics as the claims of the class at large"). A named plaintiff's claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *See id.* (internal quotation omitted). Commonality and typicality overlap, and a finding of one usually results in a finding of the other. *Id*; *see also Gen. Tel. Co. of Southwest*, 457 U.S. at 158, n. 13 ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

Here, the "essential characteristics" between Plaintiffs' claims and those of the respective classes they seek to represent are more than significant—they are practically identical. First, each of the Plaintiffs' and class members' claims result from the exact same conduct—Defendants' unsolicited automated political survey calls. Additionally, the automated surveys contained the exact same message—an offer for a purportedly "free cruise" in exchange for answering political or public opinion based questions. Ex. 3, CCL Dep. Lambert at 64-65 (agreeing that "all the survey calls transferred to Caribbean Cruise Line mention[ed] a free cruise"). Moreover, all of the surveys had the same purpose—to benefit Defendants by creating potential leads that, if successful, would generate profits for Defendants. As a result, each of the Plaintiffs' rights under the TCPA were violated by the same common course of conduct that Defendants subjected every other putative class member to, and Plaintiffs, like all of the other class members suffered the exact same injury. Nothing more is required, and typicality is satisfied.

### Adequacy

Finally, Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This determination has two elements: the adequacy of the named plaintiffs' counsel, and the adequacy of the named plaintiffs' ability to protect the

separate and distinct interests of class members." *Adams*, 2001 WL 336830 at *6. A named plaintiff

will be adequate so long as his or her claims are not "antagonistic or conflicting…with other

members of the class," and he or she has a "sufficient interest in the outcome of the case to ensure

vigorous advocacy." *Maxwell v. Arrow Fin. Servs., LLC*, No. 03 C 1995, 2004 WL 719278, at *5 (N.D.

Ill. Mar. 31, 2004). For their part, class counsel is "adequate" if they are competent and have the

resources necessary to sustain the complex litigation necessitated by class claims. *See Gomez v. Ill.

State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987).

Plaintiffs and their Counsel are undoubtedly adequate to represent the Proposed Classes

here. Foremost, each Plaintiff has the same interests as the other members of their respective

classes. That is, they, like every other member of the Proposed Classes they seek to represent,

received unsolicited telemarketing calls from Defendants in violation of the TCPA. They thus share

the same interest in ensuring that Defendants' conduct does not continue in the future, and in

recovering the statutory damages to which they are entitled. Further, Plaintiffs have and will

continue to vigorously prosecute this case, including by responding to numerous sets of written

discovery, providing Defendants with various documents, and sitting for their depositions in

Chicago. Additionally, each of the Plaintiffs have a full understanding of the case, their duties as

class representatives, and have affirmatively committed themselves to acting in the Proposed

Classes' best interests at all times. *See e.g.* Ex. 21, Excerpts of Deposition of Parkes at 76-78 (stating

that he would "do whatever I need to do" in response to Defendants' question about his ability to

commit himself to the demands of this case); Ex. 22, Excerpts of Deposition of Stone at 94-96

(indicating her refusal to walk away from the litigation if Defendants compensated her individually,

because she is a class representative and the putative class needs to be compensated too); Ex. 23,

Excerpts of Deposition of Birchmeier at 36 (explaining his obligations as a class representative and

recognizing his "need to be a full participant in this case"). Moreover, none of the Plaintiffs has any interests antagonistic to the Proposed Classes.

Plaintiffs have also retained experienced and skilled counsel who have, and will continue to, adequately represent the interests of Proposed Classes. *See* Exs. 25 & 26, Declaration of Scott Rauscher and attached Loevy & Loevy Firm Resume, and Declaration of Jay Edelson and attached Edelson LLC Firm Resume, respectively. That is, Plaintiffs' Counsel have a wealth of experience in prosecuting complex class actions and have routinely served as class counsel in similar actions. *Id.* Thus, both Plaintiffs and their counsel are more than adequate to represent the Proposed Classes and the final requisite to certification under Rule 23(a) is satisfied.

## V.      The Classes Satisfy Rule 23(b)(3)

The Proposed Classes also satisfy the dual requirements of Rule 23(b)(3): classwide issues predominate, and a class action is the superior method to handle this lawsuit.

### *Predominance*

Rule 23(b)(3)'s "predominance requirement looks to whether the proposed class is 'sufficiently cohesive' to warrant 'adjudication' by representation." *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 383 (N.D. Ill. 2011) (citing *Dukes*, 131 S. Ct. at 2566)). This does not mean, however, that individual issues need be entirely absent. Rather, "[c]ourts in this district agreed that the presence of some limited issues requiring individual inquiry do not defeat predominance." *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181, at *15 (N.D. Ill. Jan. 4, 2013). As such, "[p]redominance is satisfied where common evidence may prove the class member's claims," even in the presence of limited individual issues. *Id.* (citing *Messner*, 669 F.3d at 815).

