## IN THE UNITED STATES DISTRICT COURT FOR THE
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| GRANT BIRCHMEIER, STEPHEN PARKES, and REGINA STONE, on behalf of themselves and a class of others similarly situated, | Case No. 1:12-cv-04069 |
| *Plaintiffs*, | Honorable Matthew F. Kennelly |
| *v.* | |
| CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY, LLC, THE BERKLEY GROUP, INC., and VACATION OWNERSHIP MARKETING TOURS, INC., | |
| *Defendants.* | |

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

I.      THE CLASS IS OBJECTIVELY ASCERTAINABLE .................................................3

      A.      The Ascertainability Requirement Does Not Require Plaintiffs
              to Identify Each Class Member So Long as the Proposed
              Classes are Objectively Defined ...........................................................3

      B.      Class Members Can Be Identified By Defendants' Own Records,
              By the Records of Third Parties, and By Class Member Affidavits.......6

              i.      Because there exist lists identifying the phone numbers called
                      by Defendants, as well as the phone numbers used by them to
                      make the calls, denying certification due to Defendants' failure
                      to maintain a complete call list would be improper ......................6

              ii.     Courts in this District routinely allow the use of sworn
                      testimony and affidavits to demonstrate class membership ........8

      C.      Individual and Merits-Based Issues Do Not Preclude Ascertainability ...............9

              i.      Whether the ESG Defendants were responsible for
                      effectuating the call .....................................................................9

              ii.     Whether the survey was "political" in nature, whether
                      the same survey was given to each Class member, and
                      whether an exemption applied...................................................11

              iii.    Whether the call recipient actually took the survey,
                      opted for an upgraded vacation, or was required to view a
                    timeshare presentation, and whether that presentation
                    related to a Berkley timeshare ...................................................12

                iv.    Whether the call was made to a landline or cell phone ..............13

                v.      Whether the call recipient suffered actual damages....................14

                vi.    Ascertaining Class membership will not require the
                    Court to prematurely determine the issue of vicarious
                    liability or the merits of the case...............................................14

II.     THE PROPOSED CLASSES OTHERWISE MEET ALL OF RULE 23'S
      REQUIREMENTS .......................................................................................16

**A.** **Rule 23's Numerosity Requirement is Satisfied**............................................16

**B.** **Rule 23's Commonality and Predominance Requirements are Satisfied**...............18

**C.** **Rule 23's Typicality Requirement is Satisfied**....................................................19

**D.** **Rule 23's Adequacy Requirement is Satisfied**...................................................20

**E.** **Rule 23's Superiority and Manageability Requirements Are Satisfied**..................22

**<u>CONCLUSION</u>**.................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) ................................................*passim*

*Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126 (7th Cir. 1974)............................................8

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012) ................................4, 8, 9

*Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2011 WL 4628744
    (N.D. Ill. Sept. 30, 2011) ................................................................................................14 n.16

*CE Design v. Beaty Const., Inc.*, No. 07 C 3340, 2009 WL 192481
    (N.D. Ill. Jan. 26, 2009) ................................................................................5, 7-8, 24

*Chapman v. Wagener Equities, Inc.*, 09 C 07299,, 2014 WL 540250
    (N.D. Ill. Feb. 11, 2014) ............................................................................................*passim*

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012) ................................11

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983) ............................................19, 20

*Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974)................................................24

*Foreman v. PRA III, LLC*, No. 05 C 3372, 2007 WL 704478 (N.D. Ill. Mar. 5, 2007) ..............................16

*GM Sign, Inc. v. Group C Cmcn's*, No. 08 C 4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ..................18

*Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769
    (N.D. Ill. June 22, 2009) ................................................................................................5, 22

*Harris v. comScore*, 292 F.R.D. 579 (N.D. Ill. 2013) ................................23

*Herkert v. MRC Receivables Corp.*, 254 F.R.D. 334 (N.D. Ill. 2008) ................................8, 9 n.7

*Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152 (N.D. Ill. 2009)................................12

*Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008) ................................*passim*

*In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211 (N.D. Ill. 1980)................................23-24

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,*
    *Report and Order,* 18 FCC Rcd. 14014, 2003 WL 21517853 (F.C.C. July 2, 2003)........................11

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,*
    *Request of ACA International for Clarification and Declaratory Ruling,*
    23 F.C.C. Rcd. 559 (2008) ................................................................................................11 n.12

*Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620 (N.D. Ill. 2007)............................................................3, 4

*Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013) ...........................................1, 12

*Levitt v. Fax.com*, No. 05-949, 2007 WL 3169078 (D. Md. 2007) ...........................................7 n.3

*Manno v. Healthcare Revenue Recovery Grp.*, LLC, 289 F.R.D. 674 (S.D. Fla. 2013)...........1, 13

*Marcus v. BMW of North America*, LLC, 687 F.3d 583 (3d Cir. 2012) ...........................................7 .3

*Maxwell v. Arrow Fin. Servs., LLC*, No. 03 C 1995, 2004 WL 719278
    (N.D. Ill. Mar. 31, 2004).................................................................................22

*Messner v. Northshore Univ. Health System*, 669 F. 3d 802 (7th Cir. 2012) .........................14, 19

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953-54 (7th Cir. 2006) .........................23

*Northside Chiropractic, Inc. v. Yellowbook, Inc.*, No. 09 CV 04468, 2012 WL 3777010
    (N.D. Ill. Aug. 29, 2012)..............................................................................15

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 WL 4931001
    (N.D. Ill. Nov. 29, 2010)...............................................................................22

*Pastor v. State Farm Mut. Auto. Ins. Co.*, 05 C 1459, 2005 WL 2453900
    (N.D. Ill. Sept. 30, 2005).............................................................................15

*Phillips Randolph Enters., LLC v. Rice Fields*, 2007 W 129052 (N.D. Ill. Jan. 11, 2007) .........22

*Quality Mgmt. & Consulting Servs., Inc. v. SAR Orland Food Inc.*, No. 11 C 06791,
    2013 WL 5835915 (N.D. Ill. Oct. 30, 2013).........................................6, 7 n.3

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.* 281 F.R.D. (E.D. Wis. 2012) .........21

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ...........................................18

*Sadowski v. Med1 Online, LLC*, No. 07 C 2973, 2008 WL 2224892
    (N.D. Ill. May 27, 2008)..............................................................................17

*Saf-T-Gard Int'l, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312 (N.D. Ill. 2008) .........6, 7 n.3

*Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181
    (N.D. Ill. Jan. 4, 2013)................................................................................18, 19

*Smith v. Greystone Alliance LLC*, No. 09C5585, 2010 WL 2680147 (N.D. Ill. 2010)...........8

*State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408 (2003) ...........23
*Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894
    (N.D. Ill. 2010)............................................................................................14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................................................................................12 n.13, 15

**Rules & Statutes**

47 C.F.R. § 64.1200 ...........................................................................................................................................11 n.12

47 U.S.C 227 ..........................................................................................................................................................*passim*

Fed. R. Civ. P. 23 ...................................................................................................................................................16, 24

**Other**

Manual for Complex Litigation § 21.222 (4th ed. 2004) ...............................................................................4

Newberg on Class Actions § 3:5 (4th ed. 2008) .............................................................................................3, 5n.2

## INTRODUCTION

Starting in the summer of 2011, millions of people received unsolicited robocalls announcing they would receive a free cruise in exchange for taking a political or public opinion survey. The calls were designed to sell Caribbean Cruise Line's vacation packages and Berkley's timeshare interests, and they plainly violated the Telephone Consumer Protection Act's ("TCPA") prohibition on making unsolicited robocalls to residential and cellular telephones. *See* 47 U.S.C. § 227. Courts throughout the country routinely certify these types of cases, *see, e.g., Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013) (certifying a class of individuals who received illegal automated calls under the TCPA); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013) (certifying nationwide class of unsolicited text message recipients); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) (same), and because essentially every issue can be determined on a classwide basis, certification is likewise appropriate here.

