```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3

 4    GRANT BIRCHMEIER, et al.,          )

 5                         Plaintiffs,   )   Docket No. 12 C 4069
                                         )
 6              vs.                      )
                                         )
 7    CARIBBEAN CRUISE LINE, INC.,       )   Chicago, Illinois
      et al.,                            )   March 7, 2014
 8                                       )   1:00 p.m.
                           Defendants.   )
 9

10                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12    APPEARANCES:

13

14    For the Plaintiff:     LOEVY & LOEVY
                                BY:  MR. SCOTT R. RAUSCHER
                                312 North May Street, Suite 100
15                              Chicago, Illinois  60607

16

17                           EDELSON LLC
                                BY:  MR. RAFEY S. BALABANIAN
                                     MS. EVE-LYNN J. RAPP
18                              350 North LaSalle Street
                                Suite 1300
19                              Chicago, Illinois   60654

20

      For the Defendant:     GREENSPOON MARDER, P.A.
21                              BY:  MR. JEFFREY BACKMAN
                                     MR. RICHARD W. EPSTEIN
22                              200 East Broward Boulevard
                                Suite 1500
23                              Fort Lauderdale, Florida  33301

24

25
```

1         MC GUIRE WOODS, LLP
           BY: MR. BRIAN P. O'MEARA
2          77 West Wacker Drive
          Suite 4100
3          Chicago, Illinois  60601

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     LAURA M. BRENNAN - Official Court Reporter
24    219 South Dearborn Street - Room 2102
       Chicago, Illinois 60604
25       (312) 435-5785

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case 12 C 4069, Birchmeier v. Caribbean

3    Cruise Line.

4         MR. RAUSCHER:  Good afternoon, your Honor; Scott

5    Rauscher on behalf of the plaintiffs.

6         MS. RAPP:  Good afternoon, your Honor; Eve-Lynn Rapp

7    on behalf of plaintiffs.

8         MR. BALABANIAN:  Good afternoon, your Honor; Rafey

9    Balabanian on behalf of plaintiffs.

10        MR. EPSTEIN:  Richard Epstein on behalf of Caribbean

11   Cruise Line and Vacation Ownership Marketing Tours.

12        MR. O'MEARA:  Good afternoon, your Honor; Brian

13   O'Meara on behalf of the defendant, The Berkley Group.

14        MR. BACKMAN:  Jeffrey Backman, also on behalf of

15   Caribbean Cruise Line and Vacation Ownership Marketing Tours.

16        THE COURT:  Have you figured out who is going to go

17   first and second?

18        MR. EPSTEIN:  We have discussed allocating our time,

19   yes.

20        THE COURT:  So the defendants are going to go first,

21   and the plaintiff as the moving party goes last.  So you get

22   15 minutes.  Anybody who is not talking can sit down.  The

23   clock is running.

24        So what I want you to start off is by commenting on

25   the evidence that is discussed in the reply, the list of

1   170,000 people and the other lists that are talked about there

2   in terms of the ascertainability issue.

3           MR. EPSTEIN:  Okay.  That list of 179, they say it's

4   179,000.  Our count is less, but it's still over a hundred

5   thousand because there's a lots of calls that do not seem to

6   be traceable.  Those are calls that were actually completed.

7   Those are calls that pretty much are identifiable as having

8   been generated by one of the ESG calls.

9           THE COURT:  So the class is ascertainable at least to

10  that extent.

11          MR. EPSTEIN:  Basically, yes.  I mean, I wasn't

12  willing to come in here and concede that.  They also point to

13  a list that has 280 telephone numbers that's identifiable.  I

14  think that's the third or fourth bullet point.

15          THE COURT:  280?

16          MR. EPSTEIN:  280.

17          THE COURT:  I don't think --

18          170,000 or a hundred thousand, even if it's a hundred

19  thousand, that's a lot of people.

20          MR. EPSTEIN:  It is.

21          THE COURT:  So the class is ascertainable at least to

22  that extent.

23          MR. EPSTEIN:  We haven't drilled down on the

24  mechanics of doing this.

25          THE COURT:  You just said yes a second ago, and I

1    gave you a second chance.

2            MR. EPSTEIN:  But we believe that the technology

3    exists that you would be able to trace those calls back.  And

4    that is one of the points I wanted to make is that normally

5    when you are dealing with these kinds of issues, the plaintiff

6    comes forth with a plan to actually be able to identify who

7    the members of the class are.  That's missing here.

8            THE COURT:  Well, the reason it's missing is that the

9    people who were making the calls didn't keep very good records

10   apparently or any records, right?

11           MR. EPSTEIN:  That appears to be the case.

12           THE COURT:  Okay.  So we're going to get back --

13           MR. EPSTEIN:  But we weren't those people.

14           THE COURT:  Well, but there's at least evidence your

15   people hired the people who hired those people --

16           MR. EPSTEIN:  We hired --

17           THE COURT:  -- a link or two.

18           MR. EPSTEIN:  We hired them.

19           No.  We entered into an arrangement with them where

20   they were making calls regardless of whether they had any

21   arrangements with us.  We were providing an incentive to

22   induce their -- to improve the responsiveness of their

23   program.  They testified, Mr. DeJongh testified.

24           THE COURT:  If you want to spend your 15 minutes

25   talking about liability, I'm happy to do that.  But, I mean,

1    is it really the contention that if I hire somebody to go do

2    something and then I kind of do this and turn away and they go

3    do something that's illegal that I'm not responsible for it?

4         MR. EPSTEIN:  Well, your Honor, I don't want to

5    debate that issue.  I don't want to debate liability.

6         THE COURT:  You don't have to.  You just have to

7    answer my question.  You don't have to.  You just have to

8    answer my question.  So I just asked a question.  What is the

9    answer?

