# EXHIBIT 50

# Transcript of the Testimony of **Debra Aron**

**Date:** July 19, 2014

**Case:** Grant Birchmeier v. Caribbean Cruise Line, Inc.

Printed On: July 21, 2014

Siebert and Associates Court Reporters, Inc.
Phone: 773 851-7779
e-mail: cmsreporters@comcast.net

Page 11

1  A.  Well, we discussed together.  She's
2  also quite experienced in telecommunications
3  data issues.  She's been working in the
4  telecommunications area, as have I, for many
5  years.
6      And so we both have had quite a
7  bit of experience working with similar kinds of
8  data questions and analyzing telecommunications
9  databases.
10      So, we discussed the question of
11  what specifically we want to know, we wanted to
12  make sure that if a vendor said that they don't
13  have relevant data, that we probed that; that
14  we followed up to make sure that they may not
15  have some partial data or some relevant data,
16  that we would want to consider it if we were
17  conducting the data exercise being proposed.
18      Q.  Does Ms. Danies have notes of who she
19  talked to?
20      A.  She may.  I don't know the answer to
21  that, and I didn't inquire or see them.
22      Q.  Let's look at Footnote 4 on that same
23  page.
24      Do you see, for example, I

Page 12

1  investigated the offerings from Infutor; do you
2  see that?
3      A.  I do.
4      Q.  Did you personally investigate the
5  offerings?
6      A.  I reviewed their online materials.
7  Ms. Danies conducted the interview with them.
8      Q.  So, when it says, I was advised by a
9  sales director, it should say Ms. Danies was
10  advised?
11      MR. BACKMAN:  Form.
12      THE WITNESS:  Well, so let me say as
13  I've said to you today, all of the specific
14  interviews that I'm referring to in this report
15  were conducted by her.  And so I think it's
16  fair to say that where I say I, I'm referring
17  to my team.
18  BY MR. RAUSCHER:
19      Q.  Do you know which sales director
20  Ms. Danies spoke with?
21      A.  I can't give you a name, no.
22      Q.  Have you ever worked with -- I may be
23  mispronouncing this -- with Infutor before?
24      A.  I have not.  This is a company that

Page 13

1  represents itself as having, as I indicate here
2  in this footnote, the industry's largest
3  available database of telephone numbers for
4  forward and reverse phone append.
5      And so it seemed like a
6  worthwhile candidate to probe, to investigate.
7      As I said in my report,
8  throughout my experience in communications
9  industry, and in dealing with the kinds of
10  issues we were talking about today, I have not
11  come across any vendor that purports to be able
12  to provide historical, reliable data for
13  reverse append services.
14      Q.  How did you come across Infutor?
15      A.  Identifying Infutor was the result of
16  general research that we were conducting to
17  identify vendors that represent themselves as
18  being able to provide the kind of information
19  we were looking for.
20      Q.  How did you do that research, just
21  jump online and searched?
22      A.  The research would have included
23  online research.  It would also have included
24  the knowledge that we've obtained in the course

Page 14

1  of my involvement in other TCPA cases.
2      Q.  Which companies -- let's stop there
3  for a second.
4      Which companies did you contact
5  based on your knowledge of them from your other
6  TCPA cases, just the names of the companies?
7      A.  Any companies that we contacted in the
8  context of this research is in this report.
9      Since filing my report --
10      Q.  Well, can you just try to answer
11  the --
12      MR. BACKMAN:  I think she's trying to
13  answer it.  Let her finish.
14  BY MR. RAUSCHER:
15      Q.  I just want names.  I just want the
16  names of companies you contacted based on your
17  knowledge of those companies from other TCPA
18  cases you've worked on.
19      A.  I can't say as I sit here which of
20  these companies that I reported on.
21      My knowledge of them was the
22  direct result of other cases I've worked on.
23      Q.  Okay.
24      A.  What I'm saying is that I incorporated

Page 19

1  with respect to subpoena requests.
2      The associate to which you're
3  referring in that part of Paragraph 20 was the
4  individual at Verizon's legal compliance center
5  for its landline services that Verizon
6  represents as being qualified to speak to
7  Verizon's policies with respect to compliance
8  for subpoenas.
9      Q.  What are you basing your opinion on
10  that Verizon represents that person is
11  qualified to speak to its subpoena compliance
12  policies?
13      A.  The fact that this is the office to
14  which Verizon directs people who are making
15  inquiries about this very issue.
16      Q.  Which very issue?
17      A.  What is Verizon's policy with respect
18  to responding to subpoenas for data.
19      Q.  You don't know specifically which
20  associate your colleague talked to?
21      A.  I can't give you a name as I sit here,
22  no.
23      Q.  And do you know if that's the same --
24  the first sentence in this subparagraph refers

Page 20

1  to representatives at Verizon's legal
2  compliance center; do you see that?
3      A.  I see that, yes.
4      Q.  Do you know if Ms. Danies had multiple
5  conversations with people at Verizon?
6      A.  What I recall happened is that when
7  she spoke to the legal compliance center, the
8  initial representative referred her to a
9  supervisor because the initial representative
10  to whom she spoke didn't feel qualified to
11  answer a question about the voluminous request
12  we were asking about.
13      Q.  Do you know which staff Ms. Danies
14  spoke to at Verizon Wireless, the next
15  subparagraph?
16      A.  This would be the representative of
17  Verizon Wireless at their subpoena and court
18  order processing group.
19      Q.  Do you know how many people she spoke
20  with?
21      A.  I believe at Verizon Wireless she
22  spoke to one person.
23      Q.  So it says "they", do you know what
24  the "they" refers to there?

