**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GRANT BIRCHMEIER, STEPHEN PARKES, and REGINA STONE, on behalf of themselves and a class of others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 12 C 4069** |
| **CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY, LLC, THE BERKLEY GROUP, INC., and VACATION OWNERSHIP MARKETING TOURS, INC.,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Grant Birchmeier, Stephen Parkes, and Regina Stone filed suit on behalf of themselves and two putative classes of individuals against several entities, including Caribbean Cruise Line, the Berkley Group, Vacation Ownership Marketing Tours, and the Economic Strategy Group. Plaintiffs alleged that defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by using an artificial or prerecorded voice to call their cellular and landline phones. Plaintiffs have now moved pursuant to Federal Rule of Civil Procedure 23(b)(3) for certification of two classes of similarly situated plaintiffs. For the reasons stated below, the Court grants plaintiffs' motion, with one modification.

**Background**

In their consolidated amended complaint, plaintiffs alleged that defendants

worked in concert to make unsolicited calls to individuals without their consent, offering

them free cruise trips in exchange for participation in a political survey.  Plaintiffs alleged

that the cruise would be provided by Caribbean Cruise Line (CCL), which would require

passengers to attend a Berkley Group presentation regarding a time share property.

Plaintiffs also alleged that Vacation Ownership Marketing Trust (VOMT) was a

marketing partner of CCL and Berkley, "and all of those entities directly benefited from

the calls" at issue.  Consolidated Am. Compl. ¶ 23.  The entity conducting the surveys,

plaintiffs alleged, was Political Opinions of America, although plaintiffs alleged the

companies actually conducting the surveys were the Economic Strategy Group (ESG)

defendants or entities that the ESG defendants operated.

In August 2012, defendants moved to dismiss plaintiffs' complaint.  The Court

denied defendants' motion.  The Court also denied defendants' request to strike

plaintiffs' class action allegations, finding that plaintiffs had plausibly alleged the

necessary elements under Federal Rule of Civil Procedure 23.

Plaintiffs filed their motion for class certification in October 2013.  Defendants'

response contained several arguments to the effect that plaintiffs' proposed classes

were not ascertainable, in part because plaintiffs did not have a list of class members or

a viable method for generating one.  In plaintiffs' reply brief, they contended that they

had recently received from defendants a list of nearly 175,000 phone numbers of

individuals who "unquestionably received" calls offering free cruises in exchange for

taking a political survey because they "unquestionably received the free cruise call and

were subsequently transferred to CCL or one of its call centers." Pls.' Reply at 2. In

March 2014, the Court held a hearing on plaintiffs' class certification motion. At the

hearing, the Court asked defendants' counsel whether the classes were ascertainable at

least to the extent of the list of numbers plaintiffs mentioned in their reply brief. Defense

counsel responded, "Basically, yes. I mean, I wasn't willing to come in here and

concede that." Hrng. Trans. at 4:9–12. Defense counsel also stated that "we believe

that the technology exists that you would be able to trace those calls back," *id.* at 5:2–3,

and that "if you're drilling down the 174[,000], I don't have any argument as to

ascertainability there. We have arguments as to 50 million." *Id.* at 13:7–9. Following

the hearing, the Court ordered further briefing on plaintiffs' motion in light of ongoing

discovery by which plaintiffs were attempting to identify additional phone numbers to

which the challenged calls were placed.

### Discussion

A party seeking class certification bears the burden to "affirmatively demonstrate

his compliance" with the requirements of Federal Rule of Civil Procedure 23. *Wal-Mart

Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Plaintiffs must first satisfy the four

prerequisites of Rule 23(a): the class is so numerous that joinder of all of the class

members is impracticable (numerosity); there are questions of law or fact common to

the proposed class (commonality); the class representative's claims are typical of the

claims of the class (typicality); and the representative will fairly and adequately

represent the interests of the class (adequacy of representation). Fed. R. Civ. P.

23(a)(1)–(4). Second, the proposed class must fall within one of the three categories in

Rule 23(b), which are: "(1) a mandatory class action (either because of the risk of

incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of nonparties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior."  *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); Fed. R. Civ. P. 23(b)(1)–(3).

In their class certification motion, plaintiffs proposed two classes of individuals in the United States who received calls "by, on behalf of, or for the benefit of the Defendants."  Pls.' Mot. at 2–3.  The calls class members received "purportedly offer[ed] a free cruise in exchange for taking an automated public opinion and/or political survey" and "delivered a message using a prerecorded or artificial voice."  *Id.*  The classes plaintiffs proposed differed only in that one included people who received calls on cellular phones and the other on landline phones.  In their supplemental reply brief filed after the Court's hearing on class certification, plaintiffs proposed a revised definition applicable to both the landline and cellular phone classes:

> All persons in the United States to whom (1) one or more telephone calls were made by, on behalf, or for the benefit of the Defendants, (2) purportedly offering a free cruise in exchange for taking an automated public opinion and/or political survey, (3) which delivered a message using a prerecorded or artificial voice; (4) between August 2011 and August 2012, (5) whose (i) telephone number appears in Defendants' records of those calls and/or the records of their third party telephone carriers or the third party telephone carriers of their call centers or (ii) own records prove that they received the calls—such as their telephone records, bills, and/or recordings of the calls.

