**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GERARDO ARANDA, GRANT
BIRCHMEIER, STEPHEN PARKES, and
REGINA STONE, on behalf of themselves
and classes of others similarly situation,
     *Plaintiffs*,
     v.

CARIBBEAN CRUISE LINE, INC.,
ECONOMIC STRATEGY GROUP,
ECONOMIC STRATEGY GROUP, INC.,
ECONOMIC STRATEGY, LLC,
THE BERKLEY GROUP, INC., and
VACATION OWNERSHIP MARKETING
TOURS, INC.,
     *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case #: 1:12-cv-04069
*Related to:* Case #: 1:13-cv-00903
         Case #: 1:13-cv-00908

Honorable Matthew F. Kennelly

**CARIBBEAN CRUISE LINE, INC.'S MEMORANDUM OF LAW
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION AND BACKGROUND ......................................................1

  A.  TELEPHONE CALLS TO PLAINTIFFS ...........................................2

  B.  CCL's BUSINESS MODEL ..............................................................4

  C.  PROCEDURAL HISTORY.................................................................7

II.     ARGUMENT: SUMMARY JUDGMENT IS PROPER UNDER ANY THEORY OF LIABILITY ............................................................................9

  A.  SUMMARY JUDGMENT STANDARD ...........................................9

  B.  NO DIRECT TCPA LIABILITY EXISTS AS CCL DID NOT MAKE OR INITIATE THE POLITICAL SURVEY CALLS...............................................10

  C.  NO THEORY OF VICARIOUS LIABILITY IS PLEADED IN THE ACC OR OTHERWISE AVAILABLE AGAINST CCL...............................................11

      1. NO ALLEGATIONS REGARDING VICARIOUS LIABILITY ARE SET FORTH IN THE ACC TO PERMIT PLAINTIFFS TO PURSUE SUCH CLAIM AT THIS STAGE OF THE PROCEEDINGS ................................................11

      2. THE RECORD EVIDENCE DEMONSTRATES THAT NO THEORY OF VICARIOUS LIABILITY EXISTS TO HOLD CCL LIABLE UNDER THE TCPA ................................13

      a. CCL IS NOT VICARIOUSLY LIABLE FOR THE ACTIONS OF THE SROS........13

      b. CCL IS NOT LIABLE UNDER PRINCIPLES OF AGENCY, APPARENT AUTHORITY, OR RATIFICATION ............................18

  D.  NO JOINT VENTURE OR PARTNERSHIP EXISTS BETWEEN CCL AND ANY OTHER DEFENDANT ................................................22

  E.  CCL IS ENTITLED TO SUMMARY JUDGMENT ON TELEPHONE CALLS TO PLAINTIFFS THAT DID NOT REFERENCE A CRUISE OR APPEAR IN PLAINTIFFS' OR DEFENDANTS' PHONE RECORDS .................................24

  F.  CCL IS ENTITLED TO SUMMARY JUDGMENT ON ALL CALLS TO RESIDENTIAL LANDLINES ................................................26

III.    STAY OF LAWSUIT PENDING OUTCOME OF *SPOKEO V. ROBINS* ......................27

IV.    CONCLUSION .................................................27

## I.  INTRODUCTION

The undisputed material facts demonstrate that Caribbean Cruise Line, Inc. ("CCL") did not make or initiate the telephone calls at issue and thus, CCL cannot be directly liable for a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA").  The telephone calls made to Plaintiffs were initiated by tax exempt nonprofit survey research organizations ("SROs")[1] which, by Plaintiffs' own admissions, were conducting political and/or public opinion surveys on their own behalf. Moreover, and although not pleaded in the Amended Consolidated Complaint ("ACC"), there are no facts existing in the record to demonstrate that CCL had any direction or control over the actions of the SROs or the manner and means of how the calls were made to result in CCL being vicariously liable for the calls; the undisputed material facts reveal the opposite. Even the person who assisted the SROs' owner with placing the calls admits he never heard of, or worked with, CCL.[2]  Importantly, Plaintiffs unanimously concede they did not hear of CCL on each telephone call of which they complain. In fact, two of the named Plaintiffs admit they never heard of CCL until this lawsuit was filed.[3]

Even if CCL could somehow be found responsible for the actions of the SROs, CCL is entitled to summary judgment on the alleged calls which Plaintiffs' (and Defendants') records do not substantiate or which do not otherwise fit within the class definitions.  Finally, this case should be stayed pending the decision of the United States Supreme Court in *Spokeo v. Robins*, a case that will

---

1.  The SROs in this proceeding are, *inter alia*, Economic Strategy Group (a Political Action Committee)(hereinafter referred to as "ESGP"), Economic Strategy Group, Inc. (hereinafter referred to as "ESGI"), Economic Strategy Group, LLC (hereinafter referred to as "ESGLLC") (ESGP, ESGI and ESGLLC shall collectively be referred herein to as "ESG"), and Political Opinions of America ("POA"). ESGP does business, including conducting surveys, as POA.  ESGP was a federally licenses political action committee. ESGI was an exempt organization under IRC 501(c)(4). All of the SROs were owned, controlled and operated by Jacob DeJongh.
2.  Statement of Undisputed Material Facts in Support of CCL's Motion for Summary Judgment ("Def. SOF"), ¶¶ 78-79.
3.  Def. SOF, ¶¶ 60-61, 66.

potentially deprive Plaintiffs of Article III standing in the context of this statutory damages only claim, as Plaintiffs have openly conceded they do not seek damages for any actual, concrete injuries.[4]

### A. Telephone calls to Plaintiffs

According to Plaintiffs, they each received at least one call from a prerecorded voice that requested them to complete a political survey and thereafter, as an incentive for completing the survey, he or she would be given an opportunity to hear about or take a complimentary cruise.[5] Plaintiffs testified in deposition that CCL was never mentioned in the majority of telephone calls they claim to have received.[6] No Plaintiff ever did business with CCL or took advantage of the complimentary cruise. However, Jacob DeJongh ("DeJongh"), the owner of the SROs who controlled the calls at issue and occasionally offered a complimentary cruise to incentivize call recipients to take the surveys, admits that the complimentary cruise was not always offered on calls placed by the SROs.[7]

Plaintiff Birchmeier testified that he received one call to his cellular telephone on May 7, 2012, which he answered and heard a "recorded message … from Political Opinions of America" prompting him to "take a 30-second political survey" in return for a free two-day cruise.[8] Birchmeier cannot recall the name of any entity other than Political Opinions of America disclosed on the call,[9] and first heard of CCL through his attorneys.[10] Plaintiff Aranda complained he received one

---

4. *See* DE 202, Plaintiffs' Combined Reply in Support of Class Certification, p. 14 ("Given that the TCPA is violated once the call is made, and Plaintiffs seek to recover statutory and not actual damages, none of these issues will affect ascertainability.").
5. Def. SOF, ¶¶ 60, 64-65, 68, 74.
6. Def. SOF, ¶¶ 61-62, 65-66, 68-69, 75-76.
7. Def. SOF, ¶ 33.
8. Def. SOF, ¶ 60.
9. Def. SOF, ¶ 61.
10. Def. SOF, ¶ 62.

