IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERARDO ARANDA, GRANT                )
BIRCHMEIER, STEPHEN PARKES and       )
REGINA STONE, on behalf of themselves )
and classes of others similarly situated, )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )
                                     )
CARIBBEAN CRUISE LINE, INC.,         )
ECONOMIC STRATEGY GROUP,             )
ECONOMIC STRATEGY GROUP, INC.,       )
ECONOMIC STRATEGY, LLC,              )
THE BERKLEY GROUP, INC. and          )
VACATION OWNERSHIP MARKETING         )
TOURS, INC.,                         )
                                     )
        Defendants.                  )

## THE BERKLEY GROUP, INC.'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

M. Peebles Harrison (*Pro Hac Vice*)
700 Blue Jay Street, Suite 1
Post Office Box 405
Kill Devil Hills, North Carolina 27948
Telephone: (252) 480-1414
Facsimile: (252) 480-1765
Email: peebles@outerbankslaw.com

Brian P. O'Meara
Forde Law Offices LLP
111 West Washington Street, Suite 1100
Chicago, IL 60602
Telephone: (312) 465-4780
Facsimile: (312) 641-1288
Email: bomeara@fordellp.com

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................1

II.  SUMMARY OF THE ARGUMENT ..............................................................1

III.  FACTS ....................................................................................................3

IV.  LEGAL STANDARD ..................................................................................8

V.  ARGUMENT ............................................................................................8

    A.  Berkley Has No TCPA Liability Under *Dish Network*................................8

        1.  Berkley Is Not a Seller ....................................................................8

        2.  Berkley Is Not Vicariously Liable .........................................................12

            a.  Plaintiffs Fail to Plead Agency, Control and Benefit or Attractive Nuisance Liability ..............................................13

            b.  Even if Properly Pled, There is No Formal Agency Relationship between Berkley and the Parties Involved in Placing the Calls. ........................................................15

            c.  Even if Properly Pled, Berkley Did Not Ratify the Acts of the Parties Placing the Phone Calls. ...................................19

            d.  Even if Properly Pled, Plaintiffs' "Control and Benefit" and "Attractive Nuisance" Theories Are Not Applicable. .............22

    B.  Berkley Has No Joint Venture or Partnership Liability ..........................23

        1.  Defendants are not Liable under a Joint Venture Theory .........................23

            a.  No Intent to Form a Joint Venture ..................................24

            b.  No Joint Control....................................................24

            c.  No Joint Proprietary Interest ........................................25

            d.  No Duty to Share in Profits and Losses .............................26

        2.  Defendants are not Liable under a Partnership Theory .............................27

VI.  CONCLUSION..........................................................................................28

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................8

*Autotech Techs. Ltd. P'ship v. Aumationdirect.com, Inc.*, No. 05 C 5488,
    2005 WL 3180147 (N.D. Ill. Nov. 23, 2005) ...................................27

*Ball v. Kotter*, 723 F.3d 813 (7th Cir. 2013).................................................................8

*Bank v. Philips Electronics North America Corp.*, 2015 WL 1650926
    (E.D.N.Y. April 14, 2015) ...................................13

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)...........................................20

*Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208 (11th Cir. 1991) .....23

*Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014)...............................................10, 11

*In the Matter of the Joint Petition Filed by Dish Network, LLC et al.*, 28 FCC Rcd. 6574
    (2013)...................................................................1, 2, 8, 9, 10, 22

*J.R. Simplot Co. v. Nestle USA, Inc.*, No. 06-141-S-EJL, 2009 WL 564194
    (D. Idaho Mar. 4, 2009) ...................................27

*Jackson v. Caribbean Cruise Line, Inc.*, No. 14 CV 2485, 2015 WL 667862
    (E.D.N.Y. 2015).................................................13

*Keating v. Peterson Nelnet, LLC*, No. 14-3558, 615 Fed. Appx. 365 (6th Cir. 2015) ...........15, 16

*Keim v. ADF Midatlantic, LLC, et al.*, No. 9:12-80577-cv-KAM
    (S.D. Fla. Nov. 10, 2015)......................................23

*Kristensen v. Credit Payment Services Inc.*, No. 2:12-CV-00528-AGP,
    2015 WL 4477425 (D. Nev. July 20, 2015) .........................................12, 22, 23

*Makaron v. GE Security Manufacturing, Inc. et al.*, No. CV 14-1274,
    2015 WL 3526253 (C.D. Cal. May 18, 2015) ................................................. 10-11, 12, 20

*Mey v. Monitronics Intern., Inc.*, 959 F. Supp. 2d 927 (N.D.W.V. 2013)....................................11

*Mey v. Monitronics Intern., Inc.*, No. 5:11-cv-00090 (N.D.W.V. Feb. 16, 2012)........................12

*Murray v. Choice Energy, LLC*, No. 1:15-cv-60, 2015 WL 420439
    (S.D. Ohio July 10, 2015) ...................................20

*National Football Scouting Inc. v. Cont'l Assur. Co.*, 931 F.2d 646 (10th Cir. 1991) .................12

*NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co.*,
736 F.3d 1054 (7th Cir. 2013) ............................................................15

*Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060 (7th Cir. 2000) .................................15

*Progress Rail Services Corp. v. Hillsborough Reg'l Transit Auth.*, No. 8:04CV200-T-23EAJ,
2005 WL 1051932 (M.D. Fla. Apr. 12, 2005) ..........................................24, 25

*Schaffer by Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722
(6th Cir. 1996) ...............................................................................13, 14

*Sefton v. Toyota Motor Sales U.S.A.*, No. 09-3787, 2010 WL 1506709
(N.D. Ill. Apr. 14, 2010) ...................................................................22

*Siding & Insulation Co. v. Alco Vending, Inc.*, No. 1:11 CV 01060,
2015 WL 1858935 (N.D. Ohio Apr. 22, 2015)......................................... 12-13, 14

*Skeen v. Carnival Corp.*, No. 08-22618-CIV, 2009 WL 1117432
(S.D. Fla. Apr. 24, 2009) ...................................................................25, 26

*Smith v. State Farm Mutual Automobile Insurance Company*, 30 F. Supp. 3d 765
(N.D. Ill. 2014).............................................................................13, 21, 22

*Thomas v. Taco Bell Corp.*, 582 Fed. Appx 678 (9th Cir. 2014).............................17, 20

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ........................18, 19

*Toney v. Quality Res., Inc.*, No. 13 CV 42, 2014 WL 6757978
(N.D. Ill. Dec. 1, 2014) ...................................................................13, 21, 22

*United States v. Dish Network, L.L.C.*, No. 09-3073, 2014 WL 7013223
(C.D. Ill. Dec. 12, 2014), *vacated on other grounds*, 80 F. Supp. 3d 917
(C.D. Ill. 2015)..............................................................................20

*Wolf v. Celebrity Cruises, Inc.*, No. 13-23697, 2015 WL 1941336
(S.D. Fla. Apr. 30, 2015) ...................................................................24

**Statutes**
47 U.S.C. § 227(b) ...................................................................................1

**Rules**
Fed. R. Civ. P. 56(c) ...............................................................................8

**Regulations**

29 C.F.R. § 64.1200(f)(9) ........................................................................9

47 C.F.R. § 64.1200(f)(14) .....................................................................10

**Other Authorities**

American Heritage Online Dictionary
    http://www.yourdictionary.com/market#americanheritage (19 Nov. 2015)........................8

Cambridge Academic Content Dictionary
    http://dictionary.cambridge.org/us/dictionary/english/market (19 Nov. 2015) ..................8

Restatement (Third) of Agency § 1.01 (2006) ............................................................15

Restatement (Third) of Agency § 4.01(1) (2006) ........................................................19

Restatement (Third) of Agency § 4.03 (2006) ............................................................20

Restatement (Third) of Agency § 4.06 (2006) ............................................................20

Defendant, The Berkley Group, Inc. ("Berkley"), files this Memorandum in Support of its Motion for Summary Judgment under Fed. R. Civ. P. ("FRCP") 56.

