**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GRANT BIRCHMEIER, STEPHEN PARKES, SUSAN VIGUS, and REGINA STONE, on behalf of themselves and a Class of others similarly situation, | ) ) ) ) | |
| *Plaintiffs*, | ) | Case #: 1:12-cv-04069 |
| v. | ) | *Related to:* Case #: 1:13-cv-00903 |
| | ) | Case #: 1:13-cv-00908 |
| | ) | |
| CARIBBEAN CRUISE LINE, INC., | ) | Honorable Matthew F. Kennelly |
| ECONOMIC STRATEGY GROUP, | ) | |
| ECONOMIC STRATEGY GROUP, INC., | ) | |
| ECONOMIC STRATEGY, LLC, | ) | |
| THE BERKLEY GROUP, INC., and | ) | |
| VACATION OWNERSHIP MARKETING | ) | |
| TOURS, INC., | ) | |
| *Defendants*. | ) | |
| | ) | |

**CARIBBEAN CRUISE LINE, INC. AND VACATION OWNERSHIP
MARKETING TOURS, INC.'S JOINT STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

Defendants Caribbean Cruise Line, Inc. ("CCL) and Vacation Ownership Marketing Tours, Inc. ("VOMT"), by and through undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Northern District of Illinois Local Rule 56.1, hereby file this Joint Statement of Undisputed Material Facts In Support of Their Motions for Summary Judgment, and states as follows:

**I.      STATEMENT OF UNDISPUTED MATERIAL FACTS**

   ***A. Parties, Jurisdiction and Venue***

   1.      The named Plaintiffs in this lawsuit are Grant Birchmeier ("Birchmeier"), Stephen Parkes ("Parkes"), Regina Stone ("Stone"), and Gerardo Aranda ("Aranda").[1]

---

   1.      *See* Consolidated Amended Complaint, Docket Entry ("DE") 289.

2. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, and venue is proper pursuant to 28 U.S.C. § 1391.[2]

**B. Facts Specific to CCL**

3. CCL is a company that markets and sells cruise and vacation packages.[3]

4. On or about September 12, 2011, CCL entered into a Supplier Agreement with Economic Strategy Group ("ESGP").[4]

5. On or about September 12, 2011, CCL entered into a Supplier Agreement with Employment for America ("EFA").[5]

6. The SROs' contractual relationship with CCL was defined by the Supplier Agreements.[6]

7. A company called Linked Service Solutions ("LSS") brokered the Supplier Agreements between ESGP and CCL, which is the only relationship that ESGP, EFA and Political Opinions of America ("POA") (collectively, the "SROs") had with CCL.[7]

8. CCL did not know or have any control over where the SROs received their telephone numbers or which person or entity actually made the telephone calls.[8]

9. The SROs are survey research companies with contractual relationships with

---

2. *See* DE 289, ¶¶7-8; CCL's Answer and Affirmative Defenses at DE 290, ¶¶7-8; VOMT's Answer and Affirmative Defenses at DE 292, ¶¶7-8.
3. Declaration of Dan Lambert for CCL ("CCL Dec."), attached hereto as **Exhibit 1**, at ¶ 2; CCL Depo., p. 16, 24 (Portions of the deposition of the Daniel Lambert, the Fed.R.Civ.P. 30(b)(6) representative of CCL, are attached hereto as **Composite Exhibit 2**, and will be referred to as ("CCL Depo., p._")); DeJongh Depo., p. 20. (Portions of the deposition of Jacob DeJongh are attached hereto as **Composite Exhibit 3**, and will be herein referred to as ("DeJongh Depo., p._")).
4. A true and correct copy of the Supplier Agreement between CCL and ESGP is attached hereto as **Exhibit 4.**
5. A true and correct copy of the Supplier Agreement between CCL and EFA is attached hereto as **Exhibit 5.** Exhibits 4 and 5 shall collectively be referred to herein as the "Supplier Agreements".
6. DeJongh Depo., pp. 41-42, 127, 290, 354-355.
7. DeJongh Depo., pp. 21, 23, 127, 354, 376-377.
8. CCL Depo., p. 74-75; DeJongh Depo., pp. 342-343, 349.

various political groups under which the SROs collect information through political surveys.[9]

10. All SROs including, but not limited to, ESGP, EFA and POA, were independent entities that were the brainchild and mission of Jacob DeJongh ("DeJongh"), the founder of, sole director, sole worker and/or sole employee of, the SROs.[10]

11. The SROs did not share common ownership, directorships, board members, physical location or any other connection to CCL, outside of the Supplier Agreements.[11]

