IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| GERARDO ARANDA, GRANT BIRCHMEIER, STEPHEN PARKES, and REGINA STONE, on behalf of themselves and a class of others similarly situated,<br><br>*Plaintiffs*,<br><br><br>        *v.*<br><br>CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY, LLC, THE BERKLEY GROUP, INC., and VACATION OWNERSHIP MARKETING TOURS, INC.,<br><br>*Defendants*. | Case No. 1:12-cv-04069<br><br><br><br>Honorable Matthew F. Kennelly |

**PLAINTIFFS' AND THE CLASSES' OMNIBUS RESPONSE IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Introduction ............................................................................................................................ 1

Counter Statement of Undisputed and Disputed Material Facts ............................................. 3

    *An Overview of the Defendant Entities* ................................................................................ 3

    *Defendant CCL's VOMT's and Berkley's Longstanding and Interwoven Relationships* ........... 5

        i.     VOMT and CCL Are Effectively the Same Company ....................................... 5

        ii.    Berkley's Longstanding Relationship with VOMT, CCL, and Their Founders 7

        iii.   Berkley, VOMT, and CLL Operate a Joint Venture ........................................ 9

    *Defendants' Contracts for and the Origin of the Robocalling Campaign at Issue* ..................... 10

    *The Illegal Telemarketing Campaign* ................................................................................ 12

    *The Purpose of the Calls was to Sell Defendants' Vacation Products* ...................................... 13

    *Defendants Each Had Knowledge of the Calls and the Ability to Control the Marketing Campaign* ........ 15

    *Defendants All Benefitted from the Robocalling Campaign* .................................................. 18

    *As Evidenced by Their Testimony and Records, Plaintiffs Each Received Defendants' Robocalls Despite that they Never Consented* ............................................................................................ 18

Argument ............................................................................................................................ 19

I.       The Summary Judgment Standard ................................................................................ 19

II.      Plaintiffs and the Classes Were Not Required to Plead Vicarious Liability ............................. 20

III.     Defendants Are Each Subject to Vicarious Liability Under the TCPA ................................... 23

    A.     Berkley is a "seller" under the TCPA because the calls were made to sell timeshares on its behalf ............................................................................................... 23

    B.     VOMT is likewise a "seller" as it is not meaningfully distinct from CCL, and, in any event, it participated in encouraging Class members to buy cruises and timeshares .. 25

IV.     A Jury Could Find Berkley, CCL and VOMT Liable Under a Theory of "Classical" Agency. 28

    A.     The undisputed facts and disputed material facts prevent entry of summary judgment for CCL on a classical agency theory ............................................................... 29

i

B. The undisputed facts and disputed material facts prevent entry of summary judgment for *VOMT* on a classical agency theory ........................................................................33

C. The undisputed facts and disputed material facts prevent entry of summary judgment for *Berkley* on a classical agency theory............................................................34

V. A Jury Could Find CCL, VOMT, and Berkley Liable Under a Theory of Apparent Authority.38

VI. A Jury Could Find Berkley, CCL, and VOMT Liable Under a Ratification Theory...............41

A. No prior agency relationship is required to demonstrate liability under a ratification theory...............................................................................................................41

B. Berkley cannot obtain summary judgment by asserting that the ESG Defendants were not its agents or by claiming that Plaintiffs did not purchase anything from it directly ...................................................................................................................46

C. Contrary to Defendants' contentions, the record evidence demonstrates that each Defendant knowingly benefitted from the robocalls ....................................................48

i. There are more than sufficient facts for a jury to find that CCL and VOMT knowingly benefitted from the robocalls............................................................48

ii. Berkley learned about the robocall campaign, at the latest, months before it ended and also knowingly benefitted from the calls.........................................48

VII. Berkley, CCL, and VOMT are Not Entitled to Summary Judgment on the Joint Venture or Partnership Theories of Liability..............................................................................52

VIII. CCL is Not Entitled to Summary Judgment on Calls that Are not Part of the Class, or on "All Calls to Residential Landlines"....................................................................56

Conclusion .......................................................................................................................59

## <u>TABLE OF AUTHORITIES</u>

**<u>United States Supreme Court</u>:**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................................... 19

*Taylor v. Standard Gas & Elec. Co.*,
  306 U.S. 307 (1939) ..................................................................................... 27

**<u>United States Circuit Court of Appeals</u>:**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) .................................................................... 46

*Bausch v. Stryker Corp.*,
  630 F.3d 546 (7th Cir. 2010) ........................................................................ 21

*Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*,
  210 F.3d 18 (1st Cir. 2000) .......................................................................... 27

*Cabrera v. Jakabovitz*,
  24 F.3d 372 (2d Cir. 1994) ........................................................................... 20

*Del Marcelle v. Brown County Corp.*,
  680 F.3d 887 (7th Cir. 2012) ........................................................................ 21

*Egan v. Freedom Bank*,
  659 F.3d 639 (7th Cir. 2011) ........................................................................ 19

*Flynn v. Greg Anthony Constr. Co.*,
  95 F. App'x 726 (6th Cir. 2003) ................................................................... 27

*Harris v. Itzhaki*,
  183 F.3d 1043 (9th Cir. 1999) .................................................................. 19-20

*Illinois Bell Tel. Co. v. Glob. NAPs Illinois, Inc.*,
  551 F.3d 587 (7th Cir. 2008) ........................................................................ 27

*Keating v. Peterson Nelnet, LLC*,
  No. 14-3558, 615 Fed. Appx. 365 (6th Cir. 2015) ................................... 36-37

*Lumpkin v. Envirodyne Indus., Inc.*,
  933 F.2d 449 (7th Cir. 1991) ........................................................................ 27

*McDonald v. Household Int'l, Inc.*,
  425 F.3d 424 (7th Cir. 2005) ........................................................................ 21

*Minch v. City of Chicago,*
    486 F.3d 294 (7th Cir. 2007) ................................................................................... 20

*Moriarty v. Glueckert Funeral Home, Ltd.,*
    155 F.3d 859 (7th Cir. 1998) ................................................................................... 19

*Morlan v. Universal Guar. Life Ins. Co.,*
    298 F.3d 609 (7th Cir. 2002) ................................................................................... 58

*Mullins v. Direct Digital, LLC,*
    795 F.3d 654 (7th Cir. 2015) ................................................................................... 57

*Parko v. Shell Oil Co.,*
    739 F.3d 1083 (7th Cir. 2014) ................................................................................. 59

*Pizzo v. Bekin Van Lines Co.,*
    258 F.3d 629 (7th Cir.2001) .................................................................................... 27

*Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.,*
    614 F.3d 375 (7th Cir. 2010) ....................................................................... 42, 48, 51

*Siegel v. Shell Oil Co.,*
    612 F.3d 932 (7th Cir. 2010) ................................................................................... 22

*Thomas v. Taco Bell Corp.,*
    582 Fed. App'x 678 (9th Cir. 2014) ........................................................................ 31

*United States v. Curry,*
    187 F.3d 762 (7th Cir. 1999) ................................................................................... 35

*United States v. Peters,*
    732 F.3d 93 (2d Cir. 2013) ...................................................................................... 27

*Whitaker v. Milwaukee Cty., Wisconsin,*
    772 F.3d 802 (7th Cir. 2014) ............................................................................. 21-22

*Wright-Moore Corp. v. Ricoh Corp.,*
    908 F.2d 128 (7th Cir. 1990) ................................................................................... 19

**<u>United States District Court</u>:**

*Aqua Fin., Inc. v. Harvest King, Inc.,*
    No. 07-C-015, 2007 WL 5314547 (W.D. Wis. June 12, 2007) .................................. 27

*Ashworth v. United States,*
    No. 4276, 1971 WL 425 (S.D. Ill. Oct. 14, 1971) ................................................... 55

*Asperger v. Shop Vac Corp.*,
    524 F. Supp.2d 1088 (S.D. Ill. 2007) ........................................................27

*Assaf v. Cottrell, Inc.*,
    No. 10 C 85, 2013 WL 1282853 (N.D. Ill. Mar. 27, 2013)..............................33, 36, 40

*Bank v. Caribbean Cruise Line*, Case
    No. 12-cv-00584 (E.D.N.Y.) ........................................................ 30, 54

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    No. 12 C 4069, 2012 WL 7062748 (N.D. Ill. Dec. 31, 2012) ........................20

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014) ........................................................57

*Cellco P'ship v. Plaza Resorts Inc.*,
    No. 12-81238, 2013 WL 5436553 (S.D. Fla. Sept. 27, 2013) ................................31-32

*Foreman v. Johnson*,
    No. 03 C 187, 2006 WL 2714936 (N.D. Ill. Sept. 20, 2006) ........................49

*Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*,
    611 F. Supp. 665 (D. N.J. 1985).....................................................53-55

*In re Mason*,
    300 B.R. 160 (Bankr. D. Conn. 2003) ........................................................42

*In re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*,
    No. 11-CV-90, 2014 WL 316476 (N.D.W. Va. Jan. 28, 2014) ........................43

*In re Nigeria Charter Flights Contract Litig.*,
    520 F. Supp. 2d 447 (E.D.N.Y. 2007)........................................................42

*Jamison v. First Credit Services, Inc.*,
    290 F.R.D. 92 (N.D. Ill. 2013)........................................................ 41, 47

*Kaye v. Grossman*,
    No. 97-cv-9679 1999 WL 33465 (S.D.N.Y. Jan. 27, 1999) ........................45

*Keelshield, Inc. v. Megaware Keel-Guard, Inc.*,
    No. 00-1312, 2001 WL 575833 (C.D. Ill. May 11, 2001) ............................21

*Kristensen v. Credit Payment Servs., Inc.*,
    No. 12-CV-00528, 2015 WL 4477425 (D. Nev. July 20, 2015)........................32, 43

*Lopez v. Ram Shirdi Inc.*,
    No. 10 CV 6590, 2014 WL 4214892 (N.D. Ill. Aug. 26, 2014)........................27

*Lushe v. Verengo Inc.*,
No. CV 13-07632, 2014 WL 5794627 (C.D. Cal. Oct. 22, 2014), reconsideration denied by 2015 WL 500158 (C.D. Cal. Feb. 2, 2015) ......................................................................................*passim*

*Makaron v. GE Security Manufacturing, Inc. et al.*,
No. 14-1274, 2015 WL 3526253 (C.D. Cal. May 18, 2015) ...........................................32, 44, 45

*Mey v. Pinnacle Sec., LLC*,
No. 11CV47, 2012 WL 4009718 (N.D.W. Va. Sept. 12, 2012)...............................32, 40, 41, 46

*Murray v. Choice Energy, LLC*,
No. 1:15-cv-60, 2015 WL 4204398 (S.D. Ohio Jul. 10, 2015).....................................................44

*Respect Inc. v. Comm. on Status of Women*,
815 F. Supp. 1112 (N.D. Ill. 1993) .................................................................................................27

*Savanna Grp., Inc. v. Trynex, Inc.*,
No. 10 C 7995, 2013 WL 4734004 (N.D. Ill. Sept. 3, 2013) ..........................................................27

*Siding & Insulation Co. v. Alco Vending, Inc.*,
No. 11 CV 01060, 2015 WL 1858935 (N.D. Ohio Apr. 22, 2015)..................................................21

*Skeen v. Carnival Corp.*,
No. 08-22618, 2009 WL 1117432 (S.D. Fla. Apr. 24, 2009).........................................................56

*Smith v. State Farm Mut. Auto. Ins. Co.*,
30 F. Supp. 3d 765 (N.D. Ill. 2014) ...........................................................................29, 33, 36, 46

*Thomas v. Taco Bell Corp.*,
879 F. Supp. 2d 1079 (C.D. Cal. 2012) ...........................................................................31, 38, 44

*Thomson Reuters (Prop. Tax Servs.) Inc. v. Thomas Enterprises, Inc.*,
No. 10 CV 00990, 2010 WL 5057459 (S.D.N.Y. Dec. 7, 2010).....................................................35

*Toney v. Quality Res., Inc.*,
75 F. Supp. 3d 727 (N.D. Ill. 2014) ...............................................................................28, 29, 46

*United States v. Dish Network, LLC*,
No. 09-3073, 2014 WL 7013223 (C.D. Ill. Dec. 11, 2014) .....................................................44, 45

*Wagner v. CLC Resorts & Developments, Inc.*,
32 F. Supp. 3d 1193 (M.D. Fla. 2014)...........................................................................43, 46

**State Court:**

*17315 Collins Ave., LLC v. Fortune Dev. Sales Corp.*,
34 So. 3d 166 (Fla. Dist. Ct. App. 2010).......................................................................................25

*Applestein v. Fairfield Resorts,*
No. 0004 Sept. Term 2007, 2009 WL 5604429 (Md. Ct. Spec. App. July 8, 2009) ................31

*Dempsey v. Chambers,*
154 Mass. 330, 28 N.E. 279 (Mass. 1891) ........................................................... 43, 44

*Kovacik v. Reed,*
49 Cal. 2d 166 (Cal. 1957) .......................................................................................55

*Prazen v. Shoop,*
2013 IL 115035, 998 N.E.2d 1 ..................................................................................27

*Shook v. Beals,*
96 Cal. App. 2d 963, 217 P.2d 56 (Cal. 1950) ...........................................................52

*Wolf v. Superior Court,*
106 Cal. App. 4th 625, 130 Cal. Rptr. 2d 860 (Cal. Ct. App. 2003).............................54

**Miscellaneous:**

46 Am. Jur. 2d Joint Ventures.................................................................................. 52, 53

47 C.F.R. § 64.1200................................................................................................ 24, 26

47 U.S.C. § 227 ....................................................................................................*passim*

Black's Law Dictionary (10th ed. 2014)........................................................................43

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
18 F.C.C. Rcd. 14014 (2003)................................................................................. 24, 25

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules,*
28 F.C.C. Rcd. 6574 (May 9, 2013) ......................................................................*passim*

Restatement (Second) of Torts (1965)...................................................................... 52, 53

Restatement (Third) of Agency (2006) ....................................................................*passim*

Wright, Miller & Kane,
Federal Practice & Procedure, Civil 3d (1998)............................................................50

## INTRODUCTION

Defendants Berkley Group, Inc. ("Berkley"), Caribbean Cruise Line ("CCL"), and Vacation Ownership Marketing Tours, Inc. ("VOMT") each seek to avoid trial on the issue of vicarious liability for their rampant TCPA violations by simply ignoring disputed facts about the scope of their relationships, as well as their knowledge of and/or involvement in the year-long massive robocalling campaign at the center of this case. When the full scope of the evidence adduced in this case is considered, it is apparent that each Defendant can be held liable under multiple theories of vicarious liability: classical agency; apparent authority; and ratification. In addition, a reasonable jury could hold each Defendant liable for the TCPA violations under theories of joint venture or partnership. Ultimately, however, that determination should be left to the jury; as the inquiries necessary to address these theories of liability are notoriously fact-intensive and hotly disputed here.

As far as Defendants' specific arguments, it is telling that each Defendant repeats the already rejected plea that they are entitled to judgment as a matter of law because the operative complaint does not separately allege the various legal theories of vicarious liability at issue. The Court rejected that argument when CCL moved to dismiss Plaintiffs' original complaint, and that ruling is now the law of the case. In addition, vicarious liability is a legal theory, and Plaintiffs are not required to plead legal theories.

Second, Berkley and VOMT also contend that they are entitled to summary judgment because they are not "sellers," but that contention fares no better. Specifically, Berkley and VOMT adopt an erroneously narrow reading of the FCC regulation at issue—which makes clear that if the purpose of the call is to encourage the recipients to purchase, rent, or invest in property, either during the call or in the future, then *any* company on behalf of whom that call is made is to be considered a seller. Berkley and VOMT both fit that description. Moreover, Berkley's and VOMT's argument that they are not "sellers" is at best based on disputed issues of material fact regarding

1

how Berkley's vacation properties were sold through the robocalls and VOMT's role in the marketing efforts as well as its relationship to CCL.

When Defendants finally address the substance of the claims at issue, *i.e.*, various theories of agency liability and joint venture/partnership liability, they ignore the substantial, disputed evidence that precludes summary judgment in their favor. As set forth below, and in Plaintiffs' Response to Defendants Statement of Facts and in Plaintiffs' Statement of Additional Facts, the record contains a great deal of evidence showing that Defendants' various agency relationships warrant the denial of their summary judgment motions. And with respect to ratification, there can be no doubt that each Defendant knowingly benefitted from the robocall campaign. Because ratification in this context does not require a preexisting agency relationship, the Court should deny their motions for summary judgment on that basis alone.

