**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

GERARDO ARANDA, GRANT
BIRCHMEIER, STEPHEN PARKES, and
REGINA STONE, on behalf of themselves and
a class of others similarly situated,
*Plaintiffs*,

*v.*

CARIBBEAN CRUISE LINE, INC.,
ECONOMIC STRATEGY GROUP,
ECONOMIC STRATEGY GROUP, INC.,
ECONOMIC STRATEGY, LLC, THE
BERKLEY GROUP, INC., and VACATION
OWNERSHIP MARKETING TOURS, INC.,
*Defendants.*

Case No. 1:12-cv-04069

Honorable Matthew F. Kennelly

**PLAINTIFFS' AND THE CLASSES' REPLY IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.   The Undisputed Evidence Shows Each Named Plaintiff Received a Robocall
     Offering a Free Cruise in Exchange for Taking a Political Survey ................................... 2

     A.   There is no requirement that a called party hear an illegal call ........................... 2

     B.   Plaintiffs each received and heard Defendants' robocalls ..................................... 4

II.  Defendants Have Failed to Adduce Any Evidence to Demonstrate that Their
     Robocalls Could be Exempt from the TCPA ........................................................... 8

III. Vicarious Liability Cannot be Determined Here on Summary Judgment ................... 12

     A.   This Court has already ruled that Plaintiffs' pleadings sufficiently
          raise vicarious liability and, in any event, there is no requirement to
          plead legal theories ......................................................................................... 13

     B.   The question of agency is a factual issue and can be determined only if
          the underlying facts are undisputed and only one inference can be
          drawn from them ............................................................................................. 14

     C.   There are numerous disputes about the facts related to Defendants'
          liability as well as the "reasonable inferences" that can be drawn from those
          facts .................................................................................................................. 17

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT

*Campbell-Ewald Co. v. Gomez*, 577 U.S. ____ (Jan. 20, 2016)...................................................................3, 15

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012) ...........................................................................3

### UNITED STATES CIRCUIT COURT OF APPEALS

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) ........................................19

*Alioto v. Town of Lisbon*, 651 F.3d 715 (7th Cir. 2011) ...................................................................13

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) ........................................................................14

*CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. 2010)........................................3

*Cent. States Trucking Co. v. J.R. Simplot Co.*, 965 F.2d 431 (7th Cir. 1992)................................13

*Charvat v. NMP, LLC*, 656 F.3d 440 (6th Cir. 2011) .......................................................................3

*Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742 (7th Cir. 1998)................................. 14, 16

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012)........................................... 10, 11

*Fenje v. Feld*, 398 F.3d 620 (7th Cir. 2005) ....................................................................................6

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ............................................................9

*Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741 (7th Cir. 2010) ........................................................13

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365 (6th Cir. 2015) ...........................................15

*M.J. ex rel. Beebe v. United States*, 721 F.3d 1079 (9th Cir. 2013)..............................................15

*Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687 (7th Cir. 2000)....................................5, 6

*Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859 (7th Cir. 1998)......................................14

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)...........................................................7

*Patriotic Veterans, Inc. v. State of Indiana*, 736 F.3d 1041 (7th Cir. 2013) .....................................3

*Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir.1989)..........................................................16

*Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999) .....................................................................15

*Smith v. Lamz*, 321 F.3d 680 (7th Cir. 2003) ................................................................................5

*Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724 (7th Cir. 2014) ................................... 16, 17

*Valenti v. Qualex, Inc.*, 970 F.2d 363 (7th Cir. 1992)............................................................ 16, 17

*Ybarra v. Dish Network, L.L.C*, 807 F.3d 635 (5th Cir. 2015) ..................................................2, 3

## UNITED STATES DISTRICT COURT

*Bank v. Caribbean Cruise Line*, No. 12-cv-00584 (E.D.N.Y. Aug. 26, 2013)........................ 10, 11

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014) ..................................3, 7

*Fenje v. Feld*, 301 F. Supp. 2d 781 (N.D. Ill. 2003) ................................................................6

*Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152 (N.D. Ill. 2009) ...................................3

*Hurst v. Mauger*, No. 11 C 8400, 2013 WL 1686842 (N.D. Ill. Apr. 16, 2013) ........................15

*International Paper Co. v. Androscoggin Energy LLC*,
    No. 00-cv-6215, 2002 WL 31155069 (N.D. Ill. Sept. 26, 2002) .......................................6

*Jones v. All Am. Auto Prot., Inc.*,
    No. 314CV00199, 2015 WL 7566685 (D. Nev. Nov. 24, 2015) ..................................15

*Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014).............................2, 3

*Kostovetsky v. Ambit Energy Holdings, LLC*,
    No. 15 C 2553, 2016 WL 105980 (N.D. Ill. Jan. 8, 2016) ...........................................13

*Kristensen v. Credit Payment Servs. Inc.*,
    No. 12-CV-00528, 2015 WL 4477425 (D. Nev. July 20, 2015)...................................16

*Liberty Mut. Ins. Co. v. Tokio Marine & Fire Ins. Co.*,
    No. 03 C 4765, 2004 WL 2125411 (N.D. Ill. Sept. 22, 2004) .......................................6

*Makaron v. GE Sec. Mfg., Inc.*,
    No. CV-14-1274, 2015 WL 3526253 (C.D. Cal. May 18, 2015) ..................................16

*Mey v. Pinnacle Sec., LLC*,
    No. 11CV47, 2012 WL 4009718 (N.D.W. Va. Sept. 12, 2012) ..................................15

*Pulliam v. City of Chicago*, No. 08 C 7318, 2010 WL 3238837 (N.D. Ill. Aug. 12, 2010) ..........................6

*Siding & Insulation Co. v. Alco Vending, Inc.*,
    No. 1:11 CV 01060, 2015 WL 1858935 (N.D. Ohio Apr. 22, 2015).........................15

*Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765 (N.D. Ill. 2014)...................................... 18, 19

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) .............................................................15

*USA Certified Merchants, LLC v. Koebel*, 273 F. Supp. 2d 501 (S.D.N.Y. 2003) ........................................15

*Wengle v. DialAmerica Mktg.*, Inc.,
     No. 14-cv-10655, 2015 WL 5595505 (E.D. Mich. Sept. 22, 2015) ..................................... 11, 12

*Young v. Cty. of Cook*, 616 F. Supp. 2d 834 (N.D. Ill. 2009) ......................................................................17

*Youngblood v. Alliance Pharm.*, No. 95-cv-2796, 1998 WL 676800 (E.D. La. Sept. 30, 1998).................15

## STATE COURT

*Applestein v. Fairfield Resorts*,
     No. 0004 SEPT.TERM 2007, 2009 WL 5604429 (Md. Ct. Spec. App. July 8, 2009).............15

## RULES & STATUTES

47 C.F.R. § 64.1200 ......................................................................................................................2, 3, 8, 9, 19

47 U.S.C. § 227...........................................................................................................................................2, 8

N.D. Ill. L.R. 56.1 ......................................................................................................................................5, 6

