# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GERARDO ARANDA, GRANT       )
BIRCHMEIER, SEPHEN PARKES, and  )
REGINA STONE, on behalf of themselves  )
and classes of others similarly situated,   )
                         )
      Plaintiffs,            )
                         )
      vs.                )      Case No. 12 C 4069
                         )
CARIBBEAN CRUISE LINE, INC.,     )
ECONOMIC STRATEGY GROUP,       )
ECONOMIC STRATEGY GROUP, INC.,   )
ECONOMIC STRATEGY, LLC, THE     )
BERKLEY GROUP, INC., and VACATION  )
OWNERSHIP MARKETING TOURS, INC.,  )
                         )
      Defendants.         )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs filed suit on behalf of themselves and two classes of individuals against

Caribbean Cruise Line, Inc. (CCL), Vacation Ownership Marketing Tours, Inc. (VOMT),

The Berkley Group, Inc., and Economic Strategy Group and its affiliated entities

(collectively ESG). Plaintiffs alleged that defendants violated the Telephone Consumer

Protection Act, 47 U.S.C. § 227, by using an autodialer and an artificial or prerecorded

voice to call their cellular and landline phones. CCL, VOMT, and Berkley have each

moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs

have also moved for partial summary judgment. For the reasons stated below, the

Court grants plaintiffs' motion in part and denies defendants' motions.

**Background**

The following facts are not disputed except where otherwise noted.  This case centers on a call campaign that began in or around August 2011.  Over the course of about one year, over a million people throughout the United States received phone calls that were made to their cellular phones and residential landlines by an organization representing itself as "ESG" or "Political Opinions of America" requesting their participation in various short political surveys.  Every one of these calls featured prerecorded messages, some or all of which offered recipients an incentive to participate:  if they would briefly answer a handful of questions regarding their satisfaction with Congress and the President or their perspectives on certain issues of national concern, they would be eligible for a "free cruise to the Bahamas."

Upon completing the survey, call recipients were asked if they wanted to learn more about their prize.  The name of the cruise provider was not mentioned in the prerecorded messages, but those people who chose to learn more were transferred to a representative from CCL, a Florida company in the business of marketing and selling cruise and vacation packages to consumers.  Although the cruise was nominally free, representatives requested call recipients' credit card numbers and informed them that they would be responsible for taxes, port fees, and gratuities, as well as the cost of any upgraded amenities or activities during their trip.  Participants who opted to partake in a cruise were also offered an upgraded package that would require them to take a timeshare tour at a Berkley facility.  Berkley's name was never mentioned during these phone calls.

ESG was responsible for the phone campaign.  ESG's founder, director, and sole

employee, Jacob DeJongh, incorporated each of the ESG entities and registered them as tax-exempt nonprofit organizations.  He also registered ESG with the Federal Election Commission (FEC), though evidence in the record shows that he repeatedly failed to comply with FEC filing rules.  According to DeJongh, the purpose of the phone campaign was to raise awareness of political issues he cared about, spread his political message, and conduct meaningful political surveys whose results he could market to political parties, political action committees, and news outlets.

At the time he was setting up ESG, DeJongh had discussions with Jason Burkett (his cousin) and Scott Broomfield, both of whom worked for a company called Linked Service Solutions (LSS).  Broomfield testified before the Federal Trade Commission that during the brief testing phase of the phone campaign, in which call recipients were not offered an incentive for completing the surveys, over ninety percent of recipients hung up after hearing the first question in the survey.  Broomfield stated that it became clear that an incentive would be necessary in order to ensure that the call campaign was worth its cost.  DeJongh testified that at the time he was forming ESG, he discussed with Burkett and Broomfield the possibility of offering a free cruise incentive.

LSS brokered supplier agreements between DeJongh's companies and CCL. Each contract provided that ESG would "solicit[] survey takers by transmitting or causing to be transmitted prerecorded survey messages using an autodialer . . . ."  LSS paid ESG for the call campaign, and LSS in turn received somewhere between $2 and $2.50 from CCL for every call that was transferred to a CCL representative and lasted more than thirty seconds beyond the transfer.  Defendants contend that this evidence shows that the phone calls were made by and for DeJongh and ESG alone, and that

offering a free cruise as incentive to participate in the surveys did nothing to modify the nature or purpose of the calls. According to DeJongh, Broomfield, and defendants, these calls were made by and for a tax-exempt nonprofit, with the sole, express purpose of collecting political survey information.

Plaintiffs, however, view the evidence quite differently: They argue that ESG made these calls not to collect information or raise awareness but rather to drum up business for CCL, VOMT, and Berkley as their agent. Plaintiffs filed this lawsuit in May 2012 alleging that the telephone calls at issue violated two provisions of the TCPA. First, they alleged that defendants delivered prerecorded messages by calling consumers' cellular telephone lines without prior express consent and for no emergency purpose in violation of 47 U.S.C. § 227(b)(1)(A)(iii). Second, they alleged that defendants delivered prerecorded messages by calling consumers' residential landlines without prior express consent and for no emergency purpose in violation of 47 U.S.C. § 227(b)(1)(B). Named plaintiffs Aranda, Birchmeier, and Parkes all alleged that they received the calls on their cellular phones. Named plaintiff Stone alleged that she received calls on both her cellular phone and her residential landline.

