# IN THE UNITED STATES DISTRICT COURT FOR THE
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

GERARDO ARANDA, GRANT
BIRCHMEIER, STEPHEN PARKES, and
REGINA STONE, on behalf of themselves and
a class of others similarly situated,
*Plaintiffs*,

              *v.*

CARIBBEAN CRUISE LINE, INC.,
ECONOMIC STRATEGY GROUP,
ECONOMIC STRATEGY GROUP, INC.,
ECONOMIC STRATEGY, LLC, THE
BERKLEY GROUP, INC., and VACATION
OWNERSHIP MARKETING TOURS, INC.,
*Defendants*.

Case No. 1:12-cv-04069

Honorable Matthew F. Kennelly

## PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION
## FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

## TABLE OF CONTENTS

I.     **Introduction** ................................................................................................... 1

II.    **Background** .................................................................................................... 2

     A.    **Nature of Case** ................................................................................ 2

     B.    **Litigation History** ........................................................................... 3

     C.    **Class Counsel's Continuing Efforts Since Preliminary Approval** ..................... 8

III.   **Class Counsel's Requested Attorneys' Fee and Expense Award Is Reasonable, Falls Within the Market Rate for Similar Services, and Should be Approved** .......................................................................................... 8

     A.    **An Award of One-Third of the Benefit to the Class Correctly Compensates Counsel for the Value They Added to the Class Recovery** ......................................................................... 10

          1.    **Class Counsel should be paid based on the value that they provided for the Class** ....................................................... 11

          2.    **One-third of the Settlement Fund is a reasonable award to compensate Class Counsel for the value they provided** ......................... 16

          3.    **The Settlement Agreement requires maximizing Class Members' recovery up to the $76 million ceiling** ................................. 21

     B.    **While the Lodestar Method is a Poor Fit for This Case, Examining Class Counsel's Lodestar Confirms that One Third-of the Fund is Reasonable** .............................................................. 22

          1.    **The requested fee reflects a reasonable base rate under the lodestar standard because it comports with the prevailing market value of the time and resources the attorneys invested in the case** ......................................................... 23

          2.    **The risks of this litigation justify the effective multiplier of the one-third fee request** ...................................................... 26

IV.   **Plaintiffs' Request for $10,000 for Each Plaintiff Represents a Fair and Reasonable Incentive Award** .......................................................................... 29

V.    **Conclusion** ................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Pipe & Const. Co. v. Utah*,
    414 U.S. 538 (1974) ............................................................................................17

*Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ...............................................................................9

*Aranda v. Caribbean Cruise Line, Inc.*,
    179 F. Supp. 3d 817 (N.D. Ill. 2016).............................................................2, 5, 6

*Aranda v. Caribbean Cruise Line, Inc.*,
    No. 12-cv-4069, 2016 WL 4439935 (N.D. Ill. Aug. 23, 2016)...........................6

*Beesley v. Int'l Paper Co.*,
    No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) .......26

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D.Ill.2014) ........................................................................4, 5

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    No. 12 C 4069, 2012 WL 7062748 (N.D.Ill. Dec. 31, 2012)............................3

*Blum v. Stenson*,
    465 U.S. 886 (1984) ..........................................................................................23

*Boeing v. Van Gemert*,
    444 U.S. 472, 478 (1980) ..................................................................................26

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ...............................................................9, 29, 30

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) .............................................................................15

*Florin v. Nationsbank of Georgia, N.A.*,
    34 F.3d 560, 565 (7th Cir. 1994) .................................................................26, 27

*Florin v. Nationsbank of Georgia, N.A.*,
    60 F.3d 1245 (7th Cir. 1995) .............................................................................27

*Gastineau v. Wright*,
    592 F.3d 747 (7th Cir. 2010) .............................................................................23

*Goodman v. Hangtime, Inc.*,
No. 14-cv-1022-JRB, dkt. 124 (N.D. Ill. Sept. 29, 2015) ............................................25, 26

*In re Capital One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015)..............................................................................17, 18

*In re Caribbean Cruise Line, Inc.*,
No. 14-08021 (7th Cir. Oct. 10. 2014) .................................................................................4

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir.1992) ................................................................................................9

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ......................................................................................*passim*

*In re Synthroid Mktg. Litig.*,
325 F.3d 974 (7th Cir. 2003) .............................................................................................13

*Jeffboat LLC v. Director, Office of Workers' Comp. Programs*,
553 F.3d 487 (7th Cir. 2009) .............................................................................................23

*Kolinek v. Walgreen Co.*,
311 F.R.D. 483 (N.D. Ill. 2015). ...................................................................9, 14, 20, 22, 29

*Martin v. Reid*,
818 F.3d 302 (7th Cir. 2016) .............................................................................................30

*Montanez v. Simon*,
755 F.3d 547 (7th Cir. 2014) .............................................................................................23

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) .............................................................................................21

*Robles v. Lucky Brand Dungarees, Inc.*,
No. 10-cv-04846-MMC, Dkt. 105 (N.D. Cal. May 10, 2013) ...........................................25

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011).....................................................................................9

*Silverman v. Motorola Sols., Inc.*,
739 F.3d 956 (7th Cir. 2013) .................................................................................12, 13, 17

*Skelton v. Gen Motors Corp.*,
860 F.2d 250, 258 (7th Cir. 1988) ......................................................................................9

*Spano v. Boeing Co.*,
    No. 06-CV-743-NJR-DGW, 2016 WL 3791123 (S.D. Ill. Mar. 31, 2016) ...................30

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016). ...........................................................................6

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ...............................................................8, 9

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ......................................................9, 16, 20

*Wright v. Nationstar Mortgage LLC*,
    No. 14 C 10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) .......................13

## Statutes

47 U.S.C. § 227 ...................................................................................1

Fed.R.Civ.P. 23 .................................................................................26

## I. Introduction.

This Court having preliminarily approved the largest class action settlement to date under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") reached with defendants Caribbean Cruise Line, Inc. ("CCL"), Vacation Ownership Marketing Tours, Inc. ("VOMT"), and The Berkley Group, Inc. ("Berkley") (collectively, "Defendants"), Plaintiffs now move for attorneys' fees and incentive awards for reaching that result.

Achieving this Settlement did not come quickly or easily: it was reached on the eve of trial after four years of hard-fought litigation and three rounds of mediations with a well-respected former judge of this Court. Far outstripping Defendants previous offers to resolve this case for at most pennies on the dollar of the available statutory damages, the Settlement now provides each claiming Class Member with the ability to receive a cash payment of up to $500 for *each call* received, which is also far more than the $30-$50 *per person* typically obtained in almost any other large TCPA settlement. Further, Defendants have agreed to perform annual internal audits of their telemarketing procedures to prevent unlawful calls going forward.

In consideration for the extensive time and effort Plaintiffs and Class Counsel expended to transform a case that Defendants valued at essentially zero into the largest TCPA settlement in a landscape not lacking in comparables, Plaintiffs seek attorneys' fees in the amount of one-third of the common fund (not including notice and administration expenses) and a $10,000 incentive award for each named Plaintiff.[1] Class Counsel's fee request is entirely reasonable under the Seventh Circuit's market-based approach, is supported by the attached expert reports of Professor William B. Rubenstein of Harvard Law School (author of *Newberg on Class Actions*)

---

[1] When Plaintiffs speak of the common fund they are referring to the actual amount of money paid by Defendants, not any theoretical amount that could end up reverting back to Defendants.

and Professor M. Todd Henderson of the University of Chicago Law School, and was empirically confirmed through a survey by Professor Larry Chiagouris of Pace University. Likewise, the agreed-upon amount of the incentive awards is consistent with awards made in similar cases in this District, and entirely appropriate given the extraordinary lengths to which Plaintiffs went in securing the result for the Class. For these reasons, and as explained more fully below, this Court should approve Plaintiffs' requested attorneys' fees and incentive awards.

