1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3

4    GRANT BIRCHMEIER, et al.,          )   Docket No. 12 C 4069
                                        )
5                     Plaintiffs,       )
                                        )
6         vs.                           )
                                        )
7    CARIBBEAN CRUISE LINE, INC., et    )   Chicago, Illinois
     al.,                               )   January 31, 2017
8                                       )   9:45 o'clock a.m.
                      Defendants.       )
9

10            TRANSCRIPT OF PROCEEDINGS - MOTION
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiffs:    LOEVY AND LOEVY
                            BY:  MR. SCOTT R. RAUSCHER
15                          311 North Aberdeen Street, 3rd Floor
                            Chicago, IL  60607
16                          (312) 243-5900

17

18                          EDELSON PC
                            BY:  MS. EVE-LYNN J. RAPP
19                               MR. RAFEY S. BALABANIAN
                            350 North LaSalle Street, Suite 1300
20                          Chicago, IL  60654
                            (312) 589-6370
21

22

23   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2102
                            Chicago, Illinois  60604
25                          (312) 435-5639

1  APPEARANCES CONTINUED:

2
   For Caribbean            GREENSPOON MARDER, P.A.
3  Cruise Line, Inc.:       BY:   MR. JEFFREY BACKMAN
                            200 East Broward Boulevard, Suite 1800
4                           Fort Lauderdale, FL  33301
                            (954) 491-1120
5

6

7  For The Berkley          FORDE LAW OFFICES LLP
   Group, Inc.:             BY:   MR. BRIAN PATRICK O'MEARA
8                           111 West Washington Street, Suite 1100
                            Chicago, IL  60602
9                           (312) 641-1441

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case No. 12 C 4069, Birchmeier v.

3    Caribbean Cruise Line.

4         MR. BALABANIAN:  Good morning, your Honor.  Rafey

5    Balabanian on behalf of plaintiffs and the class.

6         MR. RAUSCHER:  Scott Rauscher also on behalf of

7    plaintiffs and the class.

8         MR. BACKMAN:  Good morning, your Honor.  Jeffrey

9    Backman for Caribbean Cruise Line and Vacation Ownership

10   Marketing Tours.

11        MR. O'MEARA:  Good morning, your Honor.  Brian

12   O'Meara on behalf of the defendant the Berkley Group.

13        UNIDENTIFIED SPEAKER:  John (inaudible) on behalf of

14   the objectors.

15        THE COURT:  So I am just going to talk about the -- I

16   think there was another motion noticed up for today.  What I

17   plan to talk about is the Motion to Extend the Claims

18   Deadline, the other motion that's entitled Motion to Enforce,

19   and the one other thing that was noticed up for today I think

20   was a motion for an order relating to Comcast.

21        MR. BALABANIAN:  Yes.

22        THE COURT:  That's all I'm going to talk about.  Do

23   you have anything to say about any of those?

24        UNIDENTIFIED SPEAKER:  No.

25        THE COURT:  Have a seat.  You can stay if you want,

1  but you don't need to talk about anything.

2          UNIDENTIFIED SPEAKER:  Thanks.

3          THE COURT:  I have a couple of threshold questions

4  and then a couple of threshold comments.

5          MR. BALABANIAN:  Yes, your Honor.

6          THE COURT:  So as I'm reading the class definition,

7  there's basically, for want of a better word, two categories

8  of class members.  There are the class members whose phone

9  numbers are reflected in the records that were obtained from

10  whichever defendant it was; that's the first class, group.

11  Then the second group would be other people who, A, claim that

12  they got calls, and, B, can provide some documentation to

13  support that.  Is that right?

14          MR. BALABANIAN:  Correct.

15          THE COURT:  And --

16          MR. BACKMAN:  Yes, your Honor.

17          THE COURT:  All right.  And nothing about the claims

18  process -- am I correct that nothing about the claims process

19  is intended to eliminate the documentation requirement for

20  that second group of people?  They still have to come up with

21  documents, right?  It's not enough for them just to say, yeah,

22  I'm in the class, signed under penalties of perjury, give me

23  my money?

24          MR. BACKMAN:  Correct.

25          MR. BALABANIAN:  We agree.

1          THE COURT:  Everybody agrees with that, okay.

2          And then I wanted to get a handle on one other thing.

3   So it looks like on the motion to extend claim deadline, it

4   was somewhere around 320 people.  Is it still about 320 people

5   or is it more than that at this point?

6          MR. BALABANIAN:  It's more now.  It's about 580.

7          THE COURT:  580.  When did it get from 320 -- it was

8   318 when you filed the motion, which was back on the 5th of

9   January.  So it's gone up another 160 since then?

10          MR. BALABANIAN:  Yeah.  Scott is telling me that it's

11   over 600 now.  The reason is because the settlement has gotten

12   a bunch of press over the last couple weeks.

13          THE COURT:  What kind of press?

14          MR. BALABANIAN:  There's just been news articles

15   about it.

16          THE COURT:  I didn't see any of them.  I guess I am

17   reading the wrong newspapers or the right newspapers.

18          MR. BALABANIAN:  I'd say probably the right ones.

19          And so we just got a lot more inquiries from

20   potential class members asking that we assist them.

21          THE COURT:  Okay.  And then the total number of claim

22   forms that had been received, it's 50,000 something?

23          MR. BALABANIAN:  72,000 and change.

24          THE COURT:  Okay.  Again, that's gone up considerably

25   in the past couple weeks, it sounds like.  The deadline is or

1  was February the 1st?

2          MR. BACKMAN:  Tomorrow.

3          MR. BALABANIAN:  Tomorrow.

4          THE COURT:  All right.  So in terms of a percentage,

5  so we are talking about a little less than 1 percent that are

6  covered by this, fair statement?

7          MR. BALABANIAN:  Yes, sir.

8          MR. BACKMAN:  May I just add one thing to that

9  calculation?  So our count is roughly 600 subpoenas, which

10  include requests for records relating to more like 700

11  telephone numbers, and so the number of calls that could be

12  claimed could be substantially more than the number of

13  subpoenas.

14          THE COURT:  Why is there a difference between the

15  number of subpoenas and the number of numbers?  Does this mean

16  that there's a person that has more than one number?

17          MR. RAUSCHER:  It could be a land line, yes.

18          THE COURT:  A land line and cell phone or two cell

19  phones?

