1       IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4  GRANT BIRCHMEIER, et al.,          )  Docket No. 12 C 4069
                                      )
5                     Plaintiffs,     )
                                      )
6              vs.                    )
                                      )
7  CARIBBEAN CRUISE LINE, INC., et    )  Chicago, Illinois
   al.,                               )  February 23, 2017
8                                     )  9:30 o'clock a.m.
                      Defendants.     )
9

10          TRANSCRIPT OF PROCEEDINGS - MOTION
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12  APPEARANCES:

13

14  For the Plaintiffs:    LOEVY AND LOEVY
                           BY:  MR. SCOTT R. RAUSCHER
15                              MR. MICHAEL I. KANOVITZ
                           311 North Aberdeen Street, 3rd Floor
16                         Chicago, IL  60607
                           (312) 243-5900
17

18                         EDELSON PC
                           BY:  MR. JAY EDELSON
19                              MR. RAFEY S. BALABANIAN
                                MS. EVE-LYNN J. RAPP
20                              MR. ALEXANDER GLENN TIEVSKY
                           350 North LaSalle Street, Suite 1300
21                         Chicago, IL  60654
                           (312) 589-6370
22

23  Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
24                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
25                         (312) 435-5639

APPEARANCES CONTINUED:

| For Caribbean Cruise Line, Inc.: | GREENSPOON MARDER, P.A.<br>BY:  MR. JEFFREY BACKMAN<br>200 East Broward Boulevard, Suite 1800<br>Fort Lauderdale, FL  33301<br>(954) 491-1120 |
|---|---|
| For The Berkley Group, Inc.: | FORDE LAW OFFICES LLP<br>BY:  MR. BRIAN PATRICK O'MEARA<br>111 West Washington Street, Suite 1100<br>Chicago, IL  60602<br>(312) 641-1441 |
| For Freedom Home Care, Inc.: | BANDIS LAW FIRM, P.C.<br>BY:  MR. ROBERT W. CLORE<br>500 North Shoreline Boulevard<br>Corpus Christi, TX  78401<br>(361) 558-3527 |
|  | JONATHAN NOVOSELSKY, P.C.<br>BY:  MR. JONATHAN P. NOVOSELSKY<br>303 West Madison, 22nd Floor<br>Chicago, IL  60606<br>(312) 286-8429 |
| For Kevin McCabe: | TODD C. BANK, ATTORNEY AT LAW, P.C.<br>BY:  MR. TODD C. BANK<br>119-40 Union Turnpike, Fourth Floor<br>Kew Gardens, NY  11415<br>(718) 520-7125 |

1    (The following proceedings were had in open court:)

2            THE CLERK:  Case No. 12 C 4069, Birchmeier v.

3    Caribbean Cruise Line.

4            THE COURT:  Good morning.

5            MR. EDELSON:  Good morning, your Honor.  Jay Edelson

6    for the class.

7            MS. RAPP:  Good morning, your Honor.  Eve-Lynn Rapp

8    for the class.

9            MR. TIEVSKY:  Good morning, your Honor.  Alexander

10   Tievsky for the class.

11           MR. BALABANIAN:  Good morning, your Honor.  Rafey

12   Balabanian for the class.

13           MR. RAUSCHER:  Good morning, your Honor.  Scott

14   Rauscher for the class.

15           MR. KANOVITZ:  Good morning, Judge.  Mike Kanovitz

16   for the class.

17           MR. O'MEARA:  Good morning, your Honor.  Brian

18   O'Meara on behalf of the defendant the Berkley Group.

19           MR. BACKMAN:  Jeffrey Backman for Caribbean Cruise

20   Line and Vacation Ownership Marketing Tours.

21           MR. CLORE:  Robert Clore for Freedom Home Care,

22   Incorporated.

23           MR. NOVOSELSKY:  Jon Novoselsky, local counsel.

24           THE COURT:  With him?

25           MR. NOVOSELSKY:  Yes.

1    MR. BANK:  Todd Bank, pro hac counsel for Kevin
2  McCabe, the objector.

3    THE COURT:  Okay.  I think where I want to start off
4  is I want to hear from anybody who is objecting to the
5  settlement, which I am going to define in a second, who, if
6  there are any, haven't filed something.  So I want to
7  distinguish between those who are objecting to the attorneys'
8  fees and those who are objecting to the settlement.

9    So I think Freedom Home Care's objection, as I read
10  it, is directed to the attorneys' fees, right?

11    MR. BANK:  Yes, your Honor.

12    THE COURT:  I want to deal with McCabe in a second.

13    Was there anybody else in the room here who wants to
14  be heard, an objection to this proposed settlement in this
15  case?  Hearing nothing.

16    Okay.  So bear with me.  I just got to get stuff
17  organized here.

18    So what's your name, the lawyer for Mr. McCabe?

19    MR. BANK:  Todd Bank.

20    THE COURT:  I need you to respond to the argument
21  that McCabe doesn't have standing.

22    MR. BANK:  I am not sure I understood the argument.

23    THE COURT:  Is that your response?

24    MR. BANK:  No.  Was something filed?  I didn't see
25  it.

1    THE COURT:  It's on the docket.  It's been on the

2  docket for two weeks.  It's called Plaintiffs' Memorandum of

3  Law in Support of Motion For Final Approval of Class Action

4  Settlement, and on pages 21, 22, 23, and 24, there is an

5  argument that's entitled McCabe Lacks Standing, et cetera.  I

6  want you to respond.  Did you see that?

7    MR. BANK:  I actually did not.

8    THE COURT:  That's your fault.

9    MR. BANK:  It is.

10    THE COURT:  What's the contention -- what's your

11  contention that you have standing?  Your claims were resolved

12  in the New York litigation.

13    MR. BANK:  No, we brought one claim for one phone

14  call and it's resolved based on a judgment, not a settlement,

15  based on a judgment --

16    THE COURT:  No difference.  It's a judgment.

17    MR. BANK:  -- solely for the one call.  There was an

18  offer of judgment for the one call for whatever the amount

19  was, I think 1500 or 2500.

20    THE COURT:  Had McCabe gotten other calls at the

21  time?

22    MR. BANK:  Yes, he had received other calls.

23    THE COURT:  Why wouldn't that be barred by the

24  Doctrine of Claim Preclusion, any other calls that you had, if

25  he had other calls at the time?  You choose to sue on one of

1 them, you choose not to sue --

2 MR. BANK: There was one thing -- there was no
3 legally binding --

4 THE COURT: I tell you what. The rules are I get to
5 interrupt you.

6 MR. BANK: I'm sorry.

7 THE COURT: You don't get to interrupt me.

8 MR. BANK: My apologies.

9 THE COURT: Do it again and you're done. Understand?

10 MR. BANK: Yes.

11 THE COURT: Okay. So let me finish my point.

12 MR. BANK: Please.

13 THE COURT: Standard rule of claim preclusion is that
14 if you have a claim, you got to sue on it. You can't split it
15 up into little bits and pieces and say I am going to sue on
16 one, win that one, now I'm going to sue you on the next one,
17 win that one. I asked you the question whether he had gotten
18 other calls at time, you told me yes. That means that his
19 claim on everything was ripe at the time you filed the
20 lawsuit. So why wouldn't any other claims McCabe have be
21 resolved by that judgment and the Doctrine of Claim
22 Preclusion?

23 MR. BANK: Well, that's not my understanding of the
24 doctrine. This isn't a question of -- I don't think a
25 plaintiff is obligated to bring a single action on every claim

1  he has.  He may.

