1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4    GRANT BIRCHMEIER, et al.,          )    Docket No. 12 C 4069
                                        )
5                      Plaintiffs,      )
                                        )
6              vs.                      )
                                        )
7    CARIBBEAN CRUISE LINE, INC., et    )    Chicago, Illinois
     al.,                              )    February 27, 2017
8                                       )    9:50 o'clock a.m.
                       Defendants.      )
9

10          TRANSCRIPT OF PROCEEDINGS - MOTION
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiffs:    LOEVY AND LOEVY
                            BY:  MR. SCOTT R. RAUSCHER
15                               MR. MICHAEL I. KANOVITZ
                            311 North Aberdeen Street, 3rd Floor
16                          Chicago, IL  60607
                            (312) 243-5900
17

18                          EDELSON PC
                            BY:  MR. JAY EDELSON
19                               MR. RAFEY S. BALABANIAN
                                 MS. EVE-LYNN J. RAPP
20                               MR. ALEXANDER GLENN TIEVSKY
                            350 North LaSalle Street, Suite 1300
21                          Chicago, IL  60654
                            (312) 589-6370
22

23   Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2102
                            Chicago, Illinois  60604
25                          (312) 435-5639

APPEARANCES CONTINUED:

| | |
|---|---|
| For Caribbean<br>Cruise Line, Inc.: | GREENSPOON MARDER, P.A.<br>BY:   MR. JEFFREY BACKMAN<br>200 East Broward Boulevard, Suite 1800<br>Fort Lauderdale, FL  33301<br>(954) 491-1120 |
| For The Berkley<br>Group, Inc.: | FORDE LAW OFFICES LLP<br>BY:   MR. BRIAN PATRICK O'MEARA<br>111 West Washington Street, Suite 1100<br>Chicago, IL  60602<br>(312) 641-1441 |
| For Freedom Home<br>Care, Inc.: | BANDAS LAW FIRM, P.C.<br>BY:   MR. CHRISTOPHER A. BANDAS<br>          ROBERT W. CLORE<br>500 North Shoreline Boulevard<br>Corpus Christi, TX  78401<br>(361) 558-3527 |
| | JONATHAN NOVOSELSKY, P.C.<br>BY:   MR. JONATHAN P. NOVOSELSKY<br>303 West Madison, 22nd Floor<br>Chicago, IL  60606<br>(312) 286-8429 |

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case No. 12 C 4069, Birchmeier v.

3    Caribbean Cruise Line.

4         THE COURT:  Mr. Backman is on the phone.

5    Mr. Backman, can you give your name for the record, please.

6         MR. BACKMAN:  Jeffrey Backman for Caribbean Cruise

7    Line and Vacation Ownership Marketing Tours.

8         THE COURT:  I am going to alert you at the beginning.

9    We are having some problems with the sound system in here.

10   Normally, you'd be hooked in through the sound system and

11   you'd be able to hear and people will be able to hear you way

12   better than is going to happen.  You are actually on my

13   speaker phone, which is sort of generally pointed out towards

14   the audience, but I am going to ask the people who are talking

15   in the court just to keep your voice up so Mr. Backman can

16   hear you.

17        Just project.  Go ahead, starting with Mr. O'Meara.

18        MR. O'MEARA:  Good morning, your Honor.  Brian

19   O'Meara on behalf of the defendant, the Berkley Group.

20        MR. BANDAS:  Good morning, your Honor.  Chris Bandas

21   for objector Freedom Home Care.

22        MR. CLORE:  Good morning, your Honor.  Robert Clore

23   for objector Freedom Home Care.

24        MR. NOVOSELSKY:  Good morning, your Honor.  Jon

25   Novoselsky, local counsel for objector Freedom Home Care.

1    MR. EDELSON:  Good morning, your Honor.  Jay Edelson
2  for the class.

3    MR. BALABANIAN:  Good morning, your Honor.  Rafey
4  Balabanian for the class.

5    MS. RAPP:  Good morning, your Honor.  Eve-Lynn Rapp
6  for the class.

7    MR. KANOVITZ:  Good morning, Judge.  Mike Kanovitz
8  for the class.

9    MR. RAUSHER:  Good morning.  Scott Rauscher also for
10  the class.

11    THE COURT:  Okay.  Give me just a second here.  Bear
12  with me.  Sorry.

13    I apologize.  I am going to have to walk out of the
14  room for a second because pretty much -- oh, no, here it came.

