**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GERARDO ARANDA, GRANT BIRCHMEIER, STEPHEN PARKES, and REGINA STONE, on behalf of themselves and classes of others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **Case No. 12 C 4069** |
| **CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY, LLC, THE BERKLEY GROUP, INC., and VACATION OWNERSHIP MARKETING TOURS, INC.,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this class action, plaintiffs allege that defendants—Caribbean Cruise Line, Inc. (CCL), Vacation Ownership Marketing Tours, Inc. (VOMT), The Berkley Group Inc., and Economic Strategy Group and its affiliated entities (collectively ESG)—violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by placing millions of automated telephone calls to consumers without their consent. After roughly four years of hotly contested litigation, the parties settled the case days before trial. A little over a month ago, the Court entered an order of final approval of the settlement agreement. *See Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at *1 (N.D. Ill. Mar. 2, 2017). The agreement provides that defendants will establish a common fund, in an amount no lower than $56 million and no higher than $76 million, from which class

members with approved claims will be paid. Individual class members will be paid $500 per call received, unless the $76 million cap is reached, in which case they will receive a *pro rata* share of the fund. Plaintiffs' counsel, lawyers from Edelson PC (Edelson) and Loevy & Loevy (Loevy), have petitioned for an award of attorney's fees in an amount equal to one-third of the final common fund total, minus the costs of administering the fund and providing notice to the class. Defendants and one of the class members, Freedom Home Care, Inc., object to the size and structure of the requested fee award. For the reasons stated below, the Court grants plaintiffs' motion for attorney's fees, costs, and incentive awards but makes a fee award lower than plaintiffs have requested.

## Discussion

The Court assumes familiarity with the background facts of the case, which the Court has discussed in a number of prior opinions. *See, e.g.*, *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 820–22 (N.D. Ill. 2016). No party has objected to plaintiffs' request that each of the four plaintiffs acting as class representatives receive a $10,000 incentive award, and nobody has disputed plaintiffs' assertion that the class representatives actively engaged in the litigation by reviewing the complaint and other documents, responding to requests for information, and sitting for depositions. The Court concludes that $10,000 is a reasonable award for the time and effort those plaintiffs expended on behalf of the class. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

As mentioned above, in addition to incentive awards for the class representatives, plaintiffs have requested attorney's fees in an amount equal to one-third of the common fund, minus notice and administrative costs. Defendants and

Freedom Home Care object to the size and structure of the requested award. They argue that attorney's fees in similar cases usually comprise a smaller percentage of the common fund and that plaintiffs have failed to justify the award of a higher percentage in this case. In addition, defendants and Freedom Home Care contend that the flat-percentage structure of the requested award deviates from the "sliding scale" model courts in the Seventh Circuit often use to award attorney's fees for class action settlements, a model outlined by the Seventh Circuit in *In re Synthroid Marketing Litigation*, 264 F.3d 712, 721 (7th Cir. 2001) (*Synthroid 1*).

Courts overseeing certified class actions "may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreements." Fed. R. Civ. P. 23(h). Defendants in this case have agreed to pay a reasonable fee award out of the settlement's common fund, up to a maximum of $24.5 million. In "common fund" cases like this, plaintiffs' attorneys petition the Court to recover their fees out of the fund, and the Court determines the appropriate portion of the fund that plaintiffs' counsel may recover. *Nationsbank of Georgia, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994). To determine the reasonableness of counsel's fee requests in such cases, a court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988).

In the Seventh Circuit, when determining the appropriate fee levels in common-fund cases, a court "must do [its] best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid 1*, 264 F.3d at 718. In the absence of a negotiated

3

agreement between the plaintiffs and their attorneys, the Seventh Circuit's market-based approach requires the Court to "set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred." *Id.* at 719. In addition to considering the risk of nonpayment and data about normal compensation rates, a court attempts to determine the market rate by looking to factors such as the quality of counsel's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Id.* at 721.

