**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GERARDO ARANDA, GRANT BIRCHMEIER, STEPHEN PARKES, and REGINA STONE, on behalf of themselves and classes of others similarly situated, | ) ) ) ) | |
| | ) | Case No. 12-cv-4069 |
| Plaintiffs, | ) ) | Judge Matthew F. Kennelly |
| v. | ) ) | |
| CARIBBEAN CRUISE LINE, INC., ECONOMIC STRATEGY GROUP, ECONOMIC STRATEGY GROUP, INC., ECONOMIC STRATEGY GROUP, LLC, THE BERKLEY GROUP, INC. AND VACATION OWNERSHIP MARKETING TOURS, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR OBJECTIONS
TO THE SPECIAL MASTER'S AWARD OF CALLS**

**Introduction**

The two most notable features of Plaintiffs' opposition brief are its repeated failure to dispute the key factual premises that demonstrate Defendants' Objections should be granted and its reliance on positions that directly conflict with the controlling provisions of the Settlement Agreement. For example, as to Defendants' objection to the award of almost $9 million to five corporate claimants based upon the 97 numbers, Plaintiffs do not dispute that there is *nothing* in the supposed "source documents" for the 97 numbers that enables anyone to ascertain when these numbers were used to make political cruise calls (the "in-service dates and times"). Without that, it is impossible to determine that a call in a Class Member's phone records pertains to the calling campaign at issue unless the Class Member could competently speak to the content of these calls. But Plaintiffs do not dispute that the five corporate claimants have failed to provide such an averment, as the person who signed the claim forms on behalf of *all* five corporate claimants never heard a single call claimed. Thus, while this single individual seeks millions of dollars on behalf of five corporate claimants, it is uncontested that he does not know the content of any of the calls.

Similarly, Plaintiffs do not dispute that the five corporate claimants failed to aver to the content of calls from the 49 Bandwidth.com numbers. Unable to do so, they argue that such an averment is unnecessary here. But the record in this case is clear that, where a Class Member seeks to recover based upon outbound telephone numbers that were associated with other calling campaigns (as was the case with the 49 Bandwidth.com numbers), the Settlement Agreement requires that the Class Member provide the underlying phone record *and* aver to the content of the calls claimed from these numbers.

Finally, as to the 39,222 Option One Class Members who failed to respond to Defendants' challenges, Plaintiffs ask that this Court simply disregard the express provisions of Section 5.5 of

1

the Settlement Agreement that mandate that non-responding Option One Class Members are to be awarded one call. Plaintiffs cite no legal authority to support their position and, instead, request that this Court re-write the terms of the Settlement Agreement. In sum, there is no basis for eschewing the controlling provisions of the Settlement Agreement and these non-responding Option One Class Members should be awarded one call.

## Argument

I. **Plaintiffs Have Failed To Meet Their Burden To Show That There Is A Basis For Using The 97 Numbers To Award Calls.**

Plaintiffs' opposition brief demonstrates why there is *no* basis for using the 97 numbers to award calls. To begin, Plaintiffs do not dispute that the five corporate claimants, which seek to recover almost $9 million of the settlement fund based upon the 97 numbers, failed to aver to the content of calls from the 97 numbers. Plaintiffs likewise concede that there is nothing in the supposed "source documents" for the 97 numbers that enables anyone to determine the in-service dates and times for when these telephone numbers were supposedly used for political cruise calls. Given that undisputed limitation of Plaintiffs' "source documents," there is no way to discern whether a call in a Class Member's phone records from one of the 97 numbers was a political cruise call or a call from an unrelated calling campaign. And because of that reality, it is not surprising that Plaintiffs gave up trying to use the 97 numbers to establish class membership when Defendants pointed out these deficiencies in Plaintiffs' "source documents" during class certification briefing. *See* Dkt. # 778, pp. 7-8. Yet Plaintiffs have provided nothing further to support the use of the 97 numbers and, as such, cannot meet their burden to show that there is a reliable basis for using the 97 numbers to award *calls*.

2

### A. Plaintiffs Concede That The Five Corporate Claimants Did Not Aver To The Content Of Any Calls From The 97 Numbers.