Here, the foregoing discussion about the common issues confronting the Proposed Classes and the adequacy of the Plaintiffs demonstrate that Rule 23(b)(3)'s predominance prong is satisfied. As discussed above, Defendants employed uniform practices with regard to each class member: (i) they used a single automated dialing system to deliver the recorded messages, (ii) each of which offered the called party a "free" cruise in exchange for taking a political or public opinion survey. Moreover, (iii) each call was designed to sell a more expensive vacation package and a timeshare interest for Defendants' under their respective marketing agreements, and each was made (iv) without first obtaining the call recipient's express consent. As such, Plaintiffs' and the Proposed Classes' claims will be subject to common proof, and this litigation should be adjudicated on a class-wide basis.

Additionally, where, as here, "a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation." *Kernats v. Comcast Corp.*, No. 09 C 3368, 2010 WL 4193219, at *8 (N.D. Ill. October 20, 2010); *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) (same); *Young v. County of Cook*, 06 C 552, 2007 WL 1238920, at *7 (N.D. Ill. Apr. 25, 2007) (same). Further, the sheer number of common issues demonstrates that such issues predominate. *See supra* at 11-16; *Messner*, 669 F.3d at 815 n.5.

### Superiority

Finally, a class action is the superior method to resolve the Plaintiffs' and the Proposed Classes' claims. *See* Fed. R. Civ. P. 23(b)(3), as there is a substantial risk that class members' claims would be forfeited absent the instant class action. Namely, the TCPA does not provide for statutory fee-shifting, so any potential individual judgment would likely be dwarfed by the attorneys' fees and costs needed to get there. As a result, without certification, class members will lose their rights by attrition, and Defendants will be able to continue their mass campaign of illegal robocalls. *See Pastor*

*v. State Farm Mut. Auto. Ins. Co.,* 487 F.3d 1042, 1047 (7th Cir. 2007) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). This alone demonstrates that resolution on a class-wide basis is the superior method of adjudicating Plaintiffs' and the Proposed Classes' claims. *See Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 WL 4931001, at *2-3 (N.D. Ill. Nov. 29, 2010) (certifying class and noting that individual damages would likely be modest).

In addition, even if individual lawsuits were filed, hearing essentially the same case over and over again would be patently inefficient. In contrast, class certification would avoid the need for multiple individual actions, and with that the duplicative proceedings, which would inevitably result in enormous and unnecessary expense to both the judicial system and its litigants. Relatedly, class certification would promote consistency of rulings and judgments, while at the same time giving all parties the benefit of finality by resolution in a single action. This too, favors certification.

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an order (i) certifying the Proposed Classes, (ii) appointing Plaintiffs as the respective Class Representatives, (iii) appointing Jay Edelson of Edelson LLC and Scott Rauscher of Loevy & Loevy as Class Counsel, and (iv) granting any such further relief as this Court deems reasonable and just.

Date: October 10, 2013                          Respectfully submitted,

                                                By: /s/            Scott Rauscher
                                                *Interim Co-Lead Class Counsel*

                                                By: /s/            Jay Edelson
                                                *Interim Co-Lead Class Counsel*

21

| | |
|---|---|
| Jay Edelson<br>Rafey S. Balabanian<br>Christopher L. Dore<br>Eve-Lynn J. Rapp<br>EDELSON LLC<br>350 North LaSalle Street, Suite 1300<br>Chicago, Illinois 60654<br>Telephone: (312) 589-6370<br>Email: jedelson@edelson.com<br>rbalabanian@edelson.com<br>cdore@edelson.com<br>erapp@edelson.com<br><br>***Counsel for Stone, and Interim Co-Lead Class Counsel*** | Scott Rauscher<br>Jonathan I. Loevy<br>Michael I. Kanovitz<br>LOEVY & LOEVY<br>312 N. May Street, Suite 100<br>Chicago, Illinois 60607<br>Telephone: (312) 243-5900<br>Email: scott@loevy.com<br>jon@loevy.com<br>mike@loevy.com<br><br>***Counsel for Birchmeier and Parkes, and Interim Co-Lead Class Counsel*** |
| Scott D. Owens<br>LAW OFFICES OF SCOTT D. OWENS, ESQ.<br>664 East Hallandale Beach Boulevard<br>Hallandale, Florida 33009<br>Telephone: (954) 306-8104<br>Email: scott@scottdowens.com<br><br>***Counsel for Stone*** | |

## <u>CERTIFICATE OF SERVICE</u>

I, Scott Rauscher, an attorney, hereby certify that on October 10, 2013, I caused the foregoing to be filed by the Court's CM/ECF system and to be served on all counsel of record.


/s/     Scott Rauscher