Incredibly, Defendants make no effort to argue the calls were authorized—the defense most defendants flock to when facing this type of case. Instead, Defendants pin their hopes of defeating certification on a single argument: that Plaintiffs have failed to satisfy Rule 23's unwritten ascertainability requirement because they cannot yet specifically identify individual class members. Stated simply, Defendants are wrong on the law and the facts.

Defendants are wrong on the law because courts in this District and elsewhere have repeatedly held that plaintiffs need not identify every individual putative class member to satisfy Rule 23. Instead, Plaintiffs must demonstrate that the Proposed Classes are capable of being ascertained by objective criteria, which they have done: any individual who received a call on his or her cellular or residential telephone offering a "free" cruise in exchange for taking a political or public-opinion survey is a member of one of the Proposed Classes.

Defendants are wrong on the facts because Plaintiffs do have records identifying many of the telephone numbers that received the illegal survey calls. Specifically, Plaintiffs have received:

- three spreadsheets that CCL produced in discovery containing a total of 174,930 unique telephone numbers of individuals who unquestionably received the free cruise call and were subsequently transferred to CCL or one of is call centers, *see* Ex.27, Sampling of CCL0002996, CCCL0004523, CCL0005804; Ex. 28, CCL Responses to Birchmeier's Third Set of Interrogatories at Resp. No. 18 (explaining that these documents show "the customer's phone number"); Ex. 29, Declaration of Ersin Ackini (explaining how the numbers within the respective documents were counted);[1]

- a massive file of telephone numbers—including those of each of the remaining Plaintiffs—that the President of the ESG Defendants, Jacob DeJongh, originally provided to Contract Center Compliance ("CCC"), his supposed "scrubbing database", and which Plaintiffs have good reason to believe may contain all of the numbers that were uploaded into the dialer during the time period DeJongh subscribed to its services, Ex. 30, Sampling of CCC Data;

- contemporaneous consumer complaints made to regulatory authorities and online complaint boards, Exs. 16 & 17; and

- documents collected by the ESG Defendants identifying telephone numbers that received the survey calls. Def. Ex. K.

Thus, Defendants' ascertainability concerns—which in reality are premature concerns about providing notice—do not provide a basis for denying class certification.

Defendants' other arguments against Rule 23's requirements simply mimic their arguments regarding ascertainability, they fare no better. In short, there should be no doubt that in this case, a class action is the superior method to adjudicate Plaintiffs and the Proposed Classes' claims, and Defendants' attempts to confuse the issues through pure speculation should not stand in the way of certification.

---

[1]     All exhibits cited in Plaintiffs' motion and reply are numbered consecutively and without repetition. Plaintiffs motion attached 26 exhibits, so the first exhibit attached to their reply brief is Exhibit 27.

## ARGUMENT

### I.     THE CLASS IS OBJECTIVELY ASCERTAINABLE.

Defendants' main challenge to certification relates to Plaintiffs' ability to satisfy Rule 23's implicit ascertainability requirements. Defendants claim the Proposed Classes are "amorphous" blobs of individuals that have not been and never could be identified without requiring the Court to make "arduous" individualized inquires. Defendants are wrong. Plaintiffs have demonstrated the Classes are ascertainable because (i) they are indisputably defined by reference to objective criteria, and (ii) there are presently a multitude of documents that identify Class members, which the parties can use to corroborate class membership. As for all the purported "individualized" issues that call ascertainability into question, all that needs to be said is they are irrelevant to the ascertainability analysis and, as speculation, offer no probative value. Ultimately, Plaintiffs have readily established that the Proposed Classes are ascertainable.

#### A.     The Ascertainability Requirement Does Not Require Plaintiffs to Identify Each Class Member So Long as the Proposed Classes are Objectively Defined.

Defendants' central argument against ascertainability is based on a fundamental misunderstanding of the law. Defendants argue the Proposed Classes are not ascertainable because the members of the Proposed Classes haven't been identified. (Berkley Opp. at 6; CCL Opp. at 10, 12.) That is not the law.

Class members need not be specifically identified for certification to be appropriate. *See Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007) ("Plaintiff need not identify each class member to secure class certification."); Newberg on Class Actions § 3:5 (4th ed. 2008) (same). Rather, the focus of Rule 23's ascertainability requirement is, and has always been, on whether classes members "can be ascertained by reference to objective criteria," such as by "reference to

3

defendants' conduct," *Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008), as opposed to "subjective criteria, like the class members' state of mind." *Lau*, 245 F.R.D. at 624.

Judge Feinerman, in *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012), recently rejected the same arguments Defendants make here. The plaintiffs in *Boundas* sought certification of a class that received "promotional gift cards [that were later] voided . . . despite having credit remaining[.]" *Id.* at 411. The proposed class included individuals who currently held a gift card and individuals who had thrown one away, only a "small proportion of [which could be] identified by [the defendant's records.]" *Id.* at 417. In certifying the proposed class, Judge Feinerman explained:

> It is enough that the class be ascertainable. The class in this case consists primarily of individuals holding an Abercrombie promotional gift card whose value was voided on or around January 30, 2010. That criterion is as objective as they come. The class also includes individuals who threw away their cards because they were told that the balances had been voided. That criterion is not as objective as actually holding a physical card, but anybody claiming class membership on that basis will be required to submit an appropriate affidavit, which can be evaluated during the claims administration process. . . .

*Id.* at 417-18 (citing Manual for Complex Litigation § 21.222, at 270 (4th ed. 2004) (class definition "must be precise, objective, and presently ascertainable")).

The same reasoning presently applies, as the complexity of ascertaining Proposed Class members in this case is no more difficult (and is likely less difficult) than it was in *Boundas*. There, class members who had thrown away their cards would have to swear—through an "affidavit procedure" like that anticipated by Defendants here (*see* CCL Opp. at 18)—not just that they had possessed a gift card, but that the card (i) had value on it when thrown away and (ii) was discarded in reliance upon the defendant's representations that it had expired. *See Boundas*, 280 F.R.D. at 417. Here, presently unidentified Class members (*i.e.*, those not appearing in Defendants' records) can simply swear that they received an offending call on a cellular or residential telephone during the relevant time period. Finally, if Plaintiffs prevail at trial, affidavits from Class members, "can be

4

evaluated during the claims administration process" to address any remaining concerns, just as *Boundas* suggested. *See id.*

In this case, there is no question that Plaintiffs' class definitions are objectively defined: if an individual's cellular or residential telephone number was called by, called on behalf of, or called for the benefit of Defendants, offering a purportedly free cruise in exchange for taking an automated political or public opinion survey, he or she is a member of one of the Proposed Classes. Courts in this District, and elsewhere, have consistently held similar objectively defined TCPA classes satisfy Rule 23's ascertainability requirement. *See CE Design v. Beaty Const., Inc.*, No. 07 C 3340, 2009 WL 192481, at *3-4 (N.D. Ill. Jan. 26, 2009) ("A class is identifiable if its members can be ascertained by reference to objective criteria," including a "defendant's conduct," such as receiving an unsolicited fax); *see also Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *3-4 (N.D. Ill. June 22, 2009) (holding a class of all persons who received a fax with a certain message was appropriate because it "provide[d] 'precise, objective criteria that would be within the personal knowledge of the potential class member,' [] making it [] apparent from the face of the notice whether a person is a [] member of the class."); *Agne*, 286 F.R.D. at 566 (holding a class of "all persons…sent text messages advertising Papa John's pizza" to be "precise and objective").[2]

Thus, because the Proposed Classes here are defined by reference to receipt of Defendants' calls offering a free cruise in exchange for taking a political survey, Plaintiffs' Proposed Classes should likewise be found to have satisfied the ascertainability requirement.