10        MR. EPSTEIN:  The answer to your question is no

11   because you're using the wrong term.  We didn't hire them.  We

12   have a contract with them.  They were doing what they were

13   doing regardless.  So as long as you use the right --

14        THE COURT:  So you enter into a contract with

15   somebody to --

16        MR. EPSTEIN:  We're not denying that there was

17   potential exposure.  We're not denying that.

18        THE COURT:  Just tell me when I can get a whole

19   question out so I --

20        MR. EPSTEIN:  Please.

21        THE COURT:  Okay.  So you contract with somebody to

22   do marketing for you.  They go out and do marketing for you

23   pursuant to the contract and they do something that is

24   illegal.  You're saying that under the TCPA, you're not

25   responsible for that?  If that's all true, you're not

1    responsible for it.

2         MR. EPSTEIN:  We're not conceding liability or

3    conceding that anything was done illegal.

4         THE COURT:  What would be the argument that you're

5    not responsible for it?

6         MR. EPSTEIN:  Well, primarily is if they didn't do

7    anything illegal.

8         THE COURT:  No, but let's say they did do something

9    illegal.  You have a contract; you turn the other way.  You

10   don't have anything to do with what they're doing.  And then

11   they go out pursuant to your contract and do something that is

12   illegal under the TCPA.  Is there some scenario under which

13   you, as the contracting party, wouldn't be liable if you

14   assume the facts that I have just described?

15        MR. EPSTEIN:  Under a strict statutory construction

16   view which other courts, albeit not yourself, but other courts

17   have ascribed to, if the party did not make or initiate the

18   call, they are not liable.  We have cited in other --

19        THE COURT:  What about the FCC regs?

20        MR. EPSTEIN:  The FCC, it's not a regulation.  It's a

21   finding, and the regs don't speak to vicarious liability.

22   They have a pronouncement.

23        THE COURT:  That's actually worse you for you, isn't

24   it?  Isn't this one of these statutes where this thing called

25   the Hobbs Act applies?

1    Maybe I'm wrong.  I think there is something about

2  the law in this area where an FCC interpretation in a ruling

3  is binding on district courts under the Hobbs Act.  If you

4  have a problem with it, you actually have to go to the Court

5  of Appeals, and our Court of Appeals has said I can't even

6  touch that.

7    MR. EPSTEIN:  You're obligated under that legal

8  principle to give deference to their interpretation, statutory

9  interpretation, of the statute under the regulations.  The

10  regulations have the effect of law.

11    THE COURT:  So let's get off of that --

12    MR. EPSTEIN:  Let's get off of that.

13    THE COURT:  -- because I actually have other

14  questions that I want to use the remainder, at least some of

15  the remainder of your time on.

16    MR. EPSTEIN:  We were allocated --

17    THE COURT:  I don't know -- I don't believe that I

18  understand what the status of the list of 2 million is, okay.

19  So there is something about 2 million calls that were

20  transferred to CCL, and the argument that is made on the

21  defense side is that isn't really relevant to anything.  And I

22  guess my question about that is:  Isn't that a subset of the

23  recipients of calls?

24    MR. EPSTEIN:  Potentially in part.  The testimony is,

25  and this is undisputed, that those 1.9 million transfer calls

1   include other sources.  There were other programs, other out-

2   bound calling sources, that Caribbean Cruise Line used other

3   than Mr. DeJongh.

4          THE COURT:  So they're not all necessarily from this.

5          MR. EPSTEIN:  It's not all from this.  That's the

6   testimony.

7          THE COURT:  Okay.

8          MR. EPSTEIN:  Some definitely will be.

9          And as you pointed out, 179,000, which would be

10  included within that 1.9 million, definitely are traceable.

11         THE COURT:  Okay.  And then the third thing I wanted

12  to ask about is this question about the proposition that not

13  all of the calls were political survey calls, not all of the

14  alleged calls were phony political survey calls, okay.  Tell

15  me how that fits into this.

16         MR. EPSTEIN:  Two different issues.  There were --

17         Not all of Mr. DeJongh's calls were overtly

18  political.  Some dealt with social issues; some dealt with

19  societal, you know, those kind of issues, where there is a

20  distinction under the First Amendment political speech

21  exception to the subset here of calls to residential telephone

22  lines.  There's basically a noncommercial or political speech

23  kind of exception that would exempt those calls from the TCPA.

24  The question is to what -- what is the breadth of that

25  particular exception?

1    And then the other part is what we were talking about

2   just 30 seconds ago, and that is other calling programs that

3   Caribbean Cruise Line had provided its free cruise

4   certificates as incentives that were done by completely

5   different people that had nothing to do with ESG.  Those were

6   political; those were social.  You know, they could be talking

7   about, you know, social policy issues, a variety of different

8   things.

9    THE COURT:  Okay.  What else would you like to tell

10  me?

11   MR. EPSTEIN:  Your Honor, I think we'll circle back

12  to kind of where you started with 179,000 and what is

13  basically wrong with that.  This case -- I think it's

14  noteworthy that this case started with hysterical ranting by

15  the plaintiffs about scams and shell companies, you know, and

16  straw men that Caribbean Cruise Line and the rest of the

17  defendants set up Mr. DeJongh in business.  What is

18  interesting is that all of that rhetoric that you find in the

19  consolidated complaint, the first amended complaint, the

20  original complaint, is nowhere to be found in the motion for

21  class certification.

22   THE COURT:  So why are you even talking about it?

23   MR. EPSTEIN:  The plaintiffs are abandoning that

24  theory.

25   THE COURT:  Why are you even talking about it?  If it

1    were me and I had 15 minutes, I wouldn't talk about things

2    that you by definition are telling me are not at issue

3    anymore.  By the way, you have used eight.