Page 21

1      A.  I think she's referring to the
2  individual she spoke to as a representative of
3  Verizon Wireless.  So, they would be Verizon
4  Wireless.
5      Q.  The next page is AT&T?
6      A.  Yes.
7      Q.  Do you know who Ms. Danies spoke with
8  at AT&T?
9      A.  AT&T has a single subpoena center that
10  handles wireless and wireline data requests.
11  And when I say single, I mean that the same
12  National Compliance Center handles both
13  wireless and wireline requests.
14      What happens at AT&T is that AT&T
15  has subpoena centers.  She contacted the
16  subpoena center and was told you have to talk
17  to the National Compliance Center for a request
18  of this magnitude.
19      She then contacted the National
20  Compliance Center and spoke to the
21  representative there who answered our questions
22  as represented in this paragraph.
23      Q.  Okay.  Who are the people she spoke
24  with at the National Compliance Center?

Page 22

1      A.  I can't give you a name.
2      Q.  Okay.  How many conversations did she
3  have with them?
4      A.  Once she reached the National
5  Compliance Center, I believe she had one
6  conversation.
7      Q.  What about Sprint, who did she speak
8  with at Sprint?
9      A.  She spoke to the individual identified
10  here as Sprint's Corporate Security
11  representative.
12      Q.  It says "representatives", do you know
13  how many people she talked to?
14      A.  She spoke to one person that provided
15  the information here.  I believe she may have
16  been referred to that person in light of the
17  nature of the request.
18      Q.  Do you know how many people she
19  said -- it says here, Sprint's Corporate
20  Security representatives handling subpoena
21  compliance and historic records requests stated
22  that a voluminous request of around 900,000
23  phone numbers would be quote, unquote
24  burdensome, but that's Sprint has the ability

Page 23

1  to process that information, and it keeps
2  going.
3       So, it says representatives told
4  her that, is it just one person?
5    A. I believe it's one person.
6    Q. So, it's not accurate to say that
7  representatives told her that, correct?
8       MR. BACKMAN: Form.
9       THE WITNESS: I can't say it's not
10 accurate. My recollection is that the
11 information represented here was provided by
12 one person.
13 BY MR. RAUSCHER:
14   Q. So, why can you not say it's
15 inaccurate?
16   A. Because I would have to verify with
17 her that she didn't speak to more than one
18 person who gave the same information.
19   Q. Assuming that you're correct, that
20 your memory is correct that it was one person,
21 that's not an accurate sentence then, right?
22      MR. BACKMAN: Form.
23      THE WITNESS: I think that's fair.
24

Page 24

1  BY MR. RAUSCHER:
2    Q. CenturyLink. It looks like nobody was
3  contacted there; is that correct?
4    A. It's not that nobody was contacted.
5  It's that no one responded to us.
6    Q. Okay. So, who did you try to contact
7  there?
8    A. At CenturyLink one is directed to an
9  outside vendor or provider that handles
10 subpoena requests for CenturyLink.
11      We spoke to them, and they said
12 that they only process subpoena requests, but
13 that to know what data CenturyLink would be
14 willing to provide or has or can provide or the
15 timeframe, we would have to speak to
16 CenturyLink directly.
17      They were not willing or able to
18 provide a phone number or person to whom we
19 could speak. We conducted our own search to
20 identify such a person.
21      But in the end, in the timeframe
22 we had, we were not able to identify someone at
23 CenturyLink who could or would speak to us
24 about this topic.

Page 25

1       What I've reported here is what
2  CenturyLink identifies on its website as its
3  policy for responding to subpoena requests for
4  data.
5    Q. Who is that outside vendor you were
6  talking about?
7    A. I believe they're called
8  CT Corporation. It's identified on their
9  website.
10   Q. And Ms. Danies called them?
11   A. She did.
12   Q. Do you know who she talked to at
13 CT Corporation?
14   A. No.
15   Q. Did anybody speak with anybody at
16 Comcast?
17   A. No. We attempted to reach Comcast.
18      At Comcast, they don't have a
19 person that answers the phone at their subpoena
20 compliance area.
21      And we left messages with Comcast
22 to which they did not respond.
23      So, we reported here what Comcast
24 reports on its website as its policy for

Page 26

1  responding to requests for subscriber data.
2    Q. Have you ever been involved in the
3  notice process in a TCPA case?
4    A. Well, what do you mean by been
5  involved with?
6    Q. In helping designing a notice plan for
7  a TCPA case?
8    A. I have not participated in designing a
9  notice plan for a TCPA case, no.
10   Q. How many TCPA cases have you provided
11 expert opinions in?
12   A. Well, by expert opinion, do you mean
13 an expert report?
14   Q. Sure. We can start with that.
15   A. In addition to this one, one other.
16   Q. Which case was that?
17   A. That was Warnick v. Dish.
18   Q. Have you provided expert testimony
19 other than reports in other TCPA cases?
20   A. Well, in the Dish case, I gave a
21 deposition, and I testified in federal court.
22   Q. Have you been involved in TCPA cases
23 other than providing expert reports or
24 testimony?