Pls.' Supp. Reply at 2.  Defendants' response to this revision addresses the ascertainability of the classes, along with the typicality of the named plaintiffs' claims as well as the manageability and superiority of the classes.  In their original response to

4

plaintiffs' motion, defendants also challenged the numerosity, commonality, typicality, and predominance of the classes. The Court will address each of the Rule 23 requirements in turn.

## A.    Rule 23(a) requirements

### 1.    Ascertainability

In addition to the four requirements listed in Rule 23(a), courts have consistently evaluated a fifth, implied requirement: that the membership of the class be sufficiently definite or ascertainable. *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012) ("[A] class must be sufficiently definite that its members are ascertainable."); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (plaintiff must show "that the class is indeed identifiable as a class" in addition to showing numerosity, commonality, typicality, and adequacy of representation plus one of the conditions of Rule 23(b)). As a court in this district has pointed out, a court need not ascertain "absent class members' actual identities . . . before a class can be certified." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012). Rather, "[i]t is enough that the class be ascertain*able*," with class members to be identified during a claims administration process if the class prevails. *Id.*

In their supplemental reply, plaintiffs argue that their revised class definition restricts class membership to those with ascertainable identities. They contend that defendants have conceded the ascertainability of the first proposed restriction—those whose "telephone number appears in Defendants' records of those calls and/or the records of their third party telephone carriers or the third party telephone carriers of their call centers." Pls.' Supp. Reply at 2. Plaintiffs say there are about 930,000 such

5

numbers, and that they also have 30,000 names and addresses of people "who purchased vacation packages after receiving one of Defendants' political survey calls." *Id.* at 1 n.2.  Of the second proposed restriction—those whose "own records prove that they received the calls—such as their telephone records, bills, and/or recordings of the calls"—plaintiffs argue such records are "similarly objective." *Id.*  Finally, plaintiffs say that even if these restrictions provide inadequate corroboration of class membership, the Court may require putative class members "to submit affidavits or claim forms." *Id.* at 3.  Defendants argue that each proposed restriction is inadequate to make the class ascertainable.

### a.     List of 930,000 phone numbers

In their original reply brief, plaintiffs said they had received spreadsheets in discovery from CCL "containing a total of 174,930 unique telephone numbers of individuals who unquestionably received the free cruise call and were subsequently transferred to CCL or one of its call centers." Pls.' Reply at 2.  Three months later, plaintiffs indicated in their supplemental reply brief that "they now have a total of approximately 930,000 unique telephone numbers of class members who unquestionably received the free cruise calls." Pls.' Supp. Reply at 1 (footnote omitted).  It appears that the list of 930,000 is an expansion of the list of 174,930 numbers of people receiving the calls described in the class definition (free cruise offer in exchange for taking political survey, prerecorded or artificial voice, between August 2011 and August 2012).  The numbers, plaintiffs say, are those "identified by Defendants as having received the transferred calls after the call recipients' completion of the free cruise survey."  *Id.* at 2 n.4.

Defendants do not address their concession at the class certification hearing in this case: that "if you're drilling down [to] the 174[,000], I don't have any argument as to ascertainability there." Hrng. Trans. at 13:7–9. Plaintiffs contend that defendants' concession "was a binding judicial admission that Defendants cannot retract now." Pls.' 2d Supp. Reply at 1 n.2. Defendants state that they "do not concede that the 930,000 telephone number list identifies class members," Defs.' Supp. Resp. at 1 n.2, because it does not indicate subscribers for the numbers in question. Defendants contend that the numbers represent "nothing more than a class of telephone numbers from 2-3 years ago, as opposed to a class of identifiable subscribers with standing to bring a TCPA claim." Defs.' Supp. Resp. at 3. Also, defendants say there is "no practical or manageable" way to identify the subscribers of the numbers. They concede that "there are publicly available sources to locate a current subscriber with just a telephone number," but add that using them would be "onerous and costly." *Id.* at 9–10.

Defendants appear to be making a two-part argument: first, the people with numbers on the list of 930,000 do not necessarily have standing under the TCPA, because plaintiffs cannot prove they were the subscribers for those numbers at the time they received the calls; and second, the classes are not ascertainable for the same reason. Defendants base this argument on *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 643 (7th Cir. 2012), where the Seventh Circuit defined "called party" within the TCPA to mean "the person subscribing to the called number at the time the call is made." Defendants argue that this means "[o]nly the person *subscribing* to a number at the time of a call has" a TCPA claim. Defs.' Supp. Resp. at 2. They also cite the case for the proposition that "Plaintiffs must propose a method to identify the person

who *subscribed* to the called number at the time of the offending call" in order to certify a TCPA class. *Id.* at 2.

The Seventh Circuit in *Soppet*, however, did not hold that "[o]nly the person *subscribing* to a number at the time of a call has" a TCPA claim. The TCPA, in 47 U.S.C. § 227, includes the phrase "called party" several times, including in the two provisions under which plaintiffs bring their claims in this case. Those provisions state that it is unlawful:

> • "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call," 47 U.S.C. § 227(b)(1)(A)(iii); and
>
> • "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party . . . ," *id.* § 227(b)(1)(B).

In *Soppet*, the Seventh Circuit was concerned with the references to "consent of the called party" in these provisions. The plaintiffs had cellular phone numbers that previously belonged to people who, the defendant argued, may have consented to receive phone calls. This Court had held "that only the consent of the subscriber assigned to Cell Number at the time of the call (or perhaps the person who answers the phone) justifies an automated or recorded call." *Soppet*, 679 F.3d at 639. The Seventh Circuit evaluated each mention of "called party" in section 227 and "conclude[d] that 'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made." *Id.* at 643.