unlawful call to his cellular telephone on March 10, 2012.[11] Aranda testified that he first heard of CCL through his lawyers and/or court documents.[12] Although he later changed his testimony to explain that he cannot remember any details from the telephone call on March 10, 2012,[13] Aranda claims he recalls receiving a call from a robotic voice and was later transferred to a live person who offered a 2-day free cruise.[14] Plaintiff Parkes testified that he received the first alleged violative call on his cellular telephone on March 13, 2012 "from Political Opinions of America" which offered a free cruise for answering a few questions.[15] Parkes testified that no business or entity other than "Political Opinions of America" was mentioned in the recording.[16] Parkes admits the only time he spoke to a CCL representative was after receiving a call on his business line (which is not at issue in this lawsuit).[17] Interestingly, Parkes' telephone records show the calls about which he complains lasted between only two and twenty-one seconds, calling into question the substance of his testimony as the length of the calls does not provide sufficient time to hear survey questions or get connected with a live representative as Parkes testified.[18]

Regina Stone's testimony regarding calls she received is not substantiated at all by her call records.[19] Regina Stone testified the first call she received on her cellular telephone offering a cruise in exchange for taking a short political survey was on April 27, 2012.[20] She claims a voice recording explained Political Opinions of America was conducting the survey, and Stone proceeded to take the

---

11.     Def. SOF, ¶ 64.
12.     Def. SOF, ¶ 66.
13.     Def. SOF, ¶ 65.
14.     Def. SOF, ¶ 65.
15.     Def. SOF, ¶ 68.
16.     Def. SOF, ¶ 68.
17.     Def. SOF, ¶ 71.
18.     Def. SOF, ¶ 72.
19.     Def. SOF, ¶ 73.
20.     Def. SOF, ¶ 74.

three-question survey.[21] Stone testified that following the survey she was connected to a live operator who advised Stone she had won a free cruise.[22] Stone claims the operator identified herself as being from CCL, and after requesting Stone's credit card information for the payment of port fees, Stone ended the conversation.[23] As set forth in her interrogatory responses, Stone claims she was called a total of fourteen (14) times on her two cellular telephones and twice on her landline telephone between April 2012 and June 2012.[24] Importantly, out of the alleged sixteen (16) calls Stone complains of in this lawsuit, she admits she only heard the name CCL on one call.[25] Moreover, of the sixteen (16) alleged calls identified in her Interrogatory responses, not one is contained in her telephone records.[26]

In their original iterations of the Complaint, Plaintiffs alleged that the political survey calls, and the SROs making those calls, were nothing more than a "sham" or "front" for the other Defendants in this case.[27] After conducting the deposition of DeJongh, the creator and operator of the SROs who sought to gather political and economic opinions of persons nationwide,[28] the Plaintiffs abandoned that theory. Now they suggest, through their recent Interrogatory responses only, that some form of vicarious liability should be utilized to establish liability over CCL. But no such theory exists.

### B. CCL's business model

CCL is a company that markets and sells cruise and vacation packages;[29] it had purely

---

21.    Def. SOF, ¶ 75.
22.    Def. SOF, ¶ 75.
23.    Def. SOF, ¶ 75.
24.    Def. SOF, ¶¶ 73-74; *see also* Regina Stone's Responses to Berkley's First Set of Interrogatories, included as part of **Composite Exhibit 13** to Def. SOF.
25.    Def. SOF, ¶¶ 75-76.
26.    Def. SOF, ¶ 73.
27.    *See* DE 1, ¶¶ 2-3; DE 24, ¶¶ 2-3.
28.    Def. SOF, ¶¶ 10, 17; *see also* **Composite Exhibit 7** to Def. SOF.
29.    Def. SOF, ¶ 3.

contractual relationships with various SROs,[30] owned and operated by DeJongh.[31] The SROs were

survey research companies with separate contractual relationships with various political groups

under which the SROs collected specifically tailored information through political surveys and

polling.[32] CCL was only involved with the SROs because the SROs, through Linked Service

Solutions ("LSS"), approached CCL seeking to provide incentives to those SROs for the individuals

who participate in the political surveys.[33] CCL was and is a separate and distinct entity from the

SROs and CCL had nothing to do with the SROs' operations or with whom the SROs contracted.[34]

CCL did not direct or control the manner and means of the SROs' business, or the political surveys

they conducted.[35] CCL did not make or initiate any political survey calls, or cause any political

survey calls to be made to anyone, let alone the calls at issue.[36] CCL did not have any input or

control regarding how telephone calls were made, when telephone calls were made, or to whom

telephone calls were made. It is the SROs and their clients who always had that right of control;

CCL only provided an incentive pursuant to the Supplier Agreements.[37]

CCL did not know where the broker and/or the SROs were getting their telephone numbers.[38]

Once SROs purchased the telephone numbers from various entities, such numbers were provided to

LSS then to the dialer.[39] CCL had no input into the scripts used on the telephone calls (except with

respect to what was required in the event the SRO utilized the cruise incentive on a particular call),[40]

---

30. Def. SOF, ¶ 6.
31. Def. SOF, ¶¶ 10, 14.
32. Def. SOF, ¶¶ 17-18.
33. Def. SOF, ¶ 7.
34. Def. SOF, ¶¶ 10-17.
35. Def. SOF, ¶ 12.
36. Def. SOF, ¶ 17.
37. Def. SOF, ¶ 21. Although CCL would have received a benefit from those individuals who wanted to hear more about the complimentary cruise offer and elected to purchase something from CCL, that fact does not create liability and did not create any type of agency relationship between CCL and the SROs.
38. Def. SOF, ¶ 8.
39. Def. SOF, ¶ 25.
40. Def. SOF, ¶ 29.

and while the SROs were to provide CCL with a general description of the political survey and script, CCL could not amend the script even if it requested to do so and could not instruct the SROs on whom to call.[41] CCL did not transfer any funds to any of the SROs.[42] The "clients" of the SROs were the political organizations and at no time was CCL a client of the SROs.[43] CCL was not involved in any negotiations or preparations of any contracts between the SROs and their clients.[44] On the contrary, the SROs' clients had the absolute right, and exercised that right, to alter or update the automated scripts utilized by the SROs.[45] CCL did not have an understanding how the calls were going to be made, how many people the SROs were going to call, and did not track the number of people that they were calling.[46]

The scope of the Supplier Agreements was for CCL to provide a complimentary cruise incentive for use on the political survey calls at the SROs discretion and commercial calls were prohibited, such that neither party to the Supplier Agreements was an agent of the other party and had no authority to represent the other party with regard to any matter.[47] The Supplier Agreements state that the SROs shall at their own costs be responsible for all licensing and no-call registry requirements, including, but not limited to, state auto dialer permits, as appropriate.[48] The Supplier Agreements required the SROs to comply with all federal and state calling laws, including the