## I. INTRODUCTION

This is a Telephone Consumer Protection Act ("TCPA") class action lawsuit. Plaintiffs contend that Berkley is liable for the political survey telephone calls at issue. These calls, however, were placed without Berkley's involvement or direction. Berkley did not make the calls. Berkley did not tell, instruct, or direct anyone to make the calls or carry out the calling campaign. Berkley's timeshare products were not mentioned or sold during the calls. Berkley did not know the calls were even being made until it learned about them through Fox News. Upon learning about the calls, Berkley immediately notified its independent marketing vendor, Vacation Ownership Marketing Tours ("VOMT"), not to send it any leads potentially generated from the calls. Berkley is not liable for the over one billion dollars Plaintiffs seek from it for the calls.

## II. SUMMARY OF THE ARGUMENT

The statute relied upon here, 47 U.S.C. § 227(b), authorizes a private cause of action for unauthorized calls to cellular and residential phone numbers using automatic telephone dialing equipment. The Federal Communications Commission's TCPA liability standards for this statute provide the analytical framework for this case. *In the Matter of the Joint Petition Filed by Dish Network, LLC et al.*, 28 FCC Rcd. 6574 (2013) ("*Dish Network*"). In *Dish Network*, the FCC held that a party who "initiates," or takes the steps to physically place, a phone call in violation of the act has direct (*i.e.*, strict) TCPA liability. *Id.* at 6582-83, ¶¶ 24, 26. Here, Berkley did not physically place the calls. Berkley is not directly liable for the calls, and Plaintiffs cannot

legitimately advance a direct liability argument against Berkley. Rather, Plaintiffs seek to hold Berkley vicariously liable for the calls.

In *Dish Network* the FCC considered when a non-dialing seller may be subject to TCPA liability. Certain petitioners in *Dish Network* argued that "on behalf of" liability subjects a non-dialing seller to liability if the calls are made simply to aid or benefit the seller. *Id.* at 6585, ¶ 31. The FCC rejected this position and held that, "we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under section [sic] either section 227(c) or section 227(b)." *Id.* at 6593, ¶ 47. Rather, the FCC determined that a "seller . . . may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services." *Id.* at 6574, ¶ 1 and 6593, ¶ 48. This liability could arise under formal agency, apparent authority or ratification. *Id.* at 6584, ¶ 28.

Berkley is not vicariously liable under the TCPA for the calls. First, *Dish Network* established that a "seller" may have vicarious liability when its goods or services are marketed by a third-party telemarketer. *Id.* Berkley's goods (timeshare ownership) were not marketed or sold during the calls, so Berkley is not a "seller" subject to TCPA liability. Second, even if Berkley could be considered a "seller", Plaintiffs cannot show that the *Dish Network* common law agency principles create liability. Plaintiffs have not pled these principles. Even if that is ignored, the party making the calls was not Berkley's agent, and Berkley did not ratify the calls. Third, Plaintiffs' "control and benefit" and "attractive nuisance" theories are also not pled and are not recognized TCPA liability theories. Finally, Plaintiffs cannot show any joint control or common ownership or other requisite attributes that would create a triable issue of fact on their joint venture or partnership theories.

### III. FACTS

***Berkley's Timeshare Business***

Berkley is a sales and marketing company. (Berkley's Rule 56.1 Statement of Material Facts ("SOF"), ¶ 11). It sells and markets timeshare interests developed and owned by its subsidiary or affiliated companies. (SOF, ¶ 12). These companies' timeshare salespeople tour and sell to customers at a particular resort. (SOF, ¶ 13). Berkley generates over fifty percent of its Florida tours through its own internal marketing programs. (SOF, ¶ 15). Because a timeshare interest is a real estate interest in Florida, the salespeople must be licensed. (SOF, ¶ 30).

***Berkley's Independent Tour Lead Generation Vendors***

Various independent vendors sell timeshare tour leads to timeshare resorts. (SOF, ¶ 18, 28). Berkley contracts with some of these independent vendors to supplement its tour lead generation efforts. (SOF, ¶ 18). Berkley and VOMT are competitors for the generation of timeshare tour customers. (SOF, ¶ 27). As competitors, Berkley and VOMT do not share marketing strategies with each other. (SOF, ¶¶ 24, 25, 27, 35, 73). Likewise, Berkley and its other marketing vendors do not share marketing strategies and processes regarding tour customer generation. (SOF, ¶ 26).

VOMT and Berkley entered into a Marketing Agreement in 2003 ("Agreement"). (SOF, ¶¶ 20-21). In exchange for a commission, VOMT agreed to generate timeshare tour leads for Berkley's Weston and Palm Beach Shores, Florida properties. (SOF, ¶¶ 17, 20, 21). The Agreement required VOMT to comply with all laws, ordinances, rules, regulations and requirements governing its actions. (SOF, ¶ 21, 23). The Agreement expressly disclaimed that it created, or could be construed to create, a partnership or joint venture. (SOF, ¶ 21, 23). VOMT did not provide Berkley information about whether any particular tour generated under the

3

Agreement was done so through mailings, telemarketing, Internet marketing or any other type of advertising. (SOF, ¶ 35).

### *VOMT's Marketing Efforts*

Based on what has been learned during discovery in this case, one VOMT marketing strategy is to broker timeshare tour leads generated by Defendant Caribbean Cruise Lines ("CCL"). (SOF, ¶ 34). CCL markets and sells vacation packages to consumers. (SOF, ¶ 36).

One of CCL's sales methods is to offer potential customers a free cruise. (SOF, ¶ 43). Once the customer commits to the free cruise, CCL salespeople attempt to sell the customer an extended vacation package for $567 or $837. (SOF, ¶¶ 38, 42, 52). The lower-end extended vacation package includes a seven-day Alamo car rental with unlimited mileage, three day/two night hotel accommodations in Ft. Lauderdale, three day/two night hotel accommodations in Orlando and entertainment dollars to use at Disney World and Universal Studios in Orlando. (SOF, ¶ 52). The more expensive extended vacation package includes the perks of a lower-end extended vacation package plus an additional two-day car rental with Alamo and three day/two night hotel accommodations at Island Seas Resorts on Grand Bahama Island. (SOF, ¶ 52).

The extended vacation packages include a requirement that the customer tour a timeshare resort. (SOF, ¶ 52). If an individual chooses an extended stay package, then CCL provides that timeshare tour lead to VOMT who, in turn, finds buyers for the leads. (SOF, ¶ 34). The timeshare resort tour, however, is not a requirement for the free cruise. (SOF, ¶ 43). Further, CCL sales representatives cannot and do not have authority to sell Berkley timeshare interests. (SOF, ¶ 37). And, unlike timeshares, vacation packages are not considered real estate, and the CCL sales representatives do not have to be licensed to sell vacation packages. (SOF, ¶ 31).