12. CCL did not direct or control the manner and means of the SROs' business.[12]

13. CCL did not provide any assistance, including monetary support, to the establishment of the SROs.[13]

14. The SROs were setup solely by DeJongh with input and funds from non-defendant third parties to conduct political surveys.[14]

15. DeJongh's business plans for the SROs, in addition to the formation of such entities, were completed before DeJongh had spoken with anyone from CCL.[15]

16. Neither DeJongh nor any of the SROs, including, but not limited to, ESG, EFA and POA, ever worked for or held an ownership interest in CCL.[16]

17. The SROs were legitimate survey organizations seeking the views of likeminded persons.[17]

---

9. DeJongh Depo., p. 36-37, 58-59, 72-73, 324-327, 370, 381, 391, 430-431.
10. DeJongh Depo., pp. 34-38, 40-41, 46, 62, 69, 72, 322-324, 329-331.
11. DeJongh Depo., pp. 355-356, 372-375.
12. DeJongh Depo., pp. 36- 37, 372-375, 430; CCL Depo., p. 92.
13. DeJongh Depo., pp. 258-259, 276-277, 330-334, 338-339, 341, 345-348, 359; CCL Depo., pp. 109-110.
14. DeJongh Depo., pp. 38, 74, 76-77, 100-101, 113, 201, 324-330.
15. DeJongh Depo., pp. 329, 331-334. *See also* the Supplier Agreements.
16. DeJongh Depo., pp. 355-56.
17. DeJongh Depo., pp. 38-39, 322-327. A copy of DeJongh's business plan, an exemplar agreement with one of his Political Action Committees, and an example of survey results provided by DeJongh to his clients are attached hereto as **Composite Exhibit 6.** DeJongh testified that POA is a legitimate company that was doing business on behalf of the ESG Defendants. DeJongh Depo., pp. 324-

18.     The SROs had contracts with political and charitable organizations.[18]

19.     The SROs and third party brokers assisted the SROs with the creation and verbiage of their websites, of which CCL had no input.[19]

20.     CCL did not have access to or information regarding the SROs' bank accounts.[20]

21.     CCL's cruise product was an incentive for the participants in certain of the SROs' surveys.[21]

22.     The SROs would have conducted the surveys with or without CCL's cruise offer incentive.[22]

23.     Only the SROs purchased and utilized the purchased phone numbers given to the dialer, Darren Robb ("Robb").[23]

24.     CCL did not know where the broker and/or the SROs were getting their telephone numbers.[24]

25.     Once SROs purchased the telephone numbers from various entities, such numbers

---

25; *id.* at p. 326 ("Q. And it states in paragraph 2 … [in] the Consolidated Complaint, the first sentence says 'Nor is POA a legitimate survey organization.' Do you agree with that? A. No, I don't."); *id.* at p. 327 ("Q. Were your surveys a sham? A. No, they were not a sham. I discussed why I was doing them, and it is for the very reasons that I discussed, and I feel very passionate….").

18.     DeJongh Depo., pp. 323-324, 370, 381, 391, 430-431. Attached hereto as **Composite Exhibit 7** are: (1) Survey Research Agreements between ESGP and American Independent Party of Southwest Florida, (2) Survey Research Agreement between ESGP and Liberty Counsel Action, (3) Agreement to Provide 1.5 Million Survey Phone Calls for Northern Virginia House of Prayer, (4) Agreement to Provide 1.5 Million Survey Phone Calls at No Cost to the Hands Across the Sea, (5) Agreement to Provide 1.5 Million Survey Phone Calls at No Cost to the Jack Kemp Foundation, (6) Agreement to Provide 1.5 Million Survey Phone Calls at No Cost to the Washington Arts Group, and (7) Agreement to Provide 100,000 Survey Phone Calls at No Cost to Young Life, Inc. These agreements will collectively be referred to as the "Survey Research Agreements".

19.     DeJongh Depo., pp. 337- 338.
20.     DeJongh Depo., p. 348
21.     DeJongh Depo., pp. 134, 254-256, 352-53.
22.     DeJongh Depo., pp. 326, 352-353, 401.
23.     DeJongh Depo., pp. 342, 351-352.
24.     DeJongh Depo., pp. 342-343, 362-363, 376-377.

were provided to LSS then to Robb.[25]

26.     While the SROs were to provide CCL with a general description of the political survey and script, CCL could not amend the script even if it requested to do so and could not instruct the SROs on whom to call.[26]

27.     CCL was not involved in any negotiations or preparations of any contracts between the SROs and their clients.[27]