Finally, CCL argues that it is entitled to summary judgment on any calls that the Plaintiffs received that CCL does not believe referenced free cruises, including all calls made to the landline class. That is because, according to CCL, Plaintiff Stone has not provided sufficient records of the calls made to her landline telephone, and so CCL says she is not a member of the Class. This claim ignores the evidence showing each of the Plaintiffs stated the calls they received referenced a free cruise, as well as the evidence put forth by Plaintiff Stone, which make clear that she has records of her landline calls. But even if Stone didn't and she wasn't a class member, that doesn't entitle CCL to summary judgment against the entire Landline Class. That is, issues of class membership are separate from issues relating to the merits of Plaintiffs' and the Classes' claims. Simply put, CCL's argument here has no merit.

When the full set of facts is considered with the correct legal standards, it is apparent that the resolution of this case depends on vicariously liability principals, which cannot be decided on

summary judgment. For these reasons, and those that follow, Defendants' motions for summary

judgment should each be denied in full.

### COUNTER STATEMENT OF UNDISPUTED AND <u>DISPUTED MATERIAL FACTS</u>

At issue in this case is a yearlong telemarketing campaign in which the ESG Defendants and

their affiliates made tens of millions of unauthorized robocalls that offered a free cruise in exchange

for taking a purported political and/or public opinion survey. (Plf. Add'l. SOF ¶¶ 41-43; Plf. Resp.

CCL/VOMT SOF ¶¶ 18, 21; Plf. Resp. Berkley SOF ¶¶ 16, 42.)[1] The robocalls were designed to sell

the vacation and timeshare products of Berkley, CCL, and VOMT. (Plf. Add'l. SOF ¶¶ 42-48; Plf.

Resp. CCL/VOMT SOF ¶ 22; Plf. Resp. Berkley SOF ¶¶ 22, 24.) Defendants omit material

information and/or rely on disputed facts to try and distance themselves from the illegal

telemarketing campaign at issue. In doing so, they distort: (i) the true nature of their relationships

with one another; (ii) their knowledge of and control over the robocalling scheme; (iii) the purpose

of the calls; and (iv) Plaintiffs' and the Classes' receipt of the calls. On a close examination of the

record, Defendants are not entitled to summary judgment. To the contrary, the manifest weight of

the evidence demonstrates they're liable for the calls.

*An Overview of the Defendant Entities.*

The robocalling campaign was effectuated through a series of written and unwritten

agreements between the Defendant entities, which are described below.

Specifically, Berkley is a Florida "timeshare sales and marketing company" that sells

timeshare interests for its affiliated properties in Florida, Virginia, Massachusetts, and Nevada. (Plf.

Add'l. SOF ¶ 1; Berkley SOF ¶ 11.) CCL is a Florida company that "markets and sells vacation

---

[1]     In responding to Defendants' motions, Plaintiffs rely on the statement of facts submitted their responses to Defendants' undisputed statement of facts and their additional facts in response to the same.

3

packages" to consumers, including by securing potential buyers for Berkley's Florida timeshare properties. (Plf. Add'l. SOF ¶ 3; CCL/VOMT SOF ¶ 3; Berkley SOF ¶ 36.)

CCL found potential buyers, or "sales leads," for Berkley properties through an exclusive contract it had with VOMT, under which CCL provided all of its sales leads for timeshare properties to VOMT. (Plf. Add'l. SOF ¶¶ 20-22; Plf. Resp. CCL/VOMT SOF ¶ 59; Plf. Resp. Berkley SOF ¶¶ 27, 34-35.) VOMT, in turn, had an exclusive contract with Berkley, whereby VOMT provided all of its sales leads for timeshare properties to Berkley. (*Id.*) Although Berkley utilizes other vendors to provide it with leads, VOMT is Berkley's primary vendor for its Florida properties and provides all of the leads for Berkley's Weston and Palm Beach Shore properties. (Plf. Add'l. SOF ¶ 13; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶ 25.)

In 2011, to bolster its marketing efforts for Berkley and VOMT, CCL entered into a contract with Defendant ESG, a now-defunct political action committee that was at one time registered with the Federal Election Commission, and which operated through its President and purported sole employee, Jacob DeJongh. (Plf. Add'l. SOF ¶¶ 36, 40-43; Plf. Resp. CCL/VOMT SOF ¶ 9; Berkley SOF ¶¶ 7.) ESG—under the control of and for the benefit of Defendants—was contracted to and then did make millions of prerecorded calls to individuals across the country. (Plf. Add'l. SOF ¶¶ 36, 40-43.) As explained in Plaintiffs' cross-motion for partial summary judgment, the contractual relationships between each of the Defendants is demonstrated by the below chart:

4



*Defendant CCL's VOMT's and Berkley's Longstanding and Interwoven Relationships.*

      **i.      VOMT and CCL Are Effectively the Same Company.**

Although Defendants claim that CCL and VOMT are two separate and distinct entities, the easily proven lack of corporate formalities demonstrates otherwise. (Plf. Add'l. SOF ¶¶ 5-7, 29; Plf. Resp. CCL/VOMT ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶ 6, 17, 68, 75.) The reality is that VOMT exists only on paper, and merely as a shell company CCL, and its founders use to pass all of CCL's sales leads directly to Berkley. (Plf. Add'l. SOF ¶¶ 6-7; Plf. Resp. CCL/VOMT ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶¶ 6, 17, 68.) CCL was founded and is operated by Daniel Lambert and James Verrillo, who also founded and operated VOMT. (Plf. Add'l. SOF ¶ 5; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶ 6.) Daniel Lambert negotiated the marketing contract between CCL and VOMT that governs their lead generation efforts. (Plf. Add'l. SOF ¶¶ 6-7; Plf. Resp. CCL/VOMT ¶¶ 36-37, 59; Plf. Resp. Berkley SOF ¶¶ 6, 19.) Likewise, VOMT does not have its own office and, aside from Daniel Lambert and James Verrillo, VOMT never had any employees, officers, directors, office space, telephone numbers, or email addresses. (Plf. Add'l. SOF ¶¶ 5, 7; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶ 6.) Lambert acknowledges that VOMT was aware of

anything CCL did because he owned VOMT. (Plf. Add'l. SOF ¶ 7; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶ 6.)

Additionally, although Defendants make much of the fact that "CCL was not created until 2008," (CCL/VOMT SOF ¶ 59), CCL was just one in long line of companies created by Daniel Lambert and James Verrillo to generate leads that could be passed to Berkley by way of VOMT. (Plf. Add'l. SOF ¶¶ 6, 24-28, 31-32; Plf. Resp. CCL/VOMT SOF ¶ 59; Plf. Resp. Berkley SOF ¶ 19.) Specifically, prior to CCL's creation, VOMT served as a shell for another one of Dan Lambert's and James Verrillo's companies, Plaza Resorts, Inc. ("Plaza Resorts"). (Plf. Add'l. SOF ¶¶ 6, 24-28; Plf. Resp. CCL/VOMT SOF ¶ 59; Plf. Resp. Berkley SOF ¶ 19.) Plaza Resorts did the exact same thing as CCL, selling vacation packages for itself and generating timeshare leads for VOMT, and thus, for Berkley. (*Id.*) VOMT provided all of the Plaza Resorts leads to Berkley, and once VOMT entered into an agreement with CCL, VOMT began providing all of CCL's leads to Berkley. (*Id.*) Additionally, Plaza Resort's vacation packages—like CCL's—included a cruise ship. (Plf. Add'l SOF. ¶ 26.) Not surprisingly, upon the creation of CCL, the majority (if not all) of Plaza's employees began working for CCL. (Plf. Add'l. SOF ¶ 27; Plf. Resp. CCL/VOMT SOF ¶ 59.) Likewise, according to Daniel Lambert, the contracts between Plaza Resorts and CCL and Plaza Resorts and VOMT "mirror" each other and are materially identical. (Plf. Add'l. SOF ¶ 25; Plf. Resp. CCL/VOMT SOF ¶ 59.)

In addition to CCL, VOMT, and Plaza Resorts, Daniel Lambert and James Verrillo have founded and operated various other companies to aid in their vacation sales and lead generations efforts, including at least one company that sold timeshares to Berkley and they then helped generate leads for Berkley to resell the timeshares to consumers. (Plf. Add'l. SOF ¶¶ 32-34.) As evidenced by the testimony of Berkley's Senior Vice President of Marketing, Dan Lambert's and Verrillo's companies are so indistinguishable that even Berkley cannot tell that VOMT (as opposed to another

one of their companies) is providing it with leads. (Plf. Add'l. SOF ¶ 29; Plf. Resp. CCL/VOMT

SOF ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶¶ 17, 21.) That Dan Lambert and James Verrillo's

companies are viewed as one in the same is further evidenced by the fact that (i) Berkley pays

Lambert and Verrillo directly for leads, (ii) when Berkley attempted to communicate with VOMT—

including about the calls at issue in this case—they emailed Dan Lambert and James Verrillo at their

CCL email addresses, (iii) CCL's Marketing Director Jennifer Poole had never heard of VOMT until

her deposition in this case—despite that CCL had an exclusive marketing contract with VOMT for

over 10 years—and neither Berkley's Senior Vice President of Marketing nor its Senior Vice

President of Sales had heard of VOMT until this lawsuit was filed either. (Plf. Add'l. SOF ¶ 29; Plf.

Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 17, 21.)[2] And, perhaps most tellingly, after

this lawsuit was filed, Lambert and Verrillo replaced VOMT with another company, through which

they can continue to inconspicuously provide Berkley with leads. (Plf. Add'l. SOF ¶ 31; Plf. Resp.

CCL/VOMT SOF ¶ 59.) As with VOMT, the new company has no employees. (*Id.*)

ii.    **Berkley's Longstanding Relationship with VOMT, CCL, and Their Founders.**

Although Berkley claims that CCL/VOMT are its "competitors" (Berkley SOF ¶ 27), that is

disputed, as Berkley has a much deeper relationship with CCL/VOMT than Defendants let on. (*Id.*)

Specifically, Berkley was founded by Dan Lambert's father, James Lambert. (Plf. Add'l. SOF ¶ 8; Plf.

Resp. Berkley SOF ¶ 27.) James Lambert was the President of Berkley (having founded its

predecessor company) from the "early 80s" until Rebecca Foster (Berkley's current President) took

over in 1994. (*Id.*) James Lambert was responsible for negotiating various contracts between VOMT

---

[2]    The companies and the roles of Dan Lambert and James Verrillo are so intertwined, they themselves
cannot even keep it straight. (Plf. Add'l. SOF ¶ 30.) For example, in his declaration in support of CCL's Motion for
Summary Judgment, Lambert claimed that he and James Verrillo were "consultants" for CCL. (CCL/VOMT Ex. A at
¶ 2.) Comparatively, when being investigated for the calls at issue in this case, Lambert informed the Federal
Trade Commission that he and Verrillo "are at the top of the management team at CCL. (Plf. Add'l SOF ¶
30.)

and Berkley until he resigned from his role as Chief Executive Officer of Berkley in 2008, and he was Berkley's primary contact with Dan Lambert and James Verrillo until he passed away. (Plf. Add'l. SOF ¶¶ 8-9; Plf. Resp. Berkley SOF ¶ 27.) As a result of this longstanding relationship, most, if not all of Berkley's executives have worked with VOMT's and CCL's founders for more than twenty years and have known Daniel Lambert since he was a teenager. (Plf. Add'l. SOF ¶ 8; Plf. Resp. Berkley SOF ¶ 27.)

Throughout the course of their relationship, Berkley has relied on VOMT/CCL to provide a significant amount of leads to Berkley, and the relationship has been a profitable one. (Plf. Resp. Berkley SOF ¶ 27.) To be sure, Berkley's key executives recognize the leads that CCL/VOMT provide to Berkley are crucial. (Plf. Add'l. SOF ¶¶ 53-60; Berkley SOF ¶ 28; Plf. Resp. Berkley SOF ¶¶ 27, 44.) By way of example, Berkley recently had to temporarily close one of its facilities after the ship CCL used to generate leads ran aground (Plf. Add'l. SOF ¶ 66; Plf. Resp. Berkley SOF ¶ 27.) Additionally, Messrs. Verrillo's and Lambert's employees have likewise maintained a regular and physical presence at Berkley's facilities, and Berkley's employees have likewise sold products from Messrs. Verrillo's and Lambert's ships. (Plf. Add'l. SOF ¶ 17; Plf. Resp. CCL/VOMT SOF ¶¶ 36, 38; Plf. Resp. Berkley SOF ¶¶ 27, 68.) Finally, the contracts between VOMT and Berkley are more favorable and allow each entity to have more control over the other than any of Berkley's other marketing contracts permit. (Plf. Add'l. SOF ¶¶ 15-18; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 68.) For example, although all of Berkley's other marketing contracts disclaim any agency relationship, the contract with VOMT has no such disclaimer. (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 68.) Other marketing contracts similarly expressly prohibit telemarketing, or, if they do not have that prohibition, at a minimum include rules that provide guidance for ensuring that Berkley's other marketing partners abide by the TCPA. (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 68.)

### iii. Berkley, VOMT, and CCL Operate a Joint Venture.

The record evidence could likewise lead a reasonable juror to conclude that Berkley operates a joint venture with VOMT/CCL. (Plf. Add'l. SOF ¶¶ 16-19, 62-63; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 36; Plf. Resp. Berkley SOF ¶¶ 27, 68, 75.) In addition to their long-standing relationships discussed above, each company contributes capital and labor, and each shares in the risk and profits of the venture. (*Id.*) More specifically, CCL and VOMT contribute their employees to generate leads and sales for Berkley—including employees who work onsite at Berkley resorts—as well as the leads themselves. (*Id.*) Berkley likewise contributes its employees to complete the sale of timeshares or other similar vacation products to those leads and the actual timeshares and other vacation properties. (Plf. Add'l. SOF ¶¶ 16-17, 46, 56; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶ 75.)

The parties likewise have the right to control and manage the sales and marketing venture. Specifically, the parties' marketing agreement provides Berkley with the right to review CCL's/VOMT's marketing programs, and CCL and VOMT with the responsibility for informing Berkley about the programs used to generate leads to Berkley. (Plf. Add'l. SOF ¶ 12; Plf. Resp. Berkley SOF ¶ 22.) In line with that contractual provision, Berkley has at times placed restrictions on CCL/VOMT's marketing efforts. (Plf. Add'l. SOF ¶¶ 51, 52, 61; Berkley SOF ¶¶ 22, 24, 62-66, 68.) The contract also permits each party to direct leads to certain timeshares, and provides for monthly meetings between high-level executives from each company to "properly coordinate and manage Tour Flows and the Resorts." (Plf. Add'l. SOF ¶ 53; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 44, 68.) Typically Dan Lambert and James Verrillo both attend those meetings for CCL/VOMT, and Berkley's entire Board of Directors attends as well. (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 44, 68.) Each party likewise has the right to veto sales of

Vacation Village Voyages to CCL/VOMT leads (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp.

Berkley SOF ¶ 68.).

Finally, the parties have agreed to share profits, as Berkley pays CCL/VOMT a commission

based on the net amount of money it generates from selling Berkley products to CCL/VOMT leads.

(Plf. Resp. Berkley SOF ¶ 74.) In fact, Berkley's Chief Financial Officer testified that the purpose of

this arrangement is to ensure that CCL/VOMT shares in the risk of the parties' venture. (Plf. Add'l.

SOF ¶¶ 16-19, 62-63; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 36; Plf. Resp. Berkley SOF ¶¶ 27, 68, 75.)

*Defendants' Contracts for and the Origin of the Robocalling Campaign at Issue.*

The robocall campaign at issue in this litigation was a result of a series of agreements entered

into by Defendants to generate leads for Defendants vacation products. (Plf. Add'l. SOF ¶ 35; Plf.

Resp. CCL/VOMT SOF ¶¶ 11-12, 36; Plf. Resp. Berkley SOF ¶¶ 22, 24.) The relevant contracts

acknowledged that telemarketing would be conducted and they were drafted specifically to allow

each entity to turn a blind eye to the illegal conduct at issue. (Plf. Add'l. SOF ¶ 61; Plf. Resp.

CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 24.)

As noted above, CCL carried out its role as Berkley's lead generator pursuant to an exclusive

contract with VOMT, whereby CCL provided each and every one of its sales leads for timeshare

properties to VOMT, and then in turn, VOMT provided each of those sales leads to Berkley

through their own exclusive agreement. (Plf. Add'l. SOF ¶¶ 20-22; Plf. Resp. CCL/VOMT SOF ¶

59; Plf. Resp. Berkley SOF ¶¶ 27, 34-35.) The contract between Berkley and VOMT allowed VOMT

to "utilize [ ] affiliated companies [in] carrying out its duties," as well as subcontractors, and it

authorized Berkley to inquire into VOMT's compliance with the laws and marketing materials at any

time. (Plf. Add'l. SOF ¶ 12; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 24, 67.) The

contract between Berkley and VOMT specifically contemplated that VOMT would conduct

telemarketing on Berkley's behalf (Plf. Add'l. SOF ¶ 13), and Berkley has described VOMT as a

company that conducts telemarketing on its behalf. (Plf. Add'l. SOF ¶ 13; Plf. Resp. Berkley SOF ¶ 68.) The contract between VOMT and CCL contained the same terms, and it specifically contemplated that CCL would use telemarketing to generate leads, as well as giving VOMT permission to use affiliates and subcontractors. (Plf. Add'l. SOF ¶¶ 12, 22; Plf. CCL/VOMT ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶ 68.) Each contract allowed the parties to terminate the contract at any time should they see fit. (Plf. Add'l. SOF ¶¶ 15, 61.)