## MISCELLANEOUS

*2015 TCPA Omnibus Declaratory Ruling and Order*, 30 F.C.C. Rcd. 7961 (2015) .........................................2

3 C.J.S. Agency § 547 (1973).......................................................................................................................14

*In Re Richard Gilmore d/b/a Democratic Dialing* (FCC File No. 12- 00004943) ........................................8, 9

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
     18 F.C.C. Rcd. 14014 (2003) .........................................................................................................9, 10

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
     27 F.C.C. Rcd. 1830 (2012) .................................................................................................................8

*In the Matter of R. and Regulations Implementing the Tel. Consumer Protec. Act of 1991*,
     20 F.C.C. Rcd. 3788 (2005) ...............................................................................................................12

## INTRODUCTION

Plaintiffs and the Classes moved for partial summary judgment against Defendants Berkley Group, Inc. ("Berkley"), Caribbean Cruise Line ("CCL"), and Vacation Ownership Marketing Tours, Inc. ("VOMT") on the only issues where the material facts are undisputed and a trial is unnecessary: that each of the Class representatives and the Class members received a prerecorded voice call on their respective cellular or landline telephone without their consent. CCL and VOMT concede there is no evidence of consent, but seek to avoid partial summary judgment by arguing that: (1) Plaintiffs have not provided evidence that the robocalls used a prerecorded voice or an ATDS; (2) not all the calls fit within the Class Definitions; (3) Plaintiffs have not presented sufficient evidence that they received the robocalls at issue; and (4) all the calls are exempt because they were made by a political non-profit entity. CCL's and VOMT's claims that any of these issues are in dispute blinks reality.

Instead of addressing the substance of Plaintiffs' Motion, Berkley merely adopts (in a single footnote) CCL's and VOMT's brief, and then all three Defendants repeat the flawed vicarious liability arguments from their own cross-motions and contend that Plaintiffs are misconstruing the evidence about the scope of their relationships, knowledge of and/or involvement in the robocalling, and profiteering from their rampant TCPA violations. If anything, Defendants' Oppositions demonstrate why summary judgment is not appropriate on the issue of vicarious liability—the Parties strongly disagree on the material facts and the inferences that should be drawn from those material facts. As Plaintiffs have previously stated, this is not one of those rare instances when vicarious liability can be decided on summary judgment, and the Court should not decide this issue here.

**ARGUMENT**

**I.     The Undisputed Evidence Shows Each Named Plaintiff Received a Robocall Offering a Free Cruise in Exchange for Taking a Political Survey.**

CCL and VOMT first argue that Plaintiffs are not entitled to partial summary judgment because they failed to produce evidence showing that each of the Plaintiffs heard one of Defendants' robocalls. (CCL/VOMT Opp. at 6-8.)[1] That is not the law. There is no requirement that a called party actually hear the violative robocall, but even if that was the law, each of the Plaintiffs has provided ample unrefuted evidence—by citing to either Defendants' or their own records and testimony—demonstrating both the requisite TCPA violation and their Class membership.

**A.     There is no requirement that a called party hear an illegal call.**

As an initial matter, CCL's and VOMT's reference to the Fifth Circuit's decision in *Ybarra v. Dish Network, L.L.C*, 807 F.3d 635, 639 (5th Cir. 2015) to argue that "Plaintiffs must demonstrate that the prerecorded messages . . . actually resulted in the recording being played" (CCL/VOMT Opp. at 6-7), cannot withstand scrutiny. Foremost, such a requirement would completely ignore the explicit and binding language of the TCPA—which makes it unlawful to "make" or "initiate" calls "using an artificial or prerecorded voice," 47 U.S.C. § 227 (b)(1)(A)(iii) and 47 U.S.C. § 277 (b)(1)(B), respectively—as well as the Federal Communications Commission's implementing regulation, which similarly states that "[n]o person or entity may . . . *initiate* any telephone call" to a cellular telephone service or any residential line using a prerecorded voice. 47 C.F.R. § 64.1200 (a)(1)(iii), 47 C.F.R. §

---

[1]     CCL and VOMT focus much of their effort here on an argument that Plaintiffs have not demonstrated that the robocalls at issue were made using an ATDS—a fact set forth only in a footnote in Plaintiffs' Motion. (*See* Dkt. 336 at 7, n. 2.) The uncontroverted evidence shows that these prerecorded voice calls, as they almost always are, were made with equipment that dialed thousands of telephone numbers at random from a database in a short period of time, which is more than sufficient to find the system an ATDS under the FCC's recent order. *See 2015 TCPA Omnibus Declaratory Ruling and Order*, 30 F.C.C. Rcd. 7961, 7973-74 (2015).

64.1200 (a)(3) (emphasis added). Such authority is binding, and may not be ignored. *See Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *1 (N.D. Ill. July 7, 2014) (Kennelly, J.) ("under the Administrative Orders Review Act (more commonly called the Hobbs Act), the [FCC's] interpretation [of the TCPA] is binding on federal district courts") (citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 449–50 (7th Cir. 2010)); *cf. Campbell-Ewald Co. v. Gomez*, 577 U.S. _____, slip op. at 14 (Jan. 20, 2016) (noting there was "no cause to question" the FCC's ruling regarding TCPA violations).

Moreover, accepting *Ybarra* by reading a "received and played" requirement into the text of the TCPA would frustrate its underlying purpose—to prohibit "intrusive nuisance calls" Congress determined were an invasion of privacy—by making calls actionable *only* if they were actually answered. *See Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012); *see also Patriotic Veterans, Inc. v. State of Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013) (referring to "Congress's goal" in enacting TCPA "to protect the privacy of citizens against unsolicited telephone calls"). As this Court aptly recognized in its certification opinion, "a call remains annoying and intrusive even if the subscriber for the number dialed is not the one answering." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 246 (N.D. Ill. 2014) (Kennelly, J.). And that is why courts have consistently held that a TCPA violation occurs—for both call and fax violations—upon initiation, rather than requiring that a message actually played and/or was received. *See, e.g., Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009) (holding that "[o]n its face, the [TCPA] prohibit[s] the *sending* of unsolicited fax advertisements and make[s] no reference at all to receipt, much less to printing") (emphasis added); *Charvat v. NMP, LLC*, 656 F.3d 440, 448 (6th Cir. 2011) (explaining that the "regulations focus on the telephone call itself . . ." and "[t]he violation of the regulation [under subsection 47 C.F.R. § 64.1200(d)] is therefore the *initiation* of the phone call without having

implemented the minimum procedures") (emphasis added and citation omitted). As such, the Fifth

Circuit's ruling that a TCPA violation has not occurred unless an individual demonstrates that she

answered that call and a prerecorded message actually played (as opposed to a making a showing

that defendant made a call that contained a prerecorded message or voice) is inconsistent with the

TCPA's purpose and an incorrect interpretation of the law.