CCL and ESG moved to dismiss plaintiffs' complaint on the grounds that (1) plaintiffs failed to adequately distinguish the role played by each defendant in the allegedly unlawful call campaign; (2) the TCPA only permits direct liability for the party that actually places unlawful calls; and (3) political survey calls to residential landlines and cellular telephones are exempt from TCPA liability. The Court denied CCL's and ESG's motion in December 2012. *See Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2012 WL 7062748 (N.D. Ill. Dec. 31, 2012). In its order, the Court explained

that because plaintiffs had plausibly alleged that CCL and ESG acted in concert, they were not required to delineate in the complaint where one defendant's conduct ended and another's began.  The Court also noted that TCPA liability applies not only to the entity that places unlawful calls but also to entities that can be held jointly or vicariously liable under common law agency and partnership principles.  Lastly, the Court rejected the argument that the calls were political survey calls exempt from TCPA coverage. The Court observed that this exemption "appears to involve the prohibition on calls with artificial or prerecorded voices, not the prohibition on calls made with automated dialers." *Id.* at 1.  Because plaintiffs had alleged both that the defendants had played a prerecorded message and that they had used an autodialer to make the calls, the Court denied CCL's and ESG's motion without addressing the question "whether the statute as interpreted by the FCC permits liability for a nonautodialed but unsolicited prerecorded call to a cellular phone for the purpose of initiating a commercial transaction where the call includes what is alleged to be a 'sham' political survey." *Id.*

The Court granted plaintiffs' motion for class certification in August 2014.  *See Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014).  The Court certified two classes of persons who allegedly received calls featuring prerecorded messages from ESG from August 2011 to August 2012.  Individuals in the first class, represented by Aranda, Parkes, Stone, and Birchmeier, allegedly received calls on their cellular phones.  Individuals in the other class, represented by Stone alone, allegedly received calls on their residential landlines.

Plaintiffs filed an amended consolidated complaint in March 2015.  Discovery closed in July 2015, and after that, CCL, VOMT, and Berkley moved for summary

judgment.  Plaintiffs moved for partial summary judgment as well.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).  The Court "may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury."  *Omnicare v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011) (internal citations and quotation marks omitted).  "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56.  *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party."  *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

Plaintiffs seek summary judgment in their favor only on the question of whether the calls were unlawful under the TCPA.  They argue that the record evidence undisputedly shows that the calls were made by an autodialer and played a prerecorded

6

message and that no exception to TCPA liability applies. Defendants counter that the evidence is inconclusive regarding whether an autodialer was used and whether a prerecorded voice was actually played on each and every call. They also cite an exception to TCPA liability that they contend should apply to all of the allegedly unlawful calls in this case.

Although each defendant has separately moved for summary judgment, their motions are variations on a theme: defendants contend that none of them can be held liable for the allegedly unlawful calls because it was ESG that actually made the calls. Defendants first argue that summary judgment must be granted in their favor because plaintiffs failed to adequately allege vicarious liability in their complaint. Second, defendants contend that the evidence does not support any theory of joint or vicarious liability on the part of CCL, VOMT, and Berkley. Third, defendants seek summary judgment based on evidence they say shows that the sole named plaintiff representing the landline class did not receive any calls to her landline and that another named plaintiff hung up before ever hearing prerecorded messages on some or all of the calls he received. Plaintiffs dispute whether issues of vicarious liability can be resolved at summary judgment, and in any event they contend that the evidence would permit a reasonable jury to find joint or vicarious liability for ESG's calls. They also argue that evidence in the record supports the claims of all four named plaintiffs.

## A.      Legality of the calls

The TCPA imposes limitations on those who engage in telephone advertising or telemarketing. Specifically, the statute prohibits a person from

> mak[ing] any call (other than a call made for emergency purposes or made
> with the prior express consent of the called party) using any automatic

telephone dialing system or an artificial or prerecorded voice . . . to any
telephone number assigned to a . . . cellular telephone service . . . or any
service for which the called party is charged for the call, unless such call is
made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A)(iii).  The statute also states that it is unlawful

to initiate any telephone call to any residential telephone line using an
artificial or prerecorded voice to deliver a message without the prior
express consent of the called party, unless the call is initiated for
emergency purposes, is made solely pursuant to the collection of a debt
owed to or guaranteed by the United States, or is exempted by rule or
order by the [Federal Communications Commission (FCC)] under
paragraph (2)(B).

*Id.* § 227(b)(1)(B).  The provision referenced in section 227(b)(1)(B) states that the FCC

"shall prescribe regulations to implement the requirements of this subsection" and that

the agency

(B)     may, by rule or by order, exempt from the requirements of
paragraph (1)(B) of this subsection, subject to such conditions as
the Commission may prescribe—

(i)     calls that are not made for a commercial purpose; and

(ii)    such classes or categories of calls made for commercial
purposes as the Commission determines

(I)     will not adversely affect the privacy rights that this
section is intended to protect; and

(II)    do not include the transmission of any unsolicited
advertisement.

*Id.* § 227(b)(2)(B).

Plaintiffs seek summary judgment only regarding whether the calls made to the

named plaintiffs and the two certified classes were unlawful calls under the TCPA.

According to plaintiffs, uncontroverted evidence shows that ESG used an autodialer and

played a prerecorded message on the calls it made to plaintiffs' cellular phones and

residential landlines. Because no exception to the TCPA applies, plaintiffs say, summary judgment should be granted in their favor on this point.