## II.    Background.

### A.    Nature of the Case.

The facts of this case are laid out in detail in the Court's order granting partial summary judgment in favor of Plaintiffs and the Class. *See generally Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016). Briefly, "over a million people throughout the United States received phone calls that were made to their cellular phones and residential landlines by an organization representing itself as 'ESG' or 'Political Opinions of America' requesting their participation in various short political surveys." *Id.* at 820. Plaintiffs argued that the calls were made "not to collect information or raise awareness but rather to drum up business for CCL, VOMT, and Berkley" in violation of the TCPA. *Id.* at 821. CCL, VOMT, and Berkley did not physically place the calls at issue. *Id*. at 820-21, 828. Rather, CCL arranged for the purported "political survey" companies to place the telemarketing calls, and then sold the leads it generated from those calls to VOMT, which in turn sold some of those leads to Berkley to pitch its timeshares. *See id*. at 831-33. Plaintiffs' theory of liability hinged on whether CCL, VOMT, and Berkley could be held vicariously liable for the telemarketing calls from which they benefited. *Id*. And it was this theory that was set to be tried before a jury when this case resolved.

### B.     The Litigation History.

Class counsel labored diligently, and with great risk of no recovery, for over four years to achieve the Settlement. (*See* Declaration of Jay Edelson, attached as Exhibit 1 at ¶ 3 and Declaration of Scott Rauscher, attached as Exhibit 2 at ¶ 3.) From the time the initial complaint was filed in 2012 until the final pre-trial conference in August of 2016, Class Counsel have taken almost 20 depositions, certified two classes, opposed three sets of dispositive motions, and appeared before this Court more than 40 times. (Edelson Decl. ¶¶ 4-8; Rauscher Decl. ¶¶ 4-8.) By way of example, Class Counsel's case file has grown to over five gigabytes of data, which, estimated conservatively, would fill more than 1,500 bankers boxes if kept on paper. While a detailed recounting of all of the work performed over the last four years would be unnecessarily voluminous, a review of the highlights underscores the value of the work that Class Counsel was required to perform to achieve the type of settlement that they did for the class.

CCL (the only currently named Defendant who was involved in the *Birchmeier* action prior to consolidation) initially responded to the complaint with a motion to dismiss, which Class Counsel opposed and this Court denied over four years ago, in December 2012. (*See* Dkts. 38, 55, 75; *see also Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2012 WL 7062748 (N.D. Ill. Dec. 31, 2012)). After the motion to dismiss was denied, the plaintiffs in two other lawsuits pending against several of the same defendants voluntarily agreed to consolidate before this Court. (*See* Dkt. 88-1 at 3-4 ¶¶ 9-10.) After consolidation, Plaintiffs Grant Birchmeier, Stephen Parkes, and David Wright[2] jointly moved to have Edelson PC and Loevy & Loevy, jointly moved to lead the case. (Dkt. 88.) Another set of lawyers, representing Susan Vigus, also

---

[2]     Ms. Stone later replaced Mr. Wright as a Named Plaintiff.

moved to be appointed lead counsel. (Dkt. 94.) The Court granted Birchmeier's, Parkes's, and Wright's motion, and denied Vigus's. (Dkt. 100.)[3]

For the next ten months, the parties engaged in substantial class discovery, and in October 2013, Plaintiffs filed their motion for class certification. (Dkt. 146.). After months of more briefing and supplemental briefing, the Court granted the motion in August 2014, certifying two classes, one for persons who received calls on landline phones and the other for persons who received calls on cellular phones, defined as:

> All persons in the United States to whom (1) one or more telephone calls were made by, on behalf, or for the benefit of the Defendants, (2) purportedly offering a free cruise in exchange for taking an automated public opinion and/or political survey, (3) which delivered a message using a prerecorded or artificial voice; (4) between August 2011 and August 2012, (5) whose (i) telephone number appears in Defendants' records of those calls and/or the records of their third party telephone carriers or the third party telephone carriers of their call centers or (ii) own records prove that they received the calls—such as their telephone records, bills, and/or recordings of the calls—and who submit an affidavit or claim form if necessary to describe the content of the call.

(collectively referred to as the "Class"). *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 256 (N.D. Ill. 2014). Unwilling to accept the Court's class certification order, Defendants filed a petition for an interlocutory appeal pursuant to Rule 23(f), which Plaintiffs opposed and the Seventh Circuit denied. *See In re Caribbean Cruise Line, Inc.*, No. 14-08021 (7th Cir. Oct. 10. 2014).

After the Court certified the Class, Plaintiffs ensured that Class Members were appropriately notified and the requirements of due process satisfied. (*See* Dkts. 247, 257, 258.) This was a laborious and expensive process. Defendants had argued that their

---

[3]     It was later determined that Vigus received a different robocall than did the Class Members here, and although she could have separately continued with her case on behalf of a different class, she apparently didn't like her chances of continuing with class litigation and stipulated to dismissal with prejudice after settling her claims individually. (Dkt. 173.)

records made it impossible to ascertain the class, and they were thus of little help in identifying and contacting Class Members. *See Birchmeier*, 302 F.R.D. at 243 ("Defendants' response [to Plaintiffs' motion for class certification] contained several arguments to the effect that plaintiffs' proposed classes were not ascertainable, in part because plaintiffs did not have a list of class members or a viable method for generating one."). So Class Counsel spent months serving subpoenas on various wireless telephone carriers, and in some instances, moving to compel their responses. (Edelson Decl. ¶ 6; Rauscher Decl. ¶ 6.) Ultimately, Class Counsel obtained contact information for nearly ninety percent of the individuals whose wireless numbers appeared in Defendants' records or those of their call centers (in addition to the approximately fifty percent of individuals whose landline number appeared on the same records), despite Defendants' arguments that doing so would be impossible. (*See* Dkt. 311; *see also* Edelson Decl. ¶ 6; Rauscher Decl. ¶ 6.) Thereafter, Class Counsel effectuated direct notice of the Court's certification order to all of those individuals. (*Id.*)

At the same time, the parties continued to engage in discovery, which—by the end of the litigation—included approximately 25 sets of interrogatories, 20 sets of document requests, 7 sets of requests to admit facts, and almost 20 depositions. (Edelson Decl. ¶ 7; Rauscher Decl. ¶ 7.) Based on the information obtained, Plaintiffs moved for partial summary judgment that the calls violated the TCPA and Defendants moved for complete summary judgment, again arguing that they could not be held vicariously liable for the calls made for their benefit. *Aranda*, 179 F. Supp. 3d at 823, 828. And again, Plaintiffs prevailed. On April 18, 2016, the Court granted partial summary judgment in the Class's favor, holding that the calls made to members of the

cellular telephone class violated the TCPA. *Id*. at 835. The Court simultaneously denied Defendants' motion for summary judgment in its entirety. *Id*.

Two issues remained for trial: (1) whether any TCPA exemptions applied to the calls made to members of the residential landline class, and (2) whether Defendants were vicariously liable for the calls under federal common law principles of agency. (Dkt. 466 at 2-3.) To resolve these remaining factual issues, the Court set a firm trial date of September 12, 2016, with the final pretrial conference to be held on September 8, 2016. (Dkt. 423.)

While the parties were preparing for trial, Defendants filed yet another set of motions based on the Supreme Court's then-recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). All three Defendants asked to decertify the Class, and CCL and VOMT additionally filed a renewed motion for summary judgment. (Dkts. 428, 435.) To prepare the decertification motion, Defendant Berkley brought in the same law firm who had represented the petitioner in *Spokeo*. The Class was fortunate to be represented by Edelson, the same firm that represented the respondent in *Spokeo*. After briefing, the Court denied Defendants' motions in their entirety in late August 2016, mere weeks before the start of trial. *See Aranda v. Caribbean Cruise Line, Inc.*, No. 12-cv-4069, 2016 WL 4439935 (N.D. Ill. Aug. 23, 2016).