20          MR. RAUSCHER:  Yes.

21          THE COURT:  In other words, you haven't combined

22  multiple people in a single subpoena.  It's multiple phone

23  numbers for a person or maybe a household.

24          MR. RAUSCHER:  It might be both actually in some

25  instances if it was the same day to the same telephone

1  company.

2        THE COURT:  So the increase in numbers, does that

3  affect the date that you're asking me for on this motion to

4  extend?

5        MR. BALABANIAN:  Not really, because at some level,

6  we can't just ask you for an open-ended extension, we

7  understand that.  It's just messier that way.  So we're

8  hopeful that the 45 days will be sufficient.  Do we think --

9  it's tough, Judge.  It's kind of a catch 22.  I'd like to give

10  the court a date certain, but what I don't want to do, though,

11  is come back to the court and say I was too ambitious and we

12  need more time than the 45 days.

13        THE COURT:  And I know it sounds like on the last

14  160, those subpoenas would have gone out by definition within

15  the last three weeks or so, but the ones before that, have you

16  gotten compliance on anything at this point?  I know there was

17  that chart.  The chart had a fairly small fraction of

18  compliance numbers.

19        MR. RAUSCHER:  That's still the same.

20        THE COURT:  Are you in communication with the phone

21  companies?

22        MR. BALABANIAN:  Um-hmm.

23        MR. RAUSCHER:  Yes.

24        THE COURT:  What are they telling you?  It just takes

25  too long, don't have the records, what are they telling you?

1    MR. BALABANIAN:  Super slow.  They are just very
2    slow.

3    THE COURT:  Were the subpoenas all issued out of this
4    court, or were there situations where you had to issue them
5    out of other districts?

6    MR. RAUSCHER:  They all issue out of this court.

7    THE COURT:  But other districts --

8    MR. RAUSCHER:  They are often served in other
9    districts.  A couple of the carriers are saying -- I think
10   it's only two are saying we just don't have those kinds of
11   records, but the rest --

12   THE COURT:  The rest aren't telling you that.  Are
13   they telling you they do, but it takes a long time to find
14   them?

15   MR. RAUSCHER:  For the most part, yes.

16   MR. BALABANIAN:  For the most part, yes, and they are
17   quite familiar with us and this case because we kind of went
18   through this dance at the notice stage, not in the same way,
19   but certainly it's on their radar.

20   THE COURT:  Next, my observation, and then I am going
21   to kind of turn it over to you to talk about whatever you want
22   to talk about.  My observation, which is largely addressed to
23   the defendants is this.  I assume you have heard the phrase
24   win the battle and lose the war.

25   MR. O'MEARA:  We have.

1    THE COURT:  So what's the battle and what's the war
2   in this case?  The battle would be these two motions.  The war
3   is approval of the settlement.  And so if what happens is that
4   I conclude you're right, contract is a contract, four corners,
5   period, end of discussion, and then I conclude, well, that
6   contract didn't give people a reasonable opportunity to go and
7   get their phone records, the war would be approval of the
8   settlement.  And so I'm just telling you right now that that
9   is an issue that is on the table.  And one of the things that
10  is going to happen before you leave the room today is we're
11  going to talk about a trial date because I am going to
12  anticipate the realistic possibility that I will not approve
13  the settlement if the defendants are able to persuade me the
14  merit of their position on these two motions, and I am not
15  going to wait until then to set a trial date.  So there you
16  go.

17    So on the -- a couple of specific questions.  I guess
18  in the -- I am talking about the Motion to Extend the Claims
19  Deadline first.  In the reply brief, the plaintiffs argue that
20  the date, the claim deadline, the February 1st date, is not a
21  material term.  And if I can kind of boil down the reasons
22  they argue for that is:  Number one, the agreement didn't say
23  February 1st, it tied it to the date for the final approval
24  hearing, which I could have set for whenever.  If I had set it
25  for May, then the final approval date would have been a later

1  date than we have now, and so, therefore, it couldn't possibly

2  have been a material date.

3  And then, secondly, there's this point made that the

4  settlement agreement contemplates that the final approval is

5  actually going to happen before all the claims get

6  adjudicated; in other words, because you have this whole

7  dispute resolution process.  And so those are all arguments

8  along the lines that the date isn't -- the February 1st date

9  is not a material term.  So I'd like to get your thoughts on

10 that.

11 MR. BACKMAN:  Sure.  Well, our position is it wasn't

12 an agreed-upon deadline, it wasn't a court-ordered deadline,

13 and the way that the preliminary approval was submitted to

14 your Honor, it had the date of February 23rd for the final

15 approval hearing already in it.  It wasn't provided to you

16 with a blank form that said --

17 THE COURT:  So if I had said I am not available on

18 February the 23rd, you would have said, okay, fine, no deal.

19 MR. BACKMAN:  No, I am not saying that.

20 THE COURT:  That would be a ridiculous argument,

21 right?

22 MR. BACKMAN:  But part of the selection of that date

23 had us going backwards from the time notice was going out.

24 THE COURT:  What if I had told you, as I would have

25 been telling you if this was last year and it had been June

1   the 23rd, what if I had told you, well, I am having surgery on
2   that date and I am not going to be available for three months?
3           MR. BACKMAN:  I don't know what we would have done.
4   I don't know what the negotiation back and forth would have
5   done.  That's just the final hearing date, which you're
6   correct and they're correct that it says 14 days from the
7   final hearing date.  That date would be February 9th, your
8   Honor.  There were different conversations that took place,
9   and if you want to hear about them, Mr. O'Meara had them with
10  Ms. Rapp.  There were conversations specifically about what
11  the claims deadline was going to be, and as you will see, it's
12  not February 9th, it's February 1st.  We actually wanted
13  January 24th, they wanted February 9th, we met in the middle.
14  It was an agreed-upon deadline.
15          THE COURT:  Fill me in on the conversations.
16          MR. O'MEARA:  Sure, Judge.  Ms. Rapp and I did talk
17  about the date.  As you recall, the original date for the
18  final fairness hearing was in January.  Because I think they
19  needed some more time to get the notice out, Ms. Rapp asked me
20  to basically kick everything back two weeks.  I said that's
21  not a problem because we are basing it off of when notice was
22  supposed to go out and the time frame between that --
23          THE COURT:  What was the notice-supposed-to-go-out
24  date?
25          MR. O'MEARA:  It was, I think, early -- like October,

1   October-ish.

2         THE COURT:  The final approval is mid September-ish,

3   thereabouts?  The preliminary approval, rather, it was mid

4   September.

5         MR. O'MEARA:  Correct.

6         THE COURT:  Like the 19th or something like that?

7         MR. O'MEARA:  Yeah, we settled early September.  So

8   those dates were in line, and Ms. Rapp asked for an additional

9   two weeks to kick everything out, including the final approval

10  hearing which had been set for, I believe, the 23rd of

11  January.  She had a proposed schedule.  I looked at it, I

12  said, okay, it looks like everything is getting kicked out two

13  weeks except for the final approval hearing which was kicked

14  out about a month, exactly a month I think, February 23rd.