2          THE COURT:  It was against the same people, right?

3          MR. BANK:  Yes, but different phone calls.

4          THE COURT:  You must have skipped the federal

5  jurisdiction class in law school.

6          MR. BANK:  Perhaps.  Again, my understanding of claim

7  preclusion is that one does not have -- one is not obligated

8  to sue on each claim.  There was -- there were no judicial

9  findings with respect to any of the phone calls; in other

10  words --

11          THE COURT:  That's not the way the Doctrine of Claim

12  Preclusion works.  The Doctrine of Claim Preclusion applies to

13  any claim that was made or could have been made in the lawsuit

14  against the same defendants.

15          MR. BANK:  My understanding --

16          THE COURT:  You have the same client in the lawsuit.

17          MR. BANK:  My understanding is that that doctrine

18  would apply to any claims based on the facts that gave rise to

19  the claim that is brought.

20          THE COURT:  Okay.  Let's skip past that.  Honestly, I

21  just think you misunderstand the law.  Let's get to the other

22  point.

23          MR. BANK:  Sure.

24          THE COURT:  The argument that you make has to do with

25  the potential Cy-près -- that's spelled C-y-p-r-è-s, Carolyn

1  -- provision.

2  So what do you think is the Cy-près aspect of this

3  settlement?

4  MR. BANK:  Well, the Cy-près aspect, as I understand

5  it, is that unclaimed funds are going to be paid to an unknown

6  as of yet undetermined recipient.  There are no parameters on

7  who this recipient might be.  The class members were not told

8  that they have the right to object to whoever is chosen or opt

9  out depending on who is chosen.  The class members have not

10  been apprised of their rights.

11  The problem with the Cy-près award is there's been no

12  showing that it would be infeasible to give the so-called

13  unclaimed funds to the class members, and that could be done

14  in a number of ways.

15  There could be -- there are a number of options that

16  could have been --

17  THE COURT:  What are they?

18  MR. BANK:  -- taken here.

19  The first one -- in no particular order, but the

20  first one is the defendants could have sent prorated checks or

21  pro rata checks to every class member that they had knowledge

22  of with appropriate release language, saying that if you

23  negotiate this payment, you will be releasing the defendants

24  as provided in the settlement agreement.  They also could have

25  sent prorated checks to those class members who made claims at

1  least -- at least to the extent of up to $1500 per call, which
2  the statute allows for.

3       THE COURT:  Nobody -- when you say "could have,"
4  nobody has been sent a check yet.

5       MR. BANK:  I'm saying that that could be or could
6  have been the procedure that was arranged.

7       THE COURT:  Okay.

8       MR. BANK:  And then also they could have sent
9  prorated checks to the class members who made the calls --

10      THE COURT:  So by definition, in this case, the only
11 people who are getting checks are the people who actually
12 submitted claim forms.  They are not just sending them out at
13 random to some large mass of people, right?

14      MR. BANK:  Correct.

15      THE COURT:  Do you have some reason to believe that
16 there's any significant number of those people who have
17 actually gone through the trouble of submitting claim forms
18 thinking that they are going to get 3 or 4 or $500 or perhaps
19 more that aren't going to cash the checks?  I mean, we could
20 end up with one check here.

21      MR. BANK:  I have no idea.

22      THE COURT:  Say it again.

23      MR. BANK:  I don't know how many members of the claim
24 will not deposit the checks.  The point is in order to have a
25 Cy-près award as part of a settlement, there has to be a

1   showing that it would be infeasible to give all the money out
2   before you start giving money out to people who aren't part of
3   the class.

4           THE COURT:  Let's say, for example, that what's left
5   over is 300 bucks and we figure it would cost -- because of
6   this whole pro rata thing, I don't know, we have tens of
7   thousands of claimants here to send -- you know, 300 bucks, to
8   divvy it up between 30,000 people, I think if my math is
9   right, that would be like a penny a person or 10 cents a
10  person; I am not sure where the decimal point is.  The stamp
11  would cost however much stamps cost these days, 45 cents.
12  That's kind of absurd, isn't it?

13          MR. BANK:  We don't know that that's going to be the
14  case.

15          THE COURT:  You don't know that it's not.  Isn't
16  there a good reason to believe -- isn't there a good reason to
17  believe that because these people have gone through the
18  trouble of submitting claim forms for an amount that is not
19  some insubstantial amount, it's not some nominal amount that
20  is often seen in these types of cases, it's a real significant
21  amount of money, is there any significant reason to believe
22  that these people aren't going to cash their checks once they
23  get them?  They have addresses on all of them.

24          MR. BANK:  I don't know what was said.
25          THE COURT:  Thanks.

1          Can I have somebody respond from the plaintiffs'
2   side, please.
3          MR. EDELSON:  Yes, your Honor.  I would like to
4   respond in reverse order and first deal with the substance.
5          Mr. Bank --
6          THE COURT:  You don't have to respond to the standing
7   thing.  Let's talk about the other part.
8          MR. EDELSON:  I would like to if only for the record,
9   if you don't mind.  Let me first deal with the substance, and
10  if you don't want to hear the rest.
11         On the substance, Mr. Bank's suggestion that we send
12  checks would naturally solve the problem.  As your Honor
13  knows, the only Cy-près component here is when checks go to
14  people, if they don't end up cashing them, so if we sent
15  checks to everybody --
16         THE COURT:  What he is basically saying is there
17  should be a second round of checks?
18         MR. EDELSON:  Which there is.  Under the settlement,
19  which I don't think Mr. Bank read terribly carefully, there
20  are two distributions.  After the first distribution, to the
21  extent that people didn't actually cash the check, that then
22  remains in the fund and the other people who were active
23  participants will get prorated increases.
24         THE COURT:  Okay.  Right.
25         MR. EDELSON:  So we're talking about a situation

1  where people have filed the claim form and then have cashed

2  the first check and then are getting a second check.  And in

3  our experience, there may be some amount that is left over,

4  but as your Honor suggested, we are talking about perhaps a

5  thousand dollars, $1500.  There is no way to distribute that

6  to the class.

7         THE COURT:  Is it basically for the reason I said;

8  it's like a ridiculous waste of postage?

9         MR. EDELSON:  Yes.

10        THE COURT:  For no good reason, assuming that the

11 numbers end up being that low, in other words.

12        MR. EDELSON:  It's not only a ridiculous waste of

13 postage, it's the number of class members.  It would cost a

14 lot more money.

15        THE COURT:  Right.

16        MR. EDELSON:  We would lose tens of thousands of

17 dollars, if not hundreds of thousands of dollars.

18        THE COURT:  You would spend a hundred dollars to save

19 one dollar, basically.

20        MR. EDELSON:  Correct.

21        THE COURT:  That's all I need to hear.  On the other

22 thing, go ahead.

23        MR. EDELSON:  If only for the record, we explained

24 claim preclusion to Mr. Bank in an email, so he was aware of

25 that.  Obviously, I agree with your Honor.

1       But the other point is the way the class is defined
2   -- and we lost this argument -- but the way the class is
3   defined in the class certification order is you either have to
4   have a number that is on the list or you have to come forward
5   with documentary evidence.

6               THE COURT:  And he's done neither.

7               MR. EDELSON:  He's done neither.  We have been asking
8   him for over a month --

9               THE COURT:  Hang on a second.  Let me get kind of to
10  the point on this.  The point is that to the extent Mr. McCabe
11  might have any claims that he could have made that didn't --
12  that he didn't make in other litigation, he's not going to be
13  precluded by the settlement in this case because he's not a
14  member of the class because, A, he is not on the list, and B,
15  he hasn't provided any documentation reflecting that he got
16  calls.