15    All right.  So I think where I want to start is with
16  the matter that I tabled regarding Freedom Home Care, so let
17  me just pull up my notes here.  Just one second.

18    Okay.  So go ahead.  You've got the floor.

19    MR. BANDAS:  Thank you, your Honor.  Chris Bandas for
20  Freedom Home Care.

21    As I understand the issue, the Court would like us to
22  address whether or not we intend to seek attorneys' fees in
23  this case if the Court reduces class counsels' attorneys'
24  fees.  The answer to that question is yes, your Honor.  The
25  basis for the fees would be a straight lodestar.  We would not

1   ask the court for a multiplier.

2          THE COURT:  Okay.  That tells me what I need to know.
3   Thanks.

4          MR. BANDAS:  Thank you.

5          THE COURT:  Just so you know, if he had known the
6   answer to that question -- I don't know why you both came up
7   here today, but you could have saved yourself a trip or, I
8   guess, two trips at this point.

9          All right.  So we have some other things that I want
10  to talk about, and I'm not sure I am going to get these in
11  exactly the right logical order.  But there's a couple of
12  things that we talked about last week that I'm going to need
13  you to kind of go over again for a second here, and one of
14  them is an issue for Mr. O'Meara, and this is the question --
15  I am not sure that the issue for Mr. O'Meara is the first one.
16  This is the question about -- I asked a question -- this was
17  towards the beginning last week -- to ask you to explain this
18  whole question of -- just to put it in very broad terms, it
19  sounds like a dumb question -- why the defendants are
20  objecting to the fees.  In other words, what I thought I was
21  kind of hearing from the plaintiff at some point in time --
22  when I say hearing, it doesn't mean necessarily orally
23  hearing; it may be something I read in the briefs -- is that
24  even if all of the claims that got objected to are tossed,
25  there's still going to be enough here to get to the high end

1   of the range.  And if you get to the high end of the range,

2   then -- this part I'm adding on; this is not something

3   Mr. Edelson said -- if you get to the high end of the range,

4   then whether the -- whether the attorneys get 5 million, 10

5   million, 15 million, or 25 million of the 75 is no -- doesn't

6   really matter to the defendant because money is all money.

7   Okay?  And I think I heard you saying that that's maybe not

8   right or that there's some flaw in kind of the steps that I

9   get to get there.

10          And I guess sort of the flip side of that is -- and I

11  know you said you had the guy here on Friday who could explain

12  the appendix, and I don't see him here right now, but I looked

13  at that thing and I need the -- as I said to the people in the

14  previous case, I need the summary for ordinary mortals.

15          So why don't I start with Mr. O'Meara to give

16  Mr. Edelson and company time to collect their thoughts on

17  that.  Go ahead.

18          MR. O'MEARA:  Judge, I think you're right that if the

19  claims that are actually paid out exceed the 76 million --

20          THE COURT:  I said 75.  I meant 76.

21          MR. O'MEARA:  -- 76, the ceiling, if you will, then,

22  right, I think our objection is moot.

23          THE COURT:  It doesn't really matter.  But do you

24  think -- as you stand there, do you think that there is some

25  reasonable basis to believe that there might be an outcome

1  under which the total claims paid out falls short of the 76?

2  MR. O'MEARA:  Yes.

3  THE COURT:  And that's presumably why you objected to

4  the fees.

5  MR. O'MEARA:  That is it.

6  THE COURT:  That answers my question.  Okay.  So

7  that's the simple version of that.  Sorry I didn't give you

8  too much time to kind of think up the executive summary,

9  Mr. Edelson.

10  Now I am over to you.  This formula thing, the thing

11  that's in the appendix, I looked at it and I looked at it, and

12  I thought I understood it, and I looked at it again, and I

13  thought I didn't understand it.  Can you walk me through it?

14  Let me get the appendix in front of me.

15  MR. EDELSON:  Your Honor --

16  THE COURT:  Any time you -- I have to say I was

17  pretty good in math, but that was a long time ago.  It's like

18  40 years ago at this point.  So any time you put something in

19  there that's got a line in there divided by, I kind of break

20  out into a cold sweat.

21  MR. EDELSON:  I peaked out at sixth grade, your

22  Honor.

23  THE COURT:  Okay.  There you go.

24  MR. EDELSON:  With apologies, I think I understand

25  and I hope to get it right.  The first part in understanding

1   what the fee award is is conceptually you can't just look at

2   what is paid to the class alone.  The fee award is a

3   percentage of what is paid to the class and what's paid in

4   fees.