**A.     General size and structure of the fee award**

Plaintiffs argue that an award amounting to one-third of the net common fund accurately reflects the result of a hypothetical *ex ante* negotiation. Plaintiffs' counsel represent that Edelson, one of the two firms representing plaintiffs, regularly charges a contingency fee of at least one-third of the recovery, plus expenses, when it brings TCPA cases on behalf of individual plaintiffs. Professor Todd Henderson, one of plaintiffs' experts, reports that other attorneys charge between 40 and 45 percent of the recovery in such cases. According to plaintiffs, counsel's request of one-third of the common fund, without an accompanying request for payment of costs and expenses, is thus less than a standard rate for individual TCPA cases. This lower rate is unsurprising, they explain, because class actions allow for more efficient resolution of claims. Professor William Rubenstein, another of plaintiffs' experts, notes that counsel's requested rate of one-third would be higher than the average rate approved in consumer class actions in the Seventh Circuit, but plaintiffs contend that the above-average rate is justified (and would be agreed to *ex ante*) because of the high value plaintiffs' lawyers generated in the case.

4

Plaintiffs rely in large part on Professor's Henderson's expert report to establish that plaintiffs' attorneys generated better-than-average value for the class and should be paid accordingly. Professor Henderson distinguishes between cases with high and low inherent values. In a case with high inherent value, the defendant or defendants are solvent, their potential exposure is high, and liability is relatively obvious and easy to establish. Imagine, for example, a large multinational corporation whose widely sold product turns out to have a clear defect that injured millions of consumers. In such a case, the defendant likely would be willing to settle the case for a large amount soon after the filing of the complaint. For cases like that, plaintiffs argue that class members and their attorneys would agree to a lower fee in an *ex ante* negotiation because there is "no need to pay counsel to 'produce' a recovery that is there for the asking." *Synthroid 1*, 264 F.3d at 721. But in a case where there are apparent obstacles to recovering a significant sum (or any sum at all), plaintiffs argue, potential class members would be willing to pay a higher rate to a law firm that would produce a large recovery. In such cases, Professor Henderson explains, to the extent the class can obtain a high-value recovery, that value is generated by the work of the lawyers.

Professor Henderson identifies a number of characteristics of this case that indicate it is a "lawyer-generated-value" case. First, he notes that although the conduct giving rise to this case allegedly involved over 50 million calls placed to individuals across the country, only five TCPA cases were brought against defendants, three of which were consolidated into this case. Thus the relatively low level of interest from the plaintiffs' bar "suggests that most members of the . . . bar saw this litigation as too risky for their practices." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013).

Similarly, only two firms served as class counsel, and the expertise of each firm (Edelson's expertise in TCPA cases and Loevy's expertise in conducting class action trials) appeared to complement the other's. According to Professor Henderson, this complementary collaboration between only two firms contrasts with cases in which a large number of firms with overlapping skill sets bring a case together, hoping to extract and share a significant portion of the case's inherent value. Unlike those cases, he says, this case is one in which the two firms worked together efficiently to generate value for the class.

Professor Henderson also points to circumstantial evidence indicating that defendants, themselves, placed a low value on the case at the outset and in its early stages. Specifically, Professor Henderson notes that defendants were unwilling to offer any significant cash value to settle the case early on and only became willing to settle for a significant amount after a class had been certified and plaintiffs had survived motions to dismiss and two motions for summary judgment. This course of dealing suggests, according to Professor Henderson, that the case's value was not inherent but was generated over time through counsel's efforts. Finally, Professor Henderson argues, the quality of the settlement for individual class members—specifically, the fact that each approved claimant stands to gain hundreds of dollars from the settlement— shows that the high settlement total is not simply the result of the size of the class, but reflects the value that counsel generated for the class by litigating the case until the eve of trial. Thus, according to Professor Henderson, plaintiffs in an *ex ante* bargaining situation would gladly agree to pay a high percentage for a large recovery in this low-inherent-value case. Professor Rubenstein reaches the same conclusion by

considering similar factors. *See* Rubenstein Decl. [dkt. no. 533-4] at 36–37 (discussing, among other factors, uncertainty of liability and settlement at outset of litigation, significance of monetary relief obtained for class, and length and contested nature of litigation).