Plaintiffs do not – and cannot – dispute that, contrary to Robert Sepulveda's sworn representation, he does not know the content of a single call claimed by the five corporate claimants from the 97 numbers. As such, Plaintiffs concede that Mr. Sepulveda is not competent to aver to the content of the thousands of calls claimed by these corporate claimants. Accordingly, there is no question that the five corporate claimants have failed to provide the sworn averment that the claim forms and Settlement Agreement specifically require. *See* Dkt. # 778-1, Claim Forms (requiring Option Two Class Members to aver that the number of calls they claim "used a prerecorded or robotic voice offering a free cruise in exchange for taking a public opinion and/or political survey"); Dkt. # 778-2, Settlement Agreement, § 1.36.

Since Plaintiffs cannot escape the fact that the five corporate claimants failed to provide the required averment as to the content of the calls they claim, Plaintiffs incorrectly argue that, under the Settlement Agreement, no such averment was required. *See* Dkt. # 789, pp. 3-4. That argument is based upon a mis-reading of the Settlement Agreement and ignores this Court's Class Certification decision.

Section 1.36 of the Settlement Agreement provides that where a Class Member's telephone is not on the Class List, the Class Member must provide its "own records [to] prove that they received the calls – such as their telephone records, bills and/or recordings of the calls" and "submit an affidavit or claim form if necessary to describe the content of the call." *See* Dkt. # 778-2, Settlement Agreement, § 1.36. Plaintiffs incorrectly suggest that the "if necessary" language in Section 1.36 means that, where Class Members submit phone records, they do not have to provide a sworn averment. But that reads out the use of "and" in Section 1.36, which makes clear that these requirements are in the conjunctive (not the disjunctive).

Moreover, Plaintiffs' construction of Section 1.36 ignores this Court's Class Certification decision, which explains why the "if necessary" language was added to Section 1.36 of the Settlement Agreement. In its Class Certification decision, this Court specifically noted that the evidence showed that the 8 Missouri AG numbers were used exclusively for the calling campaign at issue here. *See* Dkt. # 241, pp. 14-15. But as to the 49 Bandwidth.com numbers, this Court noted that the "list obtained from Bandwidth.com does not reference the content of the calls made from those numbers." *Id.* at p. 15. As this Court further explained, "[f]or this reason, plaintiffs propose 'corroborat[ion of] class members' own records' with an affidavit or claim form process." *Id.* Thus, the "if necessary" language in Section 1.36 distinguishes between telephone numbers such as the 8 Missouri AG numbers and telephone numbers such as the 49 Bandwidth.com numbers and the 97 numbers. The 8 Missouri AG numbers do not require further corroboration (*i.e.,* a sworn averment as to the content of the call) because they were exclusively used to make the political cruise calls at issue. On the other hand, the 49 Bandwidth.com numbers and the 97 numbers were not exclusively used for the political cruise call campaign and, therefore, an averment as to the content of the call is necessary. As we discuss below at page 6, Plaintiffs' own source documents for the 97 numbers affirmatively demonstrate that these numbers were used by unrelated third parties and for campaigns that have nothing to do with political cruise calls.

**B. Plaintiffs Cannot Show That Individual Option Two Class Members Averred To Calls Based Upon The 97 Numbers.**

Plaintiffs do not dispute that the Class Action Settlement Website in this case only listed the 8 Missouri AG numbers and the 49 Bandwidth.com numbers (the "list of 57 numbers"). *See* Dkt. # 778-6, List of 57 Numbers. Nor have they identified any communication or notice to Class Members showing that individual Option Two Class Members were apprised of the 97 numbers *prior* to filing their claims in this case.

4

As Defendants explained in their Objections, because individual Option Two Class Members were not apprised of the 97 numbers *prior* to submitting their claim forms, they did not – and frankly could not – claim calls based on instances where the 97 numbers were in their telephone records. Defendants used the example of one Option Two Class member, Bryan Reo, to demonstrate that individual Option Two Class Members did not claim calls from the 97 numbers, but nonetheless, pursuant to the Special Master's Award, they have been credited with calls from the 97 numbers. *See* Dkt. # 778, pp. 6-7. In their opposition brief, Plaintiffs do not contest that Mr. Reo only claimed the number of calls based upon the 57 numbers that KCC posted on the Class Action Settlement Website. And Plaintiffs simply cannot explain how Mr. Reo or other individual Option Two Class Members somehow averred to the content of calls they never claimed from the list of 97 numbers.