---

[2]     Defendants seem to suggest that the Proposed Classes are not ascertainable because they would be administratively burdensome and because Plaintiffs have "not answer[ed]… who [will] get notice of and be bound by the decision in this case." (CCL Opp. at 11-12.) Ultimately, these challenges relate to class notice and are not properly considered in connection with a motion to certify. *See Agne*, 286 F.R.D. at 566 ("[n]otice considerations technically do not come into play until [after] class [] certifi[cation],") (citing Newberg on Class Actions § 4:35). Nonetheless, as such issues can affect class manageability, Plaintiffs address such concerns *infra* (*see* § II.E), where they are more appropriately addressed.

**B.    Class Members Can Be Identified By Defendants' Own Records, By the Records of Third Parties, and By Class Member Affidavits.**

Despite these objective criteria, Defendants contend that the Proposed Classes are not ascertainable because "no records of any of the calls" exist, and as a result, it would be impossible to determine who received a free cruise call. (CCL Opp. at 10, 12; Berkley Opp. at 6.) Put differently, Defendants contend class certification should be denied because they failed to create (or maintain) records identifying everyone who was subjected to the illegal calling campaign. They are wrong.

**i.    Because there exist lists identifying the phone numbers called by Defendants, as well as the phone numbers used by them to make the calls, denying certification due to Defendants' failure to maintain a complete call list would be improper.**

As explained above, Plaintiffs have records identifying hundreds of thousands of telephone numbers that received the illegal robocalls. The fact that there may not be complete records of each and every call made does not warrant the denial of class certification. The cases on which Defendants rely do not hold otherwise.

For example, in *Saf-T-Gard Int'l, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312 (N.D. Ill. 2008), the court found the class to be unascertainable because "there appear[ed] to be *no* list of numbers from which the parties (or the court) may reasonably assume class members could be identified." *Id.* at 312 (emphasis in the original). But, importantly, the court noted that even a "subset of [a] universal list" could have been sufficient. *Id.* Similarly, in *Quality Mgmt. & Consulting Servs., Inc. v. SAR Orland Food Inc.*, No. 11 C 06791, 2013 WL 5835915 (N.D. Ill. Oct. 30, 2013), the only list of potential class members came from defendant's competitor, and that competitor "refused to identify the source of the database" and "admitted that he ha[d] no personal knowledge of how [defendant] compiled the recipient list". *Id.* at *2. The court there thus rejected plaintiff's efforts to rely on defendant's competitor's list, finding it was "unreliable," and "would require the [c]ourt to rely on a

long chain of unsupported inferences." *Id.* at *4.[3] Unlike *Saf-T-Gard* and *Quality Mgmt.*, in this case Plaintiffs possess various records allowing them to identify Class members, and as Defendants produced the majority of these lists, Defendants cannot question their reliability.[4]

Finally, Defendants' failure to ensure that adequate records were kept or preserved should not be rewarded. Specifically, although CCL may have at some point requested that DeJongh maintain his records, it was anything but diligent in ensuring that he did so (such as requiring that he produce the call records during the calling campaigns or cutting off its participation with the program if/when he didn't).[5] The truth is that CCL never required DeJongh to maintain precise records, and then failed to ask that its telephone carriers (or that its agent call centers) maintain their records of the calls once the litigation began. Ex. 28, CCL Responses to Birchmeier's Third Set of Interrogatories at Resp. No. 19 (admitting that "CCL has not otherwise requested or received 'call detail records' from [its] telephone service providers such as Sprint").

As such, denying certification because Plaintiffs do not possess a full list of call records here would essentially reward Defendants for undertaking their violation of federal law on a large scale. *Beaty Const.*, 2009 WL 192481, at *3-4 ("class certification will not be barred "because the defendant

---

[3]    Defendants also reference *Levitt v. Fax.com*, No. 05-949, 2007 WL 3169078 (D. Md. 2007) and *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593-94 (3d Cir. 2012), but those cases are also distinguishable. In *Levitt*, plaintiffs had absolutely no information about the phone numbers that were called, and regardless, the Court cited the individualized nature of the consent—specifically as it related to the need to "make a determination for each class member as to…the absence of a prior express business relationship"— as the basis for decertifying the class. 2007 WL 3169078, at *5-7. Likewise, in *Marcus*, the court did not hold that records were always required, but rather, cautioned against the use of affidavits where they would need to include statements about substantive, and potentially subjective, issues such as whether and how defendants' products damaged class members. *Marcus*, 687 F.3d. at 593-94.

[4]    Importantly, in both *Saf-T-Gard* and *Quality Mgmt.*, the Court did not address the possibility of using class members' affidavits as a means of ascertaining the proposed classes.

[5]    Indeed, the program at issue continued unabated for a period of time after Plaintiffs initiated their lawsuit. Ex. 12, Poole Dep. at Dep. Ex. 3 (showing that leads from the survey calls at issue were still being received in August 2012). Moreover, CCL's founder acknowledged that CCL destroyed documents (after this litigation started), which showed the identity of individuals who accepted the cruise offer. Ex. 31, Supplemental Excerpts of CCL 30(b)(6) Dep. at 165-167 (Lambert testifying that "[d]eal sheets are collected and then destroyed after a customer's data is entered[,]" and similarly, that CCL does not keep records of which leads are linked to specific marketing programs because "[t]here [wa]s no reason for [CCL]to know that").

has lost or destroyed the list of its alleged victims."); *see also, e.g., Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 139 (7th Cir. 1974) (class actions cannot be defeated by destroying records); *Smith v. Greystone Alliance LLC*, No. 09C5585, 2010 WL 2680147, at *3 (N.D. Ill. 2010) (failure to maintain a list of contacts will not defeat class certification); *Agne*, 286 F.R.D. at 566 ("it would be unfair to deny class certification because of the potential difficulty of identifying the class members where that difficulty is mostly due to the fact that [defendant] [] destroyed the call lists that it used.").

ii.     **Courts in this District routinely allow the use of sworn testimony and affidavits to demonstrate class membership.**

In addition to using the lists of telephone numbers discussed above, class membership can be established by affidavit or claim form, a process that courts in this District have repeatedly authorized. As noted above, Judge Feinerman approved the use of affidavits to identify class membership in *Boundas. See Boundas,* 280 F.R.D. at 417. Likewise, in *Beaty*—where the plaintiff alleged the defendant's hiring of a third-party vendor to send out facsimile advertisements to thousands of businesses violated the TCPA—the court held that it would not "bar class certification because the defendant has lost or destroyed the list of its alleged victims." 2009 WL 192481, at *4. Relying on *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 334, 348 (N.D. Ill. 2008), the *Beaty* Court went on to explain that because "a potential class can be defined in reference to objective criteria, in this case, the defendants' conduct," class membership could be determined through the "represent[ations] to the Court—via affidavit under the penalty of perjury—that they received the fax in question on the date in issue." *Beaty*, 2009 WL 192481, at *4; *see also Herkert*, 254 F.R.D. at 348 (holding that information provided on affidavits allowed "the classes [to be] ascertainable based on objectively identifiable criteria").