4               MR. EPSTEIN:  Are you permitting an amendment where

5    none has been requested?  The motion --

6               THE COURT:  I'm dealing with a motion for class

7    certification.

8               MR. EPSTEIN:  Right, and the motion -- I'm sorry.

9               THE COURT:  I'm dealing with a motion for class

10   certification that asks me to certify two, a particular

11   class -- I think it's two.  Okay, that's what I am dealing

12   with.

13              MR. EPSTEIN:  And the motion for class certification

14   tracks what the original class defined in the complaint was,

15   which was roughly, you know, everybody in America who received

16   one of these phone calls.  The only testimony you have is that

17   there was as many as 50 million of these calls.  And our view

18   is very simple, is that that's the motion that the Court

19   should be ruling on.  That motion --

20              THE COURT:  So you're saying that I don't -- I

21   can't -- it's inappropriate for me to say, okay, if we can

22   ascertain 174- or 179,000 people, then I will certify a class

23   on the people we can ascertain?  I can't do that?

24              MR. EPSTEIN:  You can do that if it had been properly

25   presented that way.

1      THE COURT:  Please.  Have you read Rule 15 in the
2  last 50 years?
3      MR. EPSTEIN:  Except for one thing, your Honor.
4  There's been no request made.
5      THE COURT:  It doesn't have to.  It can be done after
6  the fact.
7      MR. EPSTEIN:  The motion that was originally filed to
8  which we have the only chance to oppose didn't address that as
9  a possibility.  It was only in the reply does that come up.
10      And it's prejudicial, I think, to the defendants, you
11  know, for some class that has not been fully vetted out, you
12  know, to be considered by the Court.  Obviously you're not
13  appreciative, you know, of the fact of the status of the
14  pleadings here.
15      THE COURT:  I just think it's -- I'm trying to grope
16  for a nice word here -- it's just not a winning argument.
17      I mean, there is no rule, and you can't quote me one,
18  that says that the motion for class certification has to track
19  what the complaint says.  You can't.  It's just not doable.
20  You know, and you got the opportunity for oral argument here.
21  You have squandered your 10 minutes.  Okay.  You have used all
22  10, and now we're working on 11.  And, I mean, you raised this
23  issue of ascertainability in the response.  So the plaintiffs
24  dealt with it in the reply.  They said, well, we can at least
25  ascertain the 174, we can maybe ascertain the 2 million, we

1    can maybe ascertain something else.  And so I'm asking a

2    question, and then you basically start talking to me about how

3    it's an unfair amendment of the complaint.  I'm not dealing

4    with the complaint.  I'm dealing with the motion.

5          So who is going to use the other five minutes?  Is it

6    you or somebody else?

7          MR. EPSTEIN:  Well, if you're drilling down the 174,

8    I don't have any argument as to ascertainability there.  We

9    have arguments as to 50 million.

10         THE COURT:  You know what, you said that in the first

11   30 seconds, and you have used the other nine and a half.

12         MR. EPSTEIN:  Well, if you --

13         THE COURT:  Wow.

14         MR. EPSTEIN:  -- are excluding 50 million --

15         THE COURT:  I'm not.

16         MR. EPSTEIN:  -- as a possible class.

17         THE COURT:  I'm asking questions, okay.  I had a

18   question about that because I acknowledged the fact that, you

19   know, the 174 wasn't something you had addressed yet, and so I

20   gave you an opportunity to address it.  You addressed it

21   quickly.  You said that that's ascertainable.  And, you know,

22   I've asked you what else you had to tell me.  Then you start

23   talking about the rhetoric that isn't even in this motion.

24         So now you're down to three minutes.

25         MR. EPSTEIN:  I will let Mr. O'Meara have the

1  remaining time to speak on behalf of Berkley.  Thank you, your
2  Honor.

3          MR. O'MEARA:  Good afternoon again, your Honor; Brian
4  O'Meara on behalf of The Berkley Group.

5          Mr. Harrison wanted to be here from North Carolina.
6  His dad suffered a stroke.

7          THE COURT:  I'm sorry to hear that.  Please pass on
8  my sympathy.

9          MR. O'MEARA:  I will do.

10          Briefly, your Honor, just in terms of the class
11  definitions themselves as they apply to Berkley, our issue is
12  with -- if you look at the definition, it is phone calls made
13  by, on behalf of, or for the benefit.  Clearly, Berkley --

14          THE COURT:  I don't think that's a terribly great
15  argument either because you're basically --

16          And I understand that it's clear, absolutely clear,
17  that I have to -- I can't just look, you know, at the bare
18  allegations of the class certification motion.  But I don't
19  think that I have to do a class that parses the people out
20  defendant by defendant.  It's people who received phone calls.
21  You know, there's at least some basis to think that these were
22  all being done, you know, by one or a group of entities that
23  were maybe acting for different people, and maybe then there's
24  a question ultimately of who is responsible for what part of
25  it, but I don't think I have to parse that out.

1    I actually had a different question for you.  So here

2  is my question.  So you have got a situation here -- and just

3  we'll call this a hypothetical so that nobody has to concede

4  anything.  So let's say that I want to market something and I

5  decide that I'm going to do it by violating the Telephone

6  Consumer Protection Act.  I decide that that's what I'm going

7  to do, and I'm going to make as many calls as I possibly can,

8  millions and millions, until somebody shuts me down.  Okay.

9    And I do that.  And guess what?  Just like the guy

10  who does a bribe and doesn't write a check that says in the

11  memo section "bribe," I don't keep records of the phone calls

12  that I make.  And then, you know, people start showing up that

13  have gotten these calls who arguably have had their peace and

14  quiet violated and they file a lawsuit, and they say, well,

15  you know, these people were making millions and millions of

16  calls.  We should all be able to sue in one group.