*Soppet* was about the TCPA's express consent defense; the court held that only the current subscriber's consent matters, not the consent of someone who earlier had

the same phone number.  The court did not hold that the person who actually answers an otherwise TCPA-violating phone call must be the subscriber for the phone number in question in order for a violation of the TCPA to occur.  To do so would read out the language "any call" and "any telephone call to any residential telephone line" from section 227.  It would also frustrate the purpose of the statute:  to end the "annoyance" of receiving robocalls on a home phone line and the addition of "expense to annoyance" when the robocall is made to a cellular phone.  *Id.* at 638; *see also Patriotic Veterans, Inc. v. State of Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013) (referring to "Congress's goal" in enacting TCPA "to protect the privacy of citizens against unsolicited telephone calls").  A call remains annoying and intrusive even if the subscriber for the number dialed is not the one answering.  For example, a robocall to a home phone can be picked up by anyone who is in the home, thus visiting the annoyance and privacy intrusion on that person, whether or not she pays the phone bill.  Likewise, a robocall to a cellular phone does not necessarily have to be answered by the subscriber.  A parent is often the operative subscriber (i.e., the one who pays) for family plans that include all calls to and from their children's cellular phones; the child's name may not even be on the bill or in the provider's records.  Also, a subscriber's child or spouse might happen to answer the subscriber's own cellular phone when a robocall comes in, violating the privacy of the person who answers the call and leaving the subscriber on the hook for the expense.  In short, defendants' argument that class members may not have "standing to bring a TCPA claim," Defs.' Supp. Resp. at 3, because they cannot show that they were subscribers to the phone numbers in question is unpersuasive.[1]

---

[1] Defendants also cite a recent case from this district in which a class was held to be not

For these reasons, plaintiffs need not establish that the people who received the calls at the numbers on the list of 930,000 were the actual subscribers; the fact they received calls is enough to permit them to sue. Defendants still argue, however, that plaintiffs will not be able to find out who the subscribers were, or that doing so would be expensive and time-consuming. They contend that "there is no publicly available source to determine accurately the historical subscriber to a telephone number on a specific date 2-3 years ago." Defs.' Supp. Resp. at 9. Defendants concede that plaintiffs could determine current subscribers for those numbers, but they argue that "[t]he current subscriber may not be the person that subscribed to the telephone number 2-3 years ago." *Id.* Defendants also say that even if plaintiffs could obtain historical subscriber information, identifying the subscribers "would be an onerous and costly task, even if possible." *Id. B*ased on their expert's analysis, they estimate that generating a list would cost between $5 and $150 "per subscriber or per hour." *Id.* at 10 (citing Defs.' Supp. Ex. A (Aron Decl.) ¶ 20).

Plaintiffs respond that they need not identify every class member by name at this point in the litigation, citing a recent Seventh Circuit TCPA case on determination of class size. *See Chapman v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) ("[A] class can be certified without determination of its size, so long as it's reasonable to

ascertainable "because the plaintiff did not propose a method to identify the subscribers for calls made over a 4-year time period." Defs.' Supp. Resp. at 2 (citing *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013)). By that description alone, *Jamison* is distinguishable from this case, where plaintiffs have proposed multiple methods of identifying class members. It is no answer that plaintiffs proposed these methods in their second supplemental reply, rather than in their first. They were properly responsive to defendants' argument that the identities of the subscribers for the numbers on the list of 930,000 were not ascertainable, whereas defendants had conceded at the March hearing that such numbers were ascertainable.

believe it large enough to make joinder impracticable and thus justify a class action suit."). Plaintiffs also contend that they will determine class members' identities "using a combination of phone numbers in Defendants' records, the records of third-party phone carriers and third-party database providers." Pls.' 2d Supp. Reply at 2. They argue that defendants' expert did not say historical subscriber information does not exist, but only that obtaining it "might take time, and that it might cost money." *Id.* at 3. This fact, they argue, does not "have anything to do with whether class members can be identified." *Id.*

Defendants contend that their expert Dr. Debra Aron "is not aware of a database or vendor who can reliably provide the name and address of the owner of a wireless number at a specified date in the past." Defs.' Supp. Resp. at 2 n.5; *see also id.* at 9. Dr. Aron did not say this exactly. Instead, she said there is "no *industry-wide* database or vendor of a database that can reliably provide the name and address of the owner of a wireless telephone number at a specified date in the past." Defs.' Supp. Ex. A at 3 (emphasis added). She then went on to discuss the information kept on file by the various phone companies, which actually *does* encompass historical subscriber data. *See id.* at 7–8 (going back seven years for Verizon landlines and cellular phones, seven years for AT&T landlines and cellular phones, for "current subscribers and disconnected subscribers" at Sprint, seven years at CenturyLink, and two years at Comcast). Dr. Aron's declaration therefore does not support defendants' contention that the identities of the subscribers to the phone lines on the list of 930,000 numbers are not ascertainable. Her descriptions of the cost and time involved in obtaining these identities may speak to the degree of difficulty of this task, but not whether it is possible.

As noted earlier, "[i]t is enough that the class be ascertain*able*." *Boundas*, 280 F.R.D. at 417. Further, Plaintiffs state that they will be the ones responsible for identifying these people. *See* Pls.' 2d Supp. Reply at 5 ("Plaintiffs will be able to take the approximately 900,000 unique telephone numbers [defendants] have identified . . . and obtain their contact information to provide notice from either a third-party database or from the telephone carriers themselves.").