---

41.      Def. SOF, ¶ 26.
42.      Def. SOF, ¶ 13.
43.      Def. SOF, ¶ 18. *See also* Composite Exhibit 7 to SOF. Such agreements between the SROs and their respective clients demonstrate not only the independence of the SROs, but also, the legitimacy of the political surveys being conducted. For example, there are specific provisions relating to the preparation of the script(s), the number of calls to be made, the manner in which the calls would be made by the SRO for the benefit of the political organization, the term of the agreement, and what the SRO was to do with the statistical data it was collecting for the benefit of the political organization. The terms of those agreements say nothing about CCL, but rather relate to the obligations of the SRO, on the one hand, and the political organization, on the other hand.
44.      Def. SOF, ¶ 27.
45.      Def. SOF, ¶ 28.
46.      Def. SOF, ¶¶ 23-24, 29.
47.      *See* Supplier Agreements attached as **Exhibits 4-5** to Def. SOF; Def. SOF, ¶¶ 4-5.
48.      *Id.*

TCPA.[49] CCL did not, and could not, advise or affirmatively influence the SROs on its conduct or its day to day functions.[50] In fact, the SROs were not required to include CCL's offer and could choose, at the SROs' sole discretion, not to offer the cruise on the survey calls.[51] This was likely the case with the majority of calls made to Plaintiffs as only two Plaintiffs testified they had heard of CCL before this lawsuit was filed.[52] At times an SRO's client would abandon the cruise incentive; for example, Let Freedom Ring determined that it did not want CCL's incentive offer and the SROs continued to make the political calls without the cruise incentive.[53]

Significantly, the evidence adduced in this case reveals that the only relationship the dialer of the calls, Darren Rob ("Rob"), had with any person involved in this lawsuit was with DeJongh, the founder of the SROs.[54] A called party, such as each Plaintiff, was only connected to CCL via telephone if the cruise incentive was offered on that call and after he or she answered all of the questions included in the political survey and the called party expressly consented to being connected to one of CCL's representatives.[55]

### C. Procedural History.

On May 24, 2012, this lawsuit was commenced against, *inter alia*, CCL. On March 23, 2015, Plaintiffs filed the ACC, which restates the classes previously certified by the Court on August 11, 2014, and contains only two counts against several Defendants for purported *direct* violations of the TCPA, under 47 U.S.C. § 227 (b)(1)(A)(iii) and 47 U.S.C. § 227(b)(1)(B).[56]

---

49.  *Id.*
50.  Def. SOF, ¶ 32.
51.  Def. SOF, ¶ 33.
52.  Def. SOF, ¶¶ 62, 66.
53.  Def. SOF, ¶ 34.
54.  Def. SOF, ¶¶ 77-80.
55.  Def. SOF, ¶¶ 60-75.
56.  DE 289.

Once the rhetoric and the identity of the parties is stripped, the ACC alleges that:[57] "millions of customers received calls on their cellular and landline telephones made by or on behalf of Defendants to offer them a 'free' cruise package from [CCL] in exchange for taking a supposed political or public opinion survey, many of which were purportedly conducted by an entity claiming to be 'Political Opinions of America' ('POA')."[58] Plaintiffs allege the "survey was little more than a pretext for unsolicited telemarketing"[59] and that "Defendants placed (or directed or allowed to be placed for their own benefit and on their behalf) the robo-calls from numerous telephone numbers with area codes from around the country" and that the "free cruise" was not actually "free".[60] According to Plaintiffs, "[b]ecause the robo-calls were made by or on behalf of all Defendants, and each Defendant individually monetarily (and knowingly) benefited from the calls, all Defendants are liable for violating the TCPA's prohibition on calling telephones using an artificial or prerecorded voice without prior express consent."[61]

The ACC asserts only two causes of action against all of the Defendants collectively, claiming CCL (and all of the other Defendants) *directly* violated the TCPA by (1) using an automated telephone dialing system ("ATDS") and/or an artificial or prerecorded voice to call cellular telephone numbers, and (2) using an artificial or prerecorded voice to deliver a message to a residential telephone line that included the transmission of a telephone solicitation or an unsolicited advertisement. Plaintiffs claim they are entitled to treble damages because the calls were placed by Defendants knowingly.[62]

---

57. Each paragraph set forth below is as it appears in the text of the Amended Consolidated Complaint, DE 289.
58. *Id.* at ¶1.
59. *Id.*
60. *Id.* at ¶21.
61. *Id.* at ¶34.
62. *Id.* at ¶40.

## II. ARGUMENT: SUMMARY JUDGMENT IS PROPER UNDER ANY THEORY OF LIABILITY

### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63] A dispute is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.[64] A defendant can prevail on summary judgment merely by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support [any essential element of] the nonmoving party's case."[65]

Once a defendant meets its initial obligation of showing there is no genuine dispute of material fact, the onus shifts to the plaintiff to come forward with admissible evidence from which a reasonable jury could find that he has met his burden of proof.[66] It is not enough to produce "colorable" evidence; a plaintiff must proffer "significantly probative" evidence, and cannot rely on mere allegations.[67] Similarly, speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.[68] A plaintiff's naked assertion against sworn testimony does not raise a genuine issue of material fact; rather, it pits sworn testimony against speculation, conjecture and

---

63. Fed.R.Civ.P. 56(a); *see also Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)); *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008).
64. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).
65. *Celotex Corp*., 477 U.S. at 325, quoting Fed. R. Civ. P. 56(c).
66. *Id.* at 322-23.
67. *Anderson*, 477 U.S. at 247-49, 256-57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).
68. *Roney v. Illinois Dept. of Transp.*, 376 F. Supp. 2d 857, 864-65 (N.D. Ill. 2005) *aff'd,* 474 F.3d 455 (7th Cir. 2007).

self-serving conclusions.[69]

### B. No direct TCPA liability exists as CCL did not make or initiate the political survey calls

"Direct liability under the TCPA … applies only to entities that 'initiate' the telemarketing calls."[70] "By its terms, 47 U.S.C. § 227(b)(1)(A)(iii), assigns civil liability only to the party who 'makes' a call. …"[71] Moreover, the Federal Communications Commission (the "FCC") has held the word "initiate" implies a more direct connection such that a person initiates a call "when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call."[72] A strict liability analysis for finding a defendant liable when a third-party is involved has been rejected by the FCC.[73]

It is undisputed that CCL did not place any calls to Plaintiffs or any class members.[74] Therefore, Plaintiffs cannot show the central and preliminary element of the TCPA claims under a direct theory of liability—that CCL "made" or "initiated" the telephone calls at issue. Because only the maker or initiator of a call can be held directly liable under the TCPA, CCL is entitled to summary judgment on Plaintiffs' claims of direct TCPA liability.

---

69. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 934 (7th Cir. 1997); *Desir v. Bd. of Co-op. Educ. Servs. (BOCES) Nassau Cnty.*, 803 F. Supp. 2d 168, 176 (E.D.N.Y. 2011) aff'd, 469 F. App'x 66 (2d Cir. 2012).

70. *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771 (N.D. Ill. 2014); *Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2014 WL 2095310, at *4 (E.D. Mo. May 20, 2014) *rev'd and remanded*, 788 F.3d 814 (8th Cir. 2015) ("[A] seller is not directly liable for a TCPA violation unless it initiates call."); *see also In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6582 ¶ 24 (2013) ("2013 FCC Ruling") ("[W]e clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call ....").