***The Political Survey Calls At Issue***

In 2011, CCL contracted to provide the ESG Defendants with a complimentary cruise incentive. (SOF, ¶¶ 39, 42). The ESG Defendants operated under the name Political Opinions of America ("POA") and were run by an individual named Jacob Dejongh. (SOF, ¶¶ 40, 46). POA conducted political surveys and sold the survey information to various Political Action Committees. (SOF, ¶ 41). On some of its calls, POA encouraged survey participation by offering the free CCL cruise. (SOF, ¶¶ 39, 42). If the cruise incentive was included and the called individual was interested, then POA transferred the call to a CCL representative upon completion of the survey. (SOF, ¶ 42). The CCL representative would then provide the cruise details and attempt to sell a CCL vacation package. (SOF, ¶ 42, 52).

POA contracted with an individual named Darrin Robb to make the political survey calls. (SOF, ¶ 46). The political survey calls at issue started in August 2011 and ended in August 2012. (SOF, ¶ 47).

***Berkley's Non-Involvement With The Political Survey Calls***

Berkley had no involvement with the political survey calls. The undisputed facts demonstrates that:

- Berkley did not dial the phone numbers or physically make the political survey calls. (SOF, ¶ 57).

- Neither Berkley's name nor its trade name, Vacation Village, was mentioned during the calls, either during the political survey or after transfer to CCL. (SOF, ¶¶ 48, 50, 52).

- Berkley's timeshare interests were not offered for sale and could not be purchased during the calls. (SOF, ¶¶ 52, 55).

• All of the named Plaintiffs admit that they did not speak to anyone at Berkley, tour a Berkley property or purchase a Berkley timeshare product during or after the calls. (SOF, ¶¶ 53, 54).

• Recipients of the calls were not given a timeshare purchase price or advised about the terms and conditions of timeshare ownership. (SOF, ¶ 56).

• Berkley did not direct or tell others to dial the phone numbers called, did not acquire or provide to anyone the phone numbers called, did not instruct anyone as to the type of equipment to be used to make the political survey calls or tell anyone as to the time of day to place the political survey calls. (SOF, ¶¶ 57-59).

• Berkley did not participate in the creation or execution of the political survey calls. (SOF, ¶ 60).

• Berkley did not design, initiate or create the political survey concept, did not suggest to anyone that the political survey should be used, and did not prepare any of the questions used in the political survey. (SOF, ¶ 60).

• Berkley did not suggest to anyone that the offer of a free cruise should be used during the political survey calls. (SOF, ¶ 61).

• Berkley did not edit, draft, review or comment on any of the scripts or other creative material used during the political survey calls. (SOF, ¶ 61).

Plaintiffs have not, and cannot, point to any evidence to refute these facts.

### *Berkley's Immediate Request To Cease And Desist*

Berkley did not know the political survey calls even existed until May 15, 2012. (SOF, ¶ 44). On that day, Fox News broadcasted a story over television and its website claiming that

6

Berkley was "behind the campaign." [1] (SOF, ¶ 44). That day, Dan Lambert, a principal of VOMT and a consultant for CCL, emailed Berkley's directors explaining, for the first time, some background information about the political survey calls. (SOF, ¶ 44). On either May 15 or 16, 2012, Berkley's president, Rebecca Foster, advised Lambert that Berkley wanted no tour leads generated in violation of the TCPA. (SOF, ¶ 62).

Ten days later, on May 25, 2012, David Wright filed a class action against Berkley alleging calls to his cell phone in violation of the TCPA and a "bait and switch" breach of contact claim. (*See* Doc. # 82 at ¶ 2). On June 19, 2012, Berkley wrote to VOMT stating, "immediately cease and desist from any and all activities that in any way misrepresent any effort to solicit or identify prospects." (SOF, ¶ 63). Berkley further stated, "[a]s the Complaint focuses on cellular telephone solicitation, we instruct you to not provide us any marketing leads generated from calls to cellular telephone numbers." (SOF, ¶ 63).

### *Plaintiffs' Amended Consolidated Complaint*

Having discovered all of these facts during three years of litigation, Plaintiffs filed an Amended Consolidated Complaint ("ACC") on March 23, 2015. (Doc. # 289). Plaintiffs contend that Berkley is liable under the TCPA "[b]ecause the robo-calls were made by or on behalf of all Defendants and each Defendant individually monetarily (and knowingly) benefited from the calls...." (Doc. #289, ¶ 34, *see also*, ¶¶ 3, 21, 22, 29, 41, 42, 45 (all containing conclusory statements that all Defendants benefited from the calls)). Plaintiffs attempt to support this conclusion by alleging: (1) call recipients were offered "vacation packages [free cruises] in exchange for taking a political or public opinion survey" (*Id.*, ¶¶ 1, 46); and (2) once transferred, the call recipient would be "connected to a live Caribbean Cruise Line sales agent, who would

---

[1] One of Fox News' sources for the story was a plaintiff's class action law firm.

attempt to sell them an upgraded vacation package." (*Id.*, ¶ 24). Because the upgraded vacation package could include a Berkley timeshare tour, then, Plaintiffs contend, Berkley has TCPA liability. (*Id.*, ¶¶ 25, 28).

## IV. LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only a dispute over material facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate when no reasonable juror could return a verdict in favor of the non-movant based on the evidence that the parties have provided. *See Ball v. Kotter,* 723 F.3d 813, 821 (7th Cir. 2013).

## V. ARGUMENT

### A. Berkley Has No TCPA Liability Under *Dish Network*

#### 1. Berkley Is Not a Seller

The first issue for this Court to consider under *Dish Network* is whether Berkley is a "seller" with regard to the calls. If Berkley is not, that, of course, ends the case against Berkley.

As noted above, the FCC determined that a "seller . . . may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."[2] *Dish Network,*

---

[2] **Market.** *v.* "to offer for sale" or "to try to make (a product or service) appealing to particular groups of consumers." American Heritage Online Dictionary.
http://www.yourdictionary.com/market#americanheritage (19 Nov. 2015).
**Market.** *v.* "to advertise and offer goods for sale." Cambridge Academic Content Dictionary.
http://dictionary.cambridge.org/us/dictionary/english/market (19 Nov. 2015).

28 FCC Rcd. at 6574, ¶ 1 & 6593, ¶ 48. Under FCC regulations governing the TCPA: "[t]he term *seller* means the person or entity on whose behalf a telephone call or message is initiated for the purpose of *encouraging the purchase or rental of, or investment in*, property, goods or services, which is transmitted to any person." 29 C.F.R. § 64.1200(f)(9) (emphasis added). Based on the FCC's express language, Berkley is liable for the calls as a seller only if its timeshares were marketed during the call or the call recipient was encouraged to purchase Berkley timeshare products during the call. Neither happened.

Berkley was not mentioned at any point during the calls. There was no mention of Berkley or Vacation Village, its trade name, during the political survey. (SOF, ¶ 48). In fact, Darrin Robb, the individual who actually placed the calls, and Jacob DeJongh, the individual who created and oversaw the political surveys, have had no dealings with Berkley and never even heard of Berkley until after this lawsuit was filed. (SOF, ¶¶ 48, 49).