28.     The SROs' clients had the absolute right, and exercised that right, to alter or update the automated script.[28]

29.     CCL had no input into the scripts used on the telephone calls (except with respect to what was required in the event the SRO utilized the cruise incentive on a particular call).[29]

30.     A called party was only connected to CCL after he or she answered all of the questions included in a survey, assuming the cruise incentive was utilized, and after the called party expressly and affirmatively chose to be connected to one of CCL's representatives.[30]

31.     Prior to selecting to speak to an operator, even if the complimentary cruise was offered, the Plaintiffs did not hear reference to CCL.[31]

32.     CCL did not, and could not, advise or affirmatively influence the SROs on their conduct, or their day to day functions.[32]

33.     In fact, the SROs were not required to include CCL's offer and could chose, at the

---

25.     DeJongh Depo. pp. 115, 258-259, 362-363.
26.     DeJongh Depo., pp. 258-259, 358-359.
27.     DeJongh Depo., p. 416-419.
28.     DeJongh Depo., pp. 135, 383-384.
29.     CCL Depo., pp. 54-55, 73, 76; DeJongh Depo., pp. 23, 40-41, 376-377.
30.     DeJongh Depo., pp. 155-156.
31.     See infra, notes 58-76.
32.     DeJongh Depo., pp. 240, 372-375. CCL did, however, notify LSS of the availability of its call centers to accept transfers. Id. pp. 134, 155.

SRO's sole discretion, not to offer the cruise on the survey calls.[33]

34.     One of the SROs' clients, Let Freedom Ring, determined that it did not want to use CCL's incentive and the SROs continued to make the political calls for Let Freedom Ring without the cruise incentive.[34]

35.     CCL did not have any input or control regarding how the SROs' survey calls were made, when telephone calls were made or to whom telephone calls were made.[35]

36.     CCL did not direct or control the business operations of The Berkley Group, Inc. ("Berkley") or VOMT.[36]

### C.  Facts Specific to VOMT

37.     VOMT is a timeshare tour lead broker and was established in 2001. In connection with its business operations, VOMT has entered into agreements with various lead generators in the vacation sales business.[37]

38.     VOMT does not own, sell, operate or market any vacation property, timeshares and/or cruise ships.[38]

39.     On or about September 30, 2003, VOMT and Berkley entered into a Marketing Agreement.[39]

40.     On or about January 1, 2008, VOMT entered into a Marketing Agreement with

---

33.     DeJongh Depo., pp. 139, 256, 326.
34.     DeJongh Depo., pp. 390, 436.
35.     DeJongh Depo., pp. 390
36.     CCL Dec., ¶¶ 6-11.
37.     Declaration of Dan Lambert for VOMT ("VOMT Dec."), attached hereto as **Exhibit 8**, at ¶3; VOMT Depo., pp. 7. (Portions of the deposition of the Daniel Lambert, the Fed.R.Civ.P. 30(b)(6) representative of VOMT, are attached hereto as **Composite Exhibit 9**, and will be herein referred to as ("VOMT Depo. p._")).
38.     VOMT Depo pp. 8-9.
39.     *See* VOMT Depo., p. 24. A true and correct copy of the Marketing Agreement between VOMT and Berkley Group is attached as **Exhibit B** to the VOMT Dec.

CCL.[40]

41.     VOMT entered into agreements with various third parties, including CCL, to obtain potential tour prospects.[41]

42.     During the course of the VOMT/CCL relationship, the number of tours brokered by VOMT from CCL customers was fairly consistent.[42]

43.     The telephone calls at issue in this case took place between August 2011 and August 2012.  In the calendar year 2010, VOMT brokered approximately 47,000 tour prospects; in the calendar year 2011, VOMT brokered approximately 35,000 tour prospects; in the calendar year 2012, VOMT brokered approximately 36,000 tour prospects; and in the calendar year 2013, VOMT brokered approximately 36,000 tour prospects.[43]

44.     VOMT charged CCL, and any other company from which it may have obtained leads, with handling its own marketing programs and monitoring such programs for compliance.[44]

45.     VOMT was not a party to any Supplier Agreement with any SRO.

46.     The SROs do not share common ownership, directorships, board members, physical location or any other connection to VOMT.[45]

47.     DeJongh and the SROs including, but not limited to, POA, EFA and ESG, never did business with VOMT.[46]

48.     VOMT was not involved in any of the aspects of the various political surveys

---

40.     VOMT Dec., ¶ 4; a true and correct copy of the Agreement between CCL and VOMT is attached as **Exhibit A** to the VOMT Dec.
41.     VOMT Dec., ¶4; VOMT Depo p.25-26.
42.     VOMT Dec., ¶5.
43.     VOMT Dec., ¶6.
44.     VOMT Depo p. 29.
45.     VOMT Depo., p. 6; DeJongh Depo., pp. 355-356, 372-375.
46.     DeJongh Depo p. 322.