Around August 2011, CCL decided to generate sales leads for Berkley and VOMT by entering into robocalling contracts with the ESG Defendants. (Plf. Add'l. SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 39, 42.) This arrangement was brokered through Linked Service Solutions ("LSS")—a lead broker company co-owned by Scott Broomfield and Jason Birkett. (Plf. Add'l. SOF ¶ 36-37.) Scott Broomfield knew Daniel Lambert from many years earlier, as a result of their prior business relationship and Jason Birkett is Jacob's DeJongh's cousin. (Plf. Add'l. SOF ¶ 37; Plf. Resp. CCL/VOMT SOF ¶ 7; Plf. Resp. Berkley SOF ¶ 42.)

The contracts between the ESG Defendants and CCL stated that ESG would "solicit survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer." (Plf. Add'l. SOF ¶ 36.) The contract required the ESG Defendants to provide CCL with, among other things, the names and telephone numbers of those being called. (Plf. Resp. CCL/VOMT SOF ¶ 23.) Under the contract, the calls were to include offers for a "complimentary" three day/two night cruise certificate, which ultimately required the survey taker to pay additional costs prior to departure and once aboard the ship. (Plf. Add'l. SOF ¶¶ 43-45; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 30; Plf. Resp. Berkley SOF ¶ 42.) CCL paid approximately $2 for each survey call that was transferred to a CCL sales agent for more than 30 seconds, and that money was

used to pay for the costs associated with arranging and executing the robocall campaign. (Plf. Add'l. SOF ¶ 38; Plf. Resp. CCL/VOMT SOF ¶¶ 11-14, 46, 49.)[3]

### The Illegal Telemarking Campaign.

With the funding for the campaign in place, ESG drafted the political survey scripts and recorded them using online software called Voice Talent. (Plf. Add'l. SOF ¶ 39.) Specifically, DeJongh would "copy[ ] and past[e]" the survey scripts onto Voice Talent's website and Voice Talent would then "email [him] back when the recordings were ready. (*Id.*) The recordings utilized fictitious names—such as Political Opinions of America ("POA"), EFA Survey Group, and Independent Research Group—when conducting the surveys (Plf. Add'l. SOF ¶ 71; Plf. Resp. CCL/VOMT SOF ¶¶ 7, 10, 12; Plf. Resp. Berkley SOF ¶¶ 40, 46), presumably so the ESG Defendants could hide Defendants' true identities. The calls were then made to millions of people using an autodialer, and each call included a survey with a prerecorded voice. (Plf. Add'l. SOF ¶¶ 36, 40-42; Plf. Resp. CCL/VOMT SOF ¶ 8; Plf. Resp. Berkley SOF ¶ 42.)[4]

At the end of each robocall, the call recipient had the option of being transferred to a live CCL sales representative, at which point the call recipient received a materially identical pitch for an upgraded vacation package that included a mandatory presentation of Berkley's timeshare properties. (Plf. Add'l. SOF ¶¶ 44-48; Plf. Resp. CCL/VOMT SOF ¶ 38; Plf. Resp. Berkley SOF ¶ 55.)[5]

---

[3]     Although Defendants claims that the campaign was set up "solely by DeJongh with input and funds from non-defendant" LSS (VOMT/CCL SOF ¶ 14), that is simply not true. To the contrary, both DeJongh and Broomfield (the co-owner of LSS) testified that CCL provided money to the ESG Defendants—through LSS—to pay for the costs associated with arranging and executing the robocall campaign. (Plf. Add'l. SOF ¶ 38; Plf. Resp. CC/VOMT SOF ¶¶ 12-14, 46.)

[4]     Although Defendants claim that Darren Robb and his company TSOA was responsible for physically dialing the calls (Berkley SOF ¶ 46; VOMT/CCL SOF ¶ 23)—presumably to distance themselves from the illegal activity—this so-called "fact" is not at all "undisputed." (Plf. Resp. Berkley SOF ¶ 46; Plf. Resp. CCL/VOMT SOF ¶ 23.) While admittedly the testimony on this point is unclear, the majority of the evidence demonstrates that Jacob DeJongh and the ESG Defendants were responsible for dialing the calls and that Mr. Robb merely connected DeJongh with Venture VoIP, the company that owned the dialing equipment. (*Id.*)

[5]     Moreover, the terms and conditions on CCL's website suggest that even the free cruise required attendance at a Berkley timeshare presentation. (Plf. Add'l. SOF ¶ 48; Plf. Resp. Berkley SOF ¶ 43.)

Specifically, CCL sales agents told call recipients that they could take the upgraded package, at the cost of an additional $567 beyond the $118 for the purportedly free cruise, only "after touring one of our developer's offsite vacation-ownership resorts." (Plf. Add'l. SOF ¶ 45; Plf. Resp. CCL/VOMT SOF ¶ 38; Plf. Resp. Berkley SOF ¶¶ 38, 55.) If the consumer chose not to upgrade to a more expensive vacation package during the initial call, he or she was offered a timeshare presentation later, either during a telephone conversation with CCL or when they took the vacation. (Plf. Add'l. SOF ¶ 47.) Berkley was the only timeshare company whose product was offered to call recipients. (Plf. Add'l. SOF ¶ 46; Plf. Resp. Berkley SOF ¶ 27.)

### *The Purpose of the Calls was to Sell Defendants' Vacation Products.*

Although Defendants claim that the ESG Defendants (who VOMT/CCL labels as "SROs" and sometimes "ESGP") were legitimate survey research companies who contracted with and sold information to various political action committees ("PACS") (CCL/VOMT SOF ¶¶ 17-18, 21; Berkley SOF 41), that is heavily disputed (and largely irrelevant). As evidenced by the record, from the Defendants' perspective, the purpose of each call was unquestionably to sell Defendants' vacation products and increase their profits. (Plf. Add'l. SOF ¶ 53; Plf. Resp. CCL/VOMT SOF ¶ 21.)

Foremost, Dan Lambert specifically referred to the robocalling campaign as the "next great mouse trap … as far as sales go," and each of Defendants obtained numerous leads and profited from the campaign. (*Id.*) Second, the ESG Defendants were not "legitimate survey organizations [merely] seeking the views of likeminded persons" who were politically motivated and would have made the calls regardless of the offer of a free cruise. (VOMT/CCL SOF ¶ 17.) To be sure, although one of the companies who comprised the ESG Defendants was a political action committee at one time registered with the Federal Election Commission (the "FEC"), Jacob DeJongh regularly failed to meet the FEC's filing requirements and confirmed that ESG was never successful "in raising

money to assist candidates, political causes, and/or organizations," and that he "did not renew the filing he made with the [FEC] regarding ESG." (Plf. Resp. CCL/VOMT SOF ¶¶ 9, 17.)

Additionally, Defendants' reference to the ESG Defendants' relationship with various PACs in an attempt to legitimize the calling campaign and/or to demonstrate that DeJongh would have conducted the survey calls regardless of his relationship with Defendants is disputed as well. Although Defendants claim that the "true" purpose of the program was to ascertain relationships so that DeJongh and LSS could become the largest surveying company in the country, DeJongh admits that he never received any money from the PACs on whose behalf the calls were allegedly made and Broomfield has likewise confirmed that he was never paid to provide the survey data to political campaigns. (Plf. Resp. CCL/VOMT SOF ¶ 18; Plf. Resp. Berkley SOF ¶ 41.) Additionally, none of the contracts between ESG and the PACs were entered into prior to October 2011, despite that Defendants began obtaining leads as a result of the calls in August 2011. (Plf. Resp. CCL/VOMT SOF ¶ 15.)

Finally, VOMT's/CCL's assertion that the ESG Defendants were "not required to include CCL's offer" and "[c]ould have conducted the surveys with or without CCL's cruise offer incentive" (VOMT/CCL SOF 21), is likewise misleading and irrelevant. Although Plaintiffs do not dispute that the calls were not required to have a cruise offer, the weight of the evidence demonstrates that an offer for a free cruise was included in each and every call. (Plf. Add'l. SOF ¶ 43; Plf. Resp. CCL/VOMT SOF ¶ 21; Plf. Resp. Berkley SOF ¶ 43.)[6] Additionally, Broomfield has acknowledged

---

[6]     Although CCL/VOMT contend that one of the PACs—Let Freedom Ring—determined that it did not want to use CCL's incentive, and that the ESG Defendants continued to make the political calls for Let Freedom Ring without the cruise incentive (CCL/VOMT SOF ¶ 34), the record makes clear that this fact is hardly undisputed. Foremost, the portion of DeJongh's testimony cited by CCL/VOMT does not confirm that the calls continued after Let Freedom Ring refused to include cruise offers on their calls. Rather, DeJongh testified that he could not remember if non-cruise calls were ever made. (Plf. Resp. CCL/VOMT SOF ¶ 34.) Additionally, as evidenced by Broomfield's testimony to the FTC, although during the "test"

that the calls would not have been possible without Defendants' free cruise incentive. (Plf. Resp. CCL/VOMT SOF ¶ 21; Plf. Resp. Berkley SOF ¶ 42.)

In any event, regardless of the subjective motives of the ESG Defendants and their affiliates, the calls were at best dual-purpose calls subject to the TCPA's restrictions. *See* Plaintiffs' cross-motion for summary judgment. (Dkt. 336 at 12-14.)[7/8]

### *Defendants Each Had Knowledge of the Calls and the Ability to Control the Marketing Campaign.*

Contrary to Defendants' assertions, each of the Defendants had knowledge of the calls and the ability to control the robocalls at issue. Specifically, CCL, and by implication VOMT, exercised a large degree of control over the calling campaign. (Plf. Resp. CCL/VOMT SOF ¶¶ 8, 12, 35, 58.) In addition to providing the funds that allowed the campaign to move forward, CCL edited scripts, weighed in on the states to which calls should be directed, decided how many calls it would accept each day, told the ESG Defendants what information to include on their websites, told them to avoid making calls on certain holidays, and even instructed the ESG Defendants to change the name of the purported survey group when it received a complaint from a legitimate company with the same name. (Plf. Resp. CCL/VOMT SOF ¶¶ 29, 32.) CCL also ensured that it had live sales agents available to talk to call recipients who chose to be transferred to a live CCL representative at the end of the survey. (Plf. Add'l. SOF ¶¶ 44, 55; CCL/VOMT SOF ¶ 75; Plf. Resp. CCL/VOMT SOF ¶ 65.) And tellingly, when Daniel Lambert was asked how many leads the survey calls provided, he

---

period of the campaign a cruise was not offered, that only lasted "one day." (Plf. Resp. CCL/VOMT SOF ¶ 23; Plf. Resp. Berkley SOF ¶ 42.)

[7]     All citations to page numbers refer to the ECF docket page number rather than the page numbers contained within the referenced document.

[8]     The same goes for whether the SROs were "legitimate" political survey organizations. As noted above, the calls were, at best, dual-purpose calls designed to elicit survey information and to sell vacation products, and as such, are subject to the TCPA's telemarketing restrictions. (Dkt. 336 at 13-14.) Moreover, to the extent the ESG Defendants actually made some calls that did not include a free cruise offer; those calls are not part of this case. But that does not mean that the Defendants escape liability for the calls that are.

candidly acknowledged that it was "a lot more than [he] though[t] it would be," signaling that he was fully aware that the calls were taking place. (Plf. Add'l. SOF ¶ 54.)

Berkley likewise had the right to control VOMT/CCL's marketing efforts. (Plf. Add'l SOF ¶ 15; Plf. Resp. Berkley SOF ¶¶ 22, 45, 68. Plf. Resp. CCL/VOMT SOF ¶ 36.) To be sure, Berkley specifically contracted with VOMT to conduct telemarketing on its behalf and had access to and approval rights over VOMT's marketing materials and methods. (*Id.*) In addition, every month, Berkley's entire Board of Directors, including its head of marketing, met with VOMT's and CCL's founders to discuss their marketing efforts. ( Plf. Resp. Berkley SOF ¶¶ 22, 44, 68. Plf. Resp. CCL/VOMT SOF ¶ 36.) Berkley's President also testified that every time she has instructed VOMT to do something, it complied. (Plf. Resp. Berkley SOF ¶ 68.)

Moreover, there can be no doubt that Berkley knew about the calls while the campaign was running; in response to one of many consumer complaints that Berkley received, Ms. Foster wrote to Daniel Lambert and James Verrillo—at their CCL email addresses—and said that "*we* need to stop the calls to people who wish not to be called." (Plf. Resp. Berkley SOF ¶¶ 22, 24, 68.) Berkley likewise had the ability to determine which of VOMT's/CCL's leads came from the robocall campaign, as well as the call center from which the lead was generated. (Plf. Resp. Berkley SOF ¶¶ 24, 32, 35, 62.)

At the latest, Berkley learned about the robocall campaign on May 15, 2012, when Dan Lambert emailed Berkley's entire Board of Directors about the program, explaining that lawyers at Greenspoon Marder had "been involved since before the program started" and that they "have the program very well documented and set up and contracts in place with numerous Political Survey entities on whose behalf the calls are being made." (Plf. Add'l. SOF ¶ 49; Plf. Resp. Berkley SOF ¶ 44.) Mr. Lambert's email included a link to a story on Fox News's website describing the robocalls and the political surveys, and Berkley's President, later testified to hearing a story about the calls on

16

Fox News television. (Plf. Add'l. SOF ¶ 50.) In his email, Mr. Lambert also readily agreed to provide details of the calling campaign. (*See id.* at ¶ 49-50) That was approximately three months before the campaign ended sometime in August 2012. (*Id*; *see also id.* at 41.)

On May 24, 2012, nine days after Lambert emailed Berkley's Board of Directors, David Wright filed his putative class action against Berkley, alleging that the robocalls at issue violated the TCPA. (Plf. Add'l SOF 51.) Berkley was served on June 8, 2012. (*Id.*) In addition, Berkley received many complaints from consumers who received the calls, over multiple months, which included in detailed descriptions of the offending robocalls. (Plf. Add'l SOF ¶ 65; Plf. Resp. Berkley SOF ¶ 65.) Berkley responded to some of those complaints, at times coordinating its response with Lambert. (Plf. Add'l SOF ¶¶ 64-65.) In one such response, Berkley acknowledged that its marketing partners conduct non-permission based telemarketing (*id.* ¶ 64; Plf. Resp. Berkley SOF ¶ 16, 44, 73), which Berkley's own Senior Vice President of Marketing believes is illegal. (Plf. Add'l. SOF ¶ 64.) Around the same time, Berkley informed the Better Business Bureau that it "had an unprecedented amount of sales at our various resorts within the last several months." (Plf. Add'l SOF ¶ 65.)

On June 19, 2012, Berkley wrote VOMT a letter addressing the *Wright* Complaint, and "instruct[ing] you to not provide us any marketing leads generated from calls to cellular telephone numbers." (Plf. Add'l SOF ¶ 51; Berkley SOF ¶ 63.) Yet, despite their awareness of the campaign, Berkley never did anything to check whether Dan Lambert followed that purported instruction, and the undisputed facts show that he did not stop sending such leads. (Plf. Add'l SOF ¶¶ 52, 61; Plf. Resp. Berkley SOF ¶ 62.) Berkley likewise acknowledges that it did not and that it has no present intention to stop accepting leads from CCL/VOMT. (*Id.*) Finally, although any of the Defendants could have ended the robocall campaign or, at a minimum, repudiated the illegal conduct, not one of them did. (Plf. Add'l SOF ¶¶ 15, 52, 62; Plf. Resp. Berkley SOF ¶ 62.)

*Defendants All Benefitted from the Robocalling Campaign.*

Overall, Defendants made millions of calls to consumers, and as a result, benefitted significantly from the robocalling campaign. (Plf. Add'l SOF ¶¶ 41, 53-55.) CCL estimates that nearly 60,000 people bought its vacation packages as a result of the political survey campaign, (*id.* at 55-56), and that nearly one-third of the total leads it generated during the relevant timeshare came from that campaign. (*Id.* at 55-56, 58; Plf. Resp. Berkley SOF ¶ 27.) Although Plaintiffs are unable to identify the exact number of tours that Berkley received as a direct result of the campaign, it is undisputed that it received a substantial number of such tours. (*Id.*) Indeed, Berkley continued receiving leads from the robocall campaign at least through 2014. Berkley acknowledges that timeshare leads have value. (Plf. Add'l. SOF ¶ 56; Berkley SOF ¶ 28.)[9] In addition, the relationship between Berkley and VOMT/CCL is profitable, and Berkley's Chief Financial Officer does not recall a single week in which Berkley did not pay VOMT/CCL a commission check. (Plf. Add'l. SOF ¶ 19; Plf. Resp. CCL/VOMT ¶ 21; Plf. Resp. Berkley ¶ 27.)