### B. Plaintiffs each received and heard Defendants' robocalls.

Regardless of who's right about this aspect of TCPA jurisprudence, Plaintiffs put forth

unrefuted evidence that (i) every one of the robocalls at issue contained a prerecorded survey

message, and that (ii) each Plaintiff received such a call on either their landline or cellular telephone,

or both. (Plf. SOF ¶¶ 29-33, 45-55; Plf. Resp. CCL/VOMT Add'l. SOF ¶¶ 74-82.) In addition, there

can be no doubt (and Defendants do not dispute) that every one of the more than two million calls

that was transferred to CCL[2]—such as the call Plaintiff Aranda received—contained a prerecorded

message and that the call recipient heard the "free" cruise message. (*see, e.g.*, Dkt. 389, Berkley Resp.

Plfs. SOF ¶ 33 (admitting that each class member who completed the survey "was transferred to a

live CCL sales representative and received a pitch for an upgraded vacation package," and failing to

refute that the survey was prerecorded); Dkt. 373, CCL/VOMT Resp. Plfs. SOF ¶ 33 (only

disputing that every call made by the ESG Defendants offered a free cruise, but not disputing that

each class member who completed the prerecorded survey was transferred to CCL).)

Plaintiffs have likewise demonstrated that the remaining calls—i.e., those calls made to Class

members but not transferred to CCL—similarly contained a prerecorded message through the

following evidence:

---

[2]    As discussed elsewhere, CCL's records indicate that nearly two million calls were transferred to CCL and lasted more than thirty seconds (the metric for paying the lead broker). (Plf. SOF ¶ 41.) CCL has not provided records showing how many additional calls were transferred but lasted less than thirty seconds after the transfer. Those calls, of course, were also heard by the Class members who answered them and completed the survey.

(i)     direct testimony from DeJongh admitting that he utilized Voice Talent's online software services to record the survey messages (*see* Plf. SOF ¶ 27; Berkley Resp. Plfs. SOF ¶ 27 (admitting that "to effectuate the survey calls, DeJongh drafted and recorded his prerecorded surveys using non-party Voice-Talent's online software services")))[3] and confirming that ESG was a "company that solicited survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer") (Plfs. SOF ¶ 29 (citing Plfs. SOF Ex. 14, DeJongh Dep. at 37); Berkley Resp. Plfs. SOF ¶ 29 ("noting that it is undisputed that DeJongh testified that he used prerecorded messages"); CCL/VOMT Resp. Plfs. SOF ¶ 29 (same));

(ii)    the express language of CCL's contract with the ESG Defendants, which states that ESG would "solicit[] survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer"(Plfs. SOF ¶ 29 (citing Plfs. SOF Ex. 16, Supplier Agreement Between ESG and CCL at CCL.R.26.000001));

(iii)   letters sent by ESG to government officials admitting that the "ESG conducted political surveys via pre-recorded messages" and that it did so using a leased dialer (Plfs. SOF ¶ 29 (citing Plfs. SOF Exs. 20-21));

(iv)    Plaintiffs' own experiences and testimony confirming they each heard the prerecorded messages (Plfs. SOF ¶¶ 45, 47-49, 51, 53); and

(v)     physical evidence of the actual prerecorded messages that played on the calls. (Plfs. SOF ¶ 29 (citing Plfs. SOF Ex. 14, DeJongh Dep. at 287:2-10 (identifying CCL.R.26.000232 as one of the prerecorded message used by ESG) and Plfs. SOF Ex. 19.)

Notably, none of the Defendants provides contrary or additional facts to dispute this evidence, and Berkley even concedes that "Dejongh [sic] testified that he used prerecorded messages" to make the calls. (Dkt. 373, CCL/VOMT Resp. Plfs. SOF ¶ 29; Dkt. 389, Berkley Resp. Plfs. SOF ¶ 29). *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed

---

[3]     In responding to Plaintiffs' statements, Berkley does not dispute the fact that Jacob DeJongh drafted and "recorded his prerecorded political surveys using non-party Voice Talent's online software services." (*See* Dkt. 389, Berkley Resp. Plfs. SOF ¶ 27.) Responding to that same paragraph, CCL and VOMT do not even address the statement that DeJongh drafted and recorded his prerecorded surveys. Rather, they respond only to an issue that Plaintiffs did not make in that paragraph, regarding the purported role of the political action committees in contributing to the content of surveys. (Dkt. 373, CCL/VOMT Resp. Plfs. SOF ¶ 27). Thus, those facts should be deemed admitted. *See Smith*, 321 F.3d at 683.

admitted for purposes of the motion) (citing *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) and N.D. Ill. L.R. 56.1(b)). The only argument that Defendants can muster to challenge this fact is that Plaintiffs' facts cannot be presented in an admissible form. But Berkley does not explain why Plaintiffs' uncontroverted evidence would be inadmissible (*see* Dkt. 389, Berkley Resp. Plfs. SOF ¶ 29) and CCL and VOMT challenge only the admissibility of a letter "sent 'from ESG' to an attorney general" on the grounds that "it was never authenticated." (*See* Dkt. 373, CCL/VOMT Resp. Plfs. SOF ¶ 29.) The Court should reject these arguments: the evidence upon which Plaintiffs rely includes sworn testimony and documents the ESG Defendants produced during discovery, all of which are appropriately considered in deciding motions for summary judgment. *See Pulliam v. City of Chicago*, No. 08 C 7318, 2010 WL 3238837, at *4 (N.D. Ill. Aug. 12, 2010) (holding several Local Rule 56.1 paragraphs to be admitted where party failed to cite the specific Federal Rules of Evidence that would render the statements inadmissible); *Fenje v. Feld*, 301 F. Supp. 2d 781, 809 (N.D. Ill. 2003) ("Documents produced by an opponent during discovery may be treated as authentic.") (citing *International Paper Co. v. Androscoggin Energy LLC*, No. 00-cv-6215, 2002 WL 31155069 *2 (N.D. Ill. Sept. 26, 2002), *aff'd*, 398 F.3d 620 (7th Cir. 2005)).[4]

Plaintiffs have also demonstrated that they each received a call with a robotic message on their landline or cellular telephones. (Plfs. SOF ¶¶ 29-33, 45-55; Plfs. Resp. CCL/VOMT Add'l. SOF ¶¶ 74-82.) Specifically, Plaintiff Aranda's cellular phone number appears in CCL's records, so there is no dispute that he heard the political survey or that the "free cruise" message played. (Plfs. SOF ¶ 45; Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 76.) Moreover, Aranda, Birchmeier, and Parkes

---

[4]     Moreover, Defendants have no valid basis to question the letter's credibility, and they have not provided any justification to argue that it is not otherwise authentic. *See Liberty Mut. Ins. Co. v. Tokio Marine & Fire Ins. Co.*, No. 03 C 4765, 2004 WL 2125411, at *1 (N.D. Ill. Sept. 22, 2004) ("Even if a document is not properly authenticated, a party is not acting in good faith in raising an objection if the party knows that the document is nevertheless authentic."). Nevertheless, given the abundance of undisputed evidence corroborating that each call contained a prerecorded message, Defendants' admissibility challenge is entirely unavailing.

have each provided Defendants with copies of their telephone records and specifically testified about their receipt of and the content of the prerecorded calls. (Plfs. SOF ¶¶ 45, 47-49, 51.)[5] Notably, in so testifying, each and every one of them recalled being offered a "free" cruise and could recall the survey company by name. (*Id*; Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 76.) Stone has similarly provided detailed testimony evidencing her receipt of Defendants' calls and that she heard their prerecorded message, along with contemporaneous records documenting the same. (Plfs. SOF ¶ 53; Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 81.) Such records—which include contemporaneous complaints made to the Washington Attorney General's Office and a law firm complaining about the fact that she received such calls, and the fact that they were made to both her residential and cellular telephone numbers (Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 81)—demonstrate that she was a victim of Defendants' rampant TCPA violations and that her calls easily meet the requirements of both the Cellular Telephone and Landline Class.[6] The unrebutted evidence that each Plaintiff has provided is more than sufficient to satisfy their burden of proof. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015) (noting that treason is the only "type of case in American law where the testimony of one witness is legally insufficient to prove a fact").