Defendants do not dispute that the calls were made without the prior express consent of their recipients. But defendants offer three reasons why plaintiffs are not entitled to summary judgment for either class on the question of the legality of the calls. First, defendants argue that the evidence is insufficient to establish that an autodialer was used and that such evidence is irrelevant in any event because the class definitions do not contemplate the use of an autodialer. Second, defendants argue that the calls did not violate the TCPA because the evidence does not show that plaintiffs actually heard a prerecorded message when they received phone calls from ESG. Third, defendants argue that the calls were not unlawful because the FCC has exempted political survey calls and calls made by tax-exempt organizations. Even though this exemption was crafted as an exception to liability for calls to landlines, defendants contend it should be understood to protect them from liability for calls to cellular telephones as well.

Defendants begin by arguing that it does not matter whether the evidence shows that every phone call was made using an autodialer because the class definitions do not reference the manner in which the calls were dialed. The relevant question, however, is not how the class is defined but rather whether use of an autodialer bears on the question of liability. It does not matter whether the landline calls were made with an autodialer, because the TCPA does not prohibit the use of an autodialer to make calls to residential landlines. *See* 47 U.S.C. § 227(b)(1)(B). As for the cellular phone class, the same statutory provision that prohibits making a call to a cellular phone using an

artificial or prerecorded voice also prohibits making such a call using an automatic telephone dialing system. Thus if the evidence shows that ESG used an autodialer to place the prerecorded phone calls to the members of the cellular phone class, the defendants will have violated section 227(b)(1)(A)(3).

There is a genuine factual dispute regarding whether ESG used a prohibited autodialer to make the calls. "The term 'automatic telephone dialing system' means equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). As the FCC has explained, not every dialing device amounts to an "automatic telephone dialing system" within the meaning of the TCPA. *See In the Matter of Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C.R. 7961, ¶ 17 (2015). In a recent order, the Commission observed that

> the basic functions of an autodialer are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

*Id.* Plaintiffs describe evidence that an "autodialer" was used, but it consists entirely of individuals involved in the call campaign using the word "autodialer" to describe the equipment used in the campaign. Plaintiffs have not pointed the Court to evidence showing what equipment was used, how it functioned, or the degree to which it required human intervention. The record is insufficient to take away from a jury the determination of whether the equipment that was used was the type that the TCPA prohibits.

Plaintiffs do, however, point to evidence that shows that every call ESG made

featured a prerecorded message.  Defendants argue that summary judgment is inappropriate because it is not clear that plaintiffs actually heard their prerecorded message.  Citing *Ybarra v. Dish Network, LLC*, 807 F.3d 635 (5th Cir. 2015), defendants argue that at least some of the calls were not unlawful because phone records indicate that at least one of the named plaintiffs hung up before he could hear a prerecorded message.  The Fifth Circuit's holding in *Ybarra* is not binding on this Court, but even if the Court were to adhere to its logic, the evidence in this case would not require the same result.  In *Ybarra*, the Fifth Circuit confronted a situation in which a prerecorded voice played only when a call was picked up and there was a "positive voice" response, which could be either a human voice or a recorded voicemail greeting. *Id.* at 637.  The record indicated that when the result of the call was not a positive voice response, no prerecorded message ever played.  *Id.* at 637.

The evidence in this case is markedly different; it reflects that a prerecorded message played without regard to whether a call recipient gave a voice response.  The Fifth Circuit held that for TCPA liability to accrue, a prerecorded message must actually play; it did not hold that a recipient must stay on the line long enough to hear it.  *See id.* at 641 ("We hold that making a call in which a prerecorded voice might, but does not, play is not a violation of the TCPA.  Instead, the prerecorded voice must 'speak' during the call.").  Put another way, *Ybarra* does not indicate that a caller escapes liability if the recipient receives a prerecorded call and hangs up the phone once she realizes this, without hearing much (or any) of the message.  Plaintiffs have established that they received calls as part of this call campaign, and that every call included a prerecorded message.  This is sufficient to trigger TCPA liability, and *Ybarra* does not counsel

otherwise.

Finally, defendants argue that under FCC regulation, the calls are not unlawful because they were made for a political purpose by a tax-exempt organization. Through 47 U.S.C. § 227(b)(2), Congress conferred rulemaking and interpretative authority upon the FCC to fashion exemptions to TCPA liability. Under 47 C.F.R. § 64.1200(a)(3), it is not unlawful to call "any residential landline using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party" under certain limited circumstances.

Defendants acknowledge that the FCC has not extended this rule to cover cellular phones. They nevertheless urge the Court to do so. They argue that the TCPA's distinction between landlines and cellular phones is outdated and that the FCC's continued adherence to the distinction is misguided in light of the paradigm shift that has occurred since the TCPA's enactment in 1991. According to defendants, the FCC created exemptions for political surveys and calls placed by or on behalf of tax-exempt nonprofit organizations so that socially beneficial phone campaigns could be made to places where callers could count on reaching recipients. The same exemptions were not initially extended to cellular phones because calls to those phones less frequently reached their recipients while also being substantially more costly to those recipients. Now that many people do not have landlines and use cellular phones with inexpensive phone plans as their primary telephone lines, defendants say it makes little sense to confine the FCC's exemption to landlines.