As the trial date approached, Plaintiffs' counsel divided work between a trial team, led by Loevy & Loevy, and a settlement team, led by Edelson. (Edelson Decl. ¶ 11; Rauscher Decl. ¶ 11.) The parties had discussed settlement numerous times over the four years of litigation, including two previous rounds of formal mediation before the Honorable Wayne R. Andersen (ret.) of JAMS. (Edelson Decl. ¶ 9; Rauscher Decl. ¶ 9.) Given the nature of the previously failed mediation attempts and Defendants' low valuation of this case, the trial team vigorously prepared to try the case, including by drafting the final pretrial order, collectively filing and responding to

26 motions *in limine* on important evidentiary issues, and successfully moving to require key witnesses to provide live testimony after Defendants refused to bring them to trial voluntarily. (*See* Dkt. 466 (Final Pretrial Order); Dkts. 487-88 (Rulings on motions *in limine*); Dkt. 471 (Order on motion for live testimony); *see* also Edelson Decl. ¶ 11; Rauscher Decl. ¶ 11.)

The settlement team, meanwhile, focused on exhausting all possibilities for settling the case. (Edelson Decl. ¶ 12; Rauscher Decl. ¶ 12.) Less than 10 days before trial was set to begin, the settlement team began engaging in settlement negotiations with the trustee of Berkley's employee stock ownership plan, who had not previously played an active role in the litigation and who retained experienced class-action counsel. (*Id.*) After several in-person mediation sessions with Judge Andersen—one of which included a frank discussion with the Court—and days of near-constant emails and phone calls among the parties and Judge Andersen (Edelson Decl. ¶ 13; Rauscher Decl. ¶ 13), Class Counsel obtained the largest TCPA settlement in any case to date. Defendants agreed to pay between $56 million and $76 million to resolve the case, and class members stand to receive hundreds of dollars for each call they received, not a small per person sum like most comparable cases. (*See* Dkt. 502 (Settlement Agreement); *see also* Dkt. 497 at 1-2, 10-14 (Motion for Preliminary Approval).)

At what would have been the final pre-trial conference days before trial, the parties presented the Court with a binding Memorandum of Understanding that outlined the details of this settlement agreement. (Edelson Decl. ¶ 15; Rauscher Decl. ¶ 15.) The Court struck the trial date, but given the age of the case, it allowed only two weeks for the parties to work out a final agreement and for Plaintiffs to file a motion for preliminary approval, which they did on September 26, 2016. (Dkt. 494.) The Court granted the preliminary approval motion shortly thereafter. (Dkt. 503.)

7

## C. Class Counsel's Continuing Efforts Since Preliminary Approval.

Even after the Settlement Agreement was inked, Class Counsel has continued to work to ensure that the Class reaps the rewards of the Settlement. Class Counsel has communicated by phone and email with thousands of Class Members or potential class members to answer their questions and aid in their filing of claim forms. (Edelson Decl. ¶ 16; Rauscher Decl. ¶ 16.)

As part of the Settlement Agreement Defendants may challenge the number of calls each class member received. (Dkt. 502 ¶¶ 5.3-5.5, 5.7.) While all challenges are to be decided by the court-appointed Special Master based on available evidence, the Class Members also have a right to appeal the Special Master's decision to the Court. (*Id.*) Class Counsel is committed to providing representation before the Special Master (and to the Court, if necessary) to every Class Member who has a basis to resist Defendants' challenge (and there are scores as Defendants continue to fight every possible battle in this case). (Edelson Decl. ¶ 17; Rauscher Decl. ¶ 17; *see also* Dkt. 522 (Plaintiffs' Motion to Enforce Claims Provision of Settlement Agreement).) To that end, Class Counsel continues to devote substantial resources to assisting Class Members, including helping them obtain records from their telephone companies, so that they can prove whether they received calls (if they were not on Defendants' records [or the records of their call centers]) and/or how many calls they received. (Edelson Decl. ¶ 17; Rauscher Decl. ¶ 17.) Class Counsel will continue to do so until all challenges are resolved and all valid claims are paid. (*Id.*)

## III. Class Counsel's Requested Attorneys' Fee and Expense Award Is Reasonable, Falls Within the Market Rate for Similar Services, and Should Be Approved.

Turning to the relief requested in this Motion, in common fund settlements like this one, the Seventh Circuit has "consistently directed district courts to do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)

(internal quotations omitted); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) ("*Synthroid I*") (cautioning that "any method other than looking to prevailing market rates assures random and potentially perverse results"). "When attorneys' fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011). In effect, "the object is to simulate the market where a direct market determination is infeasible." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)); *see also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) (Kennelly, J.) ("When determining whether a requested fee award is reasonable, a court 'must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund.'") (quoting *Skelton v. Gen Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988)).

Although the Seventh Circuit affords district courts the discretion to apply either the "percentage of the fund" or the "lodestar" method in awarding fees in a class action where a common settlement fund is created, *see Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), "one common method of choosing between the percentage and lodestar approaches is to look to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred." *Kolinek*, 311 F.R.D. at 500-01 (citing *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)). "As other courts have observed, the normal practice in consumer class actions is to negotiate a fee arrangement based on a percentage of the plaintiffs' ultimate recovery." *Id.* at 501.

Here, Class Counsel's request for a fee award representing one-third of the net Settlement

Fund (*i.e.*, after deducting notice and administration costs) is fair and reasonable under the Seventh Circuit's market approach. Not only does an award of one-third accurately reflect the results of a hypothetical *ex ante* negotiation, but it is also in line with both privately negotiated fee arrangements in similar cases and with fee awards in other class actions. And although Class Counsel incurred $412,206.82 in out-of-pocket expenses for which they are entitled to separate reimbursement, they will instead cover that amount out of their fees. Further, although the lodestar method is not well-suited to this case, an examination of the time that Class Counsel has spent on this litigation confirms that the requested one-third fee award is appropriate.

### A. An Award of One-Third of the Benefit to the Class Correctly Compensates Counsel for the Value They Added to the Class's Recovery.

The Seventh Circuit instructs district courts to award fees to class counsel based on the "market rate," which must be determined by "approximating the terms that would have been agreed to *ex ante*, had negotiations occurred." *In re Synthroid Mktg. Litig.*, 264 F.3d at 719. In other words, the Court must figure out what the Class Members would have agreed to pay Class Counsel in a negotiation at the beginning of this case, in order to create a fee structure that "emulate[s] the incentives that a private client would put in place." *Id.*

Without the benefit of an actual *ex ante* negotiation, the Court "must . . . simply determine what value the lawyers have provided" to the class. *Id.* at 720. To make that determination, the Court should determine the inherent value of the case to the class—that is, the value the class would have received before class counsel performed any legal work—and compare it to the result that was ultimately achieved. That allows the Court to base the fee award on the value that the attorneys created for the Class by virtue of the work they performed. Seventh Circuit law, Plaintiffs' experts, and empirical data all support awarding a fee based on the value provided to the Class.

### 1. Class Counsel should be paid based on the value that they provided for the Class.

To determine how much value the lawyers have provided to the class through their work, the Court should first consider how much the case would have been worth without the lawyers' efforts. There is, after all, "no need to pay counsel to 'produce' a recovery that is there for the asking." *Synthroid I*, 264 F.3d at 721. Take, for example, the highly-publicized pending class action involving Volkswagen's intentional circumvention of emissions regulations. (*See* Declaration of Professor M. Todd Henderson, attached hereto as Exhibit 3 at 18.) That case—actually more than a thousand cases—was filed after government agencies undertook an investigation at taxpayer expense that uncovered Volkswagen's massive fraud and after Volkswagen publicly admitted to the wrongdoing. (*Id.* at 18-19.) From the outset of that litigation, there was little question that Volkswagen was going to have to settle for a substantial amount of money. (*Id.*) The many lawyers in that case added some value by filing the complaint and negotiating the terms of the settlement, but it would be inaccurate to say that the efforts of those lawyers produced all of—or even most of—the settlement value for the class. (*Id.*) It was there for the taking.