15        I then looked back because the notice documents then

16  said a February 9th claims deadline.  I then talked to Ms.

17  Rapp and said, you know, Eve, I thought everything was going

18  to get kicked out just two weeks.  The earlier claims deadline

19  was January 10th, and so I assumed -- I said you can't have

20  that January 24th because that would be two weeks,

21  inconsistent with all the other dates.  We talked about it,

22  negotiated it, and we landed on February 1st as the claims

23  deadline, and that's what the claims deadline is right now.

24        THE COURT:  So this is a discussion that was

25  happening when in relation to the preliminary approval, before

1  or after, during?

2  MR. O'MEARA:  It was after.  I will tell you it was

3  -- I was watching the Cubs game when we talked on the phone.

4  THE COURT:  That could be April 1st.  Which Cubs?

5  Are we talking about a playoff game?

6  MR. O'MEARA:  When they were getting down to the

7  playoffs.

8  THE COURT:  I am a Sox fan, you know.

9  MR. O'MEARA:  I know.

10  THE COURT:  As, I think, is your mediator.

11  MR. O'MEARA:  Yes, I know.  I am very careful.

12  THE COURT:  He probably said that a few times during

13  your mediation session.

14  MR. O'MEARA:  Yes.

15  THE COURT:  But I don't hate the Cubs.  I just want

16  to make that clear on the record.

17  MR. BALABANIAN:  How offensive is it that the 2005

18  win got no coverage like that?  Come on.

19  THE COURT:  I'm telling you.

20  MR. BALABANIAN:  They hadn't won in a long time.

21  THE COURT:  So when did the notice then actually go

22  out?

23  MR. O'MEARA:  That ended up -- I don't want to speak

24  for them, but I believe mid November was when the website went

25  live and then there was a direct notice that went out

1  thereafter, so we were framing it as when is notice going to
2  go out and how much time --

3          THE COURT:  So originally it was contemplated that it
4  was going to go out in early October, but these discussions
5  that you had with Ms. Rapp that you talked about, was that at
6  a period of time when it was apparent that it wasn't going to
7  happen in early October?

8          MR. O'MEARA:  Yes.  She reached out to me and said,
9  can we talk about timing here, and I said, sure, and that's
10  when we talked, and I think that was the whole reason that
11  they had to get notice out, or whatever was going on, and they
12  said we just need to kick everything two weeks.  I agreed
13  except for the approval date.

14          THE COURT:  Does mid November sound about right?
15          MR. BALABANIAN:  It does sound right.
16          THE COURT:  Okay.  Had you finished your point,
17  Mr. Backman?

18          MR. BACKMAN:  I did on that particular issue, yes.
19  Thank you.

20          THE COURT:  Do you want to respond?
21          MR. BALABANIAN:  I think everything they said is
22  obviously true.  I have no reason to disbelieve anything they
23  said.

24          I will say that, you know, that was in the context of
25  setting a final approval schedule, and I don't -- I think it's

1 | probably a little bit too far to say that that was a hotly
2 | disputed and negotiated point as far as the claims deadline.
3 | The notice date got kicked out because at the end of the day,
4 | KCC wasn't able to get the notice out based on the schedule
5 | that the Court had thought we were going to get the notice out
6 | at preliminary approval.
7 | Once that happened, we kind of just had to scramble
8 | to kick things out, and I am not honestly sure why we picked
9 | the 23rd of February for the final fairness hearing as opposed
10 | to some other date, but I will say that --
11 | THE COURT: That day, Mr. Backman, you were saying
12 | was in the draft order, or at least was in the settlement
13 | agreement that was presented to me at the time of the
14 | preliminary approval?
15 | MR. BACKMAN: It was in the draft order, right, the
16 | parties agreed on that date.
17 | THE COURT: So that had been negotiated as part of --
18 | whether it was with Judge Andersen or after Judge Andersen,
19 | that was all part of the discussion you had before the
20 | preliminary approval motion was presented. Does that sound
21 | right?
22 | MR. BACKMAN: Not the February 23rd date because that
23 | was the amended preliminary approval date.
24 | THE COURT: Oh, okay. See, I was misunderstanding.
25 | MR. BACKMAN: So with respect to all this timing --

1        THE COURT:  So the amended preliminary approval order

2   is the one I entered on October the 26th?

3        MR. BALABANIAN:  I think that's right, Judge.

4        THE COURT:  I am looking at the docket.

5        MR. BALABANIAN:  That's got to be the date.

6        THE COURT:  The preliminary approval order, which was

7   entered -- actually, I was wrong about the date.  It was

8   October -- I granted the motion on September 29th, the order

9   was entered on October the 5th.  And I'm just going to pull it

10  up here to see what the date for the --

11       MR. BACKMAN:  It was January 24th, your Honor.

12       THE COURT:  January 24th was the date for the

13  deadline at that point or the hearing?

14       MR. BACKMAN:  No, it would have been 14 days prior to

15  January 24.

16       THE COURT:  So January 24th was the date I had it for

17  the fairness hearing.

18       MR. BACKMAN:  Correct.

19       MR. O'MEARA:  I misspoke.

20       THE COURT:  That's okay.  So the 24th of January, and

21  then when I entered the amended preliminary approval order,

22  which was October 26th, that's when it got moved to February.

23       MR. BACKMAN:  Correct.

24       MR. BALABANIAN:  Yes.

25       THE COURT:  And then notice goes out sometime the end

1  of November.