17              MR. EDELSON:  He has not provided any documentation
18  at all.

19              THE COURT:  His claims aren't going to be released or
20  precluded by this.

21              MR. EDELSON:  I think they are gone anyway.

22              THE COURT:  By this, though, by this settlement they
23  are not going to be released or precluded.

24              MR. EDELSON:  Correct.

25              THE COURT:  Thanks.  I think that was the only issue

1  relating to the settlement.  So now we are going to go on and
2  talk about the attorneys' fees.

3        My first kind of big question here is I think that
4  this picks up on a point that I think the defendants made in
5  their response in the fee petition.  So the question is
6  whether I should adjudicate the fees now before the claim
7  objection process is done, and I think to help me out on that,
8  it would be helpful for me for somebody to give me kind of a
9  thumbnail sketch of where the claim adjudication process is at
10  the moment.  Go ahead, Mr. Balabanian.

11        MR. BALABANIAN:  Yes, your Honor.  Thank you.

12        The process hasn't yet begun in terms of the --

13        THE COURT:  You know how many objections there are,
14  or do you?

15        MR. BALABANIAN:  Not --

16        THE COURT:  Not necessarily, okay.

17        MR. BALABANIAN:  Because the claims administrator
18  hasn't yet done its final pass of validating or denying their
19  claims.  We were in court on that issue.

20        THE COURT:  What's the number currently, though?

21        MR. BALABANIAN:  Of claimants, I believe it's just
22  under 80,000, your Honor.  80,000 claimants with approximately
23  353,000 calls claimed.

24        THE COURT:  It's up significantly from the number
25  that was in the memorandum that was filed two weeks ago.  It

1  was in the 60s somewhere.

2      MR. BALABANIAN:  Yes, your Honor.  It's actually a

3  slightly smaller number.  It's actually 369,143 calls claimed

4  to date.

5      THE COURT:  369,143, and the number of claimants is

6  how many?

7      MR. BALABANIAN:  The number of claimants right now is

8  approximately 76,281.

9      THE COURT:  Maybe I just read something wrong.  I

10  thought that we already knew that the defendants were

11  objecting to some significant proportion of it.

12      MR. BALABANIAN:  They are going to.

13      THE COURT:  That part actually -- you haven't had to

14  do it yet; is that right, Mr. O'Meara?

15      MR. O'MEARA:  That is correct, your Honor.  The KCC,

16  the claims administrator, has designated all these claims as

17  approved claims.

18      THE COURT:  What's the date that that's supposed to

19  happen?

20      MR. BALABANIAN:  It's actually tied to the Court's

21  final approval and the effective date of the settlement, the

22  effective date meaning the time for the appeals period to run,

23  your Honor.

24      THE COURT:  That leads me to another question.  Is

25  the date for my final approval dependent on me also approving

1  the attorneys' fees?  In other words, can I say I approve the

2  settlement, but -- I am not saying I am going to do this.  I

3  am just asking the question.  Can I say I approve the

4  settlement, I'm deferring determination of the attorneys' fees

5  until I see how the claims process works out?  Then that

6  triggers the obligation to finalize -- for the administrator

7  to finalize the numbers and then for the defendants to start

8  making objections.

9          MR. BALABANIAN:  The Court can certainly enter an

10  order in that fashion.

11          THE COURT:  Is that your understanding too?

12          MR. O'MEARA:  I think that's right.  It's technically

13  a final judgment.  That's when it's triggered.

14          THE COURT:  All right.  Fair enough.

15          Okay.  So then walk me through -- whatever that day

16  is, let's say it's next Wednesday or whatever, you have how

17  long from -- the administrator has how long from next

18  Wednesday to say, okay, here's the claims that I've approved

19  or provisionally approved or whatever?

20          MR. BALABANIAN:  Let's assume the Court grants final

21  approval today.

22          THE COURT:  Okay.

23          MR. BALABANIAN:  The claims administrator would then

24  have 14 days from the effective date, so 30 days -- 45 days

25  from now essentially would be --

1    THE COURT:  The effective date being?

2    MR. BALABANIAN:  30 days from today.

3    THE COURT:  So it's 30 plus 14?

4    MR. BALABANIAN:  Correct.

5    THE COURT:  And then how long is it after that to

6    file objections -- to make objections?

7    MR. O'MEARA:  Then we have 30 days to file

8    objections, challenges.

9    THE COURT:  30 days.  And then challenges, or

10   whatever they're called.  And then what's the process after

11   that?  Now we're 75 days out.  The process after that is what?

12   Do you have an opportunity to respond?

13   MR. BALABANIAN:  Yes, we will have an opportunity to

14   respond.  The class members whose claims are challenged will

15   be notified to that fact.  They will be able to come forward.

16   THE COURT:  How long do they have, 30 days also?

17   MR. O'MEARA:  21 days.

18   THE COURT:  21 days.  Now we are at 96 days.

19   Okay.  And is there a deadline for the -- is it the

20   special master who then says thumbs up, thumbs down, and is

21   there a deadline on him?

22   MR. O'MEARA:  180 days from judgment.

23   THE COURT:  180 days from the judgment.

24   MR. O'MEARA:  Yes.

25   THE COURT:  Okay.  So that's sort of the outside

1  date.  And then people have an opportunity to make challenges
2  to me to whatever the special master ruled.  I assume I set a
3  date for that.

4       MR. BALABANIAN:  I don't think we actually set a date
5  for that.

6       THE COURT:  Let's assume it's 21.  Fair enough.

7       The long and the short of it is I am basically not
8  going to know for about six months how the claims process
9  ultimately comes out.  Now, I suppose I'll have a sense of it
10 way earlier than that, because once we know how many
11 objections there are, I'll have -- I'll say, okay, I know that
12 there's this many that are objected to and there's this many
13 that aren't, and from a finality standpoint, I'm looking at
14 six months.  Is that basically right?

15      MR. BALABANIAN:  You won't have absolute certainty,
16 your Honor.  As we put in our papers, we think it's a forgone
17 conclusion that the 76 million will be exhausted just based on
18 what's out there, but absolutely correct, you won't have --

19      THE COURT:  When you say that is what you mean that
20 based on your sort of general sense of what you think the
21 defendants are going to object to, even if they won on all
22 their objections, there would still be enough claims left --
23 valid claims left to get up to the cap?

24      MR. BALABANIAN:  Exactly.

25      THE COURT:  Maybe that's one of your arguments for

1   why I should decide the fees now, but let me hear your

2   arguments on why I should decide the fees now rather than

3   waiting until the claims process is done.  I don't care who

4   talks about it.  Whoever wants to do it.

5          MR. EDELSON:  Well, your Honor, as you know, we are

6   only seeking to be paid based on the claims that are actually

7   paid out.  So we are not looking today for your Honor to rule

8   that we are entitled to -- I think we are asking for $24.5

9   million.

10          THE COURT:  Basically what you're asking me to do is

11   not give them a dollar amount but rather give them a

12   percentage?

13          MR. EDELSON:  There are two options.  One is there's

14   a complicated formula.  We actually have Mr. Tievsky, who is

15   the only one smart enough at our firm to understand it who can

16   explain it.

17          THE COURT:  That's the appendix or whatever?

18          MR. BALABANIAN:  Correct, your Honor.

19          MR. EDELSON:  It is.  It was impenetrable to me, but

20   we have tested him out, and he's fairly smart.