5          So, for example, if it were just a simple $10 million

6   common fund and your Honor was giving us a third of that, we

7   would get $3.3 million.  You wouldn't say, well, let's look at

8   what the class is getting, which is 6.6 million, and then get

9   a third of that.  Do you understand?

10         THE COURT:  Yeah, I get that, sure.

11         MR. EDELSON:  Okay.  So that's the first step.  I

12   think that's partly the defendants missed that step.

13         In figuring out what is -- what is it that we won for

14   the class, under the Seventh Circuit, what we have won for the

15   class is what the class gets --

16         THE COURT:  What you get, what the incentive awards

17   are, and what the cost of notice and the cost of administrator

18   are.

19         MR. EDELSON:  Not the cost of notice.  Yes, the

20   Seventh Circuit has --

21         THE COURT:  You can't get fees on that.

22         MR. EDELSON:  You cannot.  That does not count.

23         THE COURT:  Okay.

24         MR. EDELSON:  And that's about $2 million.

25         THE COURT:  All right.  Hang on a second.  I think I

1  understand this, but I want to make sure I understand it.

2          Let's say it is 2 million and let's say that there's

3  -- the number of claims that are approved is enough to get you

4  over the 76, is the 2 part of the 76?

5          MR. EDELSON:  No.

6          THE COURT:  In other words, did the defendants agree

7  to pay a maximum of 76 inclusive of --

8          MR. EDELSON:  Correct.

9          THE COURT:  -- the cost of the administrator?

10         MR. EDELSON:  Correct.  So we would be seeking a

11  percentage of the 74.

12         THE COURT:  74.

13         MR. EDELSON:  Correct.

14         THE COURT:  Fine.

15         MR. EDELSON:  So there are two possibilities that

16  make the math really easy.  One is if the ceiling is hit, if

17  it is the 76 or 74 once you reduce it, and then it's really

18  easy and you apply a straight percentage, assuming you're

19  doing a percentage.

20         The other -- the other place where it's really easy

21  is if the floor isn't hit.

22         THE COURT:  Yeah.

23         MR. EDELSON:  And then it goes up to 56, and then we

24  get a percentage, assuming you're doing percentage, of the 56.

25         The place where it gets complicated is if it's in

1  that middle category, and that's where this excessively
2  complicated formula came up.

3          THE COURT:  So let me ask you this.   And here's
4  where I got hung up.  I was looking at this as what I
5  considered to be a simple, but what is potentially a
6  simplistic way.  And when I read the appendix and reread the
7  appendix, it suggested that the way I was looking at it is
8  wrong.  The way I was looking at it is that since what you're
9  asking for, assuming I decide to compute it this way, whether
10 it's a flat percentage or a sliding scale or whatever, you're
11 asking for a percentage of the recovery, why do we even think
12 about that number until we -- until you know what the total
13 is?  In other words, we are not saying that class members --
14 the notice that went out to class members isn't saying that
15 you're going to get at least, you know, X amount of money and
16 then the fees are going to be off to the side somewhere.  In
17 fact, the class notice -- I asked you to amend it, I think, to
18 make it clear that the cost of the fees or that the price of
19 the fees is going to come out of whatever they get, and so it
20 seems to me -- it just seemed to me when I was thinking about
21 this is that the simplest way of looking at it was to say,
22 okay, you're going to have a certain number of claims, you've
23 got this formula in the settlement agreement about how the
24 claims are going to be valued, I do that math, I take off the
25 cost of notice, and then I have a number, and then I calculate

1   the fees, if it's done by a percentage, based on that.

2         And so all of this other stuff about whether, okay,

3   if under your scenario, if it's a $10 million award and you

4   get 33 percent, well, maybe your fees are half of what the

5   class gets, but that doesn't mean it's a 50 percent fee

6   because you are not calculating -- that just seemed to me to

7   be overcomplicating things to even think about that.  Why

8   would I think about that?

9         The number is claims times amount per claim, that's a

10  total, minus the cost of administration, that's a subtotal, or

11  that's a net, and then the fees are calculated, if it's done

12  by a percentage, based on that.

13        MR. EDELSON:  I think you've got to add the fees to

14  the numerator in your math, the top part.

15        THE COURT:  Yeah.

16        MR. EDELSON:  So it's money to the class plus fees

17  divided by percent.