Plaintiffs concede that "several courts in this District considering fee requests in TCPA cases have applied different [fee] structures, such as the declining marginal percentage scale used in *In re Capital One Telephone Consumer Protection Act Litigation*, 80 F. Supp. 3d 781, 803–06 (N.D. Ill. 2015) [(Holderman, J.)]." Pls.' Mot. for Attorneys' Fees at 17. The district court in *Capital One*, a TCPA class action that resulted in a $75.5 million settlement, modeled its award after the award made in *In re Synthroid Marketing Litigation*, 325 F.3d 974, 980 (7th Cir. 2003) (*Synthroid 2*). In *Synthroid 2*, the Seventh Circuit broke a class-action settlement fund into tiers or bands and awarded class counsel a decreasing percentage of each band: 30% of the fund's first $10 million, 25% of the next $10 million, 22% of the band from $20 million to $46 million, and 15% of everything about $46 million. *Synthroid 2*, 325 F.3d at 980. The Seventh Circuit has explained the rationale behind this so-called "sliding scale" award structure as follows:

> Many costs of litigation do not depend on the outcome; it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case. Much of the expense must be devoted to determining liability, which does not depend on the amount of damages; in securities litigation damages often can be calculated mechanically from movements in stock prices. There may be some marginal costs of bumping the recovery from $100 million to $200 million, but as a percentage of the incremental recovery these costs are bound to be low. It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first. The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases.

> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman*, 739 F.3d at 959.  And, as the court in *Capital One* added, the rationale the court in *Silverman*, a securities fraud case, "applies equally, if not more, to TCPA cases because nearly all of counsel's efforts are devoted to determining liability.  Damages are fixed by statute."  *Capital One*, 80 F. Supp. 3d at 803.

Plaintiffs argue that the sliding-scale approach is inappropriate in this case, pointing out that although the Seventh Circuit approved a sliding-scale award in *Synthroid 1*, the court recognized that "systems with declining marginal percentages are [not] always best."  *Synthroid 1*, 264 F.3d at 721.  A sliding-scale approach is not best, according to plaintiffs, for cases that have a low inherent value.  Rather, they argue, the sliding-scale approach from cases like *Capital One* is the standard approach only for cases where plaintiffs' lawyers perform a relatively light amount of legal work and settle the case at an early stage for a relatively small percentage of the possible recovery on a per-person basis.  In *Capital One*, for example, the case settled prior to a contested motion for class certification or summary judgment and after only limited discovery, and class members with approved claims received $34.60, *Capital One*, 80 F. Supp. 3d at 789, well below the hundreds-of-dollars recovery that approved claimants are set to receive in this case.

Plaintiffs contend that class members would prefer to pay a flat one-third rate for the high recovery in this case than to pay a lower, sliding-scale rate to receive a low recovery like that in *Capital One*.  Plaintiffs point to an empirical studying conducted by

8

one of their experts, Professor Larry Chiagouris, as evidence that real people actually prefer such an arrangement. Plaintiffs also point to Judge Posner's remark in *Synthroid 1* that a sliding-scale approach can "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client." *Synthroid 1*, 264 F.3d at 721. The sliding-scale arrangement thus leads to results like that in *Capital One*, plaintiffs suggest, where attorneys accept settlement offers for relatively low recovery amounts per class member rather than proceeding toward trial in order to generate greater value. Potential class members who wish to incentivize aggressive litigation that would result in high recoveries would agree to a flat rate *ex ante*, plaintiffs argue.

As discussed in greater depth below, the Court agrees with plaintiffs and their experts that the unique circumstances of this case—in particular, the relatively low level of interest from the plaintiffs' bar and the late stage at which settlement occurred— warrant a higher fee award than those granted in other TCPA class actions that resulted in settlement, such as *Capital One*. The Court disagrees, however, that the award should be as high as the one plaintiffs request or that there is a sufficient basis to depart from the sliding-scale structure, which appears to have become become the standard model for cases like this in the Seventh Circuit. Plaintiffs provide only one example of a recent, large class action settlement in this circuit where an award was not structured as a sliding scale: *Silverman*. In contrast, defendants and Freedom Home Care point to a number of examples of sliding-scale awards for cases in this district involving TCPA class-action settlements. *See, e.g.*, *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215,

239 (N.D. Ill. 2016) (Feinerman, J.); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-CV-4462, 2015 WL 2147679, at *1 (N.D. Ill. May 6, 2015) (St. Eve, J.); *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14 C 190, 2015 WL 890566, at *10 (N.D. Ill. Feb. 27, 2015) (Holderman, J.); *Capital One*, 80 F. Supp. 3d at 804–05.