In an effort to make it appear that Mr. Reo and other individual Option Two Class Members could have averred to the content of calls from the 97 numbers when they submitted their claim forms, Plaintiffs "unequivocally" state that "during *the challenge period*, Mr. Reo was provided with th[e] [97 numbers]." *See* Dkt. # 789, p. 3 (emphasis added). But the challenge period started months *after* Mr. Reo and other individual Option Two Class Members submitted their sworn claim forms. As such, the fact that he (or other individual Option Two Class Members) received the 97 numbers *after* they submitted claim forms confirms that the sworn averment provided with their claim form necessarily did not speak to the content of calls from numbers that these Class Members were not aware of when they submitted their claim forms.

### C. Plaintiffs Have Not Met Their Burden To Demonstrate That There Is A Reliable Basis For Using The 97 Numbers To Award Calls.

As an initial matter, Plaintiffs offer zero response to the fact that there is nothing in the "source documents" that enables anyone to establish the in-service dates and times for when the

97 numbers were supposedly used for political cruise calls. Despite the total lack of evidence concerning the in-service dates and times for these numbers, Plaintiffs unilaterally asked KCC to credit calls based upon these numbers for the *entire* one-year Class Period. But there is no basis for doing so.

First, the list of 57 numbers that this Court specifically approved during the Class Certification process and which KCC posted on the Class Action Settlement Website *all* have specific in-service dates and times within the Class Period. Some were used for several days; others were used for several weeks or months. *See* Dkt. # 778-6, List of 57 Numbers. None of the 57 numbers were used for the entirety of the Class Period. *Id.* Yet for the 97 numbers, which have no in-service dates and times, Plaintiffs ironically demand that these numbers should somehow be used to award calls for the entire one-year Class Period.

Second, Plaintiffs' own "source documents" confirm that, during the Class Period, the 97 numbers were reported to have been used for calling campaigns unrelated to the political cruise call campaign. As Defendants detailed in their Objections (and which Plaintiffs' do not dispute), Plaintiffs' source documents show that the 97 numbers were used by an array of other companies unrelated to Defendants, including, among others, Capital One, Service Magic, Wells Fargo, WalMart, the Sierra Club, NCO Financial, and Card Member Services. *See* Dkt. # 778, pp. 11-12.

Third, as Defendants detailed in their Objections (and which again Plaintiffs do not dispute), Plaintiffs' "source documents" only provide information related to the 97 numbers for very limited time periods that span a matter of days, weeks and no more than one month. *See* Dkt. # 778, p. 11. And Plaintiffs offer no explanation how these isolated reports in their "source documents" that spanned no more than one month provide any basis to use the 97 numbers to award calls for the entire one-year Class Period.

In short, because Plaintiffs have failed to provide any basis to identify the in-service dates and times for the 97 numbers, they cannot meet their burden under the Settlement Agreement to award calls based upon the 97 numbers.[1]

In their opposition brief, Plaintiffs argue that they provided the Special Master with a summary chart showing that "each of the 97 numbers" was used for the calling campaign. *See* Dkt. # 789-2, Summary Chart. That is not correct. The chart that Plaintiffs supplied to the Special Master merely identified the Bates-number of the page(s) where the 97 numbers were referenced in the "source documents." *Id.* But the Bates-number references provided by Plaintiffs do not support their claim that each of the 97 numbers were used for the political cruise call campaign. For example, the chart that Plaintiffs provided to the Special Master cited RS 000265 as the sole support for both 253-382-9966 and 972-281-0500. *Id.* The only reference on that page to those two telephone numbers is from a caller (Kim D from Texas) who reported that she received calls from these and other numbers that consisted of "2 seconds of breathing." *See* Dkt. No. 778-10, RS 000265. There is no reference to the Defendants or political cruise calls. *Id.*

Moreover, even where the pages cited by Plaintiffs refer to the calling campaign at issue here, there are references to people receiving calls from these same numbers from unrelated calling campaigns such as credit card companies and other unrelated third parties. *See* Dkt. # 778, p. 10, citing Exh. 7, Pltfs.' Source Documents, at RS 000214-15. For example, even though the bloggers in Plaintiffs' Source Documents report having received more than 150 calls from "Rachel" at

---

[1] Recognizing the inherent unreliability of the "source documents" for the 97 numbers, Plaintiffs argue that these deficiencies should be excused because they contend that the evidentiary standard for the claims administration stage of class actions is lower than other stages of the case. *See* Dkt. # 789, p. 7. But like many of Plaintiffs' other arguments, this contention ignores the controlling language of the Settlement Agreement that specifies that, if a Class Member's claim form is challenged, the Class Member has the "ultimate burden" to "demonstrate the number of calls, greater than one (1)." *See* Dkt. # 778-2, Settlement Agreement, § 5.4.