The same reasoning applies here. Because ascertaining class membership relies on objective criteria (whether each Class member received an offending call) and their subjective reaction to that

call is irrelevant, Class members can be identified through sworn statements about Defendants'

conduct in addition to Defendants' records. Specifically, Class members can indicate (i) that they

received a call offering a free cruise (ii) that they were asked to take a political and/or public opinion

survey, (iii) and the time period in which the call was received.[6] Affidavits from the Class members,

like in *Boundas*, could then "be evaluated during the claims administration process" if Plaintiffs

prevail at trial. *Boundas* 280 F.R.D. at 417; *see also Agne*, 286 F.R.D. at 566 (holding that "whether

other consumers received the messages can be determined using claim forms and phone records, as

well as any records [p]laintiff may be able to obtain from [the party charged with actually sending the

message]").[7]

### C. Individual and Merits-Based Issues Do Not Preclude Ascertainability.

Finally, Defendants try to invent a number of individual issues to challenge the objectivity of

the class definitions, but none have any bearing on the ascertainability analysis.

#### i. Whether the ESG Defendants were responsible for effectuating the call.

Defendants argue that there is no way to trace all of the calls back to them because

supposedly (i) "ESG was not the only entity conducting [a free cruise] survey[] for CCL,"[8] and (ii)

---

[6]    Defendants claim that determining "whether the call was made since May 24, 2008" creates an individual issue precluding certification (Berkley Opp. at 12), but that is hardly the case. Testifying to the specific date or time of the alleged violation is plainly objective, and a fact of almost every class action. Moreover, testimony suggests that the calls occurred during a discrete, and relatively short, period of time between August 2011-August 2012. *See* Ex. 12, Poole Dep. at Dep. Ex. 3 (recording transferred calls from August 8, 2011 to August 5, 2012); Ex. 32, Supplemental Excerpts of Broomfield FTC Dep. at 66-68 (explaining the calls started around September 2011 and ended around the Fall of 2012). Defendants' concerns are just manufactured.

[7]    Alternatively, should the Court deem it necessary, Plaintiffs could limit the class definitions to only those individuals whose membership in one of the Proposed Classes could be confirmed by their telephone statements and/or Defendants' records. *See Herkert*, 254 F.R.D. at 348 ("[a]ny doubt over the ascertainability of the class can be resolved by amending the class definition.").

[8]    Defendants do not dispute that the other free cruise calls they discuss—*i.e.* those without a political or public opinion survey were made for the benefit of CCL (or its affiliated entity Plaza Resorts), VOMT, and Berkley. CCL and VOMT apparently attempt to distance themselves from these calls, however, by taking issue with Plaintiffs' statement that DeJongh used money he received from CCL to purchase the telephone numbers used in this case. Specifically, CCL and VOMT contend that DeJongh's testimony shows that CCL

other companies were conducting surveys for CCL that were political in nature. (CCL Opp. at 15.) This argument is a non-starter. For one, the evidence doesn't support it. As noted above, Defendants' Marketing Director testified that the political survey program at issue was the only calling program involving outbound surveys. Ex. 33, Supplemental Excerpts of Poole Deposition at 38-39, 50, 167. Moreover, even if CCL actually participated in more than one political survey program, Berkley, VOMT, and CCL all stood to benefit collectively by way of their lead agreement, and it would not make the proposed class definitions in this case any less objective.[9] And as has already been explained, anyone who didn't receive a political or public-opinion survey offering a free cruise in exchange for taking the survey would not be part of one of the Proposed Classes.[10] Class members shouldn't have any problem attesting to that fact, as each one of the named-Plaintiffs had no problem recalling the calls in their deposition, including former Plaintiff Vigus who specifically did not recall hearing the name "Political Opinions of America," a telltale sign of the political survey calls. Ex. 34, Supplemental Excerpts of Vigus Deposition at 65.[11]

---

did not purchase the telephone numbers. (CCL Opp. at 4.) But that was never the point, as Plaintiffs never said that CCL directly purchased the numbers. Rather, Plaintiffs noted that DeJongh used money from CCL to purchase the numbers, and the evidence supports that statement. *See* Ex. 32, Supplemental Excerpts of Broomfield FTC Dep. at 64-67.

[9] Despite that there is no evidence that Defendants actually utilized the other SROs, to the extent the Court believes their existence presents an issue, the class definition could easily be modified to include only those individuals who could attest to hearing one of DeJongh's sham polling companies—*e.g.* Political Opinions of America or Independent Research Group—mentioned during the free cruise calls.

[10] Regardless, Defendants' claim that "30% to 40% of the calls made did not include the cruise incentive" (CCL Opp. at fn. 25; Berkley Opp. at 10), is belied by the evidence, and specifically by previous representations made to various government agencies about the calls at issue in this case. *See* Ex. 43, August 13, 2012 Letter from ESG to Office of the Kentucky Attorney General (stating that "*[f]or each and every call completed,* the individual contacted was informed that by completing the survey, they would receive the free incentive.") (emphasis added); *Id.*, August 6, 2012 Letter from ESG to Office of the Illinois Attorney General at 2 (indicating that it has records of 72,000 people it called in Illinois, and that each received a free cruise offer).

[11] The Court may recall that Ms. Vigus received a non-political call, which among other things, gave rise to her motion to separate the case (Dkt. 151)—never mind that it was ultimately dropped in the face of Defendants' motion for sanctions against Ms. Vigus and her counsel. (Dkt. 156.)

ii. **Whether the survey was "political" in nature, whether the same survey was given to each Class member, and whether an exemption applied.**

Next, Defendants contend that because ESG conducted "different surveys…with different scripts," it would be necessary to determine which *type* of survey was used in order to ascertain class membership. (CCL Opp. at 16; Berkley Opp. at 10.) Presumably, Defendants' theory here is that determining the content of each survey call—*i.e.* determining whether the calls contained a "political," "religious," or "informational survey,"—and determining whether the survey's results were ultimately provided to a political organization will be necessary to determine whether each call was impermissible under the TCPA. This argument equally lacks merit.

CCL admits that each of the unsolicited free cruise calls were made with the goal of increasing vacation and timeshare sales for Defendants, *see* Ex. 3, CCL Dep. at 189-90 (CCL's President referring to the political program as "the next great mousetrap" and a "great way to get sales"), which means they violated the TCPA regardless of whether the calls included an otherwise exempt survey. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 917 (9th Cir. 2012) ("The FCC has determined that so-called "dual purpose" calls, those with both a customer service or informational component as well as a marketing component, are prohibited [under the TCPA].") (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order,* 18 FCC Rcd. 14014, 14095 ¶ 136, 2003 WL 21517853 (F.C.C. July 2, 2003).[12] As a result, the content of the calls

---

[12] Indeed, at least one other court has already rejected Defendants' argument that the exact same calls at issue in this case are exempt. *See* Exs. 19, 20. Moreover, as the "political call exemption" does not apply to calls made in violation of 47 U.S.C. 227(b)(1)(a)(iii), this issue is irrelevant to the Cellular Telephone Class. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling,* 23 F.C.C.R. 559, ¶ 11, (2008) (stating that 47 U.S.C. 227(b)(1)(a)(iii)'s "prohibition applies regardless of the content of the call"). In any event, although the parties have referred to a "political" call exemption, the exemption applies equally to calls made on behalf of political organizations and other non-profits. *See* 47 C.F.R. § 64.1200(a)(3). Therefore, it does not matter whether a call involved a "political" organization or a different type of non-profit for determining whether the exemption might apply—that issue could be commonly decided.

and whether the results of the survey were potentially provided to some third party has no

significance here.[13]

> ### iii. Whether the call recipient actually took the survey, opted for an upgraded vacation, or was required to view a timeshare presentation, and whether that presentation related to a Berkley timeshare.