17    And then you come in and say -- or I come in as the

18  defendant and I say:  Well, you can't do that because I didn't

19  keep records.

20    What is right about that?  It just doesn't make sense

21  to me.

22    MR. O'MEARA:  And because it is a hypothetical, but I

23  agree with you.

24    THE COURT:  Well, that's basically the situation here

25  because Mr. DeJongh didn't keep records.  And I recognize that

1    Mr. DeJongh isn't a defendant, but he was contracted with

2    somebody who contracted with somebody who was a defendant, and

3    that's the situation.  He didn't keep records, shockingly,

4    seeing as how he was doing something illegal.

5          I mean, is basically the rule then is that only the

6    person who can testify that he's the recipient of the call can

7    sue individually?

8          MR. O'MEARA:  To answer your question, I don't think

9    it is right that we don't have records.  It's unfortunate, but

10   Mr. DeJongh was the owner, if you will, of the ESG defendants

11   who are defendants.  And it is unfortunate, but we are faced

12   with that prospect now.  And at least from the Berkley Group's

13   perspective who didn't have knowledge that these calls were

14   going on, now we are caught up in a class action litigation

15   and shouldn't be deprived of --

16         THE COURT:  So when you say didn't have knowledge

17   that it was going on, just tell me where Berkley fits in, as

18   you see it.

19         MR. O'MEARA:  Berkley contracted with VOMT to

20   provide --

21         THE COURT:  With?

22         MR. O'MEARA:  VOMT, Vacation Ownership Marketing

23   Tours.

24         -- contracted with them for marketing purposes.

25         THE COURT:  What is Berkley's business?

1          MR. O'MEARA:  Berkley is basically a time share

2    business.

3          THE COURT:  Time share business.  They contracted

4    with VOMT to do marketing for them.

5          MR. O'MEARA:  Correct.

6          THE COURT:  Then VOMT does what?

7          MR. O'MEARA:  VOMT then contracts with CCL, Caribbean

8    Cruise Lines.

9          THE COURT:  Right.

10          MR. O'MEARA:  Caribbean Cruise Lines then had an

11    agreement with Mr. DeJongh.  Mr. DeJongh then --

12          Actually -- the calls were actually made by an

13    individual name Darren Robb.  His name came up once or twice

14    in the briefing.  But those were the calls that were actually

15    made.

16          So where does Berkley fit in there?  Yes, there was a

17    contract.

18          THE COURT:  So basically when the calls were being

19    made by -- whether it was DeJongh or the guy working for

20    DeJongh, some of those calls may have been for Caribbean

21    Cruise Lines and some of them may have been for your time

22    shares?

23          MR. O'MEARA:  No, none.  There is no evidence -- and

24    the evidence does demonstrate that none of the calls, any of

25    them, had time share, The Berkley Group, anything --

1      THE COURT:  When you say no evidence, you actually
2  mean no evidence?
3      MR. O'MEARA:  I mean no evidence.  There is no
4  evidence that any call was made.
5      THE COURT:  So what were you guys paying for then?
6      MR. O'MEARA:  What's that?
7      THE COURT:  Did you get stiffed by the guy?  Did you
8  sue him for stiffing you?
9      MR. O'MEARA:  No, we didn't because we didn't know
10  that is how the marketing was going on.
11      THE COURT:  So you made a contract with VOMT.  You
12  paid them, right?
13      MR. O'MEARA:  Yes.
14      THE COURT:  What did you think they were doing?
15      MR. O'MEARA:  Marketing for us in --
16      THE COURT:  For what, though?  What did you think
17  they were doing to market for you?
18      MR. O'MEARA:  That would be up -- I mean, frankly, a
19  lot of that is proprietary.
20      THE COURT:  But I'm asking you.  So you don't want to
21  tell me?
22      MR. O'MEARA:  No.  It could have been either paper or
23  it could have been phone calls.  We didn't know this
24  particular campaign was going.
25      THE COURT:  How much did you pay him?

1          MR. O'MEARA:  I don't know the full amount.  What we
2    do pay --
3          THE COURT:  Well, tell me the partial amount if you
4    don't know the full amount.
5          MR. O'MEARA:  I honestly don't know that.  What we
6    paid them for was any lead that we got, then we get a
7    commission from that lead, but we don't know where those
8    leads --
9          THE COURT:  Did you ever get leads back from them?
10          MR. O'MEARA:  Yes, we did, from various different --
11          THE COURT:  So you were basically paying for leads
12    from VOMT and you paid for -- and if somebody bought a time
13    share, then they would get a commission on that, and you would
14    get whatever the revenue from the time share.
15          MR. O'MEARA:  I actually think it was just from a
16    lead that we got.
17          THE COURT:  A lead, okay.
18          You guys are over your time, but I will give you one
19    more minute.
20          MR. O'MEARA:  No, that's fine, your Honor.
21          And just to our point, we think basically the Berkley
22    Group based on -- and to your point, it is unfortunate we
23    don't have the records, but Berkley Group's position in here
24    has never been something that we believe we should have been
25    dragged into.  I know this is class certification, but that is

1  what we tried --

2  THE COURT:  Thanks, Mr. O'Meara.

3  MR. O'MEARA:  -- to demonstrate.

4  THE COURT:  So acknowledging that maybe it's not an

5  ideal situation and, you know, depending upon one's definition

6  of fairness, you could say it's unfair, that somebody goes out

7  there and makes a whole bunch of -- does a whole bunch of bad

8  things and doesn't keep records of it.  I mean, sometimes the

9  chips fall where they fall and life isn't fair.  So you have

10  to be able to figure out who the class members are.

11  And so basically your solution is we just publish a

12  bunch of notices in a bunch of newspapers and rely on people

13  to submit affidavits:  I got a call.