Defendants' references to their deposition of Richard Kroon do not alter this analysis. Plaintiffs submitted Kroon's declaration with their first supplemental reply after oral argument on their class certification motion. In it, Kroon states he is a business intelligence developer who specializes in "completing complex calculations, designing and developing specialized user tools, and creating reporting solutions for all types and sizes of data sets." Pls.' Ex. 45 ¶ 2. Kroon goes on to describe data files he received from plaintiffs' counsel and how he calculated that there were 928,675 unique phone numbers in the files. That is the extent of the analysis in Kroon's declaration. In taking Kroon's deposition, however, defendants asked whether he knew how to identify a human being associated with a phone number. He responded that he did not know and had not heard of an "industry-wide database that might be available for that purpose." Defs.' Supp. Ex. C at 42:17–25, 43:1–5. In their latest brief, defendants point to this answer and to the fact that "Kroon candidly admitted that Plaintiffs did not ask him to and so did not make any effort to determine the name of the subscribers to the telephone numbers on his list." Defs.' Supp. Reply at 3 & n.11. Given the limited nature of Kroon's assignment, it is unclear why defendants would expect Kroon to know how to match names to telephone numbers. Regardless, Kroon's answers do not show that

the names associated with numbers on the list are not ascertainable; they show only that Kroon doesn't know. Also, as plaintiffs point out, they were not aware when they secured Kroon's services that defendants would attempt to contradict their admission at the hearing that the classes are ascertainable from the list of numbers plaintiffs had obtained to that point. Other than the general point that Kroon did not provide or obtain names for the list of 930,000 numbers, which plaintiffs do not dispute, his declaration and deposition do not help defendants' argument.

Given these points, it is fairly clear that the identities of the persons whose numbers are on plaintiffs' list of 930,000—indeed, the subscribers for those numbers at the time defendants called them—are sufficiently ascertainable.

### b. Class membership documented via phone records

Plaintiffs' second way to identify class members requires an individual to have "records prove that [she] received the calls—such as [her] telephone records, bills, and/or recordings of the calls." Pls.' Supp. Reply at 2. Plaintiffs also propose to supplement this documentary proof of class membership by having putative class members submit "affidavits or claim forms" regarding the content of the call, when the person received it, and who the call claimed to be from. *Id.* at 3. This, plaintiffs say, could come in the form of a questionnaire administered during the claims administration process. In sum, plaintiffs propose, "individuals not appearing in the call detail records described in the class definition would be entitled to relief only if they could correctly identify the call(s) they received based on the above objective criteria and by providing supporting documentation." *Id.* at 4.

One question is how the phone numbers appearing on putative class members'

phone bills would demonstrate membership in the classes.  In their supplemental reply, plaintiffs state that they have identified sixty numbers that the ESG defendants "used in connection with the calls at issue," pointing to two letters from ESG's attorney to the Missouri Attorney General's office and a list of numbers to which ESG subscribed.  Pls.' Supp. Reply at 3 (citing Pls.' Exs. 46–47).  Plaintiffs say that putative class members could establish class membership with records that they received calls from these numbers.  One of the letters from ESG to the Missouri Attorney General's office references a number that "was used by ESG in connection with a political campaign that ran for one day on March 6, 2012."  Pls.' Ex. 46 at 1.  The other letter lists eight numbers (including the one from the first letter); it states that "each and every call completed" from those numbers included "political surveys via pre-recorded messages" and that those participating in the surveys were offered a "free incentive" in exchange for doing so.  *Id.* at 2–3.  The other exhibit plaintiffs reference is a list of phone numbers they received via a subpoena to Bandwidth.com; it is entitled "Economic Strategy Group, Inc. Telephone Number History."  Pls.' Ex. 47.

Although defendants contend that these lists do not describe the content of the calls made from the listed numbers, the letter with the list of numbers that ESG's attorney provided to the Missouri Attorney General clearly does so.  It described political survey calls each of which included a "free incentive" offer.  Although the letter does not identify the "incentive" as a cruise, defendants do not argue that ESG ever offered any other incentive in connection with these calls.  Indeed, ESG owner Jacob DeJongh, who testified in a deposition for this case, was asked if "anything else [was] ever offered" during the calls he made other than a free cruise.  CCL-VOMT Ex. D at 98:4–6.  He

responded, "No. I didn't offer anything else." *Id.* at 98:7. CCL and VOMT argue in their original response to the class certification motion that thirty to forty percent of ESG's calls did not include a cruise offer. CCL-VOMT Resp. at 12. But individuals with records proving they received a call from one of the numbers on the Missouri Attorney General letter discussing the political survey/"free incentive" calls almost certainly are class members who would need to provide only these records to prove as much.

The ESG "Telephone Number History" list obtained from Bandwidth.com does not reference the content of the calls made from those numbers. For this reason, plaintiffs propose "corroborat[ion of] class members' own records" with an affidavit or claim form process. Pls.' Supp. Reply at 3. Defendants contend such a process would not be practical or reliable and that "the vagaries of putative class member's [sic] memories" render plaintiffs' proposed affidavit procedure inferior, because "[s]oliciting affidavits from putative class members . . . would invite them to speculate, or worse." *Id.* at 6–7. Defendants also cite a number of district court cases in which courts refused to permit similar affidavit processes for class member identification to proceed.