71. *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 135 (E.D.N.Y. 2015).

72. 2013 FCC Ruling, at 6583.

73. *Id.* at 6593 n.140.

74. Def. SOF, ¶¶ 8, 12, 21.

**C. No theory of vicarious liability is pleaded in the ACC or otherwise available against CCL**

1. <u>No allegations regarding vicarious liability are set forth in the ACC to permit Plaintiffs to pursue such claim at this stage of the proceedings.</u>

The ACC alleges that "Defendants placed (or directed or permitted to be placed for their benefit and on their behalf) calls from a third-party or randomly generated list of phone numbers without authorization."[75] Omitted from the ACC is any allegation that CCL is vicariously liable under a theory of agency, apparent authority, or ratification. Courts have held that although the TCPA does not expressly list available vicarious liability claims, common law principles of vicarious liability apply.[76] In its Dish Network Declaratory Ruling ("2013 FCC Ruling"), the FCC explained that a seller may face vicarious liability "under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification."[77] However, such theories must actually be pleaded in the operative complaint.[78] Failure to properly plead a claim of vicarious liability when no theory of direct liability exists under the facts entitles a defendant to summary judgment.[79] In *Siding and Insulation Co. v. Alco Vending, Inc.*, the district

---

75. DE 289, ¶22.

76. *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084-85 (C.D. Cal. 2012), quoting *Meyer v. Holley,* 537 U.S. 280, 285, 123 S. Ct. 824 (2003) ("[When] Congress creates a tort action, 'it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules.'"); *see also* 2013 FCC Ruling at 6580 (FCC clarified that a seller who does not initiate a call nonetheless may be held vicariously liable under federal common law principles of agency for violations of § 227(b) and 227(c) that are committed by third-party telemarketers); *Bank v. Philips Elecs. N. Am. Corp.*, No. 14-CV-5312 JG VMS, 2015 WL 1650926, at *2 (E.D.N.Y. Apr. 14, 2015); *Jackson,* 88 F. Supp. 3d 129; *Lary v. VSB Fin. Consulting, Inc.*, 910 So. 2d 1280, 1283 (Ala. Civ. App. 2005).

77. 2013 FCC Ruling at 6584; *see also Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *5 (N.D. Ill. 2013) (to show a third-party, independent contractor sent alleged fax advertisements "on behalf of" a defendant, a plaintiff cannot claim strict liability; it must make a case per traditional agency principles).

78. *Mey v. Pinnacle Sec., LLC,* No. 5:11CV47, 2012 WL 4009718, *5 (N.D. W. Va. 2012); *see also Thomas*, 879 F. Supp. 2d at 1084 (plaintiff claiming a TCPA violation under a vicarious liability theory must demonstrate that the principal "controlled or had the right to control" the agent and "the manner and means of the [marketing] campaign" the agent conducted).

79. *See, e.g., Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) ("The district court is not required, however, to speculate over the nature of the plaintiffs' claim or to refuse to enter

court for the northern district of Ohio granted a defendant's motion for summary judgment because the plaintiff had "failed to make any allegations of vicarious liability in its complaint" and the undisputed facts demonstrated the defendant did not physically transmit any unsolicited fax advertisements.[80] The court there recognized "[i]f a plaintiff's theory of recovery is premised upon vicarious liability, however, vicarious liability must be alleged in the complaint."[81]

Similarly, courts in this District have required a Plaintiff seeking to hold another defendant vicarious liable under the TCPA to explicitly plead such a claim. In *Toney v. Quality Resources, Inc.*, the court held that the plaintiff could not prevail under vicarious liability theories of apparent authority or ratification, as the plaintiff failed to plead such theories in her operative complaint; allegations of "on behalf of" liability were held to be insufficient.[82] In *Smith v. State Farm Mutual Automobile Insurance Co.*, the plaintiff similarly failed to allege facts to support a claim of vicarious liability under Section 227(b) of the TCPA.[83]

In this case, the ACC is silent on any vicarious liability theories.[84] The allegations of the ACC insufficiently and repeatedly allege throughout that "Defendants placed (or directed or allowed to be placed for their own benefit and on their behalf), the robo-calls...."[85] Courts find this language insufficient to plead vicarious liability.[86] As the FCC has explained, "we do not think that an action

---

summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint."); *Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 807 (7th Cir. 2014) ("[A] party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment.").

80.   *Siding & Insulation Co. v. Alco Vending, Inc.*, No. 1:11 CV 01060, 2015 WL 1858935, at *7 (N.D. Ohio Apr. 22, 2015).

81.   *Id.*; *see also Jackson*, 88 F. Supp. 3d at 135.

82.   *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 744-45 (N.D. Ill. 2014).

83.   *Smith*, 2013 WL 5346430, at *2, discussing 2013 FCC Ruling; *see also Jackson*, 88 F. Supp. 3d at 135.

84.   DE 289, ¶ 32.

85.   *See, e.g.*, DE 289, ¶21.

86.   *See Smith*, 2013 WL 5346430; *Jackson*, 88 F. Supp. 3d at 135.

taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under section either section 227(c) or section 227(b)."[87]

    2.  <u>The record evidence demonstrates that no theory of vicarious liability exists to hold CCL liable under the TCPA</u>

    *a.  CCL is not vicariously liable for the actions of the SROs*

Vicarious liability under the TCPA requires a showing that the defendant controlled the *manner and means* of the third-party vendor's marketing activities.[88] CCL is not vicariously liable as it did not control the manner and means of the conduct of the SROs and, as such, CCL cannot be held liable for the telephone calls creating the alleged TCPA violations.

In *Thomas v. Taco Bell Corp.*,[89] the plaintiff received text messages as part of a sweepstakes promotion allegedly run by an association of local Taco Bell franchisees as well as Taco Bell.[90] Following receipt of the text messages, the plaintiff asserted that Taco Bell was vicariously liable for sending text messages in violation of the TCPA.[91] At summary judgment, the court granted Taco Bell's motion, holding that the plaintiff failed to adduce evidence that Taco Bell "directed or supervised the manner and means of the text messages campaign," "created or developed the text message," or "played any role in the decision to distribute the message by way of a blast text."[92] Rather, the court found the association had acted independently in disseminating the promotion, and Taco Bell's "knowledge, approval and [administration of funds to the Association] do not amount to

---

87.    2013 FCC Ruling, at 6593.

88.    *See, e.g., Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226 (S.D. Fla. 2013) *rev'd in part*, 768 F.3d 1110 (11th Cir. 2014) (to satisfy the level of "control" necessary to establish vicarious liability under the TCPA, Plaintiffs must establish that defendants, as the principals, maintained control over, and supervised, key aspects of the undertaking.); *Thomas*, 879 F. Supp. 2d at 1081 (granting summary judgment for Taco Bell as plaintiff was unable to show "that Taco Bell controlled the manner and means by which the text message was created and distributed.").

89.    *Thomas*, 879 F. Supp. 2d 1079.

90.    *Id.* at 1081.