If the call was transferred to a CCL representative, there was no reference to Berkley or Vacation Village. (SOF, ¶¶ 50, 52, 53). The benefits and amenities of Berkley timeshare ownership were not discussed. (SOF, ¶¶ 52). The location of Berkley timeshare units was not disclosed. (SOF, ¶ 52). The timeshare purchase price or other purchase terms and conditions of purchase were not advertised. (SOF, ¶ 52, 56). Berkley timeshare interests were not sold and could not be purchased during the calls. (SOF, ¶ 55). In fact, the word timeshare appeared in the script once, and only in a generic fashion—not in specific reference to Berkley or its timeshare products. (SOF, ¶ 52). Simply put, Berkley's timeshares were not discussed, marketed, offered for sale or advertised at any point during the calls. Because of this, Berkley is not the seller.

If any party could be considered a "seller" under Plaintiffs' description of the case, it is possibly CCL, not Berkley.[3] Plaintiffs allege that the call recipient would be "connected to a live Caribbean Cruise Line sales agent, who would attempt to sell them an upgraded vacation package." (Doc. #289, ¶ 24; *see also*, SOF, ¶ 42).). A vacation package is not a timeshare interest. (SOF, ¶ 36). A timeshare interest is real estate and must be sold by someone holding a real estate license. (SOF, ¶ 30). A vacation package salesperson does not need a real estate license.  (SOF, ¶ 31). No one at CCL had the ability or capability to sell a Berkley timeshare during the calls. (SOF, ¶ 71).

Even though Berkley is not a seller, Plaintiffs claim that Berkley should be liable because the calls were made on its behalf and it "benefited from the calls." (Doc. #289, ¶ 34, *see also*, ¶¶ 3, 9, 10, 11, 12, 21, 22, 29, 34, 36, 37, 38, 39, 40, 41, 42, 45, 52, and 60.) This argument was expressly rejected in *Dish Network*, and finding that Berkley is liable for a call that never references Berkley or any Berkley product would render the FCC's ruling meaningless and create virtually unlimited exposure for any party, no matter how tenuous its connection to the call.[4]

While the "seller" issue has not been squarely addressed by the Seventh Circuit, cases from other circuits like *Gomez v. Campbell-Ewald Co.,* 768 F.3d 871 (9th Cir. 2014), *Makaron v.*

---

[3] As addressed below, simply being a seller does not make a party automatically vicariously liable, and Berkley is not suggesting that CCL is vicariously liable just because Plaintiffs may allege that CCL was the seller.

[4] This seller distinction was further acknowledged elsewhere in *Dish Network*. *See Dish Network*, 28 FCC Rcd. at 6582, ¶ 24 ("our rules have long drawn a distinction" between a telemarketer and a seller);  6584, ¶ 27 (finding that a construction of the statute that concludes that a seller always initiates a call that is made by a third party on its behalf would entirely "collapse the distinction . . . between seller and telemarketer."); 6583, ¶ 45 (ruling that manufacturer of appliances is not a seller if calls placed to sell the appliances were made by "big box" stores "to the extent that such store is selling on its own account"). Also, this analysis is consistent with the requirement that the call be a solicitation. A "telephone solicitation" is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(14).

*GE Security Manufacturing, Inc. et al.*, No. CV 14-1274, 2015 WL 3526253 (C.D. Cal. May 18, 2015)*, and *Mey v. Monitronics Intern., Inc.*, 959 F. Supp. 2d 927 (N.D.W.V. 2013), have considered the "seller" issue. Those decisions are not inconsistent with Berkley's position here.

In *Gomez*, the Navy hired Campbell-Ewald, a marketing consultant, to develop and execute a specific text messaging campaign. *Gomez*, 768 F.3d at 873. The text message was sent by Mindmatics and expressly mentioned the Navy. *Id.* The Navy and Mindmatics were not parties to the TCPA lawsuit. *Id.*

Campbell-Ewald argued that TCPA vicarious liability only extended to the merchant whose goods and services were promoted during the telemarketing campaign, the Navy, and not the marketing consultant hired to execute the campaign at issue, Campbell-Ewald. *Id.* at 878. In rejecting that argument, the court found that such a construction would contradict the ordinary rules of vicarious liability, and it would make little sense to only hold the merchant liable but not the advertising professional. *Id.* at 878-79. The *Gomez* court held there is TCPA vicarious liability where there is a common law agency relationship between "the defendant and a third-party caller". *Id.* at 879. Unlike the defendant in *Gomez*, Berkley is not an advertising professional and, as will be shown below, not in an agency relationship with the third-party caller in this case.

More to the point, unlike *Gomez, Mey* and *Makaron*, Berkley's goods and services were not mentioned during in the telemarketing campaign. In *Mey* and *Makaron*, the defendants argued they were not sellers but "manufacturers" and thus not liable under *Dish Network's* vicarious liability analysis. In those two cases, however, the manufacturers and their goods, security systems, were mentioned by name during the calls. In *Makaron,* the manufacturers' goods, GE home security systems, were mentioned by name and were advertised and promoted.

*Makaron* 2015 WL 3526253 at *8 n.7.  In *Mey*, the defendants who argued that they were manufacturers, Monitronics and UTC (using the trade name GE Security or GE), were mentioned by name and the security systems were discussed and promoted during the calls.[5] In *Makaron*, while the court found that "designation as a seller turns on agency principles the FCC espoused in its declaratory ruling", the court acknowledged that its reasoning was "somewhat circular." *Makaron*, 2015 WL 3526253, at *5. This circular conundrum, however, only exists when the purported "seller" and its goods or services are mentioned during the call, which was not the case here.

### 2. Berkley is Not Vicariously Liable

Assuming for the sake of argument that Berkley is a seller, Plaintiffs still need to demonstrate the Berkley is vicariously liable under common law agency principals. There is no genuine issue of material fact that Berkley, as a matter of law, is not vicariously liable here.

In this case, Plaintiffs failed to plead an agency theory against Berkley, and, even if they had, the undisputed facts demonstrate that Berkley has no agency liability for the calls. Furthermore, Plaintiffs also failed to plead their proffered "control and benefit" or "attractive nuisance" theories of liability, and even if pled, those theories do not support TCPA liability under *Dish Network*. "Whether an agency relationship exists is ordinarily a question of fact, but summary judgment is appropriate where the undisputed facts entitle a party to judgment." *Kristensen v. Credit Payment Services Inc.*, No. 2:12-CV-00528-APG, 2015 WL 4477425, at *2 (D. Nev. July 20, 2015) (granting summary judgment for defendants in TCPA case and finding no fact issue on vicarious liability theories), citing *Nat'l Football Scouting Inc.*

---

[5] While the opinion in *Mey* does not include the call script, the operative complaint at the time of the opinion does allege Monitronics, UTC and the specific security systems were mentioned during the calls.  Pls.' 2d Am. Compl.  at ¶ 49, *Mey v. Monitronics Intern., Inc.*, No. 5:11-cv-00090 (N.D.W.V. Feb. 16, 2012), ECF No. 100.

*v. Cont'l Assur. Co.*, 931 F.2d 646, 649 (10th Cir. 1991); *see also Siding & Insulation Co. v. Alco Vending, Inc.*, No. 1:11 CV 01060, 2015 WL 1858935, at **8-12 (N.D. Ohio Apr. 22, 2015) (holding, in TCPA fax case, plaintiff failed to establish that a genuine issue of material fact existed as to whether defendant was vicariously liable under formal agency, apparent authority and ratification theories).