conducted by the SROs.[47]

49.    VOMT did not provide any assistance, including monetary support, to the establishment of the SROs.[48]

50.    There was no component of DeJongh's business plan that involved telemarketing for VOMT.[49]

51.    Neither DeJongh nor any of the SROs including, but not limited to, ESG, EFA and POA, ever worked for or held an ownership interest in VOMT.[50]

52.    DeJongh had never heard of VOMT until after the lawsuit was filed.[51]

53.    VOMT did not enter into any agreements or contracts with any SRO.[52]

54.    VOMT did not provide any cruise or other offer to the SROs.[53]

55.    VOMT had no input into the scripts used on the survey calls made by the SROs.[54]

56.    VOMT did not transfer any funds to any of the SROs.[55]

57.    VOMT did not, and could not, advise or affirmatively influence ESG or POA on its day to day functions or in the amount of calls that the SROs conducted.[56]

58.    VOMT did not have any input or control regarding how telephone calls were made, when telephone calls were made or to whom telephone calls were made.[57]

59.    VOMT is a separate and distinct entity from CCL; VOMT was incorporated and

---

47.    DeJongh Depo pp. 322, 334, 340.
48.    DeJongh Depo pp. 322, 338-339, 345-348.
49.    DeJongh Depo pp. 322, 334.
50.    DeJongh Depo pp. 355-356.
51.    DeJongh Depo., pp. 19, 322.
52.    *See* Supplier Agreements; DeJongh Depo., pp. 334, 340.
53.    *See* Supplier Agreements; DeJongh Depo., pp. 396-398; CCL Depo., pp. 95-96.
54.    DeJongh Depo., pp. 258-259, 358-359.
55.    DeJongh Depo., pp. 330-334, 339.
56.    DeJongh Depo., pp. 240, 372-375.
57.    DeJongh Depo., p. 390

began doing business in 2001 and CCL was not created until 2008.[58] VOMT maintains its own corporate books and records, and separate bank accounts, from CCL and Berkley.[59]

**D.  *Facts Specific to the Named Plaintiffs***

60.     Plaintiff Birchmeier received one call to his cellular telephone on May 7, 2012,[60] which he answered and heard a "recorded message … from Political Opinions of America" prompting him to "take a 30-second political survey" in return for a free two-day cruise.[61]

61.     Birchmeier cannot recall the name of any entity other than Political Opinions of America disclosed on the call.[62]

62.     Birchmeier first heard the name CCL through court documents from his attorney,[63] and never heard of the name VOMT until after the lawsuit was filed.[64] Birchmeier said he decided to sue VOMT because of information his attorney discovered.[65]

63.     Birchmeier never took advantage of the free cruise offer, and never spoke with an agent of CCL.[66]

64.     Plaintiff Aranda complained he received one alleged unlawful call to his cellular telephone on March 10, 2012.[67]

65.     Aranda testified that he cannot remember any details from the telephone call on March 10, 2012,[68] other than that he received a call from a robotic voice and was later

---

58.     VOMT Dec., ¶ 20.
59.     VOMT Dec., ¶¶ 20-21.
60.     Birchmeier Depo., pp. 14-16. (Portions of the deposition of the Grant Birchmeier are attached hereto as **Composite Exhibit 10**, and will be herein referred to as ("Birchmeier Depo. p._")).
61.     Birchmeier Depo., p.18:3-19 (description of call).
62.     Birchmeier Depo., pp. 20:23-25, 21:1-10, 76-77.
63.     Birchmeier Depo., pp. 64-67.
64.     Birchmeier Depo., p. 67.
65.     Birchmeier Depo., p. 67.
66.     Birchmeier Depo., p. 100.
67.     Aranda Depo., p. 37. (Portions of the deposition of the Gerardo Aranda are attached hereto as **Composite Exhibit 11**, and will be herein referred to as ("Aranda Depo. p._")).
68.     Aranda Depo., pp. 39-42.

transferred to a live person who offered a 2-day free cruise.[69]

66.     Aranda testified that he did not hear about the free cruise during the recorded message,[70] and the first time Aranda heard of CCL or VOMT was through his attorneys and/or court documents.[71]

67.     Aranda never bought anything from CCL and never went on a free cruise.[72]

68.     Plaintiff Parkes testified that he received the first alleged violative call on his cellular telephone on March 13, 2012 "from Political Opinions of America" which offered a free cruise for answering a few questions.[73]