*As Evidenced by Their Testimony and Records, Plaintiffs Each Received Defendants' Robocalls Despite that they Never Consented.*

Each of the Plaintiffs and the other class members received at least of one of Defendants' robocalls offering a free cruise, and all of them have records demonstrating as much. (Plf. Add'l SOF ¶¶ 67-75; Plf. Resp. CCL/VOMT SOF ¶¶ 65-76.) Specifically, Plaintiffs Birchmeier, Parkes, and Aranda have each provided Defendants with copies of their telephone records, and in some cases, pictures of their phones evidencing their call logs. (*Id.*) They have likewise each specifically testified about their receipt of and the content of the calls. (*Id.*; Plf. Resp. CCL/VOMT SOF ¶ 60-76.) For her part, Plaintiff Stone has similarly provided testimony evidencing that she received the telephone calls at issue and further submitted telephone records for at least one of Defendants'

---

[9]     Unfortunately, Plaintiffs have no way of calculating the exact numbers, as Defendants have destroyed the relevant records. (Plf. Add'l. SOF ¶ 57.)

phone calls, as well as the contemporaneous complaints she made to the Washington Attorney General's Office and a law firm—both complaining about the fact that she received calls to both her residential and cellular telephone numbers. (Plf. Add'l SOF ¶ 75; Plf. Resp. CCL/VOMT SOF ¶ 73.) Ms. Stone further provided evidence demonstrating that additional calls did not appear in her telephone records, "because her landline carrier 'does not keep or have records for every incoming or outgoing call," and because on some occasions, Defendants' numbers were spoofed. (Plf. Resp. CCL/VOMT SOF ¶ 73.)

Finally, none of the Defendants obtained the consent of the Plaintiffs or the other class members to make the robocalls at issue (Plf. Add'l SOF ¶¶ 68, 72, 74, 76), nor do Defendants attempt to make that claim.

## ARGUMENT

### I.     The Summary Judgment Standard.

Defendants' burden to obtain summary judgment on vicarious liability is extremely high and they do not even approach making the required showing. "Summary judgment is only appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). If a jury could reasonably resolve a factual dispute in favor of either party, the factual dispute is genuine and summary judgment is not appropriate. *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 137 (7th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Under federal common law, "determinations regarding the existence and scope of an agency relationship" are questions of fact, which typically must be decided at trial. *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 864 (7th Cir. 1998); *see also Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999) ("[T]he question of agency should be submitted to the jury unless the facts are clearly

insufficient to establish agency or there is no dispute as to the underlying facts."); *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (same).

For the reasons set forth below, none of the Defendants are entitled to summary judgment.

## II.    Plaintiffs and the Classes Were Not Required to Plead Vicarious Liability.

Each Defendant again argues that they should prevail because Plaintiffs have not pleaded vicarious liability. (Dkt. 343 at 17-20; Dkt. 341 at 13-15; Dkt. 345 at 7-8; *see also* Dkt. 307 at 13-22.) However, this Court has already recognized that contention as a non-starter, and in any event, Plaintiffs' pleadings are more than sufficient to state a TCPA claim against all Defendants.

First, and as an initial matter, this is CCL's *third* attempt to argue that Plaintiffs have "[o]mitted . . . any allegation that CCL is vicariously liable under a theory of agency, apparent authority, or ratification," (Dkt. 341 at 13), and it has lost both times prior. As such, CCL should not be permitted to infinitely push this contention. In these circumstances, courts apply the law of the case doctrine to preclude parties from endlessly relitigating the same issue in a case. *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (under the "law of the case doctrine . . . a court ought not to re-visit an earlier ruling [ ] absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."). And in the present case, the law of the case could not be more well-settled.

Specifically, almost four years ago, this Court denied CCL's motion to dismiss on precisely this issue, rejecting as "absurd" CCL's argument that only the person who physically places calls may be held liable for TCPA violations. *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2012 WL 7062748, at *1 (N.D. Ill. Dec. 31, 2012). As such, this Court's holding that "Plaintiffs have sufficiently alleged [CCL's] involvement in making the calls at issue," *Birchmeier*, 2012 WL 7062748, at *1, is the law of the case. And, because CCL does not argue either that the Court made a manifest

error in either of those rulings or that the controlling law has changed, the Court's earlier rulings should dispense with CCL's attempt to obtain summary judgment on the issue.

Although the Court's previous orders did not involve Berkley or VOMT, those defendants add nothing new to CCL's argument. VOMT simply piggybacks on CCL's argument (dkt. 345 at 7-8), and Berkley's argument is effectively the same: that summary judgment is warranted because "[t]here are no allegations as to how the dialer was Berkley's agent." (Dkt. 343 at 19.) As with CCL, these arguments are unavailing. Plaintiffs specifically allege that "Defendants *and/or their agents* made unsolicited telephone calls to cellular telephone numbers" and "residential landline telephone numbers . . . using a prerecorded or artificial voice." (Dkt. 289 at 11-12 (emphasis added).)[10] To support these allegations, they described each Defendant's involvement in the unlawful telemarketing scheme, explaining each one's function. (*Id.* at 5-7.) Plaintiffs' complaint, therefore, "served the purposes of Rule 8 of giving the defendants fair notice of the nature of the claim against them and of stating a claim for relief that was 'plausible on its face' as required by *Iqbal* and *Twombly.*" *Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010).

This is not, as in the *Alco Vending* case heavily relied on by Defendants, a case where Plaintiffs began with only a theory of direct liability and then attempted to "amend [their] complaint through arguments in [their] brief in opposition to motion for summary judgment." *Siding & Insulation Co. v. Alco Vending, Inc.*, No. 11 CV 01060, 2015 WL 1858935, at *7 (N.D. Ohio Apr. 22, 2015). As noted above, "plaintiffs are not required to plead legal theories, even in the new world of pleading that is developing in the wake of the Supreme Court's decisions in [*Twombly*] and [*Iqbal*]." *Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014) (quoting *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (en banc)). In *Whitaker*, the Seventh Circuit rejected

---

[10] The Complaint probably didn't even need to do that much. Vicarious liability is a legal theory, *see Keelshield, Inc. v. Megaware Keel-Guard, Inc.*, No. 00-1312, 2001 WL 575833, at *8 (C.D. Ill. May 11, 2001), which need not be pled. *See, e.g., McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 427 (7th Cir. 2005).

the argument that an "alternative legal characterization of the factual relationship between the two [entities]" required the plaintiff to amend her pleadings, holding that the plaintiff was permitted to present her alternative theory because it did not "offer[] any unfair surprise." *Id.* at 808-09.

Here, not only is there no unfair surprise, there is not even a new legal theory of the relationships between the parties. Vicarious liability has been at issue in this case from the beginning. That is clear from, among other things, the fact that all three Defendants filed extensive briefs explaining why they do not believe they are vicariously liable for the robocall campaign. It is also worth noting that, in addition to the Court's decision denying CCL's motion to dismiss, Berkley addressed vicarious liability in depth in opposing Plaintiffs' motion for class certification. (*See* Dkt. 187.) Among other things, Berkley acknowledged that the "Court previously rejected the argument that there is no vicarious liability under the section of the TCPA relevant here," but argued earlier on that Berkley would be able to prove that it was not vicariously liable for the calls. (*Id.* at 14 n.13; *see also id.* at 14 ("Plaintiffs claim that Berkley is vicariously liable to the class . . .").) In fact, Berkley devoted approximately three pages of that brief to its argument that it was not vicariously liable for the calls, despite the fact that class certification decisions do not address the merits of plaintiffs' claims. (*See id.* at 14-16.) Thus, any argument that Defendants were unfairly surprised that Plaintiffs seek to hold them vicariously liable does not pass the straight-face test.

Finally, Plaintiffs understand that "[s]ummary judgment is the 'put up or shut up' moment in a lawsuit," and that they "may not simply rest upon the pleadings" to avoid summary judgment. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). As evidenced by this brief, Plaintiffs do not rest upon their pleadings. Rather, they advance detailed evidence to support their allegations that Defendants are vicariously liable for the unlawful calls, which raises genuine issues of material fact and dispels any doubt about whether they have stated a claim as against all Defendants.

### III. Defendants Are Each Subject to Vicarious Liability Under the TCPA.

Each Defendant recognizes that the FCC's 2013 *Dish Network* Order governs their potential liability under the TCPA. (Dkts. 341, 343, 345.) The FCC's *Dish Network* Order, explains that companies whom are able to stop TCPA violations but fail to do so may be held liable under these vicarious liability theories. As the FCC explained,

> [C]onsistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6588 (May 9, 2013) (the "*Dish Network* Order").

Under the *Dish Network* Order, vicarious liability is not limited "to circumstances in which formal agency exists and the principal exerts immediate direction and control." *Id.* at 6587 n.107. Rather—and consistent with the goal of ensuring that companies do not hire telemarketers and then leave them unsupervised to rampantly violate the TCPA—companies may be held vicariously liable for TCPA violations under the following theories: (1) actual or "classical" agency; (2) apparent authority; and (3) ratification. *Dish Network* Order at 6586-87.

No Defendant seriously contests this framework. Instead, Berkley and VOMT argue that they are not a "seller" covered by the TCPA or the *Dish Network* Order. In addition, all Defendants contend they are not vicariously liable under the theories described in the *Dish Network* Order. (*See* Dkts. 341, 343, 345.) None of these arguments have merit.

23

### A. Berkley is a "seller" under the TCPA because the calls were made to sell timeshares on its behalf.

First, Berkley's argument that it cannot be liable for the calls because it is not a "seller" under the regulatory definition inasmuch as its timeshares were not "marketed" nor were call recipients "encouraged to purchase Berkley timeshare products during the call" (Dkt. 343 at 1), is a nonstarter. Berkley can only reach this conclusion by an unnaturally narrow reading of the regulation and by ignoring the fact that the calls were made specifically to sell Berkley's timeshares. Berkley's argument does not withstand scrutiny.

The TCPA defines a "seller" as "the person or entity on whose behalf a telephone call or message is initiated *for the purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services . . ." 47 C.F.R. § 64.1200(f)(9) (emphasis added). The definition does not focus on the specific words spoken during the call, but rather on the *purpose* of the call. Thus, if the call's purpose is to "encourag[e]" recipients to purchase, rent, or invest in property, goods, or services, then any company on behalf of whom that call is made is a seller. *See id.*

 The FCC's discussion of when a call is an "advertisement" confirms that interpretation. To be sure, under the same regulation, an advertisement is "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). But a call can be an advertisement even if the entity making the call does not seek to sell any products during the call. For example, the FCC ruled that "a message that seeks people to help sell or market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, *during or after* the call." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14098-99 (2003) (the "2003 Order") (emphasis added). Under Berkley's reasoning, the business in the FCC's hypothetical would not be a seller (and therefore not subject to liability under the TCPA) because its words during the call did not directly attempt to sell a product. That is directly contrary to the FCC's 2003 Order, which found that the

24

business *would* need to obtain consent before making the call. *Id.* at 14099. An entity can therefore be liable as a seller under the TCPA as long as a call made on its behalf seeks to encourage individuals to purchase, rent, or invest either during or after the call. Thus, Berkley's narrow understanding of "seller" is incorrect.

Applying the correct reading of the term, Berkley is plainly a seller with regard to the calls made to the Classes. Although Berkley argues that its name was not mentioned during the calls, the telemarketing calls at issue were made to encourage the purchase of products, either during the call *or* later. *See* 2003 Order at 14098-99.[11] And Berkley's timeshares were one of the products that the calls were designed to sell. In addition, there is at least a factual dispute as to whether Berkley's timeshares were mentioned during the calls and/or in subsequent follow-up communications. Namely, Plaintiffs have shown that every class member who completed a survey was offered a materially identical pitch for an upgraded vacation package that included a mandatory presentation at one of Berkley's timeshare properties. (Plf. Add'l. SOF ¶ 44; Plf. Resp. CCL/VOMT SOF ¶ 38; Plf. Resp. Berkley SOF ¶ 55.) Even if the class member did not agree to attend the presentation during the initial call, they were offered it again later, either on the telephone with CCL or during the vacation itself. (Plf. Add'l. SOF ¶¶ 47-48.) The calls, in other words, were made with the specific purpose of encouraging class members to buy Berkley's timeshares at a presentation at a later date. Under the relevant regulations and the binding FCC orders interpreting those regulations, that is enough to render Berkley a seller, and therefore, it is not entitled to summary judgment.

---

[11]     Moreover, this whole line of argument is relevant at most to the landline calls. As described in more detail in Plaintiffs' Motion for Partial Summary Judgment, unsolicited robocalls to cellular telephones violate the TCPA regardless of the purpose or content of the calls. (Dkt. 336 at 6-10.)

**B.** **VOMT is likewise a "seller" as it is not meaningfully distinct from CCL, and, in any event, it participated in encouraging Class members to buy cruises and timeshares.**

VOMT argues that it is not a "seller" under the TCPA on the grounds that it does not "sell or advertise any products to consumers," and that no calls were placed on its behalf. (Dkt. 345 at 7-8.) That contention is, at best, based on disputed facts, and at worst, is simply an outright falsehood. Summary judgment is not appropriate on this issue either.

First, to the extent that VOMT can be considered distinct from CCL (it cannot), Plaintiff has produced evidence showing that VOMT sells Berkley's timeshares. As noted above, the relevant regulations do not specify that a seller must be encouraging individuals to purchase *its own* products, and therefore VOMT can be held liable as long as calls are made on its behalf "for the purpose of encouraging the purchase" of *some* product. *See* 47 C.F.R. § 64.1200(f)(9). To get around this problem, VOMT bases its argument on the assertion that it "does not own, sell, operate, or market any vacation property, timeshares and/or cruise ships." (Dkt. 350 ¶ 38.)

Plaintiffs, however, have adduced evidence that calls this purportedly undisputed fact into serious doubt. The contract between VOMT and CCL states that its purpose is to identify consumers who will be "offered the opportunity to purchase a timeshare interest at one of the Berkley's timeshare resorts … promoted and marketed by V[O]MT." (Plf. Add'l. SOF ¶ 23.) It further contemplates that CCL would use telemarketing to do so on VOMT's behalf. (Plf. Add'l. SOF ¶¶ 22-23.) In other words, Plaintiffs have put forth evidence that VOMT arranged for CCL to make calls on its behalf for the purpose of encouraging consumers to sell timeshares. This evidence is in direct conflict with VOMT's assertion that it does not "sell or advertise any products to consumers." Hence, VOMT cannot obtain summary judgment on this basis.

Second, Plaintiffs have produced facts showing that VOMT and CCL are not meaningfully distinct entities, and, as such, any product that CCL sells, VOMT also sells. A]lthough '[t]here is no

litmus test in the federal courts governing when to disregard corporate form,' the Supreme Court

has stated that 'the doctrine of corporate entity, recognized generally and for most purposes, will not

be regarded when to do so would work fraud or injustice.'" *Lumpkin v. Envirodyne Indus., Inc.*, 933

F.2d 449, 460 (7th Cir. 1991) (quoting *Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307, 322

(1939)).[12/13] As explained above, VOMT exists solely as a pass-through entity for CCL. (Plf. Add'l.

SOF ¶ 6; CCL/VOMT SOF Resp. ¶¶ 37, 46, 59; Plf. Resp. Berkley SOF ¶¶ 6, 17.) It does not have

its own offices, and it has no employees, officers, directors, office space, telephone numbers, or

email addresses. (Plf. Add'l. SOF ¶ 7; CCL/VOMT SOF Resp. ¶ 59; Plf. Resp. Berkley SOF ¶ 6.) It,

like CCL, was founded and operated by Daniel Lambert and James Verrillo. (Plf. Add'l. SOF ¶ 5;

CCL/VOMT SOF Resp. ¶ 36; Plf. Resp. Berkley SOF ¶ 6.) Lambert exclusively used his CCL email

account when communicating with Berkley, even though he purportedly did so in his capacity as

President of VOMT. (Plf. Add'l. SOF ¶ 7; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley

SOF ¶ 6.) Berkley's Senior Vice President of Marketing was entirely unable to identify which of

---

[12]    As with agency, federal law governs whether it is appropriate to disregard a corporate entity in a TCPA case. *See United States v. Peters*, 732 F.3d 93, 103 n.4 (2d Cir. 2013); *Flynn v. Greg Anthony Constr. Co.*, 95 F. App'x 726, 732-33 (6th Cir. 2003); *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000); *see also Illinois Bell Tel. Co. v. Glob. NAPs Illinois, Inc.*, 551 F.3d 587, 598 (7th Cir. 2008) ("[A] state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such a law."); *Lopez v. Ram Shirdi Inc.*, No. 10 CV 6590, 2014 WL 4214892, at *4 n.3 (N.D. Ill. Aug. 26, 2014). That said, there is no conflict here between federal common law and either the law of the forum (Illinois) or the law of the state where CCL and VOMT are incorporated (Florida). *See Prazen v. Shoop*, 2013 IL 115035, ¶68, 998 N.E.2d 1, 16 (corporate veil can be pierced "where adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences"); *17315 Collins Ave., LLC v. Fortune Dev. Sales Corp.*, 34 So. 3d 166, 168 (Fla. Dist. Ct. App. 2010) (corporate veil can be pierced where one corporation is a "mere instrumentality" of another and is used for improper conduct).