---

[5] CCL/VOMT themselves admit that Birchmeier "answered and heard a 'recorded message . . . from Political Opinions of America' prompting him to 'take a 30-second political survey' in return for a free two-day cruise." (Dkt. 373, CCL/VOMT Add'l. SOF ¶ 60.)

[6] Stone explained that Defendants' calls to her residential number did not appear on her telephone records because "her landline carrier 'does not keep or have records for every incoming or outgoing call,'" (Dkt. 202 at 27, n.21 *see also* Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 81)—and the Court specifically rejected Defendants' argument that she was not a proper class representative because she "could not match those calls identified in her interrogatories to her telephone records' and kept 'no notes' on the calls." *Birchmeier*, 302 F.R.D. at 252 (quoting CCL's and VOMT's opposition to Plaintiffs' motion for class certification). But even if the Court now agrees that Stone is not a proper representative for the Landline Class, that would not entitle Defendants to summary judgment against the entire Landline Class, as the issues of class membership are separate from issues relating to the merits of Plaintiffs' and the Classes' claims, and the other Plaintiffs (or another member from the Class) could represent the Landline Classes' claims. *See* Plaintiffs' Omnibus Opposition, Dkt. 376 at 58-59.

Therefore, the Court should find that Plaintiffs each received the robocalls at issue, and that such calls violated the TCPA. Similarly, the Classes are entitled to summary judgment on the ground that the calls violated the TCPA.

## II. Defendants Have Failed to Adduce Any Evidence to Demonstrate that Their Robocalls Could be Exempt from the TCPA.

CCL and VOMT next claim that the calls do not violate the TCPA because they fall under one of the statute's limited exemptions. (CCL/VOMT Opp. at 10-14.) Notably, Defendants do not contend that Plaintiffs (or any of the Class members) consented to the receipt of the calls. (Dkt. 389, Berkley Resp. Plfs. SOF ¶¶ 46, 50, 52, 54; Dkt. 373, CCL/VOMT Resp. Plfs. SOF ¶¶ 46, 50, 52, 54.) Rather, their sole argument is that the calls are immune from liability under the TCPA's "non-commercial" exemption because they were "placed by tax exempt nonprofit organizations." (CCL/VOMT Opp. 10-14.) Plaintiffs agree that Congress has excused certain "non-telemarketing, informational calls" made to landlines from the purview of the TCPA, *see In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1841 (2012) (the "2012 FCC Order") (emphasis in original), but CCL's and VOMT's contention that these robocalls should be afforded this protection is wrong.

First, and as noted in Plaintiffs' opening Motion, the non-commercial call exemption on which CCL and VOMT now rely **does not** apply to calls made to cellular telephones. *See* 2012 FCC Order, 27 F.C.C. Rcd. at 1841; *see also* 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1)(iii); *In Re Richard Gilmore d/b/a Democratic Dialing* (FCC File No. 12- 00004943), Dkt. 336, Ex. A at 3-4 (noting that there is no exemption for political calls to cellular telephones). As such, even if Defendants were able to demonstrate a disputed factual issue in this regard with respect to calls

made to landlines (and they cannot), this exception would not excuse the calls made to Plaintiffs and members of the Cellular Telephone Class.[7]

The exemption similarly does not apply to Defendants' residential landline calls, as the record makes clear that each of the calls contained telemarketing messages that were designed to sell vacation packages and increase their profits. (Plfs. SOF ¶¶ 16, 33-36, 41, 42.) *See* 2012 FCC Order, 27 F.C.C. Rcd. at 1841 (noting that the exemption applies *only* "to the extent that [the calls] do not contain telemarketing messages"); 47 C.F.R. § 64.1200(f)(12) (defining "telemarketing" to mean the "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person"); *see also In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14149 (2003) (the "2003 FCC Order") (same). To be sure, Dan Lambert specifically referred to the robocalling campaign as the "next great mouse trap . . . as far as sales go" (Plfs. SOF ¶ 42), and each Defendant obtained numerous leads and profited from the campaign. (*Id.*) Plaintiffs have likewise demonstrated that every Class member who completed a survey was offered a materially identical pitch for an upgraded vacation package that included a mandatory presentation at one of Berkley's timeshare properties. (Plfs. SOF ¶¶ 32-36.) Given the FCC's ruling that "a message that seeks people to help sell or market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, *during or after* the call," 2003

---

[7]     CCL and VOMT at least implicitly acknowledge the exemption does not apply to calls made to cellular telephones, but then assert, without support, that "there is no reason [the exemption] should not be applied to cellular telephones as well." (CCL/VOMT Opp. at 13.) That is simply wrong. The plain language of the TCPA shows that there is no exemption for unsolicited political robocalls made to cellular telephones, and courts and the FCC have interpreted the statute consistent with that plain language. *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 273 (3d Cir. 2013) (in debt collection case, holding that "the content-based exemptions" for certain types of calls made to landlines do not apply to calls made to cellular telephones); *see also In re Richard Gilmore*, Dkt. 336, Ex. A at 3-4. In any event, given that none of Defendants' calls—whether made to a landline or cellular telephone—are subject to this protection anyway, their argument is irrelevant.

FCC Order, 18 F.C.C. Rcd. 14014 at 14098-99 (emphasis added), there is no question that these calls constitute impermissible telemarketing communications and are not entitled to any exemption.