This argument ignores both the language of the regulation and the statutory design of the TCPA. Congress did not confer upon the courts the authority to make

exemptions under the TCPA.  Thus it does not matter whether it would be good policy to apply the FCC's exemption to calls made to cellular phones; the exemption expressly applies only to calls made to residential landlines.  Moreover, even if the FCC did intend to apply the exemption more broadly—an argument clearly undercut by the FCC's 2012 order stating that even "non-telemarketing, informational calls, such as those by or on behalf of tax-exempt non-profit organizations . . . require either written or oral consent if made to wireless consumers," *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1841 ¶ 28 (2012) ("*2012 FCC Order*")— it is unclear that the TCPA permits the FCC to do so.  Section 227(b)(1)(B) specifically provides that the FCC may fashion exemptions to TCPA liability for calls made to residential landlines.  *See* 47 U.S.C. § 227(b)(1)(B) (a person may not "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call . . . is exempted by rule or order by the Commission under paragraph (2)(B)").  By contrast, the TCPA contemplates exemptions to liability under section 227(b)(1)(A)(iii) for calls to cellular phones in only one place, where it says that the FCC

> may, by rule or by order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect.

*Id.* § 227(b)(2)(C).  Aside from this, section 227(b)(1)(A)(iii) does not contemplate any involvement on the part of the FCC in crafting exemptions to liability.  *See id.* § 227(b)(1)(A)(iii) (a person may not make a call using "any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned

to a . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States"); *see also 2012 FCC Order*, 27 F.C.C.R. at 1842 ¶ 29 (stating that "Section 227(b)(1)(A) and our implementing rules continue to require some form of prior express consent for autodialed or prerecorded non-telemarketing calls to wireless numbers").

The calls made to the cellular phone class were made without prior express consent. The evidence is uncontroverted that a prerecorded message was played on each call; DeJongh himself testified to this effect during his deposition. *See* Defs.' Ex. 3, dkt. no. 350-4, at 144. This is a violation of the TCPA, irrespective of whether the calls were made by or on behalf of a tax-exempt nonprofit, were made for a political or non-commercial purpose, or did not make reference to or play long enough to mention defendants' vacation products. No reasonable jury could find otherwise based on the evidence presented by the parties. The Court therefore grants summary judgment in favor of plaintiffs on the question of whether the phone calls made to the cellular phone class run afoul of the prohibition in 47 U.S.C. § 227(b)(1)(A)(iii).

The exemptions contained in 47 C.F.R. §§ 64.1200(a)(3) do apply to calls to landlines featuring prerecorded messages, and thus they potentially could shield defendants from liability for the calls made to the landline class. Under this regulation, a call to a residential landline is exempt from TCPA liability if the call is "not made for a commercial purpose," is "made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing," or is "made by or on behalf of a

tax-exempt nonprofit organization."  *Id.* §§ 64.1200(a)(3)(ii)–(iv).[1]  Defendants argue

that all three exemptions apply in this case.  First, they argue that the calls were made

with a political purpose and were therefore "not made for a commercial purpose."

Second, they argue that even if the calls were "made for a commercial purpose," they

did not "include or introduce an advertisement or constitute telemarking."  Third, they

argue that the calls were "made by or on behalf of" ESG, "a tax-exempt nonprofit

organization."

  If the calls were made for a commercial purpose, the exemption for commercial

calls that do "not include or introduce an advertisement or constitute telemarketing" will

not shield defendants from liability.  The FCC has defined "telemarketing" as "the

initiation of a telephone call or message for the purpose of encouraging the purchase or

rental of, or investment in, property, goods, or services, which is transmitted to any

person."  47 C.F.R. § 64.1200(f)(12).  It has defined "advertisement" as "any material

advertising the commercial availability or quality of any property, goods, or services."

*Id.* § 64.1200(f)(1).

  Plaintiffs note that the FCC recently clarified that non-telemarketing commercial

calls to landlines are exempt only "to the extent that they do not contain telemarketing

messages."  *2012 FCC Order*, 27 F.C.C.R. at 1841 ¶ 28.  Plaintiffs argue that this

means that even if the calls were made with the dual purposes of conducting a political

---

[1] Defendants erroneously cite 47 C.F.R. § 64.1200(a)(2) to support the argument that
"the telephone calls made by the ESG Defendants appear to be exempt from the
strictures of the TCPA because the calls were political surveys and made by 501(c)(3)
or 501(c)(4) companies."  Defs.' Mem., dkt. no. 372, at 14.  This regulation exempts
calls made by or on behalf of a tax-exempt nonprofit organization, but only where prior
express consent is given.  *See* 47 C.F.R. § 64.1200(a)(2).  No evidence tends to show,
and defendants have not argued, that any plaintiff gave prior express consent to be
contacted.

survey and selling defendants' vacation products, they are still unlawful, because one of their purposes was to market defendants' products and entice call recipients to purchase them either during the call or at some later date. *See Chesbro v. Best Buy Stores, LP*, 705 F.3d 913, 917–18 (9th Cir. 2012) (citing FCC orders and determining that "dual purpose" calls are not shielded from liability because they still contain a marketing or sales component). The Court agrees: even if the calls were made with the primary purpose of raising political awareness and learning about people's political preferences, the evidence would not permit a reasonable jury to find that they did not advertise the commercial availability of defendants' vacation packages.. *Cf. 2012 FCC Order*, 27 F.C.C.R. at 1841 ¶ 28; *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14096–97 ¶ 138, 14098 ¶ 142 (2003) (denying exemption to commercial calls with dual purposes of providing or acquiring information and advertising the availability or quality of goods or services). If the calls were made for a commercial purpose, no reasonable jury could find applicable the exemption provided in 47 C.F.R. § 64.1200(a)(3)(iii).