The Volkswagen emissions case is an example of a case with a high "inherent" value. (*Id.*) That is, a case that is worth a substantial amount of money after only perfunctory legal work. (*Id.* at 3.) A lawyer who settles a case at or near the inherent value has provided some value to the class by doing the low-risk legal work required to actually file a complaint, engage with the defendant, and obtain the settlement. (*Id.*) But that value added is relatively low, and the corresponding negotiation should produce a fee relatively close to the lawyer's hourly rate. (*Id.*)

Not all cases have a high inherent value. Some meritorious class actions have a low value—or even a zero value—at the time they are filed. (*Id.* at 19.) For example, in a decision

11

affirming a large fee award, the Seventh Circuit noted that *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013), was an "unusually risky" case that "took more than four years" to settle. The settlement was only reached "after the district court denied [the defendant's] motion for summary judgment," and the defendant "might well have prevailed on summary judgment but for some unanticipated facts plaintiffs' lawyers turned up in discovery." *Id.* In a case like *Silverman*, the value that the class ultimately received is not low-hanging fruit that merely requires a lawyer to step in and collect it. Rather, the value is created by the work that the lawyers have done in investigating the case, conducting discovery, certifying a class, and ultimately proving Defendants' liability and the amount of damages. (*See* Henderson Decl. at 23, 34-35.)

A case's inherent value is directly relevant to class counsel's fee request because the Seventh Circuit requires that class counsel be paid based on the value *they* provide for the class. *See Synthroid I*, 264 F.3d at 720-21. That's because the Class, acting rationally, would pick a fee structure that incentivizes Class Counsel to maximize the benefit the Class ultimately receives. A lawyer who brings a case with a low inherent value but is eventually able to obtain a large settlement has provided significantly more value to the class than a lawyer who merely collects a large settlement on a case that will inevitably settle for a large sum. (Henderson Decl. at 19-20.) Thus, the Court should determine the fee award in this case based on how much Class Counsel's efforts were able to increase the value of the case above its inherent value.

There are a number of indicators of a case's inherent value. (*Id.* at 16.) First, the Court can consider the number and types of plaintiffs' firms participating in the case. (*Id.*) Given the fairly certain recovery available in a case with a high inherent value, many different plaintiffs' firms are likely to pile on, because they view the case as a low risk. (*Id.* at 28-29.) In the

Volkswagen emissions case, for example, dozens of firms were involved. (*Id.* at 18-19.) In some high inherent value class actions, there are even enough firms seeking to litigate the case that the court can hold an auction to choose lead counsel. *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 977 (7th Cir. 2003) [hereinafter "*Synthroid II*"]. In such cases, it is reasonable to pick only one of the many available firms to lead the case, because it is likely that each firm participating in the auction has much the same skill set. (Henderson Decl. at 28.) A case that attracts a large number of filings from many different firms, each of whom effectively duplicates the skill sets of the other, thus indicates that the case has a high inherent value. (*Id.*)

On the other hand, a case that attracts only a few firms whose skill sets complement, as opposed to duplicate, each other's suggests that the inherent value of the case is relatively low. (*Id.* at 29-30.) For example, in *Silverman*, the Seventh Circuit noted that the fact that "no other law firm was willing to serve as lead counsel . . . suggests that most members of the securities bar saw this litigation as too risky for their practices." 739 F.3d at 958. If that case had a high inherent value with more-or-less guaranteed recovery and attendant attorneys' fees, then there would have been more interest from more firms. (*See* Henderson Decl. at 28-30.) Instead, a single firm in *Silverman* litigated a case for many years and was able to secure a settlement only after investing significant effort. *Silverman*, 739 F.3d at 958.

In this case, even though Defendants' scheme resulted in millions of unlawful phone calls, there were only five lawsuits ever litigated regarding these calls—two individual lawsuits and the three that were consolidated into this case. (Henderson Decl. at 29-30.) Simply stated, there was virtually no interest in this case from the plaintiffs' bar. (*Id.*)

Of the few firms that offered to represent the Class in this litigation, two—Edelson and Loevy—brought complementary skill sets. Edelson is highly experienced in consumer class

action litigation, particularly involving the TCPA, *see, e.g.*, *Kolinek*, 311 F.R.D. at 495 (noting that attorneys at Edelson are "highly experienced class action litigators"); *Wright v. Nationstar Mortgage LLC*, No. 14 C 10457, 2016 WL 4505169, at *11 (N.D. Ill. Aug. 29, 2016) (finding Edelson to be "exceptionally qualified and experienced in representing classes"), and their efforts have secured groundbreaking decisions in both trial and appellate courts nationwide. (Henderson Decl. at 30-33.) Loevy has successfully tried dozens of cases to verdict, including in the class action context (*id.* at 33) (which is rare). TCPA cases do not often go to jury trial, but in light of the Defendants' strategy here, maximizing the value of this case required both lawyers experienced in TCPA litigation and lawyers steeped in experience representing plaintiffs in class action jury trials. (Henderson Decl. at 33-34.) Here, those two different skill sets were brought by the two different firms who represented the Class. (*Id.*) That suggests that the firms involved here were not engaged in duplicative work, and that the lawyers' skills—not any inherent value in filing the case—were the driving force behind the Class's recovery.

Circumstantial evidence about the parties' valuation of the case at its outset also indicates its inherent value, as does the course of dealing among the parties. (Henderson Decl. at 16.) A high early settlement offer from the defendant, for example, would indicate that the inherent value of the case was high, since the defendants were willing to pay after a minimum of legal work. (Henderson Decl. at 18.) On the other hand, a low early offer or a lack of interest in settlement based on principal would tend to show that the case had a low inherent value. (Henderson Decl. at 22-23.) Comparing these figures to the final Settlement Agreement, and assessing how the difference between the two relates to Class Counsel's efforts, can help the Court determine whether the settlement value is derived from the inherent value of the case or from Class Counsel's work. (*Id.* at 16.)

Here, Defendants were not interested in a high dollar settlement until shortly before trial. (*Id.* at 23.) Early in the litigation, Defendants' settlement offers were worth effectively nothing to the Class. (*Id.* at 24.) In fact, those discussions yielded settlement options so unfavorable that even if Class Counsel had accepted one of them, this Court would have been right to deny approval. *See also Eubank v. Pella Corp.*, 753 F.3d 718, 725-26 (7th Cir. 2014) (reversing district court's approval of low-value coupon settlement, among other problematic features, and removing class counsel for having "sold out the class" by accepting it). Thus the mere filing of the complaint and other perfunctory legal work in this case created effectively no value. (Henderson Decl. at 19-20.)

After two more years of hard-fought litigation from the parties' initial mediation in 2014, the case settled on the eve of trial for a fund of between $56 and $76 million. Between 2014 and 2016, there were no external factors, such as a favorable change in law or the Class being larger than anticipated, that altered the value of the case. (*Id.* at 22-27.) The massive difference between the early settlement offer and the final Settlement Fund range can only be attributable to the efforts of Class Counsel achieving class certification, denial of a Rule 23(f) petition for review of that decision, being granted partial summary judgment, and defeating two rounds of Defendants' summary judgment briefing. (*Id.* at 19-22.)

In sum, then, the inherent value of this case was effectively zero. Few firms were willing to take the risk of bringing the case. At the outset of litigation, Defendants were not even willing to consider a monetary settlement. This was not a case where significant (or even any) recovery was "there for the taking." Rather, the entire Settlement Fund is due to Class Counsel's legal victories and their readiness to take the case to trial. For that they should be rewarded.