2              MR. BALABANIAN:  And I guess --

3              THE COURT:  I am just going to tell you, I mean, what

4  I would have done at the time.  I mean, I have to think more

5  about it -- but so one of the points that the defendants make

6  in their submission on this motion is that this whole idea

7  that people might have to get phone records, that was

8  something that could be reasonably anticipated.  I don't

9  disagree with you on that.  If I had -- I want to choose my

10  word carefully here -- if I had understood when I entered the

11  amended preliminary approval order that effectively what that

12  was going to mean -- because notice doesn't go out a

13  nanosecond after the approval order is entered, it goes out

14  three weeks after that, it's a reasonable period of time --

15  but effectively what that was going to mean was that people

16  were going to have two months after getting the notice to

17  obtain phone records from how many years ago -- 2011?

18              MR. RAUSCHER:  2011 to 2012.

19              THE COURT:  Five and a half years ago.

20              THE COURT:  Right.  -- (continuing) I might have said

21  that's not enough time because -- I mean, we had plenty of

22  experience with phone records in this case, I have had plenty

23  of it in other cases, I had plenty of it back in the days

24  before I was practicing law, but that was mostly land line

25  stuff, but phone companies get a lot of requests for records,

1  they get tons of them. They tend to -- my experience --

2  because I did both civil and criminal law when I was

3  practicing -- my experience is they always prioritize the

4  criminal stuff because they pretty much have to. Most of it

5  is coming from the government or the state or whoever. The

6  civil stuff gets put behind, and I'm really sort of

7  questioning whether, you know, that all should have been

8  flagged at that point. I am not faulting anybody. Maybe I

9  should have caught it on my own. I really just kind of

10  question whether that was a reasonable amount of time, because

11  it's not a lot of time to get phone records from the phone

12  company.

13          Do you want to say something?

14          MR. BALABANIAN: I agree with you. I would just say

15  that it is really hard to anticipate from carrier to

16  carrier --

17          THE COURT: Yeah.

18          MR. BALABANIAN: -- which one is going to be more --

19          THE COURT: You got big ones and you have small ones,

20  and some I never even heard of before.

21          MR. BALABANIAN: And some of the bigger ones, like

22  AT&T is pretty responsive.

23          THE COURT: Honestly, always been my experience.

24          MR. BALABANIAN: Yeah, and some, you know, T-Mobile

25  doesn't like subpoenas.

1  THE COURT:  And I had -- I had an antitrust MDL where
2  we had the same kind of issues because it was about text
3  messaging, so it was all about phone companies, and I had to
4  deal with -- T-Mobile was one of them.

5  MR. BALABANIAN:  It was just -- it's one of those
6  things where, sure, would we have wanted more time, yes.  At
7  some point, though, were we a little weary of asking the Court
8  for a six-month approval schedule or a five-month approval
9  schedule.

10  THE COURT:  Yeah, I don't think it's likely that I
11  would have given you that.  But, you know, the odds are pretty
12  strong that I would have said, you know, two months is
13  probably kind of pushing it, even without knowing the number
14  of requests that come in.  And I say that not because the
15  number of, you know, subpoenas or potential claimants that you
16  have had to send out subpoenas for is big in relationship to
17  the overall class or the overall numbers of claims, it's not.
18  It's one percent or a little less than one percent, but it's a
19  lot of subpoenas to send out.  Those don't all happen at the
20  snap of a finger either.

21  I will say -- one of the issues that I -- one of the
22  things that the defendants argue in the response on this
23  motion is well, okay, if you are going to extend it, then it
24  shouldn't increase the amount of money we have to pay, it
25  should -- there should be some sort of pro rata reduction of

1  everybody's claims based on this.  I regard that as

2  extraordinarily problematic.  It sets up a conflict within the

3  class.  You're pitting these 580 people against the rest of

4  them, and maybe because it's only 1 percent, it's not a huge

5  reduction, but it's a reduction.  It just -- you're setting up

6  a conflict for class counsel.  I don't regard that as a

7  realistic alternative.  It's not contemplated in the notice.

8  I think arguably there would be an argument to be made that

9  there would have to be some further notification of that.

10  Okay.  I may have one more question on that, but I am

11  going to hold it.  I want to move on to the other questions,

12  unless anybody has anything else to say to me.

13  MR. BACKMAN:  I do.  I have one thing just in the

14  context of the motion to extend.  Maybe it puts it in a

15  different perspective.

16  Our numbers that we have run preliminarily show that

17  of the some 700 telephone numbers at issue in these subpoenas,

18  roughly 425 of them are in class telephone numbers.

19  THE COURT:  In class --

20  MR. BACKMAN:  They are all on the class list.  In

21  other words, they don't need the records.

22  THE COURT:  They don't need the records?

23  MR. BACKMAN:  They don't need the records.  To file

24  their claims, they don't need the records.  Of the subpoenas,

25  roughly 300 have already filed claims.  And so our point is

1   this is a motion to extend the claims deadline.  It's not a

2   motion to approve some late-filed claims based on unique

3   circumstances.  I don't -- I don't see why the individuals who

4   have contacted them can't file their claims.  File your claim

5   form.

6           THE COURT:  But they don't have the other part -- at

7   least for the people who are out of the list, off-list people,

8   they don't have the second thing that everybody agreed a few

9   minutes ago that they needed, which is records.

10          MR. BACKMAN:  I don't know what those individuals

11  should do as I stand here now, whether they should file some

12  sort of supplemental declaration with their claim form,

13  whether there is some alternative they can do short --

14          THE COURT:  Honestly, when I ask questions at the

15  beginning, I actually ask them for a reason.  I ask them at

16  the beginning for a reason.  Everybody said, oh, no,

17  documentation is required, it's not enough to simply -- I

18  asked this question exactly this way because of this.

19          MR. BACKMAN:  And I agree with you.

20          THE COURT:  This is why I asked the question, and you

21  said that wasn't going to be good enough.  What you're telling

22  me now is go ahead and let them file the claim form, ha, then

23  we are going to object to them, and they are going to be

24  insufficient.

25          MR. BACKMAN:  We might object to them regardless,

1    whether they get the telephone records or not.  My point about

2    the documentation is yes, they needed documentation, but what

3    that documentation is is not defined.  It says in their own

4    documents, it could be telephone records, it could be a bill,

5    it could be a Caller ID record, it could be something else

6    showing --

7              THE COURT:  Who keeps phone bills from five years

8    ago?