21          THE COURT:  It's somewhat penetrable to me.

22          MR. EDELSON:  That's why you're a federal judge, your

23   Honor.

24          THE COURT:  Somewhat.  I am not going to give a

25   percentage on the somewhat.

1    MR. EDELSON:  Anyway, one option is you do the

2   formula.  The other option, which may be the easiest one, is

3   that you give us a percentage of the minimum, the 56.

4    THE COURT:  Yeah.

5    MR. EDELSON:  And then we can come back and apply for

6   fees, to the extent that there are more claims after that, and

7   just do it in two phases, and we would be totally comfortable

8   with that, your Honor.

9    THE COURT:  Okay.  You answered my question.

10   The last brief I got on the fees was from the

11   plaintiffs, so let me hear from defendants first on anything

12   else you want to tell me on the fee issue.

13   MR. O'MEARA:  No, Judge, I think we covered it in our

14   papers.  Our position is you should apply the sliding-scale

15   approach that other judges in this district have applied based

16   on the Synthroid case, the Seventh Circuit case.

17   THE COURT:  So the thing that I really would like to

18   hear from you on is the argument that's made, or at least part

19   of the argument that's made is that, you know, Synthroid

20   itself says that these declining percentage scenarios aren't

21   always best.  In fact, it says it pretty much in those words,

22   264 F.3d at page 721.  This is not to say that systems with

23   declining marginal percentages are always best, and it goes on

24   to explain -- Judge Easterbrook, I think it was, goes on to

25   explain why.

1          I think one of the things the plaintiffs are arguing

2    is that this is one of the situations in which the -- what you

3    might call the exception that the Court talks about in

4    Synthroid would apply.  If you disagree with that, obviously,

5    tell me why you disagree.

6          MR. O'MEARA:  I think the concept of the sliding

7    scale is that most of the effort is put towards liability.

8    The fact that these damages can increase significantly,

9    especially on a TCPA, doesn't necessarily require or allow for

10   or make an exception that this should be an across-the-board

11   percentage.  I think this is the perfect case for a sliding

12   scale for that reason.

13         I mean, the TCPA, the damages are applied

14   mechanically, as I think they were recognized in Synthroid.

15   If you look at Capital One, Gehrich, the other cases that we

16   cited, Wilkins, Crawford, all of these cases apply the

17   sliding-scale approach to amounts that had a significant

18   common fund.

19         THE COURT:  Well, isn't kind of the history of the

20   settlement negotiations in this case, though, some indication

21   that getting the number up was the result of counsel's effort,

22   not just the fact that, oh, we have a bunch of people and they

23   are entitled to a certain amount of money?

24         MR. O'MEARA:  Sure.  I know they raised a point about

25   the defendants' position here and it was a long case, but I

1 think the fact of the matter is that this is a TCPA case and

2 TCPA cases are tough. We did not have a ton of defenses.

3 Consent wasn't a huge issue as it was in Capital One.

4 THE COURT: Basically, by the time you got past

5 summary judgment, it boiled down to the political call

6 exception, but then the big issue was the issue of what I'll

7 call accountability, if you will. At least the farther you

8 got away -- the farther the particular defendant got away from

9 the phone calls, as I recall, if I can say this, the defendant

10 that had the money was the furthest removed from the making of

11 the calls. So this -- there were still defenses.

12 I guess just to put a finer point on what I was

13 saying, at least from what I was told -- and I don't know, and

14 honestly, maybe I should be finding out from you what the

15 demand was and the offer was at various points in time, but

16 essentially -- and they're painting it with a broad brush I

17 suspect because there was some resonance about getting into

18 that that at an earlier point in time. The offer was go jump

19 in the lake, and that was true for a very significant amount

20 of time, and it only changed kind of towards the end of the

21 ball game. And I think the notion, at least part of it, is

22 that that chain of events suggests that it wasn't just one of

23 these things, well, there's this law, there's a whole bunch of

24 people that are going to get a whole bunch of money, but

25 rather, it was the efforts of counsel that got it to that

1 point.

2 MR. O'MEARA: I understand, your Honor. I just think

3 that the way the case played out, we lost a lot of motions,

4 and the fact that we may not have put a lot on the table at

5 the beginning or throughout I don't think should be given

6 great weight. I think looking --

7 THE COURT: Should it be given any weight?

8 MR. O'MEARA: I wouldn't. I mean, we --

9 THE COURT: Can I ask you when the first dollar --

10 when the first settlement offer of money was made, at what

11 point in the process? You guys were dealing with former Judge

12 Andersen for a couple of years, right?

13 MR. O'MEARA: Correct. I think it was in the second

14 mediation.

15 THE COURT: Okay.

16 MR. O'MEARA: Or was it the first?

17 MR. BACKMAN: Value was put on the table at the first

18 mediation.

19 THE COURT: That could be a dollar and 50 cents, you

20 know.

21 MR. BACKMAN: From our perspective, it wasn't. We

22 are not in a position and we don't want to get into and

23 divulge all those communications.

24 THE COURT: But see, I am in a spot here because I

25 mean the argument that you guys are making is that this isn't

1   a case in which, you know, the -- again, what I am roughly

2   calling the exception in Synthroid applies, and part of the

3   argument that's made -- and I think legitimately the response

4   to that without knowing the facts, but just theoretically, is

5   you know, you could have a scenario in which it's clear from

6   the process of settlement negotiations that this is a case in

7   which it really was counsel that got it up this notch and this

8   notch and this notch, and, therefore, it's not really

9   appropriate to apply a declining percentage to each one of

10  those notches.

11          I mean, honestly, I almost think it's kind of the --

12  a consequence of the argument -- that the arguments that are

13  being made, maybe I should know.  I am not sure there is law

14  about that actually, about whether I am even entitled to find

15  out.  Is there?

16          MR. EDELSON:  Yeah.

17          THE COURT:  You guys do this stuff all the time.

18          MR. EDELSON:  Your Honor, absolutely.  First of all,

19  we have already divulged information in the mediation.

20          THE COURT:  What I got was pretty broad brush,

21  though.

22          MR. EDELSON:  We told -- at the preliminary approval

23  hearing when you asked whether fees were ever discussed.

24          THE COURT:  That, sure.

25          MR. EDELSON:  And both parties were open about it.

1 Nobody asserted a mediation privilege. They have now

2 responded and made a specific statement that they put value on

3 the table early on. That's not true.

4 THE COURT: At least it's not true from what you

5 know. Part of the issue may be -- I don't know how the

6 mediation got done. I do settlement conferences, and, you

7 know, sometimes, you know, you have people making proposals to

8 the mediator separately, and there may be situations -- and I

9 know this has happened with me, not at these dollar amounts,

10 obviously, but that somebody has made a proposal, and I don't

11 even communicate it to the other side because I don't want to

12 end the mediation, because I figure that it could make the

13 other people run from the room screaming.

14 MR. EDELSON: Your Honor, in the course of the

15 mediation, there was a mediation proposal by the mediator.

16 THE COURT: He made one?

17 MR. EDELSON: He made one, so that is very clear

18 there.

19 THE COURT: You know that, okay.

20 MR. EDELSON: We do know that. And we do know that

21 the only dollar amount they put on the table as of 5/28/2015

22 wouldn't have covered the cost of notice. There was never a

23 deal that they ever put on the table that would have netted

24 the class a penny.