18        THE COURT:  See, again, I thought I had this all

19  figured out until I read the appendix, and I thought I had it

20  all figured out again until you said that just now.  Maybe I'm

21  just dense.  It doesn't make sense to me.

22        MR. EDELSON:  Well --

23        THE COURT:  So, look --

24        MR. EDELSON:  I can try it another way.

25        THE COURT:  So what's -- what is a number of claims

1  that if ultimately approved would -- let's just pick a number
2  out.  What's a number of claims that if ultimately approved
3  would have us end up somewhere between 56 and 76?
4        MR. O'MEARA:  It's actually calls, right, so the
5  number of calls itself.
6        THE COURT:  Fair enough.  Calls, yes.
7        MR. O'MEARA:  I think we had an example of like over
8  a hundred thousand.
9        THE COURT:  Let's say there's a hundred thousand
10 calls that end up getting through the whole objection process,
11 okay?  So then what happens?  Somebody's got to take that
12 100,000 and convert it to an amount of money so the defendants
13 know how much they end up having to pay, right?
14       MR. O'MEARA:  Correct.
15       THE COURT:  What's the number you multiply times a
16 hundred thousand to get there?
17       MR. O'MEARA:  500.
18       THE COURT:  500.  Under that scenario, it would be 50
19 million?
20       MR. O'MEARA:  Correct.
21       THE COURT:  Now, does the 2 million in that scenario,
22 does that come off of the 50 million or does it get added onto
23 the 50 million?
24       MR. O'MEARA:  I think it gets added on.
25       THE COURT:  It gets added on.  So actually, you're

1 | stuck with 52 million?

2 | MR. O'MEARA: Correct.

3 | THE COURT: The reason being that it's still under
4 | 76?

5 | MR. O'MEARA: Yes.

6 | THE COURT: In other words, if the number of calls
7 | times $500 got you to 76 million, then you don't have to pay
8 | another 2 million?

9 | MR. O'MEARA: That's right.

10 | THE COURT: Now you're at 52 million. Now -- but I
11 | don't calculate the fees based on the 52, it's based on the
12 | 50. All right. Let's say just for purposes of discussion
13 | that I end up saying, okay, plaintiffs are entitled to
14 | one-third, under that scenario, you get $16,666,666.66?

15 | MR. EDELSON: No, your Honor. We would actually get
16 | half of the 50 -- I forgot the number, 52 or 54 million.
17 | That's how you get a third. Because you've got to add -- so
18 | you've got the claims.

19 | Let's make it easy. If there was $4 going to the
20 | class, for us to get a third, that would be $2 of 6. You add
21 | the $4 plus the attorneys' fees and divide that by three. So
22 | X equals 4 plus X divided by 3.

23 | THE COURT: Wait a second. Under this scenario where
24 | there's a hundred thousand calls, $500 per call -- we are
25 | disregarding the $2 million for now -- I guess we wouldn't

1   disregard the $2 million, because you're saying under that

2   scenario, the fee, if I said it was a third, would actually be

3   25 million, not 50 million -- not 16,666...

4          MR. EDELSON:  The reason is because 50 million is to

5   the class, 25 is for fees, so the class got 75 million.

6          THE COURT:  So why didn't somebody then tell me that

7   I was just flat wrong back when I told you when we talked

8   about the notice that you had to add something to the notice

9   that basically said that whatever amount is approved for fees

10  is going to come out of what you get as a class member,

11  because you just told me that it doesn't.

12         MR. EDELSON:  It does.

13         THE COURT:  No, it doesn't.

14         MR. EDELSON:  Well --

15         THE COURT:  You multiplied it times 500 bucks.  Where

16  did the 500 bucks figure come from, Mr. O'Meara?

17         MR. O'MEARA:  That's what's agreed to be paid per

18  call.

19         THE COURT:  It doesn't come out of it unless you get

20  to a certain number, if you get up to a hundred thousand or

21  somewhere around a hundred thousand.

22         MR. O'MEARA:  That's correct, your Honor.  You're

23  correct.

24         MR. EDELSON:  Luckily in this case, though,

25  everything was accurate because the fees will come out.

1          THE COURT:  Okay.  Fine.  Point to me -- I think I

2   got -- I ought to have the -- I thought I had the settlement

3   agreement here somewhere.

4          All right.  I asked this question the other day, and

5   then I looked at it on the screen and didn't print it out.

6   Does somebody remember offhand what docket entry the

7   settlement agreement is?