In addition, in *Silverman*, the Seventh Circuit approved a flat-rate award only after providing the defense of the sliding-scale approach that the Court quoted above. The court noted, however, that no objector had raised the prospect of a sliding-scale structure in the district court. *Silverman*, 739 F.3d at 959. The court in *Silverman* also mentioned that no objector had presented the data showing that the 27.5% rate awarded "substantially exceeds the norm for large settlements." *Id.* Despite the strong policy rationale supporting the sliding-scale approach and the fact that the 27.5% flat-rate award was "at the outer limit of reasonableness," the court approved the award "given the way the subject was litigated in the district court." *Id.* Thus, in a case like this one in which an objector and defendants *have* raised concerns about the size and structure of the award, *Silverman* does not appear to support plaintiffs' argument. Rather, the reasonableness of both the size and structure of plaintiffs' requested award is undermined by the Seventh Circuit's concern that fee awards should "allow[] the clients to reap more of the benefit at the margin" and Judge Easterbrook's comment that a 27.5% award represents the "outer limit of reasonableness." *Id.*; *see also Capital One*, 80 F. Supp. 3d at 803–04 ("[T]he data available on past awards in TCPA cases and other class actions show that the mean and median recovery for a $75.5 million TCPA case are between 20% and 24% of the settlement fund.").

The Court is also not persuaded that this case fits into the category of cases the

Seventh Circuit identified as those in which "declining marginal percentages are [not] always best." *Synthroid 1*, 264 F.3d at 721. In discussing such cases, Judge Posner described the possibility that declining marginal returns would lead attorneys to forego engaging in the extra work needed to increase their clients' recovery because the opportunity costs of doing so would exceed the benefit to the lawyers of the larger recovery. *Id.* But based on plaintiffs' own representations, that concern was not present in this case. According to plaintiffs, "[u]p until the very end, Class Counsel were fighting to get anything more than $0 for the class." Pls.' Reply in Supp. of Attorneys' Fees at 11. Thus counsel would have had the same or virtually the same incentive to fight for that award whether they were receiving a flat rate or a sliding-scale rate. For this reason, the concern identified in *Synthroid* would not provide a reason for potential class members to deviate from the sliding-scale structure in an *ex ante* negotiation in this case.

The Court also disagrees with plaintiffs that class members necessarily would accept a flat rate in this case because of its low inherent value or because of the possibility that counsel could generate a high recovery through aggressive litigation. It appears to be true that the plaintiffs' bar's interest in suing the defendants was limited, such that counsel would have been well positioned to bargain for a favorable fee structure. That said, the record does not suggest that counsel would have been negotiating in a completely non-competitive market. Plaintiffs and Professor Chiagouris may be correct that class members would be willing to pay a higher, flat-rate percentage of a settlement fund in order to gain a larger absolute recovery. But in a hypothetical bargaining situation, well-informed class members would also be aware that the sliding-

scale structure is, as Professor Rubenstein says, "often used in Seventh Circuit cases," Rubenstein Decl. at 3, and likely would shop around to see if any other firm would be willing to take their case and pursue a large recovery for a sliding-scale fee. It is not clear that the hypothetical class members in this case would be faced with the binary choice between a high-percentage fee with a large recovery, on the one hand, and a sliding-scale fee for a small recovery, on the other. Just as hypothetical plaintiffs may be willing to accept a higher fee percentage for a larger absolute recovery, it is also likely, all else being equal, that they would prefer the sliding-scale approach to a higher flat rate if both hypothetical law firms were willing and able to pursue a large recovery. In short, although it is possible that a hypothetical bargain would result in an agreement for a flat rate, it seems no more probable than an agreement for a sliding-scale rate, and thus the Court sees no reason to depart from the sliding-scale approach that, as noted, appears to have become the standard model in this circuit for cases of this type.