"Card Services" from (425) 390-8922 (*id.*), Plaintiffs nevertheless suggest that the source documents somehow justify awarding $500 to each Class Member every time this phone number showed up in a Class Member's phone records.

Plaintiffs' new chart – Exhibit 5 to their opposition brief – likewise fails to show that there is a reliable basis for using the 97 numbers to award calls. Exhibit 5 to Plaintiffs' opposition seeks to address 29 of the 97 numbers that Defendants pointed out had no support in Plaintiffs' "source documents." While Plaintiffs attempt to connect these 29 telephone numbers to the calling campaign at issue, the references to political cruise calls in Exhibit 5 relate to other telephone numbers, not the 29 numbers identified at pages 8-9 of Defendants' Objections. For instance, at page 2 of Exhibit 5, Plaintiffs concede, as they must, that the person reporting (253) 246-8515, (253) 246-8573 and (253) 246-8564 claims receiving 69 calls from these telephone numbers regarding purchasing a security system (not a political cruise call). *See* Dkt. # 789-6, p. 2. Plaintiffs argue that because this report was made in the "context" of a blog report about a different number – (253) 382-9912 – that included references to political cruise calls (as well as calls from other telemarketing campaigns) that there is somehow a basis to conclude that the three numbers reported to be used to sell security systems should be deemed to be telephone numbers used to make political cruise calls. Perhaps recognizing the flimsy nature of that contention, Plaintiffs try to argue that the above-referenced numbers are "related" to numbers associated with Pacific Telecom. *Id.* But the pages that they cite from the "source documents" do not indicate that those three numbers were being used by Pacific Telecom. *See* Dkt. # 789-4, pp. 256, 288-89. And, as we discuss below, even if these numbers were connected to Pacific Telecom, that does not mean they were used for political cruise calls as the Federal Trade Commission ("FTC") found that Pacific Telecom numbers were being used to sell home security systems. *See infra* pp. 8-9.

8

And while Plaintiffs suggest that references in their "source documents" to "Pacific Telecom" (or "Pacifictel") can be linked to Defendants (*see* Dkt. # 789, p. 6), Plaintiffs ignore that the very FTC lawsuit they point to shows that Pacific Telecom/Pacifictel was leasing telephone numbers and providing caller-ID services to many other telemarketing companies who were conducting calling campaigns unrelated to the political cruise call campaign.[2]  *See* Exh. A, 05/18/2018 First Amended Complaint in *FTC v. CCL, Inc*., Case No. 15-CV-60423-WJZ, ¶¶ 16, 94-95, 101-102.  As the FTC complaint alleges, this included calling campaigns for credit card interest rate reduction programs, extended automobile warranties, home security systems, carpet cleaning services, travel services, debt consolidation and mortgage services.  *Id.* at ¶¶ 101-02.  And Plaintiffs' own source documents are replete with references to these other calling campaigns.  *See* Dkt. # 778, pp. 11-12.  As such, there is no way to determine if references to Pacific Telecom/Pacifictel in Plaintiffs "source documents" relate to the political cruise call campaign at issue or the myriad of other calling campaigns that Pacific Telecom/Pacifictel was involved with according to the FTC.  *See* Exh. A, ¶¶ 101-02.

## II.    Plaintiffs Do Not Satisfy Their Burden To Show That The 49 Bandwidth.com Numbers Can Be Used As A Basis To Award Calls To The Five Corporate Claimants.

Defendants have objected to the award of calls to the five corporate claimants based on calls from the 49 Bandwidth.com numbers because these corporate claimants did not provide a sworn averment as to the content of the calls received from these numbers.  *See* Dkt. # 778, p. 13.

---

[2] Plaintiffs also suggest that references to "Independent Survey Group" in their "source documents" can be used to establish that the number was used to make political cruise calls.  But the FTC complaint in *FTC, et al. v. CCL, Inc. et al,* demonstrates that "Independent Survey Group" (or "IND SUR GROUP") was a caller-ID name that Pacific Telecom gave to its many telemarketing clients to disguise the source of calls.  *See* Exh. A, at ¶ 117.  Accordingly, there is no way to determine if the report of calls from "Independent Survey Group" or "IND SUR GROUP" were related to the political cruise call campaign or some other unrelated calling campaign that other telemarketers were using then.