Defendants also argue that individual inquires would be required to determine which

individuals "elected an upgraded vacation package…[and] attended a [Berkley] sales presentation,"

as well as whether that presentation related to a Berkley timeshare, in order to ascertain the

Proposed Classes. (CCL Opp. at 6; Berkley Opp. at 10.) These are desperate arguments.

The TCPA makes it unlawful for Defendants "to make" or "to initiate" any telephone call

using an artificial or prerecorded voice. *See* 47 U.S.C 227(b)(1)(A), (b)(1)(B). Hence, the violation

occurs as soon as the call is placed. *See e.g. Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152,

1159 (N.D. Ill. 2009) (holding that "on its face, the [TCPA] prohibit[s] the *sending* of unsolicited fax

advertisements and make[s] no reference at all to receipt, much less to printing.") (emphasis added);

*Lee*, 289 F.R.D. at 293 (the TCPA "prohibits the *sending* of text message [calls], without prior

consent, through use of an 'automatic telephone dialing machine'") (emphasis added).[14] Thus, what

happened once a call was answered (or even if the call wasn't answered)—such as whether class

members took the survey, opted for an upgraded vacation, or were required to view a timeshare

presentation—does not create an actual issue, much less an individual one that would prevent the

class members from being ascertained.

---

[13]     Nor is it relevant that the scripts differed depending on what entity's name DeJongh attached to the call, so long as the calls (i) offered a free cruise (ii) in exchange for taking a political or public opinion survey (iii) for the ultimate benefit of Defendants. As a result, each of the call recipients suffered the same injury—a violation of the TCPA—and any difference in the type of questions that were asked is irrelevant. *See, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (holding that commonality is satisfied where the named representative and the proposed class members "have suffered the same injury").

[14]     Defendants attempt to distinguish *Lee* by claiming that the defendants there "did not even challenge class certification." (CCL Opp. at 7.) That's a misread of the docket in that case. *See Lee*, No. 11-cv-00043 (N.D. Cal.), Dkt. No. 78, Opposition to Plaintiff's Motion for Class Certification. One of the defendants didn't oppose certification, but the main defendant certainly did.

Furthermore, the assertion that the "calls in question would relate to Berkley only [if] a call recipient…agree[d] to attend a sale presentation," (Berkley Opp. at 10), is equally unavailing. Defendants admit that they provided leads from these calls to each other exclusively, so any call offering a free cruise was made to benefit each of the Defendants. *See* Ex. 3, CCL 30(b)(6) Dep. at 146-148 (explaining per their contracts, CCL provided leads to VOMT exclusively, and VOMT in turn provided those leads exclusively to Berkley); *see also* Ex. 4-6. That every call did not result in the sale of a timeshare or cruise does not affect Defendants' ultimate liability.

### iv.    Whether the call was made to a landline or cell phone.

Defendants' argument that fatal individual issues exist because there is "no way" to determine whether the class members received calls on their landline or cellular telephone, (CCL Opp. at 15-16; Berkley Opp. at 10), similarly does not prevent the Proposed Classes from being objectively ascertained. Aside from the fact that Class members could easily indicate as much in their affidavits, on their claims forms, or by providing their telephone bills, this argument ignores the available technology that is capable of making this distinction. For example, an expert could be retained to perform a "cell-phone scrub," which would distinguish between cell phone and landline telephone numbers. *See Manno*, 289 F.R.D. at 684 n.3  (discussing with approval the fact that plaintiff "enlist[ed] an expert to perform a 'cell phone scrub' [to] segregate[e] mobile numbers from landlines."). Further, online verification sites—like searchbug.com and phonevalidator.com—could likewise verify to what type of phone a number is assigned. Thus, the distinction between residential and landline phones does not create an individualized issue or preclude ascertainability.[15]

---

[15]    Notably, the distinction between the landline and cellular telephone calls in this case has little relevance given that none of the calls were truly political in nature and all were made using an artificial or pre-recorded voice. *See* 47 U.S.C. 227 (b)(1)(A)(iii), (b)(1)(B).

### v. **Whether the call recipient suffered actual damages.**

Next, Defendants argue that to determine class membership, individual proof will be required to determine actual damages because each class member may have had "a different telephone plan, stayed on the phone for varying amounts of time, [or] accepted the complimentary cruise." (CCL Opp. at 16.) Also not true.

Given that the TCPA is violated once the call is made, (*see supra* § I.C.ii), and Plaintiffs seek to recover statutory and not actual damages, none of these issues will affect ascertainability. *See, e.g.*, *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010) (availability of statutory damages in TCPA case made individualized damages inquiry unnecessary and class certification appropriate). Thus, the Court should reject this argument as well.[16]

### vi. **Ascertaining Class membership will not require the Court to prematurely determine the issue of vicarious liability or the merits of the case.**

Finally, Defendants contend that membership in the Proposed Classes is not ascertainable because it would require the Court to delve into the merits of "whether Berkley is vicariously liable to the putative classes." (Berkley Opp. at 13-15.) Although they do not explicitly say it, what Berkley appears to be arguing here is that Plaintiffs have proposed impermissible fail-safe classes—*i.e.* classes that are "defined so that whether a person qualifies as a member" would require individual determinations of "whether [each] person has a valid claim." *Messner v. Northshore Univ. Health System*, 669 F. 3d 802, 825 (7th Cir. 2012). This argument doesn't withstand scrutiny either.

---

[16]     Relatedly, Defendants assert that issues of "standing" would present individual inquires precluding ascertainability, (CCL Opp. 16), but they do not explain how or why. To the extent Defendants raise this issue because they believe individual inquiries will be required to determine whether the call recipient was the actual owner of the telephone, this is a non-issue as "ownership of the receiving machines is not required by the [TCPA]." *Chapman v. Wagener Equities, Inc.*, 09 C 07299, 2014 WL 540250, at *4 (N.D. Ill. Feb. 11, 2014) (quoting *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2011 WL 4628744, at *3 (N.D. Ill. Sept. 30, 2011)).

First, membership in the Proposed Classes does not depend on individual inquiries regarding Berkley's liability. Rather, the Court can objectively determine whether a particular individual is a member of one of the Proposed Classes if he or she received an automated call that offered a free cruise in exchange for taking a political survey. As all of these calls were designed to benefit all of the Defendants—including Berkley—each Defendant's liability will ultimately turn on common questions about their knowledge of, their involvement in, and the benefit they gained from the calls. *See Agne*, 286 F.R.D. at 568 (granting class certification and holding that "[w]hether [defendants] can be held liable for the conduct of its franchisees is a common question whose answer is 'apt to drive resolution of the case'") (citing *Dukes*, 131 S. Ct. 2551). As a result, the proposed class definitions "merely set[] the boundaries of the class" and "resolving the substantive merits" of Plaintiffs' claims are not required. *See Hinman*, 545 F. Supp. 2d at 807 (rejecting the argument that a "class defined to include individuals who did not consent…reache[d] too far into the merits of the case").

The cases Defendants rely on for this point are inapposite, as the courts in each of those cases would have been required to determine the merits of *each* potential class member's claims *individually* to ascertain class membership. *See Northside Chiropractic, Inc. v. Yellowbook, Inc.*, No. 09 CV 04468, 2012 WL 3777010, at *4-5 (N.D. Ill. Aug. 29, 2012) (requiring the court to determine whether each customer was "beguiled and misled by [the defendant's] false representations" to identify class membership); *Pastor v. State Farm Mut. Auto. Ins. Co.*, No. 05 C 1459, 2005 WL 2453900 (N.D. Ill. Sept. 30, 2005) *aff'd sub nom. Pastor v. State Farm Mut. Auto Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007) (holding that the class was not "objectively ascertainable" because it would require the court to individually determine whether each putative class members' car was or was not in "usable" condition to ascertain their membership in the class).