14  MR. RAUSCHER:  That's part of the solution, your

15  Honor.

16  THE COURT:  You know, the cases on ascertainability

17  seem to talk about objective criteria.  Is there a case that

18  says that somebody saying, oh, yeah, I'm one of the people,

19  that that is objective criteria?

20  MR. RAUSCHER:  Your Honor --

21  THE COURT:  Say "yes" or "no" first.

22  MR. RAUSCHER:  Yes.

23  THE COURT:  Then tell me, all right.

24  MR. RAUSCHER:  The Boundas case, B-o-u-n-d-a-s v.

25  Abercrombie, that Judge Feinerman decided, he said -- that was

1  a case about improperly -- allegedly improperly voiding gift

2  cards.  He said if a class is defined as people who had a gift

3  card that was improperly voided and those people still have

4  the gift card, that is as objective as --

5        THE COURT:  They would have something to show.

6  That's objective.

7        MR. RAUSCHER:  That's the first part.

8        THE COURT:  That's objective.  Okay.  So what's the

9  second part?

10       MR. RAUSCHER:  The second part is, he said it is less

11  objective if they don't have their gift card, and a lot of

12  people would have discarded them, but we can use an affidavit

13  process to handle that part of it.

14       THE COURT:  I don't know the extent to which Judge

15  Feinerman went into it, and I don't use a lot of gift cards

16  and I have never -- well, I'm not going to say I've never been

17  in an Abercrombie because I've bought people gift cards at

18  Abercrombie before.  But if somebody once had a gift card at

19  Abercrombie and used it, okay, somewhere in the bowels of

20  Abercrombie and Fitch's servers, there would be a record that

21  that person bought something.  So you would have something,

22  wouldn't you?

23       MR. RAUSCHER:  I'm not sure that there would be a

24  record, and I'm certainly not sure that that record would tie

25  to the person who the gift card was for if they paid in cash.

1  There would be a record that a gift card was issued

2  presumably, but a lot of people presumably also paid in cash.

3  I don't think there would be a record of that, which I think

4  would be --

5          THE COURT:  But if the people paid in cash, they

6  didn't have gift cards.  Maybe I'm missing something.

7          MR. RAUSCHER:  Someone could have given it as a gift.

8  I'm just thinking as a hypothetical.

9          THE COURT:  In other words --

10         MR. RAUSCHER:  If I buy a gift card for someone else

11 and I pay in cash.

12         THE COURT:  So the plaintiffs were the people who had

13 bought the gift cards, not necessarily the people who had used

14 the gift cards.  Sure, okay.  I would have been the plaintiff,

15 not my daughter, in other words.

16         MR. RAUSCHER:  I'm not sure technically who would

17 have been the plaintiff, but I think my point was if you could

18 have bought a gift card.

19         THE COURT:  So why should I agree with Judge

20 Feinerman on that other than that he's really nice and very

21 smart?

22         MR. RAUSCHER:  Well, one, because it doesn't reward

23 people.

24         THE COURT:  That doesn't sound objective to me,

25 though.

1          MR. RAUSCHER:  Your Honor, here there is more

2   evidence.  There is more evidence just beyond affidavits.

3          THE COURT:  What is it?

4          MR. RAUSCHER:  In addition to the document that you

5   discussed earlier with the defendants.

6          THE COURT:  That's the 174 or whatever?

7          MR. RAUSCHER:  That's the 174 or so.

8          We have served subpoenas on additional carriers that

9   the defendants were using, and that's Caribbean Cruise Line

10  and their -- at least one so far has indicated they have six

11  months of call detail records, and that's going to be the same

12  type of incoming call.

13         THE COURT:  So you have still got stuff coming in.

14         MR. RAUSCHER:  We still have stuff coming in.

15         We just got an interrogatory response identifying

16  them, and so we served a subpoena.

17         We also have evidence in the hands of class members

18  in addition to them just saying so.

19         THE COURT:  Like what would that be?

20         MR. RAUSCHER:  You could have a voicemail if someone

21  would have saved it.  You could presumably have a caller ID

22  record, and you could have people's telephone bills.

23         In one way you can look at a telephone bill.

24         THE COURT:  See, here is the problem.  Here is the

25  problem.  And I know that I'm probably mushing together, you

1  know, ascertainability and superiority and a bunch of other

2  things, okay. But if you sort of hypothesize a situation

3  where we're going to rely on people's say-so, and maybe their

4  say-so is supported by something else, then aren't the

5  defendants going to be able -- aren't they entitled to go

6  challenge those people, and then don't you get down -- then

7  aren't you really into some sort of an individualized inquiry?

8          MR. RAUSCHER: I don't think the type of challenge

9  that we might face here would be enough of an individual

10  inquiry to take this out of the realm where class

11  certification would be appropriate. I'm not going to say the

12  defendants have no right to challenge anything, but certain of

13  those challenges we think can be made on a class-wide basis;

14  for example, whether all of the calls that ESG made had a free

15  cruise offer attached to it.

16          THE COURT: I'm not even talking about that. I'm

17  talking about just identifying recipients of calls. I'm still

18  at step one. I'm not at step four or whatever step that would

19  be. I'm just talking about identifying the people who got

20  calls.

21          I mean, I can see the notion of -- and I don't know

22  whether people ever define classes like this. I can see

23  saying, okay, I'm certifying a class of the people who got

24  calls who are reflected in exhibit whatever it is that

25  identifies.

1    MR. KANOVITZ:  I'm sorry, Judge.  Judge, I apologize.

2    THE COURT:  Go ahead and finish talking to him.  I

3 will start my sentence over.  I want him to hear my question.

4    (Brief interruption.)