Defendants' arguments, however, primarily assume a class or claim identification process that is based on affidavits alone, not the combination of documentary evidence and a sworn statement that plaintiffs propose. *See, e.g.*, *Brey Corp. v. LQ Mgmt. LLC*, Civil No. JFM-11-718, 2014 WL 943445, at *1 (D. Md. Jan. 30, 2014) ("A putative class member would be able to establish his, her, or its standing only by submitting an affidavit that he, she or it had received the unsolicited fax."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2012 WL 865041, at *15 (S.D. Ill. Mar. 13, 2012) (proposal of two-part questionnaire without

mention of submission of evidence from class members). In one of defendants' cases where plaintiffs suggested that putative class members offer proof of class membership in the form of a receipt or product label, the court observed that plaintiffs "offer[ed] no basis to find that putative class members will have retained" such documentation. *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010). Here, by contrast, plaintiffs contend that class members "likely will be able to order copies from their telephone service providers, as Plaintiffs themselves did." Pls.' Supp. Reply at 3 n.6.

In addition, limiting the classes only to those person's whose membership can be proved by reference to some other party's records is fundamentally unfair to potential class members. Defendants have provided in discovery a list of phone numbers of those who received the offending calls, and defendants now argue the classes should be limited only to the records defendants themselves have produced. (In fact, they argue that even the records they have produced are not sufficient for class certification.) In other words, defendants are essentially arguing that the contours of the class should be defined by defendants' own recordkeeping. This would result in an artificial class definition that would leave out individuals who actually received the calls in question— an unquestionably objective criterion—and who possess a record that is at least circumstantial evidence of class membership, a picture they can complete with their own sworn statements. Doing this—or declining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct. The Court does not agree that the

classes should be limited in the way defendants propose.

The Court therefore concludes that plaintiffs' second method of identifying class members satisfies the requirement of ascertainability.  Should a putative class member's records fail to indicate that she received a political survey call with a free cruise incentive, she may in addition to her records provide a sworn statement at an appropriate point during the litigation.  The Court will address below defendants' arguments regarding the manageability of this process.

### 2.    Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable."  Courts have found that a class of forty is, or at least can be, sufficiently large to satisfy Rule 23(a)(1).  *See Pruitt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006); *Costello v. BeavEx Inc.*, No. 12 C 7843, 2014 WL 1289612, at *8 (N.D. Ill. Mar. 31, 2014).  In initially responding to plaintiffs' motion, defendants CCL and VOMT briefly argue that the proposed classes are not sufficiently numerous because plaintiffs "never establish[ed] even in general terms a number of putative class members."  CCL-VOMT Resp. at 17.  The Court has concluded above that the classes, which contain significant numbers of members, are sufficiently ascertainable.  Considering this conclusion, and the fact that there are over 900,000 members, the proposed classes are sufficiently numerous.

### 3.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  To show commonality, plaintiffs must demonstrate that the class members' claims "depend upon a common contention" which is "of such a nature that it is capable of classwide

resolution." *Wal–Mart Stores,* 131 S. Ct. at 2551. In this inquiry, "for purposes of Rule

23(a)(2), even a single common question will do." *Id.* at 2556 (internal alterations and

quotation marks omitted). Relying on the Supreme Court's decision in *Wal–Mart*, the

Seventh Circuit has explained that to establish commonality, a plaintiff must show that

the class members all "suffered the same injury." *Jamie S.*, 668 F.3d at 497 (citing

*Wal–Mart*, 131 S. Ct. at 2551); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir.

2012). Superficial common questions are insufficient to satisfy Rule 23(a)(2). *Jamie S.*,

668 F.3d at 497.

Plaintiffs contend that the proposed classes' "single contention" is that

defendants made or benefited from "robocalls that utilized a prerecorded voice to send

the same type of message, from the same person, using the same technology,"

producing "several common and controlling factual and legal questions." Pls.' Mot. at

12. Plaintiffs proceed to outline five questions they contend are common to the classes,

including "whether each defendant can be held commonly liable to Plaintiffs" and

"whether Defendants' survey calls utilized an artificial or prerecorded voice." *Id.* at 12–

16. Defendants respond to each purported common question largely by contending that

plaintiffs cannot identify class members and thus cannot show common questions

among them. Defendants also argue that there are dissimilarities among the

experiences of the class members, such as whether they participated in the political

survey, the length of each call, and the cellular phone plan of each cellular phone

plaintiff. Finally, citing district court cases from other circuits, defendants contend that

the classes will feature "different defenses and damages" because they "include

unanswered calls, calls to disconnected telephone numbers and calls where the

recipient hung up immediately before completing the political survey or hearing about a free cruise, if any." CCL-VOMT Resp. at 22.

The parties' arguments on commonality were filed before plaintiffs modified their proposed class definitions to restrict membership to those for whom defendants' records or their own records show they belong in the classes. As plaintiffs note, only "individuals, to the extent they have records of the calls, are provided with relief" under the revised class definitions. Pls.' Supp. Reply at 1 n.3. Further, defendants' argument does not track the language in the class definitions. Those who are members of one of the proposed classes by definition received the same calls offering a free cruise in exchange for a political or public opinion survey, made by or for one of the defendants, using the same artificial or prerecorded voice technology. This is a common alleged injury presenting a common question. Defendants' commonality arguments are related largely to how one determines who is in the classes, which is not responsive to whether there are common issues among those who are class members. The commonality inquiry differs from the question of ascertainability. Here there is a common injury, resulting from receipt of the allegedly offending calls, not to mention common questions regarding the liability of the defendants who did not themselves place the calls. The Court likewise determines that there are questions of law or fact common to each class member.