91.    *Id.*

92.    *Id.* at 1085.

controlling the manner, method and means of the text message campaign."[93]

In *Applestein v. Fairfield Resorts, Inc.*, the plaintiff filed suit against Fairfield Resorts complaining about prerecorded voice messages Fairfield allegedly left plaintiff in violation of the TCPA.[94] Fairfield had entered into a written agreement with a telemarketer, Tele-Max, to obtain prospects to attend a sales presentation for the defendant's resort properties.[95] The plaintiff sought to hold Fairfield vicariously liable for the telemarketer's calls.[96] The appellate court reviewed the record to determine whether the telemarketer acted as Fairfield's agent or as an independent contractor:

> [T]he Marketing Agreement specifically provided that Tele-Max was an independent contractor, not an agent, and that Tele-Max retained authority over its "personnel, equipment, and facilities necessary to conduct the Marketing Services." Tele-Max had no authority to sell any vacation ownerships for Fairfield; it merely provided persons interested in touring a Fairfield facility. Such sales were made only by Fairfield and only at Fairfield's properties. In addition, no evidence was adduced at trial to suggest that Fairfield had "the right to train, to select, supervise, discipline, or train the individual [employees] who worked for [Tele-Max]" which would support a finding that Fairfield "had the right to control ... [Tele-Max's] employees." Finally, aside from needing approval from Fairfield regarding the content of its telemarketing scripts, Tele-Max retained "the full power and authority of the means, manner and methods of performing its responsibilities" under the Marketing Agreement. Tele-Max thus retained a general right of control over its "conduct."

Based on these facts, the court held the record established the telemarketer was acting as an independent contractor and not as an agent; as such, the court rejected the argument that Fairfield could be liable for the conduct of the telemarketer on a theory of agency. Finally, the court recognized no "strict vicarious liability" could exist simply because calls were placed "on behalf of" Fairfield.[97]

---

93.    *Id.* at 1086.
94.    *Applestein v. Fairfield Resorts*, No. 0004 SEPT.TERM 2007, 2009 WL 5604429 (Md. Ct. Spec. App. July 8, 2009).
95.    *Id.*
96.    *Id.*
97.    *Id.*

Similarly, in *Mey v. Pinnacle Sec., LLC*, the plaintiff received automated telephone calls from a third party hired by the defendant to generate sales leads.[98] On the defendant's motion for summary judgment, the court found that the defendant played a "passive role" in its relationship with the third-party lead generators because it did not control, or even have access to, the content of the prerecorded calls.[99] The court analyzed whether Pinnacle should be held liable under a theory of vicarious liability and, in granting summary judgment in favor of Pinnacle, the court held that "Mey has failed to create an issue of material fact with regard to Pinnacle's ability to control the manner and means of the calls made on its behalf...."[100]

In *Makaron v. GE Security Manufacturing, Inc.*, a case discussing theories of agency and ratification, the plaintiffs brought a putative class action against UTC Fire & Security of Americas Corporation, Inc. and Security One Alarm Systems complaining of telephone calls made using an ATDS or prerecorded message.[101] Plaintiffs alleged that Security One, as agent of UTC, called the plaintiffs to market a GE home security system.[102] UTC sells the equipment it manufactures "to independent distributors and dealers, who then resell that equipment to other businesses or consumer end-users"[103] and "[t]housands of downstream, independent businesses sell [UTC]'s security equipment."[104] The evidence revealed that UTC "does engage in its own marketing, but that marketing is limited to business to business marketing, targeted to reach [UTC]'s distributors and dealers."[105] UTC argued it was not liable under the TCPA because it is a "manufacturer" and could not be considered a "seller" since alleged calls were not made on its behalf.

---

98.     *Mey*, 2012 WL 4009718, at *5.
99.     *Id.*
100.    *Id.*
101.    *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253 (C.D. Cal. May 18, 2015).
102.    *Id.* at *1.
103.    *Id.*
104.    *Id.* at *2.
105.    *Id.*

The court analyzed the 2013 FCC Ruling and explained that UTC could be deemed "a 'seller' under the TCPA if it turns out it has an applicable agency relationship with the entities that made the calls to the plaintiffs. Thus, [UTC]'s vicarious liability, and its possible designation as a 'seller', turns on the agency principles the FCC espoused in its declaratory ruling."[106] The court then analyzed the relationship between UTC and third party distributors/authorized dealers, recognizing no actual agency exists since *inter alia* contracts prohibit such dealers from marketing "as" or "on behalf of" UTC. Similarly, the court noted no apparent authority exists because apparent authority "is only established 'by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonable relied."[107] The only manifestation made was when UTC granted Security One and other authorized dealers a limited license, but the manifestation was made by UTC to Security One rather than to the plaintiffs. The court also noted that UTC is entitled to summary judgment as to ratification, because "[a]lthough a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it."[108]

In *Kristensen v. Credit Payment Services, Inc.*, the District Court for Nevada rejected vicarious liability arguments in a TCPA case where plaintiffs claimed defendants had contracted with a third party to send text messages advertising payday loans. Rather than directly sue the party who sent the text messages, plaintiffs sought to hold the lenders who allegedly purchased the leads, and the party who contracted with the entity that sent the messages, vicariously liable under theories such as ratification and apparent authority, discussed further *infra*, as well as a "control and benefit"

---

106.    *Id.* at *5.
107.    *Id.* at *8 (internal citation omitted).
108.    *Id.* at *10.

theory of vicarious liability.[109] The *Kristensen* court ultimately granted summary judgment for defendants after finding no theory of vicarious liability subjected them to claims under the TCPA, as there was "no evidence that any of the defendants had either the legal or practical ability to control whether [the text sender] sent out unsolicited texts."[110]

Plaintiffs seem to rest their hat solely on the fact that CCL received a benefit as a result of the telephone calls made by the SROs that included the CCL complimentary cruise incentive. But that is not enough to create liability.[111] CCL is even more removed from the SROs than the independent contractors outlined in *Thomas*, *Applestein*, *Mey*, *Makaron*, and *Kristensen* as at no time did CCL request, direct or instruct any of the SROs to make or initiate any telephone calls.[112] Rather, CCL allowed the SROs to use its complimentary cruise offer at the SROs' sole discretion.[113] CCL entered into a contract with the SROs solely to provide an incentive to the political survey participants, with no requirements or influence on the SROs's business operations, conduct and/or telephone calls.[114] If the calls were made "on behalf of" any other person or entity, it was the political organizations that contracted with the SROs to make political survey calls for their particular cause or organization; and it is the political organizations that "controlled" the content of the political surveys, not CCL.[115] CCL was unable to control whether the SROs continued to make the survey calls, and the survey calls were being made before CCL ever agreed to provide an incentive.[116] DeJongh's testimony and the explanation of the Supplier Agreements set forth *supra* demonstrates CCL's lack of control over the calls allegedly placed to Plaintiffs, and that ultimately, CCL did not

---

109.   *Kristensen v. Credit Payment Servs. Inc.*, No. 2:12-CV-00528-APG, 2015 WL 4477425, at *3 (D. Nev. July 20, 2015).
110.   *Id.* at *7.
111.   2013 FCC Ruling, at 6593.
112.   Def. SOF, ¶ 12.
113.   Def. SOF, ¶¶ 21, 33.
114.   Def. SOF, ¶¶ 4-5, 12-15, 21-22, 32.
115.   Def. SOF, ¶¶ 18, 26-28.
116.   Def. SOF, ¶¶ 21-22.

exercise any control over the manner and means by which the SROs made, generated, initiated or otherwise performed the political survey calls.