### a.    Plaintiffs Fail to Plead Agency, Control and Benefit or Attractive Nuisance Liability

The ACC contains no allegations that a common law agency relationship existed between Berkley and the party who physically placed the call. In fact, after the filing of the ACC, Berkley specifically asked Plaintiffs to describe all facts, documents, evidence or proof that substantiated or proved each theory of liability. Plaintiffs responded with a 13 page answer that identified the *Dish Network* theories but, like the ACC, failed to identify facts supporting Berkley's liability under those theories. (SOF, ¶ 77). Plaintiffs' failure to plead vicarious liability, among other things, warrants summary judgment in Berkley's favor. *Siding & Insulation Co. v. Alco Vending, Inc.*, 2015 WL 1858935, at *7 (holding summary judgment appropriate where plaintiff failed to allege vicarious liability under TCPA); *Schaffer by Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 731 (6th Cir. 1996) (affirming that summary judgment was appropriate against plaintiff who never alleged vicarious liability in its complaint).[6]

---

[6]  While the following decisions were based on motions to dismiss, not motions for summary judgment, they are instructive as to the pleading requirements to advance a vicarious liability theory under the TCPA.  *Toney v. Quality Res., Inc.*, No. 13 CV 42, 2014 WL 6757978 (N.D. Ill. Dec. 1, 2014)(dismissing under 12(b)(6) the vicarious liability theories of apparent authority and ratification because they were not properly pled); *Smith v. State Farm Mutual Automobile Insurance Company,* 30 F. Supp. 3d 765 (N.D. Ill. 2014)(granting 12(b)(6) motion in favor of certain defendants because the complaint failed to properly allege facts supporting formal agency, apparent authority or ratification theories of vicarious liability); *Bank v. Philips Electronics North America Corp.*, 2015 WL 1650926, at *2 (E.D.N.Y. April 14, 2015) (granting motion to dismiss (i) because allegations that the calls were "made by, or on behalf of, or with the authorization of" a defendant were too conclusory to state a claim against the defendant and (ii) for

In *Alco Vending,* the plaintiff asserted that it had properly pled TCPA vicarious liability because it had alleged that (1) the faxes were sent "by or on behalf of Defendant" and (2) "Defendant knew or should have known" the faxes about Defendant's goods and services were sent without permission. *Alco,* 2015 WL 1858935, at *7 n.3. The court rejected these arguments and granted summary judgment holding that using language alluding to the fact that another entity other than the defendant physically sent the faxes did not amount to a sufficient pleading of vicarious liability. *Id.*

The same analysis applies here. The ACC only asserts Berkley is liable because calls were made on its behalf and it benefited from the calls. There are no allegations as to how the dialer was Berkley's agent. There are no allegations that any other defendant in this case acted as Berkley's agent with regard to the phone calls. As seen by the Plaintiffs' discovery responses, there simply are no facts that would allow Plaintiffs to plead in good faith common law agency liability. Because the agency theory of vicarious liability is not properly pled, Berkley is entitled to summary judgment.

Likewise, summary judgment is warranted due to Plaintiffs' failure to plead the "control and benefit" and "attractive nuisance" theories of liability. Plaintiffs served discovery responses on May 22, 2015 -- two months after filing the ACC -- disclosing for the first time the attractive nuisance and control and benefit theories of liability. To date, the phrases "attractive nuisance" and "control and benefit" have not been used in the ACC or any prior iteration of Plaintiffs' complaints, much less an articulation of facts that makes those theories plausible in this case.

---

failure to allege facts that establish an agency relationship between defendant and dealers or any control by defendant over the dealers); *Jackson v. Caribbean Cruise Line, Inc.,* No. 14 CV 2485, 2015 WL 667862 (E.D.N.Y. 2015)(granting 12(b)(6) motion because vicarious liability not pled where complaint fails to allege ability to give "interim instructions" or any non-conclusory allegation of "direction" or "control").

These new theories have not been properly pled, which is fatal to Plaintiffs' claims. *See Alco Vending, Inc.*, 2015 WL 1858935, at \*7; *Schaffer by Schaffer*, 74 F.3d at 731.

### b. Even if Properly Pled, There is No Formal Agency Relationship between Berkley and the Parties Involved in Placing the Calls.

Plaintiffs appear to rely on Berkley's contract with VOMT to support their vicarious liability argument under a formal agency principle. But in order to parlay the VOMT contract into formal agency, Plaintiffs must show that there is a formal agency relationship with the party who actually made the calls.

Formal agency is based on a "[f]iduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006).[7] "Power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restatement (Third) of Agency § 1.01, cmt. f(1) (2006).

Here, any argument that Berkley is liable under the TCPA by virtue of its Agreement with VOMT is unsustainable and *Keating v. Peterson Nelnet, LLC*, No. 14-3558, 615 Fed. Appx. 365 (6th Cir. 2015) clearly shows why. In *Keating*, CUnet provided marketing services to higher education institutions. 615 Fed. Appx. at 367. CUnet then contracted with CornerBlue to conduct a particular marketing campaign. *Id.* at 367-68. CornerBlue subcontracted with AKMG to conduct the campaign. *Id.* AKMG then subcontracted with River City Media to transmit the

---

[7] The federal common law of agency is in accord with the Restatement. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000); *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013).

text messages at issue. *Id.* The *Keating* plaintiffs attempted to hold CUnet vicariously liable under the TCPA for the River City Media text messages. *Id.* at 371.

The Sixth Circuit refused to hold CUnet liable under the TCPA for the River City Media text messages. First, the Sixth Circuit found that CUnet's contract with CornerBlue did not allow CornerBlue to make any "representation on CUnet's behalf", which prevented any actual authority to arise. *Id.* at 372. The court stated, "[s]uch contractual language flies directly in the face of the classic definition of common-law agency. . . [b]ecause CornerBlue was never authorized to act on CUnet's behalf, but rather only pursuant to contractual obligations, no principal-agent relationship was established." *Id.*

Second, the Sixth Circuit held that "most damaging to Plaintiff's position, [was the fact that] the improper acts that Keating seeks to impute to CUnet through that defendant's business relationship with CornerBlue were not performed by CornerBlue at all." *Id.* "River City Media sent the unauthorized text messages to the putative plaintiff class—without the knowledge or acquiescence of CornerBlue or of CUnet." *Id.* "CUnet and River City Media were unaware of each other's existence until the filing of this lawsuit." *Id.* It was established that "CUnet never contracted with AKMG or River City Media; that CUnet was not aware that CornerBlue subcontracted with AKMG or that AKMG subcontracted it responsibilities to with River City Media;…and that River City Media never had any contact of any sort with . . . CUnet or CornerBlue." *Id.* Thus, the Sixth Circuit affirmed summary judgment in CUnet's favor. *Id.* at 375.