69.     Parkes testified that no business or entity other than "Political Opinions of America" was mentioned in the recording during that call.[74]

70.     Parkes claimed he received another call on April 14, 2012,[75] but his call records show the call lasted only ten (10) seconds.[76]

71.     Parkes also claims he received calls on his business lines (which are not at issue in this lawsuit), and admits the only time he spoke to a CCL representative was after receiving a call on his business line.[77]

72.     Parkes's telephone records show the calls about which he complains lasted between only two and twenty-one second.[78] Parkes testified that the calls were the same and he

---

69.     Aranda Depo., pp. 43-45.
70.     Aranda Depo., pp. 45-46.
71.     Aranda Depo., pp. 30-31.
72.     Aranda Depo., pp. 48.
73.     Parkes Depo., pp. 33-35. (Portions of the deposition of the Stephen Parkes are attached hereto as **Composite Exhibit 12**, and will be herein referred to as ("Parkes Depo. p._")).
74.     Parkes Depo., p. 37.
75.     Parkes Depo., p. 110.
76.     Parkes Depo., p. 110.
77.     Parkes Depo., pp. 35-37, 109-110.
78.     Parkes Depo., pp. 102-108.

cannot recall any variations in the calls lasting of differing lengths.[79]

73.     The calls Regina Stone alleges she received are not substantiated by her call records.[80]

74.     Regina Stone testified the first call she received on her cellular telephone offering a cruise in exchange for taking a short political survey was on April 27, 2012.[81]

75.     Stone testified that following the survey she was connected to a live operator who advised Stone she had won a free cruise. Stone claims the operator identified herself as being from CCL, and after requesting Stone's credit card information for the payment of port fees, Stone ended the conversation.[82]

76.     Stone admits that except on one telephone call, she never listened past the prerecorded voice long enough to take the survey.[83] Stone first heard of VOMT through her attorneys.[84]

### E. Facts Relevant to All Parties

77.     Darren Rob assisted Jacob DeJongh with placing the telephone calls.[85]

78.     Darren Rob brokered the relationship between Jacob DeJongh, the owner of the SROs, and Venture VoIP, the "dialer" or entity that housed the software and equipment to assist DeJongh in placing calls.[86]

---

79.     Parkes Depo., pp. 102-108.
80.     Stone Depo., pp. 152-165. (Portions of the deposition of the Regina Stone are attached hereto as **Composite Exhibit 13**, and will be herein referred to as ("Stone Depo. p._")). *See* Regina Stone's responses to Berkley's First set of Interrogatories, included as part of Composite Exhibit 13, pp. 6-7. Attached hereto as **Composite Exhibit 14** are the call records produced by Aranda, Parkes, and Stone, as referenced in their depositions.
81.     Stone Depo., pp. 22-25.
82.     Stone Depo., pp. 36-37.
83.     Stone Depo., p. 148.
84.     Stone Depo., p. 77.
85.     DeJongh Depo., p. 156.
86.     Darren Robb's Depo., p. 111. (Portions of the deposition of the Darren Robb are attached hereto as **Composite Exhibit 15**, and will be herein referred to as ("Robb Depo. p._")).

79. Darren Rob had never heard of CCL until after the lawsuit was filed.[87] Robb never spoke with anyone from CCL.[88]

80. Robb never heard of VOMT until the date of his deposition on May 8, 2014.[89]

DATED: November 23, 2015           Respectfully submitted,

*s/Jeffrey Backman*
RICHARD W. EPSTEIN, ESQ.
(Fla. Bar No. 229091)
Admitted Pro Hac Vice
Richard.Epstein@gmlaw.com
JEFFREY A. BACKMAN, ESQ
(Fla. Bar No. 0662501)
Admitted Pro Hac Vice
Jeffrey.Backman@gmlaw.com
GREENSPOON MARDER, P.A
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
954.491.1120 (Telephone)
954.343.6958 (Facsimile)

Timothy A. Hudson
THudson@TDRLAWFIRM.com
TABET DiVITO & ROTHSTEIN, LLC
209 S. LaSalle Street, Suite 700
Chicago, Illinois 60604
Telephone: (312) 762-9450
Facsimile: (312) 762-9451
Firm No.: 38234

*Attorneys for Defendant Caribbean Cruise Line, Inc. and Vacation Ownership Marketing Tours, Inc.*

---

87. Robb Depo., p. 120.
88. Robb Depo., p. 121.
89. Robb Depo., p. 121.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification on this 23rd day of November, 2015.

*s/Jeffrey Backman*
Jeffrey A. Backman