[13]    As piercing the corporate veil is an equitable remedy, there is no requirement that it be specifically pled. *See Asperger v. Shop Vac Corp.*, 524 F. Supp.2d 1088, 1094-95 (S.D. Ill. 2007); *see also Aqua Fin., Inc. v. Harvest King, Inc.*, No. 07-C-015-C, 2007 WL 5314547, at *3 (W.D. Wis. June 12, 2007) (labeling piercing the corporate veil and "equitable remedy" and further explaining that "under Fed.R.Civ.P. 8, a plaintiff is required to plead claims, not remedies . . . [a]nd with respect to those claims, the plaintiff need not plead either facts or legal theories: under the Federal Rules of Civil Procedure, a plaintiff need not plead any more than is necessary to place the defendants on notice of his claim." (citing *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 634 (7th Cir.2001)).

Lambert's and Verrillo's companies Berkley contracts with, further proving that they are not meaningfully distinct entities. (Plf. Add'l. SOF ¶ 29; Plf. Resp. CCL/VOMT SOF ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶¶ 17, 21.) In fact, CCL's own Director of Marketing, who communicated directly with Berkley, had never heard of VOMT until preparing for her deposition in this case. (Plf. Add'l SOF ¶ 29; Plf. Resp. Berkley SOF ¶¶ 17, 21.)

If, as the above facts suggest, CCL and VOMT are one and the same, then VOMT necessarily sells whatever CCL is selling. CCL itself acknowledges that it "markets and sells cruise and vacation packages" (Dkt. 350 ¶ 3), and it does not try to argue that it is not a seller. Further, Plaintiffs have shown that the calls at issue in this case were made for the purpose of selling CCL's cruises and on CCL's behalf. (Plf. Add'l. SOF ¶¶ 53-55; Plf. Resp. CCL/VOMT SOF ¶ 21.) Because Plaintiffs have produced evidence showing that CCL and VOMT are alter egos, the calls were also made for the purposes of selling VOMT's cruises and on VOMT's behalf. Thus, VOMT's argument that it is entitled to summary judgment because it is not a seller falls flat.

## IV. A Jury Could Find Berkley, CCL and VOMT Liable Under a Theory of "Classical" Agency.

No Defendant disputes that the TCPA provides for vicarious liability under a theory of actual authority, or so-called "classical" agency. As the FCC explains, "[t]he classical definition of agency contemplates the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *Dish Network* Order at 6586 (internal quotations omitted).[14] As set forth in the Restatement (Third) of Agency, "[t]he power to give interim instructions distinguishes principals

---

[14] "The federal common law of agency as described in *Dish Network* is in accord with the Restatement." *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004, at *6 (N.D. Ill. Sept. 3, 2013). Courts in the Seventh Circuit (and elsewhere) look to the Restatement of Agency for guidance in interpreting the federal common-law of agency. *See, e.g.*, *Respect Inc. v. Comm. on Status of Women*, 815 F. Supp. 1112, 1117 n.8 (N.D. Ill. 1993).

in agency relationships from those who contract to receive services provided by persons who are not agents." *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 742 (N.D. Ill. 2014) (citing Restatement § 1.01, cmt. (f)(1)). The Restatement further explains that a "person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment. A principal's failure to exercise the right of control does not eliminate it, nor is it eliminated by physical distance between the agent and principal." Restatement (Third) Of Agency § 1.01, cmt. (c).

When an agent is authorized to hire subagents, a principal is liable for the acts of those subagents as well. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 775 (N.D. Ill. 2014) ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal. An agent may appoint a subagent if the agent has actual or apparent authority from the principal to do so.") (internal citations and quotations omitted). An agency relationship "can be created by contract or by conduct." *Toney*, 75 F. Supp. 3d at 744.

Here, the parties created various agency relationships by contract and by conduct – Berkley with VOMT and CCL, CCL with the ESG Defendants. As a result of these relationships, none of the Defendants are entitled to summary judgment.

**A.**   **The undisputed facts and disputed material facts prevent entry of summary judgment for CCL on a classical agency theory.**

CCL argues that is entitled to summary judgment on a theory of classical agency because it had no involvement in or control over ESG's robocalling. (Dkt. 341 at 15-22.) This assertion ignores the substantial evidence demonstrating the exact opposite. First, CCL omits that its contract with the ESG Defendants expressly provided for robocalls, and that the contract required the ESG Defendants to provide CCL with, among other things, the names and telephone numbers of the call recipients. (Plf. Resp. CCL/VOMT SOF ¶ 23.) CCL also fails to mention that it edited the scripts

used on the calls,[15] weighed in on the states to which calls should be made, told the ESG

Defendants (through their affiliates) what content to include on their websites, directed the ESG

Defendants not to make calls on certain holidays, told the lead broker how many calls it would

accept each day, and instructed the ESG Defendants and the lead broker to change the name of the

purported survey group when it received a complaint from a legitimate company with the same

name, which the lead broker then did. (*See*, Plf. Resp. CCL/VOMT SOF ¶¶ 11, 12, 26, 29, 32, 35.)

And during the robocall campaign, CCL was in near-constant contact with the lead broker. (Plf.

Add'l. SOF ¶¶ 36-38.) CCL—through the lead broker LSS—also provided the funds that were used

to effectuate the campaign. (Plf. Add'l SOF ¶ 38; Plf. Resp. CCL/VOMT SOF ¶¶ 11-14, 46, 49.) A

reasonable jury could certainly find these facts sufficient to demonstrate actual authority.

In fact, another court already reached the same conclusion when it denied CCL's motion for

summary judgment with respect to same calls at issue in this case. In *Bank v. Caribbean Cruise Line*,

Case No. 12-cv-00584 (E.D.N.Y.), the court denied CCL's motion for summary judgment based

only on its review of the contract between CCL and ESG, and without considering the substantial

additional evidence available in this case. (*See* Dkt. 336, Ex. A, *Bank* Decision at 20-25.) The *Bank*

court held that a reasonable fact-finder could determine that CCL "exerted control over the delivery

of its message to potential cruise recipients," particularly given the contractual provision stating that

ESG would "'provide [CCL] with a general description of each political survey campaign and an

exact script along with an exact audio file of each survey.'" (*Id.* at 20.) This same contract provision

is at issue here. *See id.*; *see also Lushe v. Verengo Inc.*, No. CV 13-07632 AB R, 2014 WL 5794627, at *5

(C.D. Cal. Oct. 22, 2014) (denying summary judgment on classical agency theory in TCPA case

where defendant edited call scripts, monitored performance, provided telephone lines to accept call

---

[15]     In fact, the person who edited the scripts on CCL's behalf is a lawyer at Greenspoon Marder, the
same law firm representing CCL and VOMT in this case.

transfers, and knew that calls were being using automated equipment), *reconsideration denied*, No. CV 13-07632, 2015 WL 500158 (C.D. Cal. Feb. 2, 2015).

Nevertheless, CCL fails to acknowledge the *Bank* decision, let alone explain why it was wrong. Instead, CCL addresses a handful of cases that are distinguishable from this case. For example, in *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012), *aff'd* 582 Fed. App'x 678 (9th Cir. 2014), the court granted Taco Bell's motion for summary judgment because it did not exercise any "control over the manner and means of the text message campaign," and it had no "role in the decision to distribute the message by way of a blast text." 879 F. Supp. 2d at 1085. CCL, by contrast, exercised direct control over the content of the calls and over the method they were made. (*See, e.g.*, (*See*, Plf. Resp. CCL/VOMT SOF ¶¶ 11, 12, 26, 29, 32, 35.) [16] Indeed, its contract with the ESG Defendants expressly provided for robocalls. (Plf. Add'l. ¶¶ 35-36.)

CCL's reliance on *Applestein v. Fairfield Resorts*, a 2009 Maryland state court case, fares no better. In *Applestein*, a Maryland appellate court affirmed a judgment entered after a bench trial, holding there was sufficient evidence to support the factual finding at trial that the calling party in that case was not acting as the defendant's agent for the calls at issue where, among other factors, the relevant contract expressly forbid the calling party from making robocalls. No. 0004 Sept. Term 2007, 2009 WL 5604429 (Md. Ct. Spec. App. July 8, 2009). Even though it was decided years before the *Dish Network* Order, the *Applestein* decision supports Plaintiffs' position rather than CCL's, as it shows that trial is necessary to decide the fact-intensive agency questions. *See Cellco P'ship v. Plaza Resorts Inc.*, No. 12-81238-CIV, 2013 WL 5436553, at *6 n.7 (S.D. Fla. Sept. 27, 2013) ("*Applestein*

---

[16]     In addition, although the ruling was affirmed on appeal, *Thomas* was decided before the FCC issued the *Dish Network* Order, and it applies the wrong legal standard. Even under a classical agency theory, a defendant is liable if he or she has the right to control the actions of its agent, regardless of whether it actually exercises that right.

stated that whether an entity acts as an agent or an independent contractor under the TCPA is a question of fact.").

CCL's remaining cases similarly do not support its motion for summary judgment. (*See* Dkt. 341 at 17-19.) In *Mey v. Pinnacle Sec., LLC*, the defendant was entitled to summary judgment because it had "little to no control over the means or manner by which [lead generation] companies generate sales leads" for its business. No. 11CV47, 2012 WL 4009718, at *5 (N.D.W. Va. Sept. 12, 2012). For the reasons described above, that distinguishes *Mey* from this case. Nor does *Makaron v. GE Security Manufacturing, Inc. et al.*, No. 14-1274, 2015 WL 3526253 (C.D. Cal. May 18, 2015), help CCL either. In that case, plaintiff sought to hold a defendant liable for TCPA violations committed by one of its thousands of authorized dealers, but the Court held that there was "no evidence that [the defendant] controlled or directed the marketing campaigns of its authorized dealers, much less the specific marketing campaigns that targeted [p]laintiffs in th[e] case." 2015 WL 3526253, at *7. By contrast, there is substantial evidence that CCL directed and controlled the robocall campaign, and that it did so acting as Berkley's agent or subagent (through VOMT). Finally, CCL relies on *Kristensen v. Credit Payment Servs., Inc.*, No. 12-CV-00528, 2015 WL 4477425 (D. Nev. July 20, 2015), for the proposition that summary judgment is appropriate where "there was 'no evidence that any of the defendants had either the legal or practical ability to control whether [the text sender] sent out unsolicited texts.'" (Dkt. 341 at 18-19.) Here, again, there is substantial evidence that CCL had both the legal and practical ability to control whether the ESG Defendants and their associates made unsolicited robocalls offering a free CCL cruise package, as well as evidence demonstrating that they exercised it. (*See, e.g.*, Plf. SOF ¶¶ 38, 43; Plf. Resp. CCL/VOMT SOF ¶¶ 11, 12, 26, 29, 32, 35.)

Thus, CCL cannot be granted summary judgment in its favor under an actual authority theory—particularly in the face of the substantial facts indicating its liability.

**B.** **The undisputed facts and disputed material facts prevent entry of summary judgment for *VOMT* on a classical agency theory.**

The evidence shows that a jury could find VOMT liable under the classical agency theory for the same reasons that it could find that CCL is liable under that theory. VOMT's motion for summary judgment does not deny that CCL is its agent, and it does not move for summary judgment on that ground. Rather, VOMT implicitly acknowledges that its liability for the robocalls hinges on CCL's liability (Dkt. 345 at 9, 12 (stating that VOMT merely "incorporates the legal authority and argument by CCL in its Motion for Summary Judgment")), and then briefly argues that because it had no direct relationship with the ESG Defendants and their affiliates it cannot be liable for the calls. *Id.* But that argument ignores that VOMT's contract with CCL specifically contemplates that CCL would conduct telemarketing and permits CCL to use subagents to carry out its obligations, and that VOMT knows everything that CCL knows, through Dan Lambert. (Plf. Add'l. SOF ¶¶ 7, 10-13; Plf. Resp. Berkley SOF ¶¶ 22, 24, 68.)[17] CCL did use subagents—the ESG Defendants and Scott Broomfield—and therefore VOMT is liable for their actions as well. *See e.g.*, *Smith*, 30 F. Supp. 3d at 775 (principal may be held liable for acts committed by authorized subagents); *Lushe*, 2014 WL 5794627, at *5 (holding that defendant who knew that contractor was using subcontractor to carry out marketing could be held liable for subcontractor's TCPA violations). VOMT's failure to address this point constitutes waiver for purposes of summary judgment, *see, e.g.*, *Assaf v. Cottrell, Inc.*, No. 10 C 85, 2013 WL 1282853, at *1 (N.D. Ill. Mar. 27, 2013), and it is therefore not entitled to summary judgment on a classical agency theory either.

---

[17]     It also ignores the fact that, as set forth above, VOMT and CCL are not separate entities in any meaningful way. (Plf. Add'l. SOF ¶¶ 5-7, 29; Plf. Resp. CCL/VOMT ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶ 6.)

### C. The undisputed facts and disputed material facts prevent entry of summary judgment for *Berkley* on a classical agency theory.

Berkley likewise is not entitled to summary judgment, as its motion ignores the facts elicited through discovery, and a reasonable jury could find that it has a classical agency relationship with VOMT and CCL as well. For instance, its motion ignores that Berkley has worked with VOMT's and CCL's founders for more than twenty years and that Berkley was founded by Dan Lambert's (the founder of CCL and VOMT) own father. (*See, e.g.*, Plf. Add'l. SOF ¶¶ 8-9, 11-12; Plf. Resp. Berkley SOF ¶ 27.) Even if it is believed that Berkley has taken a hands off approach to managing that relationship, it still has the right to exercise control over VOMT's and CCL's marketing efforts—including the right to give VOMT interim instructions—which is the hallmark of a classical agency relationship. (Plf. Resp. Berkley SOF ¶¶ 22, 24, 68.) For example, Berkley's current President testified that every time she has instructed VOMT to do something, it has complied, including when Berkley told VOMT to stop sending Florida residents to tour Berkley's properties, and when Berkley directed to stop sending leads that violated certain timeshare regulations. (Plf. Resp. Berkley SOF ¶ 68.) Berkley's Senior Vice President of Marketing provided similar testimony, stating that he also instructed VOMT to stop sending Florida residents to tour their properties, and that he had instructed VOMT to stop sending leads that were generated in violation of certain timeshare regulations. (*Id.*) And during the robocall campaign at issue, in response to one of many consumer complaints that Berkley received, Ms. Foster wrote to VOMT that "*we* need to stop the calls to people who wish not to be called" (Plf. Resp. Berkley SOF ¶¶ 22, 24, 68.) (emphasis added), showing that Berkley had the right to instruct VOMT not to dial particular numbers.

In addition to the above facts, Berkley's entire Board of Directors meets with VOMT's and CCL's founders every month to discuss their marketing efforts. (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 24, 44, 68.) Although Berkley's Board of Directors has testified that

they discuss only tour flow at those meetings, rather than specific marketing programs that VOMT is using, a jury would not have to believe that testimony. The contract states that the purpose of the meeting is to help ensure good relations between the companies, (Plf. Resp. Berkley SOF ¶¶ 22, 24, 44, 68), and Berkley's Senior Vice President of Sales testified that it is important for Berkley's Senior Vice President of Marketing to attend each such meeting, as he is "best equipped to evaluate the marketing climate." (Plf. Resp. Berkley SOF ¶¶ 44, 68.) Given these facts, a reasonable jury could find that the meetings are used for more than running through numbers of prospective tours. (Plf. Resp. Berkley SOF ¶¶ 22, 24, 44, 68); *see, e.g., E.g., United States v. Curry*, 187 F.3d 762, 768 (7th Cir. 1999) (citing with approval pattern instruction that explains direct and circumstantial "evidence should be given equal weight").