Nonetheless, CCL and VOMT rely on a handful of "facts" to argue that ESG's calls were informational (i.e. non-commercial) in nature. These so-called facts are not true. Most importantly, no reasonable person could determine that DeJongh "would have conducted the surveys" absent the free cruise offer, as CCL and VOMT now claim. ESG's brokers specifically testified that the calls would not have been possible without the free cruise incentive (Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 64), and, in fact, calls without a free cruise offer only occurred during a "test" period that only lasted "one day." (*Id.* (citing Plf. Add'l. SOF Ex. 58, Broomfield Dep. at 58).)[8] Moreover, although the ESG Defendants claim to have entered into agreements with various political organizations that they claim controlled the content of and benefitted from the surveys, none of the contracts between the ESG Defendants and the PACs were entered into prior to October 2011, which was months after Defendants began obtaining leads as a result of the calls, in August 2011. (*Id.*) Nevertheless, even accepting Defendants' rendition of the facts as true for purposes of summary judgment, the calls were at least in part designed to sell Defendants' vacation packages, and thus violated the TCPA even if they were also designed to deliver some sort of political message. *See* 2003 FCC Order, 18 F.C.C. Rcd. at 14089 (explaining that an entity cannot seek to "immunize itself by simply inserting purportedly 'non-commercial' content into [an otherwise commercial] message"); *see also Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 917 (9th Cir. 2012) ("The FCC has determined that so-called 'dual purpose' calls, those with both a customer service or informational component as well as a marketing component, are prohibited [under the TCPA].") (citing the 2003 FCC Order, 18 F.C.C. Rcd. 14014 at ¶ 14095). Indeed, CCL made the exact same argument in *Bank v. Caribbean Cruise Line*,

---

[8]     Of course, even if certain of ESG's calls did not include a free cruise offer, this would not mean that its "free" cruise calls are entitled to the exemption.

and the Eastern District of New York rejected it outright. No. 12-cv-00584, Dkt. 49 (E.D.N.Y. Aug.

26, 2013), at 12-13 (rejecting CCL's argument that "the robocalls' political survey content, which is

only part of the call, exempts the free cruise message from TCPA liability," despite that CCL

produced "survey research agreements," "draft survey questions," and "statistical compilations of

survey answers") (attached as Plfs. SOF Ex. 47).

    CCL and VOMT do not provide any valid basis to stray from the FCC's prior rulings or the

*Bank* and *Chesbro* decisions. Instead, they rely on a single opinion from the District of Michigan—

*Wengle v. DialAmerica Mktg.*, Inc., No. 14-cv-10655, 2015 WL 5595505, *4 (E.D. Mich. Sept. 22,

2015)—where a Michigan district court found that for-profit telemarketer DialAmerica's calls selling

magazine subscriptions were exempt from liability because they were made on behalf of the non-

profit organization, "SOMI." But the facts in *Wengle* are drastically different and not helpful to

Defendants. Specifically, the *Wengle* court rejected the plaintiff's contention that the calls were made

for DialAmerica's "own commercial purpose" because, *inter alia,* (i) the calls "result[ed] in a business

and contractual relationship between the *customer and SOMI* [the non-profit organization]," *id.* at *8

(emphasis in the original), (ii) the "customer pa[id] SOMI directly, [and] the funds [we]re deposited

into a SOMI-controlled bank account," (iii) the unrebutted evidence demonstrated that DialAmerica

was a valid telemarketing entity whose telemarketing efforts were "critical to fulfilling the [non-

profit's] core mission," *id.* at 7, and (iv) each and every call "explain[ed] that [DialAmerica wa]s a

professional fundraiser calling 'for' SOMI," "extoll[ed] [SOMI's] good works, and stress[ed] [its]

financial needs." *Id.* at *7, 9.[9]

---

[9]    CCL and VOMT make much of the fact that the *Wengle* Court relied on the non-profit's ability to
control the content of the telemarketing calls as a basis for reaching its decision (CCL/VOMT Opp. at 12),
but that was not a main factor on which the *Wengle* court relied, and in any event it does not help CCL or
VOMT given the evidence in this case showing that they had the right to edit the scripts as well. To be sure,
though CCL and VOMT claim the PACs had the "right" to alter the survey questions (CCL/VOMT Add'l.
SOF 70), it is absurd to suggest that these entities exerted a similar degree of control over the calls as the non-

In contrast to *Wengle*, the overwhelming beneficiaries of the calls were Defendants' for-profit companies—not the PACs with whom DeJongh claims he contracted—and a relationship between the PACs and the call recipients did not result. Similarly, there is no evidence that the calls were "crucial" to anything other than Defendants' own commercial purpose, which was to encourage call recipients to purchase their vacation products. (Plfs. SOF ¶¶ 16, 33-36, 41-42; Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 70.) Therefore, the *Wengle* decision does not support Defendants' conclusion that the calls at issue here are exempt from the TCPA.

As Defendants have failed to adduce any evidence demonstrating the calls are subject to any TCPA exemptions, Plaintiffs are entitled to summary judgment on these issues as well.

## III.   Vicarious Liability Cannot be Determined Here on Summary Judgment.

Finally, Defendants devote a substantial portion of their briefs to discussing the issue of vicarious liability. To start, CCL and VOMT repeat their assertion that Plaintiffs have failed to adequately plead vicariously liability in their complaint (CCL/VOMT Opp. at 16-17), and Defendants then argue that issues of vicarious liability can and should be determined on this record, despite that Plaintiffs have not even moved for summary judgment on this ground. (CCL/VOMT Opp. at 15-17; Berkley Opp. at 4-8.) In addition to the fact that none of these arguments have merit, even a cursory review of the record makes clear that summary judgment in Defendants' favor is not

---

profit in *Wengle*, given that the calls in this case began well before the contracts with the PACs were ever entered. (Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 64.) Moreover, the *Wengle* Court recognized that prior to enacting the telemarketing program at issue, the FCC ***specifically rejected*** DialAmerica's request to find that its telemarketing calls were subject to the non-commercial exemption on at least two occasion, *see Wengle*, 2015 WL 5595505, at *2 (citing *In the Matter of R. and Regulations Implementing the Tel. Consumer Protec. Act of 1991*, 20 F.C.C. Rcd. 3788, 3799, n.85 (2005)), which prompted DialAmerica to revise its telemarketing program. Importantly, in explaining why the calls in DialAmerica's new program now qualified for the requested exemption, the court explained the ways in which the new program differed—all of which focused on the call recipients' direct relationship with the non-profit organization. *Wengle*, 2015 WL 5595505, at *2. None of the changes discussed mentioned the non-profit's ability to control the content of the calls, which presumable then, is a right the non-profits always had. *Id.* As such, it is clear that the non-profit organization's control over the surveys' content was not the driving force behind the court's ultimate decision, and the Court should disregard Defendants' suggestions to the contrary.

appropriate, and likely, that a review of the evidence will lead the trier of fact to come out the other way.