Defendants do not concede, however, that the calls were made for a commercial purpose. They contend that the exemption for calls "not made for a commercial purpose" applies because the evidence shows that the calls were made for a political purpose by a tax-exempt nonprofit organization. The FCC has stated that non-commercial calls include "calls conducting research, market surveys, political polling or similar activities which do not involve solicitation as defined by our rules." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act*, 7 F.C.C.R. 8752, 8774 ¶ 41 (1992). The agency defines "solicitation" by telephone in precisely the same terms as

"telemarketing":  "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  But it provides exceptions for calls to people who have given prior express consent and calls made by or on behalf of a tax-exempt non-profit.  47 C.F.R. § 64.1200(f)(14).

Plaintiffs argue that at the very least, these calls had both non-commercial and commercial purposes and thus are not entitled to the exemption contained in 47 C.F.R. § 64.1200(a)(3)(ii).  Because the FCC has stated that "dual purpose" calls are not entitled to exemption, plaintiffs argue, the exemption should not apply.  But the "dual purpose" calls to which the FCC has referred are not calls made for both "commercial" and "non-commercial" purposes, but rather commercial calls made for both "informational" and "telemarketing" purposes.  *See 2012 FCC Order*, 27 F.C.C.R. at 1841 ¶ 28; *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14096–97 ¶ 138, 14098 ¶ 142 (2003).  The FCC's guidance concerning calls made with dual purposes does not control whether the calls were made with or without a commercial purpose.

The crux of defendants' argument invoking this exemption and the next is that the calls were made for a political purpose by and on behalf of ESG, a tax-exempt non-profit organization.  As explained above, non-commercial calls are exempt if they do not include solicitations, and FCC regulations indicate that calls made by or on behalf of a tax-exempt non-profit organization are not telephone solicitations.  Accordingly, if the calls were made "by or on behalf of a tax-exempt nonprofit organization," defendants can invoke both the exemption for calls "not made for a commercial purpose," 47 C.F.R.

§ 64.1200(a)(3)(ii), and the exemption for calls "made by or on behalf of a tax-exempt nonprofit organization," *id.* § 64.1200(a)(3)(iv).

DeJongh registered the ESG entities as tax-exempt nonprofit entities. If they were acting on their own behalf, these exemptions would absolve ESG of liability for the calls. But it is not clear at this stage of the litigation—as the Court will explain in detail in the next section—that ESG made the calls on its own behalf or rather did so as an agent of other defendants. Indeed, plaintiffs have not moved for summary judgment on whether ESG acted as the other defendants' authorized agent; they argue that this is a question the jury must decide. If ESG was acting as a conduit for CCL, VOMT, and Berkley to solicit business and generate profit, then the calls can hardly be said to have been made "by or on behalf of a tax-exempt nonprofit organization." Because a reasonable jury could find that ESG was acting on its own and without the authorization of CCL, VOMT, and Berkley, the Court cannot say at this juncture whether the exemptions contained in sections 64.1200(a)(3)(ii) and 64.1200(a)(3)(iv) might shield defendants from liability.

For this reason, the Court denies plaintiffs' motion for summary judgment regarding the landline class. If plaintiffs successfully demonstrate at trial that ESG was not a tax-exempt non-profit organization making calls on its own behalf, but rather made the calls as an agent for CCL, VOMT, and Berkley, then none of the exemptions contained in section 64.1200(a)(3)(ii)–(iv) will protect defendants from liability.

## B.   Joint or vicarious liability

Defendants seek summary judgment on the basis that they cannot be held vicariously or jointly liable for calls that ESG made. Their initial point is that plaintiffs

failed to plead vicarious liability adequately in their amended consolidated complaint. Defendants continue to press this point even though the Court has already rejected it. Defendants also argue that the evidence would not permit a reasonable jury to find vicarious liability under any theory of agency, joint venture, or partnership.

As an initial matter, defendants take issue with plaintiffs' assertion that "courts generally refuse to decide agency issues at summary judgment" because agency issues must be determined by a jury except where "no competent evidence legally sufficient to prove it has been introduced." Pls.' Mem., dkt. no. 336, at 11 & n.4 (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 & n.14 (2d Cir. 1994)). Although both sides argue vigorously about this issue, they are both right to an extent: vicarious liability, like any other issue of fact, may be adjudicated summarily only where the evidence would not permit a reasonable jury to find for the nonmoving party. *See Spitz v. Proven Winners N.A., LLC*, 759 F.3d 724, 731 (7th Cir. 2014) (internal quotation marks omitted) ("Agency is a notoriously fact-bound question, but summary judgment on the existence of an agency relationship is still appropriate when the plaintiff fails to meet her burden in presenting sufficient facts to show that a genuine issue of material fact exists with respect to the agency issue.").

Defendants next argue that they may not be held liable for unlawful phone calls ESG made to members of both classes because plaintiffs did not sufficiently allege vicarious liability in their complaint. A plaintiff is required to allege facts sufficient to put defendants on notice of the nature of the claims against them and allow for a plausible inference that defendants are liable, and a plaintiff typically may not offer new and significantly different contentions at the summary judgment stage. *Whitaker v.*

*Milwaukee Cty.*, 772 F.3d 802, 808 (7th Cir. 2014). But "plaintiffs are not required to plead legal theories, even in the new world of pleading that is developing in the wake of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (en banc) (parallel citations omitted).