## 2. One-third of the Settlement Fund is a reasonable fee award to compensate Class Counsel for the value they provided.

To determine whether the amount of Class Counsel's fee request is reasonable, the Court must "try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. That process is designed to estimate the market rate for Class Counsel's services. *Synthroid I*, 264 F.3d at 719. Here, the Class would have agreed to pay attorneys' fees that incentivized Class Counsel to work to obtain the highest possible recovery in what was an inherently low-value case. Applying a hypothetical *ex ante* negotiation between the Class and Class Counsel here demonstrates that because the entire fund is attributable not to any inherent value in the case, but to the value that Class Counsel added by virtue of their legal work, the Class would have agreed to and the Court should award a flat percentage of the entire fund as compensation. Class Counsel's request of one-third of the fund is a fair and reasonable fee award that reflects the market rate for the value of the legal services that they provided to the Class.

As a starting point to determining whether Class Counsel's request reflects the market rate for the services they provided, the Court can turn to *bona fide* negotiated fee structures in TCPA cases involving individual clients who received many calls. (Henderson Decl. at 12.) When Edelson brings such cases on behalf of private clients without seeking to represent a class, it charges a contingency fee of at least 33 1/3%, plus expenses. (Edelson Decl. ¶ 23.) These rates are equal to, and in most cases, lower than what other firms charge in individual cases for similar work, which generally ranges from 40 to 45 percent, plus expenses for TCPA cases where an individual receives hundreds of calls. (Henderson Decl. at 12.) Class Counsel's request of one-third of the Class's recovery, without a separate request for expenses is significantly lower than these privately-negotiated rates. That's unsurprising because the nature of the class action device allows lawyers to resolve claims more efficiently than would be possible in individual suits. *See*

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974) (noting "the efficiency and economy of litigation which is a principal purpose of the [class action] procedure").

The one-third fee request also does not differ markedly from the average rate that district courts award in TCPA settlements nationwide. (*See* Declaration of Professor William B. Rubenstein, a copy of which is attached as Exhibit 4 at ¶ 35.) That said, it is true that several courts in this District considering fee requests in TCPA cases have applied different structures, such as the declining marginal percentage scale used in *In re Capital One Telephone Consumer Protection Act Litigation*, 80 F. Supp. 3d 781, 803-06 (N.D. Ill. 2015). But that structure does not apply mechanically to every case. *See Synthroid I*, 264 F.3d at 721 ("This is not to say that systems with declining marginal percentages are always best."); *Silverman*, 739 F.3d at 959 (affirming district court's grant of flat percentage of a common fund in a class action settlement). In a case with a large number of class members and a high inherent value, "[t]he marginal rates diminish as the recovery increases because, notwithstanding the class's desire to incentivize counsel to seek a higher award, the measure of damages depends more on the number of class members (or phone calls) than the additional efforts of counsel." *Capital One*, 80 F. Supp. 3d at 804. In other words, the size of the fund in that case depended almost entirely on the number of class members and the case's inherent value, not on the efforts of counsel. But in a case with a low or zero inherent value, the size of the fund depends mostly, if not entirely, on the success of Class Counsel's legal work. (Henderson Decl. at 15-16.)

Working through a hypothetical *ex ante* negotiation demonstrates that in a case with a low inherent value like this one, the flat percentage model proposed by Class Counsel is the right one. Consider a competing proposal from Firm X, which offers to represent the Class, to do the work necessary to obtain a result similar to what the *Capital One* class received, and to accept

attorneys' fees on the *Capital One* sliding scale, plus expenses. The *Capital One* class had 17.5 million members, of whom 7.87% submitted claims and were paid $34.60 each (despite having received multiple calls). 80 F. Supp. 3d at 786-87. Thus Firm X's stated goal in this case (which has about 1 million Class Members) would be a fund of about $3.8 million—enough to pay 7.87% percent of the class $34.60 per person while getting paid 30% of the fund.[4] Class Counsel, on the other hand, proposes a flat fee of one-third of the fund, expenses included, but it promises to litigate the case all the way to trial, if necessary, to obtain as large a recovery as possible (ideally, $500 per call).

Given the choice between Firm X's offer and Class Counsel's offer, the Class in an *ex ante* negotiation would have chosen Class Counsel and their proposed fee structure. It's the only choice that makes rational and economic sense. If Class Counsel had achieved *only* the *Capital One* result that Firm X promised, then the Class would have agreed to pay 33% instead of 30% of the $3.8 million settlement fund, and each claimant would have received $32.95—about $1.65 less than if they had picked Firm X. But if Class Counsel was able to achieve a much larger recovery—a $56 to $76 million settlement fund with per call recovery—then individual Class Members would be better off to the tune of hundreds or even thousands of dollars. If, at the outset of litigation, Class Counsel had even a 0.5 percent chance of obtaining an additional $450 per person (not even per call) more than Firm X, then the expected value of that chance to each Class Member is $2.25. The risk of having to pay an extra $1.65 in fees in the event of a small recovery is more than justified by the expected value of the larger recovery. Even though Class Counsel's requested fee represents a slightly higher percentage of the recovery than Firm X's hypothetical offer, Class Counsel's proposal is the only sensible option. (Henderson Decl. at 35.)

---

[4]      Notice costs, administration costs, and incentive awards are omitted for simplicity.

The Seventh Circuit forecasted this possibility in *Synthroid I* (which *Capital One* cites as the basis for the sliding-scale structure) when it noted that a declining marginal percentage structure "create[s] declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery." 264 F.3d at 721. Indeed, examining other fee agreements in large TCPA settlements demonstrates that the *Capital One* model is the market rate for obtaining a settlement that pays class members an inherent value that is a small percentage of the possible recovery on a per-person (not per-call) basis, and that requires a relatively light amount of legal work. In every other TCPA class action settlement with more than a million class members other than this one, class counsel settled the case before adversarial class certification. (*See* Largest TCPA Settlements Chart, attached to the Edelson Declaration as Exhibit 1-B.) And in the vast majority of those cases, class members recovered less than $100 per person despite receiving numerous calls in violation of the TCPA, and the attorneys' fee award was around 25 percent of the fund, with larger funds paying smaller percentages to the attorneys. (*Id.*) For attorneys who are willing to take on a risky case that requires more valuable legal work that results in a much more favorable settlement, the market rate is higher. Indeed, one of the most important factors weighed in determining the reasonableness of attorneys' fees is the risk of non-payment that Class Counsel faced when embarking on the action, as the estimated magnitude of this risk necessarily affects the price at which Class Counsel would have been willing to offer their services in an *ex ante* negotiation. *See Synthroid I*, 264 F.3d at 721. Considering the high risk in taking this case and the small number of firms that were involved here, it's unlikely anyone would have been willing to litigate this case at all, in any manner, for a lower rate. (Henderson Decl. at 29-30; Rubenstein Decl. ¶ 50.)

Although the Seventh Circuit calls for considering a "hypothetical *ex ante* bargain," *Williams*, 658 F.3d at 635, empirical evidence is also an important consideration. *See, e.g.*, *Capital One*, 80 F. Supp. 3d at 796-99; *Kolinek*, 311 F.R.D. at 501. To that end, Class Counsel retained a consumer behavior expert whose empirical analysis confirms the logical conclusion that people are willing to pay more, both in absolute terms and as a percentage, to obtain a better recovery in a class action such as this. (*See* Declaration of Professor Larry Chiagouris, attached hereto as Exhibit 5.) A random sample of people similar to class members (*i.e.*, American adults with telephones) were asked for their views on appropriate compensation for attorneys in a TCPA class action given a range of potential recoveries ranging from $10 to $500. (Chiagouris Decl., Ex. A at 2-3.) More specifically, each individual who took the survey was asked whether for various recoveries they would accept a fee agreement whereby the client received 65% of the recovery and the attorneys received 35%.[5] (*Id.* at 9-10.) A higher percentage of people were willing to accept the 65-35 split for a $500 recovery than for a $10 recovery. (*Id* at 12-13.) Even more tellingly, a statistically significant number of people who were opposed to paying their lawyer $3.50 out of a $10 settlement were nevertheless amenable to accepting $65 when their lawyer would take $35. (*Id.*) That result confirms the Seventh Circuit's comment in *Synthroid I* that the percentage of recovery need not always decline with a higher recovery. It is entirely rational, especially in a low inherent value case like this one, for the Class to agree to pay a flat percentage in order to obtain a larger total recovery than they otherwise would.