9              MR. BACKMAN:  I don't know.  I wasn't negotiating

10   this agreement from the plaintiffs' perspective.  I was

11   negotiating --

12             THE COURT:  Your argument is cross-purposes to

13   yourself at this point.  You know --

14             MR. BALABANIAN:  I am not sure they want that to be

15   the case in terms of the portion of the class that is supposed

16   to adduce, I would think, records based on what we have all

17   talked about.  Maybe they have a recording of the phone call,

18   but I think that's going to be a really small number.

19             THE COURT:  I already have one objection from a pro

20   se objector.  It's on the docket.  It was filed in the end of

21   November saying, I object to this because you have limited

22   this -- you have already limited the class too much for this

23   filing of this requirement of documents.  I am going to quote

24   what he says:

25             I am shocked that I am required to file supporting

1  documentation to have myself included in this class action.
2  Keeping paperwork or screen shots of phone calls that were
3  received five-plus years ago would classify me as a hoarder
4  and could fill my house ten times over if I had to do this
5  with all the paperwork I go through.  You can't possibly
6  expect me to be able to reproduce these records, end of quote.

7  Now, it's a little bit of an exaggeration.  You
8  wouldn't have to be a hoarder.  You would have to be kind of a
9  mini hoarder, or at least you'd have to be somewhere towards
10  the middle of the obsessive-compulsive scale, let's just put
11  it that way, but he has a valid point.  And so, you know, this
12  is one -- even though this guy didn't have a lawyer, it's an
13  objection, I have to consider this objection, and I have to
14  consider -- if I can quote, you know, Justice Douglas from
15  1965, I have to consider the penumbra of his objection, and
16  the penumbra of his objection is you've done this in a craft
17  way that precludes people who could legitimately find
18  themselves in this class from having the opportunity to do
19  that.  That's why I said the other thing that I said at the
20  outset.  You win the battle and lose the war.

21  I mean, I think people could -- particularly if it's
22  right, as you just said, that 300-and-some odd of these people
23  are on the list already, and I guess I'd encourage you to tell
24  -- to give that list to Mr. Rauscher or Mr. Balabanian.  So
25  really what we're talking about is 260 people.  I mean, I can

1   imagine somebody making a rational business decision that,
2   okay, we can live with giving those people -- and I am not
3   talking about extending the claims deadline for everybody; I
4   don't think anybody is.  We are talking about extending the
5   date for these people to perfect their claim.  I could justify
6   a reasonable business decision that I am just going to live
7   with potentially some proportion of those 260 people, it
8   probably won't be all of them because all of them won't be
9   able to even come up with the records, as opposed to here
10  comes the monkey wrench flinging across the room falling into
11  the settlement over there.  Just a thought.

12          We are going to move on to the other motion.  The
13  other motion is called Motion to Enforce, and it looks like --
14  so this is the one that I will call -- with one exception what
15  I will call form completion deficiencies.

16          Okay.  The one exception would be not on the list and
17  didn't submit any supporting evidence.  That's not a form
18  completion deficiency.  Now, some of these people might have
19  been people you subpoenaed records for.  If they are not, you
20  know, those people -- I mean, that's not a form completion.
21  They are not class members.

22          MR. BALABANIAN:  Right.

23          THE COURT:  They are not class members as the term
24  has been defined.  The rest of them are all form completion
25  errors.  I guess again I will just make an observation.  I

1    will not quote Justice Douglas.  I will quote Mr. Rogers.
2    People make mistakes.  And any time you have 50,000 people
3    fill out a form, you're going to have some percentage of them
4    that are going to make mistakes.  I know this -- I will give
5    you an example.  It's not a perfect example, but it's an
6    example.  When I pick juries -- you got pretty close to this
7    process -- there is a questionnaire that people fill out.
8    It's routine for people to make mistakes.  It's routine for
9    people to leave things blank and not realize they left them
10   blank, and we end up having to ask them about it here.  It's
11   routine for people to put down the wrong bit of information,
12   and then they correct it when you actually ask them a
13   question, and we all know this from life.

14          I know it from reading briefs that are filed by
15   lawyers, typos, you know, that don't get caught one way or
16   another.  Mistakes get made.  And I understand the point that
17   people -- you know, you are a member of a class, you are
18   submitting it under the penalties of perjury, you're supposed
19   to be careful, I get all that, but there's going to be some
20   percentage of mistakes.  Again, win the battle, lose the war
21   is an issue here.

22          So the rest of them are things like -- so the one
23   thing that's agreed to is that everybody has agreed, it seems
24   like, that if somebody put the phone number on the wrong
25   line -- and that's apparently something like 832 calls --

1          MR. RAUSCHER:  We are up a little bit 9.

2          THE COURT:  It's around 900.  -- (continuing) that

3    both sides agree that those were okay.

4          MR. BALABANIAN:  Yes.

5          MR. BACKMAN:  Yes.

6          THE COURT:  Right?

7          MR. O'MEARA:  Yes.

8          THE COURT:  It looks like on the other side where the

9    people chose both options one and two, everybody's now agreed

10   that if they didn't list the number of calls, it's option one,

11   which is the lower dollar amount; if it did list the number of

12   calls, then you can assume it's option two, that's the higher

13   dollar amount.  That leaves everything else:  no signature, no

14   identification number, no phone number was listed, it shows

15   option two but didn't list the number of calls, didn't check

16   either option -- or didn't check off either option, I guess

17   that covers it.

18          So do you have a sense of how many people -- on the

19   stuff that didn't get agreed to, how many people we have left

20   there, ballpark?

21         MR. RAUSCHER:  I think --

22         MR. O'MEARA:  I have a list.

23         MR. RAUSCHER:  I think we are somewhere around -- I

24   should have added this up before.

25         MR. BACKMAN:  I think it's about 15,000 or so.

1    THE COURT: That's a big percentage of the class. So
2  that's how many?

3         MR. BALABANIAN: 72,000.

4         THE COURT: So 15,000 -- it's over 20 percent.

5         Let me ask you this question. So in the -- in terms
6  of the process, let's say that there had never been -- let's
7  say that no motions had gotten filed and these were all done
8  in the ordinary course, what the defendants contend should
9  have happened is the claims administrator should have said
10  denied, right, because you didn't fill out the form the right
11  way, denied. Those people would all be told your claim has
12  been denied. You have the ability to appeal, right? Still
13  right?