25 THE COURT: Up to that point.

1     MR. EDELSON:  Up to that point where we had
2  litigated.

3     THE COURT:  Where were we in May 2015?  Was that
4  before or after class certification?

5     MR. EDELSON:  That was after class certification.
6  Settlement didn't start moving in any real way until about two
7  to three months before trial.  That's when all of this
8  happened.  So it wasn't as if we were getting there, getting
9  there.  It was there was no talks because we weren't in the
10  same world.

11     THE COURT:  Okay.  All right.  Go ahead, Mr. O'Meara.
12     MR. O'MEARA:  And we did have several mediations
13  prior to certainly summary judgment, and, you know, in terms
14  of what is value, people have different views.  We did -- I
15  will tell you Berkley separately put dollars on the table.  It
16  wasn't --

17     THE COURT:  Do you know whether -- I don't say any of
18  this critically of former Judge Andersen, because as I said,
19  it's something that mediators sometimes do.  Sometimes you
20  don't communicate a proposal because you don't -- do you know
21  whether the proposals you made were being communicated to the
22  plaintiffs?

23     MR. O'MEARA:  I believe our dollar proposal was
24  communicated to the other side.  They can correct me if I'm
25  wrong.  Yes, I do.

1           THE COURT:  Let me ask you this.  Question one is

2   whether I can -- question one is whether I can get information

3   about that; in other words, what was the -- what was the

4   demand, what were the offers at various points in time.

5   Question number two is whether I should.  Question number

6   three is what's the form in which it should be done.  In other

7   words, can I -- if this were a non-class case, I might have

8   people do it under seal.  I am not sure I can do that in a

9   class case.

10           So those would be my sort of three questions in that

11  order:  Can I, should I, and if yes and yes, in what form?

12  Anybody have any thoughts on those?

13           MR. EDELSON:  Yes, your Honor.  When we were before

14  your Honor previously, you suggested -- we have been saying we

15  want to do this.  This makes our whole case.  And you

16  suggested if they opened the door, we'd be able to provide

17  evidence.  We'd like to do that.

18           We don't think it should be under seal.  It's a class

19  action.  And we can lay out exactly on this date, this is what

20  happened, on this date, this is what happened.  We actually

21  thought that we had come to an informal agreement that they

22  were just going to concede that no money was on the table, and

23  then they were going to make their Cap One argument.  So we

24  are a little surprised here that they're taking --

25           THE COURT:  Well, I'm going to -- in a second, we are

1   going to table this and move on to other things.  Do you have

2   any thoughts on my three questions?

3          MR. O'MEARA:  No.  I guess our position is mediation

4   negotiations are, you know, confidential.

5          THE COURT:  Right, but I mean the analogy to Rule 407

6   is that if something is admissible for some other purpose,

7   which, you know, that is what we are talking about here.

8          Let me ask -- I think I have one other question for

9   you all here.  Let me just find it.  For the defendants, in

10  other words.

11         So at page 16 of your response -- of the defendants'

12  response, I believe that I know -- I believe that I know the

13  answer to my question, but I just think it's significant.

14  Page 16 at the bottom of the page is where you go through --

15  you have this chart that goes through the declining

16  percentages and how they were used in various cases.  Then you

17  make this argument -- you have a quote from Capital One which

18  says, The type of potentially bankruptcy-level exposure is

19  sufficient to compel an in terrorem settlement before a

20  liability determination is made and is accordingly a factor

21  that reduces class counsel's risk of non-payment, and then you

22  say that was certainly the case here.  What's the "that"?  The

23  "that" is a potentially-bankruptcy level exposure,

24  quote-unquote?

25         MR. O'MEARA:  Yes.

1     THE COURT:  That's the thing I need you to elaborate

2  on.  I know we had some discussions about this at earlier

3  points in time as we were getting ready for trial.  If that's

4  one of the issues, I think you just need to flesh it out a

5  little more.

6     MR. O'MEARA:  I guess the point is if we went to

7  trial.

8     THE COURT:  If you went to trial and lost on

9  everything, you were going down the tubes, basically.

10     MR. O'MEARA:  Done.  Done, exactly.

11     THE COURT:  And as I recall it -- and I know there's

12  reference in here to the -- is it the ESOP trustee --

13     MR. O'MEARA:  Yes.

14     THE COURT:  -- getting involved?

15     MR. O'MEARA:  Right.

16     THE COURT:  The company from which all of the lion's

17  share of the settlement is coming from is owned by an ESOP; is

18  that right?  Or the shares are owned by an ESOP?  Is it all

19  shares, a derivative of the shares?

20     MR. O'MEARA:  It is a 100 percent, yes.

21     THE COURT:  So the trustee is the person who is sort

22  of in charge of voting the shares and all that kind of thing?

23     MR. O'MEARA:  I guess --

24     THE COURT:  Basically, all right.  So the thing that

25  I guess I was wondering about -- this is a little bit off

1   point from the question I asked, but why did that person get

2   involved only at the tail end, or did he get involved earlier

3   and I just didn't --

4           MR. O'MEARA: Yeah. I think because at that time, we

5   were approaching trial.

6           THE COURT: That's when everybody's backs were

7   against the wall.

8           MR. O'MEARA: Yeah.

9           THE COURT: That's a fair explanation. Not all

10   answers are perfect. Sometimes it's just practicality.

11           Let's see. Two other things -- three other things.

12           Number one, this may partly be the fact that the

13   appendix that explained the formula was not 100 percent

14   penetrable. Okay? So my initial reaction when I got your

15   response is why did the defendants care, aren't they paying

16   out the same amount of money whether the fees are A or whether

17   the fees are half A, and I gather that that's wrong, that's

18   not the case. In other words, does it make a difference to

19   the defendants how big the fee award is?

20           MR. O'MEARA: Yes.

21           THE COURT: Is there a way you can do that in a

22   simple, easy to understand couple of sentences or three or

23   maybe four sentences?

24           MR. O'MEARA: I will try. Because there is a range

25   between 56 and 76 -- for example -- I think to try it put it

1  in example, if the class payout is $40 million based on the
2  claims that came in, based on our challenges, sustained
3  challenges, people get $40 million.  If they get 24 million --
4        THE COURT:  The percentage, yeah.
5        MR. O'MEARA:  If they get 24 million -- again, this
6  is math -- but that goes up to 64.
7        THE COURT:  64.
8        MR. O'MEARA:  If they get 15, then we are in that
9  range.  It's basically a $20 million sweet spot here.
10        THE COURT:  You clearly have a legitimate interest.
11        That leads me to question two.  So the filing that
12  was made by Freedom Home Care came in a few days before yours.
13  Did you take their position into account in drafting yours, or
14  did you just do it completely independently?  In other words,
15  were you influenced by what the objector said?
16        MR. O'MEARA:  Before they came, we were absolutely
17  going to argue the sliding scale.
18        THE COURT:  You were still planning to argue the
19  arguments that you made?
20        MR. O'MEARA:  Absolutely.  Now, of course we read it
21  and said, okay, this is actually consistent with what we were
22  arguing.  I mean, the cases are the cases that were cited.
23        THE COURT:  All right.  Then my last one, which is
24  maybe one of the bigger ones.  So one of the arguments that's
25  made in the defendants' papers has to do with this whole thing

1  about comparing the so-called Lodestar and whatnot, and

2  there's arguments about how -- you know, too many lawyers, too

3  many hours, you know, doubling up and so on.  You know, the

4  way -- I am not a fan of Local Rule 54.3.  In fact, I am a

5  sworn enemy of it.  But in a standard case when you have a fee

6  petition in our district, when there's objections to it,

7  there's this exchange of information where if a party is

8  objecting to hours or hourly rates, then they have to kind of

9  cough up their own information.