8          MR. BALABANIAN:  It's 502, your Honor.

9          MR. EDELSON:  502.

10          THE COURT:  502, thank you.  I've got it up.

11          What paragraph of the settlement agreement do I look

12   at that explains to me the calculation that Mr. Edelson just

13   gave me or what page, I guess?  Either way is fine.

14          MR. EDELSON:  The calculation with how to come up

15   with --

16          THE COURT:  In other words, a class member is going

17   to get a maximum of $500 per call less if there's enough --

18   too many calls to get you over 76 million, but that at least

19   under the type of scenario we just talked about, that the fees

20   don't come out of and aren't calculated based on the amounts

21   that the class members would get under that scenario.

22          MR. EDELSON:  It's Section 2.2(b).

23          THE COURT:  Give me a page.

24          MR. EDELSON:  Page 15, your Honor.

25          THE COURT:  Page 15, 2.2(b).  Let me just read it to

1    myself.

2          I am going to try to take out the unnecessary

3    language.  Each approved claim gets you 500 bucks a call

4    unless the total plus administration expenses, incentive

5    award, and fee award would exceed 76 million.  That's it right

6    there, basically.  It's the parentheses that says, Plus

7    payment of settlement administration expenses, any incentive

8    award, and any fee award.

9          So in that case -- in other words, if it would exceed

10   -- if the calculation in the first sentence would exceed 76

11   million, the class member gets a pro rata share after payment

12   of administration expenses, incentive award, and fee award,

13   and then it gives an example.  Okay.

14         MR. EDELSON:  I hate to introduce something, but

15   something defendants said was actually inaccurate.

16         THE COURT:  What's that?

17         MR. EDELSON:  What they were suggesting was if there

18   are $50 million to be paid to the class --

19         THE COURT:  Yeah.

20         MR. EDELSON:  -- then our fees would be -- you know

21   what?

22         THE COURT:  I am not sure --

23         MR. EDELSON:  I am going to withdraw that.

24         THE COURT:  Fair enough.

25         And so the thing that I had you add to the notice is

1 probably still true in the overwhelming majority of potential

2 scenarios because it would be only if the amount of calls fell

3 below some certain number that a fee award would never affect

4 what the person was getting per call, right?

5         MR. EDELSON: Correct.

6         THE COURT: Okay. All right. I was concerned that

7 maybe I had said something that in retrospect turned out to be

8 inaccurate. I don't think it was. You got the message across

9 -- the message that I wanted to get across in that was, hey,

10 if you want to come in and object to the fees, come in and

11 object to the fees because it might affect you, and that was

12 the message that that part of the notice said. It sounds like

13 there may be some small number of scenarios where that's not

14 accurate, but in the large numbers, it is accurate. Does

15 anybody disagree with what I said?

16         MR. O'MEARA: We do not disagree.

17         THE COURT: And you do not disagree.

18         MR. EDELSON: No.

19         THE COURT: I think I now get it. Let me put it this

20 way. I think I get it again.

21         So let me move on then to the other questions I

22 wanted to ask -- the other topics that I wanted to discuss.

23         A couple of the things I left on the table were sort

24 of generally speaking whether fees should be decided now or

25 later, and then as part of that question, whether and the

1 extent to which I ought to have the defendants provide

2 information about their fees and hourly rates, hours and

3 hourly rates, and whether -- and in what form I ought to have

4 people give me kind of the blow by blow of the settlement

5 negotiations. So those two issues are still -- those two and

6 a half or three issues are still on the table.

7 And the more I thought about this, the -- the more I

8 think -- first of all, at a minimum, I want -- before I decide

9 exactly when I'm going to decide the fees, I want to get this

10 information, unless somebody can come up with a good reason

11 why I shouldn't get it about the settlement history and about

12 the defendants' attorney hours and hourly rates. And then --

13 I know there was sort of a fallback position, if you will,

14 made by Mr. Edelson. The fallback position was -- it's

15 probably an unfair characterization, but you get my point --

16 you calculate the fees, a percentage based on the low-end

17 number, and then you come back later and ask me for more

18 depending on how many claims get approved. I know that's out

19 there and on the table. I want to think about that a little

20 bit more.

21 Does anybody want to say anything more, and I guess

22 this would really be a question for Mr. O'Meara and people on

23 the defense side about whether there's some reason why I

24 shouldn't tell you to give me something that says, this is

25 hours and hourly rates for the attorneys that represented the

1  defendants and then this question about disclosing the

2  settlement negotiation history.