**B.      Specific structure and size of the award**

Given that the Court has determined that a sliding-scale structure is appropriate in this case, the question becomes how the recovery should be split into bands and what percentage of each band should go toward the fee award. Determining what numbers class members and attorneys would agree to for a hypothetical downward scaling fee arrangement is necessarily "more art than science." *Capital One*, 80 F. Supp. 3d at 804. As a starting place, however, the cases have established 30% as the benchmark percentage for the first band of recovery in sliding-scale arrangements. *See Synthroid II*, 325 F.3d at 980; *Gehrich*, 316 F.R.D. at 239; *Craftwood*, 2015 WL 2147679, at *4; *Wilkins*, 2015 WL 890566, at *10; *Capital One*, 80 F. Supp. 3d at 804–

05.  As this Court has noted before, "attorney's fee awards in analogous class action settlements shed light on the market rate for legal services in similar cases."  *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015) (Kennelly, J.).

The parties disagree about whether, if a sliding-scale arrangement is used, the benchmark percentages should be adjusted upward to account for the high risk (or, to use Professor's Henderson's term, the low inherent value) of the case.  In *Capital One*, for example, Judge Holderman applied a six-percentage-point risk premium because empirical evidence presented to the court in that case showed that "high risk" consumer class actions usually result in a percentage fee premium of six percentage points over "low and medium risk" cases.  He determined that potential legal impediments to class certification and to establishing liability made the case a risky one.  *Capital One*, 80 F. Supp. 3d at 806.  Thus, the court in *Capital One* took the fee structure from *Synthroid 2* (30% for the first $10 million, 25% for the second $10 million, 22% for the band from $20 million to $46 million, and 15% for the remainder) and added six points to the percentage applied to the first band of recovery while rounding down to an even 20% for the third band (36% for the first $10 million, 25% for the second $10 million, 20% for the band from $20 million to $45 million, and 15% for the remainder).  The court declined to add the risk premium to bands other than the first one.  It reasoned that sophisticated class members would have balked at doing so "because the risk factors present in [that] case related only to establishing liability and would not have affected Class Counsel's ability to achieve the additional damages recovery reflected in the second, third and fourth tiers."  *Id.* at 807.  This Court has also applied a six-point risk premium to the 30% benchmark in a TCPA case with a smaller total settlement ($11 million) where the risks

13

involved in establishing liability were "real and significant." *Kolinek*, 311 F.R.D. at 502.

Defendants and Freedom Home Care maintain that this case does not warrant a risk premium and that if a risk premium is applied, it should be confined to the first band, as in *Capital One*. They note that risk premiums were not applied, for example, in *Gehrich*, *Craftwood*, or *Wilkins*, and they contend that the risks the plaintiffs faced in *Capital One* and *Kolinek* are not present in this case. Defendants say that, unlike plaintiffs in this case, the plaintiffs in *Capital One* faced manageability concerns that posed a potential obstacle to class certification and that plaintiffs risked losing on summary judgment or at trial if they failed to rebut the defendant's defense that the plaintiffs' consented to the calls or if forthcoming FCC orders barred their claims. *See Capital One*, 80 F. Supp. 3d at 790–91. And defendants argue that this case is unlike *Kolinek* because the plaintiffs did not face "significant risks" associated with undertaking class representation. *Kolinek*, 311 F.R.D. at 502.