Plaintiffs initially argue, as they do with respect to the 97 numbers, that no averment is necessary to support an award based upon the 49 Bandwidth.com numbers. They next argue that they "do not agree" that there is evidence that the 49 Bandwidth.com numbers were used for calling campaigns other than the political cruise call campaign. Neither argument has merit.

As discussed above, when Option Two Class Members seek to recover based upon their own phone records (as is the case with respect to the 49 Bandwidth.com numbers), Section 1.36 of the Settlement Agreement requires those Class Members to also provide a sworn averment as to the content of the call to establish that the call was, in fact, a political cruise call. *See* Dkt. # 778-2, Settlement Agreement, § 1.36. The one exception is where outbound phone numbers, such as the 8 Missouri AG numbers, were exclusively used for the political cruise call campaign. *See supra* at p. 4. Because of that exception, Section 1.36 uses the "if necessary" language to qualify the circumstances where an averment is necessary (*i.e.*, where the outbound numbers were *not* exclusively used to make political cruise calls).

In recognition that a sworn averment is required as to the content of the calls if the 49 Bandwidth.com numbers were not exclusively used to make the political cruise calls, Plaintiffs attempt to dispute that the 49 Bandwidth.com numbers were used for other calling campaigns unrelated to Defendants. *See* Dkt. # 789, p. 8. But they offer no evidence to support that claim; rather, Plaintiffs simply argue that they "did not and do not agree with Defendants' position" that the 49 Bandwidth.com numbers were used for other calling campaigns. *Id.* Contrary to their unsupported assertion, the sworn testimony in this case, including from Jacob DeJongh and Scott Bromfield (the individuals who utilized the 49 Bandwidth.com numbers), is that the 49 Bandwidth.com numbers were, in fact, used for other calling campaigns unrelated to Defendants 30-40% of the time. *See* Dkt. # 188, p. 7, fn. 25. Plaintiffs have failed to provide any evidence to

refute that sworn testimony from Messrs. Broomfield and DeJongh. Given Plaintiffs' failure to do so, Plaintiffs have no basis to argue that the 49 Bandwidth.com numbers were exclusively used for the political cruise call campaign. As such, they cannot escape that, pursuant to Section 1.36 of the Settlement Agreement, the five corporate claimants were required to aver to the content of calls from the 49 Bandwidth.com numbers. And, as we discussed above, Plaintiffs do not dispute that the five corporate claimants have failed to provide the necessary averment given that Mr. Sepulveda did not hear a any of the calls from the 49 Bandwidth.com numbers and thus, does not know if a single call out of the thousands of calls claimed from the 49 Bandwidth.com numbers was a political cruise call.[3]

### III. Plaintiffs Cannot Explain How Option One Class Members Who Failed To Respond To Challenges Should Nonetheless Get Credit For More Than One Call In Contravention Of The Express Provisions Of Section 5.5 Of The Settlement Agreement.

Section 5.5 of the Settlement Agreement provides that, if a challenged Option One Class Member "does not timely submit the supplemental documentation or testify before the Special Master, the Special Master *shall* sustain the Defendants' challenge and the Settlement Class Member *will* have an Approved Claim for *one (1) call*." *See* Dkt. # 778-2, Settlement Agreement, § 5.5. (emphasis added). As set forth in Defendants' Objections, 39,222 Option One Class Members failed to respond to Defendants' challenges to their claims. *See* Dkt. # 778, p. 14. Because Plaintiffs cannot dispute the controlling language of Section 5.5 or that these Option One Class Members failed to respond to Defendants' challenges as required by Section 5.5, Plaintiffs

---

[3] Plaintiffs additionally argue that the five corporate claimants are not required to provide a sworn averment as to the content of calls claimed from these numbers because "each has at least one call on the Class List." *See* Dkt. # 789, p. 8. Plaintiffs offer no support for that contention. Nor could they, as they have never shown that the thousands of phone numbers claimed by the five corporate claimants were on the Class List.

ignore the plain language of Section 5.5 and falsely suggest that Defendants have challenged Option One claims even where they lacked a factual basis for doing so.