Unlike *Northside* and *Pastor*, there are no unique inquiries necessary to determine whether an individual will be a Class member here. Class membership is based on objective criteria, and the

ultimate determination of Defendants' liability under the TCPA is an issue to be commonly decided *in the future. See Foreman v. PRA III, LLC*, No. 05 C 3372, 2007 WL 704478, at \*6 (N.D. Ill. Mar. 5, 2007) (rejecting defendants' reliance on *Pastor* where it was "still necessary for the court to examine whether [their] practices that served the basis for class membership… constitute[d] a FDCPA violation"). Notably, Defendants have not cited a single case where the eventual need to determine vicarious liability in a common manner—which is the case here—precluded class certification based on ascertainability or otherwise.[17]

In sum, none of purported individual issues raised by Defendants prevent the Court from ascertaining the Proposed Classes here. The Court should find ascertainability readily satisfied.

## II.    THE PROPOSED CLASSES OTHERWISE MEET ALL OF RULE 23'S REQUIREMENTS.

The bulk of Defendants' remaining Rule 23 challenges essentially mimic their arguments against ascertainability. For many of the same reasons, they must be rejected.

### A.    Rule 23's Numerosity Requirement is Satisfied.

First, in a single sentence, Defendants assert that Plaintiffs do note meet Rule 23(a)(1)'s numerosity requirement "because the class cannot be ascertained." (CCL Mot. at 16.) This argument, while convenient, is without support.

Numerosity is established where the class is so numerous that joinder of all members in a single action is impracticable, Fed. R. Civ. P. 23(a)(1), and an "exact number or identity of the class members" need not be established. *Hinman*, 545 F. Supp. 2d at 806. Instead, Plaintiffs may rely on

---

[17]    Although addressing the issue of liability would be premature at this juncture, Berkley's discussion of the various forms of vicarious liability and how they would apply to Defendants nonetheless lack merit. For one, the Court has already indicated that Defendants' reliance on the fact that Plaintiffs did not know each Defendant by name is meaningless. Ex. 35, October 16, 2013 Transcript of Proceeding at 33:8-11 (explaining that "nobody would have heard of who the [actual responsible] entities were"). Moreover, Berkley has omitted significant information that will be relevant to any vicarious liability determination, like that it was aware of, and received complaints about the calls, but nevertheless continued to receive leads from CCL/VOMT and benefit from them. *See, e.g.,* Ex. 36, Sample of Consumer Complaints to Berkley.

"common sense assumptions" to meet the numerosity requirement. *Id.* Here, the record demonstrates that such "common sense assumptions"—while not inappropriate—are not even necessary, as the evidence clearly establishes numerosity.

Specifically, in addition to DeJongh's testimony that 50 million total calls were made as part of the calling campaign, Ex. 11, DeJongh FTC Dep. at 79:13-14—a fact on which Defendants repeatedly themselves rely throughout their briefs—Defendants' internal records demonstrate that at minimum the class totals nearly two million individuals. *See* Ex. 12, Pool Dep. at Deposition Ex. 3 (recording the total amount of political calls made and then transferred to CCL to be 1,945,866); *see also* Ex. 27, Sampling of CCL002966, CCL 004523, CCL005804. In addition, thousands of documented complaints by Class members corroborate that the Proposed Classes are sufficiently numerous. Ex. 16.[18] *See Hinman*, 545 F. Supp. 2d at 805 ("Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient"). These records alone easily establish numerosity. *See Sadowski v. Med1 Online, LLC*, No. 07 C 2973, 2008 WL 2224892, at *3 (N.D. Ill. May 27, 2008) (rejecting the argument that proposed class size was "nothing more than speculation because the list of specific fax numbers… that received the faxes at issue no longer exist").

---

[18]     Defendants label Plaintiffs' use of these contemporaneous complaints from websites as "egregious," because, according to them, they (i) do not have dates associated with them, (ii) relate to other types of calls, and because they (iii) "do[] not mention CCL or VOMT." (CCL Opp. at 9-10, 14-15.). Defendants' attempt to create hysteria should be ignored. First, as indicated on the face of the documents, *each* complaint plainly lists the specific year, month, and date the complaint was made under the "name" of the call recipient who lodged it. Ex. 16. Second, the attorney affidavit attached by CCL to argue that the complaints relate to other types of calls, contains only excerpts of the complaints that *Defendants' selected and pulled from January 31, 2014*— nearly two years after the calls were made. The attorney affidavit does not include the actual print outs of the complaints or the dates they were lodged; that the types of calls complained of are different is understandable, given the fact that the illegal calls at issue in this case ended long before January 31, 2014. Third, the Court has already rejected the idea that class members would be able to identify the Defendants given the great effort that was made to conceal the identity of the companies behind or that stood to benefit from the calls. Ex. 35.

## B.  Rule 23's Commonality and Predominance Requirements are Satisfied.

In challenging the existence of commonality and predominance, Defendants essentially make the same arguments that they made in the context of ascertainability. They fare no better this time around.

Here, common issues apt to drive resolution of the litigation abound because all Class members received the same calls, made by (or on behalf of) the same Defendants, using the same technology, and resulting in the same injury. *See Hinman*, 545 F. Supp. 2d at 806 (finding commonality satisfied where defendant engaged in a "standard course of conduct," of transmitting "fax broadcasts [] *en masse*"); *see also Agne*, 286 F.R.D. at 567. This alone is enough to establish commonality, *see Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (commonality is satisfied where "a common nucleus of operative fact" exists, even if as to one question of law or fact), and none of the so-called individual issues offered by Defendants demonstrate that these common issues do not predominate.

Foremost, Defendants' challenge regarding "consent' is unavailing.[19] For this point, Defendants simply state—without citing to any supporting authority—that "the question [of consent] turns on highly individualized determinations that thwart the conclusion that this is [a] common issue." (CCL Opp. at 19-20.) This type of "unsupported speculation" cannot defeat commonality or predominance, and does not warrant the denial of class certification. *See, e.g., Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181, at *9 (N.D. Ill. Jan. 4, 2013); *GM Sign, Inc. v. Group C Cmcn's*, No. 08 C 4521, 2010 WL 744262, at *3 (N.D. Ill. Feb. 25, 2010) (holding that "[defendant's] unsupported speculation that some of the proposed class members" consented could "not warrant denial of class certification."). This is especially true here, where Plaintiffs have proffered evidence specifically demonstrating that consent is highly unlikely. *See* Ex.

---

[19]    Defendants confuse Plaintiffs' first common issue, "whether each Defendant can be held commonly liable to Plaintiffs" (Mot. at 12), and instead label it as a discussion about "consent." (CCL Opp. at 17.)

1, DeJongh Dep. at 117-18, 258:23-259:1-4 (testifying that he wanted to indiscriminately call the entire country); Ex. 3, CCL 30(b)(6) Dep. at 106-07 (Lambert stating that CCL "ha[d] no idea" whether individuals consented to receive the survey calls).