5    THE COURT:  I can see -- I can hypothesize the idea

6 of certifying a class of people that says, okay, starting out

7 the definition the way you have, everybody who got calls as

8 reflected in the attached exhibit, and we would attach, you

9 know, the list of phone numbers or whatever.  Beyond that,

10 we're relying on people's say-so, at least as things now

11 stand.  I don't know what you're going to get from these other

12 people.  But we're relying on people's say-so.

13    And I guess my concern is if we're relying on

14 people's say-so, unless your position is that their say-so is

15 gospel and it's not subject to inquiry, which would be hard to

16 imagine, then we're going to -- then there is going to have to

17 be some process to figure out, you know, whether the say-so is

18 good enough.

19    MR. RAUSCHER:  That --

20    THE COURT:  I mean, in the cases that you're talking

21 about -- I mean, in Judge Feinerman's case -- maybe they

22 haven't gotten far enough down the road.  If somebody submits

23 an affidavit, is that the end of the story; they're in?

24    MR. RAUSCHER:  He says that you can handle that as

25 part of the claims process.  I know something similar was done

1     in the Household International Securities Litigation that

2     ended in a jury verdict, and the defendant still had the right

3     to rebut the presumption of fraud on the market in the

4     securities case.

5             But here, at least for some people, there is a way we

6     think that you can verify that they got the calls in a way

7     that defendants won't be able to rebut because --

8             THE COURT:  What?

9             MR. RAUSCHER:  -- they don't have -- the defendants

10    didn't keep records, and so that is, we know at least some

11    telephone numbers that ESG was using to make the calls.  ESG

12    responded to government inquiries, and I think twice they sent

13    a letter to the Missouri attorney general's office

14    acknowledging that they used eight specific telephone numbers

15    to make the calls.

16            We served a subpoena on bandwidth.com, which is one

17    of the telephone companies that ESG subscribed or got numbers

18    that they subscribed to through.  That company produced to us

19    a list of 57 numbers that ESG subscribed to and the dates for

20    each of the telephone numbers.

21            So if someone has a bill showing that they received a

22    call from that number during the relevant time period, we have

23    something that can be verified and the defendants aren't going

24    to be able to --

25            THE COURT:  People still get bills that say who

1  called them?

2       MR. RAUSCHER:  Absolutely.  Our clients have turned

3  over bills.  Maybe not everybody in the class for every single

4  call, but absolutely call detail records.

5       THE COURT:  But how would I define the class then in

6  a way that would require somebody to submit some sort of

7  evidence and not just their say-so?

8       MR. RAUSCHER:  Your Honor, we think that you could do

9  subclasses.  We don't think that's an issue that should

10  prevent the overall --

11       THE COURT:  The people who is say-so is sub class A,

12  the people who can prove it is subclass B?

13       MR. RAUSCHER:  It may not be something you need to

14  redefine the class for, and it may be something that we see

15  how much class-wide evidence we have on certain numbers.  But

16  you could do subclasses by telephone numbers, if that's what

17  it came down to, at a later date if we needed to adjust for

18  the fact that there are certain areas in which we can verify

19  for everybody and certain ones where we can't.

20       THE COURT:  So what is the -- I was talking about

21  this list of 2 million, the calls that were forwarded by CCL.

22  Give me your take on how that fits in.

23       MR. RAUSCHER:  My take is that is a subset of the

24  political --

25       THE COURT:  Of what?

1          MR. RAUSCHER:  Of the political calling campaign.

2          THE COURT:  How do you know that, or what makes you

3    think that?

4          MR. RAUSCHER:  That's what Jennifer Poole testified

5    to.

6          THE COURT:  Jennifer?

7          MR. RAUSCHER:  Jennifer Poole is the marketing

8    director.  That's what she testified to.  And there is also an

9    interrogatory response.

10         THE COURT:  Do I have the interrogatory response?

11         MR. RAUSCHER:  I'm almost certain that it's in there.

12   I would like to -- I can verify what it says.

13         THE COURT:  Somebody else can verify while you're

14   talking.  So it's a subset of the people who got political

15   calls.

16         MR. RAUSCHER:  That's correct.

17         THE COURT:  Allegedly --

18         MR. RAUSCHER:  People who got the political -- right,

19   the alleged -- the calls that are part of this case.

20         THE COURT:  Yes.

21         MR. RAUSCHER:  A subset of that group and who were

22   transferred to Caribbean Cruise Line or one of its call

23   centers and who were on the phone for more than 30 seconds.

24         THE COURT:  Okay.  And the significance of the more

25   than 30 seconds, does that suggest that somebody actually had

1    a conversation of some sort, or at least a little bit of a

2    conversation?

3              MR. RAUSCHER:  Yes, and I think that's actually how

4    they decided whether they needed to pay the lead broker for

5    the calls.

6              THE COURT:  Oh.  Is that in something that I have

7    here?

8              MR. RAUSCHER:  I'd like to verify that.

9              THE COURT:  The trigger for payment, in other words?

10             MR. RAUSCHER:  It's in her testimony.  I would have

11   to check it.

12             THE COURT:  Wait a second.  Wait, wait, wait.  So in

13   order to get paid, somebody would have to show that they kept

14   somebody on the phone for 30 seconds.

15             MR. RAUSCHER:  No, because the payment that I'm

16   talking about is the payment that Caribbean made to the lead

17   broker.  They were doing a per call --

18             THE COURT:  Who is the lead broker?

19             MR. RAUSCHER:  The lead broker is a guy named Scott

20   Broomfield, who at least allegedly stood in the middle of

21   Jacob DeJongh, his cousin, and Caribbean Cruise Line.

22             THE COURT:  Okay.  But I guess what I am getting at

23   is how would anybody know?  I'm just sort of groping as to

24   whether there is some other evidence out there.  How would

25   anybody know that he was on the phone for more than

1    30 seconds?