### 4. Typicality

Rule 23(a)(3) requires class plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This requirement "directs the district court to focus on whether the named representatives'

claims have the same essential characteristics as the claims of the class at large."

*Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).  Plaintiffs contend that the

"essential characteristics" of named plaintiffs' claims are "practically identical" to those

of the proposed classes at large because they received calls offering a free cruise in

exchange for answering an automated political survey.  Pls.' Mot. at 17.

Defendants contend that the named plaintiffs "are not typical of the proposed

class(es)" because their "claims do not appear on the list" of 930,000 numbers plaintiffs

have obtained.  Defs.' Supp. Resp. at 1.  However, the Court has concluded that the

proposed classes are ascertainable not only as to the list of 930,000 numbers but also

as to those whose own records (plus, in some situations, affidavits) establish their

membership.  Although the named plaintiffs' phone numbers are not on the list of

930,000, they "have each testified about the content of Defendants' free cruise calls and

produced numerous telephone phone records evidencing their receipt."  Pls.' Supp.

Reply at 7 n.11.  Although this assertion does not include a citation to the record,

plaintiffs elsewhere have pointed to the named plaintiffs' various depositions and

answers to interrogatories detailing the content, dates, and times of the calls they

received.  This would place the named plaintiffs within plaintiffs' second proposed

method of identifying class members:  through presentation of their own records

combined with a sworn statement about the content of their phone calls.  For this

reason, and because the named plaintiffs received the same type of call as the other

class members, their claims are typical of those of the class.[2]

---

[2] Defendants' other arguments on the typicality of the named plaintiffs' claims date from before plaintiffs altered their class definition.  Regardless, those arguments largely did not concern the typicality of the named plaintiffs' claims, but rather pointed out that there

One issue plaintiffs should consider as this litigation proceeds is whether they should designate additional class representatives, a possibility plaintiffs themselves raise in their supplemental memoranda. *See id.* ("[O]ther putative class members who do appear in those records have indicated that they are interested in, and willing to, serve as named plaintiffs in this case."). Plaintiffs may be well-advised to do so, considering the fact that the named plaintiffs appear to represent only those class members whose membership is determined via plaintiffs' second proposed identification method. The classes as a whole likely would benefit from having class representatives whose phone numbers appear on the list of 930,000 that plaintiffs have presented.

### 5.  Adequacy

Rule 23(a)(4) requires that the named plaintiffs and class counsel "will fairly and adequately protect the interests of the class." On this question, courts look to "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). The adequacy and typicality requirements "tend[ ] to merge." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation marks omitted). The Seventh Circuit has concluded, for example, that conflicts of interest can counsel against a finding of adequacy. *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012). Also, a class representative with "serious credibility problems . . . may not be an adequate class

---

likely would be inconsistencies in the experiences of each plaintiff when receiving the calls in question. Defendants argue that some of the named plaintiffs did not participate in the survey offering a free cruise or ask to be transferred to CCL. The TCPA violation, however, is complete upon receive of the pertinent call; it does not require the survey to be taken or the transfer to CCL to be made.

representative." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Defendants do not take issue with the adequacy of class counsel. They contend, however, that the named plaintiffs are inadequate and have conflicts with their fellow class members. They say plaintiff Stone "could not match those calls identified in her interrogatories to her telephone records" and kept "*no* notes" on the calls. CCL-VMT Resp. at 25. They also argue that plaintiffs Birchmeier and Stone failed to keep records of their research on the calls they received, and that none of the named plaintiffs had heard of CCL, VMT, or Berkley, which means they are inadequate because their claims are "being driven by someone else." *Id.* Yet defendants have not explained how these contentions, if taken as true, are fatal to the named plaintiffs' adequacy as class representatives or their credibility. There is no requirement for a class representative to research or keep notes on her claims, nor do defendants cite a case suggesting such a requirement. In short, defendants' arguments in this regard are unpersuasive. In addition, the fact that the proposed representatives have offered records and have submitted to questioning in depositions about the phone calls they received reflects that they are satisfying the duties associated with a role the Seventh Circuit has labeled "nominal." *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013). Further, defendants do not identify any conflict of interest between the named representatives and the rest of the classes, but rather point out theoretical inconsistencies in the experiences of other class members. This argument does not speak to the adequacy of the named plaintiffs as class representatives. Considering these conclusions, the Court agrees with plaintiffs that the class representatives are

adequate.

**B.      Rule 23(b)(3) requirements**

      **1.      Predominance**

Under Rule 23(b)(3), plaintiffs must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  A court evaluating predominance must "test[ ] whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  This is a "more demanding" element than those listed in Rule 23(a).  *Comcast Corp v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  The Seventh Circuit has stated that the predominance inquiry "requires a qualitative assessment" and is not akin to "bean counting" or "counting noses."  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

That said, plaintiffs seeking to certify a class need not show "common results for members of the class" in addition to "common evidence and methodology" to satisfy the predominance requirement.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012).  They also "need not . . . prove that the predominating question will be answered in their favor."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013).