> ### b. *CCL is not liable under principles of agency, apparent authority, or ratification.*

The federal common law of agency as described in the 2013 FCC Ruling is in accord with the Restatement (Third) of Agency.[117] The restatement explains that "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."[118] Actual authority, where a person is an agent for another party, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent takes action on the principal's behalf.[119] An agent's actual authority can only originate with expressive conduct by which the principal manifests assent to the agent's actions with legal consequences for the principal.[120] In this jurisdiction, "[t]he 'key consideration' in determining whether an agency relationship exists is whether the principal had the right to control the 'manner and method' in which the agent performs work. …"[121]

Here, CCL entered into the Supplier Agreements which gave the SROs authority only to use CCL's complimentary cruise as an incentive to persons to complete the SROs' political surveys.[122] CCL did not employ nor empower any SRO to initiate or make the telephone calls of which Plaintiffs complain.[123] There is no evidence existing in this record to establish which SRO made calls to each Plaintiff, what relationship CCL has to any such SRO, or how CCL was involved in

---

117.  *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).
118 .  Restatement (Third) Agency, § 1.01 (2006).
119.  Restatement (Third) Agency, § 3.01 cmt. b (2006).
120.  *Id.*
121.  *Peterson v. H & R Block Tax Servs., Inc.*, 971 F. Supp. 1204, 1213 (N.D. Ill. 1997).
122.  Def. SOF, ¶¶ 4-5, 21.
123.  Def. SOF, ¶¶ 4-5, 12, 21-22, 24.

directing and controlling the manner and means of the subject telephone calls. The evidence shows the opposite. For example, DeJongh testified that he was making the survey calls prior to ever being introduced to CCL, that he would have continued to make the calls even if there was never a relationship with CCL, and that even after the CCL relationship was formed, only a percentage of the survey calls included the complimentary cruise incentive.[124] Moreover, the Supplier Agreements state that the SRO "is an organization that conducts public opinion surveys and polls for political and market research purposes"; that the SRO "solicits survey takers by transmitting or causing to be transmitted prerecorded survey messages..."; that the SRO "desires to incentivize and thus increase survey participation by providing survey takers certain complimentary products and/or services"; that the SRO is "seeking third-party entities... to make available incentives or promotional items for use by [the SRO] in [their] survey"; that the SRO prepares the script for the political survey campaign and its only obligation is to provide a copy of any such script to CCL; that the SRO is precluded from engaging in the very conduct alleged by Plaintiffs herein; that all title to all data gathered in performing the political surveys remains the property of the SRO; that "[n]either party is an agent of the other party..."; that all intellectual property shall remain the property of the SRO; and that the political survey call campaign shall not be considered a "work for hire".[125] CCL exercised no control over the manner and means by which the SROs made, generated, initiated or otherwise performed the political survey calls.[126] CCL played no role in the creation or dissemination of any prerecorded calls allegedly placed by the SROs and had no role in determining how the SROs generated the call lists.[127] Nor did CCL have any involvement, direction or control over any of the

---

124. Def. SOF, ¶¶ 22, 33-34.
125. *See* Supplier Agreements, attached as **Exhibits 4-5** to Def. SOF.
126. Def. SOF, ¶¶ 12, 14-18, 20-21.
127. Def. SOF, ¶¶ 8, 19, 24.

SROs business operations.[128] CCL's only involvement in content was with respect to its complimentary cruise incentive (to the extent the SRO elected to use it on a particular call), and requiring the SROs to warrant that they would comply with applicable federal and state laws.[129]

Plaintiffs also cannot extend liability to CCL pursuant to apparent authority. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal."[130] Apparent authority arises only where the principal (1) makes "manifestations" to a third party, and (2) provides "a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question."[131] As set forth in *Toney v. Quality Resources, Inc.*, for a plaintiff to plead apparent authority, the plaintiff "must allege that she reasonably believed that [the calling entity] called her as [the principal's] agent and that her belief is traceable to a manifestation of [the agent's] authority from [the principal]."[132] "[F]or apparent authority to exist, the principal 'must communicate either directly or indirectly with the third party' or take some action that instills in the third party a reasonable belief that the actor had authority to act as the principal's agent."[133]

Plaintiffs must have *reasonably* believed the SRO was authorized to act on behalf of CCL, and reasonably relied on that belief to their detriment, but no facts involved in this lawsuit in any

---

128.    Def. SOF, ¶¶ 10-13.

129.    Def. SOF, ¶¶ 21, 29; *Supplier Agreements*.

130.    *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 744 (N.D. Ill. 2014) (citing Restatement (Third) of Agency § 2.03 cmt. c (2006)).

131.    *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997); *see also Smith*, 2014 WL 3906923, at *8 (as none of plaintiffs communicated directly or indirectly with defendant or defendant's insurance agents, plaintiffs failed to plead a plausible basis for holding defendant liable under an apparent authority theory).

132.    *Toney*, 75 F. Supp. 3d at 744; *see also Makaron*, 2015 WL 3526253, at *8-*9 (apparent authority cannot arise unless the principal's manifestations to a third party supply a "reasonable basis" for that party to believe that the principal has authorized the alleged agent to do the act in question).

133.    *Id.*, quoting *Bridgeview Health Care Ctr. Ltd. V. Clark*, No. 09CV5601, 2013 WL 4495221, at *3 (N.D. Ill. Aug. 21, 2013).

way support such a belief; each Plaintiff testified the calls were made by an organization named

Political Opinions of America and two of the named Plaintiffs never heard of CCL until this lawsuit

was filed.[134] "A principal is not subject to liability when actions that an agent takes with apparent

authority … do not themselves constitute the tort...."[135]  In this case, the alleged violation of the

TCPA was completed the moment an SRO reached Plaintiffs by telephone – and before Plaintiffs

had any possible notion that the SRO might be acting on behalf of CCL.[136] Without a reasonable

belief traceable to CCL, and without any reasonable reliance, no apparent authority exists.  Since

none of the Plaintiffs purchased a cruise package or received any benefit, or anything at all, from

CCL –there was clearly no reasonable reliance.[137]

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect

as if done by an agent acting with actual authority."[138] A principal can ratify an act by "(a)

manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a

reasonable assumption that the person so consents."[139]  A principal cannot "ratify" an alleged agent's

conduct – thereby subjecting itself to full liability for wrongful conduct – if there was no actual or

implied agency relationship in the first place.[140] Moreover, an alleged principal may be held liable

based on a ratification theory only where it has "retain[ed] a benefit" and "has knowledge of material

facts."[141] If the principal does not receive a benefit, no ratification occurred.[142]  The *Toney* court