The similarities between *Keating* and this case are striking. This is demonstrated by reciting the Sixth Circuit's language in the *Keating* case and simply substituting the parties from *Keating* with the parties in this case[8]:

- *Berkley's contract with VOMT/CCL did not allow VOMT/CCL to make "any representation on Berkley's behalf." (SOF, ¶¶ 23, 45). "Such contractual language flies in the face of the classic definition of common-law agency."*

- *"Because VOMT/CCL was never authorized to act on Berkley's behalf, but rather only pursuant to contractual obligations, no principal agent-relationship was established."*

- *"Most damaging to plaintiff's position, the improper acts that Birchmeier seeks to impute to Berkley through that defendant's business relationship with VOMT/CCL were not performed by VOMT/CCL at all."(SOF, ¶ 46) "Robb made the unauthorized phone calls to the putative plaintiff class—without the knowledge or acquiescence of VOMT/CCL or of Berkley". (SOF, ¶¶ 24, 33, 44, 46, 48, 49, 73).*

- *"Berkley and the ESG Defendants or Robb were unaware of each other's existence until the filing of this lawsuit." (SOF, ¶¶ 48, 49).*

- *It was established "that Berkley never contracted with the ESG Defendants or Robb; that Berkley was not aware that VOMT/CCL subcontracted with the ESG Defendants or that the ESG Defendants subcontracted its responsibilities to with Robb; that Robb never had any contact of any sort with . . . Berkley." (SOF, ¶¶ 21, 24, 33, 35, 44, 48, 49, 73).*

*Keating* demonstrates how Berkley has no TCPA liability based on the VOMT contract. Another circuit court decision that squarely addresses TCPA vicarious liability, *Thomas v. Taco Bell Corp.*, 582 Fed. Appx 678 (9th Cir. 2014)("*Taco Bell II*"), shows Berkley has no TCPA liability for another reason. Berkley had no control over the manner and means of the calls.

---

[8]   Berkley = CUnet
   VOMT/CCL = CornerBlue
   ESG Defendants = AKMG
   Robb = River City Media
   Phone Call = Text Message

In *Taco Bell,* the Ninth Circuit, in an unpublished opinion, affirmed the district court decision granting summary judgment in favor of the defendant Taco Bell Corporation ("Taco Bell"). In the district court, the plaintiff alleged that Taco Bell had TCPA liability for text messages sent by the Chicago Area Taco Bell Local Owners Advertising Association ("Association"). *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ("*Taco Bell I*"). The Association was made up of Taco Bell store operators in the Chicago area and consisted of 12 members, one of which was Taco Bell. *Id.* at 1081. In 2005, the Association and its advertising agency, ESW Partners LLC ("ESW") sponsored a local sweepstakes promotion. *Id.* at 1082. ESW hired ipsh!net, Inc. ("Ipsh") to send the text messages for the promotion. *Id.*

In considering the matter, the district court recognized there were facts in the case that may have shown Taco Bell approved of and authorized the release of funds for the advertising campaign, but that "[m]ere approval and funds administration cannot be equated with control over the manner and means by which the campaign was designed and executed." *Taco Bell I,* 879 F. Supp. 2d at 1085. Nonetheless, the district court granted summary judgment in favor of Taco Bell because "[a]ll of [the] control over the manner and means of the text message campaign was exercised by the Association, ESW, and Ipsh, and Ms. Thomas has not presented any evidence to the Court demonstrating that Taco Bell controlled the action of these entities with respect to the campaign." *Id.* There was no evidence that Taco Bell "supervised the manner and means of the text message campaign," "created or developed the text message" or "played any role in the decision to distribute the message by way of blast text." *Id.*

The same is the case here. Berkley did not know about the political survey campaign or the fact that it was going to be conducted. (SOF, ¶¶ 33, 44). It did not design, initiate or create the political survey concept or suggest that it be used and did not edit, draft, review or comment

on any of the scripts or other creative material used during the political survey calls. (SOF, ¶¶ 60, 61). It did not supervise or instruct the ESG Defendants. (SOF, ¶¶ 33, 48). Berkley did not direct or tell others to dial the telephone numbers and did not acquire or provide to anyone the numbers to be called. (SOF, ¶¶ 49, 57, 59). Berkley did not instruct anyone as to the type of equipment to be used to make the political survey calls. (SOF, ¶ 58). Most telling, Berkley was even further removed from the political calls than Taco Bell was from the text messages. Unlike Taco Bell, Berkley had no knowledge of the calls, did not approve the calls, and did not administer funds for the political survey calls. (SOF, ¶¶ 33, 44, 48, 49, 60). Berkley, "simply put, had nothing to do with it." *Taco Bell I,* at 1085.

**c.     Even if Properly Pled, Berkley Did Not Ratify the Acts of the Parties Placing the Phone Calls.[9]**

Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority. Restatement (Third) of Agency § 4.01(1) (2006). Berkley has no ratification liability because it rejected tour leads after it first learned about the political survey calls on May 15, 2012. Within twenty-four hours, Berkley advised VOMT that it did not want tour leads potentially generated in violation of the TCPA. (SOF, ¶ 62). Shortly after being sued in one of the cases constituting this consolidated action, Berkley reiterated its position in writing and told VOMT to not send to Berkley any leads generated from calls to cellular telephone numbers. (SOF, ¶ 63).

Because Berkley took these steps, it did not manifest "assent or otherwise consent[] to a prior act done by another person and thereby adopt[] its legal consequences." Restatement

---

[9] While "apparent authority" is another method of establishing TCPA vicarious liability, Berkley does not believe that Plaintiffs are advancing (or credibly could advance) such a theory here. Plaintiffs' testimony and admissions are clear that no one heard Berkley, its trade name or any representation about its products during the calls. (SOF, ¶¶ 50, 52, 53).

(Third) of Agency § 4.01(1) cmt. c (2006). Rather, Berkley told VOMT it wanted no benefits from these calls and expressly rejected those benefits. Under these facts, Plaintiffs cannot meet their burden of proof and summary judgment in Berkley's favor is appropriate. *Id.*§ 4.06 cmt. b (the burden to prove ratification is on the "party attempting to establish that ratification occurred").

Plaintiffs' ratification theory also fails because no agency relationship exists between Berkley and any of the ESG Defendants, Robb or DeJongh. (SOF, ¶¶ 48, 49). "A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf." Restatement (Third) of Agency § 4.03. That is, "[w]hen an actor is not an agent and does not purport to be one, the agency-law doctrine of ratification is not a basis on which another person may become subject to the legal consequences of the actor's conduct." *Id.* § 4.01 cmt b. [10] As set forth in the above agency analysis, the ESG Defendants and Robb were not Berkley's agents and did not purport to be Berkley's agents. (SOF, ¶¶ 48, 49). Without this agency relationship or the holding out of any agency relationship, the ratification argument fails. *Taco Bell II*, 582 Fed. Appx. at 680, citing *Batzel v. Smith,* 333 F.3d 1018, 1036 (9th Cir. 2003); *see also United States v. Dish Network, L.L.C.,* No. 09-3073, 2014 WL 7013223, at *61 (C.D. Ill. Dec. 12, 2014) (ratification requires proof that the dialer represented that it was an agent of the seller), *vacated in part upon reconsid. on other grounds*, 80 F. Supp. 3d 917 (C.D. Ill. 2015); *Makaron*, 2015 WL 3526253, at *10 (no finding of ratification because no evidence to support principal-agent

---

[10] In their discovery responses, Plaintiffs cite this same portion of cmt. b of § 4.01 for the apparently inconsistent position that ratification may create an agency relationship where none existed. The full paragraph provides as follows: "In most jurisdictions, ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act. It is necessary that the actor have acted or purported to act on behalf of the ratifier. See § 4.03. This limits the range of ratifiable acts to those done by an actor who is an agent or who is not an agent but pretends to be." There is nothing in the record that shows the ESG Defendants or Robb purported to be or pretended to be Berkley's agents. They did not know of each other until this lawsuit. (SOF, ¶¶ 48-49).

relationship existed); *Murray v. Choice Energy, LLC*, No. 1:15-cv-60, 2015 WL 420439, at *6 (S.D. Ohio July 10, 2015)(TCPA case holding agency is a "necessary element for ratification").