Although the contract between Berkley and VOMT is silent as to whether they intended to set up an agency relationship, that silence weighs in favor of an agency finding and against summary judgment in this case. *See Thomson Reuters (Prop. Tax Servs.) Inc. v. Thomas Enterprises, Inc.*, No. 10 CV 00990, 2010 WL 5057459, at *2 (S.D.N.Y. Dec. 7, 2010) (denying summary judgment where "contract is silent on the issue of agency"). This is particularly true in light of the other marketing contracts that Berkley produced. Namely, Berkley produced four contracts with its other marketing partners, and every single one of those other than the VOMT contract contains an express disclaimer of an agency relationship. (Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley ¶ 68.) Put differently, when Berkley wanted to disclaim an agency relationship, it knew how to do so, and the lack of such a clause in Berkley's contracts with VOMT is telling. Moreover, the contract contains various other provisions upon which a reasonable jury could rely to find that an agency relationship exists, such as that (i) VOMT agreed to provide Berkley with a list of all of its marketing programs, (ii) Berkley is permitted to ensure that all of those programs are legal, (iii) VOMT is able to bind Berkley to taking timeshare tours, and that (iv) VOMT/CCL employees are authorized to

35

work onsite at Berkley properties without paying rent. (Plf. Add'l. SOF ¶¶ 16-17; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 22, 44, 68, 75.)

Perhaps recognizing that the record evidence precludes summary judgment, Berkley argues that Plaintiffs "must show there is a formal agency relationship with the party who actually made the calls." (Dkt. 343 at 20.) Berkeley's position is plainly not the law.[18] Foremost, it fails to acknowledge that Plaintiffs' claim of liability under the classical agency theory is based on Berkley's relationship with VOMT. (Dkt. 343 at 20.) As *Smith* and myriad other cases demonstrate, principals are liable for the acts of their agents and authorized subagents. *See Smith*, 30 F. Supp. 3d at 775. Here, Berkley's contract with VOMT specifically contemplated that VOMT would use subagents to carry out its telemarketing activities (Plf. Add'l. SOF ¶ 12; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶¶ 24, 68), and so Berkley is liable for the subagents' TCPA violations. *See Smith*, 30 F. Supp. 3d at 775; *Lushe*, 2014 WL 5794627, at *5 (rejecting argument that direct agency relationship is required when subcontractor violates TCPA).

Setting aside the fact that Plaintiffs are not trying to show that Berkley had a direct agency relationship with the ESG Defendants, and thus are not required to make that showing, the main case upon which Berkley relies does not support its bid for summary judgment. Specifically, Berkley asserts that *Keating v. Peterson Nelnet, LLC*, No. 14-3558, 615 Fed. Appx. 365 (6th Cir. 2015) "clearly shows why" Plaintiffs cannot prove "that Berkley is liable under the TCPA by virtue of its Agreement with VOMT." (Dkt. 343 at 20.) But that case is not even superficially similar.

The plaintiffs in *Keating* sought to hold a defendant vicariously liable for transmitting unsolicited text messages that were sent by a subcontractor of a marketing company it hired to

---

[18]     In addition to the fact that Berkley's argument that Plaintiffs must show a direct agency relationship between Berkley and the ESG Defendants is an incorrect statement of the law, its failure to argue that VOMT is not its agent constitutes waiver for purposes of summary judgment. *See Assaf*, 2013 WL 1282853, at *1.

conduct a specific marketing campaign on its behalf. *Id.* at 367. However, the defendant's agreement with the marketing company expressly forbid the marketing company from using text messages to carry out the campaign. *Id.* at 367-68. It likewise expressly forbid the marketing company from using subagents. *Id.* at 368 (noting that contract "prohibited the assignment, transfer, or delegation of any obligation incurred under the terms of the document without prior written consent from CUnet"). Despite those specific restrictions, the marketing company used a subcontractor to send text messages without informing the defendant it was doing either of those things. *Id.* at 368. After the defendant received a consumer complaint, it deactivated the marketing campaign while it investigated the complaint and reactivated the program *only* after receiving assurances that no more text messages would be sent. *Id.* at 368-69. After it got one more complaint, it permanently deactivated the marketing campaign. *Id.* at 369.

In short, *Keating* simply stands for the uncontroversial proposition that companies are not liable for the unauthorized actions of unauthorized subcontractors.[19] But that does not help Berkley at all. In contrast to the defendant in *Keating*, Berkley specifically hired VOMT to conduct telemarketing on its behalf, it specifically authorized VOMT to use subcontractors to do so, and it failed to take any reasonable steps to stop the illegal calling campaign even after receiving far more than two isolated complaints. (Plf. Add'l. SOF ¶¶ 61-62, 64-65; Plf. Resp. Berkley ¶ 62.) Moreover, unlike Berkley, the defendant in *Keating* did not make a hollow request that the illegal activity cease, and then continue to accept leads. (Plf. Add'l. SOF ¶¶ 61-62; Plf. Resp. Berkley ¶ 62.) Thus, as the FCC succinctly explained in the *Dish Network* Order, there is no question that Berkley can be held liable for the robocall campaign:

---

[19] The *Keating* Court also relied on the fact that the relevant contract had a section stating that the parties were independent contractors, and not agents. *Keating*, 615 F. App'x at 372. Although parties may not avoid agency liability merely by writing a contract that disclaims such a relationship, it is worth noting that Berkley's contract with VOMT does not contain such a disclaimer, unlike its agreement with every other one of its marketing partners. (Plf. Resp CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶ 68.)

we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.

*Dish Network* Order at 6593.[20]

In sum, because Berkley has not sought summary judgment on the grounds that VOMT is not Berkley's agent, Plaintiffs and the Classes are entitled to a trial on that issue. Even if Berkley had briefed that issue, however, the genuine disputes of material fact identified above would preclude summary judgment.

## V.    A Jury Could Find CCL, VOMT, and Berkley Liable Under a Theory of Apparent Authority.

Defendants' attempts to obtain summary judgment under a theory of apparent authority fail as well. More specifically, CCL and VOMT claim that they are entitled to summary judgment because neither did anything to create a reasonable belief traceable to them that the ESG Defendants were acting on their behalf. (Dkt. 341 at 22-23; Dkt. 345 at 12-13.) Berkley does not address this issue substantively, but merely provides a footnote suggesting that Plaintiffs could not advance this theory because "no one heard Berkley, its trade name or any representation about its products during the calls." (Dkt. 343 at 24 n.9.) None of these arguments are sufficient.

---

[20]    Berkley also relies on *Thomas v. Taco Bell*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012), but that case also does not help Berkley. Again, although *Thomas* was affirmed on the specific facts in that case, it was also decided before the *Dish Network* Order (which specifically calls out its flawed reasoning). Additionally, the discussion of the actual-agency theory of liability in *Thomas* centered entirely on whether the relevant defendant exercised control over the specific marketing campaign at issue. Admittedly, Plaintiffs do not contend that Berkley actually exercised significant control over the robocall campaign. Rather, they contend that Berkley had a sufficient right to control VOMT's actions, through its lengthy and contractual relationship with VOMT, so that VOMT was Berkley's agent. Berkley's right to control is sufficient to establish liability. *See* Restatement (Third) Of Agency § 1.01, cmt. c. By contrast, adopting Berkley's view that it may avoid liability by choosing not to supervise VOMT or CCL or their authorized subagents flies in the face of the *Dish Network* Order's baseline proposition, i.e. that "allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions." *Dish Network* Order at 6588.

In regards to CCL and VOMT's contentions, their recitation of the law and the facts negate

their argument. "Apparent authority is the power held by an agent *or other actor* to affect a

principal's legal relations with third parties when a third party reasonably believes the actor has

authority to act on behalf of the principal and that belief is traceable to the principal's

manifestations." Restatement (Third) Of Agency § 2.03 (2006) (emphasis added). As the FCC

explained in its *Dish Network* Order, "[a]pparent authority holds a principal accountable for the

results of third-party beliefs about an actor's authority to act as an agent when the belief is

reasonable and is traceable to a manifestation of the principal." *Dish Network* Order at 6586 and

n.102, citing Restatement (Third) of Agency § 2.03, cmt. c. The FCC further explained that:

> apparent authority can arise in multiple ways, and does not require that 'a principal's
> manifestation must be directed to a specific third party in a communication made
> directly to that person.' *Id.* [Restatement (Third) of Agency § 2.03, cmt. c.], reporter's
> note a. Rather, 'a principal may create apparent authority by appointing a person to a
> particular position.' *Id.* Similarly, 'a principal may permit an agent to acquire a
> reputation of authority in an area or endeavor by acquiescing in conduct by the agent
> under circumstances likely to lead to a reputation.' *Id.*, cmt. c. And '[r]estrictions on
> an agent's authority that are known only to the principal and the agent do not defeat
> or supersede the consequences of apparent authority for the principal's legal
> relations' with others.' *Id.* In such circumstances, for example, the presence of
> contractual terms purporting to forbid a third-party marketing entity from engaging
> in unlawful telemarketing activities would not, by themselves, absolve the seller of
> vicarious liability.

*Id.* at n.102.

Here, the facts show a jury could find that both CCL—and because they are

indistinguishable entities, VOMT—are liable under a theory of apparent authority because it

appointed the lead broker and the ESG Defendants to make robocalls on its behalf; the calls

advertised CCL's products, and call recipients were transferred to CCL sales agents. (Plf. Add'l. SOF

¶¶ 36-38, 43-45, 55; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 30, 33; Plf. Resp. Berkley SOF ¶¶ 42, 43.)

Under the FCC's decision in the *Dish Network* Order, CCL's decision to appoint the ESG

Defendants and their associates to make the robocalls on its behalf unquestionably creates liability

under an apparent authority theory, particularly given that the calls themselves discussed CCL's vacation packages and call recipients were directly transferred to live CCL sales agents. *See Dish Network* Order at 6586 and n.102; *see also Lushe*, 2014 WL 5794627, at *7 ("Whether CTA and MOV were Defendant's apparent agents are also triable issues of fact: the scripts that CTA and MOV used, and that Defendant itself either authored or approved, identified Defendant by name. A jury could reasonably conclude that authorizing CTA and MOV to name Defendant during their phone calls amounts to an affirmative manifestation from Defendant to Plaintiffs-albeit an indirect one-that could create agency by apparent authority."); *Mey*, 959 F. Supp. 2d at 932 (applying the FCC's declaratory ruling and finding it "patently clear that Mey, the non-movant, ha[d] met her burden at summary judgment and adduced more than a scintilla of evidence that VMS acted 'on behalf of' Monitronics and UTC, exposing them to potential liability under 47 U.S.C. § 227(c)" where both entities had agreements "that enable[d] it to hold itself out as an 'authorized dealer,' and further finding that this "fact alone could lead a reasonable finder of fact to conclude that UTC and Monitronics cloaked VMS with the apparent authority to act on their behalf, thus exposing them to liability under § 227(c).") (internal citations omitted). Just as in *Mey*, CCL entered into a contract permitting ESG and its affiliates to make calls referencing CCL's free cruises, and even transferring call recipients to CCL sales agents.

In regards to Berkley, it must face trial on the apparent authority theory because it has waived any arguments relating to this theory by failing to brief the issue, despite being on notice Plaintiffs were pursuing it. (*See, e.g.*, Dkt. 343; Berkley Ex. AA, Plaintiffs' Response to The Berkley group, Inc.'s Third Set of Interrogatories to Plaintiffs, attached hereto as Exhibit AA, at Resp. No. 1.) To be sure, that type of perfunctory argument results in waiver. *See, e.g.*, *Assaf*, 2013 WL 1282853, at *1. And, even if that were not the case, Berkley's contention that the calls did not have "any representation about [Berkley's] products" is not accurate. During the calls, call recipients were

40

offered upgraded vacations and told that those vacation packages all required a timeshare presentation. (Plf. Add'l. SOF ¶¶ 44-48; Plf. Resp. CCL/VOMT SOF ¶ 3; Plf. Resp. Berkley SOF ¶ 55, 71.) Each of the presentations occurred at Berkley properties as Berkley vacation products were the only timeshare upgrades marketed on the calls. (Plf. Add'l. SOF ¶ 46; Plf. Resp. CCL/VOMT SOF ¶ 59; Plf. Resp. Berkley SOF ¶ 27.) As in *Mey* and *Lushe*, the calls here had sufficient indicia that they were being made on Berkley's behalf so as to create a triable issue on apparent authority. *See Lushe*, 2014 WL 5794627, at *7; *see also Mey*, 959 F. Supp. 2d at 932.

Therefore, all three Defendants will likely be found liable under the apparent authority doctrine by a jury. Certainly none are entitled to summary judgment.

## VI. A Jury Could Find Berkley, CCL, and VOMT Liable Under a Ratification Theory.

Defendants also argue summary judgment in their favor is warranted under a ratification theory because a prior agency relationship is required and because there are no facts showing that they knew of the robocalling. (Dkts. 341, 343, 345.) Berkley goes one step further, arguing that liability cannot result because it did not have a direct relationship with the ESG Defendants and because the Named Plaintiffs did not ultimately purchase their timeshares. Of all Defendants' arguments, these are the most legally and factually strained.

### A. No prior agency relationship is required to demonstrate liability under a ratification theory.

Defendants' contention that an agency relationship must exist to establish liability under a ratification theory is not well founded. A company ratifies a telemarketer's TCPA violations if it "knowingly accepts the benefits of the transaction." *See, e.g., Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92, 100 (N.D. Ill. 2013) (citing Restatement (Third) Of Agency § 4.01 at cmt. d). Typically ratification applies to a party who accepts benefits knowing the material facts, but a party is also liable under a ratification theory if it accepts the benefits of a transaction despite knowing that it does not have all the material facts. *See* Restatement (Third) Of Agency § 4.06(b) (2006) ("A

41

principal may choose to affirm without knowing the material facts. The fact that the principal had knowledge may be inferred, as may the principal's assumption of risk of lack of knowledge."). And a party may not evade liability by burying its head in the sand to avoid learning the relevant facts. *See In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 467 (E.D.N.Y. 2007) ("having once ratified its agents' acts, [a principal] cannot afterwards avoid the effect of such ratification by showing that it was not acquainted with all the facts of the transaction ratified, when it was always in a position and was in possession of means of learning them.") (internal citation and quotation omitted); *see also In re Mason*, 300 B.R. 160, 168-69 (Bankr. D. Conn. 2003) ("[i]f the agent procures a contract by fraudulent or corrupt practices, although the principal has not been privy in any way to such conduct of his agent, by claiming the benefit of the contract, the principal must take it tainted as it may be with such practices."). *Cf. Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378-79 (7th Cir. 2010) ("You can't stare the truth in the face, disbelieve it, and then claim to have been ignorant. . . . When ordinary diligence following a notice would expose the untruth, the plaintiff has all required knowledge.") (internal quotation and citations omitted).

Ratification in the TCPA context "may occur 'through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences.'" *Dish Network* Order at 6587 (quoting Restatement (Third) of Agency § 4.01, cmt. d.) As just one example, the FCC explained that a company may be bound by even unauthorized conduct of a telemarketer if the company "is aware of ongoing conduct encompassing numerous acts by [the telemarketer]" and yet "fail[s] to terminate," or, in some circumstances, "promot[es] or celebrat[es]" the telemarketer. *See Dish Network* Order at n.104.

Contrary to Defendants' assertion, "ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act." Restatement (Third) Agency § 4.01 cmt. (b); *see also id.* Introductory Note ("A person may ratify the act of an actor who was not an

agent at the time of acting when the actor purported or assumed to act as the person's agent. See §
4.01, Comment b, and § 4.03. Ratification thus may create an agency relationship after the fact."); *see
also RATIFICATION*, Black's Law Dictionary (10th ed. 2014) ("A person's binding adoption of an
act already completed but either not done in a way that originally produced a legal *obligation or done by
a third party having at the time no authority to act as the person's agent* <an adult's ratification of a contract
signed during childhood is necessary to make the contract enforceable>") (emphasis added).

The FCC has adopted this view of ratification. The *Dish Network* Order explained that
vicarious liability **is not limited** "to circumstances in which formal agency exists and the principal
exerts immediate direction and control," *id.* at 6587 n.107, and contrasted "classical agency" with
ratification. Thus, as many courts have recognized, under the FCC's binding *Dish Network* Order,
companies may be held liable for TCPA violations even if those violations are committed by
independent contractors. *Kristensen*, 12 F. Supp. 3d at 1301 ("The 2013 FCC [*Dish Network* Order]
recognized that an agency relationship could arise by ratification."); *Wagner v. CLC Resorts &
Developments, Inc.*, 32 F. Supp. 3d 1193, 1196 n.1 (M.D. Fla. 2014) (holding in TCPA case that one
party "ratified [another party's] conduct by accepting the benefit of its actions" adequately alleged
ratification claim after separately addressing claims under actual and apparent authority theories); *In
re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, No. 11-CV-90, 2014 WL 316476, at *6 (N.D.W.
Va. Jan. 28, 2014) ("Vicarious liability [for TCPA violations], however, does not require proof of a
formal agency relationship; instead, a plaintiff may use principles of apparent authority and
ratification to establish such liability.")