**A. This Court has already ruled that Plaintiffs' pleadings sufficiently raise vicarious liability and, in any event, there is no requirement to plead legal theories.**

CCL's and VOMT's main argument supporting their position that the question of vicarious liability can be decided on summary judgment is their contention that theories of vicarious liability "must actually be pleaded in the operative complaint." (CCL/VOMT Opp. at 17.) The Seventh Circuit, however, has "stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). The rule is so permissive that "[e]ven citing the wrong statute needn't be a fatal mistake, provided the error is corrected in response to the defendant's motion for summary judgment and the defendant is not harmed by the delay in correction." *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Thus, in the agency context, "[a]ll [Plaintiffs] must plead are facts that would plausibly give rise to an agency relationship." *Kostovetsky v. Ambit Energy Holdings, LLC*, No. 15 C 2553, 2016 WL 105980, at *7 (N.D. Ill. Jan. 8, 2016) (Feinerman, J.).[10]

This Court held years ago that Plaintiffs' Complaint presented facts sufficient "to allege[] each defendant's involvement in making the calls at issue." (Dkt. 77 ¶ 2.) That should be the end of the matter. Assuming, *arguendo*, that the operative Complaint is not sufficiently specific with regard to the types of agency theories on which Plaintiffs intend to proceed, it is still irrelevant because they have explained their legal theories—in detail—well before the summary judgment stage. (*See, e.g.,*

---

[10] This rule has no bearing on whether the existence of an agency relationship is a question of law or a question of fact. *See Cent. States Trucking Co. v. J.R. Simplot Co.*, 965 F.2d 431, 433 (7th Cir. 1992) ("Although agency is a legal concept, whether particular 'facts' show an agency relationship existed is itself a 'fact' for purposes of separating the district judge's function from our own.") (internal alterations omitted). The jury should decide whether the evidence that Plaintiffs offer at trial leads to the conclusion that CCL, VOMT, and Berkley are vicariously liable for the calls at issue.

Dkt. 376 at 21-22, addressing extensive history of litigation regarding vicarious liability in this case; *see also* Dkt. 346-2 at 258-276, Ex. AA to Berkley's SOF (interrogatory responses)). Notably, CCL and VOMT do not even try to argue that they have been unfairly taken by surprise or harmed by Plaintiffs' assertion of this theory. And, put simply, Defendants cannot escape liability in this case by claiming that the Complaint has not adequately alleged these theories either.

**B. The question of agency is a factual issue and can only be determined if the underlying facts are undisputed and only one inference can be drawn from them.**

Next, Defendants take issue with Plaintiffs' assertion that a jury must decide Defendants' liability, making much of cases holding that in certain rare circumstances, questions of agency may be determined on summary judgment. (CCL/VOMT Opp. at 15-17; Berkley Opp. at 4-7.) Defendants, however, cannot dispute the general rule that "the existence and scope of an agency relationship are questions of fact, to be decided by the trier of fact," *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 746 (7th Cir. 1998), not at summary judgment. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 864 (7th Cir. 1998) ("determinations regarding the existence and scope of an agency relationship" are questions of fact, which typically must be decided at trial); *see also Cabrera v. Jakabovitz*, 24 F.3d 372, 386 & n.14 (2d Cir. 1994) (quoting 3 C.J.S. Agency § 547 (1973)) (the issue of agency must be determined by the jury "unless no competent evidence legally sufficient to prove it has been introduced or the material facts from which it is to be inferred are undisputed and only one conclusion can be reasonably drawn therefrom."). In short, Plaintiffs do not contend that summary judgment on the question of agency is never appropriate under any circumstance. Their position is merely that on *this* record and under *these* circumstances, a jury could reasonably come to the conclusion that ESG acted as an agent (or subagent) for VOMT, CCL, and Berkley when it placed the unlawful telephone calls at issue.

14

To counter the weight of authority supporting Plaintiffs' position, CCL and VOMT provide a half-page single-spaced string citation of cases that it contends decide "issues of vicarious liability at summary judgment." (CCL/VOMT Resp. at 16 & n. 68.) Many are not TCPA cases and apply rules of law in contexts so varied that it is difficult to see how they relate to this case at all.[11] In the majority of the TCPA cases CCL and VOMT reference, the plaintiffs were unable to support their factual assertions with any evidence that a jury could reasonably conclude that an agency relationship existed.[12] That's insufficient at summary judgment in any context, but it is not an issue here because Plaintiffs have provided more than enough evidence to allow a jury reach the conclusion that Defendants are vicariously liable for the calls. (*See infra*, Section III.C.) In the rest of the cases CCL and VOMT cite, courts outside this circuit erred either by requiring a classical agency relationship in spite of the FCC's binding order that such a relationship is not required,[13] *see Gomez*, slip op. at 14 (finding "no cause to question" the FCC's ruling "that under federal common-law principles of agency, there is vicarious liability for TCPA violations"), or by incorrectly deciding the agency issue

---

[11] *See, e.g., Youngblood v. Alliance Pharm.*, No. Civ. 95-2796, 1998 WL 676800, at *6 (E.D. La. Sept. 30, 1998) (applying Louisiana's Napoleonic civil code, not the common law of agency); *USA Certified Merchants, LLC v. Koebel*, 273 F. Supp. 2d 501, 504 (S.D.N.Y. 2003) (denying a motion for reconsideration with only cursory discussion of the original ruling); *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999) (applying vicarious liability standard specific to employment discrimination, not the common law of agency); *M.J. ex rel. Beebe v. United States*, 721 F.3d 1079, 1085 (9th Cir. 2013) (holding that because "Plaintiffs' claims . . . are based on a theory of vicarious liability" under Alaska law, the defendant necessarily had federal and tribal sovereign immunity).

[12] *See Hurst v. Mauger*, No. 11 C 8400, 2013 WL 1686842, at *2 (N.D. Ill. Apr. 16, 2013) ("[Plaintiff] has primarily set forth legal arguments, legal conclusions, [his] own characterizations of the undisputed facts in the record, and statements unsupported by accurate citations to the record"); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) ("*[A]ll* evidence in the record points to the fact that [the purported agent] sent the unauthorized text messages to the putative plaintiff class—without the knowledge or acquiescence of [defendants].") (emphasis added); *Jones v. All Am. Auto Prot., Inc.*, No. 314CV00199, 2015 WL 7566685, at *5 (D. Nev. Nov. 24, 2015) ("Plaintiffs provide *no evidence* that Royal knew or should have known that AAAP was violating the TCPA.") (emphasis added); *Siding & Insulation Co. v. Alco Vending, Inc.*, No. 1:11 CV 01060, 2015 WL 1858935, at *1 (N.D. Ohio Apr. 22, 2015) ("[T]here was insufficient evidence on the record by which a jury could reasonably find for the plaintiff under any of those agency theories.").

[13] *See Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1086 (C.D. Cal. 2012) (no discussion of ratification or apparent authority); *Applestein v. Fairfield Resorts*, No. 0004 SEPT.TERM 2007, 2009 WL 5604429, at *6 (Md. Ct. Spec. App. July 8, 2009) (same); *Mey v. Pinnacle Sec., LLC*, No. 5:11CV47, 2012 WL 4009718, at *5 (N.D.W. Va. Sept. 12, 2012) (same).

at summary judgment when it should have gone to trial.[14] Nothing in CCL/VOMT's string cite is persuasive.

Besides citing to a large number of out-of-circuit cases, CCL and VOMT wave away the Seventh Circuit's dictate that agency relationships are generally fact issues by claiming that the *Chemtool* court "actually affirmed the district court's resolution of vicarious liability issues that were decided at summary judgment[.]" (CCL/VOMT Resp. at 15.) They are wrong. The agency issues in *Chemtool* were decided at a bench trial, not at summary judgment. 148 F.3d at 744. That's why the district judge was able to make *factual* findings with regard to agency—*he* was sitting as the trier of fact. *Id.* Plaintiffs advocate for the same process here: the agency issues should be decided by the trier of fact.