Defendants say that summary judgment should be granted in their favor because this case is like *The Siding & Insulation Co. v. Alco Vending, Inc.*, No. 11 C 01060, 2015 WL 1858935, at *7 (N.D. Ohio Apr. 22, 2015), in which a district court in Ohio found a plaintiff's failure to plead agency liability fatal to his TCPA claim. In *Alco Vending*, the plaintiff alleged that the defendant was directly liable for junk faxes sent in violation of the TCPA. At the summary judgment stage, the parties were in agreement that two others who were neither directly named nor indirectly mentioned in the complaint had actually sent the faxes. The plaintiff, however, argued that the defendant should be held liable under theories of vicarious liability that the plaintiff "failed to plead and raised only in its opposition to Defendant's summary judgment motion." *Id.*; *see also Bridgeview Health Care Ctr., Ltd. v. Jerry Clark*, Nos. 14-3728 & 15-1793, 2016 WL 1085233, at *3 n.2 (7th Cir. Mar. 21, 2016).

This case is nothing like *Alco Vending*. Throughout the course of litigating this case, plaintiffs have consistently contended that defendants acted in concert and that the phone calls were made by or on behalf of some combination of ESG, CCL, VOMT, and Berkley. *See Birchmeier*, 2012 WL 7062748, at *1 (ruling on motion to dismiss; noting that "[p]laintiffs allege that the defendants acted in concert . . . and that is sufficient for present purposes. The whole point of plaintiffs' allegations is that it is

difficult to tell where one defendant stops and the next one starts.").  And in their amended consolidated complaint, plaintiffs repeatedly alleged that "[d]efendants and/or their agents made unsolicited telephone calls" in violation of the TCPA.  Am. Cons. Compl., dkt. no. 289, ¶¶ 50, 51, 58, 59; *see also id.* at ¶¶ 52, 60 (alleging that defendants "ma[de], or ha[d] or allow[ed] to be made on their behalf, the unsolicited robocalls utilizing an artificial or prerecorded voice").  Although the particular theories of vicarious and joint liability upon which plaintiffs ultimately rest their claims may have become clear to defendants only more recently, plaintiffs had no obligation under federal pleading rules to apprise defendants of their legal theories in their complaint. The bottom line is that defendants have been on notice since near the outset of the case that plaintiffs seek to hold them vicariously or jointly liable, and that is all plaintiffs were required to do.

The TCPA imposes liability upon any person who makes unlawful phone calls using an autodialer or a prerecorded message.  As the FCC—which Congress vested with the authority to promulgate rules and regulations implementing the TCPA, *see* 47 U.S.C. § 227(b)(2)—has declared through rulemaking and adjudicative orders, liability for a TCPA violation may be imputed to a party that did not itself place the unlawful calls if the party that placed the calls did so as an agent of that party.[2]  *In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6593 ¶ 48 (2013) (hereinafter "*Dish Network*").  The FCC calls such principals "sellers."  *See* 47 C.F.R. § 64.1200(f)(9).  As both parties acknowledge, the FCC has made clear that federal common law agency

---

[2] Under the Hobbs Act, the Court must apply any final FCC order that governs the matter at issue.  *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010).

principles apply in the TCPA context. *Dish Network*, 28 F.C.C.R. at 6574 ¶ 1. This means that a seller may be vicariously liable in the context of an agency relationship, which is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Agency § 1.01 (2006).[3]

Berkley and VOMT contend that they cannot be held vicariously liable under any circumstances because they are not sellers. The FCC has defined a "seller" as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(9). VOMT suggests that it is not a seller because it does not sell or advertise any products to consumers, nor does it own or operate CCL's cruises. Berkley argues that it is not a seller because neither ESG's recorded messages nor CCL's representatives marketed Berkley's timeshare products or encouraged call recipients to purchase them. Both VOMT and Berkley also point out that their names were not mentioned during any of the calls.

If these arguments were valid, an entity could avoid TCPA liability by empowering an agent to make prerecorded calls encouraging consumers to visit the principal's store so long as the agent did not say the principal's name and did not attempt to make a sale on the phone call. This narrow a reading of the TCPA would undermine the law's purpose, and it would directly contradict the FCC's broad definition of commercial messages. *See In re Rules & Regulations Implementing the Tel.*

---

[3] The federal common law of agency is in accord with the third Restatement. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).

*Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14098 (2003). As explained in the previous section of this opinion, the evidence in the present case would permit a reasonable jury to determine that one purpose of the calls was to convince consumers to take a nominally free cruise through CCL during which they would spend money on food, drink, and other products CCL could sell them. A reasonable jury could also conclude that one purpose of the calls was to help CCL sell an upgraded cruise package that would fulfill VOMT's lead-generation obligations to Berkley and bring customers to Berkley's facilities for timeshare presentations. If the calls were made to increase the flow of consumers to CCL's cruises and Berkley's timeshare presentations, then they were made in order to encourage consumers to engage in the type of economic activity that renders VOMT and Berkley "sellers" who are vicariously liable for their agents' violations of the TCPA.