The Settlement achieved here is the result of *years* of discovery, motion practice, and trial preparation by which Class Counsel forced Defendants into a position where they decided to accept a settlement that was highly favorable to Class Members, paying out many times more

---

[5] As discussed in Professor Chiagoruis's report, other fee splits were used as well. 739 F.3d 956 The 65/35 split is discussed here as an example supported by the survey.

than other settlements, rather than face a jury on the facts. (Henderson Decl. at 11, 29-31.) Even without knowing that Class Counsel was going to be able to obtain the amount of per call recovery available, their rate structure would still have been more attractive *ex ante* than a firm that proposed to settle this case on similar terms to *Capital One*. Accordingly, the Court should find that the market rate for the value that class counsel provided is one-third of the common fund (minus notice and administration costs of approximately $2 million) and award fees accordingly.

### 3. The Settlement Agreement requires maximizing Class Members' recovery up to the $76 million ceiling.

The Seventh Circuit requires that a fee award be calculated based on the total benefit to the Class, which means that it includes the cash relief, attorneys' fees, and incentive award but excludes notice and administration costs. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (holding that attorneys' fees are calculated by comparing "the ratio of (1) the fee to (2) the fee plus what the class members received."). The Settlement Agreement provides that:

> Each Settlement Class Member who submits an Approved Claim shall be entitled to a payment of $500 per call, unless the total of such payments (plus payment of all Settlement Administration Expenses, any incentive award to the Class Representatives, and any Fee Award to Class Counsel) would exceed the $76,000,000 Ceiling. In that case, each Settlement Class Member who submits an Approved Claim would be entitled, per call, to a *pro rata* share of the total Settlement Fund (after payment of all Settlement Administration Expenses, any incentive award to the Class Representatives, and any Fee Award to Class Counsel) based on the total number of calls resulting from Approved Claims. By way of example, if the total payments at $500 per call (plus payment of the Fee Award, incentive awards, and Settlement Administration Expenses) would be less than $56,000,000, each Settlement Class Member who submits an Approved Claim will get a *pro rata* payment of more than $500 per call up to a maximum of $1,500 per call, so that the total payout is at least equal to the $56,000,000 Floor. If the Settlement Fund is in between the Floor and Ceiling, then every Settlement Class Member with an Approved Claim will receive $500 per call. Only when the Settlement Fund reaches the Ceiling will Settlement Class Members with an Approved Claim receive a *pro rata* share of the Settlement Fund after payment of the Fee Award, incentive awards, and Settlement Administration Expenses.

(Dkt. 497-1, pgs. 15-16.)

To be clear, Class Counsel's request is for one-third of the final amount of the common fund, not including notice and administration expenses. Because the total size of the Settlement Fund will depend on the number of claims, the fee award, in turn, will depend on the total size of the Settlement Fund. Although the parties' agreement to a floor and a ceiling adds some minor complications to how the size of the fund is calculated (a detailed explanation is included in the Appendix to this brief), the basic principle is that the per-call relief will not dip below $500 unless the sum of claims, incentive award, notice and administration costs, and attorneys' fee award exceeds the $76 million cap.

**B.    While the Lodestar Method is a Poor Fit for This Case, Examining Class Counsel's Lodestar Confirms that One-Third of the Fund Is a Reasonable Award.**

Seventh Circuit law permits—but does not require—courts to consider class counsel's lodestar when determining a fee award in a common fund class action settlement. "[C]onsideration of a lodestar check is not an issue of required methodology," and district courts can award fees based solely on a percentage of a common fund settlement. *Williams*, 658 F.3d at 636. As discussed above, a percentage of the fund method, without regard to lodestar, correctly replicates the market for TCPA attorneys, who are not generally paid by lodestar. *See Kolinek*, 311 F.R.D. at 501.

Nevertheless, a lodestar check here would still confirm the reasonableness of Class Counsel's one-third fee request. Class Counsel's base lodestar of $4,985,049.50 reasonably reflects their experience and expertise, and the range of requested risk multipliers accurately and fairly compensates them for the high risk of taking this case.

**1. The requested fee reflects a reasonable base rate under the lodestar standard because it comports with the prevailing market value of the time and resources the attorneys invested in the case.**

In a lodestar analysis, the Court considers the number of hours expended by class counsel, class counsel's hourly rate, and the level of risk taken on by class counsel. *See Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). The analysis begins with the base rate, "which is calculated by multiplying a reasonable hourly rate by the number of hours reasonably expanded." *See id*. A reasonable hourly rate is based on the local market rate for the attorney's services, which is best evidenced by "the amount the attorney actually bills for similar work" or "if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014); *see also Jeffboat LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009) (reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation.") (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).

The following chart details the figures relevant for calculating the base rate in this case:[6]

---

[6]    The hours expended are higher than the hours that Professor Rubenstein uses in his report, reflecting the Class Counsel continues to devote substantial effort to this case.

| ATTORNEY (Position) | YEARS OF EXP. | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| Jay Edelson (Founder & CEO) | 20 | 475.1 | $775 | $368,202.50 |
| Rafey Balabanian (Managing Partner) | 12 | 972.4 | $650 | $632,060.00 |
| Ryan D. Andrews (Partner) | 12 | 294.6 | $610 | $179,706.00 |
| Eve-Lynn J. Rapp (Hiring Partner) | 8 | 2562.8 | $550 | $1,409,540.00 |
| Christopher Dore (Partner) | 8 | 155 | $525 | $81,375.00 |
| J Dominick Larry (Associate) | 5 | 65.3 | $395 | $25,793.50 |
| Stewart Pollock (Associate) | 3 | 104.8 | $350 | $36,680.00 |
| Jamie Holz (Associate) | 3 | 109.5 | $350 | $38,325.00 |
| Alex Tievsky (Associate) | 2 | 185.2 | $300 | $55,560.00 |
| Lily Hough (Associate) | 1 | 115.5 | $270 | $31,185.00 |
| Law Clerks | n/a | 500 | $225 | $112,500.00 |
| Shawn Davis (Direct of Forensics) | n/a | 50 | $200 | $10,000 |
| **EDELSON SUB TOTAL** | | **5590.2** | | **$2,980,927.00** |

| ATTORNEY (Position) | YEARS OF EXP. | HOURS | HOURLY RATE CONSUMER | HOURLY RATE CIVIL RIGHTS | TOTAL (CONSUMER RATE) |
|---|---|---|---|---|---|
| Arthur Loevy (Partner) | 54 | 20 | $825 | $600 | $16,500.00 |
| Jon Loevy (Partner) | 24 | 75 | $825 | $550 | $61,875.00 |
| Mike Kanovitz (Partner) | 23 | 160 | $825 | $550 | $132,000.00 |

| | | | | |
|---|---|---|---|---|
| Daniel Twetten (Partner) | 16 | 4.25 | $650 | $450 | $2,762.50 |
| Elizabeth Wang (Partner) | 12 | 2 | $610 | $400 | $1,220.00 |
| Scott Rauscher (Associate) | 12 | 2,714 | $610 | $400 | $1,655,540.00 |
| Frank Newell (Associate) | 11 | 66.5 | $550 | $375 | $36,575.00 |
| Cindy Tsai (Associate) | 10 | 18.5 | $550 | $375 | $10,175.00 |
| Daniel Hernandez (Project Attorney) | 1 | 111 | $225 | n/a | $24,975.00 |
| Paralegals | n/a | 500 | $125 | $125 | $62,500.00 |
| **LOEVY SUB TOTAL** | | **3,671.25 hours** | | | **$2,004,122.50** |
| **CLASS COUNSEL TOTAL** | | **9,261.45 hours** | | | **$4,985,049.50** |

(Edelson Decl. ¶ 20; Rauscher Decl. ¶ 20.)