14         MR. BACKMAN: No, your Honor. If the claim is
15  rejected by the class administrator, that's it.

16         THE COURT: What's the appeal involve?

17         MR. BACKMAN: The challenge process is a challenge
18  process negotiated for the defendants to challenge any
19  approved claim.

20         MR. BALABANIAN: That's not exactly --

21         MR. BACKMAN: I'm sorry, and the plaintiffs have that
22  right too.

23         MR. BALABANIAN: It really deals with the number of
24  calls claimed.

25         MR. BACKMAN: Correct.

1        MR. BALABANIAN:  That's what the challenge process
2    deals with, not a deficient claim that's denied.  The
3    settlement doesn't contemplate down the road six months from
4    now all those people getting notice.  That would be incredibly
5    costly.
6        THE COURT:  I might not have understood that.  That
7    would be on me.
8        So give me a reason why a claim would be approved and
9    then somebody would appeal it.  I mean, give me an example of
10   one.
11       MR. BACKMAN:  From our perspective, we would be
12   challenging the number of calls.
13       THE COURT:  Got it.
14       MR. BACKMAN:  An easy example is somebody who selects
15   option 2.
16       THE COURT:  They are on the list and the list says
17   they got one and they say they got three.
18       MR. BACKMAN:  Correct, or like some of these folks
19   have said 9,999 calls.  We are going to challenge those.
20       THE COURT:  You got one of those?
21       MR. BACKMAN:  Yes.
22       MR. BALABANIAN:  And we are probably going to
23   challenge that too.  We haven't seen that claim yet.
24       THE COURT:  Someone really said 9,999?
25       MR. BALABANIAN:  I am not going to take a position

1   against one of my clients, but we would likely challenge that
2   claim as well.

3           THE COURT:  You can imagine a wall of the kitchen
4   with the slash marks on it, 1, 2, 3, 4, slash, 1, 2, 3, 4,
5   slash, sort of like somebody counting off the days they were
6   in prison.

7           Okay.  That's interesting.

8           Okay.  So that's what that was.

9           All right.  So, basically, for these 15,000 people,
10  if the defendants are right, what will happen is that they're
11  told denied, and then that's essentially the end of it.

12          MR. BALABANIAN:  Right.

13          THE COURT:  And when will they be told that they are
14  denied?

15          MR. BALABANIAN:  They are not going to be told they
16  are denied.  They're just not going to ever be paid on account
17  of the settlement.

18          THE COURT:  Is that right?

19          MR. BACKMAN:  That's my understanding, yes.

20          THE COURT:  Okay.  So let me just -- this issue had
21  not occurred to me until about a minute and a half ago, but it
22  occurred to me a minute and a half ago, so I am going to raise
23  it now,  particularly given the number of people.  It's
24  reasonable to think that I'm going to hear from some of those
25  people after the fact, and the reason I can say this is,

1  again, experience.  I had another case -- how big was the
2  potential class in this case?
3          MR. BALABANIAN:  This class?
4          THE COURT:  As defined.
5          MR. BALABANIAN:  About a million on the list.
6          THE COURT:  So I had another case actually with
7  Mr. Kanovitz from Mr. Rauscher's firm that involved strip
8  searches upon intake at the Cook County Jail.  The class was
9  potentially as big as 500,000 people, and most of these people
10 were in custody.  So we had this whole elaborate process of
11 sending out notice.  I still get today -- this was a
12 settlement paid out three, four years ago; just a ballpark --
13 I still get today something from people that My claim got
14 wrongfully denied, or, I never got notice, I just heard about
15 this from my cellmate or whatever.  I am going to hear from
16 some of these people because the amount of money that people
17 are getting -- potentially getting in this case is actually a
18 little bit more than those people at least at the low end were
19 getting in that case.
20         So what are the implications of -- so if somebody
21 comes back to me kind of with a version of this gentleman,
22 this Dr. Taylor, Dr. Taylor's objection saying, My claim got
23 denied, I filled out the form, oh, I looked at it, and, you
24 know, I put something on line A when it should have been on
25 line B, this isn't fair.  So all of those people potentially

1  would have a legitimate objection to the claim processing and

2  approval process, and yet it will be too late for them to

3  raise it because the settlement will have already been

4  approved or denied -- not approved, I guess.  Let's say it's

5  approved, is that a problem?

6       MR. BALABANIAN:  Yeah, I think that those people -- I

7  didn't mean to jump in, but I think those people --

8       THE COURT:  I asked a question.  You are not jumping

9  in.

10      MR. BALABANIAN:  Their objection would be essentially

11  that we didn't follow the settlement agreement.  If you accept

12  our reading of it and those people filed deficient claims, we

13  think the settlement agreement clearly provides it, and we

14  don't think it's a remarkable point, that those people should

15  be given notice of the deficiency and an opportunity to cure

16  it.  And if that doesn't happen, I think their objection would

17  be you didn't comply with the actual language of the

18  settlement agreement.  And I think they would probably have

19  somewhat of a valid objection there.

20      What the dispute at this point boils down to is

21  should we tell these people right now that their claim is

22  going to get denied if they don't do anything, and I think the

23  agreement clearly provides for that.

24      THE COURT:  Mr. Backman.

25      MR. BACKMAN:  I think you have to default to the

1   agreement itself.  The agreement doesn't contemplate noticing

2   an opportunity to cure.  The screening for fraud and abuse

3   provision that they cite to isn't a notice and opportunity to

4   cure provision.  So the agreement that the parties entered

5   into is what needs to be followed by the class administrator.

6           THE COURT:  Can you point me to where -- I am not

7   saying it's not there.  I just want to see where it is.

8           I got the -- I've got the -- I think I have the

9   settlement agreement here.

10          MR. BALABANIAN:  I have a copy, if the Court needs

11  it.

12          THE COURT:  No, I think I've got it.  I've got it

13  here.  Can you point to me the provision in the settlement

14  agreement or better yet, maybe both places, first the

15  settlement agreement and the notice to the class members that

16  talks about the way in which the forms have to be filled out,

17  how they get denied, and that kind of thing.

18          MR. BALABANIAN:  Yes.  One moment, your Honor.

19          THE COURT:  Yeah, it's a long agreement.  I wouldn't

20  expect you to kind of know that kind of off the top of your

21  head.

22          MR. BALABANIAN:  So to the agreement, turning to the

23  agreement, I would say the first thing you would look at is

24  the definition of approved claim.