10         So I guess my question to you is if I'm going to

11  entertain your contentions about too many hours, hourly rate

12  is too high, should I be -- would there be something wrong

13  with me saying to you I want to see yours?

14         MR. O'MEARA:  I don't think there would be anything

15  wrong.

16         THE COURT:  I wouldn't make you do a full-blown fee

17  petition.  My guess is all your stuff is on the computer and

18  you could say, okay, O'Meara spent this many hours at this

19  amount of time, Backman spent this many hours at this amount

20  of time, and I could kind of figure it out that way.

21         MR. O'MEARA:  Sure.  I wouldn't say you can't do it.

22         THE COURT:  Is there a reason I shouldn't do it?

23         MR. O'MEARA:  I think the only point we'd try to make

24  there is even if you consider the Lodestar as is, doing it

25  let's say a two times multiplier and that gets you up to, you

1  know, roughly almost $11 million.  And so we think if you do a

2  comparison, even on the Lodestar that they have, it's still at

3  11 million, it's not the 24 million.  And the fact that, you

4  know, there was -- at least on its face, there appeared to be

5  some duplicative work based on some other cases in which you

6  decided, your Honor, in terms of what's the appropriate rate.

7  So it wasn't -- you know, we didn't mean to snipe at anybody.

8           THE COURT:  I didn't take it that way.

9           MR. O'MEARA:  We looked at what's been filed in

10 previous filings.  I know they used one fee petition I had in

11 the BMO case.  I don't think you necessarily need to go

12 through the exercise of looking at all of our records, but,

13 you know.

14          THE COURT:  Is there anybody else on this side of the

15 V before I get to Mr. -- I am blanking on your name -- before

16 I get to the guy behind you there.

17          MR. CLORE:  Mr. Clore.

18          THE COURT:  Mr. Backman, do you want to say anything?

19          MR. BACKMAN:  No.

20          THE COURT:  So my question for you is -- so just out

21 of curiosity, the due date for objections to the settlement

22 was what?

23          MR. CLORE:  I believe we filed the objection on --

24          THE COURT:  That wasn't my question.  I asked what

25 the due date was.

1    MR. CLORE:  Sorry.

2    THE COURT:  So the real question is did you file it

3    before the due date?

4    MR. CLORE:  Yes, your Honor.

5    THE COURT:  Okay.  I find that interesting because

6    lawyers pretty much never do that.  And so one interpretation

7    of why you filed it before the due date -- to anticipate a

8    question I am going to be asking you later -- is that you

9    might be looking for some money at some point in time.

10    MR. CLORE:  I'm sorry?

11    THE COURT:  It was pretty predictable -- in fact, not

12    pretty predictable.  It was 100 percent predictable that the

13    defendants were going to object to the fee amount for the

14    reasons that Mr. O'Meara described, and the fairly obvious

15    objection that anybody in this situation would make is the one

16    that you made and that they ended up making which is that, you

17    know, you should use a sliding-scale approach that the Seventh

18    Circuit has talked about in Synthroid and some other cases,

19    and that you filed yours first because that would give you a

20    better argument later on that, oh, well, I'm entitled to some

21    money if you end up cutting fees.

22    MR. CLORE:  I'm sorry.

23    THE COURT:  What am I missing?

24    MR. CLORE:  I think I misspoke, Judge.  We filed our

25    objection on the objection deadline, which I believe was

1  January --

2     THE COURT:  When you said earlier a second ago, you
3  misspoke?

4     MR. CLORE:  I was confused.  I'm sorry.  I didn't
5  understand the question.

6     THE COURT:  What was confusing?

7     MR. CLORE:  I just didn't understand.  I apologize,
8  your Honor.

9     THE COURT:  Okay.  Anyway, so let me get to that
10  bottom line.  So let's say what ends up happening here, just
11  hypothetically, is that I end up cutting the percentage and
12  they end up getting $5 million less in fees.  I'm just pulling
13  these numbers out of the air.  They end up getting $5 million
14  less in fees than what they're asking for.  You're going to
15  come back to me at that point and say, I want some of that
16  money, right?

17     MR. CLORE:  I don't know, your Honor.

18     THE COURT:  No, no, come on.  I'm going to quote one
19  of my former colleagues.  I did not just fall off of the back
20  of a turnip truck.

21     I am going to put my question again.  You are going
22  to come back to me at that point and -- let's say that I do
23  that on the ground that the proper approach is a descending
24  sliding-scale approach under Synthroid, and that as a result
25  of that, the plaintiffs' attorneys get less money.  You're

1  going to come back to me at that point, are you not, and say,
2  I want to be compensated?

3          MR. CLORE:  We may take that position.  I mean, to be
4  honest with you, your Honor, we haven't fully gone down that
5  road and discussed what our options would be.

6          THE COURT:  Well, have you had similar experience in
7  other cases?

8          MR. CLORE:  I have not.  Mr. Bandis may have.

9          THE COURT:  Mr. Who?

10          MR. CLORE:  Mr. Bandis.

11          THE COURT:  He is the guy, right.

12          So this is your first rodeo, so to speak?

13          MR. CLORE:  More or less, yes.

14          THE COURT:  Then maybe I made a mistake in not making
15  Mr. Bandis come in here.  Maybe I should have him come in and
16  answer my question.

17          MR. CLORE:  I think I can answer the question.

18          THE COURT:  Look, seriously, isn't it a foregone
19  conclusion that that's exactly what's going to happen?  You're
20  going to come back and ask for money, and my next question is
21  how much and what's it going to be based on?

22          MR. CLORE:  We haven't had those conversations, your
23  Honor.

24          THE COURT:  Then remind me of the basis on which the
25  guy that I admitted pro hac vice -- which is him, right?

1           MR. CLORE:  Yes, your Honor.

2           THE COURT:  -- (continuing) over an objection, he
3    came in for that.

4           MR. CLORE:  Yes, your Honor.

5           THE COURT:  Why isn't he here today?

6           MR. CLORE:  Number one, he couldn't because he has
7    children in Corpus Christi and was unable to make it, and
8    number two --

9           THE COURT:  He was able to make it up here --
10   presumably his children were in Corpus Christi when he came up
11   here on the pro hac motion.

12          MR. CLORE:  That's true, your Honor.  I am an
13   associate with the firm and he sent me in his place.

14          THE COURT:  Do you have an appearance on file?

15          MR. CLORE:  Yes.

16          THE COURT:  Did I admit you pro hac?

17          MR. CLORE:  No, I am admitted before --

18          THE COURT:  You are a member of the bar.

19          MR. CLORE:  Yes, sir.

20          THE COURT:  I need somebody here who can answer my
21   question.  It's an obvious question, and he knows the answer
22   to it.  And quite honestly, your protestation that you don't
23   know the answer is -- does not pass the straight-face test.