3  MR. O'MEARA:  Sure.  On the first issue regarding our

4  records, I mean, we'd be happy to provide them.

5  THE COURT:  I don't want records.  I want a summary.

6  MR. O'MEARA:  I understand.  I don't know that it's

7  absolutely necessary.  Even if you take the rates and the

8  amount now before your Honor, it's almost $5 million.  Our

9  position is just even if you consider that, which you can,

10  it's really the two multipliers is kind of a standard of what

11  we believe rather than a five multiplier.

12  THE COURT:  I get that.  I get that.  Nobody should

13  take, you know, from the fact that I'm asking for this that I

14  have made up my mind in any way, shape, or form about the

15  basis of the fee calculation, because I haven't.  This is all

16  data that I want to consider.

17  MR. O'MEARA:  Yes.

18  THE COURT:  That's what I'd like you to do.  It makes

19  sense, I think, to have it all in one document for all the

20  defendants put together.  I just want to get hours and hourly

21  rates.  I think because there's also been an issue raised

22  regarding the number of attorneys, I think it should be

23  attorney A spent, you know, a hundred hours at X hourly rate,

24  attorney B spent 200 hours at Y hourly rate and so on, and it

25  probably ought to be broken down on a per defendant basis.

1    MR. O'MEARA:  We had a firm --

2    THE COURT:  How long should I give you to do that?

3    MR. O'MEARA:  If we could get 14 days.

4    THE COURT:  Sure.  That's fine.  So the order is

5    going to say that the defendants have until the 13th of March

6    to provide information regarding attorney hours and hourly

7    rates.

8    So the second question is settlement negotiation

9    history.  So we talked about this a little bit last week.  I

10   think Mr. Edelson's position was it ought to be disclosed and

11   it ought to be a matter of public record because it's a class

12   action, so that's the question.

13   MR. O'MEARA:  Our position, your Honor -- it hasn't

14   changed, and I hope I didn't give any indication otherwise --

15   we believe those settlement discussions, including the

16   mediation, are confidential.  All the parties signed a

17   confidentiality agreement prior to entering into all of the

18   mediations with Judge Andersen.  We don't believe, frankly,

19   the history of the specifics of the settlement negotiations

20   are relevant to the attorneys' fee determination, and so we

21   would very strenuously say that those specifics of the

22   negotiations are confidential, have remained confidential, we

23   have not waived any confidentiality, and they really do not

24   play a relevant role, we believe, in your determination of

25   attorneys' fees.

1          THE COURT:  Mr. Edelson, is there more that you want

2   to say about that or anybody on your side of the fence?

3          MR. EDELSON:  Yes, your Honor.  First of all, we have

4   provided evidence in the form of an affidavit from me, and we

5   are trying to find the pinpoint cite.

6          THE COURT:  Is this an affidavit to the fee petition?

7          MR. EDELSON:  Yes.

8          MR. BALABANIAN:  Yes, and the reply brief, your

9   Honor.

10          THE COURT:  All right.  Because your affidavit on the

11   fee petition is Exhibit 1?

12          MR. BALABANIAN:  Yes.

13          THE COURT:  And I mean, it did say -- I mean, it gave

14   -- that affidavit gave some sort of general information, but

15   it didn't give what I would call a blow by blow.

16          MR. EDELSON:  Which we would be happy to do.

17          THE COURT:  Do you think that you've already given it

18   to me at some point in time?  If you did, I didn't see it.

19          MR. EDELSON:  No, we would like to.  But what our

20   understanding was the way we perceived was we would give our

21   views of this, and if they objected to it, then we would go

22   through the blow by blow.  But we did give an affidavit, which

23   is evidence.  Our expert looked at all the settlement

24   negotiations, gave an expert opinion.  Both of those are --

25   have not been refuted with any evidence.  If they want to

1   refute that, they certainly have the right to, and then we can

2   say -- everything is in writing, we can say, here's exactly

3   what happened.  But this is a big point for the basis of our

4   fees, and --

5         THE COURT:  Yeah, so the way I look at this is that

6   -- again, the fact that I'm asking about this is not an

7   indication that I think this is a dispositive issue because,

8   honestly, certain people decide things in certain ways.  I'd

9   rather know more than less before deciding things, and I'd

10  rather actually know more than less before deciding, frankly,

11  how to go about deciding it.