According to defendants, plaintiffs overstate the level of risk in the case and understate its inherent value. They note that Edelson and Loevy filed separate cases in this district within days of each other, with a third group of firms filing suit a few months later in the Southern District of Florida (the *Vigus* case), and they argue that, once the cases were consolidated in this Court, the efforts by Edelson and Loevy to prevent the lawyers in *Vigus* from acting as class counsel demonstrate that the case had significant inherent value and was not as high-risk as plaintiffs assert. Defendants also contend that the risk in this case was reduced because the attorneys general in Washington and Maine, whose statements plaintiffs quote in the complaint, had already investigated the conduct at issue, and the Federal Trade Commission had already launched an

14

investigation that would eventually result in a lawsuit and a consent judgment. Finally, defendants argue that the "type of potentially bankruptcy-level of exposure" defendants faced from the claims of willful TCPA violations increased the possibility of an "*in terrorem* settlement . . . that reduces Class Counsel's risk of non-payment." *Capital One*, 80 F. Supp. 3d at 805.

The Court agrees with defendants that plaintiffs are incorrect when they assert that "the inherent value of this case was effectively zero." Pls.' Mot. for Attorneys' Fees at 15. But the Court is convinced that the risks of non-recovery in this case were greater than those faced by the plaintiffs and their counsel in *Capital One* and *Kolinek*. To be sure, plaintiffs in this case did not face the identical risks present in *Capital One* and *Kolinek*. But although the issue of plaintiffs' consent to the calls was not at issue in this case, as it was in *Capital One*, other difficult legal and factual issues did pose potential obstacles to plaintiffs' success at the case's outset. The difficulty in identifying class members, for example, especially given the absence of retained records regarding who was called, raised serious questions about the likelihood of class certification.[1] Plaintiffs' success also depended critically on the difficult legal and factual question of defendants' vicarious liability, because success by the plaintiffs on that point was the only way they could impose liability on a defendant that had the financial wherewithal to satisfy an eight-figure judgment.

As the Court has discussed, the fact that the case proceeded to the eve of trial

---

[1]     The Court notes that although defendants attempt to distinguish *Capital One* on the basis of the manageability issues in that case, defendants themselves argued at the class certification stage in this case that the "[m]anageability challenges . . . would be enormous." Defs.' Mem. in Supp. of Mot. to Decertify at 13.

and that defendants offered significant value in settlement only at that late stage indicates that defendants believed their prospects for escaping liability without settling were good. And as the Court has also discussed, defendants and Freedom Home Care have not rebutted plaintiffs' assertion that the plaintiffs' bar was relatively uninterested in this case, suggesting a belief that it was saddled with risk. Once they had already filed their cases, the fact that Edelson and Loevy sought to be the sole firms to act as class counsel in this case does not change the assessment of the case's risk, as that decision may have reflected a good-faith belief that their exclusive collaboration was the most efficient way to litigate the case.

Regarding defendants' assertion that government involvement prior to the lawsuit reduced plaintiffs' risks, it simply does not appear that government activity had much effect on this case. The only government action brought with regard to the conduct in this case was filed after this lawsuit, did not name Berkley or VOMT as defendants, and resulted in a small consent judgment of $500,000. Finally, although the Court agrees that there was likely an *in terrorem* component to defendants' ultimate decision to settle the case for the amount they did, this is not a case where plaintiffs' "leverage . . . derives primarily from the magnitude of [the defendant's] liability." *Wilkins*, 2015 WL 890566, at *11. The magnitude of potential liability provided plaintiffs with significant leverage, to be sure. But the settlement negotiation history[2] reveals that this was insufficient to secure a significant offer from defendants at the litigation's early stages.

_____

[2] In this regard, the Court relies on the discussion of the settlement history contained in plaintiffs' brief. *See* Pls.' Mot. for Attorneys' Fees at 15. Defendants interposed no objection to plaintiffs' discussion of the settlement negotiations, nor do they dispute the details.

When plaintiffs did settle this case, their leverage derived in large part from their pre-trial success and the fact that they had advanced to the eve of trial.

Because of the relative lack of interest from other plaintiffs' attorneys and the fact that the case progressed as far as it did, the Court is persuaded that plaintiffs and their counsel faced materially greater risks in this case than those faced in the other recent TCPA class actions the parties have discussed. Thus the Court believes that at least a 6% premium should be added to the first band of recovery and that class members would have agreed to pay at least that risk premium in a hypothetical negotiation.