Plaintiffs' misleading argument ignores that Defendants compared each Option One claim to the Class List to determine whether a challenge was appropriate. Defendants' expert, Anya Verkhovskaya, first performed a detailed analysis of the Class List and identified duplicate and triplicate loading of phone numbers, calls outside of the Class Period, and non-call data contained in the Class List.[4] After performing that analysis, Defendants crossed-checked the Option One claims against the corrected Class List and identified which claims to challenge. That cross-check is set forth in Exhibit N to Defendants' expert report, which identifies the factual bases for each Option One claim that Defendants have challenged, including the fact that an Option One Class Member's phone number did not appear in the Class List three times. *See* Dkt. # 761-28 through 761-39. If a Class Member's phone number appeared in the corrected Class List less than three times, then Defendants lodged a challenge. If a Class Member's phone number appeared in the corrected Class List three times, then Defendants did not lodge a challenge. In fact, Defendants did not challenge 2,691 Option One claims. *See* Dkt. # 702-1, A. Verkhovskaya Declaration, ¶ 2. Nevertheless, Plaintiffs misleadingly posit that Defendants challenged Option One claims even where the Class List supported the award of three calls. But that is not the case, as Defendants did not challenge Option One claims where the corrected Class List supported the award of three calls.

Moreover, Plaintiffs are unable to explain how the carefully negotiated challenge provisions of Section 5.5 of the Settlement Agreement can somehow be cast aside. In the event of

---

[4] These technical issues are currently before the Special Master and Plaintiffs have acknowledged, at least in large part, that recovery should be reduced. *See* Dkt. # 778-22, 06/07/2019 letter to Special Master; *see also* Dkt. # 697, p. 15, fn. 11 ("In the majority of those instances, Plaintiffs *agree* with Defendants' challenges and that the Class Members' recovery should be appropriately reduced.") (emphasis in original).

a challenge, Section 5.5 requires that the Class Member must either "submit supplemental documentation to prove each call claimed or schedule a telephonic hearing with the Special Master where the Settlement Class Member must testify as to the basis for each separate call claimed." *See* Dkt. # 778-2, Settlement Agreement, § 5.5.  There is no carve out in Section 5.5 or any other provision of the Settlement Agreement that excepts certain Option One Class Members from complying with this provision, including Option One Class Member that may have received two calls.  To the contrary, Section 5.5 makes clear that, where an Option One Class Member fails to submit supplemental documentation or request a hearing in response to a challenge, the Option One Class Member shall be awarded one call.  *Id.*

Every Option One Class Member had an opportunity to respond to a challenge by providing supplemental documentation or requesting a hearing with the Special Master.  And many Option One Class Members followed that contractually required procedure.  In fact, almost 4,000 Option One Class Members submitted declarations averring to the exact number of calls received and requesting a telephonic hearing.  *See* Dkt. # 763, p. 15.  Moreover, an additional group of Option One Class Members provided documentation other than declarations and another 20 claimants simply requested telephonic hearings.  *Id.*  Defendants did not object to the Award to these thousands of Option One Class Members who, in compliance with Section 5.5, responded in one form or another to the challenges and were credited with more than one call.  *See* Dkt. # 778-3, Award, p. 3.  While thousands of Option One Class Members responded to a challenge and were awarded additional calls, other Option One Class Members chose not to do so.  In those instances, the Settlement Agreement is clear as to how to handle the Class Members who chose not to respond to a challenge – they get credit for one call.

13

While the language in the Settlement Agreement should be the end of the inquiry on this issue, Plaintiffs reaffirmed the agreement that non-responding Option One Class Members would receive one call. Specifically, when negotiating the language of the Challenge Notice, Plaintiffs agreed that the Challenge Notice should advise Class Members that, "[a]lthough Defendants' records do not necessarily evidence the number of calls you received because their records are incomplete, because a party has challenged your claim, *you are required to submit proof that you received the number of claimed telephone calls if you want to recover for more than one call.*" *See* Dkt. # 791-1, Exh. C, Email from Plaintiffs' counsel to KCC (emphasis added). Accordingly, Plaintiffs were well-aware that, if a Class Member failed to respond to a challenge, then that Class Member would get credit for one call. If Plaintiffs desired to set a lower standard for responding to a challenge or divide Option One Class Members into different categories, then they could have included appropriate language in the Settlement Agreement. Plaintiffs failed to do so and now, as in other instances, Plaintiffs attempt to inject additional language into the Settlement Agreement that is contrary to the express terms of the Settlement Agreement. But basic principles of contract construction do not permit Plaintiffs' after-the-fact bid to re-write the ramifications of not following the Settlement Agreement's bargained-for challenge process.