Likewise, Defendants are wrong when they assert that determining whether the calls are subject to a political exemption requires individual inquiries "to identify the content of the calls" (CCL Opp. at 20-21.) As discussed above, all of the calls made by DeJongh's companies contained a materially identical public opinion or political survey, and all were made for Defendants' benefit. *See* Ex. 3, CCL 30(b)(6) Dep. at 146-48 (describing how CCL provided each and every lead exclusively to VOMT, and how VOMT then provided those exclusively to Berkley). Thus, there is no real question that the ultimate resolution of the exemption issue will be resolved on a classwide basis. *See Savanna Grp., Inc.*, 2013 WL 66181, at *15 ("[p]redominance is satisfied where common evidence may prove the class member's claims," even in the presence of limited individual issues) (citing *Messner*, 669 F.3d at 815).

### C. Rule 23's Typicality Requirement is Satisfied.

Similarly, typicality is satisfied because each Plaintiff received at least one call that offered a free cruise in exchange for taking a political/public opinion survey and suffered the same injuries, which gave rise to the same TCPA claim and right to recover statutory damages. *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (typicality satisfied where "the named representatives' claims have the same essential characteristics as the claims of the class at large").

Nevertheless, Defendants argue against typicality by repeating the same arguments they assert against ascertainability. According to them, because Plaintiffs (i) "did not all participate in the survey," (ii) were not each "offered" and did not each "accept a cruise," and (iii) did "not all purchase a timeshare from Berkley," their damages and defenses will vary, and their claims will not be typical of the proposed class members. (CCL Opp. at 22-24.) Like those before them, these

arguments should be rejected. As discussed above, Defendants' concerns have no bearing on the "essential characteristics" (*e.g.*, receipt of unsolicited calls offering a free cruise in exchange for taking a survey) of Plaintiffs' and the Proposed Classes' TCPA claims. *See Chapman*, 2014 WL 540250, at *11 ("[f]actual distinctions between the representative parties [] and the class members' claims do not destroy typicality.") (citing *De La Fuente*, 713 F.2d at 232). As such, typicality is satisfied.

### D. Rule 23's Adequacy Requirement is Satisfied.

Similarly, Rule 23's adequacy requirement is easily satisfied. Defendants do not challenge the adequacy of proposed class counsel, and they would have no basis to do so. Similarly, Plaintiffs are more than adequate as they (i) have the same interests as the other putative Class members, (ii) are committed to vigorously prosecuting the Proposed Classes' claims, and have (iii) no antagonistic interests.[20] (Mot. at 18-19.) Defendants' challenges to Plaintiffs' adequacy should be rejected.

Foremost, Defendants' assertion that Plaintiffs Stone and Birchmeier are inadequate because they have failed to produce or preserve relevant documents is patently false and borders on bad faith. Birchmeier readily produced all the relevant documents sought from him by Defendants— including his call records, phone bills, and screen shots of the offending calls he received—and did not produce any personal notes or research, because no such documents exist. Ex. 37, Supplemental Excerpts of Birchmeier Deposition at 71-75. Likewise, Stone has produced all of the call records she possesses, and there can be no question that the evidence demonstrates that she received Defendants' calls. Ex. 38, Nov. 25, 2014 – Jan. 15, 2015 Email Chain at 10-11.[21] Defendants' claim

---

[20] Defendants make the strange statement that the history of blunders involving former plaintiff Vigus somehow makes clear that the current Plaintiffs face adequacy issues (CCL Opp. at 15. ) It is not clear what Defendants are referring to, as Ms. Vigus, represented by her own counsel (who also represented her when she filed her lawsuit), dropped her case after it came to light that certain of her allegations were untrue.

[21] Defendants' suggestion that Stone is inadequate because she could not match all the calls "identified in her interrogatories to her telephone records" (CCL Opp. at 25), is unfounded. First, Stone has repeatedly testified that she answered the calls on numerous occasions and heard POA mentioned, confirmed that she completed the survey on at least one occasion, and even recalled the type of questions she was asked. Ex. 39, Supplemental Excerpts of Stone Dep. at 24-26; 32-35; 54-55, 62:4-9; 63:21-25. Moreover, at least one of

that Stone refused to produce her communications about the calls with her former attorney is also wrong. *See id.* (making clear that Stone produced all of her intake communications with her attorney's office and that "no [other records of the] communications between Stone and [] her attorneys reflecting the date and time of the calls she received" existed).

Similarly, that Plaintiffs could not identify each of the Defendants by name until after the commencement of this litigation says nothing of their adequacy. As Defendants effectuated this robocalling scheme in a manner specifically designed to conceal their identity, this fact is unsurprising. *See* Ex. 35, Oct. 16, 2013 Trnscpt. at 33:8-11. This is particularly true given that, here, CCL has gone to great lengths to avoid detection. Ex. 42; *cf.* Mitchell FTC Dep. at 37-38 (explaining that Lambert named him President of CCL because Mitchell has a common name that makes it difficult for consumers to trace complaints to the company). In reality, Plaintiffs here have more than sufficient knowledge about and commitment to this case to satisfy the adequacy requirement. *See* Ex. 21-23. *See also Reliable Money Order, Inc. v. McKnight Sales Co., Inc.* 281 F.R.D. 327, at 333-34 (E.D. Wis. 2012) (rejecting defendant's adequacy argument that plaintiff was "merely a pawn of the class lawyers").

Finally, none of the purported "unique" differences asserted by Defendants—such as whether certain Class members took the survey, accepted the cruise, or were the actual owner of the telephone numbers that received the calls—would make Plaintiffs' interests antagonistic to, or in conflict with those of Proposed Class members. Again, the TCPA violations occurred when the calls

---

Defendants' calls does appear on Stone's phone records, and her interrogatories now reflect that accordingly. Ex. 40, Stone Supplemental Interrogatory Response to CCL. Resp. No. 2 (adding another one of Defendants' calls to her interrogatory responses, the number for which appears in her phone records). As such, the notion that her "TCPA claims are driven by someone else" (CCL Opp. at 25), is absurd. Finally, although Defendants fail to acknowledge it, the reason many of Stone's calls do not appear in her telephone records is because (i) her landline carrier admits that it "does not keep or have records for every incoming or outgoing call," Ex. 41, Composite of Stone Production at RS000040, and likewise because, (ii) as explained by her phone provider, given the nature of her pre-paid cell phone, certain of the call detail records do "not show transaction[s when] the phone [wa]s not in use." *Id.* at RS000789.

were placed.[22] What happened on the calls is not sufficient to create a conflict between Plaintiffs and the Proposed Classes' claims. (Mot. at 18.) *See Maxwell v. Arrow Fin. Servs., LLC*, No. 03 C 1995, 2004 WL 719278, at *5 (N.D. Ill. Mar. 31, 2004) (finding that a named plaintiff will be adequate so long as his or her claims are not "antagonistic or conflicting…with other members of the class," and he or she has a "sufficient interest in the outcome of the case to ensure vigorous advocacy.").

As such, Plaintiffs are adequate class representatives.

### E.     Rule 23's Superiority and Manageability Requirements Are Satisfied.

Finally, Defendants proffer two main arguments against a finding that Plaintiffs have satisfied Rule 23(b)(3)' superiority requirements. Neither is convincing.