2    　　　MR. RAUSCHER:  So people might know they were on the

3    phone for more than 30 seconds.  Again, they may --

4    　　　THE COURT:  Maybe I misunderstood you.  I thought

5    what you were telling me is that there was a trigger for

6    payment and the trigger for payment is if the call lasted 30

7    seconds or more.

8    　　　MR. RAUSCHER:  That's right.  Are you asking how did

9    Caribbean know that?

10   　　　THE COURT:  In other words, if I'm the guy who, in

11   order to get paid, has to keep somebody on the phone for 30

12   seconds or more, how do I prove to the guy that's paying me

13   that I kept somebody on the phone for 30 seconds?

14   　　　MR. RAUSCHER:  We don't know exactly mechanically how

15   that worked, but we know that --

16   　　　THE COURT:  Have you taken the depositions of those

17   people?

18   　　　MR. RAUSCHER:  We have not spoken to that person yet,

19   but we talked to Mr. DeJongh who didn't remember much of the

20   technical details.

21   　　　THE COURT:  Yes.

22   　　　MR. RAUSCHER:  When we asked Caribbean all these

23   questions, they were on one side of it, and I don't think we

24   got any clear evidence on that.

25   　　　THE COURT:  Okay.  You have a couple of minutes here.

1    MR. RAUSCHER:  A couple other things I just wanted to
2    touch on.  One, with respect to Berkley's role in this, every
3    call was designed to sell a free cruise and a Berkley time
4    share.  So the fact that they weren't mentioned on every call
5    we don't think in any way affects --

6    THE COURT:  Why do you say that every call was
7    designed to sell both?

8    MR. RAUSCHER:  Because we have evidence that there
9    were, so there was a free cruise attached to every call.  I
10   know defendants dispute that, but the ESG defendants have
11   admitted to the FTC and to multiple state attorney generals
12   that every call had a free cruise offer attached to it.

13   We deposed the founder of Caribbean Cruise Line who
14   said, we tried to up-sell a vacation package to everybody who
15   answered and talked to us.  And the up-sell on the vacation
16   package includes a mandatory -- if you buy one, it includes a
17   mandatory time share presentation.

18   And if they didn't buy the up-sell, they tried to
19   push them on the time share or try to sell them on a time
20   share later.  We think the evidence strongly supports the idea
21   that every call was designed to sell Caribbean's vacation
22   packages and Berkley's time share.

23   In any event, we think that's a merits inquiry that
24   doesn't need to be decided now.

25   THE COURT:  Okay.  So should I be -- so what is

1    the -- what do you have out there as far as subpoenas to phone
2    companies and whatnot?
3            MR. RAUSCHER:  Well, we have -- I think we served
4    three fairly recently.  We got a response from one company
5    saying we have six months of call detail records.
6            THE COURT:  And they're preserving them presumably.
7            MR. RAUSCHER:  They're preserved.  They're archived,
8    so it's going to cost money to -- and we're going to have to
9    talk to defendants about, I think, who should be responsible
10   for that.
11           THE COURT:  That's one.  How many others do you have?
12           MR. RAUSCHER:  That's one.  We have another one out
13   there to Sprint, and that one has multiple -- that one has
14   most of the telephone numbers -- many of the telephone numbers
15   that they have identified.  We don't have a response on that
16   yet.
17           THE COURT:  And what do you think the records --
18           Let's just talk about the first company that has six
19   months of records.  What are those records going to show?  Are
20   they going to show the records -- are they going to show the
21   numbers that were called from those phone numbers, as you
22   understand it?
23           MR. RAUSCHER:  I think it will show the same type of
24   information that we have.  It will also show the numbers of
25   the people who received the calls at least.  We have not seen

1  the records but --

2         THE COURT:  The number of the recipients of the

3  calls.

4         MR. RAUSCHER:  The number of recipients.

5         THE COURT:  It would be like my long distance phone

6  records and it shows that I called somebody in New York at

7  such and such a phone number.

8         MR. RAUSCHER:  That's our understanding.

9         THE COURT:  Okay.

10         MR. RAUSCHER:  At least that.

11         THE COURT:  So should I be -- shouldn't I be waiting

12  then until that whole process gets run out?

13         MR. RAUSCHER:  We don't think you need to wait for

14  that, your Honor.

15         THE COURT:  What if I want to?

16         MR. RAUSCHER:  I think that's certainly a reasonable

17  approach.

18         THE COURT:  I mean, because there's this big brouhaha

19  about, you know, the alleged absence of objective evidence,

20  and if there is more objective evidence that's just sitting

21  out there waiting for somebody to pay to dredge it up, then, I

22  mean, to me that's pretty darned close to a no-brainer that I

23  wait for that because, I mean, just think of the opposite

24  scenario.  Okay.

25         So one of three things is going to happen.  Either

1    I'm going to say class certification is denied because it's

2    not ascertainable and you're going to come back to me in three

3    months and say, wait a second, Judge, here it is, we got it,

4    and I'm going to have to do this all over again.

5         Scenario two is I grant class certification.  It gets

6    appealed, and while it's on appeal, the stuff comes in, and so

7    then the Court of Appeals is working off, you know, some

8    partial record.

9         I don't know what the third scenario is.  It doesn't

10   make sense to me.  If there is something other --

11        Why is it just now that you're subpoenaing these

12   things?  Is it something about an interrogatory answer?

13        MR. RAUSCHER:  We had issued an interrogatory asking

14   who did you -- which telephone service providers did you use

15   to take incoming calls?

16        THE COURT:  When did you get the answer to that?

17        MR. RAUSCHER:  We got it -- it was part of the

18   motion.  It was very recent.  They served it after the motion

19   to stay was denied.

20        THE COURT:  Okay, okay, okay.  Then you sent out the

21   subpoenas you have been dealing with, okay.