Plaintiffs contend that common issues predominate because "Defendants employed uniform practices with regard to each class member," including using the same dialing system to deliver recorded messages, all offering a free cruise in exchange for taking a political survey.  Pls.' Mot. at 20.  Defendants argue that individualized issues predominate.  They contend that the Court would have to conduct

mini-trials to decide whether an individual should fit in the landline or cellular phone class and that plaintiffs "fail to present a scientific method that will enable them to prove individual issues will not predominate over common issues." CCL-VOMT Resp. at 27. Specifically, they argue that the Court would have "to determine whether an individual fits within one of the proposed classes, whether any of the Defendants (and if so, which Defendants) are responsible to a particular class member, whether any defenses apply, and the damages recoverable (if any)." *Id.* They also contend that the "gathering" of "individualized 'proof'" from class members would be "inherently flawed" as it would be based on class members' "bare recollection[s]." *Id.* at 28.

The Court does not agree that the litigation would be "overwhelmed by . . . individual questions" if the Court certifies the proposed classes. CCL-VOMT Resp. at 27. As noted earlier, the common question among class members is whether they received calls fitting the description in the class definitions. These definitions do not leave much room for variation and are undoubtedly common to each class member: offer of a free cruise; offer made in exchange for participation in a political or public opinion survey; use of a prerecorded or artificial voice; date of call; by, on behalf of, or for the benefit of defendants. Defendants have not shown that any of these elements will be subject to variation among those described in the proposed class definitions. To put it another way, whether a particular defendant is liable is not an *individual* issue among class members. The same applies to defendants' argument that the Court would have to determine whether any defenses apply; they have not persuasively argued that defenses can or would vary among class members. Furthermore, defendants' contention about calculation of individual damages is a non-issue in terms

24

of predominance.  Plaintiffs are asking only for statutory damages, which eliminates individual variations.  *See* Pls.' Reply at 14 ("Plaintiffs seek to recover statutory and not actual damages.").

Moreover, plaintiffs' revised class definitions largely address defendants' arguments on predominance.  There need not be individualized inquiries of those with numbers on the list of 930,000 who unquestionably received the calls in question. Membership in the classes deriving from that list would not require probing into the memory of person with a number on the list.  As for those putative class members who enter the classes via submission of their own records, or their records plus sworn statements, their class membership will plainly not rest on "bare recollection" alone; they must also submit objective evidence.  Any difficulty involved in this process is more appropriately addressed under the manageability factor encompassed in the Rule 23(b)(3) inquiry, which the Court examines below.  Regardless, arguments about whether someone belongs in the classes do not speak to whether common questions predominate *among class members*; those who are in the classes will be those who can document that they meet the class definitions.  Rather, these arguments go to whether an individual may join the classes, which is a different question.

In sum, the Court concludes that there is predominance of common questions among members of plaintiffs' proposed classes.

### 2.      Manageability

One factor considered in evaluating whether a class should be certified under Rule 23(b)(3) is "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  The manageability question "encompasses the whole range of practical

problems that may render the class action format inappropriate for a particular suit."
*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

In arguing that plaintiffs' proposed classes are not manageable, defendants first renew their argument that it will be either impossible or else costly and onerous to obtain the identities of the subscribers for the phone numbers on the list of 930,000. *See* Defs.' Supp. Resp. at 8–10. The Court has largely addressed this argument above. Defendants' own expert has stated that it is possible to obtain historical subscriber information from each carrier, and plaintiffs have stated that they will obtain the information.

Defendants also take issue with the manageability of the classes regarding the category of those who obtain membership through a combination of documentary evidence and a sworn statement. Defendants contend that an affidavit procedure in this case would be "daunting and unwieldy" and require "arduous individualized inquiries." Defs.' Supp. Resp. at 8. Plaintiffs maintain that the affidavit process could "employ imaginative solutions," such as posing a standard set of questions to putative class members about the calls they received. Pls.' Supp. Reply at 6. Plaintiffs alternatively propose that the Court could appoint a magistrate judge or special master to administer claims, create subclasses, or alter or amend the classes. *Id.* (citing *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)).

Defendants do not respond in particular to any of these ideas. The Court can make a decision at a later point in this litigation about the specific nature of the process for permitting individuals in this category to demonstrate their class membership. At present, however, there is no indication that this sort of a process, whatever form it

takes, will prove unduly cumbersome. Indeed, there is a good chance that, given the requirement to have separate documentation, the sworn statement process will not produce a torrent of putative class members or anything close to it. In short, it would be imprudent for the Court to presume a problem before one occurs. Moreover, as plaintiffs note, district courts have considerable flexibility in fashioning solutions to manageability issues that arise in class action litigation. *See Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 888 (7th Cir. 2011) ("[T]he district court has substantial latitude in the management of complex class-action litigation."). The Court will have the ability to fashion a solution that fits the particular circumstances of this case, and defendants do not contend otherwise.

Defendants also argue that plaintiffs have not outlined a notice plan and that "there is simply no way that Plaintiffs can identify and contact the recipients of more than 50 million calls." CCL-VOMT Resp. at 30. In a later memorandum, defendants repeat the point that plaintiffs have offered no proposal for effectuating notice in this case. *See* Defs.' Supp. Resp. at 10. To the contrary, however, plaintiffs have proposed several methods for notifying potential class members of their claims: "To be sure, such notice could easily be circulated in nationwide newspapers and magazines, through an online media campaign, and even on Defendants' websites and online complaint boards, which the potential class members here are likely to view." Pls.' Reply at 24. They argue that this sort of a notice program would comply with Rule 23(c)(2), which requires the court to direct "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Seventh Circuit has stated that the rule requires "only the best notice that is

practicable." *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676–77 (7th Cir. 2013) (internal quotation marks omitted). The court noted that "[w]hen reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted." *Id.* Plaintiffs' proposed methods of notice fall squarely within this line of reasoning. Given that the number of class members approaches and possibly exceeds one million persons, it is likely that there will not be a practicable way to reach each person individually, making broad-based forms of notice appropriate.