---

134.    Def. SOF, ¶¶ 60-62, 66, 68.
135.    Restatement (Third) of Agency § 7.08 cmt. b (2006).
136.    Def. SOF, ¶¶ 60-76.
137.    *See, e.g., Makaron*, 2015 WL 3526253, at *8-*9.
138.    *Toney*, 75 F. Supp. 3d at 745, quoting Restatement (Third) of Agency § 4.01(1) (2006).
139.    Restatement (Third) of Agency § 4.01(2) (2006).
140.    *See, e.g., Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003) ("[A] principal agent relationship is . . . a requisite [to ratification], and ratification can have no meaning without it"); *Kaye v. Grossman*, 1999 WL 33465, at *2 n.1 (S.D.N.Y. 1999) (ratification "presupposes an agency relationship; it does not create one where none otherwise existed"); Restatement (Third) of Agency § 4.03 cmt. b ("When an actor is not an agent and does not purport to be one, the agency-law doctrine of ratification is not a basis [for liability].").
141.    Restatement (Third) of Agency § 4.01 cmt. G.

discussed whether the alleged principal in that case had ratified the conduct of the telemarketer, finding the plaintiff's arguments failed there because she had not alleged the principal "accepted any benefit that stemmed from" the telemarketer's calls *to the plaintiff*.[143] The court expressly rejected a theory of ratification based upon a general agreement to generate leads.[144] In other words, a general benefit theory of ratification does not exist; each Plaintiff must show that they did business with CCL and that CCL had knowledge of the TCPA violation at the time it accepted the benefit.

Plaintiffs did not obtain a free cruise or purchase a vacation package from CCL. For CCL to ratify the alleged unlawful conduct of the callers, it must have been aware of their conduct, gained a benefit, and knowingly accepted the benefit.[145] Not only is there no agency relationship, but no Plaintiff in this lawsuit purchased anything from CCL; thus, they cannot allege CCL benefited from the calls Plaintiffs allege they received. Any attempt to impose vicarious liability against CCL on a ratification theory fails.

### D. No joint venture or partnership exists between CCL and any other Defendant

Rather than allege the existence of a joint venture or partnership between CCL and the parties that initiated the alleged violative calls, Plaintiffs allege a joint venture/partnership exists between CCL, VOMT, and Berkley.[146] Without a joint venture with the SROs that actually made the

---

142. *See, e.g., The Davis Companies, Inc. v. Emerald Casino, Inc.*, No. 99C6822, 2003 WL 22113414, at *5 (N.D. Ill. 2003) (no vicarious liability where the alleged principal had not gained "sufficient" benefit from alleged agent's actions); *Davis v. Carroll*, 937 F. Supp. 2d 390 (S.D.N.Y. 2013) (no ratification where alleged principal had not received any benefit from the agent's conduct); *Cooperative Agricole Groupment de Producteurs Bovins de L'Oest, v. Banesto Banking Corp.*, 1989 WL 82454, at *17 (S.D.N.Y. 1989) (no ratification where the principal had not accepted any benefits "flowing from the unauthorized acts").

143. *Toney*, 75 F. Supp. 3d at 745-46.

144. *Id.*

145. *Lassen Mun. Util. Dist. v. Kinross Gold U.S.A. Inc.*, 2013 WL 924623, at *9 (E.D. Cal. 2013); Restatement (Third) of Agency § 4.06 cmt. a (ratification must be based on "knowledge of material facts about the act of the agent or other actor"); *Moore v. Local Union 569 of Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1543 (9th Cir. 1993) (plaintiff failed to show that defendant ratified alleged agent's conduct "with full knowledge of its unlawful character").

146. DE 289, ¶¶ 32-33.

telephone calls about which Plaintiffs complain, there can be no basis for liability against CCL as the non-calling party. CCL's relationship with VOMT and Berkley, without the inclusion of the calling party, is irrelevant. Regardless, CCL did not enter into a joint venture or partnership with either VOMT or Berkley related to the survey calls at issue in this case or otherwise.[147] For this Court to find the existence of a joint venture, it must find the following elements: "(1) intention of the parties to create a joint venture; (2) joint control or joint right of control; (3) joint proprietary interests in the subject matter of the venture; (4) right of both venturers to share in the profits; and (5) duty of both to share in the losses."[148] A partnership, on the other hand, "is created 'when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses.'"[149] The existence of a partnership is fully dependent upon "whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both."[150]

Plaintiffs cannot show the existence of any of the foregoing elements related to CCL and any SRO – or, although irrelevant, with any other Defendant.[151] Plaintiffs allege CCL, VOMT, and Berkley operate as a *general* joint venture/partnership "with respect to the sale of Berkley timeshares

---

147. Def. SOF, ¶ 36; CCL Dec., ¶¶ 7-11, attached as **Exhibit 1** to Def. SOF; VOMT Dec., ¶¶ 7-11, attached as **Exhibit 8** to Def. SOF.

148. *Skeen v. Carnival Corp.*, No. 08-22618-CIV, 2009 WL 1117432, at *3 (S.D. Fla. Apr. 24, 2009); *see also Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211 (11th Cir. 1991). Florida law contains similar elements; the Florida Supreme Court has explained:

> In order to create a joint venture, a contract must contain the following elements: (1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained. The absence of one of the elements precludes a finding of a joint venture.

*Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1089 (Fla. 2008).

149. *C. I. R. v. Culbertson*, 337 U.S. 733, 740 (1949).

150. *Id.* at 741.

151. Def. SOF, ¶ 36; CCL Dec., ¶¶ 7-11, attached as **Exhibit 1** to Def. SOF; VOMT Dec., ¶¶ 7-11, attached as **Exhibit 8** to Def. SOF.

and vacation packages,"[152] but Plaintiffs are unable to substantiate this allegation as no evidence

exists to support this claim. Nor do Plaintiffs ever tie any such theory to specific telephone calls at

issue and the relationship with the SROs. Regardless, whether a joint venture or partnership exists

between CCL, VOMT, and Berkley has no bearing on Plaintiffs' claims as the undisputed evidence

shows none of these entities initiated the telephone calls. Nevertheless, there is no evidence that

CCL created a joint venture or partnership with any party to make the calls at issue; in fact, the

evidence demonstrates that no such venture or partnership was ever intended or created since CCL

specifically crafted its contracts with other parties to avoid the creation of a joint venture; neither

CCL nor the individuals who control it have any say in Berkley's operations, and Berkley does not

have any control or right to control CCL's operations.[153] Plaintiffs cannot show the existence of any

of the foregoing elements. Thus, summary judgment must be granted in favor of CCL on any

supposed joint venture or partnership theory of liability.[154]

### E. CCL is entitled to Summary Judgment on telephone calls to Plaintiffs that did not reference a cruise or appear in Plaintiffs' or Defendants' phone records

On August 11, 2014, this Court certified two classes. Any calls for which the named

Plaintiffs, or any putative class member, seek relief must fit within a class definition. The classes

certified consist of a Cellular Telephone Class and Landline Telephone Class. The classes require,

by their very definitions, that *in the least*: **(1) the call included an offer of a free cruise**, and **(2) the**

**called telephone number appears in Defendants' records OR the records of the called party**.

Not all calls made by the SROs, however, included a complimentary cruise incentive.[155] Based on

the testimony of the named Plaintiffs, CCL is entitled to summary judgment on several calls the

---

152.    DE 289, ¶¶ 32-33.
153.    VOMT Dec., ¶¶ 7-11.
154.    Nor is there any alter-ego, joint venture or partnership relationship with VOMT; not only is no such theory pleaded, but it is expressly refuted by the record evidence. *See* CCL Dec. and VOMT Dec., attached as Exhibits 1 and 8 to Def. SOF.
155.    Def. SOF, ¶¶ 33-34, 70, 76.

named Plaintiffs claim to currently be at issue.