Finally, Plaintiffs' ratification theory fails because none of the Plaintiffs did any business with Berkley. (SOF, ¶ 54). The *Toney* case is instructive regarding the ratification analysis on this point. In *Toney*, the plaintiff alleged that the seller ratified the telemarketer's misconduct by knowingly accepting the benefits from tens of thousands of sales while knowing that the telemarketer was using automated dialing to obtain those customers. 75 F. Supp. 3d at 745. The plaintiff also alleged that the seller knew of a host of complaints about the nature of the calls, but the seller continued to accept the benefits of the calls after those complaints. *Id.* Based on that, the plaintiff argued that the defendants were liable for ratification. *Id.*

In finding that such a complaint failed to plead a ratification cause of action, the court in *Toney* was persuaded by the fact that the plaintiff did not allege that the seller accepted any benefits that stemmed from a call to the plaintiff. *Id.* at 745-46. In fact, the court found that the plaintiff failed to allege that she did any business with the seller because of the calls. These facts were determinative in concluding that ratification had not been pled and the court granted the 12(b)(6) motion to dismiss. *Id.*; s*ee also Smith v. State Farm Mut. Auto Ins. Co.*, 30 F. Supp. 3d 765 (N.D. Ill. 2014)(ratification theory dismissed because the plaintiffs failed to allege that they did business defendants).

Here, Plaintiffs have no factual support for the ratification theory. They did not hear of Berkley during the calls. (SOF, ¶ 50). They did not speak to anyone at Berkley and did not tour a Berkley property. (SOF, ¶ 53). The Plaintiffs have not conducted business with or purchased a timeshare from Berkley. (SOF, ¶ 54). Without this factual support, Plaintiffs ratification theory fails.

**d.    Even if Properly Pled, Plaintiffs' "Control and Benefit" and "Attractive Nuisance" Theories Are Not Applicable.**

In their interrogatory answers, Plaintiffs propose that Berkley can be held vicariously liable under the TCPA pursuant to the "control and benefit" and "attractive nuisance" theories of liability. However, neither the Restatement (Third) of Agency nor the FCC recognizes the "control and benefit" or "attractive nuisance" theories as agency principles.

The FCC has clearly held that common law agency principles cover the vicarious liability analysis for TCPA violations: a "seller may be held vicariously liable under federal common-law principles of agency for TCPA violations committed by third-party telemarketers." *Dish Network*, 28 FCC Rcd. at 6584, ¶ 28. Decisions from this District have held that common law agency principles apply to the TCPA vicarious liability analysis. *See Sefton v. Toyota Motor Sales U.S.A.*, No. 09-3787, 2010 WL 1506709, at *3 (N.D. Ill. Apr. 14, 2010); *Toney*, 75 F. Supp. 3d at 742; *Smith v. State Farm*, 30 F. Supp. 3d at 773-74.

Still, Plaintiffs attempt to advance the copyright infringement theory of "control and benefit." (Pls. Resp. to Berkley's Third Set. Interrogs., pp. 10-14). Plaintiffs, however, present no compelling argument to expand this liability theory to TCPA violations, and none exists. In fact, Plaintiffs' argument was squarely rejected by another district court considering it. *See Kristensen v. Credit Payment Services Inc.*, 2:12-CV-00528-APG, 2015 WL 4477425, at **6-7 (D. Nev. July 20, 2015).[11] In *Kristensen*, the District Court of Nevada addressed the "control and benefit" argument by the plaintiffs there, who cited the same authority cited in Plaintiffs' discovery responses here. In rejecting the plaintiffs' argument, the court noted that only traditional common law agency principles applied to TCPA claims, and "plaintiffs have provided no compelling

---

[11] One of the law firms, Edelson P.C., representing Plaintiffs in this case also represented the plaintiffs in *Kristensen* where the "control and benefit" theory was rejected.

reason to adopt the control and benefit test when determining vicarious liability under the TCPA." *Id.*

Similarly, Plaintiffs' interrogatory answers fail to cite any authority supporting the argument that either liability or damages for a TCPA claim are measured under an "attractive nuisance" tort analysis. Berkley knows of no cases holding a party liable under the TCPA pursuant to a novel attractive nuisance theory. Accordingly, these theories do not prevent entry of summary judgment in favor of Berkley and against Plaintiffs.

**B.      Berkley Has No Joint Venture or Partnership Liability**

**1.      Defendants are not Liable under a Joint Venture Theory**

Plaintiffs' ACC alleges that Berkley, VOMT and CCL were in a joint venture with "respect to the sale of Berkley timeshares and vacation packages." (Doc. #289, ¶ 32). Under Plaintiffs' theory, VOMT and CCL provide the cruise ship, the telemarketing operations to generate timeshare tour leads, the telemarketing employees, and the on-site employees at Berkley resorts. For its part, Plaintiffs allege, Berkley contributes the timeshare sales employees and the actual timeshare properties.

To find there is TCPA joint venture liability under federal common law, the court must consider the following factors: (1) the venturers' intentions, (2) a joint right of control, (3) joint proprietary interest in the subject matter of the venture, (4) sharing of profits, and (5) a duty to share in losses. *See* Order Denying Defs.' Mot. Dismiss at 17, *Keim v. ADF Midatlantic, LLC, et al., No. 9:12-80577-cv-KAM* (S.D. Fla. Nov. 10, 2015), ECF No. 114, citing *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 2011 (11th Cir. 1991). These factors should not be applied mechanically, and no one factor is decisive. *Id.* Plaintiffs cannot show, as a matter of law, the existence of any of these factors.

### a. No Intent to Form a Joint Venture

There is no evidence that Berkley intended to form a joint venture with VOMT. They do not file partnership or joint venture tax returns, and Berkley's Agreement with VOMT is clear: "[n]othing contained in this Agreement shall constitute or be construed to create a partnership or joint venture" between Berkley and VOMT. (SOF, ¶¶ 21, 23, 68). Such language defeats the claim that there was intent to create a joint venture. *See Wolf v. Celebrity Cruises, Inc.*, No. 13-23697, 2015 WL 1941336, at *9 (S.D. Fla. Apr. 30, 2015) (granting summary judgment in favor of the defendant on plaintiff's joint venture claim and determining that the parties' intent to enter into a joint venture was not established where agreement "clearly manifest[ed]" the defendant's intent that its purported co-venturer "not be construed as anything more than an independent contractor.").

### b. No Joint Control

Regarding the joint control element, "[f]or joint venture purposes, the parties must have mutual control over the subject matter of the venture and the authority to bind one another with respect to the subject matter of the venture." *Progress Rail Services Corp. v. Hillsborough Reg'l Transit Auth.,* No. 8:04CV200–T–23EAJ, 2005 WL 1051932, at *3 (M.D. Fla. Apr. 12, 2005).