The FCC's view is supported by more than 100 years of case law and is in line with the
Restatement of Agency, to which federal courts in this circuit turn when deciding issues of federal
common law. Indeed, Justice Oliver Wendell Holmes authored the leading opinion in this area of
the law, *Dempsey v. Chambers*, 154 Mass. 330, 331, 28 N.E. 279, 279-80 (Mass. 1891), almost 125 years

43

ago as a justice on the Massachusetts Supreme Court. *See* Restatement (Third) Of Agency § 4.01 (calling *Dempsey* one of the "classic authorities for this proposition" that ratification does not require a preexisting agency relationship). Justice Holmes explained in *Dempsey* that "ratification goes to the relation [of master and servant], and establishes it *ab initio*. The relation existing, the master is answerable for torts which he has not ratified specifically, just as he is for those which he has not commanded, and as he may be for those which he has expressly forbidden." *Dempsey*, 154 Mass. at 334. Justice Holmes further explained that "[i]t **never** has been doubted that a man's subsequent agreement to a trespass done in his name and for his benefit amounts to a command so far as to make him answerable." *Id.* at 333 (emphasis added).

Defendants ignore the Restatement, the text of the *Dish Network* Order, and the more than one hundred years of case law showing that ratification does not require a preexisting agency relationship. Instead of analyzing that precedent, they rely on two cases from the 9th Circuit—*Thomas v. Taco Bell Corp.*, 582 Fed. App'x 678 (9th Cir. 2014) and *Makaron v. GE Security Manufacturing, Inc. et al.*, No. 14-1274, 2015 WL 3526253 (C.D. Cal. May 18, 2015)—one from the Central District of Illinois (*United States v. Dish Network, LLC*, No. 09-3073, 2014 WL 7013223, at *61 (C.D. Ill. Dec. 11, 2014)) and one from a district court in Ohio (*Murray v. Choice Energy, LLC*, No. 15-cv-60, 2015 WL 4204398, at *6 (S.D. Ohio Jul. 10, 2015)) for the proposition that ratification cannot occur absent a preexisting agency relationship. (*See* Dkt. 343 at 25-26; *see also* Dkt. 341 at 23 n.140.)

Although the Ninth Circuit appears to require a preexisting agency relationship for ratification in the TCPA context, that non-precedential case law cannot be squared with the *Dish Network* Order or with the more than 125 years of case law consistent with that order.[21] Indeed, the

---

[21]    In addition, the facts in *Makaron* are nothing like the facts here. There, the defendant was a wholesaler of security systems, selling those systems to dealers who then sold the systems to consumers. The *Dish Network* Order acknowledges that companies are not liable in that scenario. *Makaron*, 2015 WL 3526253, at *1. *Makaron* also turned on the fact that there was "absolutely no evidence presented that UTCFSA ever

*Thomas* opinion did not acknowledge or address the *Dish Network* Order when discussing ratification, and another court in the Ninth Circuit recently rejected *Thomas* as "neither binding nor well-reasoned in light of the authority it cites." *Lushe*, 2015 WL 500158, at *7.[22] This Court should reject *Thomas* for the same reasons. Similarly, *Murray*—the case from the Southern District of Ohio—cites two Ninth Circuit cases for the proposition that a preexisting agency relationship is required for ratification, without analyzing whether those opinions are correct or trying to square them with the *Dish Network* Order.[23]

Finally, contrary to Berkley's claims, *United States v. Dish Network* does not require a preexisting relationship and Berkley is simply wrong when it suggests otherwise. Rather, the court in that case explained that "ratification requires proof that the Retailer *represented that it was the agent of Dish*," not that it actually was an agent. *Dish Network, L.L.C.*, 75 F. Supp. 3d at 1018.[24] The *Dish Network* court then denied defendant's motion for summary judgment. *See id.* Even that holding regarding ratification goes too far, as there is no requirement in the FCC's *Dish Network* Order or in the Restatement (Third) of Agency that the calling party hold itself out as the agent of the defendant, but, at a minimum, it does not support granting Berkley's motion for summary judgment.

---

ratified any action by SOAS regarding telephonic communications with end-user consumers." *Id.* at *10. Here, by contrast, VOMT and CCL were Berkley's marketers, and they carried out their contractual obligations through subcontractors, as VOMT's contract with Berkley permitted. (Plf. Add'l. SOF ¶¶ 12, 20, 36; Berkley SOF ¶ 39.)

[22] The *Lushe* court was specifically addressing *Thomas'* discussion of apparent authority, but the same principles apply to all of the *Thomas* court's analysis.

[23] CCL's citation to *Kaye v. Grossman* is likewise unpersuasive. (*See* Dkt 341 at 23.) The *Kaye* court's statement that ratification "presupposed an agency relationship" was dicta, made in a footnote to the section of the court's opinion rejecting an argument that a wife's promise to repay her husband's debt was sufficient to qualify as a "legal guarantee." No. 97-cv-9679 1999 WL 33465, at *2, 2 n.1 (S.D.N.Y. Jan. 27, 1999).

[24] The most natural reading of the court's statement that the seller represented it was the defendant's agent is that the seller held itself out as acting on behalf of the seller, not that it told people it was an agent in the sense that the seller was able to control the agent's activities. That is in line with the fact pattern here, where ESG made calls offering a free cruise for CCL, and CCL told call recipients that they could take an upgraded vacation as long as they attended a timeshare presentation (all of which were at Berkley properties).

**B.** **Berkley cannot obtain summary judgment by asserting that the ESG Defendants were not its agents or by claiming that Plaintiffs did not purchase anything from it directly.**

Berkley also argues that Plaintiffs' and the Classes' claims still fail because there is no evidence that "the ESG Defendants or Robb purported or pretended to be Berkley's agents." (Dkt. 343 at 25 n.10.) Even if the Court disagreed with the *Dish Network* Order and the line of cases holding that ratification may occur even without a preexisting agency relationship, the fact that the ESG Defendants and Darren Robb did not pretend to be Berkley's agents is beside the point. The ESG Defendants and Robb were VOMT's and CCL's subagents, and there is no question that VOMT and CCL purported to (and did) act on Berkley's behalf, and that they were authorized to do so. As stated above, because Berkley's contract with VOMT expressly contemplated VOMT's use of subagents, Berkley is liable for their illegal acts, just as it would be liable if VOMT or CCL physically made the calls themselves. *See Smith*, 30 F. Supp. 3d at 775 (principal may be held liable for acts committed by authorized subagents); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013) ("the absence or infrequency of direct communication from Lens.com to its affiliates is not conclusive on whether the affiliates were its agents. A principal can authorize its agent to appoint a subagent, and the subagent can then act as an agent for the principal even though the principal's control is indirect").

Nor, as Berkley claims, is it entitled to summary judgment merely because the Named Plaintiffs did not purchase anything from Berkley. (Dkt. 343 at 26.) Although *Toney* and *State Farm* dismissed ratification claims at the pleadings stage for failing to adequately allege that the defendant benefitted from the conduct at issue, other courts have not adopted that line of reasoning. *See, e.g.*, *Wagner*, 32 F. Supp. 3d at 1196 and n.1 (allowing ratification theory against timeshare company to proceed in TCPA case despite no allegation that plaintiff had any interaction with or purchased any product from the timeshare company); *see also Mey*, 959 F. Supp. 2d at 934 (denying TCPA

46

defendants' motion for summary judgment on ratification theory despite no allegation that plaintiff had purchased anything or spoken directly to those defendants). This Court should follow *Mey*, *Wagner*, and the *Dish Network Order* rather than *Toney* and *State Farm* because accepting Berkley's argument that liability can only result if plaintiffs purchase the marketed item would essentially give marketers of expensive products (such as Berkley's timeshares) a free pass to violate the TCPA. They would take comfort in the fact that the most they would ever pay for a lead was the maximum $1,500 fine for a TCPA violation, and that they would only have to pay that for successful lead generation calls. Put differently, Berkley would be free to hire someone to blanket the country with robocalls, which is extremely cheap to carry out (as evidenced by the fact that CCL paid someone approximately $2 per successful call transfer to make millions and millions of calls). Berkley would then only face liability for TCPA violations when sued by someone who not only answered the call, but also decided to visit a Berkley property, leaving the rest of the victims to sue only the dialer, who almost certainly would not have money to defend those lawsuits or satisfy the inevitable judgments. That is precisely why the FCC endorsed a ratification theory of liability for TCPA violations, *see Dish Network* Order at 6588-89, and it is why the Court should reject Berkley's argument here. In any event, contrary to lack of alleged benefits for the ratifying companies in *Toney* and *State Farm*, Berkley admits that it accepts nearly 40,000 leads from CCL/VOMT each year (Berkley SOF ¶ 67), and that those leads have value (Berkley SOF ¶ 28).[25] *Cf. Jamison*, 290 F.R.D. at 100 (in TCPA case, stating that it was "unlikely that Honda would be able to escape liability by arguing that FCS was not its agent" because Honda received some benefit from the calls at issue).

---

[25]     Notably, Berkley does not contend that it received no benefit from the robocall campaign. Nor could it. (Plf. Add'l. SOF ¶¶ 53-54, 56; Berkley SOF ¶¶ 28, 67). Rather, Berkley contends only that the Named Plaintiffs did not tour Berkley timeshares. As explained above, it cannot avoid liability on that ground.

**C. Contrary to Defendants' contentions, the record evidence demonstrates that each Defendant knowingly benefitted from the robocalls.**

> **i. *There are more than sufficient facts for a jury to find that CCL and VOMT knowingly benefited from the robocalls.***

CCL and VOMT knew about the robocall campaign before it started, when CCL entered into written and oral contracts to begin the campaign.[26] CCL benefited greatly from the campaign. Its Marketing Director, Jennifer Poole, testified that the campaign was a success, and it sold nearly 60,000 vacation packages as a result of the calls. (Plf. Add'l. SOF ¶ 55.) Its founder, Dan Lambert, described the robocall campaign as "the next great mouse trap … as far as sales go." (*Id.* ¶ 53; Plf. Resp. CCL/VOMT SOF ¶ 21.) Given that Lambert was one of two VOMT employees, (Plf. Add'l. SOF ¶ 28; Plf. Resp. CCL/VOMT SOF ¶ 36) that company also knew about the campaign from the start, and it unquestionably benefitted from the campaign as well. (Plf. Add'l. SOF ¶ 7 (explaining that the companies share the same knowledge, through him). Namely, CCL received payment from VOMT for each lead it generated for Berkley. (Plf. Add'l. SOF ¶ 22; Plf. Resp. Berkley SOF ¶ 75.) And because Berkley received a substantial number of leads as a result of the robocall campaign, which means that VOMT paid CCL $50 for each of those leads (and Berkley paid VOMT for each sale generated from such a lead), there is also no question that VOMT benefitted from the campaign. (Plf. Add'l. SOF ¶¶ 21, 22, 56-57; Plf. Resp. Berkley SOF ¶¶ 67, 75.)

> **ii. *Berkley learned about the robocall campaign, at the latest, months before it ended and also knowingly benefited from the calls.***

A reasonable jury could conclude that Berkley knew about the robocall campaign even before it started. As noted above, Berkley's contract with VOMT provided for monthly meetings

---

[26] Given that VOMT had no employees other than Dan Lambert and James Verrillo, and Dan Lambert is the CCL employee who arranged for the robocall campaign, VOMT's knowledge of the campaign is the same as CCL's. *See, e.g., Prime Eagle Grp. Ltd.*, 614 F.3d at 378 ("One fundamental rule of agency law is that corporations 'know' what their employees know-at least, what employees know about subjects that are within the scope of their duties.")

between company executives, and Berkley's entire Board of Directors attends those meetings. (Plf. Resp. CCL/VOMT SOF ¶ 46; Plf. Resp. Berkley SOF ¶¶ 44, 68.) Moreover, although Berkley's executives have testified that those meetings are used only to discuss the number of leads that VOMT will be providing during a certain time period, a reasonable jury could disregard that testimony, given the circumstantial evidence suggesting that the meetings are used for additional purposes. For example, Berkley's Senior Vice President of Marketing attends each meeting despite the fact that the meetings purportedly have nothing to do with Berkley's marketing efforts, or with VOMT's marketing efforts for that matter. (Plf. Resp. Berkley SOF ¶¶ 44, 68.) And, although Berkley also claims that VOMT considers its marketing techniques proprietary, much evidence refutes that claim. For example, the parties contract expressly contemplates that VOMT will conduct telemarketing on Berkley's behalf, (Plf. Add'l. SOF ¶ 11; Plf. Resp. Berkley SOF ¶ 16), which Berkley acknowledged to government investigators looking into these very robocalls. (Plf. Add'l. SOF ¶ 13; Plf. Resp. Berkley SOF ¶ 15.) Additionally, Dan Lambert testified that Berkley was "well aware of the fact that" his entities conducted telemarketing for Berkley. (Plf. Add'l. SOF ¶ 13; Plf. Resp. Berkley SOF ¶¶ 24, 32, 68.) Moreover, when Dan Lambert forwarded Berkley an email in May 2012 addressing the robocall campaign, he readily agreed to provide Berkley with details of the program. (Plf. Add'l. SOF ¶¶ 49-50.)[27] And during his deposition, Berkley's Senior Vice President of Sales was able to identify multiple marketing methods that CCL/VOMT use, including telemarketing. (Plf. Resp. Berkley SOF ¶¶ 24, 68.) Although courts may not weigh credibility in deciding summary judgment, where, as here, "'the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the

---

[27] Berkley's Senior Vice President of Marketing was, however, able to list the marketing techniques that all of Berkley's genuine competitors (timeshare companies) use to market their products, casting doubt on their claim that they have no knowledge of VOMT's marketing techniques. (Plf. Resp. Berkley SOF ¶¶ 24, 68)

type of dispute over a genuine issue of material fact that should be left to the trier of fact.'" *Foreman v. Johnson*, No. 03 C 187, 2006 WL 2714936, at *5 (N.D. Ill. Sept. 20, 2006), quoting 10A Wright, Miller & Kane, Federal Practice & Procedure, Civil 3d § 2726 at 446 (1998).[28]

In any event, the Court need not determine at summary judgment exactly when Berkley learned about the robocall campaign, because there is no dispute that Berkley knew about it by May 2012, at the latest, months before it ended in August 2012. (Plf. Add'l. SOF ¶¶ 41, 66; Plf. Resp. Berkley SOF ¶ 32.) Knowing that the campaign would generate leads for Berkley, Foster claims that she told Lambert to stop sending any leads generated from calls to cellular telephones. (Plf. Add'l. SOF ¶ 51; Plf. Resp. Berkley SOF ¶ 62.)[29] Berkley, however, has never done anything to check whether Lambert followed that purported instruction, and the undisputed facts show that he did not stop sending such leads. (Plf. Add'l. SOF ¶¶ 52, 61; Plf. Resp. Berkley SOF ¶ 62.) Moreover, shortly after the Fox News stories and Lambert's email about the robocalls, Berkley was served with the complaint in *Wright v. Berkley*, which was eventually consolidated with this case. (Plf. Add'l. SOF ¶ 51.) That complaint alleged that Berkley was liable for a robocall campaign where political survey calls were made in an effort to sell Berkley products. (*Id.*) The *Wright* complaint provided detailed allegations of the content of the calls, the methods used to make the calls, and the fact that call recipients were transferred to CCL after completing the surveys. (*Id.*) In addition, Berkley received

---

[28]    In addition to the above-described examples casting doubt on the credibility of Berkley's testimony in this case, there are other similar examples. For one, Berkley's President initially denied during a Rule 30(b)(6) deposition that VOMT conducted telemarketing on Berkley's behalf, despite the company previously representing to multiple government agencies that VOMT did conduct telemarketing on its behalf, and telling at least one agency that VOMT was its primary telemarketer. (Plf. Add'l. SOF ¶ 13-14.) And when Berkley received consumer complaints, it never disclosed that it had a relationship with any of the companies involved in the calling campaign, despite learning about the campaign's details in May 2012 at the latest. (Plf. Add'l. SOF ¶ 65.) As one more example, its Senior Vice President of Sales testified in this case that it had to fire its entire sales force at one of its locations after Lambert's and Verrillo's cruise ship had an accident, while its President denied that. (Plf. Add'l. SOF ¶ 66; Plf. Resp. Berkley SOF ¶ 44.)
[29]    Foster also claims that she told Lambert to stop sending leads generated by inappropriate conduct. (Berkley SOF ¶ 62.) She does not explain what "inappropriate conduct" meant in that context. More importantly, Lambert's testimony on behalf of CCL contradicts her testimony and suggests that she never made any such statement. (Plf. Resp. to Berkley SOF ¶ 62.)

numerous complaints from consumers who received the calls during the span of the campaign. (Plf. Add'l. SOF ¶ 65.) The consumer complaints also included detailed descriptions of the calls. (*Id.*) Berkley responded to some of those complaints, at times coordinating its response with Lambert. (Plf. Add'l SOF ¶¶ 29, 65-66; Plf. Resp. Berkley SOF ¶¶ 24, 32, 44.)