Berkley recognizes (in bold, italic type, no less) that *Chemtool* was decided at a bench trial, but it is no more able to distinguish the case. (Berkley Opp. at 4.) Instead, it supports its position with the Seventh Circuit's statement in *Valenti v. Qualex, Inc.*, 970 F.2d 363, 367 (7th Cir. 1992) (quoting *Rankow v. First Chicago Corp.,* 870 F.2d 356, 359 (7th Cir.1989)), that courts can decide the question of agency in rare cases where "the relationship is 'so clear as to be undisputed.'" (Berkley Opp. at 4-5.) But *Valenti* is nothing like this case. There, at summary judgment, the plaintiff offered nothing but a bare allegation that an agency relationship existed, with no citation to any evidence. *Valenti*, 970 F.2d at 368. Similarly, in *Spitz v. Proven Winners N. Am., LLC*—another case on which Berkley relies—the court noted *two times* that agency is typically not an appropriate question for summary judgment. 759

---

[14]    In *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274, 2015 WL 3526253, at *8 (C.D. Cal. May 18, 2015), the court incorrectly relied on a Ninth Circuit case applying California law to hold that ratification requires a pre-existing agency relationship, which it does not in the TCPA context. (*See* Plaintiffs' Omnibus Opposition, Dkt. 376 at 41-45.) In *Kristensen v. Credit Payment Servs. Inc.*, No. 2:12-CV-00528, 2015 WL 4477425, at *2 (D. Nev. July 20, 2015) the evidence in support of the plaintiff's ratification theory was far more tenuous than it is here. By way of example, Berkley's counterpart in *Kristensen* did not, *inter alia*, (i) have a twenty-something year long relationship with the other defendants, (ii) have the right to provide its marketers with interim instructions about their marketing efforts, (iii) regularly meet to discuss the prospects being provided, and/or (iv) expressly permit telemarketing to be used in order to generate leads.

F.3d 724, 731-32 (7th Cir. 2014). Like *Valenti*, summary judgment was appropriate in *Spitz* only because "the undisputed facts [led] to only one reasonable inference." *Spitz*, 759 F.3d at 732. As discussed below and at length in Plaintiffs' Omnibus Opposition, this is not the type of rare case where an agency determination can be made on summary judgment.

### C. There are numerous disputes about the facts related to Defendants' liability as well as the "reasonable inferences" that can be drawn from those facts.

Wrongly assuming that the notoriously fact-intensive issues of vicariously liability can properly be decided, Defendants endeavor to convince the Court that summary judgment in their favor is appropriate on the instant record. (Berkley Opp. at 4-7.)[15] Defendants' efforts here fall flat. As detailed more thoroughly in Plaintiffs' Omnibus Opposition, there is ample evidence demonstrating why the issue of liability could not possibly be decided in any of the Defendants' favor on this factual record, and likely, that just the opposite is true.

Specifically, although CCL and VOMT deny that "they worked closely with the ESG Defendants" and contend that there is no evidence to support Plaintiffs' assertion that they ratified the conduct or that they "gladly accepted the benefits of the campaign" (CCL/VOMT Opp. at 2),[16] the record demonstrates that Defendants' position is at best disputed, if not entirely false. Specifically, CCL, and by implication VOMT, contracted with ESG for the explicit purpose of

---

[15] Recognizing that Plaintiffs have not moved for summary judgment on the liability issue, CCL and VOMT (unlike Berkley) stop short of suggesting that the undisputed facts warrant a summary judgment ruling in their favor. Nevertheless, presumably intending to suggest that the evidence is in their favor, CCL's and VOMT's Opposition goes to great lengths to argue that Plaintiffs have misrepresented their role in, and control over, the telemarketing campaign at issue. (*See* CCL/VOMT Opp. at 2-6.) As such, Plaintiffs briefly respond.

[16] CCL and VOMT also curiously take issues with the fact that Plaintiffs included facts outside of those dealing with the content and method of delivering the robocalls, in this instance, correctly noting that the calls' legality is the only issue raised by Plaintiffs' Motion. (CCL/VOMT Opp. at 2, 5 n. 6.) But all of the facts that Plaintiffs included in their Statement of Facts provide relevant background and context for the legal issues presented in Plaintiffs' opening Motion or are directly necessary to decide those issues. As this Court has previously explained, nothing in the Local Rules "requires a summary judgment movant to cite to each paragraph of its statement of facts in its motion or brief," *Young v. Cty. of Cook*, 616 F. Supp. 2d 834, 843-44 (N.D. Ill. 2009) (Kennelly, J.), so Defendants' suggestion that this is somehow improper is not well-founded.

"solicit[ing] survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer" (Plfs. SOF ¶ 25; *id.* at ¶¶ 9-10; *see also* Plf. Resp. CCL/VOMT ¶¶ 36, 59; Plf. Resp. Berkley SOF ¶ 6, 17, 68, 75.) In addition, CCL readily accepted—and attempted to sell vacation packages to—the approximately 2 million calls that were transferred as a result, and CCL greatly profited from this process. (Plfs. SOF ¶¶ 40-42; Plf. Resp. CCL/VOMT SOF ¶ 38; Plf. Resp. Berkley SOF ¶ 55; Plfs. Add'l. SOF ¶¶ 55-56 (testimony showing that CCL sold nearly 60,000 vacation packages as a result of the calls); Plfs. SOF ¶ 23 (evidencing that VOMT "paid" CCL $50 for each lead obtained and that Berkley paid VOMT for those same leads).)

It's likewise clear that CCL controlled and knowingly ratified the conduct given that it was intimately involved in the campaign by: (i) editing the scripts used during the calls; (ii) weighing in on the states to which calls should be made; (iii) telling the ESG Defendants (through their affiliates) what content to include on their websites; (iv) directing the ESG Defendants not to make calls on certain holidays; (v) informing the lead broker how many calls it would accept each day; and (vi) instructing the ESG Defendants and the lead broker to change the name of the purported survey group after receiving consumer complaints. (*See* Plfs. Resp. CCL/VOMT Add'l. SOF ¶ 68.) CCL and VOMT are plainly not entitled to summary judgment on this record.