The question, then, is whether the evidence would permit a reasonable jury to find that CCL, VOMT, and Berkley were party to agency relationships under federal common law agency principles such that they may be held liable for ESG's actions in making the calls. Plaintiffs argue that CCL expressly or impliedly authorized ESG to act as its agent in making the unlawful calls. They also argue that VOMT is liable because VOMT and CCL are one and the same or because VOMT authorized CCL to enlist ESG to make unlawful calls. Plaintiffs further contend that Berkley gave VOMT actual or apparent authority to launch the unlawful call campaign and conscript ESG as a subagent or that Berkley at least should be held liable based on a ratification theory, because it knowingly accepted the benefits that flowed from the call campaign in the form of increased business. Plaintiffs alternatively suggest that in their concerted effort

to put together the call campaign, CCL, VOMT, and Berkley were effectively a joint venture.  Accordingly, they argue that each defendant should be liable for the unlawful acts ESG took in furtherance of the joint venture.

An entity may be held vicariously liable for violations of the TCPA "under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification."  *Dish Network*, 28 F.C.C.R. at 6582 ¶ 28.  "Formal agency," as the FCC calls it, is also known as "actual authority."  Actual authority may be express or implied.  *Bridgeview Health Care*, 2016 WL 1085233, at *3.  An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act.  "While express actual authority is proven through words, implied actual authority is established through circumstantial evidence."  *Id.* at 6.  A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf.  *Opp*, 231 F.3d at 1064.  "To create apparent authority, the principal must speak, write, or otherwise act toward a third party."  *Bridgeview Health Care*, 2016 WL 1085233, at *3.  Finally, ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions.  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004).  It "requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction."  *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013).

Defendants are correct that the evidence does not support vicarious liability for

CCL, VOMT, or Berkley based on a theory of apparent authority. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03. The conduct of the alleged principal, not that of the alleged agent, determines whether the principal can be held liable based on a theory of apparent authority. *See Bridgeview Health Care*, 2016 WL 1085233, at *3 ("[The principal's] conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him."). In this case, when the prerecorded messages stated that call recipients who completed the surveys would qualify for a cruise, they arguably suggested that ESG was calling on CCL's behalf. But ESG made this representation, not CCL. And plaintiffs cite no representations or conduct along these lines by Berkley and VOMT either. They also point to no evidence that third parties were aware of the contractual relationships between ESG and CCL, CCL and VOMT, or VOMT and Berkley. The Court is unpersuaded that merely entering into a contract authorizing calls to be made amounts to taking action "toward a third party" sufficient to give rise to apparent authority where there is no evidence of any third party's awareness of this.

The evidence could, on the other hand, support a finding by a reasonable jury against each of the defendants on other bases. For example, plaintiffs have adduced evidence that would permit a reasonable jury to find that CCL expressly or impliedly granted ESG the actual authority to make unlawful calls on CCL's behalf. The supplier agreements between CCL and ESG provide that ESG "shall provide [CCL] an exact

telephone script along with an exact audio file of each survey," Pls.' Ex. 16, dkt. no. 338-1, at 54, and evidence in the record shows that on at least one occasion, CCL's attorneys proposed edits to the survey script being used. A reasonable factfinder could infer from this and other evidence in the record that CCL authorized the call campaign and had control over the manner and means by which ESG conducted it.

There is also evidence that would permit a reasonable jury to find VOMT liable for the unlawful calls because it is either the alter ego of CCL or gave CCL and ESG actual authority to take action on its behalf. VOMT and CCL share identity of ownership and management; indeed, Daniel Lambert served as the Rule 30(b)(6) witness for both CCL and VOMT, and he testified that it was difficult even for him to clearly distinguish his role with VOMT from his role with CCL. Lambert and James Verrillo, the founders and operators of CCL and VOMT and the only employees of VOMT, used the same telephone lines and CCL email accounts to conduct business for both companies. In addition, VOMT expressly granted CCL (in a contract Lambert negotiated on both companies' behalfs) the authority to conduct telemarketing and contract with subagents in furtherance of the CCL–VOMT marketing arrangement. "A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) of Agency § 3.15(1). An agent may appoint a subagent if the agent has actual or apparent authority from the principal to do so. *See id.* § 3.15(2). A reasonable jury could find that VOMT and CCL are one and the same, and that together they granted actual authority directly to ESG to make the calls at issue. Even if a jury determined that VOMT and CCL are distinct entities, it

could reasonably find that VOMT granted actual authority to CCL to enlist ESG as a subagent.

Similarly, a reasonable jury could conclude from the evidence that Berkley impliedly authorized VOMT to act as its agent and enlist the subagents that carried out the call campaign. The evidence permits the reasonable conclusion that Berkley expressly authorized VOMT to seek out vendors to generate leads for its timeshare products, that VOMT and CCL are one and the same or VOMT expressly authorized CCL to create a package and enlist others to offer that package in a call campaign, and that CCL expressly authorized ESG to make phone calls offering a free cruise. Even considering the fact that all of the contracts expressly prohibited agents and subagents from violating the law, a reasonable jury could find vicarious liability based on grants of actual authority.