The attorney rates listed in the chart above are comparable to those charged by attorneys with similar background or experience, and that they are reasonable compared with judicially approved rates in class actions in the Northern District of Illinois, especially considering their experience and expertise. (Rubenstein Decl. ¶ 41.) Moreover, with respect to the Edelson firm, the rates are the same rates that Class Counsel charges to their hourly clients, and they have been approved by courts in this District. (Edelson Decl. ¶ 23.) *See also Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846-MMC, Dkt. 105 (N.D. Cal. May 10, 2013) ("The Court finds the rates charged [by Edelson PC] to be appropriate and reasonable in light of the experience of each attorney and that the hourly rates are in line with comparable market rates."); *Goodman v. Hangtime, Inc.*, No. 14-cv-1022-JRB, Dkt. 124 (N.D. Ill. Sept. 29, 2015) (approving fee award

based on Edelson's hourly rates).[7] The number of hours Class Counsel worked was similarly reasonable given the length of the litigation, the complexity of the case, and the size of the recovery. (Rubenstein Decl. ¶ 46.)

As detailed in the chart above, Class Counsel have logged 9,261.45 hours in uncompensated time in order to achieve the Settlement in this case, and (as of the time of filing) billed a balance of $4,985,049.50 in attorneys' fees. Because of the challenge process and the need to assist class members with their claims, Class Counsel will spend significantly more time on this case after this brief is filed. (Edelson Decl. ¶ 21; Rauscher Decl. ¶ 21.) Class Counsel has also fronted $412,206.82 in unreimbursed litigation costs, for which they are not seeking separate reimbursement. (Edelson Decl. ¶ 22; Rauscher Decl. ¶ 22.)[8] Therefore, applying the lodestar standard here, Class Counsel's base lodestar equals $4,985,049.50.

> **2.    The risks of this litigation justify the effective multiplier of the one-third fee request.**

Analysis of a reasonable fee, however, must not stop with the base lodestar. If the Court decides to consider Class Counsel's lodestar, then "a risk multiplier is not merely available . . . but mandated," because "counsel had no sure source of compensation for their services." *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (internal quotation omitted) [hereinafter "*Florin I*"]. "[T]he need for such an adjustment is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is

---

[7]    Fees for Loevy & Loevy lawyers are more frequently decided in the civil rights context, for which rates are lower than commercial cases. Professor Rubenstein was aware of this when opining that the hourly rates for the Loevy attorneys in this case are reasonable.

[8]    "It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation." *Beesley v. Int'l Paper Co.*, 3:06-CV-703-DRH-CJP, 2014 WL 375432, *3 (S.D. Ill. Jan. 31, 2014) (citing Fed. R. Civ. P. 23; *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980)).

inescapably contingent." *Id.* (internal quotation omitted). The amount of the multiplier is, like the percentage of the fund, "an effort to mimic market forces." *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995) [hereinafter "*Florin II*"].

To set the multiplier "[a] court must assess the riskiness of the litigation by measuring the probability of success of this type of case *at the outset* of the litigation." *Florin I*, 34 F.3d at 565 (emphasis in original). Although coming up with the exact number of a multiplier "is inevitably somewhat subjective," *id.*, Seventh Circuit law holds that "[t]he multiplier is determined by dividing 1 by the probability of success," *Florin II*, 60 F.3d at 1248 n.3. Some cases, for example, are less risky because they come on the heels of a government investigation or criminal prosecution. (Henderson Decl. at 28-29; Rubenstein Decl. ¶ 50.) Other signs that a case is less risky include suing an established defendant who is known to be solvent or having the ability to spread the risk among a number of law firms because of a rush of attorneys seeking to represent the same class. (*Id.*)

Here, if Class Counsel recovers the full $76 million for the Class, then the requested one-third fee award will be approximately $24.5 million, or a multiplier of 5.1. (Rubenstein Decl. ¶ 46.)[9] Based on the *Florin II* calculation, that fee award would be appropriate if there were a 20% chance of success at the start of litigation. At the other possible extreme, if Defendants only pay the $30 million that they have to put up at final approval and default on the remainder of the settlement agreement, then Class Counsel's requested multiplier will be about 2, implying a 50% chance of success. (Rubenstein Decl. ¶ 46.)

At the outset of this litigation, estimating a 20% chance of success would have been

---

[9]     The risk multiplier figures here are those in Professor Rubenstein's report. However, each multiplier is now lower, given the additional hours Class Counsel has devoted to this case since providing Professor Rubenstein with their lodestar.

reasonable—even conservative. To start, this case did not begin with any help from a government investigation or other outside source. (*See* Rubenstein Decl. ¶ 45.) Class Counsel and the named plaintiffs investigated and prosecuted this case on their own. (*Id.*) The Defendants are private companies about whom little was known at the outset of litigation, including regarding their solvency, which also increased the risk of non-payment. (Edelson Decl. ¶ 19; Rauscher Decl. ¶ 19.) Indeed, Defendants' financial condition continues to play a role in both the class recovery and the fee award, because Defendants are funding the settlement in installments. (Edelson Decl. ¶¶ 14, 19; Rauscher Decl. ¶¶ 14, 19.) While Class Counsel do not anticipate that Defendants will default, the continued existence of the risk of non-payment *after* settlement demonstrates that an even lower chance of recovery existed at the outset of the litigation. (Edelson Decl. ¶ 14; Rauscher Decl. ¶ 14.)

Defendants' course of conduct with regard to Settlement also underscores the risk of non-payment here. In less risky litigation, the fact and amount of settlement is relatively predictable. (Rubenstein Decl. ¶ 50.) Here by contrast, after two years of litigation, Class Counsel still had no realistic settlement option that would have allowed them to obtain material recoveries, meaning that there was still a high risk of non-payment. (Henderson Decl. at 25-26.) Considering that Plaintiffs' position after two years was stronger than it was at the outset of litigation, the risk of non-payment was necessarily even higher at the outset.

Further, some of the same factors that indicate the low inherent value of the case also demonstrate the risk. That is intuitive because there is less risk in taking on a case with a high inherent value (*i.e.*, a case that will settle for a substantial amount of money with little legal work required). (Henderson Decl. at 18-19.) For example, in a case with a high probability of success, many firms are likely to be willing to sign onto the case because they are likely to get paid.

(Rubenstein Decl. ¶ 50.) That also allows the lawyers to spread the risk among a number of firms. (*Id.*) Here, by contrast, only three firms were willing to prosecute the case, and only two ultimately did so. (Rubenstein Decl. ¶ 53.) These firms were willing to bear—and did bear—increased risk by prosecuting the case on their own, even when other firms were not willing to do so. (*Id.*) That increased risk affects the multiplier. (*Id.* ¶¶ 47-48, 50, 54.)

In addition to appropriately compensating Class Counsel for the risk involved in this litigation, the requested multiplier is in line with multipliers in other cases in this District and nationwide. (*Id.* ¶¶ 36-40, 48-49.) This is especially true when compared to settlements with a large recovery. (*Id.* ¶¶ 44-45.) Courts regularly approve settlements with even higher multipliers than Class Counsel's request here, even for cases that are less risky than this one. (Rubenstein Decl. ¶ 48 & Exhibit D.) Given the high risk involved in this case, a multiplier of between 2 and 5 is entirely reasonable. (*Id.* ¶ 55.)