25          THE COURT:  Which is which page?

1        MR. BALABANIAN:  Page 5.

2        THE COURT:  All right.  I am there.

3        MR. BALABANIAN:  It's 1.2.

4        THE COURT:  Let me just read it to myself.  Approved

5   claims means a claim form dot, dot, dot that is submitted

6   timely and in accordance with the directives of the claim form

7   and the provisions of the settlement agreement, fully and

8   truthfully completed and executed with all the information

9   requested in the claim form, signed by the settlement class

10  physically, electronically, et cetera, and verified by the

11  settlement administrator.  Okay.

12       So then my second question is the notice.  The notice

13  is attached to this thing?

14       MR. BALABANIAN:  It is, your Honor.

15       THE COURT:  Is the claim form part of the notice?

16       MR. BALABANIAN:  It was for the -- yes, it is.

17       THE COURT:  So what I'm looking for is on the thing

18  -- I mean, honestly, I don't think anybody -- at least nobody

19  in their right mind would rationally expect anybody to read

20  the settlement agreement in its entirety.  Where on what the

21  people actually saw in their notice, other than potentially

22  the argument that it's obvious that when you're filling out a

23  form and have to sign it under penalties of perjury that it

24  needs to be accurate, but where is it in there that tells

25  people what Mr. Balabanian just cited to in the settlement

1  agreement?

2  MR. BACKMAN:  Your Honor, you are looking at docket

3  entry 502?

4  THE COURT:  I am looking at 497, but I think it's the

5  same as 502.

6  MR. BACKMAN:  Yes.

7  THE COURT:  I can pull up 502.

8  MR. RAUSCHER:  Your Honor, I have a claim form in

9  hard copy, if it would help.

10  THE COURT:  That would help, thanks.

11  MR. RAUSCHER:  This would be people on the class list

12  because they are not being asked to provide --

13  MR. BACKMAN:  I have the other ones too.

14  THE COURT:  Let me see the other one too.

15  MR. RAUSCHER:  I should double-check.  I might have

16  given you the non-class list.  That one actually may require

17  proof.

18  MR. BACKMAN:  It may have some pen mark on there.  I

19  apologize.

20  THE COURT:  Don't worry about it.

21  MR. BACKMAN:  I could direct you to the long form

22  notice as well in the document.

23  THE COURT:  Where in the long form?

24  MR. BACKMAN:  If you're at docket entry 502.

25  THE COURT:  What paragraph?

1      MR. BACKMAN:  It would be page -- it would start at
2  page 59 of 73.
3      MR. BALABANIAN:  Of the ECF.
4      MR. BACKMAN:  Of the ECF.
5      THE COURT:  What's the document?
6      MR. BACKMAN:  I could bring up the copy.
7      THE COURT:  That would be easier.
8      MR. BACKMAN:  Again, it's got some handwriting.
9      THE COURT:  Don't worry about that.
10      MR. BACKMAN:  Sure.
11      THE COURT:  Okay.  Yeah, this is the same thing I had
12  up on my screen.  So what part of this?
13      Okay.  What part of the notice should I be looking at
14  here?
15      MR. BACKMAN:  I would think page 3 of that document.
16  It starts --
17      THE COURT:  And now that I have it on my screen, you
18  can have this back because it will help you to kind of refer
19  me to the right spot.
20      MR. BACKMAN:  I think paragraphs 6, 7, and 8.
21      THE COURT:  Let me just read those.
22      If I can use the kind of breakdown that was used in
23  the motion by the plaintiffs, you have A through H, I think.
24  When C was -- didn't identify the number of calls, does that
25  mean the person didn't check off either option 1 or option 2?

1    MR. BALABANIAN:  I think so, yes.

2    THE COURT:  Or did it mean something different than

3  that?  That was actually another category.  F was didn't

4  choose either option 1 or option 2.

5    MR. RAUSCHER:  I think that would more likely be they

6  didn't put option 2.

7    THE COURT:  Or didn't fill in the blank.

8    MR. RAUSCHER:  Or filled in the blank but put

9  something like I got a bunch of calls or more than X number of

10  calls, something like that.

11    THE COURT:  Does that sound right to you?

12    MR. BACKMAN:  Yeah, or several was the example.

13    MR. RAUSCHER:  Several.

14    MR. BACKMAN:  The class administrator --

15    THE COURT:  And the breakdown is three calls or

16  fewer.  If a person submits a proper claim form and checked

17  off option 1, three calls or fewer, they get X, whatever X

18  turns out to be.  If they submit a proper claim form with the

19  required proof and check option 2, more than three calls and

20  give a number, then remind me what happens.  Is it a multiple

21  of X or is it X plus something or what?

22    MR. BACKMAN:  It's per call after three, it's 500 per

23  call after three depending on how high.

24    MR. RAUSCHER:  It's per call no matter how many you

25  pick.

1    THE COURT:  So we have some people, for example, that
2    chose option 2 which says, Option 2, more than three calls,
3    but they didn't fill in the blank.
4         MR. RAUSCHER:  Yes.
5         MR. BALABANIAN:  Yes.
6         THE COURT:  And the defendants' position is that
7    those people didn't submit a compliant claim form and they
8    should be denied even if they submitted documentation.
9         MR. BACKMAN:  Correct.
10       THE COURT:  Wow.  In all -- I know that the claim
11   form isn't a contract as such, but you're talking about
12   compliance with a contract, and there's something -- it's been
13   a long time since I took first year of contracts, I am not
14   going to tell you how long ago it was, it was a long time
15   ago -- substantial performance.  I mean, why wouldn't you
16   treat somebody who checked off more than three but didn't give
17   a number, fine, then you are going to default back to option
18   1?
19       MR. BACKMAN:  Can I just --
20       THE COURT:  And the reason I'm asking this now is it
21   sounds like what's happening is I am never going to get to
22   decide that.  It's going to all be decided by the
23   administrator, and I am never even going to see it.
24       MR. BACKMAN:  Can I say it a little differently?  Our
25   perspective is from the defense side, that if there's

1   information in the claim form which allows the class

2   administrator to determine that a claim is eligible to be

3   approved, that the class administrator should do what it can

4   to make that determination.  We can fight about the number of

5   calls later.  If there is not enough information in the claim

6   form for the class administrator to determine eligibility,

7   then it should be rejected.