24          MR. CLORE:  Okay, your Honor.  I think we may very
25   well apply, but --

1    THE COURT:  What basis -- on what basis is it done?
2   Is it done on an hourly rate, is it a percentage, what is it?
3        MR. CLORE:  Again, we have not --
4        THE COURT:  Well, then I am not going to hear from
5   you.  I am just not going to listen to you.  Mr. Bandis -- I
6   am going to have to have somebody in here that is able to
7   answer my questions.  That's it.
8        So when is Mr. Bandis available?  Is he available on
9   Monday?  Is he available on Tuesday?  Is he available on
10  Wednesday?  I am here all next week.
11       Go out and make a call right now.  I am going to sit
12  here while you do it so move fast.
13       MR. CLORE:  Thank you.
14     (Brief pause.)
15       THE COURT:  Let me just add one thing.  I looked at
16  the rule.  I know the rule says that when one attorney from a
17  law firm is in the case that a second one can just file an
18  appearance without making a motion.  I am not sure that
19  applies to people who are admitted pro hac.  So Mr. -- you
20  just filed an appearance, you didn't ask for leave to file it.
21  You filed your appearance last Thursday, as I'm getting it
22  here.  When did you become a member of the bar of the court?
23       MR. CLORE:  Shortly before then, a few days before
24  it.
25       THE COURT:  Okay.  So this was all part of the plan,

1 I take it then?

2         MR. CLORE: I'm sorry. What plan?

3         THE COURT: Mr. Clore wasn't going to be here. He

4 knew then that he wasn't going to be here.

5         MR. CLORE: Mr. Bandis?

6         THE COURT: Mr. Bandis, right. You're Mr. Clore.

7         MR. CLORE: No, I don't think that was part of the

8 plan.

9         THE COURT: When did he know he wasn't going to be

10 here?

11         MR. CLORE: I can't answer that question.

12         THE COURT: Did you talk to him?

13         MR. CLORE: Yes, I just spoke to him. Number one, to

14 answer your first question. We do intend on filing that

15 application. If the Court were to reduce these and it were

16 based on that -- what you discussed, and we actually would

17 intend on applying an application. We would request an

18 opportunity -- we haven't done the legal research on the

19 appropriate methodology if we're entitled to anything at all,

20 and third, he said he can come here whatever day next week you

21 need him here.

22         THE COURT: Okay. So it's going to be Monday. So

23 what else? Maybe I'll just wait for Monday and he can make

24 whatever arguments Freedom Home Care has then. So that's what

25 I'm going to do in fact.

1      Let's see.  So it's going to be at 9:30 on Monday.

2   There was one or two -- I think there was one or two other

3   questions that I wanted to ask plaintiffs' counsel.  Give me

4   just a second here.

5      It was a question really about -- I don't know if

6   it's doctor or Professor Henderson's report.  And it might

7   help me a little bit, because I went back to try to refresh my

8   recollection about what happened towards the beginning of the

9   case when there were several cases going on and there was

10  another law firm in addition to the Edelson firm and the Loevy

11  firm, and I need somebody to kind of give me a thumbnail

12  sketch of how that all played out.  In other words, I recall

13  that the other firm -- I don't recall as I sit here whether

14  they basically dropped out of consideration on their own or

15  whether there was a proposal that was made, and I kind of

16  think it was the latter.  I think what happened was that the

17  two firms that remained in the case came in and said we were

18  proposing to have this dual role in the case, and it was at

19  some point after that that the other firm dropped out, but I

20  could have that wrong.  Can you help me out?

21      MR. EDELSON:  Sure.  Your Honor actually specifically

22  asked us to include the other firm -- the main firm was

23  Andersen Wanca.

24      THE COURT:  Yes, the local firm, and there's like a

25  St. Louis firm or something like that.

1         MR. EDELSON:  Correct.  I don't remember their name.
2    I apologize.  And you said, you guys are lead, but they should
3    have a role as well.  We did involve them in the case in the
4    beginning.  It then turned out that their plaintiff was not a
5    member of the class.

6         THE COURT:  That part I remember, but I didn't
7    remember the sequence of events.

8         MR. EDELSON:  Right.  So did have TCPA claims, but
9    just based on --

10        THE COURT:  They got a different type of call.

11        MR. EDELSON:  Different type of call, and that was
12   one of the points that Professor Henderson made which is this
13   is an experienced class action firm, they had seen the lay of
14   the landscape --

15        THE COURT:  So that was just a preliminary.  My real
16   question is this.  So one of the factors that Professor
17   Henderson lays out is how many lawsuits are there out there
18   and how many law firms are competing for them.  Let's assume
19   for purposes of discussion that that other case kind of drops
20   out of the picture because they ended up not being a member of
21   the case.  At least I had two firms competing for it here.  So
22   there was some competition, and I guess one of my questions
23   about Professor Henderson's analysis is that how do you not --
24   how is anybody supposed to know how much is a lot of
25   competition and how much isn't much and how much is a lot of

1  lawsuits and how much isn't much?

2         I mean, we all know that there are cases in which a
3  whole bunch of lawsuits get filed.  Honestly, observation has
4  suggested to me that that sometimes is dependent upon what is
5  reported in the news media or what's happening with government
6  agencies or things like that.  Sometimes there's not many
7  lawsuits filed.  But there is a million and one factors that I
8  would assume, never having been a plaintiffs' class action
9  lawyer, a million and one factors that go into people's
10  decisions about whether to file a lawsuit; you know, what do
11  we think we can get out of it, do we have a plaintiff, is it a
12  viable claim, all sorts of things.

13         So how am I supposed to evaluate how significant that
14  factor is, I guess, is my question.

15         MR. EDELSON:  Thank you for the question.

16         First, if you want to know how it works in the
17  plaintiffs' world, there are what is called low-entry cases,
18  low bearers of entry.

19         THE COURT:  What's that mean?

20         MR. EDELSON:  What that means is that it's easy to
21  get a client.  So, for example, the Toyota sudden recall case.
22  Anyone who wants to file a class action can file a class
23  action because somebody knows somebody who had a Toyota.  Here
24  this was a low-bearer entry case.  They blanketed the
25  country --

1          THE COURT:  There were lots of people out there.

2          MR. EDELSON:  There were tons of people.  It was not

3    hard to get a client.  That's the first thing.

4          Then the second thing is this an area of the law that

5    is active.  So if it is an incredibly complex area of the

6    law -- for example, involving a new privacy statute nobody

7    understands -- plaintiffs' bar is going to stay away from

8    that.  TCPA is not like that.

9          THE COURT:  It's litigated over.

10         MR. EDELSON:  It's overlitigated, if I can say so.

11   So having only two firms who want to pursue it --

12         THE COURT:  The idea is that since this is such a

13   well developed area of the law and low barriers to enter, if

14   it was a really great case, you would have expected a lot of

15   law firms to get involved.

16         MR. EDELSON:  Yes, but even more than that, other

17   firms did get involved and then they quickly backed out.

18   Mr. Bank, who had his own suit --

19         THE COURT:  He settled it on an individual basis.

20         MR. EDELSON:  -- settled it individually, and

21   Mr. Wanca did so as well.  And even as a plaintiffs' bar, this

22   was a case that the plaintiffs' bar was watching throughout,

23   and as the plaintiffs' bar saw us getting more and more --

24   further and further in the suit, they didn't bring their own

25   cases, again, involving our calls or other calls.  I don't

1  think there's a lot of litigation, if I'm correct, involving
2  them, and the real reason was because of collectability.  The
3  only way that we were going to get any money was if we were
4  going to win on the vicarious liability argument.

5      THE COURT:  I would have to think, because I have had
6  some of these other TCPA cases that have gone to judgment, and
7  some of them -- I know you guys were in the Kolinek case.
8  That's an easy one.  It's Walgreens.  The Capital One case,
9  it's a bank.  We know they've got money.

10      MR. EDELSON:  Right.

11      THE COURT:  I got to think that in a lot of these
12  cases, the issue that you just pointed out is a big problem;
13  in other words, the entity actually making the calls is not
14  likely to have any assets or to even still be around, and you
15  have to be able to work it back to somebody who actually has
16  money in order to be able to collect.