12        One of the arguments that's made on the defense side

13  is that, you know, default rule or maybe it's more than the

14  default rule is this whole descending percentage scale.  The

15  plaintiffs make the argument, well, it's not a default rule,

16  but even if it is, Synthroid talks about it doesn't apply in

17  every case, this is a case it doesn't apply in.  There are

18  reasons why it doesn't apply.  And it seemed to me from

19  reading the briefs that part of that pitch -- and I know

20  that's not the only argument that's made, but part of that

21  pitch is that the way settlement negotiations in this case

22  proceeded explains why this case fits within what I'll call

23  the exception that Judge Easterbrook talked about in

24  Synthroid.  So as part of trying to figure this whole thing

25  out, I think that I would like to get more about that.

1     So, look, so -- A, it's a class action, and, B, I
2   have an objector, and the objector is objecting on this basis.
3   That's on the one hand.  On the other hand, you have this
4   confidentiality agreement.  I know those are standard
5   operating procedures in mediations that are done with people
6   like retired Judge Andersen, and so I'm trying to figure out
7   -- I'm trying to figure out if there is a way that I can get
8   this information so I can evaluate whether I'm going to take
9   it into account without making it a matter of public record
10  and open it up only if I decide that it should be taken into
11  account.  And I don't know if I can -- I don't know if I can
12  slice it that thin.  That's the question.
13          MR. EDELSON:  I have a suggestion that might work.
14          THE COURT:  Okay.
15          MR. EDELSON:  Why don't we do it under seal.
16          THE COURT:  So the whole deal is whether the tall guy
17  standing over there gets to see it or not.
18          MR. EDELSON:  Yeah, he should get it.  That's my
19  view.  He can be part of the protective order as long as he
20  understands it's under seal.  And then, you know, our position
21  is ultimately it shouldn't be under seal, but as a threshold
22  matter, he is the only one I believe who is objecting to fees.
23          THE COURT:  Correct.
24          MR. EDELSON:  So that seems like it would solve the
25  problem.

1          THE COURT:  Do you have a view on this?

2          MR. NOVOSELSKY:  I would be okay with going about it

3   in that way, your Honor.

4          THE COURT:  If the under seal basically meant

5   attorneys' eyes only, are you comfortable with that too?

6          MR. NOVOSELSKY:  Yes, your Honor.

7          THE COURT:  Mr. O'Meara?

8          MR. O'MEARA:  Judge, our position --

9          THE COURT:  I know your position is I shouldn't take

10  it into consideration.  I am not prepared to buy off on that

11  right now.

12         MR. O'MEARA:  I know, but I appreciate your

13  willingness to look at it under seal.  I guess what I'd ask is

14  to the extent there is a determination that it should be in

15  the public record --

16         THE COURT:  I'll give you a chance.

17         MR. O'MEARA:  -- we can brief it.

18         THE COURT:  Absolutely.  That's a completely

19  reasonable request.  I absolutely will let you do that.

20         What I want to get is a -- I don't know the best way

21  to do this.  Just get a report regarding the settlement

22  negotiation is to be filed under seal.  It only can be viewed

23  by counsel of record for the parties and objector Freedom Home

24  Care, Inc., and that's it.  None of those people can disclose

25  it to anybody else.  If you think you need to disclose it to

1  somebody else, you got to come and ask me first, and before I
2  make it a matter of public record, I will give the parties a
3  chance to brief that.

4          Should I get something -- can you do something joint,
5  or does it make more sense -- you tell me.  You tell me.
6  What's the form and manner I should get this?

7          MR. O'MEARA:  It's unusual from our perspective.  We
8  can do it jointly, that's fine.  I wonder if I could just
9  suggest, is it possible we could submit is to you in a
10 different form rather than under seal?  I think if someone
11 sees a docket entry with something under seal, later on if you
12 decide it does get unsealed, I just have a concern.

13         THE COURT:  Well, there's going to be an order that's
14 going to say it's to be filed under seal.  It won't be just
15 kind of this mystery entry.  I don't know if there is any
16 other way rather than making a paper airplane and sending it
17 to me that you could get it to me.  Let's do it that way.  Is
18 that same two weeks enough time to do that?