Professor Rubenstein contends that in this case, based on "the degree of effort the attorneys would need to put in, the likelihood of success, and the risks associated with undertaking class representation," *Kolinek*, 311 F.R.D. at 502–503, a six-point premium should be applied to the *Synthroid 2* scale at each band of recovery (for example, 36% for the first $10 million, 31% for the second $10 million, 28% for the band between $20 million and $46 million, and 21% for the remainder of the fund). In the alternative, he suggests that the recovery bands should be expanded, citing as a model the Seventh Circuit's discussion of a hypothetical agreement that granted counsel 35% of the first $20 million, 25% of the next $20 million, and 10% of the remainder. *See Synthroid 2*, 325 F.3d at 978.

Defendants and Freedom Home Care argue that applying a risk premium at each band would be inappropriate for the same reasons the courts in *Capital One* and *Gehrich* declined to do so. In *Capital One*, Judge Holderman declined to apply a risk premium at each band because plaintiffs' "risk existed only with regard to liability, not damages." *Capital One*, 80 F. Supp. 3d at 806. Thus, once plaintiffs overcame the

17

obstacles to establishing liability, "Class Counsel's ability to obtain a large recovery was no longer materially affected by that risk." *Id.* Similarly, Judge Feinerman opined in *Gehrich* that the "issue is not how hard the lawyers did or did not work; rather, it is how hard they did or did not work for each dollar of recovery, and that does indeed differ between the first large chunk and the rest of the settlement." *Gehrich*, 316 F.R.D. at 239. But this case differs from those two in an important respect: both *Capital One* and *Gehrich* settled at an early stage, prior even to a contested class certification motion. *See id.* at 230 ("[T]he parties have not engaged in substantial motion practice or discovery[.]"); *Capital One*, 80 F. Supp. 3d at 791 (discussing "serious obstacles to class certification" should the plaintiffs proceed to trial). It is thus not clear that there was a significant difference between the work class counsel in this case did "for the first large chunk and the rest of the settlement" or that the risk of a non-recovery substantially decreased once they had filed the complaint or survived a motion to dismiss. Rather, as indicated above, defendants do not dispute plaintiffs' representation that "up until the very end, Class Counsel were fighting to get anything more than $0 for the class."

The Court concludes, therefore, that it would be reasonable for plaintiffs in an *ex ante* bargaining situation in a case like this to recognize that counsel's efforts can increase the size of the settlement beyond "the first large chunk." In such a negotiation, for example, plaintiffs and their potential attorneys might consider that at each successive, successful stage of the litigation (for example, the denial of a motion to dismiss stage to certification of a class to the denial of summary judgment), the size of the expected payout increases as defendants' bargaining power decreases. A

defendant may, for example, be unwilling to settle for any amount initially because it believes the case will be dismissed, and following the denial of a motion to dismiss, the defendant may be willing to pay $10 million, but not more, because it still believes the class is unlikely to be certified. The defendant would be likely to offer more following class certification, and plaintiffs' counsel could reasonably expect to be awarded a considerable portion of that increased fund, which only became available following counsel's work to certify the class. But at the same time that counsel's success at each stage of the litigation may increase the expected value for his clients, counsel's own risk of nonpayment also decreases as another obstacle to recovery is removed. Plaintiffs in a hypothetical negotiation might, therefore, agree to pay a risk premium at each band in a high-risk case like this but insist that the size of the premium decrease at each band, as the risk of non-recovery decreases. The Court will apply this logic by awarding a decreasing risk premium to the standard sliding-scale structure.

Taking the award structure in *Gehrich*, *Wilkins*, *Craftwood*, and *Capital One* as a guide (30% for the first band, 25% for the second band, 20% for the third band, 15% for the fourth band), the Court applies a six-point premium to the first band, a five-point premium to the second band, a four-point premium to the third band, and a three-point premium to the fourth band. Thus, the Court awards class counsel 36% of the first $10 million ($3.6 million), 30% of the second $10 million ($3.5 million), 24% of the band from $20 million to $56 million ($8.64 million), and 18% of the remainder. Although the "standard" third band spans from $20 million to $45 million (*Capital One*) or $46 million (*Synthroid 2*), the Court expands it to $56 million in this case, because that number represents the amount defendants have agreed to pay regardless of the number of