Plaintiffs additionally argue that, even though the 39,222 Option Class Members identified in Defendants' Objections admittedly did not submit supplemental documentation or request a hearing with the Special Master, the provisions of Section 5.5 should be deemed satisfied because Class Counsel advanced arguments on their behalf based on data from the Contact Center Compliance ("CCC"). *See* Dkt. # 789, p. 9. The Settlement Agreement, however, does not provide that the specific requirements of Section 5.5 can be satisfied by Class Counsel providing a generalized response to challenges on behalf of tens of thousands of Option One Class Members.

Defendants made specific challenges to each Option One claim and notice of those challenges was sent. Per the express terms of the Settlement Agreement, once challenged, the "Settlement Class Member" was required to "either submit supplemental documentation to prove each call claimed or schedule a telephonic hearing with the Special Master where the Settlement Class Member must testify as to the basis for each separate call claimed." *See* Dkt. # 778-2, Settlement Agreement, § 5.5. But Class Counsel's reliance on CCC data to artificially inflate the call count for Option One Class Members is much different. Instead of the Class Member submitting supplemental documentation and/or requesting telephonic hearings, Class Counsel, likely without Option One Class Members' knowledge, submitted a mass response referencing CCC data, which is simply a list of millions of phone numbers. The CCC data, however, does not contain any dates or times and it does not identify a single call placed or received by anyone. Class Counsel's reliance on millions of unspecified phone numbers from CCC falls far short of the required "supplemental documentation to prove each call claimed." *See* Dkt. # 778-2, Settlement Agreement, ¶ 5.5. Moreover, the CCC issue was extensively briefed before the Special Master who agreed that CCC data was unreliable and found that the "relationship to the calling campaign is attenuated at best and extremely diluted even if slightly relevant." *See* Dkt. # 778-3, Award, p. 4. Plaintiffs should not be permitted to backdoor that argument here.

Based on the foregoing, Defendants request that, pursuant to Section 5.5 of the Settlement Agreement, this Court instruct KCC to award one call to each Option One Class Member who failed to respond to Defendants' challenges. *See* Dkt. # 778-21.

## <u>Conclusion</u>

WHEREFORE Defendants respectfully request that this Court grant the Objections asserted herein and reduce the Special Master's Award accordingly.

Dated: July 10, 2019                    Respectfully Submitted,

                                        By: /s/ *Richard J. Prendergast*
                                             One of Defendants' Attorneys

Richard J. Prendergast, Esq.
Michael T. Layden, Esq.
RICHARD J. PRENDERGAST, LTD. (#11381)
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(T) (312) 641-0881
(F) (312) 641-3562
rprendergast@rjpltd.com
mlayden@rjpltd.com


Kevin M. Forde, Esq.
Brian P. O'Meara, Esq.
Forde Law Offices LLP
111 West Washington Street
Suite 1100
Chicago, IL 60602
(T) 312.465.4780
(F) 312.641.1288
bomeara@fordellp.com
www.fordellp.com


M. Peebles Harrison (*Pro Hac Vice*)
Rose, Harrison & Gilreath, P.C.
700 Blue Jay Street, Suite 1
Post Office Box 405 Kill Devil Hills,
North Carolina 27948
Phone: (252) 480-1414
Fax: (252) 480-1765
peebles@outerbankslaw.com

*Counsel for Defendant The Berkley Group, Inc.*


and


By:      /s/ Jeffrey A. Backman

Richard W. Epstein (Florida Bar No. 229091)
Richard.Epstein@gmlaw.com

16

Jeffrey A. Backman (Florida Bar No. 662501)
Jeffrey.Backman@gmlaw.com
GREENSPOON MARDER, P.A.
200 E. Broward Blvd., Suite 1500
Fort Lauderdale, Florida 33301
954.491.1120 (Telephone)
954.343.6958 (Fax)
*Admitted Pro Hac Vice*

Timothy Hudson, Esq.
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, Illinois 60604
312.762.9476 (Telephone)
312.762.9451 (Fax)
thudson@tdrlawfirm.com

*Counsel for Defendants Caribbean Cruise Line, Inc. and
Vacation Ownership Marketing Tours, Inc.*