First, Defendants argue that a class action is not a superior method for adjudicating TCPA class actions such as this one, because it will "generate massive damages and attorneys' fees." (CCL Opp. 30.) Courts in this District "squarely reject" this argument. *See Green*, 2009 WL 1810769, at *3 (rejecting defendant's argument that "Congress did not intend that the TCPA serve as a vehicle to bring class complaints[,]" and further explaining that the Seventh Circuit has "forcefully" rebuffed the argument that the TCPA's potentially large penalties result in "[un]sound public polic[ies]") (citation omitted); *see also Phillips Randolph Enters., LLC v. Rice Fields*, 2007 W 129052, at *3 (N.D. Ill. Jan. 11, 2007) (Congress is not required to "to make illegal behavior affordable."). Moreover, this Court has recognized that there is little incentive to pursue TCPA claims independently, which makes class resolution the superior method for aggrieved individuals, such as the class members here, to pursue their claims. *See e.g. Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 WL 4931001, at *2-3 (N.D. Ill. Nov. 29, 2010) (Hon. Kennelly, M.) (certifying a TCPA

---

[22]     Indeed, as discussed *supra* (Section I.C.iii.), because the TCPA prohibits Defendants from *making or initiating* calls, *see* 47 U.S.C 227(b)(1)(A), (b)(1)(B), what happened after the calls were made has no bearing on Plaintiffs' ability to represent the Proposed Classes. Similarly, as the TCPA does not require that the call recipient be the actual owner of the telephone on which the call was received, no conflict exists here either. *See Chapman*, 2014 WL 540250, at *4 ("ownership of the receiving machines is not required by the Act").

class and noting that individual damages would likely be modest). Indeed, the Seventh Circuit—in

the case of *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953-54 (7th Cir. 2006)—has done away

with the argument that the threat of annihilative damages should act as a bar to class certification.

There, the Court stated that:

> The reason that damages can be substantial, however, does not lie in an "abuse" of
> Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per
> person, 15 U.S.C. § 1681n(a)(1)(A), combined with GMACM's decision to obtain the
> credit scores of more than a million persons.

> Many laws that authorize statutory damages also limit the aggregate award to any
> class. For example, the Fair Debt Collection Practices Act says that total recovery
> may not exceed "the lesser of $500,000 or 1 per centum of the net worth of the debt
> collector". 15 U.S.C. § 1692k(a)(2)(B)(ii). The Truth in Lending Act has an identical
> cap. 15 U.S.C. § 1640(a)(2)(B) (substituting "creditor" for "debt collector"). See also
> 15 U.S.C. § 1693m(a)(1)(B), 12 U.S.C. § 4010(a)(2)(B), and 12 U.S.C. § 4907(a)(2)(B).
> Other laws, however, lack such upper bounds. See 15 U.S.C. § 1679g(a) (Credit
> Repair Organizations Act); 15 U.S.C. § 1667d (Consumer Leasing Act). The Fair
> Credit Reporting Act is in the cap-free group.

> … Maybe suits such as this will lead Congress to amend the Fair Credit Reporting
> Act; maybe not. While a statute remains on the books, however, it must be enforced
> rather than subverted. An award that would be unconstitutionally excessive may be
> reduced, see *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123
> S.Ct. 1513, 155 L.Ed.2d 585 (2003), but constitutional limits are best applied after a
> class has been certified. Then a judge may evaluate the defendant's overall conduct
> and control its total exposure. Reducing recoveries by forcing everyone to litigate
> independently—so that constitutional bounds are not tested, because the statute
> cannot be enforced by more than a handful of victims—has little to recommend it.

*Id.*

Next, Defendants contend that certification would present manageability problems because

Plaintiffs cannot identify and contact each and every one of the proposed class members directly,

and even if they could, such notice would require "substantial resources." (CCL Opp. at 28-29.) As

an initial matter, although the number of class members may seem large, that alone does not make

the class unmanageable or the cost of notice prohibitive. *See Harris v. comScore*, 292 F.R.D. 579, 565-

566 (N.D. Ill. 2013) (certifying a class of approximately 10 million individuals in the United States

and another 55 million individuals world-wide); *see also In re Folding Carton Antitrust Litig.*, 88 F.R.D.

211, 216-17 (N.D. Ill. 1980) (citing *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974) (certifying a class of 3,750,000)). Moreover, Plaintiffs must ensure only that class members receive the "best notice that is practicable under the circumstances," Fed. R. Civ. P. 23 (C)(2)(B), and the type of direct notice suggested by Defendants would not be required. *See Beaty*, 2009 WL 192481, at *10.

Indeed, the court in *Beaty* addressed this issue under near identical circumstances. There, the plaintiff sought to certify a class of unsolicited fax recipients and, because the master lists of call recipients was lost or destroyed, planned to provide notice by publication only. *Beaty*, 2009 WL 192481, at *10. Defendant opposed plaintiff's proposed notice plan, arguing that it would fail to identify those individuals who did "not remember receiving the fax in question." *Id.* The Court rejected this argument, explaining that Rule 23 did not require "perfect notice". *Id.* The Court further held that "plaintiff should be afforded [] flexibility with respect to providing notice to unknown, potential class members[,]" and especially in this case, where "the list of potential plaintiffs was destroyed by [defendant] or its agent." *Id.*

As in *Beaty*, where direct notice can't be effectuated, publication notice would be reasonably practicable and would not create any manageability issues. To be sure, such notice could easily be circulated in nationwide newspapers and magazines, through an online media campaign, and even on Defendants' websites and online complaint boards, which the potential class members here are likely to view. Moreover, and in addition to the notice effectuated in *Beaty*, Plaintiffs could potentially use the existing records of the class members' phone numbers—and ultimately others obtained through further discovery—to identify class members, and confirm class membership. Such flexibility is necessary given Defendants' failure to maintain adequate records. When considered against the tremendous burdens that bringing individual actions would create, *Beaty*, 2009 WL 192481, at *10, along with the barriers that would prevent the class members from litigating their claims individually, Plaintiffs' Proposed Classes would not be unmanageable. *See Agne*, 286

24

F.R.D. at 566, n. 6 (evaluating the potential burdens of notice relative to 23(b)(3)'s other factors and holding that notice—"even if [d]efendants are ultimately unable to produce complete lists"—would not be unmanageable).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an order (i) certifying the Proposed Classes, (ii) appointing Plaintiffs as the respective Class Representatives, (iii) appointing Jay Edelson of Edelson PC and Scott Rauscher of Loevy & Loevy as Class Counsel, and (iv) granting any such further relief as this Court deems reasonable and just.

Date: March 3, 2014          By: /s/ Rafey S. Balabanian
                                  *Interim Co-Lead Class Counsel*

Date: March 3, 2014          By: /s/ Scott R. Rauscher
                                  *Interim Co-Lead Class Counsel*

| | |
|---|---|
| Jay Edelson<br>jedelson@edelson.com<br>Rafey S. Balabanian<br>rbalabanian@edelson.com<br>Eve-Lynn J. Rapp<br>erapp@edelson.com<br>EDELSON PC<br>350 North LaSalle Street, Suite 1300<br>Chicago, Illinois 60654<br>Tel: 312.589.6370<br>Fax: 312.589.6378<br><br>*Counsel for Stone, and Interim Co-Lead Class Counsel* | Scott R. Rauscher<br>scott@loevy.com<br>Michael I. Kanovitz<br>mike@loevy.com<br>Jonathan I. Loevy<br>jon@loevy.com<br>LOEVY & LOEVY<br>312 N. May Street, Suite 100<br>Chicago, Illinois 60607<br>Tel: 312.243.5900<br>Fax: 312.243.5902<br><br>*Counsel for Birchmeier and Parkes, and Interim Co-Lead Class Counsel* |
| Scott D. Owens<br>scott@scottdowens.com<br>LAW OFFICES OF SCOTT D. OWENS, ESQ.<br>664 East Hallandale Beach Boulevard<br>Hallandale, Florida 33009<br>Tel: (954) 306-8104<br><br>*Counsel for Stone* | |

## <u>CERTIFICATE OF SERVICE</u>

I, Eve-Lynn J. Rapp, an attorney, hereby certify that on March 3, 2014, I caused the foregoing to be filed by the Court's CM/ECF system and to be served on all counsel of record.


/s/ Eve-Lynn J. Rapp