22        You're out of time, but I will give you one minute.

23        (Brief interruption.)

24        MR. RAUSCHER:  Your Honor, someone just brought me

25   the citation to Ms. Poole's deposition testimony about the

1    list of 2 million people.  It's Exhibit 12.  It looks like

2    it's Exhibit 12 to our class certification brief.

3              THE COURT:  Okay, I will find it.

4              MR. RAUSCHER:  She says:  We're looking at the list.

5    It's 1,945,866 total calls.

6              And I said:

7    "Question:  "That's the total number of calls that were

8    transferred to Caribbean Cruise Line as a result of political

9    surveys?"  And she says "correct."

10             THE COURT:  Okay, thanks.

11             So I have two questions for you.  I have two

12   questions for somebody who is actually going to answer my

13   question and not talk about other stuff.  So if you can deal

14   with that, Mr. Epstein, then you can be that person; otherwise

15   delegate somebody else.  Are we clear?

16             MR. EPSTEIN:  We are.

17             THE COURT:  Okay.  So do you want to say anything

18   about the reference to Ms. Poole's testimony?

19             MR. EPSTEIN:  Ms. Poole -- yes.

20             Ms. Poole testified that there were other call

21   programs that were being conducted at the same time by call

22   centers other than Mr. DeJongh.

23             THE COURT:  So what you're going to tell me is that

24   maybe it's a political survey, but it's not necessarily your

25   political survey.

1    MR. EPSTEIN:  It is not Mr. DeJongh's political

2  survey.

3    THE COURT:  Okay.

4    MR. EPSTEIN:  There were other companies like Mr.

5  -- were not like Mr. DeJongh but other companies doing what

6  Mr. DeJongh had done.

7    THE COURT:  I get it.

8    MR. EPSTEIN:  Okay.

9    THE COURT:  The second question is this whole thing

10  about why shouldn't I wait and see what comes in from these

11  subpoenas.

12    MR. EPSTEIN:  Well, that dovetails in with our point

13  is that we don't have the ability to identify who the class

14  members are other than that very small subset where we can

15  actually trace the numbers.  If there is an ability to trace

16  the numbers, then the numbers become -- or the people become

17  more ascertainable.

18    THE COURT:  Okay.

19    MR. EPSTEIN:  If you were to certify a class today

20  addressing your --

21    THE COURT:  Yeah, yeah.

22    MR. EPSTEIN:  -- scenario number two, we would almost

23  certainly have to take review on that.

24    THE COURT:  Of course you would, right.

25    MR. EPSTEIN:  And all of a sudden evidence is coming

1  in.

2           THE COURT:  It's crazy.  I mean, the Court of Appeals

3  would say:  Why did you do this now, Kennelly?  You should

4  have waited until everything came in.

5           MR. EPSTEIN:  And, your Honor, with due respect, it

6  kind of dovetails with what I was addressing, and that is the

7  status of the motion as it sits today, the motion is not

8  supported by that evidence.

9           THE COURT:  Well, you know what, the motion got filed

10  when it did because I put a deadline on it, okay.  That is the

11  fact.  I put a deadline on it.  That's why it got filed,

12  right?

13           MR. EPSTEIN:  Yes.

14           THE COURT:  You filed --

15           Did I set a deadline?  Maybe I didn't set a deadline.

16           MR. EPSTEIN:  You did.

17           THE COURT:  I set a deadline.  So that's why it got

18  filed.  Maybe I screwed up.  Maybe I set the wrong deadline.

19  Maybe it didn't dawn on me that there was other evidence that

20  had to be gathered.  So that wouldn't be on them; that would

21  be on me, I think, just under any reasonable way of looking at

22  it.  So I'm going to have to think about that.

23           MR. EPSTEIN:  We don't disagree with that point at

24  all, your Honor.

25           THE COURT:  I may end up just kind of putting the

1   brakes on this for a while, but I guess here's what I'd like

2   to get, if you can do this.  If I can get a status report,

3   let's say, by Tuesday, it doesn't have to be anything very

4   elaborate -- it can be from the plaintiffs -- that basically

5   says:  Here's the subpoenas we have out there.  Here's what

6   they're for.  You can attach them if you want.  Here's what

7   they're for and here's the status of what we're getting on

8   each one of these or what we think we're getting or where our

9   discussions are and so on.

10              If you can file some --

11              I don't want more -- no argument on the class

12  certification motion.  I just want the status of the

13  subpoenas.  If you have anything to say on the defense side

14  about the status of the subpoenas after they file their thing

15  on the 11th of March, then you can file something by the 13th

16  of March, and I will wait until after I get both of those to

17  figure out whether to put the brakes on or not.

18              MR. EPSTEIN:  Just one word to sort of clarify I

19  think what I heard counsel say.  If they were sending

20  subpoenas to the companies that Caribbean uses, I'm not sure

21  it's going to reveal the information he's suggesting.  If they

22  found the ones that Mr. DeJongh was using, it may do that.

23              THE COURT:  Well, maybe I will find this out when you

24  guys submit something.

25              MR. EPSTEIN:  That's what we will find out because

1    I'm not sure as we sit here.

2              THE COURT:  Thanks.  Take care.

3              MR. RAUSCHER:  Thank you, your Honor.

4              THE COURT:  All right.

5

6

7       (Which were all the proceedings had in the above-entitled

8    cause on the day and date aforesaid.)

9

10                    C E R T I F I C A T E

11

12         I hereby certify that the foregoing is a true and

13    correct transcript of the above-entitled matter.

14

15

16    */s/ Laura M. Brennan*                    March 14, 2014

17

18    _____        _____

19    Laura M. Brennan
      Official Court Reporter               Date
20    Northern District of Illinois

21

22

23

24

25