Considering defendants' lack of response to (or even acknowledgment of) plaintiffs' proposals, and the fact that notice by publication is acceptable in these circumstances, the Court declines to conclude that the classes would be unmanageable on notice grounds.

### 3. Superiority

Another requirement under Rule 23(b)(3) is that "a class action is superior to other available methods for fairly and efficiently adjudicating" the particular controversy. This, along with the predominance requirement of Rule 23(b)(3), is intended "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (internal quotation marks and alterations omitted).

Plaintiffs contend that class treatment is a superior vehicle for their claims because the TCPA does not provide for fee-shifting, meaning potential statutory damages "would likely be dwarfed by the attorneys' fees and costs needed to get there." Pls.' Mot. at 20. They also argue that litigation of individual claims of class members

would be inefficient and that class treatment would provide finality and consistency.

Defendants respond that a class action is not a superior vehicle for this case because "Congress felt statutory damages provided sufficient incentive" for TCPA claims. Defs.' Supp. Resp. at 11; *see also* CCL-VOMT Resp. at 30 ("[T]he $500/$1,500 damages involved on an individual basis is incentive enough to bring a small claims case."). Whether or not that is true, it does not mean the claims cannot be bound together in a class action, in which each plaintiff still would be entitled to his individual statutory damages. Defendants add that CCL has defended against TCPA cases in other venues, such as "small claims, trial and even federal courts." *Id.* Again, this does not imply that the class action in this case would not be a superior way of binding individual claims together given the efficiencies the class action mechanism creates. In this case, plaintiffs have alleged that defendants chose to violate the TCPA on a very large scale by targeting a million or more people with inappropriate calls. Individual litigation of the claims of each individual would not be a superior or efficient way to resolve the claims.

Defendants go on to argue that leaving the determination of which class members are entitled to damages to a special master or claims administrator would create "a windfall" to those who are not cut from the class. *Id.* at 12. This is because, in defendants' telling, those who are eliminated from the class would not be compensated for actual damages but instead would receive "statutory damages, which were *awarded* to someone who should never have been in the class, would then inure to the benefit of those remaining in the class." *Id.* This argument assumes that there would be an award of a total amount of statutory damages based upon the total number of class

members, which then would not be reduced if individuals are eliminated from the class in some post-litigation claims administration process. This argument is thus quite speculative, to say the least, and it makes unwarranted assumptions about what the Court might do in a far-off stage of litigation. The argument is not a basis to say that joinder in a class action of nearly a million claims, each of relatively modest dollar value, is not superior to individual litigation of those claims.

Defendants also argue that the potential liability in this case is "ruinous" and could be "in the **billions**," which is "well beyond what Congress established." Defs.' Supp. Resp. at 11–12; CCL-VOMT Resp. at 30. But as plaintiffs point out, the Seventh Circuit has rejected this argument as a barrier to class certification. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953–54 (7th Cir. 2006). In *Murray*, the court observed that the potential for substantial damages resulting from statutory damages to class members lies in Congress's formulation of those damages and does not involve an abuse of the class action mechanism. *Id.* at 953. Should a damages award prove to be unconstitutionally excessive, it may be reduced, but "after a class has been certified," not before. *Id.* at 954. Further, determination of liability for any given defendant will happen later, and there could be a finding of no liability as to some or all defendants. Speculation about how that might come out is not an appropriate barrier to class certification. Defendants also link their ruinous liability argument to the cost of identifying putative class members, stating again that "Plaintiffs did not provide a workable method to *identify* and *manage* the proposed class(es)." Defs.' Supp. Resp. at 12. The Court need not address this point again, other than to say that in view of the class membership identification mechanisms proposed, a conclusion that the cost

involved will be excessive amounts to unwarranted speculation.

In sum, the Court concludes that the class action is a superior device for litigation of plaintiffs' claims.

## Conclusion

For the reasons stated above, the Court grants plaintiffs' motion for class certification [docket no. 146] with one modification. The Court certifies two classes, one for individuals who received cellular phone calls and another for those who received landline calls, each with the following definition:

> All persons in the United States to whom (1) one or more telephone calls were made by, on behalf, or for the benefit of the Defendants, (2) purportedly offering a free cruise in exchange for taking an automated public opinion and/or political survey, (3) which delivered a message using a prerecorded or artificial voice; (4) between August 2011 and August 2012, (5) whose (i) telephone number appears in Defendants' records of those calls and/or the records of their third party telephone carriers or the third party telephone carriers of their call centers or (ii) own records prove that they received the calls—such as their telephone records, bills, and/or recordings of the calls—and who submit an affidavit or claim form if necessary to describe the content of the call.

The class representatives are the named plaintiffs, Grant Birchmeier, Stephen Parkes, and Regina Stone. The Court appoints Jay Edelson of Edelson PC and Scott Rauscher of Loevy & Loevy as class counsel. This case is set for a status hearing on August 20, 2014.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 11, 2014