For example, Regina Stone claims, as set forth in her interrogatory responses, that she was called a total of fourteen (14) times on her two cellular telephones and twice on her landline telephone between April 2012 and June 2012.[156] Out of the alleged sixteen (16) calls Stone complains of in this lawsuit, she admits she only heard the name CCL or a complimentary cruise incentive on one call.[157] However, no such calls are found within the call records Stone produced, nor are such claimed calls found in Defendants' call records.[158] As such, CCL is entitled to summary judgment on all of the calls Stone claims were made to her as such calls are not substantiated by her or any call records, as required for Stone's calls to fall within the class definition.

Similarly, Plaintiff Stephen Parkes complains of several calls made to his business numbers (which are not part of this lawsuit) and also five calls allegedly made to his cellular telephone.[159] However, Parkes phone records suggest he did not listen through the length of the purported calls he received from Defendants long enough to hear whether a complimentary cruise was offered, which is required for a call to come within the class definition.[160] Parkes testified the only time he spoke to a CCL representative was likely after receiving a call on his business line.[161] CCL is entitled to summary judgment on Parkes' claim of entitlement to statutory damages for the five alleged calls to his cellular telephone since there is no evidence to support that a complimentary cruise was offered and no records to substantiate his claim.

---

156.   *See* Regina Stone's responses to Berkley's First set of Interrogatories, pp. 6-7, attached as part of **Composite Exhibit 13** to Def. SOF.
157.   Def. SOF, ¶ 76.
158.   Def. SOF, ¶ 73.
159.   Def. SOF, ¶¶ 68-72.
160.   Def. SOF, ¶ 70.
161.   Def. SOF, ¶ 71.

### F. CCL is Entitled to Summary Judgment on All Calls Placed to Residential Landlines

This Court certified two classes of Plaintiffs, including a "Landline Telephone Class." However, the only named Plaintiff who has claimed calls were made to a landline telephone number was Regina Stone and, as set forth *infra*, Stone's own records fail to substantiate the alleged calls she claims she received on her landline.[162] As such, CCL is entitled to summary judgment on Stone's personal claims, and the Landline Telephone Class should be decertified as no representative who "fairly and adequately protect[s] the interests of the class" as required by Rule 23(a)(4), Fed. R. Civ. P., is involved in this lawsuit. Because there is no Plaintiff with standing to represent the landline class, summary judgment should be granted as to the entire Landline Telephone Class.[163] Alternatively, and although briefly addressed by this Court in its Order denying VOMT and CCL's motion to dismiss,[164] CCL should not be subject to liability for calls placed to residential landlines as such calls were placed on behalf of tax exempt nonprofit organizations.[165] Moreover, CCL is entitled

---

162.    Def. SOF, ¶ 73.

163.    *See, e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 148, 102 S. Ct. 2364, 2365, 72 L. Ed. 2d 740 (1982) (noting Rule 23(a)'s "requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claim.'"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class."); *Williams v. Boeing Co.*, No. C98-761P, 2005 WL 2921960, at *7 (W.D. Wash. Nov. 4, 2005) *aff'd in part, dismissed in part*, 517 F.3d 1120 (9th Cir. 2008)

164.    *See* DE 75, p. 3 ("The Court need not address at this juncture whether the statute as interpreted by the FCC permits liability for a non-autodialed call to a cellular phone for the purpose of initiating a commercial transaction where the call includes what is alleged to be a 'sham' political survey."). Notably, following Plaintiff's discovery of the SROs at issue, Plaintiffs amended their complaint and the currently operative complaint no longer alleges the survey calls were a "sham" for the other Defendants; nor do any facts exist in the record to prove that the survey calls were a "sham".

165.    *See, e.g.*, *Wengle v. DialAmerica Mktg., Inc.*, No. 14-CV-10644, 2015 WL 5595505, at *4 (E.D. Mich. Sept. 22, 2015), as amended (Oct. 2, 2015); *Fitzhenry v. Indep. Order of Foresters*, No. 2:14-CV-3690-DCN, 2015 WL 3711287, at *3 (D.S.C. June 15, 2015), quoting 47 C.F.R. 64.1200(a)(3)(iv) (emphasis in original) ("No person or entity may ... [i]nitiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call ... *[i]s made by or on behalf of a tax-exempt nonprofit organization*.").

to summary judgment on all calls placed where an artificial or prerecorded voice did not actually

play.[166]

### III. STAY OF LAWSUIT PENDING OUTCOME OF *SPOKEO v. ROBINS*

CCL alternatively requests that the Court stay this lawsuit pending the United States

Supreme Court's impending decision in *Spokeo, Inc. v. Robins,*[167] as set forth in CCL and VOMT's

Motion to Stay being filed contemporaneously with this Motion.[168] Plaintiffs have conceded they

have not suffered and do not seek any actual damages.[169]

### IV. CONCLUSION

As the foregoing establishes, CCL is entitled to summary judgment on all counts.

Alternatively, CCL requests that this matter be stayed pending the ruling of the Supreme Court in the

case of *Spokeo v. Robins*.

DATED: November 23, 2015        Respectfully submitted,

        *s/Jeffrey Backman*
        RICHARD W. EPSTEIN, ESQ.
        (Fla. Bar No. 229091)
        Admitted Pro Hac Vice
        Richard.Epstein@gmlaw.com
        JEFFREY A. BACKMAN, ESQ
        (Fla. Bar No. 0662501)
        Admitted Pro Hac Vice
        Jeffrey.Backman@gmlaw.com
        GREENSPOON MARDER, P.A
        200 East Broward Blvd., Suite 1800
        Fort Lauderdale, Florida 33301
        954.491.1120 (Telephone)
        954.343.6958 (Facsimile)

---

166. *Ybarra v. Dish Network, L.L.C.*, No. 14-11316, 2015 WL 6159755, at *4 (5th Cir. Oct. 20, 2015) ("To be liable under the 'artificial or prerecorded voice' section of the TCPA, we conclude that a defendant must make a call and an artificial or prerecorded voice must actually play.")
167. 135 S.Ct. 1892 (2015).
168. DE 335.
169. *See supra*, Note 4.

Timothy A. Hudson
THudson@TDRLAWFIRM.com
TABET DiVITO & ROTHSTEIN, LLC
209 S. LaSalle Street, Suite 700
Chicago, Illinois  60604
Telephone: (312) 762-9450
Facsimile: (312) 762-9451
Firm No.: 38234

*Attorneys for Defendant Caribbean Cruise Line, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF  notification on this 23rd day of November, 2015.

*s/Jeffrey Backman*
Jeffrey A. Backman