As to the "mutual control" prong of this element, VOMT and CCL have no control over Berkley's timeshare operations. (SOF, ¶ 69). They are not involved in and have no say in Berkley's timeshare sales prices. (SOF, ¶ 70). They do not supervise any Berkley employees and do not have access to Berkley financial records. (SOF, ¶ 69). They are not involved in any aspect of Berkley's timeshare resort's development. (SOF, ¶ 72). They do not have the ability to sell Berkley's timeshare units or bind Berkley to any other type agreement. (SOF, ¶ 71). Likewise, Berkley has no control or authority over any aspect of CCL's vacation packages pricings,

accommodations offered or sales methods. (SOF, ¶¶ 68, 70). Berkley does not have access to

VOMT or CCL's financial records and does not supervise any CCL or VOMT employees. (SOF,

¶¶ 68).

The most telling factor in regard to this element, however, is the inability of any party to

bind the other. Only licensed real estate agents can sell Berkley's timeshare interests. (SOF, ¶

30). CCL's employees do not have to be licensed to sell real estate because that is not what they

are selling; they are selling vacation packages and no license is required to do so. (SOF, ¶ 31). As

such, VOMT and CCL employees are not permitted to sell Berkley timeshares and cannot bind

Berkley to a timeshare sales contract or any other agreement.  (SOF, ¶¶ 69, 71). The vacation

packages sold during the call were owned by CCL, not Berkley, and Berkley has no right to sell

them. (SOF, ¶ 71). Without this ability to sell the others' products, there simply cannot be a joint

venture with "respect to the sale of Berkley timeshares and vacation packages."

### c.  No Joint Proprietary Interest

The joint proprietary interest factor is also missing here. "A joint proprietary interest

generally requires joint ownership of the subject matter of the contract." *Progress Rail Services

Corp.,* 2005 WL 1051932, at *3. There is no evidence that Berkley, VOMT, or CCL are joint

owners of the assets used in the alleged joint venture. Berkley's subsidiaries own the timeshare

interests. (SOF, ¶ 74). CCL owns the vacation packages. (SOF, ¶ 76). Berkley does not have an

interest in the telemarketing call centers. (SOF, ¶ 74).

*Skeen v. Carnival Corp.*, No. 08-22618-CIV, 2009 WL 1117432 (S.D. Fla. Apr. 24,

2009), a case with a similar fact pattern, makes the point.  In *Skeen*, the plaintiff attempted to

hold Carnival, a cruise ship operator, liable under a joint venture theory for injuries she sustained

while on a "Caves and Caverns" excursion booked and purchased through Carnival. The

excursion took place away from the ship and was operated by Total Gusto, a third-party defendant. The plaintiff alleged that each party contributed assets to the joint venture because they owned assets individually that were used to conduct the business. *Id.* at *4.

In granting a 12(b)(6) motion to dismiss for failure to allege a joint proprietary interest, the court found,

> [i]n the case before the court, Carnival can book tour excursions, yet lack an ownership interest in assets used for conducting excursions. Further, Total Gusto can provide excursions to Carnival passengers, yet not have an ownership interest in Carnival's sales and booking systems. Thus, Plaintiff has not established that Carnival and Total Gusto jointly own resources for conducting excursion tours.

*Id*.

The same is true here. Plaintiffs allege that VOMT or CCL were booking timeshare tours for Berkley. Yet neither VOMT nor CCL owned Berkley timeshares or vacation packages. (SOF, ¶¶ 74, 76). Berkley did not own or lease the telemarketing infrastructure serving the marketing efforts. (SOF, ¶ 74). CCL, not Berkley, owned the vacation packages sold during the phone calls. (SOF, ¶ 76). Berkley's subsidiaries, not VOMT or CCL, own the timeshare interests. (SOF, ¶ 76). Without joint ownership of the component parts of the alleged joint venture, there simply is no joint venture.

### d. No Duty to Share in Profits and Losses

Finally, Plaintiffs cannot show that the parties share in the profits or have a duty to share in the losses for Berkley's timeshare sales. The VOMT marketing agreement only obligates Berkley to pay a commission; it does not obligate Berkley to share profits from its operations or for VOMT to share its profits with Berkley. (SOF 75). Berkley has no obligation to contribute to cover any of VOMT's or CCL's losses and has no obligation to guarantee any their debts. (SOF, ¶ 75). "[T]he fact that two business entities entered into a contractual relationship with one

another and both obviously desired to profit from the relationship does not evidence a joint venture." *J.R. Simplot Co. v. Nestle USA, Inc.*, No. 06-141-S-EJL, 2009 WL 564194, at * 8 (D. Idaho Mar. 4, 2009) (granting summary judgment for defendant and determining no joint venture existed).

Nonetheless, Plaintiffs argue "Berkley shares the risk of losing money if VOMT/CCL cannot provide it with sufficient leads to sell its products." (SOF, ¶ 77). Under this theory, however, virtually any business relationship creates a joint venture. For example, a manufacturer that needs widgets for its product risks losing money if a supplier fails to supply the widgets. But that does not create a duty to share in the losses so as to create joint venture. The same is true here. Berkley undertook some risk in losing money, which is inherent in virtually any business relationship, but Berkley never undertook a duty to share in CCL's or VOMT's losses. (SOF, ¶ 75).

### 2. Defendants are not Liable under a Partnership Theory

The joint venture analysis and the partnership analysis are essentially the same. *See Autotech Techs. Ltd. P'ship v. Autmationdirect.com, Inc.*, No. 05 C 5488, 2005 WL 3180147, at *5 (N.D. Ill. Nov. 23, 2005) (Illinois law) ("Partnership legal principles govern joint ventures and the only distinction of consequence between the two is that a joint venture relates to a single enterprise or transaction, whereas a partnership relates to a general business of a particular kind.")(internal citations omitted). For all the reasons set forth above in the joint venture analysis, Plaintiffs' partnership theory fails as well. Berkley did not and does not own any interest in CCL or VOMT or in any of their assets. (SOF, ¶ 75). VOMT or CCL did not and does not have any ownership interest in Berkley or in any of its assets. (SOF, ¶ 75). There is no mutual control over Berkley's timeshare operations or CCL's vacation sales operations. (SOF, ¶¶

68, 69, 70). Finally, and most telling, neither party can sell the others products or bind the other to any sales contract or other agreement. (SOF, ¶ 71).

After years of discovery, Plaintiffs injected this theory into the litigation for the first time in their ACC without any facts to back it up. Plaintiffs simply have no evidence to refute the fact that no partnership exists, and Berkley is entitled to summary judgment.

## VI. CONCLUSION

For the forgoing reasons, Defendant The Berkley Group, Inc.'s Motion for Summary Judgment should be granted in its entirety.

DATED this the 23rd day of November 2015.

THE BERKLEY GROUP, INC.

By: /s/Brian P. O'Meara
One of its Attorneys

M. Peebles Harrison (*Pro Hac Vice*)
700 Blue Jay Street, Suite 1
Post Office Box 405
Kill Devil Hills, North Carolina 27948
Telephone: (252) 480-1414
Facsimile: (252) 480-1765
Email: peebles@outerbankslaw.com

Brian P. O'Meara
Forde Law Offices LLP
111 West Washington Street, Suite 1100
Chicago IL 60602
Telephone: (312) 465-4780
Facsimile: (312) 641-1288
Email: bomeara@fordellp.com

*Attorneys for The Berkley Group, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, states that the foregoing THE BERKLEY GROUP, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was electronically filed with the Clerk of Court by using the CM/ECF system, which will provide copies to all counsel of record registered to receive CM/ECF notification on this 23rd day of November, 2015.

<u>/s/Brian P. O'Meara</u>