In short, there is no question that Berkley knew about the robocall campaign well before it ended. Even assuming for purposes of summary judgment that the notice Berkley received did not provide it with all of the relevant facts regarding the robocalls and assuming that Berkley did not know anything more than is described above, it still had the requisite knowledge by May 2012 to be held liable because "ordinary diligence"—here, simply asking Dan Lambert for all of the details of the robocall campaign, which he offered to provide when he emailed Berkley's Board of Directors, and taking real steps to actually ensure that Berkley did not receive leads generated from that campaign, as opposed to making a hollow request that it stop sending leads generated from calls to cellular telephones— would have permitted Berkley to easily learn any additional relevant facts about the program that it did not yet know. *See Prime Eagle Grp. Ltd.*, 614 F.3d at 378-79. Of course, Berkley also could have repudiated the acts by ending its relationship with Lambert entirely, but it did not do any of those things. (Plf. Add'l. SOF ¶¶ 61-62.)

The evidence also shows that a jury could certainly find that Berkley benefitted from the calling campaign. In fact, Berkley does not even suggest otherwise. Rather, it contends that it is not liable because the Named Plaintiffs did not do business with Berkley, but as described above, that does not help Berkley. Berkley acknowledges that its relationship with VOMT and CCL is a profitable one, and the evidence shows, that Berkley received thousands of tours as a result of the calling campaign. (Plf. Add'l. SOF ¶¶ 56-60; Plf. Resp. Berkley SOF ¶¶ 27, 67.) Moreover, despite learning about the calling campaign by May 2012 at the latest, Berkley has never repudiated VOMT's and CCL's actions. (Plf. Add'l. SOF ¶¶ 15, 49-52, 62; Plf. Resp. Berkley SOF ¶ 62.) To the contrary,

Berkley continued taking leads from the program for years after the calling campaign ended, and during that time, it renegotiated its agreement with VOMT and began paying VOMT more money for leads than it had ever paid before. (Plf. Add'l. SOF ¶ 63.)

It is no stretch to think a jury could find that this constitutes ratification under the *Dish Network* Order. In fact, Berkley's behavior exactly mirrors the fact pattern that the *Dish Network* Order provides as an example of how ratification may occur in the TCPA context. As of May 2012 at the latest, Berkley was "aware of ongoing conduct encompassing numerous acts by" CCL and VOMT, but it "fail[ed] to terminate" that relationship, instead, "promot[ing] or celebrat[ing]" the relationship by increasing VOMT's compensation and not taking any steps to ensure it did not receive sales leads generated from the illegal robocall campaign. *See Dish Network* Order at n.104.

## VII. Berkley, CCL, and VOMT are Not Entitled to Summary Judgment on the Joint Venture or Partnership Theories of Liability.

CCL and VOMT, but not Berkley, contend that they cannot be liable under the joint venture or partnership theories because Plaintiffs have not alleged that CCL or VOMT was in a joint venture with the ESG Defendants. (Dkt. No. 341 at 24-26.) CCL cites no cases to support that position, and it is just wrong. Joint venturers and partners are liable for their co-partners' tortious conduct. So if any of the joint ventures/partners are liable for the robocall campaign, all of them are liable. *See* Restatement (Second) of Torts § 491 cmts. (b), (c), (d) (1965); *see also, e.g., Shook v. Beals*, 96 Cal. App. 2d 963, 970, 217 P.2d 56, 61 (Cal. 1950) (joint venturers liable for conduct of co-joint venturers).

Because this case arises under a federal statute, the federal common law of joint venture liability applies to Plaintiffs' claim that Berkley (and CCL and VOMT) are liable as joint venturers. The Restatement (Second) of Torts explains that:

> The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*See* Restatement (Second) of Torts § 491 cmt. (c) (1965)[30]; *see also* 46 Am. Jur. 2d Joint Ventures § 8 ("the following elements must be present so as to establish the existence of a joint venture: a contribution of money or services by each of the parties; joint proprietorship and mutual control over the subject matter of the venture; an agreement to share profits; and an express or implied contract establishing the relationship"). The requirement that the parties have "an equal right of control" does not mean that they must have equal control over all elements of the joint venture. *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F. Supp. 665, 679 (D. N.J. 1985); *see also* 46 Am. Jur. 2d Joint Ventures § 12 ("The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coventurer of something promotive of the enterprise."). Along those lines, "joint venturers may agree that responsibility for particular tasks shall reside with less than all the venturers." *Hellenic Lines, Ltd.*, 611 F. Supp. at 679.

The existence of a joint venture turns on the facts of each case, "and while every element may not necessarily be present in every case, it is generally agreed that in order to constitute a joint venture there must be a community of interest and a right to joint control. The community of pecuniary interest requires that the parties have a right to share in the profits and a duty to share in the losses. A joint venture exists where there is a joint interest in property, an express or implied agreement to share profits and losses of the venture, and there are actions or conduct showing joint cooperation in the venture." 46 Am. Jur. 2d Joint Ventures § 8. Finally, whether a joint venture exists is a fact specific inquiry, which "is frequently a question for the jury, under proper direction from the court." *See* Restatement (Second) of Torts § 491 cmt. (c); *see also* 46 Am. Jur. 2d Joint Ventures § 8 ("the existence or nonexistence of a joint venture depends on the facts and

---

[30] As Berkley notes, joint enterprise and partnership liability is essentially identical (Dkt. 343 at 32), and so Plaintiffs address them both under the joint venture heading.

circumstances of each particular case and no fixed nor fast rule may be promulgated to apply generally to all situations").[31]

A jury could find that Berkley, CCL, and VOMT are each liable under joint venture and partnership theories. As described above, Berkley has a long-standing relationship with VOMT, CCL, and other companies owned and controlled by Dan Lambert and James Verrillo, with the joint goal of selling vacation packages and properties. The relationship between the companies is so deep, and so dependent on Mr. Lambert's and Mr. Verrillo's relationship with Berkley's principals, that Berkley's Senior Vice President of Marketing is unable to identify which company Berkley contracts with, despite the fact that the contract is one for marketing. (Plf. Add'l. SOF ¶ 29; Plf. Resp. CCL/VOMT SOF ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶ 17.) Those facts show an implied agreement among the group. *See* Restatement (Second) of Torts § 491 cmt. (b), (c).[32] In addition, the parties have express agreements to act on each other's behalf. (Plf. Add'l. SOF ¶¶ 11, 13, 16-29. 35-36, 53-63; Plf. Resp. CCL/VOMT SOF ¶ 36, Plf. Resp. Berkley SOF ¶¶ 16, 17, 22, 24, 44, 68.) Thus, Defendants cannot show that the undisputed facts favor summary judgment on the first element of the joint venture theory.

Moreover, the group unquestionably has a common purpose—to sell vacation packages and timeshare products—satisfying the second element necessary to show joint venture liability. (Plf. Add'l. SOF ¶¶ 6, 10-18, 53-60; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 36.) In addition, there is a community of pecuniary interest in that purpose, with the parties each contributing capital or labor,

---

[31]     The inquiry into whether the parties formed a partnership is essentially the same as the inquiry into whether they are liable as joint venturers.

[32]     Although the parties' agreements purport to disclaim the existence of a joint venture relationship, that is not dispositive. *See, e.g.*, Dkt. 336, Ex. A, *Bank*, at 24 ("A contract provision reciting a legal conclusion is not admissible evidence on the question of whether the legal conclusion is correct."); *see also Wolf v. Superior Court*, 106 Cal. App. 4th 625, 639 (Cal. Ct. App. 2003), as modified on denial of reh'g (Mar. 20, 2003) ("no amount of contractual disclaimers avowing this was a debtor-creditor relationship instead of a joint venture can turn it into something it was not").

and each taking responsibility for certain aspects of the venture. (Plf. Add'l. SOF ¶¶ 16-17; Plf. Resp. CCL/VOMT SOF ¶ 36; Plf. Resp. Berkley SOF ¶¶ 68, 75.) VOMT's and CCL's contribution of labor to the joint venture (both in the form of labor to generate sales leads, and labor onsite at Berkley properties to ensure that the needs of those individuals are met) is sufficient to establish the joint pecuniary interest, because they lose the value of that time and labor if Berkley cannot sell its products to the leads that VOMT and CCL provide. *See, e.g., Ashworth v. United States*, No. 4276, 1971 WL 425, at *8 (S.D. Ill. Oct. 14, 1971) (recognizing joint venture where, "under the terms of th[e] agreements[,] the parties [we]re to share in the proceeds of the sale of any crop; and [one party wa]s to contribute the land while the [other parties we]re to contribute the cash"); *see also Kovacik v. Reed*, 49 Cal. 2d 166, 169 (Cal. 1957) (recognizing that joint venture can exist with one party contributing capital and another contributing labor). In addition, Berkley's Chief Financial Officer acknowledges that the compensation agreement between Berkley and VOMT is set up to ensure that VOMT shares the risk of their venture. (Plf. Add'l. SOF ¶¶ 16-19, 62-63; Plf. Resp. CCL/VOMT SOF ¶¶ 21, 36; Plf. Resp. Berkley SOF ¶¶ 27, 68, 75.)

Ignoring this evidence, Berkley appears to rely primarily on the fact that VOMT and CCL purportedly cannot bind Berkley to anything because only licensed timeshare sales people can sell timeshares in Florida, and VOMT and CCL do not require their employees to have such a license. (Dkt. 343 at 29-30.) That argument misses the point. Joint venturers need not be able to bind each other with respect to every single action to establish the requisite "joint control." As noted in *Hellenic Lines, Ltd.*, "joint venturers may agree that responsibility for particular tasks shall reside with less than all the venturers." 611 F. Supp. at 679. Here, Berkley, CCL, and VOMT agreed that CCL and VOMT would be responsible for generating leads for Berkley's timeshare sales, and that Berkley would be responsible for closing the sales for those leads. Moreover, CCL and VOMT *do* have the right to bind Berkley to provide tours to all CCL/VOMT customers who purchase an upgraded

vacation package from CCL, and either party can veto Berkley selling certain products to leads that VOMT/CCL provide. (Plf. Resp. Berkley SOF ¶¶ 70, 67.) At a minimum, then, there is a genuine dispute of material fact that precludes summary judgment regarding each party's right of control for the joint venture.[33]

## VIII. CCL is Not Entitled to Summary Judgment on Calls that Are not Part of the Class, or on "All Calls to Residential Landlines."

CCL's final argument has two parts. First, it contends that it is entitled to summary judgment on any calls that the Named Plaintiffs received that CCL does not believe referenced free cruises. (Dkt. 341 at 26-29.) Second, it contends that Named Plaintiff Stone does not have the type of proof that the class definition requires to demonstrate class membership. According to CCL this means that there is no class representative for the residential class and that CCL is therefore entitled to summary judgment on all calls to landlines. (*Id.* at 28-29.) CCL is wrong on all accounts. As it acknowledges, only calls that referenced a free cruise are part of the Classes. But that does not mean that CCL is entitled to summary judgment on other calls. More importantly, the Named Plaintiffs have provided evidence that all of the calls they received did reference a free cruise. (Plf. Add'l. SOF ¶¶ 67, 70, 73, 75; Plf. Resp. CCL/VOMT SOF ¶¶ 60, 65-68, 73-75.) Again, that CCL disbelieves Plaintiffs, without citing any record evidence to reasonably dispute Plaintiffs' claims, does not mean that CCL is entitled to summary judgment on any of the calls that Plaintiffs received.

With respect to Stone, CCL is wrong when it argues that she has not provided the type of records that the Court's class certification order requires to prove she is a class member. Namely, Stone submitted contemporaneous records of the calls she received on her landline—in the form of

---

[33]     Berkley also contends that *Skeen v. Carnival Corp.*, No. 08-22618, 2009 WL 1117432 (S.D. Fla. Apr. 24, 2009) shows there is no joint proprietary interest. (Dkt. 343 at 30-31.) That is wrong. In *Skeen*, the court granted a motion to dismiss where plaintiff alleged that a tour operator was in a joint venture with a cruise company. But unlike in this case, the extent of that relationship was limited to the tour company booking tours for cruise ship passengers. As described above, the parties in this case have a far deeper relationship.

complaints that she made to the Washington Attorney General's Office, as well as to a law firm—documenting the calls. (Plf. SOF ¶ 53; Plf. Resp. CCL/VOMT SOF ¶ 73.) As Plaintiffs acknowledged in their class certification briefing, the residential landline calls did not show up on her telephone records, but that "is because her landline carrier 'does not keep or have records for every incoming or outgoing call,'" (Dkt. 202 at 27, n.21 *see also* Plf. Resp. CCL/VOMT SOF ¶ 73.) The Court specifically rejected Defendants' argument that Stone was not a proper class representative because she "'could not match those calls identified in her interrogatories to her telephone records' and kept 'no notes' on the calls." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 252 (N.D. Ill. 2014) (quoting CCL and VOMT opposition to Plaintiffs' motion for class certification).

The Court's class certification order provides examples of the type of proof that class members might submit to prove class membership, such as telephone records, voicemails, or screenshots showing the calls, but the order does not say that those are the only type of records upon which class members may rely. Plaintiffs submit that Stone's near-contemporaneous complaints regarding the offending calls are similar to screen shots that a class member may have taken of the calls and that such records—in addition to her sworn interrogatory answers and deposition testimony—should be sufficient to establish class membership. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015) (post-*Birchmeier* case holding that ascertainability can be met even if only way to identify class members is through affidavits, and noting that treason is the only "type of case in American law where the testimony of one witness is legally insufficient to prove a fact").

Nevertheless, even if the Court disagrees and believes that Stone's supporting evidence is not sufficient to prove her membership in the residential class, that does not mean that CCL is entitled to summary judgment on her claims, or that there are no current class representatives for

individuals who received landline calls. And, it likewise certainly does not mean that CCL is entitled

to summary judgment for calls made to landlines. First, each Named Plaintiff and each class member

suffered the exact same injury, an unsolicited robocall call made using a prerecorded voice, and that

is illegal whether it was made to a cellular telephone or a residential landline telephone. Therefore,

each Named Plaintiff is an appropriate class representative for both classes, and that is how the

Court's order is written. (*See* Class Certification Order, Dkt. 241 at 31 (certifying classes and

appointing Named Plaintiffs as class representatives).) Second, even if the Court determined that

Stone was not part of the residential class, she would still have an individual claim against the

Defendants, and the merits of that claim would turn on the same principles and evidence, as the

class claims.

Finally, Stone's status as a class representation has nothing to do with whether CCL is

entitled to summary judgment on all calls to residential telephones. The issue of class certification is

separate from the issue of liability, and so the fact that a class may need a new representative does

not mean that the defendant is entitled to summary judgment on the merits of the classes' claims.

Indeed, the certified class has standing on its own, and the appropriate remedy if the Court

determines that Stone's documentation is insufficient (and that neither her nor any of the other

Named Plaintiffs are appropriate representatives for those who received residential landline calls)

would be to appoint a new class representative—no to decertify the residential class. *Cf. Morlan v.

Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("After a suit is certified as a class

action, a loss of standing by the named plaintiff does not destroy or (if it affects just one of several

claims) curtail the federal court's jurisdiction; he can be replaced by a member of the class who has

standing."). Moreover, determining which class members have valid claims is a normal part of

litigation, and the fact that one class member may not have sufficient proof under the Court's class

definition obviously does not mean that CCL is entitled to summary judgment against the class as a

whole. *See, e.g., Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084-85 (7th Cir. 2014) ("To require the district judge to determine whether each of the 150 members of the class has sustained an injury—on the theory that if 140 have not, and so lack standing, and so should be dropped from the class, certification should be denied and the 10 remaining plaintiffs be forced to sue (whether jointly or individually)—would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified. The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.") (emphasis in original).

As such, this argument—like their others—does not support the entry of summary judgment against Plaintiffs here.

### **CONCLUSION**

For the reasons set forth above, the Court should deny Defendants' motions for summary judgment.


Respectfully submitted by:

| | |
|---|---|
| /s/ Rafey S. Balabanian | /s/ Scott R. Rauscher |
| Jay Edelson | Scott R. Rauscher |
| Rafey S. Balabanian | Michael I. Kanovitz |
| Eve-Lynn J. Rapp | Jonathan I. Loevy |
| EDELSON P.C. | LOEVY & LOEVY |
| 350 North LaSalle Street, Suite 1300 | 312 N. May Street, Suite 100 |
| Chicago, Illinois 60654 | Chicago, Illinois 60607 |
| Telephone: (312) 589-6370 | Telephone: (312) 243-5900 |
| Email: jedelson@edelson.com | Email: scott@loevy.com |
| rbalabanian@edelson.com | jon@loevy.com |
| cdore@edelson.com | mike@loevy.com |
| erapp@edelson.com | |
| *Class Counsel* | *Class Counsel* |

## CERTIFICATE OF SERVICE

I, Scott R. Rauscher, hereby certify that on December 23, 2015, I caused the foregoing to be filed by the Court's CM/ECF system and to be served on all counsel of record.

/s/ Scott R. Rauscher