Berkley's suggestion that it "cannot be vicariously liable" (Berkley Opp. at 6) is equally wrong. Foremost, Plaintiffs vehemently disagree with Berkley's contention that it "had no part in the alleged robocalling campaign." (*Id.* at 2.)[17] The record demonstrates that every call was made for the

---

[17]    Berkley's legal arguments—essentially that it cannot be held liable for the calls because (i) Plaintiffs haven't demonstrated that Berkley had a direct relationship with ESG and because (ii) Berkley is not a "seller" as the FCC's *Dish Network* Order requires (Berkley Opp. at 5-6, 8), are similarly unavailing. First, and as fully detailed in Plaintiffs' Omnibus Opposition (*see* Dkt. 376 at 44-46), Plaintiffs need not demonstrate that Berkley had a direct relationship with ESG in order to recover on a valid agency theory. To be sure, as ESG was VOMT's and CCL's subagent, and those entities did and were authorized to work (as agents) on Berkley's behalf (Plf. Add'l. SOF ¶ 12; Plf. Resp. CCL/VOMT ¶ 36; Plf. Resp. Berkley SOF ¶¶ 24, 68), liability can result. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 775 (N.D. Ill. 2014) (principal

purpose of selling Berkley's timeshare products (*see* Plf. SOF ¶¶ 33-36 (explaining that each individual transferred to CCL was offered a materially identical pitch for an upgraded vacation package that included a mandatory presentation at one of Berkley's timeshare properties); Plfs. SOF ¶ 36 (evidencing that even if the Class member did not agree to attend the presentation during the initial call, they were offered it again later, either on the telephone with CCL or during the vacation itself); *see also* Plf. Resp. Berkley Add'l. SOF ¶ 10), and it cannot reasonably be disputed that Berkley benefitted from the telemarketing calls. (Plfs. SOF ¶ 42; Plfs. Resp. Berkley SOF ¶ 27.).[18]

Additionally, although Berkley contends otherwise, many facts in the record would permit a reasonable jury to infer that Berkley knowingly ratified the TCPA violations (and/or that Berkley is liable under classical agency and apparent authority theories as well). In short summary, and as explained in more detail in Plaintiffs' Omnibus Opposition, those facts include, *inter alia*: (i) that Berkley had an exclusive contract with VOMT that expressly contemplated VOMT's telemarketing,[19] required VOMT to provide Berkley with a list of all of its marketing programs, and

---

may be held liable for acts committed by authorized subagents); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013) ("the absence or infrequency of direct communication from Lens.com to its affiliates is not conclusive on whether the affiliates were its agents. A principal can authorize its agent to appoint a subagent, and the subagent can then act as an agent for the principal even though the principal's control is indirect"). Second, and as also set out in Plaintiffs' Omnibus Opposition (*see* Dkt. 376 at 23-25), the idea that Berkley is not a "seller" under the TCPA is equally meritless. The TCPA defines a "seller" as "the person or entity on whose behalf a telephone call or message is initiated *for the purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services . . ." 47 C.F.R. § 64.1200(f)(9) (emphasis added). Thus, if the call's purpose is to "encourag[e]" recipients to purchase, rent, or invest in property, goods, or services, then any company on behalf of whom that call is made is a seller, *see id*, as the facts plainly demonstrate Berkley is here. (*See, e.g.*, Plfs. SOF ¶¶ 33-36.)

[18]    Berkley's attempt to escape liability because it was not mentioned by name on the call (Berkley Opp. at 4), is not well-founded either. As the FCC has made clear, "a message that seeks people to help sell or market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, *during or after* the call," FCC 2003 Order at 14098-99, and even if the product is not specifically referenced by name.

[19]    Berkley suggests that Plaintiffs intentionally miscited the contractual language between VOMT and CCL to incorrectly reference CCL's intention to provide VOMT with "Prospect[s who] would be offered the opportunity to purchase a timeshare at the *Berkley's* timeshare resorts", and to make the contractual language appear more favorable to Plaintiffs' position. (Berkley Opp. at 3 (citing Dkt. 337 at ¶ 22)). Plaintiffs' mistake was entirely inadvertent, but they acknowledge it: the contract refers to "**various** timeshare resorts"

did not explicitly disclaim an agency relationship despite that every single other one of Berkley's marketing contracts did (Plf. SOF ¶¶ 20, 24; Plf. Resp. Berkley Add'l. SOF ¶ 2; Dkt. 379, Plf. Add'l. SOF ¶¶ 11, 20-22; Dkt. 377, Plf. Resp. Berkley SOF ¶¶ 22); (ii) Berkley's longstanding and interconnected relationship CCL, VOMT, and their key executives (Plfs. SOF ¶¶ 11-16; Plf. Resp. Berkley Add'l. SOF ¶ 2); (iii) the parties' regular monthly meetings with Berkley's entire Board of Directors, and Dan Lambert and James Verillo for CCL and VOMT (Plfs. Resp. Berkley Add'l. SOF ¶¶ 1-2); and (iv) Berkley's right to and practice of giving VOMT interim instructions, which its President Rebecca Foster testified she believed were always followed. (Plf. Resp. Berkley Add'l. SOF ¶ 12; Dkt. 377, Plf. Resp. Berkley SOF ¶¶ 22, 68.) Moreover, Berkley does not refute that it knew of the calls by May 2012 at the latest, months before the calls ended; nor could it, given the various communications it had with the other Defendants and the numerous detailed complaints about the calls it received. (Berkley SOF ¶ 44; Plf. Resp. Berkley Add'l. SOF ¶ 12 (citing Plf. SOF Ex. 31.); Dkt. 379, Plf. Add'l. SOF ¶¶ 49-51; Dkt. 377, Plf. Resp. Berkley SOF ¶ 44.)

In the end, a juror could certainly determine that these facts, and those discussed in Plaintiffs' Omnibus Opposition to Defendants' motions for summary judgment, support a finding of liability in Plaintiffs' favor against each of the Defendants, and as a result, a ruling on vicarious liability is simply not appropriate.

## **CONCLUSION**

For the reasons set forth above, the Court should grant Plaintiffs' motion for partial summary judgment.

---

rather than specifically to "Berkley's timeshare resorts." Moreover, the mistake has little significance given the exclusive nature of the Parties' relationships, i.e., every single prospect CCL provided to VOMT would then in fact be exclusively provided to Berkley, and so all of the "various" resorts were Berkley resorts. (Plfs. SOF ¶ 20.)

Respectfully submitted by:

/s/ Rafey S. Balabanian               /s/ Scott R. Rauscher

| | |
|---|---|
| Jay Edelson | Scott R. Rauscher |
| Rafey S. Balabanian | Michael I. Kanovitz |
| Eve-Lynn J. Rapp | Jonathan I. Loevy |
| EDELSON P.C. | LOEVY & LOEVY |
| 350 North LaSalle Street, Suite 1300 | 312 N. May Street, Suite 100 |
| Chicago, Illinois 60654 | Chicago, Illinois 60607 |
| Telephone: (312) 589-6370 | Telephone: (312) 243-5900 |
| Email: jedelson@edelson.com | Email: scott@loevy.com |
| rbalabanian@edelson.com | jon@loevy.com |
| cdore@edelson.com | mike@loevy.com |
| erapp@edelson.com | |
| | |
| *Class Counsel* | *Class Counsel* |

**CERTIFICATE OF SERVICE**

      I, Eve-Lynn J. Rapp, hereby certify that on January 27, 2016, I caused the foregoing to be filed by the Court's CM/ECF system and to be served on all counsel of record.


                      /s/ Eve-Lynn J. Rapp