The evidence would also permit a reasonable jury to find that CCL, VOMT, and Berkley ratified acts that ESG undertook on their behalf by knowingly accepting the benefits that flowed from them. Ratification occurs when a principal knowingly chooses to accept the benefits of unauthorized actions an agent takes on the principal's behalf. *See NECA-IBEW Rockford*, 736 F.3d at 1059.[4] Specifically, there is evidence that would support a reasonable finding that each of the three defendants now seeking summary judgment was aware of the call campaign and the fact that the campaign

---

[4] In a recent decision addressing agency principles in the TCPA context, the Seventh Circuit stated that "[t]here are three types of agency: (1) express actual authority, (2) implied actual authority, (3) apparent authority." *Bridgeview Health Care*, 2016 WL 1085233, at 3. But the Seventh Circuit has consistently recognized ratification as a valid theory of agency liability, and the Court does not understand *Bridgeview Health Care* to call its validity into question or suggest that ratification cannot give rise to liability for violations of the TCPA.

could drum up business for it.  There is even evidence that all three of these defendants became aware of the possibility that some or all of the calls being made were unlawful under the TCPA and that each of them continued to accept business flowing from the campaign.  Specifically, Berkley's Rule 30(b)(6) witness testified that in May 2012, Berkley became aware (from a Fox News report and an email from Lambert) that call recipients were complaining about the calls and that a lawsuit might be imminent.  The call campaign continued through August, and although Berkley points to evidence that it made an attempt to either cease any unlawful conduct or no longer receive referrals arising out of unlawful calls, it does not identify evidence that it took any steps to ensure that it would no longer receive leads generated through potentially unlawful calls.  A reasonable jury could conclude from this evidence that CCL, VOMT, and Berkley all knew that ESG was placing unlawful calls to gin up business for them and accepted the benefits from this campaign.

Defendants are not wrong to suggest that plaintiffs have, at several points in their statements of material facts submitted in connection with the pending motions, overstated the evidence that supports their position.  But plaintiffs have nonetheless adduced evidence that, when characterized appropriately, would permit a reasonable jury to find CCL, VOMT, and Berkley vicariously liable for unlawful phone calls made by ESG.  For these reasons, defendants are not entitled to summary judgment on the grounds they cite.

## D.     Stone's and Parkes's phone records

Finally, defendants contend that summary judgment should be granted in their favor on the claims of Parkes and Stone based on those plaintiffs' phone records.

Specifically, defendants point out that Parkes claims to have received five calls via his cellular phone, but his phone records show that he did not listen to the calls long enough to hear a reference to a free cruise or to speak to a CCL representative. Parkes also claims to have actually spoken to a CCL representative only during a call made to his business line, a call that does not fit within the class definition. Defendants also contend that summary judgment should be granted in their favor "as to the entire Residential Landline Class" because Stone, the only named plaintiff to claim membership in that class, claims to have received two landline calls that are not reflected in either her phone records or ESG's records. *See* CCL's Reply, dkt. no. 411, at 25. Defendants argue that this makes Stone an inadequate class representative, and they seek summary judgment due to there being "no named Plaintiff with standing under the Residential Landline class, and because the time to amend pleadings has long passed." *Id.*

As an initial matter, defendants' latter challenge is procedurally improper. Defendants are seeking summary judgment on claims belonging to an entire class of plaintiffs based on the alleged inadequacy of its named representative. If Stone is an inadequate representative because her claim is infirm, the appropriate course of action would be to dismiss her individual claim and allow the plaintiffs to propose a different class representative.

But even if summary judgment on the claims of the entire class were an appropriate procedural mechanism to deal with this issue, it would not matter. Parkes and Stone have viable claims, and they are adequate class representatives. In defendants' view, class members may prevail on TCPA claims against defendants only

by producing phone records that show they received a call and heard a prerecorded message offer a free cruise. But defendants' arguments are premised on a misreading of the class definitions, which are not as narrow as defendants seem to think. The classes include "[a]ll persons . . . to whom (1) one or more telephone calls were made," irrespective of whether those persons heard the messages in their entirety or asked to be transferred to a CCL representative. Moreover, the classes include all such persons:

> whose (i) telephone number appears in Defendants' records of those calls and/or the records of their third party telephone carriers or the third party telephone carriers of their call centers or (ii) own records prove that they received the calls—*such as* their telephone records, bills, and/or recordings of the calls—and who submit an affidavit or claim form if necessary to describe the content of the call.

*Birchmeier*, 302 F.R.D. at 256 (emphasis added). Importantly, use of the words "such as" indicates that the definition contains a non-exhaustive list of the methods by which class membership may be shown. As the Court explained in its order granting class certification, "[s]hould a putative class member's records fail to indicate that she received a political survey call with a free cruise incentive, she may in addition to her records provide a sworn statement at an appropriate point during the litigation." *Id.* at 250.

As discussed in an earlier section of this decision, Parkes did not need to hear any defendant's name or stay on the line long enough to hear the free cruise offer in order for the call to be unlawful, nor did he need to be connected with CCL representatives. And although neither Stone's nor defendants' phone records reflect that Stone received calls to her landline, other evidence, including her testimony and complaints she filed with the Washington Attorney General's Office, would permit a reasonable jury to conclude that she received such calls. The Court therefore denies

defendants' summary judgment motions insofar as they challenge the evidence supporting Stone's and Parkes's claims.

## Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for partial summary judgment [dkt. no. 336] in part, finding that plaintiffs have established the unlawfulness of calls with prerecorded messages made to the cellular phone class. The Court otherwise denies plaintiffs' motion and also denies defendants' motions for summary judgment [dkt. nos. 340, 342, 344]. The case is set for a status hearing on April 25, 2016 at 9:00 a.m. to discuss a schedule for further proceedings, including a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 18, 2016