In both TCPA suits and consumer class actions in general, attorneys are generally paid based on a percentage of the recovery obtained, not hours worked. *Kolinek*, 311 F.R.D. at 501. Accordingly, the lodestar method is not particularly well-suited to evaluating Class Counsel's fee request in this case. Nevertheless, if the lodestar method is applied, then an examination of the amount of time Class Counsel put into this case, their rates, and the amount of risk they accepted, confirms that Class Counsel's request of one-third of the common fund is fair and should be approved.

## IV.    Plaintiffs' Request for $10,000 for Each Plaintiff Represents a Fair and Reasonable Incentive Award.

Incentive awards of $10,000 for serving as a Class Representative is also fair and reasonable. Because "a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook*,

142 F.3d at 1016. In deciding whether an incentive award is reasonable, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id*.

These factors are readily satisfied in the instant action. Each plaintiff has worked alongside Class Counsel and actively engaged in every stage of the litigation—reviewing the complaint and other documents, equipping Class Counsel with the information needed to pursue their (and the class's) claims, and responding to requests for additional information throughout the settlement process. (Edelson Decl. ¶ 25; Rauscher Decl. ¶ 24.) Each Plaintiff sat for a deposition, and each was prepared to testify in person at the trial (including Ms. Stone, who lives in Louisiana and travels only by train). (Edelson Decl. ¶ 26; Rauscher Decl. ¶ 25.) Were it not for Plaintiffs' efforts and contributions to the litigation, the Class would not have obtained the substantial benefit conferred by the Settlement. (Edelson Decl. ¶ 27; Rauscher Decl. ¶ 26.) Further, the proposed incentive awards of $10,000 are in line with those awards approved in similar class action settlements. *See Martin v. Reid*, 818 F.3d 302, 306 (7th Cir. 2016) (affirming approval of settlement agreement with $10,000 incentive award to named plaintiff); *Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *4 (S.D. Ill. Mar. 31, 2016) (approving $10,000 incentive awards for named plaintiffs "who engaged in discovery, were deposed, and prepared for trial"). Accordingly, the requested incentive awards are reasonable and should be approved.

## V. Conclusion.

For the reasons stated above, Plaintiffs respectfully request that the Court approve the fee award in the amount one-third of the fund (less notice and administration expenses), approve the

30

requested incentive award of $10,000 to each Class Representative, and award such other and further relief the Court deems equitable and just.

Dated: January 9, 2017      Respectfully submitted by:

            /s/ Jay Edelson       

            Jay Edelson
            EDELSON PC
            350 North LaSalle Street, 13th Floor
            Chicago, Illinois 60654
            Telephone: (312) 589-6370
            Email: jedelson@edelson.com

            Rafey S. Balabanian
            Eve-Lynn J. Rapp
            EDELSON PC
            123 Townsend Street, Suite 100
            San Francisco, California 94107
            Telephone: (415) 212-9300
            Email: rbalabanian@edelson.com
            erapp@edelson.com

            Scott R. Rauscher
            Michael I. Kanovitz
            Jonathan I. Loevy
            LOEVY & LOEVY
            311 North Aberdeen Street, Third Floor
            Chicago, Illinois 60607
            Telephone: (312) 243-5900
            Email: scott@loevy.com
            jon@loevy.com
            mike@loevy.com

            *Class Counsel*

## APPENDIX

Because the parties negotiated a floor and a ceiling to Defendants' payment, calculating the per-call recovery and the attorneys' fee award requires a little extra math. Determining the size of the fund starts with the following equation:

$$fund = amount\ per\ call * number\ of\ calls + incentive\ awards + notice + fee\ award$$

The fee award is therefore calculated by taking a percentage of the total benefit to the class, which is the fund minus notice costs. Thus, assuming that the Court grants Class Counsel's request for one-third of the fund, the equation for the fee award is:

$$fee\ award = \frac{1}{3}(amount\ per\ call * number\ of\ calls + incentive\ awards + fee\ award)$$

To avoid a self-referential definition, the above equation can be algebraically simplified to:

$$fee\ award = \frac{amount\ per\ call * number\ of\ calls + incentive\ awards}{2}$$

Using these equation and the settlement agreement, the Court can calculate the total size of the fund and, thus, the fee award. As the agreement dictates, if at all possible, class members will be paid $500 per call. That gives this equation:

$$fund = 500c + incentive\ awards + notice\ + \frac{500c + incentive\ awards}{2}$$

where $c$ is the number of calls entitled to payment.

When performing this calculation after the claims challenge process is over, the total notice cost, the number of calls entitled to payment, and the amount of the incentive awards will all be known numbers. If, after substituting those numbers for the variables, the result of the above equation is between $56 million and $76 million, then that is the size of the fund. Each class member will receive $500, and the fee award will be one-third of the fund, minus notice costs.

However, per the settlement agreement, Defendants have agreed to pay no less than $56 million and no more than $76 million. Therefore, if the result of the fund equation at $500 per call is below $56 million or above $76 million, then the result of the above equation is invalid, and a separate calculation is required. If the result is below $56 million, then Defendants will pay exactly $56 million. If the Court grants class counsel's request, then they will receive a fee of one-third of $56 million minus notice expenses. The remainder, after notice costs and incentive awards, would be divided among the class *pro rata* per call (so each call would be compensated with an equal share of $56,000,000 minus notice costs, fee award, and incentive awards). If the result is above $76 million, then Defendants will pay exactly $76 million. In that case, class counsel's requested fee is one-third of $76 million minus notice expenses (although, per the settlement agreement, in no event greater than $24.5 million), and the class will divide the remainder on a per call basis.

Examining a few specific scenarios is helpful. Assume there are 60,000 calls entitled to payment after Defendants' challenges are resolved, that notice costs are $2,000,000 (a realistic estimate), and that $40,000 in incentive awards are approved. Using the fund equation above to at $500 per call results in:

$$500 * 60,000 + 40,000 + 2,000,000 \ + \frac{500 * 60,000 + 40,000}{2}$$

That comes out to $47,060,000, which is under the $56,000,000 floor. Accordingly, at 60,000 calls, the fund would be $56,000,000. Class counsel's fee request would be one-third of that amount less notice, or $18,000,000. After the fee award, $40,000 for incentive awards, and $2,000,000 for notice, the class would split the remaining $35,960,000, resulting in a payment of $599.33 per call.

If there were 80,000 calls claimed, then the same equation works out to:

33

$$500 * 80,000 + 40,000 + 2,000,000 + \frac{500 * 80,000 + 40,000}{2}$$

or \$62,060,000. Since this number is between the floor of \$56 million and the ceiling of \$76 million, each class member would receive \$500 per call. The fee award is the last term in the above equation ($\frac{500*80,000+40,000}{2}$) or \$20,020,000.

Finally, if there were 120,000 calls claimed then at \$500 per call, the equation works out to:

$$500 * 120,000 + 40,000 + 2,000,000 + \frac{500 * 120,000 + 40,000}{2}$$

or \$92,060,000. That is above the ceiling of \$76,000,000, so the fund would be capped at \$76,000,000. To calculate the fee award, subtract the \$2,000,000 in notice costs from the size of the fund to get \$74,000,000 and multiply by one-third. Since that figure is greater than the contractually agreed maximum fee of \$24,500,000, the fee request would be \$24,500,000. After the fee award, \$40,000 for incentive awards, and \$2,000,000 for notice, the class would split the remaining \$49,460,000, resulting in a payment of \$412.16 per call.

**CERTIFICATE OF SERVICE**

I, probably Eve-Lynn J. Rapp, hereby certify that on January 9, 2017, I caused the foregoing to be served by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system.

/s/      Eve-Lynn J. Rapp