8          THE COURT:  Maybe I'm asking the question to the

9   wrong people.  Are the class counsel telling me that if

10  somebody checked off option 2 but didn't fill in the blank and

11  did everything else that they're supposed to do, that what's

12  going to happen is that the claims administrator is going to

13  say denied?

14         So there's three possible answers to that question.

15  One possible answer is yes, one possible answer is no, and one

16  possible answer is I don't know.

17         MR. BALABANIAN:  Yes, as things stand correctly.

18         THE COURT:  Why would they do that?

19         MR. BALABANIAN:  Because they have to have an

20  agreement between the parties to send out this notice of

21  deficiency, and other than that, they can either -- they can

22  only accept or reject claims.

23         THE COURT:  I guess what I am asking is a different

24  question.  What you're telling me is that if somebody checks

25  off on this long claim form here option 2, more than three

1  calls, I affirm that I received blank number of calls, they
2  left it blank, they attached documentation of some sort, the
3  claims administrator is going to say -- by the way, I am
4  holding it up like this, that's on purpose, that's meant as a
5  reference.  Do you remember that picture from the 2011
6  election?

7          MR. BACKMAN:  Judge Rosenberg.

8          THE COURT:  The guy holding up the form and looking
9  to see if the --

10         MR. BACKMAN:  With the magnifying glass too.

11         THE COURT:  I kid.  The claims administrator is going
12  to say you lose?

13         MR. BALABANIAN:  We would tell the claims
14  administrator that it should default to three.

15         THE COURT:  Who does the claims administrator answer
16  to, you or me or nobody?

17         MR. BALABANIAN:  Both parties and the Court,
18  ultimately.

19         THE COURT:  No, I'm not going to find out about this.
20  They don't answer to me.  You guys just told me this is all
21  under the radar before I get it.  The only possibility of any
22  challenges to denials are going to be these challenges over
23  the number of claims, not over yes or no.  It's going to be
24  over the number of claims.

25         MR. BACKMAN:  The way I've seen this come up in the

1  past -- I am not sure if Rafey and Scott have a different

2  experience -- but the way I've seen this come up is not --

3  well, it would be a settlement agreement that has a specific

4  notice and opportunity to cure provision.  If that exists, the

5  settlement administrator would do what the settlement

6  agreement says.

7          As it relates to this deficient/rejected/approved,

8  the way I see it come up is after the determination is made in

9  connection with the final approval of all the claims, the

10  parties would come back and challenge the administrator's

11  designations or reject it.  That's how this would come.  This

12  group of claims should not have been deemed rejected, and then

13  your Honor would make that decision.

14          What we are here on, they are asking for an

15  opportunity to cure for every one of these buckets.

16          THE COURT:  So here's where we are at this point,

17  unless anybody has anything else you want to say.  Does

18  anybody have anything else you want to say on these?  I am not

19  going to rule on these right now.  I am just going to talk to

20  you.

21          So, look, I'm happy to make a ruling on this stuff.

22  I will do that, but I would like -- I am going to strongly

23  suggest that everybody go back and spend like a day and a

24  half, that would be the rest of today and tomorrow, to see if

25  you can -- if there is a way that you can come up with some

1 | accommodation on some or all of this stuff. I am not saying
2 | you have to, I am not saying you don't have to. And then you
3 | come back on Thursday, you'll tell me, and then I'll rule on
4 | whatever is left, whether it's everything that's left or
5 | whether it's some part of it. That's what I am going to
6 | suggest.
7 | There has to be a prompt ruling on this. I know that
8 | Thursday is the day after the deadline, but I'm out of here.
9 | I am not in here tomorrow morning. I am not in here --
10 | frankly, I mean, I could theoretically have you come back
11 | tomorrow afternoon, but it kind of depends how long something
12 | goes. I could theoretically have you come back tomorrow
13 | afternoon if that would be better, like 2:00 or something like
14 | that.
15 | MR. BACKMAN: I'm assuming you might want to hear
16 | from counsel again, so tomorrow afternoon would be better for
17 | me.
18 | THE COURT: Then you don't have to stick around for
19 | two extra days. Does that give you enough time to talk?
20 | MR. BACKMAN: Yeah, we could certainly all get
21 | together.
22 | THE COURT: You may have to talk to other people --
23 | MR. BACKMAN: Get on the phone with our clients, but
24 | I think we should be okay.
25 | THE COURT: Hang on one second.

1       THE COURT:  2:00 o'clock tomorrow.  The motions are
2   entered and continued to 2:00 o'clock tomorrow.

3       MR. BALABANIAN:  Thank you, your Honor.

4       THE COURT:  You don't have to file anything.  Just
5   come in at 2:00.  You are going to tell me here is where we
6   are.  We haven't agreed to anything, which is fine.  We have
7   agreed to this, this, and this and not this, which is fine.
8   We have agreed to everything, which is fine.

9       MR. BACKMAN:  Thank you, your Honor.

10      THE COURT:  Then I will just rule on whatever is
11  left.

12      MR. BALABANIAN:  Final motion we will deal with
13  tomorrow.  It's agreed essentially.

14      THE COURT:  But my impression on that, though, is
15  that -- I mean, it's a moot point.  The subpoena to Comcast,
16  it's a moot point unless I grant one of these motions, right?

17      MR. RAUSCHER:  I think not necessarily, because it
18  could be relevant in the challenge process.  It might be too
19  late to start serving subpoenas --

20      THE COURT:  Fair enough.  Was that motion unopposed?
21      MR. BACKMAN:  We don't oppose it.

22      THE COURT:  You don't oppose it.  Let me just pull it
23  up here.

24      Pam, this is docket No. 553.  It's a motion for an
25  order compelling Comcast to produce records.  It's granted.

1          Have you given me the draft order on that yet?

2              MR. RAUSCHER:  No.  We can talk.

3              MR. BALABANIAN:  We will email it to your Honor.

4              THE COURT:  Get it to me today because most of

5     tomorrow I'm not going to be here.

6              MR. BALABANIAN:  Thank you for taking the time.

7     Thank you, your Honor.

8          (Which were all the proceedings had in the above-entitled

9     cause on the day and date aforesaid.)

10         I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
11

12    _____        _____
      Carolyn R. Cox                      Date
      Official Court Reporter
13    Northern District of Illinois

14    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

15

16

17

18

19

20

21

22

23

24

25