17      MR. EDELSON:  That's the major analysis that we do.
18  We get calls all the time from class members saying, I'm
19  getting robo calls, and then we look into it and say, is there
20  anyone out there that can handle any sort of judgment, and if
21  not, you know, it's not easy to pursue.  If we pursued it, it
22  would be on really a pro bono basis.

23      THE COURT:  You answered my question.

24      Mr. Clore, look, here's the deal.  I'll let you talk
25  now, but whatever you tell me now, Mr. Bandis isn't going to

1 | get to duplicate it. Whatever you say now you are taking out
2 | of Bandis' time on Monday.

3 |         MR. CLORE: Okay.

4 |         THE COURT: I have specific questions I want to ask
5 | him. They're the ones that I asked you. If you want to
6 | contribute anything to the discussion that we have had so far,
7 | that's fine, but just understand and please pass on to
8 | Mr. Bandis that he's not going to get to duplicate it.

9 |         MR. CLORE: Okay. That's fair enough, Judge.

10 |         THE COURT: If you want to say, if that's going to be
11 | the case, I will let him talk on Monday, that would be fine
12 | with me.

13 |         MR. CLORE: I would prefer to speak.

14 |         THE COURT: Go for it.

15 |         MR. CLORE: Thank you. I appreciate it.

16 |         I am prepared on the merits, and, unfortunately, I
17 | didn't think to address that question. We apologize, and I
18 | apologize.

19 |         THE COURT: Get to your point.

20 |         MR. CLORE: Yes, your Honor.

21 |         I would say, first of all, that -- I am going to try
22 | not to rehash argument. Professor Rubenstein, class counsel's
23 | own expert, Professor Rubenstein's sliding-scale model falls
24 | well below the class counsel's request, regardless of whether
25 | we were at the floor or the ceiling. It's $76 million. We're

1  still $4 million below the fee request.  So even Professor
2  Rubenstein --

3       THE COURT:  The guy from Harvard, not the guy from
4  University of Chicago.

5       MR. CLORE:  Yes, on class actions.  Even he can't
6  justify what they're asking for.  Of course, in the Silverman
7  case, the Seventh Circuit said if we go with a big percentage,
8  which I am not advocating, we are limited to 27.5 percent,
9  which would still fall millions below what they're requesting.
10  Under either method, there is no way that you can get to 24.5
11  million.

12       Secondly, your Honor, you asked about should your
13  Honor apply -- I know the Synthroid I opinion discusses in
14  dicta --

15       THE COURT:  You know what, from a district judge
16  sitting on the 21st floor, dicta from the 27th floor is pretty
17  darn good.

18       MR. CLORE:  Fair enough.  Fair enough.  The Court
19  said there may be instances, as you pointed out, where the
20  sliding scale may not be appropriate and such would be the
21  case where attorneys -- it was an entirely attorney-driven
22  settlement.  And we would just say that the Silverman case,
23  nevertheless, suggested that -- I'm sorry.  That was the
24  Synthroid I case.

25       In Silverman where the Court discussed in strong

1    language that a diminishing sliding scale is generally

2    appropriate in these types of large settlements.  In that

3    case, it was a similar type of risk involved.  The Court said

4    it was, quote, unusually risky.  It was on file for four

5    years, and the cost there of litigation far exceeded the costs

6    here.  So I don't think there's any way you can say that this

7    case -- the diminishing scale doesn't apply in Silverman.  It

8    does in Silverman.  You can't rectify those two cases.

9            THE COURT:  Got it.

10           MR. CLORE:  They talked a lot about ex ante

11   negotiations and the fact that we didn't articulate how that

12   took place, but I think it's clear in the opinions of the

13   juris that we cited that ex ante methodology or the ex ante

14   negotiation is contemplated or is supported by the sliding

15   scale, and so they rely on a -- they relied on a survey

16   conducted by a data marketing company which they say proves

17   that consumers --

18           THE COURT:  All right.  This is -- I know what you're

19   talking about.

20           MR. CLORE:  They say that it proves that consumers

21   aren't interested in a declining marginal scale.  And, your

22   Honor, if you look at the study, this is a highly indulgent

23   extrapolation that's not supported by the survey.

24           To begin with, it's -- the questions that were posed

25   to the individuals was about the fee percentages for

1    settlements between 100 and $500, so there's no telling

2    whether that would reveal that they asked for numbers even

3    approaching what we have here.

4          And then more importantly, on the high end of the

5    survey, the $500 settlement, there was a considerable drop off

6    in approval of the fees of the highest percentage.  So the

7    survey could be interpreted to say that the class members

8    would support a sliding scale.

9          Class counsel also apparently, seeing the writing on

10   the wall, in the reply submitted a new fee scale that's not

11   supported by any of their experts and it's not supported by

12   any authority.  It's a two-tiered scale that goes 34 percent

13   for the first 56 million and 30 percent for the remainder.

14   It's clear that that -- that scale just happens to award them

15   24.5 million.  We would urge that that scale, which was

16   obviously result oriented, not be utilized.

17         I would also note that Professor Henderson in his

18   expert report indicated -- I know that class counsel just said

19   that there are a ton of calls.  And Professor Henderson said

20   approximately 50 million, which puts the potential liability

21   in this case in the multiple billions.

22         THE COURT:  Right, uncollectible.  Seriously,

23   uncollectible, unless it was Chase, and maybe not even Chase.

24   Right?

25         MR. CLORE:  Well, I mean, some of the -- it appears

1    that some of the defendants are able to make --

2              THE COURT:  50 billion?

3              MR. CLORE:  Pardon?

4              THE COURT:  50 billion?

5              MR. CLORE:  No, no, of course.

6              THE COURT:  Do you think anything that has a B?

7              MR. CLORE:  That's true.

8              THE COURT:  Pretty much you have to be like a fortune

9    10 company in order to finance that.

10             MR. CLORE:  Yeah.

11             THE COURT:  That's kind of the whole point of why the

12   case ended, I think, or a good portion of why the case ended

13   up settling when it did because, you know, there was

14   recognition on both sides that, you know, there could be a

15   judgment that would be effectively uncollectible, because it

16   would essentially put the defendants into Chapter 7 or Chapter

17   11 or whatever.

18             I don't want you to repeat points you made in your

19   brief.

20             MR. CLORE:  Okay.  My point there was just that the

21   case, I don't believe, was ever at zero inherent value as they

22   claimed.

23             So, again, even under their own expert's methodology,

24   who does apply the sliding scale incidentally to arrive at

25   fees, Professor Rubenstein, class counsel -- the fee request

1   is still excessive by at least 4 million and up to $10

2   million.  We would urge the Court to apply the modified

3   Synthroid structure and award no more than $15 million.

4              THE COURT:  Okay.  So we are going to recess this

5   until Monday at 9:30.

6              Mr. Backman --

7              MR. BACKMAN:  Yes.

8              THE COURT:  -- I will let -- if you want to give my

9   clerk a phone number, we will call you.

10             MR. BACKMAN:  I was going to ask for that.

11             THE COURT:  You are the only person.  I know he is

12  from out of town.

13             See you on Monday.

14             MR. EDELSON:  Thank you, your Honor.

15             MR. BALABANIAN:  Thank you, your Honor.

16    (Which were all the proceedings had in the above-entitled

17  cause on the day and date aforesaid.)

18    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
19

20  _____          _____
    Carolyn R. Cox                    Date
    Official Court Reporter
21  Northern District of Illinois

22  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

23

24

25