19         MR. EDELSON:  Yes, your Honor.

20         THE COURT:  Fine. That's also due on the 13th of
21 March.

22         MR. O'MEARA:  Judge, I am thinking in my head about
23 getting hours and stuff.  Can I get 21 days?

24         THE COURT:  Sure.  That's fine.  21 days, that's
25 fine.

1    MR. O'MEARA:  Thank you.

2    THE COURT:  The fee thing is the 20th of March.  The

3    settlement history thing is the 16th of March.  I think that I

4    can -- I am not giving up too much when I tell you that --

5    again, as I suggested last week, aside from the one other

6    objector, there's nobody objecting to the terms of the

7    settlement as distinct from the attorneys' fees -- I am

8    working on an order approving the settlement because I think

9    the criteria have been met.  I am not going to walk through

10   that today because it's going to be in a written order and

11   it's just going to leave the fees for later determination.

12   And hopefully, by the time I figure that out, I will know what

13   later means, although I can't guarantee that.

14   Anything else anybody wants to talk about here today?

15   Mr. Backman, do you have anything you want to bring

16   up?

17   MR. BACKMAN:  I couldn't really hear the lawyers.  I

18   am just hearing the context of the order with respect to the

19   disclosure of the settlement communications in some sort of

20   written form.

21   THE COURT:  Yeah.  Let me tell you -- I'm sorry.  It

22   is kind of a bad situation here with the sound.

23   What I've told the attorneys is that I want a joint

24   report that basically gives me what I'll call a blow-by-blow

25   description of the settlement discussions.  It's to be filed

1 under seal, attorneys' eyes only.  The attorney for objector
2 Freedom Home Care is going to get to see it, but it's
3 attorneys' eyes only for him too.  He was okay with that.

4 If anybody thinks they need to show it to anybody
5 other than counsel of record, they are going to need to come
6 ask me.  And I guaranteed to Mr. O'Meara we will put in the
7 order that before I contemplate unsealing it, I will give the
8 parties a chance to brief that.

9 MR. BACKMAN:  Thank you for clarifying that for me,
10 your Honor.  I take it there is no talking you out of that
11 disclosure in the first place.

12 THE COURT:  Mr. O'Meara gave it his level best.

13 MR. BACKMAN:  I am wondering if we could do some sort
14 of in camera discussion with you as opposed to putting it on
15 paper and perhaps have Judge Andersen there as well.

16 THE COURT:  What would be the reason for doing that?
17 What difference does it make?

18 MR. BACKMAN:  I always have concerns when it's under
19 seal.  Once it's on paper, once it's filed in the court
20 records even under seal, you can't get any of that back.

21 THE COURT:  Look, here's the deal.  It's a class
22 action.  If I had an in camera discussion, I'd have the court
23 reporter there, and I'd tell her to put the transcript under
24 seal.  All roads lead to Rome.

25 MR. BACKMAN:  Perhaps I misunderstood some comments

1    during the course of the hearing.  It seemed like you want to
2    know to know before you even decide if you want to know for
3    purposes of your ruling.  That's the only reason I suggest
4    something a little more informal.

5              THE COURT:  Actually, you described that accurately,
6    and when we all go back some day and read that sentence, it's
7    going to look pretty goofy, but it's accurate.  Yeah, the
8    short answer is I don't think that I'm going to be able to
9    make up my mind, you know, just off-the-cuff, and so I would
10   prefer to have something that I can think about and digest and
11   not have to deal with in that way.  And the bottom line is I
12   do not believe that CM/ECF -- that a single under seal entry
13   in the history of CM/ECF has ever been hacked by anybody, and
14   so I really don't think that there's a basis for concern
15   there.

16             And the bottom line is that there's a finite number
17   of attorneys of record who are going to see this, and I want
18   to think about that for a second because now that I'm thinking
19   about it, the other objector is also an attorney of record,
20   and he's not entitled to it.  So I think I'm going to have my
21   courtroom deputy think about if there's a way of limiting who
22   can see this particular document to particular individuals,
23   but we will talk about that offline.  I would probably then
24   just make it -- I'd ask each side, including the Freedom Home
25   Care, to designate one person who is able to see the thing,

1  but I don't know.  I will think about that.  I got to move on

2  to something else, though, and I don't want to spend too much

3  more time talking about this.

4          MR. BACKMAN:  Thank you.

5          THE COURT:  Anything else?

6          Thanks.  Take care.

7          MR. EDELSON:  Thank you, your Honor.

8          MR. O'MEARA:  Thank you, your Honor.

9          MR. NOVOSELSKY:  Thank you, your Honor.

10    (Which were all the proceedings had in the above-entitled

11  cause on the day and date aforesaid.)

12    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
13

14  _____          _____
    Carolyn R. Cox                     Date
    Official Court Reporter
15  Northern District of Illinois

16  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

17

18

19

20

21

22

23

24

25