approved claims. This provides a rough guide to the portion of the recovery whose value is most clearly attributable to the work of the lawyers, as opposed to the size of the class. *Cf. Synthroid 2*, 325 F.3d at 980 (defining the boundaries of the third band ($22 million to $46 million) by using aspects of the settlement the parties had agreed to *ex post* as benchmarks). That said, the Court also applies a risk premium of three points (from 15% to 18%) to the portion of the recovery from $56 million up to $74 million (the settlement fund total less the $2 million estimated cost for notice and administration). Although that band may appear to be more analogous to the bands discussed in *Capital One* and *Gehrich*, where the material risks have been reduced and the counsel need not work as hard for each dollar of recovery, the Court concludes that a premium is still appropriate. Plaintiffs' ability to recover an amount above $56 million is at least partly attributable to the aforementioned establishment of vicarious liability, as well as the lawyers' efforts to identify claimants and assist them in substantiating their claims.[3]

Thus, should the fund reach the $76 million cap, the Court intends to award counsel 18% of the remaining $18 million ($3.24 million). In sum, therefore, if the total settlement fund is at the $56 million floor, and $2 million goes toward notice and administration, the Court will award counsel $15.26 million ($3.6 million plus $3.5 million

---

[3]     The Court declines plaintiffs' suggestion to adopt a structure that pays 34% of the first $56 million and 30% of the remainder. Using only two bands, with the first going up to $56 million, would conflict with the Seventh Circuit's suggestion to divide a large settlement into multiple tiers to "allow[] the clients to reap more of the benefit at the margin." *Silverman*, 739 F.3d at 959. In addition, plaintiffs do not explain where they derived the 34% and 30% numbers, and their proposal appears to be an attempt to arrive at a final figure close to their original request.

plus 24% of $34 million, or $8.16 million), which amounts to roughly 28.3% of the common fund, net of notice and administration costs. If the fund reaches the $76 million ceiling, the Court will award counsel $18.98 million ($3.6 million plus $3.5 million plus $8.64 million plus $3.4 million), which amounts to roughly 25.6% of the common fund, net of notice and administration costs. That final percentage is slightly higher than the 20% to 24% range that Judge Holderman considered to be the mean and median recoveries for TCPA cases of this value, but the Court has explained above why an above-average fee award is reasonable and appropriate in this case.[4]

The Court notes that it did not engage in a lodestar analysis in determining a reasonable fee award in this case. None of the parties advocated for the lodestar approach, and the Court does not think the lodestar analysis would be particularly helpful in this case. As Professor Henderson explains, the lodestar approach may be useful "where the quality of the output or the assessment of the lawyers' work is unclear, [in which case] the district court might want to focus on inputs instead of outputs." Expert Report of M. Todd Henderson [dkt. no. 533-3] at 14. In this case, however, it is clear that counsel provided exceptional representation for the class and produced high-value output, securing the "largest and strongest TCPA settlement in history." *Id.* at 27. Thus, although plaintiffs provided a lodestar analysis as a "cross check" on its percentage request, and despite the parties' disagreements about the appropriateness of plaintiffs' selected lodestar multiplier, the Court bases its analysis of

---

[4] The Court also notes that plaintiffs have not requested reimbursement for expenses, which they represent to be over $400,000 at the time of their motion. The fact that the Court's award does not include expenses gives the Court even greater confidence that the slightly-above-average award is justified in this case.

the fee award in this case largely on factors other than the hours counsel worked, the reasonableness of their billing hours, and the appropriate multiplier rate.

## Conclusion

For the reasons stated above, plaintiffs' motion for attorney's fees, costs, and incentive awards [dkt. no. 533] is granted in part and denied in part. The Court awards $10,000 to each of the class representatives. Because the process for approving claims is still ongoing, the Court awards at this time only those attorney's fees corresponding to the minimum amount defendants will be required to pay into the common fund. As discussed above, that fee amount is $15.26 million. Class counsel may petition the Court for the remainder of the fee award upon conclusion of the claims-approval process.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 6, 2017